# Exhibit A

Affidavit in Support of Search Warrant

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By: DAVID ZHOU
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2438

# 18 MAG 9029

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

**TO BE FILED UNDER SEAL**

:

UNITED STATES OF AMERICA

-v.-

ALL MONIES AND FUNDS CONTAINED IN
HSBC BANK USA ACCOUNT 141000147,
HELD IN THE NAME OF "GLOBAL
TRADING SOLUTIONS LLC" AND ALL
FUNDS TRACEABLE THERETO,
INCLUDING ACCRUED INTEREST;

ALL MONIES AND FUNDS CONTAINED IN
HSBC BANK USA ACCOUNT 697825922,
HELD IN THE NAME OF "REGINALD
DENNIS FOWLER" AND ALL FUNDS
TRACEABLE THERETO, INCLUDING
ACCRUED INTEREST; AND

ALL MONIES AND FUNDS CONTAINED IN
HSBC SECURITIES USA ACCOUNT
HMB861668, HELD IN THE NAME OF
"REGINALD DENNIS FOWLER" AND ALL
FUNDS TRACEABLE THERETO,
INCLUDING ACCRUED INTEREST;

                Defendants-in-rem.

AFFIDAVIT IN SUPPORT
OF SEIZURE WARRANT
IN REM PURSUANT TO
18 U.S.C. §§ 981
AND 984

:

:

:

:

:

:

:

:

:

:

:

:

:

:

- - - - - - - - - - - - - - - - x

1

Ex. A, Aff. in Support of SW, p.1                    USAO-0001994

STATE OF NEW YORK               )
COUNTY OF NEW YORK              :ss.:
SOUTHERN DISTRICT OF NEW YORK   )

TODD P. MCGEE, being first duly sworn, hereby depose and state as follows:

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been for approximately 17 months. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. During my time as a Special Agent for the FBI, I have participated in investigations of fraud schemes and money laundering, among other things, and have conducted or participated in surveillance, the execution of search warrants, and the review of financial records and electronic communications.

2.   This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984:

a.   All monies and funds contained in HSBC Bank USA account 141000147, held in the name of "Global Trading Solutions LLC" (the "GTS Account"), and all funds traceable

2

thereto, including accrued interest.

b.   All monies and funds contained in HSBC Bank USA account 697825922 ("Fowler Account-1"), held in the name of "Reginald Dennis Fowler," and all funds traceable thereto, including accrued interest.

c.   All monies and funds contained in HSBC Securities USA account HMB861668 ("Fowler Account-2"), held in the name of "Reginald Dennis Fowler," and all funds traceable thereto, including accrued interest.

(collectively, the "Target Property").

3.   The Target Property constitutes the proceeds of, and property involved in, violations of 18 U.S.C. §§ 1960 (operation of an unlicensed money transmitting business) and 1957 (monetary transactions involving property of specified unlawful activity) (the "Target Offenses"), as described below.

4.   This affidavit is based upon my personal knowledge, my review of documents and other evidence; my conversations with other law enforcement personnel and other individuals; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of computers and computer data.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts

3

that I have learned during the course of my investigation.
Where the contents of documents and the actions, statements, and
conversations of others are reported herein, they are reported
in substance and in part, except where otherwise indicated.

5. As set forth below, there is probable cause to
believe that the Target Property is subject to seizure and
forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C) and 18
U.S.C. § 981(b) as property involved in violations of 18 U.S.C.
§§ 1960 (operating an unlicensed money transmitting business)
and 1957 (monetary transactions involving property of specified
unlawful activity), or property traceable thereto.

**STATUTORY BASIS FOR FORFEITURE**

6. The statutory provisions pursuant to which the
Target Property is subject to civil seizure and forfeiture are
as follows:

*Unlicensed Money Transmitting Business Offense*

7. Title 18, United States Code, Section
981(a)(1)(A), subjects to civil forfeiture:

> Any property, real or personal, involved in a transaction
> or attempted transaction in violation of section 1956, 1957
> or 1960 of this title, or any property traceable to such
> property.

8. 18 U.S.C. § 1960 imposes a criminal penalty on
any person who:

> knowingly conducts, controls, manages, supervises, directs

4

Ex. A, Aff. in Support of SW, p.4          USAO-0001997

or owns all or part of an unlicensed money transmitting business.

9.    As relevant here, Section 1960(b)(1) defines an "unlicensed money transmitting business" as a

> money transmitting business which affects interstate or foreign commerce in any manner or degree and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable, [or] (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section.

Meanwhile, Section 1960(b)(2) defines "money transmitting" to "include[] transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

10.    Arizona law requires anyone operating a money transmitting business to be licensed.  In particular, Arizona Revised Statutes, section 6-1202, provides in relevant part that "[a] person shall not . . . engage in the business of receiving money for transmission or transmitting money . . . without first obtaining a license as provided in this chapter or becoming an authorized delegate of a licensee with respect to those activities."  Meanwhile, Arizona Revised Statutes, section 6-

5

1201(17) defines the term "transmitting money" to mean "the transmission of money by any means including transmissions within this country or to or from locations abroad by payment instrument, wire, facsimile, internet or any other electronic transfer, courier or otherwise."

a. Based on my review of the website of the Arizona Department of Financial Institutions, which maintains a publicly available listing of Arizona-licensed money transmitters, I have learned that at no point have the individual Reginald Dennis Fowler, the entity "Global Trading Solutions LLC" in Chandler, Arizona, or the entities "Bitfinex" or its parent company "iFinex" been licensed to operate as a money transmitting business in the State of Arizona.

11. Colorado law requires anyone operating a money transmitting business to be licensed. In particular, Colorado Revised Statutes, section 11-110-105, provides that "[a] person shall not engage in the business of money transmission without first procuring a license from the board; except that an agent, subagent, or representative of a licensee or an employee of an agent, subagent, or representative who acts on behalf of a licensee in the transmission of money by the licensee is not required to be licensed under this article 110." Meanwhile,

6

Colorado Revised Statutes, section 11-110-103(11), defines
"money transmission" to "mean[] the sale or issuance of exchange
or engaging in the business of receiving money for transmission
or transmitting money within the United States or to locations
abroad by any and all means including but not limited to payment
instrument, wire, facsimile, or electronic transfer."   Under
Colorado Revised Statutes, sections 11-110-118 and 11-110-206,
violations of the money transmission laws can be punishable as a
misdemeanor.

    a. Based on my review of the website of the
Colorado Department of Regulatory Agencies, which maintains a
publicly available listing of Colorado-licensed money
transmitters, I have learned that at no point have the
individual Reginald Dennis Fowler, the entity "Global Trading
Solutions LLC" in Chandler, Arizona (which, according to the
Colorado Secretary of State's website, is incorporated in
Colorado), or the entities "Bitfinex" or "iFinex" been licensed
to operate as a money transmitting business in the State of
Colorado.

    12. New York law requires anyone operating a money
transmitting business to be licensed.   In particular, New York
Banking Law, section 641(1), provides that "[n]o person shall .

7

. . engage in the business of receiving money for transmission or transmitting the same, without a license therefor obtained from the superintendent as provided in this article, nor shall any person engage in such business as an agent, except as an agent of a licensee or as agent of a payee . . . ." Under New York Banking Law, section 650, engaging in money transmission without the required license can be punishable as a misdemeanor or a felony.

     a.   Based on my review of the website of the New York Department of Financial Services, which maintains a publicly available listing of New York-licensed money transmitters, I have learned that at no point have the individual Reginald Dennis Fowler, the entity "Global Trading Solutions LLC"[1] in Chandler, Arizona, or the entities "Bitfinex" or "iFinex" been licensed to operate as a money transmitting business in the State of New York.

     13.  The requirement that money transmitting

---

[1] Based on my review of state agency websites for Arizona, Colorado, and New York, as well as my review of U.S. Treasury records, I learned, among other things, that GTS is registered with certain registered agents, namely, Wolz Corporate USA Inc., Capitol Corporate Services, Inc., and an individual named Brandon DeShaun Hicks. None of those registered agents has been licensed to operate as a money transmitting business in either Arizona, Colorado, or New York, or with the Secretary of the Treasury or FinCEN.

Ex. A, Aff. in Support of SW, p.8          USAO-0002001

businesses be registered with the U.S. Department of Treasury is
set forth in a series of statutes and regulations, which are
described in relevant part here:

      a.    Title 31, United States Code, section
5330(a)(1) provides that "[a]ny person who owns or controls a
money transmitting business shall register the business (whether
or not the business is licensed as a money transmitting business
in any State) with the Secretary of the Treasury[.]"  Section
5330(d)(1), in turn, explains, in part, that the "term 'money
transmitting business' means . . . (A) any . . . person who
engages as a business in the transmission of funds, including
any person who engages as a business in an informal money
transfer system or any network of people who engage as a
business in facilitating the transfer of money domestically or
internationally outside of the conventional financial
institutions system; (B) is required to file reports under
section 5313; and (C) is not a depository institution (as
defined in section 5313(g)."

      b.   Title 31, United States Code, Section
5313(a) provides that "[w]hen a domestic financial institution
is involved in a transaction for the payment, receipt, or
transfer of United States coins or currency . . . in an amount,

9

denomination, or amount and denomination, or under circumstances

the Secretary prescribes by regulation, the institution and any

other participant in the transaction the Secretary may prescribe

shall file a report on the transaction at the time and in the

way the Secretary prescribes." The term "financial institution"

is defined in 31 U.S.C. § 5312(a)(2)(R) as "a licensed sender of

money or any other person who engages as a business in the

transmission of funds, including any person who engages as a

business in an informal money transfer system or any network of

people who engage as a business in facilitating the transfer of

money domestically or internationally outside of the

conventional financial institutions system."

          c.    Under the statutory scheme described above,

the Secretary of the Treasury is given the authority to

establish which individuals and entities are subject to 31

U.S.C. 5330's registration requirement.  31 U.S.C. §§ 5313(a);

5330(a)(2) & (c)(1).  These regulations are contained in the

Code of Federal Regulations ("CFR").  In particular, 31 C.F.R. §

1022.380(a)(1) provides that "each money services business

(whether or not licensed as a money services business by any

State) must register with FinCEN [an agency within the U.S.

Department of Treasury] . . . . as required by 31 U.S.C.

10

5330[.]"  31 C.F.R. § 1010.100(ff) includes a "money

transmitter" as a "money services business."  The term "money

transmitter" is, in turn, defined by 31 C.F.R. § 1010.100(ff)(5)

to include "the acceptance of currency, funds, or other value

that substitutes for currency from one person and the

transmission of currency, funds, or other value that substitutes

for currency to another location or person by any means. 'Any

means' includes, but is not limited to . . . an informal value

transfer system; or . . . [a]ny other person engaged in the

transfer of funds."  Accordingly, the Treasury regulations

establish that any person engaged in the transfer of funds is

required to register with FinCEN.

        d.    Financial institutions are required to

conduct various monitoring and reporting activities, including

the filing of currency transaction reports ("CTRs") and

Suspicious Activity Reports ("SARs").  For instance, the filing

of CTRs is mandated by 31 C.F.R. § 1010.311, which provides that

"[e]ach financial institution . . . shall file a report of each

deposit, withdrawal, exchange of currency or other payment or

transfer, by, through, or to such financial institution which

involves a transaction in currency of more than $10,000."  This

regulation applies to money services businesses as defined

11

above. 31 C.F.R. § 1022.310. Likewise, "[e]very money services business . . . shall file with the Treasury Department, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of law or regulation," also known as SARs. 31 C.F.R. § 1022.320(a)(1). By failing to register with FinCEN, a money transmitting business prevents the Treasury from ensuring that the business is properly filing CTRs and SARs. This has the effect of allowing an unregistered money transmitting business to operate as a shadow bank through which funds can pass without being subjected to the scrutiny that Congress has sought fit to impose upon the United States financial system.

     e. Based on my review of records obtained from the United States Treasury, I have learned that at no point have the individual Reginald Dennis Fowler, the entity "Global Trading Solutions LLC" in Chandler, Arizona, or the entities "Bitfinex"[2] or "iFinex" been registered with the Secretary of the Treasury or FinCEN as a money transmitting business as set forth

---

[2] A post on the website news.bitcoin.com claimed, in substance and in part, that "Bitfinex is registered as an MSB with FinCEN under its legal name FGXNA Inc." However, based on my review of U.S. Treasury records, I learned that there is no entity named "FGXNA Inc." licensed or registered with the Secretary of the Treasury or FinCEN.

in the statutes and regulations described above.

      f.    Based on my review of publicly available court documents, I have learned that, on or about April 5, 2017, iFinex, BFXNA Inc., BFXWW Inc., and Tether Limited filed a civil lawsuit in federal court in the Northern District of California against Wells Fargo Bank. *See* 17 Civ. 1882 (N.D. Cal. 2017) (JSC). As detailed below, iFinex claims that itself, BFXNA, and BFXWW operate together as Bitfinex, with BFNXA used to contract with U.S.-based customers.

      i.    The civil complaint explained, in substance and in part, that iFinex is a "privately-held financial technology company that operates a Virtual Currency trading platform" incorporated in the British Virgin Islands with offices in Taiwan. *See* 17 Civ. 1882 (N.D. Cal. Apr. 5, 2017) (Dkt. No. 1, at ¶ 6) (the "Complaint").

      ii.    The Complaint further explained that "BFXNA and BFXWW are wholly-owned subsidiaries of iFinex that are incorporated in the British Virgin Islands. BFXNA contracts with U.S. based customers that use iFinex's Virtual Currency platform, while BFXWW contracts with non-U.S. customers. iFinex, BFXNA, and BFXWW (collectively, "Bitfinex") operate globally, with their primary banking relationships in Taiwan."

13

(Complaint ¶ 7.)   Together, iFinex, BFXNA, and BFXWW operated as "Bitfinex" through the website www.bitfinex.com and provided a trading platform for cryptocurrencies.   (Complaint ¶¶ 15-16.)

     iii. The Complaint also explained that "Plaintiffs have worked cooperatively with U.S. law enforcement agencies, such as the Department of Justice, Federal Bureau of Investigation, the Internal Revenue Service, the Department of Homeland Security, the Secret Service; with independent federal regulators such as the Commodity Futures Trading Commission; and, with state regulatory agencies and others, to uphold the highest standards of integrity and compliance with regulatory law."   (Complaint ¶ 20.)

     iv.   The Complaint further stated that "BFXNA and Tether are registered with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") as Money Services Businesses.   They make reports to FinCEN and to other international Financial Intelligence Units."   (Complaint ¶ 21.)

     g.   Based on my review of records obtained from the U.S. Treasury, I have learned that BFXNA is registered with FinCEN as a money transmitting business.   On the other hand, BFXWW is not registered with the Secretary of the Treasury or

14

FinCEN as a money transmitting business.[3]

       h.   As explained in detail below, I submit there

is probable cause to believe that Fowler and GTS are engaged in

an unlicensed money transmitting business and transacted in

property involved in that illegal business notwithstanding

BFXNA's registration with FinCEN. *First*, when the GTS Account

---

[3] Based on my review of records obtained from the United States Treasury, I learned, among other things, that Tether is registered with FinCEN as a money transmitter. According to a public records search, Tether may have employees who are also employed by Bitfinex. However, based on a public records search and my review of the Bitfinex website and the Complaint, I believe that Tether and Bitfinex are separate companies. Furthermore, I have seen no indication that either Reginald Fowler or Global Trading Solutions LLC has any relationship to Tether.

Although Tether jointly filed the lawsuit with iFinex against Wells Fargo, the Complaint does not identify any formal relationship between Tether and iFinex/Bitfinex. Instead, the Complaint described Tether as, in substance and in part, "a privately-held financial technology company that operates a platform to store, send, and make purchases with digital tokens called tethers that are backed by U.S. dollars on deposit from customers. Tether is incorporated in Hong Kong and has offices in Taiwan." (Complaint ¶ 8.) With respect to the relationship between Bitfinex and Tether, the Complaint stated, in substance and in part, that "Bitfinex and Tether are leading members of the Blockchain Alliance," which is "a non-profit corporation that creates a forum for U.S. and global law enforcement and regulatory agencies and approximately 30 digital currency companies to share information and best practices and to work together to combat criminal activity using digital currency, such as government corruption, money laundering, and terrorist financing." (Complaint ¶ 19.) Users of Bitfinex can deposit either fiat currency or tethers into their Bitfinex accounts. (Complaint ¶ 26.)

15

was opened, Fowler provided information to HSBC indicating that GTS was a real estate development and investment business that collected rental income and sold properties. Neither Fowler nor GTS identified any affiliation with, or claimed to be working as an agent of, BFXNA or any other entity associated with Bitfinex. As a result, GTS – which, as noted above, is not registered as a money transmitting business with FinCEN or any of the relevant states – was operating as an illegal money transmitter when it transferred money to and from various individuals and entities, including other GTS-related entities, on behalf of Bitfinex. *Second*, as described below, the GTS Account sent and received money from both U.S.-based persons as well as non-U.S. based persons. By iFinex/Bitfinex's own admission in the Complaint, its licensed entity BFXNA was used to contract with U.S.-based persons only. The separate entity, BFXWW, was used to contract with non-U.S. persons, but BFXWW is not licensed with FinCEN. Accordingly, even assuming *arguendo* that GTS is an agent of BFXNA, the GTS Account's numerous transactions involving non-U.S. persons are not on behalf of an entity covered by a FinCEN license and are thus illegal money transmissions.

16

*Monetary Transactions Involving Property of Specified Unlawful Activity Offense*

14.   18 U.S.C. § 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Section 1957(f)(1) defines monetary transaction to include the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . ."

15.   Pursuant to 18 U.S.C. §§ 1956(c)(7)(A), 1957(f)(3), and 1961(1), operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 is a specified unlawful activity for the purposes of Section 1957.

*Seizure Warrants*

16.   The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C). Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure." In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer

17

in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

  17.  With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution .., or precious metals:

> (A)  it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

> (B)  it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

> (b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more

18

than 1 year from the date of the offense.

## BACKGROUND AS TO THE TARGET OFFENSES

18. Based on my review of publicly available news articles and Internet postings, including my review of the website of the purported "cryptocurrency" trading platform Bitfinex (www.bitfinex.com), I have learned, among other things, the following:

a. Bitfinex is a company that purports to be an online trading platform for cryptocurrencies. Based on my training and experience, I understand that cryptocurrency, or "virtual currency," is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, and/or (3) a store of value, but does not have legal tender status. Unlike so-called fiat currency, which is currency like the U.S. dollar that a government has declared to be legal tender but is not backed by a physical commodity, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Bitcoin, which users store in digital "wallets" identified by unique electronic "addresses," is an example of a cryptocurrency.

b. According to the Bitfinex website, users of

19

Bitfinex can create an account through the website and trade in cryptocurrencies. Users can fund their accounts, which can contain different "wallets," by making deposits of certain fiat currencies, including the U.S. dollar, into bank accounts specified by Bitfinex.

        c.    The "About" page of the Bitfinex website identifies five individuals as comprising the "Bitfinex Senior Team." Reginald Dennis Fowler is not listed as a member of the "Senior Team."

        d.    On or about October 6, 2018, a reporter for "The Block" (www.theblockcrypto.com), which describes itself as a "reliable and newsworthy source for all things pertaining to . . . crypto," posted on Twitter the following, in sum and substance: "Bitfinex is now banking with HSBC through a private account of Global Trading Solutions. Very good fit if you ask me. It's also worth mentioning that all EUR [Euro], JPY [Japanese Yen] and GBP [British Pounds] deposits are paused but that Bitfinex 'expects the situation to normalize within a week.' Banking issues?" The Twitter post included the following image, which appears to be a screenshot from a Bitfinex webpage:

20



The screenshot appears to show a Bitfinex webpage where the user could create a wire deposit of least $10,000 U.S. dollars that would be credited to his or her digital wallet. The recipient of the wire was identified as "Global Trading Solutions LLC," located at "4939 W. Ray Rd., #4-349, Chandler, AZ 85226," with the account number 141000147 at HSBC Bank N.A. in New York, New York, *i.e.*, the GTS Account.

19.   Based on my review of HSBC "know your customer" ("KYC") information for GTS and transactional data produced by HSBC, I learned, among other things, that, although Fowler told HSBC that GTS was a real estate development and investment entity that developed properties and would earn real estate-

21

related income, GTS instead appeared to be using the GTS Account
to transmit money on behalf of users of Bitfinex.  In
particular, I learned the following:

        a.    The account number 141000147 displayed in
the screenshot above is associated with a HSBC Bank N.A. account
opened in the name of "Global Trading Solutions LLC" ("GTS"),
and is referred to in this Affidavit as the GTS Account.  In the
account opening documents, GTS provided its address as "400 N.
56th Street, Chandler, AZ 85226."

        b.    The GTS Account was opened on or about
August 8, 2018 by Fowler.  Based on my review of KYC information
for GTS maintained by HSBC and my conversation with an employee
of HBSC ("Employee-1"), I learned, among other things, that HSBC
communicated directly with Fowler to collect KYC information for
GTS.  According to the KYC information, Fowler told HSBC, in
substance and in part, that he had developed many real estate
properties in the past.  He further stated that GTS specifically
had invested in, and built, two properties, and that GTS would
hold the properties and rent them out to collect rental income
or sell them later on and invest in other projects.  Fowler
stated that GTS's principal source of funds would be rental
income or money from the sale of GTS's properties.

22

c.     With respect to transfers of funds into the
GTS Account, I observed, among other things, the following:
Between on or about August 31, 2018 and October 5, 2018, the GTS
Account received approximately 77 incoming wires totaling
approximately $9,685,249.95.  The wires were transmitted from
accounts held by various individuals and entities at banks
across the world, including Hong Kong, Germany, Australia,
Turkey, the United Arab Emirates, and New York, New York.

d.     Based on my training and experience, I know
that wire transmissions include an optional section for
"Originator to Beneficiary Information" ("OBI") where the sender
can include a description or note to the recipient, akin to the
memo line on a check.  Many of the wires into the GTS Account
had OBI sections that contained only numbers and did not
describe the reasons for the wire.  However, the OBI sections of
certain wires sent to the GTS Account contained descriptions
that, based on my training and experience, do not appear on
their face to be related to real estate transactions or rental
income.  For example:

i.     Most notably, for a wire of
approximately $11,000 sent on or about October 3, 2018 by
"Heinrich F Maurer Kreuzstrasse 15 H" from a U.S.-based Charles

23

Schwab account, the OBI stated, in sum and substance:

"REFERENCE: 9120505149 **BITFINEX**:    ACC. HEINRICH MAURER"

(emphasis added).  Based on my training and experience, I

believe that "ACC" is shorthand for "account" and that this wire

transfer was intended to deposit money into Maurer's Bitfinex

account.  (*See supra* ¶ 18(b), (d).)

        ii.  For a wire of approximately $19,110

sent on or about September 26, 2018 by "Gary Wong" from an

Australian bank, the OBI stated, in sum and substance: "TRADE

BROKER 9120168886 TRANS 41613904022099407."

        iii. For a wire of approximately $81,673

sent on or about September 27, 2018 by "Mustafa Aktas" from a

Turkish bank, the OBI stated, in sum and substance: "BUYING AND

SELLING FOREIGN EXCHANGE, 9120168886-4161-1950504-8169631."

        iv.  For a wire of approximately $3,962 sent

on or about September 27, 2018 by "Val Vincent Mendoza" from a

bank in the Philippines, the OBI stated, in sum and substance:

"TRADE PAYMENT OF GOODS ORDERED /DELIVERED REF NO 9120168886

MESSAGE TO BEN 4161335111 1878193  18.00 FEE DEDUCTED."

        v.    In addition, the OBI sections for

several wires contained descriptions such as "INVESTMENT,"

"INVESTMENT/SECURITIES," and "PURCHASE INVESTMENT PRODUCT."

24

e.   With respect to transfers of funds out of
the GTS Account, I observed, among other things, the following:
Between on or about September 6, 2018 and October 5, 2018, the
GTS Account sent approximately 19 outgoing wires totaling
approximately $2,334,068.95.  The wires were transmitted to
accounts held by various individuals and companies at banks
across the world, including Hong Kong, Australia, Taiwan, and
Canada.

f.   I also observed transfers to and from the
GTS Account involving other companies with names virtually
identical to GTS and bank accounts at foreign banks that I
believe represent Fowler's efforts to move money between various
accounts over which he has control. For example:

i.   On or about August 31, 2018, the GTS
Account received an incoming wire for approximately $5,000,000
from an account in the name of "Global Trade Solutions GMBH" at
the German bank DB Privat-Und Firmenkundenbank AG.   The OBI
section for that wire stated, in sum and substance:
"INTERCOMPANY TRANSFER."

ii.   On or about September 27 and 28, 2018,
the GTS Account sent a total of approximately $1,000,000 to an
account in the name of "GTS - Canada Corporation" at the

25

Canadian Imperial Bank of Commerce.  The OBI section for the transfer on or about September 27, 2018 stated, in sum and substance, "INTERCOMPANY TRANSFER."

          iii. The GTS Account also sent an outgoing wire on or about September 18, 2018 for approximately $189,850 to the Bank of America account of an individual named "Nancy Krutoy," who has an address in Maryland (the "Krutoy Account").  The OBI section stated, in sum and substance: "ORDER 37880 PAYMENT TO PARTNER FOR REAL ESTATE."  Based on my conversation with an investigator at Bank of America and my review of transactional data produced by Bank of America, I learned, among other things, that less than a month earlier, on or about August 24, 2018, the Krutoy Account sent an outgoing wire for approximately $190,000 (*i.e.*, virtually the same amount that it later received on or about September 18, 2018) to an account at Deutsche Bank in the name of "Global Trade Solutions GMBH."  The OBI section for that August wire stated, in sum and substance, "Trade related."

          g.    Notably, for an outgoing transfer of approximately $1,146.01 on or about October 5, 2018 to "Epayments Systems Ltd Clients Funds," the OBI section stated, in sum and substance: "OBI:PAYOUT **E-WALLET** 001-180796 PAYMENT TO PARTNER FOR INVESTMENT HOLDING" (emphasis added).  As

26

discussed above, digital "wallets" are used on the Bitfinex website and are used to store cryptocurrency.

h. The OBI sections for several other outgoing wires stated, in substance and in part, "PAYMENT TO PARTNER FOR INVESTING HOLDING" but without any reference to e-wallets.

i. Based on my participation in this investigation, I learned on or about October 17, 2018 that HSBC had reached out to the FBI regarding the Target Property. I then personally met with employees of HSBC on or about October 18, 2018. Meanwhile, based on my review of news reports and Internet posts, I learned, among other things, that on or about October 16 and 17, 2018, several blogs that cover cryptocurrency issues posted reports that Bitfinex was shifting its banking relationship from HSBC to the Hong Kong-based Bank of Communications.

20. Based on my review of transactional data produced by HSBC, I learned, among other things, that Fowler's personal account at HSBC (*i.e.*, Fowler Account-1) received almost $60,000,000 from accounts in the name of "Global Trading Solutions LLC" at two different banks (Citibank and Enterprise Bank and Trust) in a one-month time period. Fowler then transferred the vast majority of those funds into his HSBC

27

securities account (*i.e.*, Fowler Account-2).  Because Fowler

moves money between numerous GTS-named accounts at different

banks, I submit that there is probable cause to believe that the

funds in Fowler Account-1 and Fowler Account-2 are involved in

violations of 18 U.S.C. §§ 1960 and 1957 and are therefore

subject to seizure.  18 U.S.C. § 981(a)(1)(A) & (C) and §

981(b).  In particular, I have learned the following:

a.    Fowler is the listed owner of Fowler

Account-1.  The listed address for Fowler Account-1 is "4939 W

RAY RD # 4349, CHANDLER, AZ," which is virtually identical to

the address listed on the Bitfinex deposit and wire-transfer

webpage shown in Paragraph 18(d), *supra*.

b.    Between in or about June 11, 2018 and July

11, 2018, accounts in the name of "Global Trading Solutions LLC"

at Citibank and Enterprise Bank and Trust sent approximately six

wires totaling approximately $59,712,154.97 to Fowler Account-1.

i.    Notably, the listed address for the

Global Trading Solutions LLC account at Enterprise Bank and

Trust was "4939 W RAY RD #4-349, CHANDLER, AZ 85226," which is

the same address listed on the Bitfinex webpage and virtually

identical to the address for Fowler Account-1.

ii.   For two of the six wires, the OBI

28

section stated, in sum and substance: "INTERCOMPANY TRANSFER TEL
480-961-9610."

        c.    Fowler transferred a total of approximately
$74,000,000 from Fowler Account-1 and another personal savings
account into Fowler Account-2.  Fowler made approximately three
outgoing wire transfers out of Fowler Account-2 in or about
August 2018, leaving a market value of more than $60,000,000 in
Fowler Account-2 as of approximately October 10, 2018.  At least
one of the outgoing wire transfers from Fowler Account-2 was
made to the account of an entity that shares the same "4939 W.
Ray Road #4-349, Chandler, AZ 85226" address as Fowler Account-
1, the Global Trading Solutions LLC account at Enterprise Bank
and Trust, and the deposit webpage of Bitfinex.

        d.    In the account opening documents for Fowler
Account-2, Fowler indicated that the account was not associated
with a money services business, or "MSB," a term of art that
includes money transmitting businesses.

        21.   Based on my conversation with an employee of HSBC
("Employee-2") who spoke with Fowler several times on the
telephone about Fowler Account-2 over the last two weeks, I
learned, among other things, the following:

        a.    During one conversation, Fowler stated, in

substance and in part, that the sources of the money in Fowler's HSBC accounts were from property management and certain business relationships with technology, specifically, drones.

b.   Beginning or about October 12, 2018, Fowler spoke with Employee-2 several times on the telephone regarding Fowler's attempt to transfer money out of Fowler Account-2. Fowler initially sought to transfer out approximately $40,000,000, but later he increased the amount of the attempted transfer to approximately $50,000,000.  Fowler asked Employee-2, in substance and in part, why the attempted money transfers were not being completed.  Fowler told Employee-2, in substance and in part, that the money would be used to buy a building in London.

22.   Based on my conversations with an employee of HSBC ("Employee-3") and my review of transactional data produced by HSBC, I learned, among other things, that Fowler controls an account numbered 40119984080265 domiciled at HSBC's United Kingdom bank ("Fowler Account-3"), from which Fowler made numerous outgoing wire transfers to various individuals and entities around the world, as well as yet another foreign bank account with a name similar to GTS.  The transfers were processed through a U.S. dollar correspondent account numbered

30

000269867 at HSBC Bank USA.  In particular, I learned the following:

        a.   Fowler is the listed owner of Fowler Account-3.  The listed address for Fowler Account-3 is the same or virtually identical West Ray Road address in Chandler, Arizona that is associated with (i) the Global Trading Solutions LLC account at Enterprise Bank and Trust, (ii) the Bitfinex deposit webpage, and (iii) the address for Fowler Account-1.

        b.   Between on or about July 19, 2018 and October 9, 2018, Fowler Account-3 sent about 40 outgoing wires that totaled approximately $22,366,352.26.  The outgoing wires were sent to the accounts of various individuals and entities at banks all over the world, including Hong Kong, Australia, Japan, Panama, and the United States.  The OBI section for the large majority of the outgoing wires stated, in sum and substance, "PAYMENT TO PARTNER FOR INVESTMENT" or "PARTNER PAYMENT."

        c.   Between on or about September 4, 2018 and September 13, 2018, Fowler Account-3 sent approximately three wires totaling about $3,198,829 to an account in the name of "Global Trade Solutions AG," with an address in Switzerland. The OBI section for those three wires all stated, in sum and substance: "INTER COMPANY TRANSFER."

31

## CONCLUSION

23. Based on the foregoing, I submit that there is probable cause to believe that funds held in the accounts constituting the Target Property are subject to forfeiture as property involved in violations of 18 U.S.C. §§ 1960 (operating an unlicensed money transmitting business) and 1957 (monetary transactions involving property of specified unlawful activity), or property traceable thereto.

a. Specifically, I submit that there is probable cause to believe that, contrary to the documents and representations Fowler has made to HSBC, the GTS Account was used to receive deposits from users of the cryptocurrency trading platform Bitfinex, and that the funds in the GTS Account were subsequently transmitted to other individuals and entities around the world, and/or to other accounts controlled and owned by Fowler or his related entities. Although the subsidiary BFXNA of Bitfinex's parent company, iFinex, is licensed as a money transmitter with FinCEN, GTS did not identify itself to HSBC as acting as an agent for, or having any affiliation with, BFXNA, Bitfinex, iFinex, or any other Bitfinex-related entity. In addition, the GTS Account transmitted money involving non-U.S. persons, which by Bitfinex/iFinex's own admission in the

32

Complaint is the domain of a different subsidiary BFXWW that is not registered or licensed with FinCEN. Accordingly, GTS and Fowler acted as a money transmitting business without a license.

b. Moreover, there is probable cause to believe that the funds transferred into Fowler Account-1 and Fowler Account-2 from accounts of GTS-named entities were proceeds involved in, or traceable to, the Target Offenses. Because Fowler's company, GTS, is not licensed to transmit money by the U.S. Treasury, the State of Arizona, the State of Colorado, or the State of New York, the transmission of money to and from the Target Property constitutes the unlicensed operation of a money transmitting business. It necessarily follows that the subsequent transmissions and transfers of that money are illegal transactions involving property of a specified unlawful activity, namely, the illegal money transmitting business.

24. Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue warrants authorizing the seizure of the Defendant Property.

25. At this time, Fowler and his co-conspirators are not aware of this investigation by the FBI into GTS and Bitfinex. Premature disclosure of this investigation may cause the conspirators, who may include individuals who run the

33

Ex. A, Aff. in Support of SW, p.33          USAO-0002026

Bitfinex trading platform and are therefore skilled with computers as well as individuals who are located in foreign countries or have money located in foreign countries, to seek to destroy evidence, including electronic evidence, or to flee the United States to avoid investigation or arrest, or to undertake efforts to conceal their illegal proceeds.

34

26.   Accordingly, I also respectfully request that this Affidavit be sealed until further order of the Court so as not to jeopardize the investigation of this matter, except that the Government may without further order from this Court (1) provide this Affidavit to domestic and foreign law enforcement authorities and personnel assisting the Government in this investigation in order to effect the seizure of the Target Property and to otherwise aid in the investigation of this matter, and (2) produce this Affidavit in any criminal or civil forfeiture proceedings as necessary to comply with any discovery and disclosure obligations.

TODD P. MCGEE
Special Agent, FBI

Sworn to before me
this 23rd day of October 2018.

HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

35