UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA,

Ind. No.: S1-19-CR-254 (ALC)

- v. -

REGINALD FOWLER,

*Defendant*.

---------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT REGINALD FOWLER'S PRETRIAL MOTIONS**

Edward V. Sapone, Esq.
Sapone & Petrillo, LLP
*Attorneys for Defendant*
*Reginald Fowler*
40 Fulton Street, 17th Floor
New York, New York 10038
Tel: (212) 349-9000
Email: ed@saponepetrillo.com

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................1

POINT ONE

      ALL EVIDENCE SEIZED PURSUANT TO THE OCTOBER 23, 2018
      SEARCH WARRANTS MUST BE SUPPRESSED, AS THEY WERE
      OBTAINED WITHOUT PROBABLE CAUSE ...................................................3

    A.   Alleged Bases for the HSBC Seizure Warrants Generally .........................3

    B.   The GTS HSBC Account: HSBC Bank USA Account 14000147,
       held by GTS .........................................................................................5

    C.   The Fowler HSBC Accounts: HSBC Bank USA, account # 697825922
       and HBSC Securities USA, account # HMB861668,
       held by Reginald Fowler .....................................................................8

      ARGUMENT

      THE COURT SHOULD (1) VACATE THE OCTOBER 23, 2018 SEIZURE
      WARRANTS OF THE HSBC ACCOUNTS PURSUANT TO FED. R.
      CRIM. P. 41(g) BECAUSE THE UNDERLYING APPLICATION
      LACKED PROBABLE CAUSE, OR (2) GRANT AN EVIDENTIARY
      HEARING TO DEVELOP ISSUES OF FACT CONCERNING THE
      SEIZURES PURSUANT TO RULE 41(g) .......................................................10

    A.   Mr. Fowler has Standing to Contest the Seizure Warrants .........................15

    B.   The Good Faith Exception Does Not Apply .................................................16

    C.   The Court Should Suppress the October 24, 2018 Statement as Fruit
       of the Poisonous Tree ..................................................................................17

    D.   The Court Should at Least Scale Back the Seizures to Reflect the Net
       Proceeds or Funds Involved in the Alleged Illegal Activity .......................18

POINT TWO

      BECAUSE THE INDICTMENT FAILS TO IDENTIFY CRITICAL FACTUAL
      DETAILS NECESSARY FOR MR. FOWLER TO  PREPARE FOR TRIAL,
      PREVENT UNFAIR SURPRISE AND AVOID DOUBLE JEOPARDY, THE
      COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE A
      BILL OF PARTICULARS  ...........................................................................23

    A.   Factual Background:  The Need and Request for a Bill of Particulars ...........23

B.  Legal Standard ........................................................................... 27

C.  The Requested Particulars .......................................................... 32

D.  Broadening Phrases, Such as "Others Known and Unknown," "*Inter Alia*,"
and "Elsewhere," Must Be Stricken Because They Impermissibly Expand
the Charges Against Mr. Fowler ..................................................33

POINT THREE

THE COURT SHOULD DIRECT THE GOVERNMENT
TO PROMPTLY PROVIDE DEFENDANT WITH *BRADY* MATERIAL ...........35

A.  Factual Background .....................................................................35

B.  Legal Standard and Discussion....................................................35

POINT FOUR

THE COURT SHOULD ENTER A SCHEDULING ORDER CONSISTENT
WITH THE VOLUME OF DISCOVERY, THE SERIOUSNESS OF THE
CHARGES, THE NUMBER OF POTENTIAL WITNESSES AND EXHIBITS,
AND THE ANTICIPATED LENGTH OF THE TRIAL, TO PERMIT
ADEQUATE TRIAL PREPARATION AND TO ASSURE THE EFFICIENT
CONDUCT OF THE TRIAL ................................................................37

CONCLUSION ...............................................................................39

## Table of Authorities

**Cases**                **Page(s)**

*In Re: 650 Fifth Avenue & Related Prop.*, 777 F. Supp. 2d 529 (S.D.N.Y. 2011)................ 19, 20

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................... 1, 33, 34, 36

*Herring v. United States*, 555 U.S. 135 (2009)................................................................. 16

*Illinois v. Gates*, 462 U.S. 213 (1983) ............................................................................ 11

*Jones v. United States*, 362 U.S. 257 (1960) ................................................................... 11

*United States v. Barnes*, 158 F.3d 662 (2d Cir. 1998)..................................................... 27

*United States v. Bin Laden*, 92 F.Supp.2d 225 (S.D.N.Y. 2000).............................. 27, 28, 29, 30

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ....................................... 26, 27

*United States v. Cambio Exacto S.A.*, 166 F.3d 522 (2d Cir. 1999) ............................... 15

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000)................................................... 11

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ................................................... 12, 16

*United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012) ....................................... 19, 20

*United States v. Gagnon*, 373 F.3d 230 (2d Cir. 2004) ........................................... 11, 12

*United States v. Galestro*, No. 06-CR-285, 2008 U.S. Dist. LEXIS 53834
    (E.D.N.Y. July 15, 2008) ...................................................................................... 10

*United States v. George,* 975 F.2d 72 (2d Cir.1992) ...................................................... 16

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ................................................... 34

*United States v. Kalish*, 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009)....................... 19, 20

*United States v. Leon*, 468 U.S. 897 (1984)............................................................... 16, 17

*United States v. Lino*, No. 00-CR-632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2,
    2001) .................................................................................................................... 27

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ........................................... 19, 20

*United States v. Moore*, 968 F.2d 216 (2d Cir. 1992) .................................................. 17

*United States v. Mostafa*, 965 F.Supp.2d 451 (S.D.N.Y. 2013) ................................ 29, 31, 32, 33

*United States v. Rajaratnam*, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) .............................. 27

*United States v. Ramirez*, 609 F.3d 495 (2d Cir. 2010) ............................................... 27

*United States v. Rocha-Gomez*, 412 F. Supp. 3d 369 (S.D.N.Y. 2019) ................................. 12

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) ............................................. 34

*United States v. Travisano*, 724 F.2d 341 (2d Cir. 1983) ............................................. 11

*United States v. Upton*, 856 F.Supp. 727 (E.D.N.Y. 1994) ........................................... 30

*United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993) ................................................. 11

*United v. States v. Kahale*, 789 F.Supp.2d 359 (E.D.N.Y. 2009), *af f'd sub nom.*
   *United States v. Graham*, 477 Fed.Appx. 818 (2d Cir. 2012), *cert. denied sub*
   *nom. Scarlato v. United States*, 568 U.S. 914 (2012) ............................................ 27

*Wong Sun v. United States*, 171 U.S. 471 (1963) ...................................................... 18

**Statutes and other Authorities**

U.S. Const. amend IV .............................................................................. passim

18 U.S.C. § 371 ................................................................................... 1, 25

18 U.S.C. § 981 ............................................................................ 10, 18, 19, 21

18 U.S.C. § 984 ....................................................................................... 2

18 U.S.C. § 1343 ..................................................................................... 26

18 U.S.C. § 1344 ................................................................................. 22, 23

18 U.S.C. § 1956 ..................................................................................... 19

18 U.S.C. § 1960 ........................................................................... 1, 3, 10, 25

18 U.S.C. § 3500 ..................................................................................... 35

28 U.S.C. § 2461 ..................................................................................... 19

Fed. R. Crim. P. 32.2(b)............................................................................................. 10

Federal Rule of Criminal Procedure 7(f) .................................................................. 26

Federal Rules of Criminal Procedure Rule 41(g) ................................................. 3, 10

## PRELIMINARY STATEMENT

Defendant Reginald Fowler respectfully submits this memorandum of law in support of his pretrial motions for an order directing: (1) suppression of all evidence obtained during the search and seizure of various bank accounts pursuant to a seizure warrant, and all evidence obtained as a result of this seizure (fruits of the poisonous tree); (2) the Government provide to Defendant Reginald Fowler a Bill of Particulars; (3) that all *Brady* material be promptly disclosed to Defendant; and (4) that a timetable for pretrial disclosure be set.

This is an extraordinary case, as it combines an unprecedented theory of criminal liability for alleged 18 U.S.C. § 1344 Bank Fraud offenses. The Indictment broadly accuses Mr. Fowler of Bank Fraud (Counts One and Two), Operating an Unlicensed Money Transmittal Business (Counts Three and Four ), Wire Fraud (Count Five), and notifies Fowler of the Government's intention to seek forfeiture of numerous bank accounts held by Mr. Fowler and his business, Global Trading Solutions, LLC. ("*GTS*"). The charges stem from Fowler's receipt and transmittal of funds related to his successful myriad industries, including GTS.

The indictment is devoid of any facts from which counsel can discern the Government's theory of liability as to the bank fraud charges. It is silent as to anything of value criminalized by law that Mr. Fowler tried to obtain from any bank by allegedly misrepresenting the source of his banking business. The mammoth discovery, consisting of terabytes of emails and mountains of financial and bank data, sheds no light on the charges relating to Bank Fraud and Wire Fraud.

The essence of the charges against Mr. Fowler in Count Four, charging a violation of 18 U.S.C. § 1960, alleges his operation of an unlicensed money transmittal business.  Count Three charges an 18 U.S.C. § 371 conspiracy. Counts One and Two allege substantive and conspiratorial Bank Fraud, arising from Mr. Fowler's alleged false statements to banks in the

operation of the money transmittal business alleged in Counts One and Two. Neither Count alleges that Fowler sought or obtained from the banks anything of value prohibited by law. We respectfully ask the Court to direct the Government to particularize the charges.

Count Five alleges that Mr. Fowler committed Wire Fraud "in connection with his acquisition of an ownership stake in the [professional sports] League, among other things, (i) by falsely claiming personal ownership of funds that were, in truth and in fact, funds FOWLER had obtained through the unlicensed money transmitting business charged in Count Four of this Indictment, and (ii) by converting those individuals' funds toward his investment in the League."

This case is born of the Government's interest in a company named Bitfinex, a virtual currency exchange platform, which allegedly commingled client and corporate funds to cover up $850 million dollars of client funds that went missing in mid-2018.  As early as October 2018, members of the Federal Bureau of Investigations (the "*FBI*") were investigating Bitfinex. *See generally* Affidavit in Support of Seizure Warrant In Rem Pursuant to 18 U.S.C. §§ 981 and 984, dated October 23, 2018 (the "*October 23 Affidavit*"); Exhibit A to accompanying Declaration.

In connection with this investigation, FBI Special Agent Todd McGee was searching the internet and found a Twitter post by a reporter, dated October 6, 2018, from an online newspaper named, "The Block" (www.theblockcrypto.com), which alleged that "Bitfinex is now banking with HSBC through a private account of Global Trading Solutions," and attached an image from an unknown source with banking details.  *See* October 23 Affidavit at para 18(d). Without vetting the reporter or the source of the reporter's information, Agent McGee credited this unverified, unreliable information and sought to link with Bitfinex the business dealings of GTS and Mr. Fowler.

As described more fully below, Agent McGee woefully failed to sufficiently identify evidence to establish probable cause to link with Bitfinex, GTS, Mr. Fowler, and the funds in three accounts seized by the Government. Without probable cause for the seizures, the warrants must be vacated pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure, and all evidence obtained as a result of this seizure should be suppressed as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

**POINT I**

**THE COURT SHOULD SUPPRESS
ALL EVIDENCE SEIZED PURSUANT TO THE
OCTOBER 23, 2018 SEARCH WARRANTS BECAUSE
THE WARRANTS WERE OBTAINED WITHOUT PROBABLE CAUSE**

**A.  Alleged Bases for the HSBC Seizure Warrants Generally**

On October 23, 2018, members of the FBI obtained two seizure warrants in the United States District Court for the Southern District of New York, signed by Hon. Katharine H. Parker, which authorized the seizure of all funds in and traceable to three HSBC accounts owned or controlled by Mr. Fowler:  (1) HBSC Securities USA Account HMB861668, held by Reginald Fowler; (2) HSBC Bank USA account 14000147, held by Global Trading Solutions LLC; and (3) HSBC Bank USA account 697825922, held by Reginald Fowler (collectively, the "*HSBC Accounts*"). *See* Seizure Warrants, dated October 23, 2018, Exhibit B to Sapone Declaration.

The case for probable cause supporting issuance of these warrants for seizure of the HSBC Accounts was set forth in the October 23 Affidavit, and signed by Agent McGee. Specifically, Agent McGee claimed that GTS and Mr. Fowler were operating an unlicensed money transmitting business on behalf of Bitfinex, in violation of 18 U.S.C. § 1960 (operation of an unlicensed monetary transmitting business) and § 1957 (monetary transactions involving property of specified unlawful activity), and that the accounts allegedly contained the proceeds

of, and property involved in, those crimes. *See* October 23 Affidavit, at para. 13(h), 19(i), 23(a) and 25.

As set forth in the October 23 Affidavit, state and federal licensing requirements exist for money transmitting businesses. *See* October 23 Affidavit at para. 9 through 13. The October 23 Affidavit notes that Ifinex, BFXNA, and BFXWW operate together as Bitfinex through the website www.bitfinex.com, and Bitfinex provided a trading platform for cryptocurrencies. *See* October 23 Affidavit at para. 13(f). The October 23 Affidavit further reads that BFXNA contracts with U.S.-based customers, while BFXWW contracts with non-U.S. customers. *See* October 23 Affidavit at para 13(f). According to Agent McGee, in October 2018, BFXNA was properly registered with the U.S. Department of Treasury as a money transmitting business, but BFXWW was not registered. *See* October 23 Affidavit at para 13(g).

Agent McGee asserted, and therefore, led Magistrate Judge Parker to believe as she considered whether to sign the warrant, that, because Bitfinex is operating a money transmitting business, any company or individual receiving or sending funds on its behalf is also operating a money transmitting business and, thus, was required to be licensed pursuant to the relevant state and federal laws.[1] *See generally* October 23 Affidavit. While Agent McGee concedes the possibility that a company operating on Bitfinex's behalf with respect to US-based customers might be an agent of BFXNA covered by BFXNA's license, the same could not be said for transactions involving non-U.S.-based customers. *See* October 23 Affidavit at para 13(h). Thus, according to Agent McGee, because GTS and Mr. Fowler did not possess a license to conduct a

---

[1]     It is worth noting that while Agent McGee further claims that neither "Bitfinex," nor its parent company Ifinex is registered as a money transmitting business in Arizona, Colorado or New York, he does not address whether the same is true for BFXNA or BFXWW. *See* October 23 Affidavit at para. 9, 10(a), 11(a), and 12(a).

money transmitting business, they were operating an unlicensed money transmitting business at least with respect to the significant non-U.S.-based customers. *See* October 23 Affidavit at para. 9-13.  Agent McGee's argument, however, turns on whether the October 23 Affidavit presented a sufficient nexus between Bitfinex and GTS, and Mr. Fowler.

**B.  The GTS HSBC Account: HSBC Bank USA Account 14000147, Held by GTS**

It's worth highlighting that the primary foundation in the October 23 Affidavit supporting Agent McGee's claim that GTS was operating as an unlicensed money transmitting business using HSBC Bank USA Account 14000147 (the "*GTS HSBC Account*") on behalf of Bitfinex came from McGee's review of a Twitter post by an unnamed reporter who was unfamiliar to Agent McGee. With respect to this post, Agent McGee stated:

> On or about October 6, 2018, a reporter from "The Block" (www.theblockcrypto.com), which describes itself as a "reliable and newsworthy source for all things pertaining to …crypto," posted on Twitter the following, in sum and substance: "Bitfinex is now banking with HSBC through a private account of Global Trading Solutions. Very good fit if you ask me. It's also worth mentioning that all EUR [euro], JPY [Japanese Yen] and GBP [British Pounds] are paused but that Bitfinex 'expects the situation to normalize within a week.' Banking issues?"

*See* October 23 Affidavit at para. 18(d). Agent McGee noted that the Twitter post included an image (and he included it in his affidavit at *id*.), which identified "HSBC account 141000147" as an account belonging to GTS along with its address and banking details. *See id*. The image did not include or reference the source from which the image was obtained. Nonetheless and without basis, Agent McGee stated that the image "appeared to be screenshot from a Bitfinex webpage." *See id*. Although Agent McGee later stated in the October 23 Affidavit that he reviewed the Bitfinex website, he made no mention of observing the image in the Twitter post on the Bitfinex website. Therefore, notably, his own research undermines the key assumption driving his position.

With respect to the Twitter post, Agent McGee was able to confirm only through HSBC that the account number listed in the post was held by GTS at the address specified in the post. *See* October 23 Affidavit at para. 19(a).  HSBC allegedly provided Agent McGee with "know your customer" ("*KYC*") information for GTS (*see* October 23 Affidavit at para. 19) and transactional data (*see* October 23 Affidavit at *id.*), and Agent McGee spoke to a confidential informant-employee at HSBC (*see* October 23 Affidavit at para 19(b)).  Nonetheless, the October 23 Affidavit includes scant evidence from these sources that GTS was operating an unlicensed money transmitting business on behalf of Bitfinex as the agent claimed.

 According to these sources, "the GTS account was opened on or about August 8, 2018 by Fowler," who communicated directly with HSBC regarding KYC information for GTS. *See* October 23 Affidavit at para 19(b). According to the information allegedly provided by Mr. Fowler to HSBC, GTS's business was related to real estate and property management. *See* October 23 Affidavit at para. 13(h) and 19(b).  In addition, Mr. Fowler also allegedly explained to another confidential HSBC employee that he was also in the technology business. *See* October 23 Affidavit at 21(a). As such, these sources from HSBC did not support Agent McGee's claim that GTS was using the GTS HSBC Account for a money transmitting business on behalf of Bitfinex.  *See* October 23 Affidavit at paras 13(h), 19(i), 23(a) and 25.

Indeed, Agent McGee's claim is based on two items in the October 23 Affidavit.  The *first*, as mentioned above, is some Twitter post by some unnamed reporter from some self-proclaimed "reliable and newsworthy" online newspaper that Agent McGee never verified. *See* October 23 Affidavit at para. 18(d). The *second* comes from HSBC transactional data, reflecting only one incoming wire in the amount of $11,000 on October 3, 2018 from a U.S.-based account containing a reference to "Bitfinex." *See* October 23 Affidavit at para. 19(d)(i) (A wire of

$11,000 sent on October 3, 2018, with reference line "9120505149 BITFINEX: ACC. HEINRICH MAURER").

This is the universe of information in the October 23 Affidavit linking GTS to Bitfinex.

However, with respect to the 96 wires that Agent McGee noted were sent between the GTS HSBC Account and "individuals and entities across the world" between August 31, 2018 and October 5, 2018, the majority of these wires did not describe the reason for the wire, nor indicate that GTS' business was other than the purposes allegedly provided by Mr. Fowler. *See* October 23 Affidavit at para 19.

Even the several wires that Agent McGee identifies with references to "trade broker","trade payment", and "buying and selling foreign exchange", "payout e-wallet" (*see* October 23 Affidavit at para. 19(d)(ii-iv) and (g)) that might arguably be perceived as not related to real estate or property, do not reflect a nexus to Bitfinex.

Absent a demonstrable nexus to Bitfinex, the October 23 Affidavit failed to provide a sufficient basis for the seizure warrants. Moreover, these references are consistent with another of Mr. Fowler's alleged business focuses as claimed by an unnamed HSBC employee— "technology." *See* Affidavit at paras 21(a).

Further, contrary to Agent McGee's claim, the remaining descriptions of wires— *i.e.* "INVESTMENT," "INVESTMENT/SECURITIES," and "PURCHASE INVESTMENT PRODUCT"— are consistent with GTS being related to real estate and property management. *See* October 23 Affidavit at para 19(v).

Further, Agent McGee's other allegations offered in support of his position were either irrelevant or contradictory to establishing probable cause to believe that GTS was operating a money transmitting business using the GTS HSBC Account on behalf of Bitfinex. For example,

while Agent McGee points to a meeting on October 18, 2018 with unidentified HSBC employees regarding the "Target Property," he does not identify any information whatsoever communicated at that meeting, let alone any information that would support a probable cause determination for his claim that GTS was running an unlicensed money transmitting business on behalf of Bitfinex. *See* October 23 Affidavit at paras.13(h), 19(i) and 25.

Significantly, the October 23 Affidavit noted unidentified "new reports and internet posts," wherein Agent McGee allegedly learned that "on or about October 16 and 17, 2018, several blogs that cover cryptocurrency issues posted reports that Bitfinex was shifting its banking relationship from HSBC to the Hong Kong-based Bank of Communications." *See* October 23 Affidavit at para. 19(i).  Rather than support the link with Bitfinex, this revelation undermines the unverified claims in the Twitter post from 10 days prior that Bitfinex was moving its banking relationship to HSBC. *See* October 23 Affidavit at para. 18(d). Also contradicting his position is Agent McGee's indication that there was no reference to Mr. Fowler or GTS on Bitfinex's actual website when he reviewed it. *See* October 23 Affidavit at para. 18.

**C.    The Fowler HSBC Accounts: HSBC Bank USA account 697825922 and HBSC Securities USA Account HMB861668, Held by Reginald Fowler**

As mentioned, on October 23, 2018, seizure warrants were also issued for HSBC Bank USA account 697825922, held by Reginald Fowler ("*Fowler Account 1*") and HSBC Securities USA account HMB861668, held by Reginald Fowler ("*Fowler Account 2*" and together with, Fowler Account 1, the "*Fowler HSBC Accounts*") based on the October 23 Affidavit.

According to Agent McGee,

[b]ased on my review of the transaction data produced by HSBC … Fowler's personal account at HSBC (i.e., Fowler Account 1) received almost $60,000,000 from accounts in the name of "Global Trading Solutions LLC" from two different banks in a one-month time period. Fowler then transferred the vast majority of those funds into his HSBC Securities Account (i.e., Fowler Account 2). Because

> Fowler moves money between numerous GTS-named accounts at different banks,
> I submit that there is probable cause to believe that the funds in Fowler Account 1
> and Fowler Account 2 [the "Fowler HSBC Accounts"] are involved in violations
> of 18 U.S.C §§ 1960 and 1957 and are therefore subject to seizure.

*See* October 23 Affidavit at para. 20.

Put another way, according to Agent McGee, the Government was entitled to seize "Fowler HSBC Accounts" because these accounts allegedly received funds from other accounts held by companies also named Global Trading Solutions at other banks. Accordingly, should the Court agree that the October 23 Affidavit failed to establish the requisite nexus between the GTS and Bitfinex, justifying the seizure of the HSBC GTS account, then it likewise follows that the probable cause showing was also insufficient to seize the Fowler HSBC accounts. The basis was even weaker, as the alleged accounts sharing the name GTS with the GTS HSBC Account were not (1) identified by the Twitter post, nor (2) held at HSBC. Given Agent McGee's silence on the issue, these accounts also appear to be absent any direct references to Bitfinex.

Further, while Agent McGee's presentation in the October 23 Affidavit with respect to these accounts assumes that GTS used numerous HSBC accounts to operate an unlicensed money transmitting business on behalf of Bitfinex, he offers no additional support for this claim.

For example, the references for the wires coming in and going out of these accounts, as set forth in the October 23 Affidavit, are consistent with Mr. Fowler having received income from real estate, property management and technology-related businesses as he allegedly claimed. *See* October 23 Affidavit at para. 22(b) and (c) ("PAYMENT TO PARTNER FOR INVESTMENT", "PARTNER PAYMENT" or "INTERCOMPANY TRANSFER").

Finally, Agent McGee's contention that "Fowler made numerous outgoing wire transfers to various individuals and entities around the world, as well as yet another foreign bank account with a name similar to GTS" is equally unpersuasive. *See* October 23 Affidavit at para 22. For

9

an individual to possess accounts in foreign jurisdictions—and to send and receive funds internationally—in this day and age is no more suggestive of a money transmitting business as it is numerous other businesses conducted internationally, including real estate, property and technology businesses.

## ARGUMENT

### THE COURT SHOULD (1) VACATE THE OCTOBER 23 SEIZURE WARRANTS OF THE HSBC ACCOUNTS PURSUANT TO FED. R. CRIM. P. 41(g) BECAUSE THE UNDERLYING APPLICATION LACKED PROBABLE CAUSE

The Court should vacate the HSBC Seizure Warrants because the October 23 Affidavit demonstrated an insufficient nexus between the GTS HSBC Account and Bitfinex and, accordingly, demonstrated an insufficient basis to believe that GTS was operating an unlicensed money transmitting business on behalf of Bitfinex using that account. In the alternative, the Court should grant an evidentiary hearing pursuant to Rule 41(g) to discover issues of fact related to the seizures. Because the alleged link between the Fowler HSBC Accounts and Bitfinex was even weaker, the seizure warrants for those must also be vacated.

The government obtained warrants to seize the HSBC Accounts pursuant to 18 U.S.C. § 981(b). In order for property to be seized under 18 U.S.C. § 981(b), the Government must have probable cause to believe that the seized property is subject to forfeiture. *See* 18 U.S.C. §§ 981. To establish probable cause, the Government must establish a nexus between the property it seeks to seize and the illegal activity. *See* Fed. R. Crim. P. 32.2(b) and *United States v. Galestro*, No. 06-CR-285, 2008 U.S. Dist. LEXIS 53834, at *32 (E.D.N.Y. July 15, 2008).

18 U.S.C. § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, <u>involved in a transaction</u> or attempted transaction <u>in violation of section 1956, 1957 or 1960</u> of this title, <u>or any property traceable to such property</u>."

Title 18 U.S.C. § 1960 imposes a criminal penalty on any person who: "knowingly conducts, controls, manages, supervises, directs or owns all or part of an unlicensed money transmitting business." Section 1960(b)(1) defines an "unlicensed money transmitting business" as a money transmitting business which effects interstate or foreign commerce in any manner or degree and (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was required to be licensed or that the operation was so punishable, [or] (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section.

Section 1960(b)(2) defines "money transmitting" to "include[] transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

While a magistrate judge's determination that probable cause existed to support the issuance of a search warrant is generally afforded great deference (*see Illinois v. Gates*, 462 U.S. 213, 236 (1983); *see also United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)), it is for the reviewing court to "decide whether the magistrate performed [her] neutral and detached function on the facts before [her], and did not merely serve as a rubber stamp for conclusions drawn by the police." *Travisano*, 724 F.2d at 345.

Although a warrant application may rely on hearsay from an informant to establish probable cause, *see Jones v. United States*, 362 U.S. 257, 269 (1960), particularly relevant are the "'informant's veracity, reliability and basis for knowledge,' and the extent to which an informant's statements [...] are independently corroborated." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004); *United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir. 1993) ("explaining that the core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable.").

When determining whether an informant is reliable, courts typically consider certain facts, including how the informant obtained the disclosed information (*see Wagner*, 989 F.2d at 73); whether law enforcement met with the informant in-person (*see United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000)); and what the informant's motive was in disclosing the information. *See Gagnon*, 373 F.3d at 236. Courts often value independent corroboration of an informant's information in assessing an informant's veracity. *See United States v. Clark*, 638 F.3d 89, 98 (2d Cir. 2011) ("finding that partial corroboration of an informant is a circumstance that, on totality review, may allow a judicial officer to credit the informant's whole account."). Lack of corroboration can similarly play an important role in a court's analysis of probable cause. *See, e.g. United States v. Rocha-Gomez*, 412 F. Supp. 3d 369, 373–74 (S.D.N.Y. 2019).

Applying these standards to the instant facts, the Court should vacate the HSBC Seizure Warrants because the government failed to establish a sufficient nexus between the alleged criminal conduct (*i.e.*, operating an unlicensed money transmitting business on behalf of Bitfinex) and the assets seized for forfeiture (the HSBC Accounts). Specifically, as discussed above, the universe of support linking the GTS HSBC Account and Bitfinex in the October 23 Affidavit is:

(i)        unreliable hearsay statements in a Twitter post by an unnamed reporter (unfamiliar to Agent McGee) and Agent McGee's unjustified and unverified assumptions regarding the source of that unvetted reporter's information;

(ii)       A sole reference to "Bitfinex" in an incoming wire into the HSBC GTS account, which could just as easily been the result of the sender seeing the same unreliable Twitter post onto which Agent McGee latched.

While Agent McGee initially acknowledges in the October 23 Affidavit that he is making an assumption from reviewing a singular Twitter post by an unnamed, unvetted reporter that the image included "appeared to be a screenshot" taken from the Bitfinex website (*see* October 23 Affidavit at para. 18(d)), respectfully, the remainder of his affidavit misleadingly and unjustifiably converts this unverified assumption into fact. Notably, although Agent McGee states that he performed research on the Bitfinex website (*see* October 23 Affidavit at para. 18), he does not indicate that his research confirmed his assumption. His silence on this front speaks volumes as to his inability to do so, which in turn, speaks volumes about the reliability of the Twitter post.

Without the Twitter post, Agent McGee's only link between the GTS HSBC Account and Bitfinex is one incoming wire with a reference to "Bitfinex." However, given this unreliable and scant presentation, this one wire could just as reasonably be viewed as the result of one individual having seen the same Twitter post that Agent McGee found and also assuming the reporter obtained his information from Bitfinex. However, as previously discussed, nothing in the narrative offered by Agent McGee demonstrates the reliability of the reporter or source of the reporter's information; nor is there any indication that Agent McGee sought to speak to the reporter, representatives of Bitfinex or any of the several individuals controlling the accounts associated with the handful of wire references that Agent McGee viewed as suspicious.

Without a sufficient link to Bitfinex, the October 23 Affidavit left no reason to conclude that Mr. Fowler and GTS were operating a money transmitting business using the HSBC Accounts rather than being involved in real estate, property management and technology as the remaining portions of the October 23 Affidavit support. Indeed the remaining items presented in support of Agent McGee's position in the October 23 Affidavit were either irrelevant or contradictory to establishing that GTS and Mr. Fowler were operating a money transmitting business on behalf of Bitfinex using the HSBC Accounts, namely:

- The transactional data pertaining to the majority of wires identified were consistent or equivocal with respect to the alleged stated sources of funds in the HSBC Accounts (*see* October 23 Affidavit at para. 19 and 22);

- Fowler's possession of accounts in foreign jurisdictions from which he received and sent funds is no more suggestive of a money transmitting business than conducting real estate and technology businesses internationally or many other international businesses (*see* October 23 Affidavit at para. 22);

- Agent McGee notes that a meeting occurred on October 18, 2018 with unidentified HSBC employees regarding the HSBC Accounts, but fails to identify any information that he learned at that meeting, let alone information that would support a probable cause determination that GTS was running an unlicensed money transmitting business on behalf of Bitfinex *(see* October 23 Affidavit at para. 13(h), 19(i) and 25;

- That Agent McGee's review of the Bitfinex website neither confirmed a link between the two companies or contained any reference to Mr. Fowler or GTS *(see* October 23 Affidavit at para. 18);

- That the Bitfinex website did not contain a page reflecting the image included in the random unverified Twitter post as reflected by Agent McGee's silence on this point *(see* October 23 Affidavit at para. 18);

- "On or about October 16 and 17, 2018, several blogs that cover cryptocurrency issues posted reports that Bitfinex was shifting its banking relationship from HSBC to the Hong Kong-based Bank of Communications" (*see* October 23 Affidavit at para. 19(i)), which undermines the unverified claims in the Twitter post from 10 days prior that Bitfinex was moving its banking relationship to HSBC, not away from it. *See* October 23 Affidavit at para. 18(d);

Therefore, the contents of the October 23 Affidavit were insufficient to establish probable cause to seize the GTS HSBC Account and, thus, should be vacated.

Because the link between GTS and Bitfinex is also the basis for the seizure warrant for the Fowler HSBC Accounts, those, too, should be vacated. Indeed, the warrants authorizing the seizure of these accounts had an even more attenuated basis as, if we are to credit Agent McGee's sources, they represent funds transferred from other GTS accounts at other banks not referenced by the Twitter post upon which this whole house of cards relies. Moreover, we respectfully submit that Agent McGee's apparent assumption that any account held by a company named GTS was subject to seizure merely because it shared a name with the company holding the GTS HSBC Account was mere speculation and should result in the Court vacating the seizure warrants as to the Fowler HSBC Accounts.

The references for the incoming and outgoing wires in the Fowler HSBC Accounts set forth in the October 23 Affidavit were also consistent with Fowler having received income from real estate, property management and technology-related businesses. *See* October 23 Affidavit at para. 22(b) and (c) ("PAYMENT TO PARTNER FOR INVESTMENT", "PARTNER PAYMENT" or "INTERCOMPANY TRANSFER").

Finally, it's worth underscoring that an individual who possesses accounts in foreign jurisdictions and sends and receives funds internationally *(see* October 23 Affidavit at para. 22) is no more indicative of a money transmitting business any more than it is indicative of other businesses conducted internationally, including property, real estate and technology-related businesses.  *See* October 23 Affidavit at para 22.

As such, the contents of the October 23 Affidavit were insufficient to establish probable cause to seize the Fowler HSBC Accounts and, thus, the warrants authorizing their seizure should also be vacated.

A. **Mr. Fowler Has Standing to Contest the Seizure Warrants**

To demonstrate standing to contest the seizure of funds, the defendant need only allege a 'distinct and palpable injury to himself' that is the direct result of the 'putatively illegal conduct of the [adverse party]' and likely to be redressed by the requested relief.'" *United States v. Cambio Exacto S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (internal citations omitted).  In determining standing to contest the seizure and forfeiture of funds, courts look to ownership and possession of the seized property as reliable indicators of standing to claim injury. *See Cambio*, 166 F.3d at 527.

As set forth above, and in the October 23 Affidavit, Mr. Fowler was the owner or controller of said HSBC Accounts, as the case may be. Moreover, Mr. Fowler was further injured when the HSBC Accounts were seized because he was not only deprived of access to funds in the accounts and income from the business, the seizure ultimately caused the demise of his business.  *See* Affidavit of Reginald Fowler dated October 13, 2021 ("*Fowler Affidavit*"), Exhibit C.

Accordingly, Mr. Fowler has standing to question the legality of the seizure.

**B. The Good Faith Exception Does Not Apply**

The good faith exception does not apply on these facts, and should not save the seizures of the HSBC Accounts, which were otherwise unlawful.

A determination that the warrant at issue was not supported by probable cause does not automatically dictate the suppression of all evidence seized or statements subsequently obtained by law enforcement. The animating principle of the exclusionary rule is deterrence of police

misconduct, but the extent to which the rule is so justified "varies with the culpability of the law enforcement conduct." *Herring v. United States*, 555 U.S. 135, 141-42 (2009) (suggesting that deterrent value of exclusionary rule is most effective in cases of flagrant or deliberate violation of rights).

Thus, in *United States v. Leon,* the Supreme Court recognized an exception to the exclusionary rule for "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). The Court reasoned that, in those circumstances, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921. Application of the good-faith exception, thus, turns on "'whether a reasonably well-trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145, quoting *Leon*, 468 U.S. at 922 n.23. "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on an invalidated warrant. *United States v. George,* 975 F.2d 72, 77 (2d Cir.1992).

Because suppression is a "last resort," most searches [or seizures] conducted pursuant to a warrant fall within *Leon*'s protection. *United States v. Clark*, 638 F.3d 89, 99–100 (2d Cir. 2011). However, there are four circumstances where the good-faith exception is inapplicable: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliability upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923, 104 S.Ct. 3405).

Respectfully, the good faith exception fails on the third ground established in *Leon*. The warrant, which relied exclusively on the uncorroborated statements of an unreliable unnamed reporter and Twitter post were so lacking in *indicia* of probable cause that reliance on them was unreasonable.

Therefore, the good faith exception cannot save the otherwise unlawful seizures.

### C. The October 24 Statement Should be Suppressed as Fruit of the Poisonous Tree

On October 23, 2018, Agent McGee served the HSBC Seizure Warrants on HSBC, which disabled any further activity in these accounts. This seizure resulted in Mr. Fowler and GTS being unable to do business or otherwise direct the HSBC Accounts. HSBC was unable to assist Mr. Fowler in understanding the reason for the seizures, but provided contact information for members of the FBI.  *See* Fowler Affidavit.

Consequently, the Government alleges[2] that on October 24, 2018—one day after the illegal seizures—Mr. Fowler made a phone call to members of the FBI, during which time he admitted that GTS was an unlicensed money transmitting business (the "***Alleged October 24th Statement***"). *See* Agent notes, dated 10/24/18. Mr. Fowler was not represented by counsel nor was he advised that he was the subject or target of any criminal investigation. *See* Fowler Affidavit.

As set forth above, the HSBC Seizure Warrants lacked probable cause because Agent McGee was unable to provide any nexus between GTS and Bitfinex beyond a random unverified and uncorroborated Twitter post from October 6, 2018 and one wire reference.

Any statements made by Mr. Fowler on October 24, 2018, one day following the illegal seizures of the HSBC Accounts were derived from these illegal seizures. Because the seizures

---

[2]     Counsel is not making admissions attributable to Defendant, but is instead reiterating the Government's claims relative to Defendant's <u>alleged</u> statements.

were unlawful, the Alleged October 24th Statement and all other evidence that stemmed from the unlawful seizures should be suppressed. *See Wong Sun v. United States*, 171 U.S. 471 (1963) (holding that information and evidence obtained as a result of illegal police action is inadmissible as "fruit of the poisonous tree").

Specifically, the Court should also suppress all evidence obtained thereafter as the fruits of the poisonous tree as the primary bases set forth in support of all subsequent search and seizure applications were the October 23 Affidavit and Alleged October 24th Statement.

**D.  The Court Should at Least Scale Back the Seizures to Reflect the Net Proceeds or Funds Involved in the Alleged Illegal Activity.**

Even assuming *arguendo* that the October 23 Affidavit established probable cause to believe that GTS was using the GTS HSBC Account to operate an unlicensed money transmitting business on behalf of Bitfinex, the October 23 Affidavit failed to justify the seizure of all funds in the HSBC Accounts. As discussed above, the October 23 Affidavit established, at best, a nexus between GTS and Bitfinex with respect to a singular transaction in the amount of $11,000 in the GTS HSBC Account; it offered no evidence or information that the proceeds contained in the HSBC Accounts were derived from the alleged unlawful activity. Yet, the Government has seized three HSBC Accounts and all funds contained in those accounts.

For the reasons stated below, the Court should scale back that seizure to no more than $11,000 in line with the forfeiture law.

A Court may issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C). Title 18 U.S.C. § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." (emphasis added). Section 981(a)(1)(C) provides for forfeiture of "[a]ny property, real or personal, which

constitutes or is derived from proceeds" traceable to a violation of any "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7); or a conspiracy to commit any of those crimes. The statute applies in virtually all federal forfeiture proceedings except those in drug cases.[3]

The definition of "proceeds" in § 981(a)(2) provides courts with two principal alternatives:

> (A)  In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

> (B)  In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services.

The question when applying § 981(a)(2) turns on how to differentiate cases involving "illegal goods" and "illegal services" under subsection (A) from those involving "lawful goods" and "lawful services" that are "sold or provided in an illegal manner" under subsection (B). Most courts approach this question by asking whether the criminal activity involved can normally be performed in a lawful manner. *See, e.g.*, *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012); *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012); *In re 650 Fifth Avenue & Related Prop.*, 777 F. Supp. 2d 529 (S.D.N.Y. 2011); *United States v. Kalish*, 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009).

The Second Circuit in *Mahaffy* provides such an example. In *Mahaffy*, the alleged scheme involved stockbrokers who provided purportedly confidential customer order

---

[3]  Although entitled "Civil forfeiture," 18 U.S.C. § 981 does not apply only in civil forfeiture actions. By operation of 28 U.S.C. § 2461(c), it also can apply to forfeiture proceedings in criminal cases.

information to a day-trading firm that then traded in securities in advance of the brokerage firms' customers, in a practice known as "front-running." Because "[t]rading those securities, as a general matter, is not unlawful," the court held that subsection (B) would apply and that the proper measure of forfeiture would be each stockbroker's net, not gross, gain.

The Second Circuit reaffirmed that conclusion in *Contorinis*, an insider trading case, holding squarely that "[t]he definition of proceeds for insider trading violations is" governed by subsection (B). 692 F.3d at 146.

Similarly, the court in *In re 650 Fifth Avenue & Related Prop.*, 777 F. Supp. 2d 529 (S.D.N.Y. 2011), applied subsection (B) because transferring funds, managing business affairs and real estate investments, and running a charitable organization are "normally legal activities," but were only alleged to be illegal in that case because they were performed for the Iranian government. Subsection (B) also has been applied in this district with respect to a fraudulent advance fee scheme engaged in by an unlicensed entity. *See, e.g United States v. Kalish*, 05 Cr. 656 (RPP) (S.D.N.Y. May. 21, 2009), 2009 WL 130215, 1 (denying Government's motion to reconsider Court's prior holding that forfeitable proceeds of [Defendant's] "advance fee scheme are subject to a deduction for 'direct costs' under the definition of 'proceeds' in §(a)(2)(B)).

Applying the above precedent, subsection (B) clearly should be applied, here, because transferring funds are "normally legal activities," but are only alleged to be illegal here because doing so required a license. *See In re 650 Fifth Avenue*, 777 F. Supp. 2d at 551-52 (explaining that *"*transferring funds" is "normally [a] legal activit[y]); *see also Kalish*, 2009 WL 130215.

Thus, Mr. Fowler can be ordered to forfeit only the net profits he received, not the gross revenues generated by the offense. *See Contorinis*, 692 F.3d at 145 (holding that the appellant could not "be ordered to forfeit profits that he never received or possessed"); *Mahaffy*,

693 F.3d at 138 (holding that where defendant engaged in securities trading which is an otherwise lawful activity and the "illegality occurred when the defendants bought and sold securities as part of a scheme involving illegal bribery and front-running," forfeiture only applied to the difference between gross commissions paid to each defendant and commissions paid to his employer).

The October 23 Affidavit, however, presents no allegations or evidence regarding the net proceeds made from the alleged offenses.  Thus, seizure of all funds in all accounts amounts to nothing more than a knee-jerk application of § 982(a)(2)(A) requiring us to impermissibly speculate that all the funds in the HSBC Accounts constituted illegal gross proceeds. Thus, to justify the seizure, we are left to consider whether the government established that all funds in all three accounts seized were "involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A)(emphasis added).

The almost $60,000,000 received by Fowler in Fowler Account 1 between June and July, 2018, which he transferred to Fowler Account 2, came from two different accounts at Citibank and Enterprise Bank and Trust —not the GTS HSBC Account. *See* October 23 Affidavit at para. 20(b). Those accounts at Citibank, Enterprise Bank and Trust have no ties to Bitfinex beyond sharing an address with the GTS HSBC Account that was referenced by an image posted on Twitter by an unnamed, unvetted reporter, which Agent McGee believed –but could not confirm—was obtained from the Bitfinex website.

As such, these funds can neither be said to have been involved in a transaction or attempted transaction in violation of section 1960 on the case presented in the October 23

Affidavit in violation of § 981(a)(1)(A), nor constitute "net proceeds" of the offense as required by § 981(a)(2)(b).

As previously discussed, there was only one wire with a reference to "Bitfinex" into the GTS HSBC Account according to the October 23 Affidavit; this wire was in the amount of $11,000 and referenced the name "ACC. HEINRICH MAURER." The October 23 Affidavit provides no information received from Heinrich Maurer or with respect to Heinrich Maurer to further articulate the purpose of this wire or any other dealings with the GTS HSBC Account. Nonetheless, should the Court maintain the seizure warrants at all, we respectfully request that the Court at least scale back the seizures to reflect the funds involved in the alleged unlicensed money transmitting business on behalf of Bitfinex.

\* \* \*

<u>**POINT TWO**</u>

**BECAUSE THE INDICTMENT FAILS TO
IDENTIFY CRITICAL FACTUAL DETAILS, NECESSARY FOR
DEFENDANT TO  PREPARE FOR TRIAL, PREVENT UNFAIR
SURPRISE AND AVOID DOUBLE JEOPARDY, THE COURT SHOULD
<u>DIRECT THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS</u>**

**A. <u>Factual Background:  The Need and Request for a Bill of Particulars</u>**

The Indictment alleges:

**COUNT ONE**
(Conspiracy to Commit Bank Fraud)

The Grand Jury charges:

1. From at least in or about February 2018 up to and including in or about October 2018, in the Southern District of New York and elsewhere, REGINALD FOWLER, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

2. It was a part and object of the conspiracy that REGINALD FOWLER, the defendant, and others, known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, FOWLER opened numerous U.S. based business bank accounts at several different banks, and in opening and using these accounts FOWLER falsely represented to those banks that the accounts would be primarily used for real estate investment transactions even though FOWLER knew that the accounts would be used, and were in fact used, by FOWLER and others to transmit funds on behalf of an unlicensed money transmitting business related to the operation of cryptocurrency exchanges.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**
(Bank Fraud)

The Grand Jury further charges:

24

3. From at least in or about February 2018 up to and including in or about October 2018, in the Southern District of New York and elsewhere, REGINALD FOWLER, the defendant, willfully and knowingly, executed and attempted to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, FOWLER opened and used numerous bank accounts at financial institutions the deposits of which were insured by the Federal Deposit Insurance Corporation, including a bank based in Manhattan, New York, and in so doing falsely represented to these financial institutions that the accounts would be primarily used for real estate investment transactions even though FOWLER knew that the accounts would be used, and were in fact used, by FOWLER and others to transmit funds on behalf of an unlicensed money transmitting business related to the operation of cryptocurrency exchanges.

(Title 18, United States Code, Sections 1344 & 2.)

Title 18 U.S.C. § 1344 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or

both.

The Indictment in Mr. Fowler's case is scant on details and speaks only in broad and undefined terms, thus boiling a complex, multi-transactional case down to sweeping generalities that provide no specifics and no roadmap to the charges Mr. Fowler will be required to defend against. Descriptions in the Indictment universally omit necessary details such as (1) locations, dates, times, and precision as to the volume of that transactions occurred; (2) the parties involved in transactions; and (3) the definitions of terms or words, such as "artifice to defraud" that characterize the transactions.

Counts One and Two charging Conspiracy to Commit Bank Fraud and Bank Fraud allege that between February  2018 and October 2018 "REGINALD FOWLER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud" and "REGINALD FOWLER, the defendant, and others, known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution…" The Indictment further alleges "FOWLER opened numerous U.S.-based business bank accounts at several different banks, and in opening and using these accounts FOWLER falsely represented to those banks that the accounts would be primarily used for real estate investment transactions even though FOWLER knew that the accounts would be used, and were in fact used, by FOWLER and others to transmit funds on behalf of an unlicensed money transmitting business related to the operation of cryptocurrency exchanges."

The indictment further charges:

## COUNT THREE
(Conspiracy to Operate an Unlicensed
Money Transmitting Business)

The Grand Jury further charges:

4. From in or about February 2018 up to and including in or about October 2018, in the Southern District of New York and elsewhere, REGINALD FOWLER, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

5. It was a part and object of the conspiracy that REGINALD FOWLER, the defendant, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 1960.

Overt Act

6. In furtherance of the conspiracy, and to effect the illegal object thereof, REGINALD FOWLER, the defendant, together with others known and unknown, committed the following overt act, in the Southern District of New York and elsewhere:

    a. On or about August 8, 2018, FOWLER opened a bank account with a bank in Manhattan, New York, for the purpose of conducting an unlicensed money transmitting business.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Operation of an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

7. From at least in or about February 2018 up to and including in or about October 2018, in the Southern District of New York and elsewhere, REGINALD FOWLER, the defendant, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 1960 & 2.)

## COUNT FIVE
### (Wire Fraud)

The Grand Jury further charges:

8. From at least in or about June 2018 up to and including at least in or about February 2019, in the Southern District of New York and elsewhere, REGINALD FOWLER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, FOWLER defrauded individuals associated with a professional sports league (the "League") in connection with his acquisition of an ownership stake in the League, *inter alia,* (i) by falsely claiming personal ownership of funds that were, in truth and in fact, funds FOWLER had obtained through the unlicensed money transmitting business charged in Count Four of this Indictment, and (ii) by converting those individuals' funds toward his investment in the League.

(Title 18, United States Code, Sections 1343 & 2.)

27

Counts Three and Four, alleging a Conspiracy to Operate an Unlicensed Money Transmitting Business (and a substantive offense) alleges that between February 2018 and October 2018, Fowler "and others known and unknown, did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce." It further alleges that "[o]n or about August 8, 2018, FOWLER opened a bank account with a bank in Manhattan, New York, for the purpose of conducting an unlicensed money transmitting business.

Count Five, alleging Wire Fraud, alleges that between June 2018 and February 2019, "FOWLER defrauded individuals associated with a professional sports league (the League") in connection with his acquisition of an ownership stake in the League, *inter alia,* (i) by falsely claiming personal ownership of funds that were, in truth and in fact, funds FOWLER had obtained through the unlicensed money transmitting business charged in Count Four of this Indictment, and (ii) by converting those individuals' funds toward his investment in the League."

* * *

### B.  Legal Standard

Under Federal Rule of Criminal Procedure 7(f), a court has broad discretion to order a bill of particulars to "identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted). Mr. Fowler requires the particulars requested in order that these goals be fulfilled.

Notably, "in complex conspiracy cases . . . the potential for unfair surprise and the difficulty of preparing a defense are amplified," warranting a bill of particulars.  *United States v.*

28

*Rajaratnam*, 09-CR-1184, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) at *2. *See also, United v. States v. Kahale*, 789 F.Supp.2d 359, 373 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 Fed.Appx. 818 (2d Cir. 2012), *cert. denied sub nom. Scarlato v. United States*, 568 U.S. 914 (2012) (explaining that "[c]ertain charges, such as the fraud charges alleged here, by their nature carry a greater potential for causing unfair surprise at trial due to their complexity").

Moreover, where a bill is warranted, "it is of no consequence that the requested information would have required the disclosure of evidence or the theory of the prosecution." *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998); *United States v. Lino*, No. 00-CR-632 (WHP), 2001 WL 8356 at *3 (S.D.N.Y. Jan. 2, 2001) (holding that "if necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars will be required even if the effect is disclosure of the Government's evidence or theories" [citing *Barnes*]).

In the instant case, the Government's production of massive amounts of discovery necessitates a bill of particulars.

Indeed, "[i]t is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States v. Bin Laden*, 92 F.Supp.2d 225, 234 (S.D.N.Y. 2000) (citations omitted), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008). *See also, United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) (noting that District Court had ordered a bill of particulars "because so much discovery was produced to the defendants, not too little").

In *United States v. Bin Laden (El-Hage)*, 92 F. Supp.2d 225 (S.D.N.Y. 2000), Judge Sand explained that "a bill of particulars [was] necessary . . . to permit the Defendants to prepare a defense and to prevent prejudicial surprise at trial," based, in part, on the Court's conclusion that "several of the allegations contained in the 'Overt Acts' section of the Indictment are cast in terms that are too general, in the context of [that] particular case, *to permit the Defendants to conduct a meaningfully directed investigation of the relevant facts and circumstances and be prepared to respond to the charges*." *Id*., at 235 (emphasis added).

The particulars Mr. Fowler requests are necessary to adequately prepare a defense, to avoid unfair surprise and to protect against double jeopardy.

Only one of the conspiracies charged against Mr. Fowler contains a single overt act (Count Three, charging Conspiracy to Operate an Unlicensed Money transmittal Business):

> a. On or about August 8, 2018, FOWLER opened a bank account with a bank in Manhattan, New York, for the purpose of conducting an unlicensed money transmitting business.

That scant information alleged in the five counts does nothing to identify what, where, when and how Mr. Fowler engaged in the charged counts span nearly one year and across several continents. The sheer volume of discovery exacerbates the problem.

Absent the government's production of the below-requested particulars, the indictment's lack of specificity, it would be impossible for Mr. Fowler "to conduct a meaningfully directed investigation." Moreover, due to the essentially global nature of the transactions in this case, if Mr. Fowler is not notified of these particulars sufficiently in advance of trial, he will be unable, at the eleventh hour, to mount a defense based on witnesses, documents, or other information that can be procured and produced only through a rather challenging, if feasible at all, international investigation and travel. Mr. Fowler's codefendant in a prior superseding

indictment is a fugitive and believed to be abroad.  Under such circumstances, Fowler's ability to prepare and present a defense without the requested information would be irreparably impaired. *See Bin Laden (El-Hage)*, 92 F. Supp.2d at 234-36.

Nor does the voluminous discovery in this case provide a roadmap for the alleged transactions that would obviate the need for a bill of particulars. As former Judge Katherine Forrest stated in *United States v. Mostafa*, 965 F.Supp.2d 451, 465 (S.D.N.Y. 2013), *"*[A] bill of particulars is . . . unnecessary when the Government has produced materials in discovery concerning the witnesses and other evidence" and "[t]hus, in determining whether to order a bill of particulars a court must examine the totality of the information available to the defendant, both through the indictment and through pre-trial discovery." *See also Bin Laden*, 92 F. Supp.2d at 233.

*Bortonovsky,* 820 F.2d 572 (2d Cir. 1987) is instructive: "Nowhere in the indictment . . . d[id] the Government specify the dates of the staged burglaries or enumerate which of numerous documents were falsified" on the basis that "it fulfilled its obligation to inform [defendants] of the charges by being explicit in the indictment and by providing over 4,000 documents to defense counsel during discovery." *Id*., at 574.

In *Bortonovsky*, the Court found that the defendants "were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information: the dates of the fake burglaries and the identity of the three fraudulent documents." *Id*. The Court also found that the "Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged." *Id*., at 575.

The court in *Bortonovsky* ultimately concluded that as a result of the Government's failure to reveal crucial information and the district court's failure to require it, "[i]n effect, the burden of proof impermissibly shifted to [the defendants]." *Id.*

Indeed, if Mr. Fowler is not provided the requested particulars in this case he will suffer the same fate. He will not be able to parse through multiple terabytes of discovery in the hopes that he will guess correctly as to the transactions that the Government intends to put before the jury.

In *United States v. Upton*, 856 F.Supp. 727 (E.D.N.Y. 1994), where defendants were charged with falsifying airplane maintenance records, the district court directed the Government to provide a bill of particulars identifying the alleged falsified documents:

> [A]lthough the Superseding Indictment does detail 33 specific instances of falsification of records, it would be unfair under the circumstances of this case to allow the government to introduce allegedly falsified maintenance records buried in thousands of documents already produced without prior notice to defendants of those documents upon which the government intends to rely. The same rationale applies to defendants' request for a bill of particulars regarding which specific documents have been allegedly falsified; without prior knowledge of these documents, defendants are unduly hampered in the preparation of their defense and there is the risk of unfair surprise.

*Upton*, 856 F.Supp. at 753.

In sum, the relevant case law underscores the need for a bill for particulars in this case, in which millions of pages of documents have been produced. As the late S.D.N.Y. Judge Sand, citing Second Circuit precedent, noted, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *Bin Laden, supra*, 92 F.Supp.2d at 234 (citing *Bortnovsky,* 820 F.2d at 575).

Accordingly, "to avoid surprise at trial and give [Mr. Fowler] sufficient information to meet the charges against him" as judges in this district have stated was the very purpose of a bill

of particulars, the Court should order the Government to provide to Mr. Fowler the requested bill of particulars. *See, e.g. Mostafa,* 965 F.Supp.2d at 465, *citing Bin Laden,* 92 F. Supp.2d at 233.

## C. *The Requested Particulars*

The Court should direct the Government to provide the following particulars:

    1. With respect to Counts One and Two, please identify:

        a. by name, all known "others";

        b. the specific identifiable property that Fowler attempted to obtain from banks or others;

        c.  the specific dates upon which Mr. Fowler is alleged to have made false representations;

        d. identify the specific banks and bank accounts that Mr. Fowler opened in furtherance of the charged counts;

        e. the "documents" or "otherwise" in which Mr. Fowler made false representations;

        f.  any other unlawful conduct alleged to have been committed by Mr. Fowler; and

        g. each false representation made by Mr. Fowler upon which the Government will rely in support of Counts One and Two.

    2.    With respect to Counts Three and Four, please identify:

        a.  by name, all unknown others;

        b.  identify all acts in furtherance of Mr. Fowler's  operating a "money transmittal business";

        c.  identify by name all those "supervised" or "directed" in the operation of an unlicensed money transmittal business;

        d.  the specific transactions constituting the unlicensed money transmittal business; and

        e.  any other unlawful conduct alleged to have been committed by Mr. Fowler.

    3.    With respect to Count Five, please identify:

        a.  the "individuals associated with a professional sports league" who were "defrauded";

        b.  the name and address(es) of the professional sports league;

        c.  all documents in which, or communications through which Mr. Fowler "falsely claim[ed] personal ownership of funds";

        d. the individuals or entities whose funds were converted by Mr. Fowler;

        e. the specific property/funds converted by Mr. Fowler "toward his investment in the League"; and

        f. any other unlawful conduct alleged to have been committed by Mr. Fowler.

**D.**    **Broadening Phrases, Such as "Others Known and Unknown," "Among Others," and "Elsewhere," Should Be Stricken From the Indictment Because They Impermissibly Expand the Charges Against Defendant Fowler**

It is well-settled in this district, as this Court repeatedly has acknowledged, that "'[a]s to broadening phrases, surplusage may be struck if it impermissibly expands the charge' and that 'broadening phrases in charging paragraphs can enlarge specific charges.'" *See, e.g. Mostafa*, 965 F.Supp.2d at 467, *citing Kassir*, 2009 WL 995139, at *2; *see also Pope*, 189 F.Supp., at 25 (finding that "language impermissibly delegated to the prosecution the authority to enlarge the

specific charges, which could have resulted in 'depriving [the] defendant of his constitutional right to be accused of a felony offense only on the basis of a grand jury indictment'").

In this case, the Indictment includes broadening language, including phrases such as "others known and unknown," "among others," and "elsewhere," which impermissibly expand the charges against Mr. Fowler beyond the specific charges returned by the grand jury.

Accordingly—given that these phrases insinuate crimes not charged, as well as untold numbers of transactions, locations and persons involved in each crime that are not otherwise specified in the Indictment, or even decipherable from the evidence—the Court should strike them from the Indictment.

Indeed, while we are aware that the Court, in *Mostafa*, denied a motion to strike surplusage with leave to renew, that addressed these specific phrases, the particular usage of these phrases within the context of Mr. Fowler's case is distinguishable as are the specific circumstances in this case. For instance, in *Mostafa*, the defendant had some idea of who the "others known and unknown" were and where the "elsewhere" locales might be, because the case involved particular regions of the world and known entities. In contrast, the allegations in this case revolve around transactions that took place on the internet and telephone and concerned locations across the globe. Without any specific parameters in the Indictment which create limits, the charges, as a result of phrases such as "others known and unknown," "inter alia," "among others" and "elsewhere" have, thus, been expanded to include anyone and everyone, in every location in the world.

Therefore, the Court should strike this language as surplusage to avoid "depriving [Mr. Folwer] of his constitutional right to be accused of a felony offense only on the basis of a grand jury indictment." *See Pope*, 189 F.Supp., at 25.

## POINT THREE

## THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE TO DEFENDANT ALL KNOWN BRADY MATERIAL

### A.  Factual Background

To date, the Government has provided no *Brady* material to Mr. Fowler.

Mr. Fowler believes that numerous others made statements to the Government prior to Mr. Fowler's indictment exculpating Fowler from criminal involvement in the charged conduct. To date, no statements have been provided to Mr. Fowler. Mr. Fowler is in no way calling into question the integrity of the prosecutors who have been wholly professional in this and every other case litigated with defense counsel.

Respectfully, the Court should order the Government to turn over the full interview reports of those witness statements to the extent they exist.

### B.  Legal Standard and Discussion

*Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny require the Government "to disclose material information that is 'favorable to the accused, either because it is exculpatory, or because it is impeaching.'"  *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)).  The obligation to produce such material serves the objectives of fairness and accuracy in prosecutions, and "recognizes the possibility that the evidence on which the prosecution relies to prove the defendant's guilt is not necessarily truthful, accurate, or complete." *Rodriguez*, 496 F.3d at 225.  The Government must produce exculpatory and impeachment material relating to testifying and non-testifying witnesses.  *United States v. Jackson*, 345 F.3d 59, 70 (2d Cir. 2003).

Critically, the Government "must make disclosures in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *Rodriguez*, 496 F.3d at 226 (citations omitted).  And the "disclosures must be sufficiently specific and complete to be useful." *Id.* (citation omitted).

Thus, we respectfully ask the Court to order the Government to disclose all *Brady* material—including, specifically, full witness statements. Putting aside potential trial delay, waiting until the eve of trial to disclose *Brady* material is contrary to constitutional demands of fair trial.

**POINT FOUR**

**THE COURT SHOULD ENTER A SCHEDULING ORDER
CONSISTENT WITH THE VOLUME OF DISCOVERY,
SERIOUSNESS OF THE CHARGES, AND NUMBER OF
UNIDENTIFIED WITNESSES TO PERMIT ADEQUATE TRIAL
PREPARATION AND TO ASSURE THE EFFICIENT CONDUCT OF THE TRIAL**

The defense knows nothing about the core transactions upon which the Government will rely on out of the hundreds of thousands of transactions reflected in the discovery provided. We are obliged to provide to Mr. Fowler the effective assistance of counsel, but cannot do so unless the Government identifies the specific information it will use at trial from the mass of information subpoenaed and seized in this case and found on cell phones and computers at Mr. Fowler's office and at other locations. Even if the Court grants our motion to particularize, the Court should ask the Government to provide to Mr. Fowler as early as possible:

- a book of exhibits that the Government intends to offer at trial;

- a witness list;

- the Government's 404(b) letter;

- 3500 material; and

- the principal jury instructions.

We, therefore, respectfully ask the Court to set appropriate dates for the early production of the above-requested items, reflecting (1) the volume of discovery, seriousness of the charges, number of anticipated—as yet unidentified—witnesses and exhibits, and (2) the need for defense counsel to provide to Mr. Fowler the effective assistance of counsel.

We note there is no reason to believe that the requested disclosures would endanger Government witnesses. We, therefore, propose the following dates for the Government's

disclosures (subject to amendment), and of course are also amenable to dates relating to defense disclosures:

1. Preliminary, non-binding list of Government trial witnesses 60 days before the trial date;

2. Preliminary, non-binding list of Government trial exhibits and copies of the marked exhibits 60 days before the trial date;

3. Government disclosure of any expert notice 60 days before trial;

4. Government 404(b) letter 60 days before trial;

5. Government's requests to charge 60 days before trial;

6. Government's disclosure of 18 U.S.C. § 3500 material 30 days before trial;

7. A final Government list of trial witnesses 14 days before trial; and

8. A final Government list of trial exhibits and copies of any marked exhibits, not previously provided, 14 days before trial.

## **CONCLUSION**

For all of the forgoing reasons, the Court should grant to Defendant Reginald Fowler all of the relief requested, including suppression of all evidence that the Government has seized following its execution of the October 23, 2018 seizure warrant, including derivative evidence such as Mr. Fowler's alleged inculpatory statements.  Finally, the Government should be directed to provide the requested bill of particulars, *Brady* material and a timetable for disclosure prior to trial.

Dated:         New York, New York
               October 14, 2021

                                       Respectfully submitted,

                                        /s/

                            _____

                            Edward V. Sapone, Esq.
                            Sapone & Petrillo, LLP
                            *Attorneys for Defendant*
                            *Reginald Fowler*
                            40 Fulton Street, 17th Floor
                            New York, New York 10038
                            Tel: (212) 349-9000
                            Email: ed@saponepetrillo.com

cc:     AUSA Sebastian Sweet
        AUSA Jessica Greenwood
        AUSA Samuel Rothschild