UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                :

UNITED STATES OF AMERICA        :

                                :

       - v. -                 :           S3 19 Cr. 254 (ALC)

                                :

REGINALD FOWLER,           :

                                :

             Defendant.     :

                                :

------------------------------------------------------x

## **MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Jessica Greenwood
Samuel Rothschild
Sheb Swett
Assistant United States Attorneys
*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 1

**ARGUMENT** .................................................................................................... 5

I.      **The Defendant's Motion to Suppress Should Be Denied** ....................... 5

  A.    Relevant Facts ....................................................................................... 5

  B.    Applicable Law ....................................................................................... 6

    1.    Probable Cause ................................................................................. 6

    2.    Good Faith ........................................................................................ 7

    3.    Fruit of the Poisonous Tree ............................................................. 8

    4.    Rule 41(g) ........................................................................................ 8

    5.    Scope of Seizure .............................................................................. 9

  C.    Discussion .............................................................................................. 10

    1.    The Seizure Warrants were supported by probable cause. .............. 10

    2.    Agents relied on the Seizure Warrants in good faith. ..................... 13

    3.    The October 24, 2018 statement is not the fruit of any poisonous tree. ..... 14

    4.    There is no ground to vacate the Seizure Warrants under Rule 41(g). ..... 15

    5.    The Seizure Warrants do not need to be "scaled back." .................. 17

II.     **The Defendants' Motion for a Bill of Particulars Should Be Denied** ..... 18

  A.    Applicable Law ....................................................................................... 18

  B.    Discussion .............................................................................................. 21

III.    The Defendant's Motion to Strike Surplusage From the Indictment is Meritless and Should be Denied. ......................................................... 26

IV.     The Defendants' Motion to Disclose Purported *Brady* Material Should Be Denied ..... 27

V.      The Defendant's Motion for a Pretrial Disclosure Schedule Should Be Denied ..... 28

CONCLUSION..........................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Chaim v. United States*, 692 F. Supp. 2d 461 (D.N.J. 2010) ...................................................... 16

*De Almeida*, *v. United States*, 459 F.3d 377 (2d Cir. 2006) ...................................................... 9

*Herring v. United States*, 555 U.S. 135 (2009)............................................................................. 7

*Illinois v. Gates*, 462 U.S. 213 (1983) ................................................................................... 7, 13

*In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66 (2d Cir. 2016)...................................... 10

*Kaupp v. Texas*, 538 U.S 626 (2003) ......................................................................................... 14

*Nardone v. United States*, 308 U.S. 338 (1939)........................................................................... 8

*Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999) ........................................................... 8

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003)................................................ 19

United States v. Bin Laden, 91 F.Supp.2d 600 (S.D.N.Y. 2000) ................................................ 26

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................... 22

*United States v. Binday*, 908 F. Supp. 2d 485 (S.D.N.Y. 2012).......................................... 21, 23

*United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013) ................................................................................................................................... 20, 25

*United States v. Booth*, No. 99 CR. 378 LBS, 1999 WL 1192317 (S.D.N.Y. Dec. 14, 1999)..... 26

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ............................................... 21, 22, 23

*United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446 (S.D.N.Y. Apr. 14, 2020) .. 25

*United States v. Chen*, 378 F.3d 151 (2d Cir. 2004)................................................................... 21

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) .................................................................... 7

*United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012) .......................................................... 17

*United States v. Corley*, 2020 WL 4676650 (S.D.N.Y. Aug. 11, 2020).................................. 9, 15

*United States v. Cosme*, 796 F.3d 226 (2d Cir. 2015) ................................................................ 16

*United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310 (S.D.N.Y. Sept. 24, 2009)20, 25

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ............................................... 19

*United States v. DePalma*, 461 F. Supp. 778 (S.D.N.Y. 1978) .................................................. 26

*United States v. Facciolo*, 753 F. Supp. 449 (S.D.N.Y. 1990) ................................................... 18

*United States v. Falso*, 544 F.3d 110 n.24 (2d Cir. 2008) ........................................................ 13

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) 19

*United States v. Fruchter*, 104 F. Supp. 2d 289 (S.D.N.Y. 2000) .............................................. 24

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)................................................. 19

*United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810 (S.D.N.Y. Nov. 14, 2007) .................................................................................................................................. 20, 25

iii

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ................................................. 19, 20

*United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008 (S.D.N.Y. 2003) ......... 20

United States v. Jimenez, 824 F.Supp. 351 (S.D.N.Y.1993) ........................................................ 26

*United States v. Johnson*, 21 F. Supp. 2d 329 (S.D.N.Y. 1998) ................................................. 18

*United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2009 WL 995139 (S.D.N.Y. Apr. 9, 2009) . 26

*United States v. Knoll*, 16 F.3d 1313 (2d Cir. 1994) ................................................................. 14

*United States v. Leon*, 468 U.S. 897 (1984) ............................................................................ 7, 8

*United States v. Mahabub*, 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ... 18, 19

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ......................................... 18, 23

*United States v. Martin*, 426 F.3d 68 (2d Cir. 2005) ................................................................... 7

*United States v. Moore*, 968 F.2d 216 (2d Cir. 1992) ............................................................. 8, 13

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ............................................... 26

*United States v. Paroutian*, 299 F.2d 486 (2d Cir. 1962) ............................................................ 8

*United States v. Pinto Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018) ........................................ 9

*United States v. Remire*, 400 F. Supp. 2d 627 (S.D.N.Y. 2005) ................................................ 23

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ............................................. 20

*United States v. Rocha-Gomez*, 412 F. Supp. 3d 369 (S.D.N.Y. 2019) ....................................... 12

*United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ................................................................................................................................. 20, 23

*United States v. Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005), *aff'd*, 514 F.3d 277 (2d Cir. 2008) ...................................................................................................................................... 17

*United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604 (S.D.N.Y. Nov. 4, 2002) .. 24, 25

*United States v. Skelos*, No. 15 Cr. 317, 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .............. 22

*United States v. Smith*, 9 F.3d 1007 (2d Cir. 1993) ..................................................................... 7

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006) ........................................................... 14, 15

*United States v. Tomero*, 462 F. Supp. 2d 565 (S.D.N.Y. 2006) ................................................ 14

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ................................................................ 18

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................ 18, 20, 23, 24

*United States v. Ullah*, No. 02 Cr. 899 (JFK), 2003 WL 1396300 (S.D.N.Y. Mar. 20, 2003) ..... 15

*United States v. Ventresca*, 380 U.S. 102 (1965) ........................................................................ 7

*United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993) ...................................................... 6, 7, 13

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ............................................................ 18, 21

*United States v. Washington*, 947 F. Supp. 87 (S.D.N.Y. 1996) .................................................. 26

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007) .............................................................................. 7

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................................................................. 8, 14

## Constitutional Provisions

U.S. Const. Amend. IV. ............................................................................................................ 6

## Statutes

18 U.S.C. § 981 ................................................................................................................ 9, 10, 17

18 U.S.C. § 982 .................................................................................................................... 9, 10

18 U.S.C. § 983 ........................................................................................................................ 10

18 U.S.C. §§ 3500 .................................................................................................................... 28

## Rules

Fed. R. Crim. Pro. 4 .............................................................................................................. 8, 16

Fed. R. Crim. Pro. 7 ................................................................................................................ 18

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's motions (1) to suppress evidence obtained pursuant to a seizure warrant for various bank accounts, as well as derivative evidence obtained as a result of the seizure; (2) for a bill of particulars, (3) to strike surplusage in the indictment; (4) for disclosure of *Brady* material; and (5) for a pretrial disclosure schedule.  (Dkts. 91-94.)  The defendant's motions should be denied.

## BACKGROUND

On April 11, 2019, a grand jury sitting in this District returned Indictment 19 Cr. 254 (ALC) (the "Original Indictment"), which was filed under seal, charging the defendant with carrying out a scheme to defraud financial institutions and operate a massive, unregulated, money services business ("MSB").  (Dkt. 4 at 1-9.)  Specifically, the defendant was charged with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, one count of bank fraud, in violation of 18 U.S.C. § 1344, one count of conspiracy to operate an unlicensed money services business, in violation of 18 U.S.C. § 371, and one count of operating an unlicensed money services business, in violation of 18 U.S.C. § 1960.  (Dkt. 4 at 9-13.)  The Original Indictment contained a detailed, nine-page overview of the defendant's scheme that included, among other things, the overall structure of the MSB, descriptions of the false representations made to the banks, and an explanation of the defendant's role in the scheme.  (Dkt. 4 at 1-9.)

That same day, the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, issued a warrant for the defendant's arrest.  (Dkt. 9.)  On April 30, 2021, the defendant was arrested, and the Original Indictment was unsealed.  (Dkt. 5.)  On February 20, 2020, a grand jury sitting in this District returned Superseding Indictment S3 19 Cr. 254 (ALC) (the "Superseding Indictment"), which, in addition to charging Counts One through

Four of the Original Indictment, charged the defendant with one count of wire fraud, in violation of 18 U.S.C. § 1343 (Dkt. 55.)

These charges all relate to the defendant's involvement with Crypto Capital, a company that Oz Yosef, a co-defendant in this case, founded in 2013 to allow individuals to exchange cryptocurrency and fiat currency.[1]  During the period of Crypto Capital's existence, up to and including the period charged in this case, traditional banks were reluctant to handle cryptocurrency transactions, so cryptocurrency investors and exchanges were frequently seeking reliable alternative means for buying and selling cryptocurrency.  Crypto Capital emerged as a popular "payment processor" for fiat-to-crypto transactions.

To facilitate these transactions, Crypto Capital used a network of bank accounts around the world to send and receive funds.  In 2017, Oz Yosef and another individual purchased Global Trade Solutions AG, a Swiss entity that held a non-banking financial intermediary license from a self-regulating body in Switzerland.  However, most of the bank accounts used as part of the scheme were neither located in Switzerland nor owned by Global Trade Solutions AG.  Instead, individuals would set up accounts in different countries around the world, using business names similar to Global Trade Solutions, and these accounts would send and receive funds on behalf of Crypto Capital's clients.  By its own estimates, Crypto Capital was processing over $100 million in transactions each month for over 10 million users in 2017.  Much of this business occurred

---

[1] This overview of facts the Government anticipates it would present at trial is meant to provide the Court with additional context for the alleged conduct.  This overview is based on the Government's current understanding of the facts, and the Government does not intend to limit or bind itself to this information for any purpose, including in its presentation at trial.  As the Government's investigation is ongoing, its understanding of the facts and its intended presentation at trial may evolve as that investigation continues.

through accounts at a Polish bank.  However, in 2017 the Polish authorities seized the funds in those accounts, worth approximately $350 million.

As Crypto Capital sought new banking partners in the wake of the Polish seizures, the defendant became involved in this business in early 2018, when he met Oz Yosef.  The defendant incorporated Global Trading Solutions LLC ("GTS") in or about February 2018.  The defendant used this entity and similar entities in the United States, Portugal, the United Kingdom, Germany, and Canada, to open bank accounts that Crypto Capital used to route fiat and cryptocurrency transactions.  This business was documented in regular email traffic between the defendant and his co-conspirators, including Oz Yosef and Ravid Yosef, another charged co-conspirator.  The defendant and his co-conspirators also maintained online spreadsheets containing periodic ledgers of transactions in and out of the defendant's GTS-related accounts.  A document prepared by Crypto Capital estimated that the defendant handled approximately $1 billion in transactions in 2018.

Although the defendant understood that these accounts, many of which were based in the United States, would handle cryptocurrency transactions on behalf of Crypto Capital, he did not register GTS as an MSB.  Nor did he disclose GTS's business to banks when opening these accounts.  Rather, he falsely stated that GTS was part of his family of companies and involved in real estate investments.  The defendant misrepresented the GTS business both in written communications with banks and in discussions with bank personnel.  For example, the defendant prepared a corporate summary of GTS's business in response to an inquiry from HSBC.  This summary stated that GTS was a joint venture capital company used to develop real estate projects that GTS would build and then sell or lease.  This was not true.  Additionally, the defendant and others would include false information in the narrative portion of outgoing wires to disguise the

nature of the business.  However, the defendant did not control the narrative portion of incoming wires into his account, many of which referenced cryptocurrency.  When banks discovered these discrepancies, they closed GTS accounts.

Relatedly, in mid-to-late 2018, the defendant engaged in a scheme to obtain the majority equity interest in the Alliance of American Football ("AAF"), a new football league, by fraudulently misrepresenting that funds held in GTS accounts actually belonged to him.  In meetings with AAF executives throughout 2018, the defendant provided bank account balance information for GTS accounts, including accounts held at HSBC, worth hundreds of millions of dollars.  The defendant represented that these were his personal funds from real estate holdings and aviation businesses that he would use to fund his ownership interest in the AAF.  The funds in these accounts were in fact deposits of Crypto Capital customers, which the defendant never disclosed to AAF executives.  In July 2018, the defendant reached a handshake agreement with AAF executives to invest $50 million in the AAF and provide $120 million in debt financing, which would make the defendant the majority shareholder in the AAF.  After signing a contract with the AAF, however, the defendant struggled to meet his payment deadlines.  The defendant did make one payment of approximately $13.5 million in December 2018, which was funded largely through money in the defendant's GTS accounts that was transferred to the AAF through a series of transactions both within the defendant's own accounts and with another individual.  By January 2019, however, the defendant was once again behind on his payments, which coincided with the Government's seizure of the defendant's accounts at HSBC.  The defendant never disclosed the Government's seizure to AAF executives. Ultimately, the defendant withdrew his funding commitment after the first week of the AAF's inaugural season.

4

## ARGUMENT

## I.     The Defendant's Motion to Suppress Should Be Denied

The defendant requests several forms of relief with respect to two seizure warrants dated October 23, 2018.  He is not entitled to any.

### A.     Relevant Facts

On October 23, 2018, the Honorable Katharine H. Parker, United States Magistrate Judge for the Southern District of New York, issued seizure warrants 18 Mag. 9029 (the "Seizure Warrants") for: (i) HSBC Bank USA account 141000147, held by GTS (the "GTS Account"); (ii) HSBC Bank USA account 697825922, held by Reginald Fowler ("Fowler Account-1"); and (iii) HSBC Securities USA account HMB861668, held by Reginald Fowler ("Fowler Account-2," and, together with Fowler Account-1, the "Fowler Accounts," which, together with the GTS Account, are the "HSBC Accounts").  (Dkt. 93-2.)

The Seizure Warrants were issued based on an affidavit submitted by Todd P. McGee, a Special Agent with the Federal Bureau of Investigation (the "Affidavit").  (Dkt. 93-1.)  The Affidavit, which was 35 pages long, contained myriad details about the unlicensed MSB scheme later alleged in the indictments and the defendant's role in that scheme.  (*See generally id.*)[2] Among other things, the Affidavit detailed Special Agent McGee's understanding of Bitfinex and GTS.  (*Id.* at 12-15, 19-21.)  For example, the Affidavit described public reporting on Twitter that Bitfinex was banking with HSBC through GTS, and the Affidavit included a screenshot of what appeared to be a Bitfinex webpage that provided details of how Bitfinex users could wire funds to GTS at HSBC.  (*Id.* at 20-21.)  The Affidavit also specified what Special

---

[2] The Affidavit also listed as a Target Offense transacting in property derived from specified unlawful activity (namely, the unlicensed MSB), in violation of 18 U.S.C. § 1957.  (Dkt. 93-1 at 17.)

Agent McGee had learned about the HSBC Accounts based on materials that HSBC provided and conversations that Special Agent McGee had with HSBC employees (*id.* at 21-23), including statements that the defendant made to HSBC employees (*id.* at 29-30). Additionally, the Affidavit provided examples of the types of transactions giving rise to the Government's allegations. (*Id.* at 23-29, 31.) For example, the Affidavit described wire transfers to the GTS Account that appeared to be related to Bitfinex, as opposed to real estate, which the defendant had stated was the purpose of the GTS Account. (*Id.* at 22-23.) Similarly, the Affidavit described wire transfers into the Fowler Accounts from accounts with names like "Global Trading Solutions" at other banks. (*Id.* at 27-28.)

On October 24, 2018, one day after the Seizure Warrants were issued and served, the defendant called the Federal Bureau of Investigation (the "FBI"). In the course of that phone call, the defendant stated, in substance and in part, that GTS received wire transfers of funds from customers for the purchase or sale of cryptocurrency, and the defendant confirmed that GTS was not registered as an MSB in the United States.

**B.    Applicable Law**

**1.    Probable Cause**

The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. A judge's finding of probable cause is afforded significant deference. "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists. . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).

6

Moreover, the determination that probable cause exists is a relatively low threshold. "The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Gates*, 462 U.S. at 232).  Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231).  "'[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

### 2.     Good Faith

It is well established that a deficient warrant does not "automatically dictate the suppression of all . . . evidence seized." *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011). Indeed, the Second Circuit has remarked that "suppression is 'our last resort, not our first impulse' in dealing with violations of the Fourth Amendment." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)).  As a result, the Supreme Court has long recognized an exception to the exclusionary rule for "evidence obtained on objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).

There are four scenarios in which that good faith exception does not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable

7

cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially

deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d

Cir. 1992) (citing *Leon*, 468 U.S. at 923).

### 3.    Fruit of the Poisonous Tree

"The fruit of the poisonous tree doctrine . . . is an extension of the long-recognized

exclusionary rule, and is calculated to deter future unlawful police conduct and protect liberty by

creating an incentive—avoidance of the suppression of illegally seized evidence—for state actors

to respect the constitutional rights of suspects." *Townes v. City of New York*, 176 F.3d 138, 145

(2d Cir. 1999) (citations and internal quotation marks omitted).  The exclusionary rule, in other

words, "extends beyond evidence directly seized in an unlawful [seizure], to pr[o]scribe use of

all evidence obtained as an indirect result of such illegal activity—the 'fruit of the poisonous

tree.'" *United States v. Paroutian*, 299 F.2d 486, 489 (2d Cir. 1962).  This rule, however, does

not invalidate all evidence obtained subsequent to an unlawful search or seizure.  If the

connection between the unlawful action and the subsequent evidence is "so attenuated as to

dissipate the taint" of the unlawful action, this doctrine does not apply.  *Wong Sun v. United*

*States*, 371 U.S. 471, 491 (1963) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

### 4.    Rule 41(g)

Rule 41(g) of the Federal Rules of Criminal Procedure provides:

A person aggrieved by an unlawful search and seizure of property or by the
deprivation of property may move for the property's return. The motion must be
filed in the district where the property was seized. The court must receive
evidence on any factual issue necessary to decide the motion. If it grants the
motion, the court must return the property to the movant, but may impose
reasonable conditions to protect access to the property and its use in later
proceedings.

"A Rule 41(g) motion is an equitable remedy that is available only when there is no

remedy at law and the equities favor the exercise of jurisdiction." *De Almeida*, *v. United States*, 459 F.3d 377, 382 (2d Cir. 2006) .  The Second Circuit has emphasized that, "[j]urisdiction under Rule 41 is to be exercised with great restraint and caution since it rests upon the court's supervisory power over the actions of federal law enforcement officials." *Id*.  Accordingly, where a "claimant is afforded the opportunity to test the legality of the seizure in [a] forfeiture proceeding, relegat[ing] the claimant to that proceeding would avoid problems inherent in parallel proceedings." *Id.*

"In order to prevail on a Rule 41(g) motion, the moving party must demonstrate that: "(1) [the party] is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended." *United States v. Corley*, 2020 WL 4676650, at *13 (S.D.N.Y. Aug. 11, 2020) (alterations in original) (quoting *United States v. Pinto Thomaz*, 352 F. Supp. 3d 287, 311 (S.D.N.Y. 2018)).

### 5.    Scope of Seizure

Pursuant to 18 U.S.C. § 981(b)(1), with certain exceptions, "any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General." Subsection (a), in turn, establishes measures of forfeiture for different offenses.  Subparagraph (a)(1)(A) pertains to unlicensed money services offenses, in violation of 18 U.S.C. § 1960.  It provides that the Government can forfeit (and thus seize) "[a]ny property . . . involved in a transaction or attempted transaction in violation of section . . . 1960 of this title, or any property traceable to such property." *See also* 18 U.S.C. § 982(a)(1).  "To show that the property was 'involved in' such a transaction, the Government has the burden of proving that 'there was a substantial connection between the property and the offense.'" *In re 650 Fifth Ave. & Related*

9

*Properties*, 830 F.3d 66, 95 (2d Cir. 2016) (quoting 18 U.S.C. § 983(c)(3)).  Subparagraph (a)(1)(C), by contrast, pertains to certain enumerated offenses, including bank fraud.  It provides that the Government can forfeit (and thus seize) "[a]ny property, . . . which constitutes or is derived from proceeds traceable to [the] violation."  *See also* 18 U.S.C. § 982(a)(2).

### C.   Discussion

#### 1.   The Seizure Warrants were supported by probable cause.

The Affidavit clearly set forth probable cause to believe that the GTS Account was used to receive deposits from users of Bitfinex and that the funds transferred to the Fowler Accounts from accounts of GTS-named entities were proceeds involved in, or traceable to, an unlicensed MSB.

The defendant does not dispute that processing payments for Bitfinex would constitute MSB activities.  Rather, he argues only that the Affidavit failed to establish that the HSBC Accounts were processing Bitfinex payments.  With respect to the GTS Account, most straightforwardly, the Affidavit described an October 3, 2018 wire to the GTS Account with the description "REFERENCE: 912050149 **BITFINEX**: ACC. [Customer-1]," indicating that the wire was intended to deposit funds into Customer-1's Bitfinex account.  (Dkt. 93-1 ¶ 19(d)(i) (emphasis added)).  It is difficult to conceive of what more could be required to establish probable cause to believe that the GTS Account was used to receive deposits from Bitfinex users.

In a futile attempt to explain away that explicit connection between the GTS Account and Bitfinex, the defendant suggests that that wire might have been sent by someone who saw the Twitter post explaining that Bitfinex was banking through GTS.  (Dkt. 94 ("Def. Mem.") at 13.) But that is both irrelevant insofar as the account would *still* be used as a MSB even if by solely through Bitfinex's direction, and impossible: the wire was sent on October 3, 2018, whereas the

10

Twitter post was put up on October 6, 2018.  (Dkt. 93-1 ¶¶ 18(d), 19(d)(i).)

Moreover, the wire that explicitly mentioned Bitfinex was far from the only piece of evidence furnishing probable cause to believe that the GTS Account was being used to receive and remit funds from and for Bitfinex users.  As just another example, the Affidavit also referred to a September 27, 2018 wire with the description "BUYING AND SELLING FOREIGN EXCHANGE . . . ."  (Dkt.93-1 ¶ 19(d)(iii).)  That description, coupled with the other evidence of a connection to Bitfinex, offered probable cause to believe that the GTS Account was receiving deposits from users of the cryptocurrency platform.  While the Affidavit, by necessity, provided only a few examples of information in wire transfers, it also included an analysis of overall activity in the GTS Account.  This activity, which included a large number of incoming and outgoing wires to jurisdictions around the world (*id.* ¶¶ 19(c), 19(e)), large transfers between seemingly affiliated companies (*id.* ¶¶ 19(f)(i)-(ii)), and the use of third parties to effect inter-company transfers (*id.* ¶ 19(f)(iii)), all support the Affidavit's conclusion that the GTS Account was involved in an unlicensed MSB.

The defendant's attempts to undermine the probable cause finding here do not withstand scrutiny.  For example, the defendant makes much of the Affidavit's assertion that on October 16 and 17, 2018, several blogs reported that Bitfinex was shifting its banking from HSBC to a Hong Kong-based bank.  (Def. Mem. 8, 14)  In the defendant's view, that reporting undermines the October 6, 2018 Twitter post, which had implied that Bitfinex was moving its banking *to* HSBC. (*Id.*).  The defendant overlooks, however, that to establish probable cause as relevant here, there was no requirement that the GTS Account be linked to Bitfinex activity for a particularly lengthy period.  Even if the GTS Account had been associated with Bitfinex up until October 16, 2018, that would not have undermined a probable cause finding that the GTS Account was being used

to receive deposits from Bitfinex users.

The defendant also takes aim at the Affidavit's reliance on a Twitter post, which, the Affidavit points out, was by an unnamed reporter not familiar to Special Agent McGee.  (Def. Mem. 12-13.)  Contrary to the defendant's assertions, Special Agent McGee acted appropriately in relying on that Twitter post in the Affidavit.  First, Special Agent McGee in no way minimized or concealed the fact that the Twitter post was relevant to Special Agent McGee's investigation.  Second, the Twitter post itself had sufficient corroboration to allow Magistrate Judge Parker to consider it in assessing probable cause.  For one thing, the post included an image that appeared to corroborate the post's message that Bitfinex was banking with HSBC through GTS.  (Dkt. 93-1 at 21.)  More importantly, however, the steps that Special Agent McGee and other law enforcement officers took in response to seeing the Twitter post further corroborated the post's message.  In particular, as described above, wire-detail information from HSBC corroborated that Bitfinex users were sending funds to GTS.  (*Id.* ¶ 19(d)(i).)  As a result, the defendant's invocation of cases for the proposition that courts value corroboration of information from unknown sources is uncontroversial and does not advance his cause.  (See Def. Mem. 12.)  This case is not like *United States v. Rocha-Gomez*, 412 F. Supp. 3d 369, 376 (S.D.N.Y. 2019), cited by the defendant, where "[t]here was . . . virtually no corroboration of [an unknown sources]'s information."  Here, the wire transaction records, among other things, corroborated the Twitter post.

The defendant argues that there was even less to support the seizure of the Fowler Accounts, as they were further attenuated from Bitfinex than the GTS Account.  (Def. Mem. 15).  The Affidavit, however, easily made out probable cause to seize the Fowler Accounts.  Specifically, the Affidavit adduced details of particular transactions into Fowler Account-1 from

accounts held by GTS-named entities, and subsequent transfers from Fowler Account-1 to Fowler Account-2.  (*See, e.g.*, Dkt. 93-1 ¶ 20.)  That is more than enough, as "[t]he quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'"  *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235).  By showing that GTS, which was not licensed to transmit money, in fact transmitted money to the Fowler Accounts, the Affidavit cleared the relatively low probable cause bar, especially since the Affidavit had provided another example of a personal account being used to facilitate the movement of funds between GTS-held accounts.  (*See* Dkt. 93-1 ¶ 19(f)(iii).)

## 2. Agents relied on the Seizure Warrants in good faith.

Even if the Seizure Warrants were not supported by probable cause, which they were, suppression would still be improper because the executing agents relied in good faith on the Seizure Warrants.  The defendant argues that the good-faith exception does not apply here because the Affidavit is so lacking in indicia of probable cause as to render reliance upon it unreasonable.  (Def. Mem. 17.)  The defendant cites no authority for that argument.  For good reason.  "This is a very difficult threshold to meet, as evidenced by the many decisions of [the Second Circuit] rejecting objections to the good-faith exception on this basis."  *United States v. Falso*, 544 F.3d 110, 128 n.24 (2d Cir. 2008).  In fact, courts have declined to find that barrier to the good-faith exception simply where "the warrant application . . . was not a 'bare bones' affidavit, but rather contained many objective facts."  *Moore*, 968 F.2d at 222.  Such was the case here.  As discussed above, the Affidavit contained many facts about Bitfinex, GTS, their relationship, and the transactions evidencing it.

Accordingly, even if this Court were to disagree with the issuing Magistrate Judge and find fault with the Seizure Warrants in this case, there are no grounds to conclude that the agents

13

acted other than in good faith when executing those Seizure Warrants and, in turn, there is no basis to suppress the fruits of those seizures. *United States v. Tomero*, 462 F. Supp. 2d 565, 572 (S.D.N.Y. 2006).

### 3.    The October 24, 2018 statement is not the fruit of any poisonous tree.

The defendant argues that the statements he made to the FBI the day after the bank account seizures should be suppressed as fruit of the poisonous tree. (Def. Mem. 18-19.) The premise of that argument, however, is faulty. As described above, there was nothing unlawful about the October 23, 2018 bank account seizures. The Affidavit in support of the Seizure Warrants set forth probable cause to believe that the HSBC Accounts were subject to seizure, and the executing agents relied in good faith on those Warrants. As a result, "there is no poisonous tree and thus no fruit requiring suppression." *United States v. Knoll*, 16 F.3d 1313, 1322 (2d Cir. 1994).

Even if, however, there were something improper about the seizure warrants, which there was not, any taint of those seizures had clearly dissipated by the time the defendant contacted the FBI to discuss the seizures. In *Wong Sun*, the Supreme Court determined that the petitioner was unlawfully arrested without probable cause or reasonable suspicion. 371 U.S. at 491. After his arraignment and release from custody, he "returned voluntarily several days later" to provide a statement to law enforcement. *Id.* The Supreme Court determined that this voluntary statement was not the fruit of the petitioner's illegal arrest and was admissible against him. *Id.* Since *Wong Sun*, courts have looked to various factors, such as "the 'temporal proximity' of the [illegal conduct] and the alleged consent," "the presence of intervening circumstances," and "'the purpose and flagrancy of the official misconduct.'" *United States v. Snype*, 441 F.3d 119, 134 (2d Cir. 2006) (quoting *Kaupp v. Texas*, 538 U.S 626, 633 (2003)). In *Snype*, the Second Circuit

14

held that an apartment owner had lawfully given consent to search her apartment even though a "heavily armed SWAT team" had unlawfully entered her apartment and placed her in handcuffs only twenty minutes earlier.  *Id.* at 131.  However, by the time the owner had given consent, the SWAT team had left the apartment, her liberty had been restored, and the owner had been able to call her sister to assist with the situation.  Those "intervening circumstances successfully dissipated any taint from the initial entry."  *Id.* at 135; *see also United States v. Ullah*, No. 02 Cr. 899 (JFK), 2003 WL 1396300 at *6-7 (S.D.N.Y. Mar. 20, 2003) (three hours elapsing between defendant and statement was sufficient time to dissipate any alleged taint).

In this case, every factor weighs in favor of a finding that any unlawful taint had dissipated when the defendant contacted the FBI.  First, the conduct here was hardly flagrant, as the FBI's seizure was based on a warrant signed by a United States Magistrate Judge.  Nor did the defendant personally experience the FBI's actions—no agents entered his home, placed him in handcuffs, or otherwise overbore his will by creating a fearful atmosphere.  Second, there was an obvious intervening factor and a temporal break between the seizure and the statement: the defendant's decision to contact the FBI the following day to discuss the seizure.  This closely follows the facts of *Wong Sun*.  The Court should follow that case in denying the defendant's motion.

### 4.    There is no ground to vacate the Seizure Warrants under Rule 41(g).

As an initial matter, because, as discussed above, the Seizure Warrants were supported by probable cause, the defendant cannot show that "either the seizure was illegal or the government's need for the property as evidence has ended," and as a result the defendant cannot "prevail on [his] Rule 41(g) motion."  *Corley*, 2020 WL 4676650, at *13.  But even if there were some flaw in the prior probable cause finding (and there was no such flaw), the remedy would

15

not be releasing the seized funds, as the defendant desires.  Instead, per the Second Circuit's decision in *United States v. Cosme*, 796 F.3d 226, 233 (2d Cir. 2015), the remedy would be for the Court to make a fresh determination whether there is, in fact, probable cause to believe that the property is forfeitable.  *Id.* at 233 ("[N]o proper finding of probable cause has occurred in this case and, thus, we must remand the case to the district court to determine whether probable cause supports the forfeitability of the restrained property.").  There is overwhelming probable cause to believe that the seized property is forfeitable.  Indeed, the defendant's motion does not argue as a general matter that there is no probable cause linking the HSBC Accounts to this criminal case, as it cannot, only that the Affidavit fails to set forth that probable cause.  The defendant has been indicted by a Grand Jury in this District for, among other things, his use of the HSBC Accounts as part of an unlicensed MSB.  (*See, e.g.*, Superseding Indictment ¶¶ 9(a)-(c), 10(a)-(c).)  Since the filing of the Original Indictment, the Court has signed two post-indictment restraining orders for GTS accounts on the identical theory supporting the seizure of the HSBC Accounts—that these accounts were used as part of an unlicensed MSB.[3]  For these obvious reasons, the defendant is not entitled to an evidentiary hearing under Rule 41(g) and the defendant's requests under Rule 41(g) should be denied.[4]

_____

[3] These orders were filed under seal and have been provided to the defendant in discovery.

[4] The Court need not entertain the defendant's Rule 41(g) motion for the further reason that this criminal case, which is scheduled for trial in three months, will resolve the matter either through an acquittal or through a criminal forfeiture proceeding.  This accords with the need, under Rule 41, to "protect access to the property and its use in later proceedings."  Fed. R. Crim. Pro. 41(g).  Return of the property, or some portion of it, could lead to its dissipation, reducing the amount of funds available for forfeiture and restitution.  This is a factor weighing strongly against the defendant's motion.  *See Chaim v. United States*, 692 F. Supp. 2d 461, 475 (D.N.J. 2010) ("[T[he Government [] has an interest in the funds.  It has claimed these monies were used in illicit conduct . . . and that they are subject to forfeiture.  If the funds were returned, they would or could be used and depleted, reducing the amount available to the Government should it be entitled to forfeiture in this case.").

### 5.      The Seizure Warrants do not need to be "scaled back."

Contrary to the defendant's assertion (Def. Mem. 19-23), there is no need to "scale back"
the scope of the Seizure Warrants.  As described above, when it comes to unlicensed money
services businesses offenses under 18 U.S.C. § 1960, the Government may forfeit and seize any
property "involved in a [violative] transaction or attempted transaction . . . or any property
traceable to such property."  18 U.S.C. § 981(a)(1)(A).  That language is very broad.  "The term
'involved in' has consistently been interpreted broadly by courts to include any property
involved in, used to commit, or used to facilitate the [unlicensed money services business]
offense."  *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005), *aff'd*, 514
F.3d 277 (2d Cir. 2008).  As the Affidavit describes, the funds in the GTS Account were deposits
from users of Bitfinex, and GTS was not a licensed MSB.  As a result, the funds in the GTS
Account were "involved in" the Section 1960 offense.  (Dkt. 93-1 ¶ 23(a).)  Similarly, the
Affidavit explains that there is probable cause to believe that the funds in the Fowler Accounts
were also "involved in" the Section 1960 offense, as the Fowler Accounts took in funds from
other bank accounts with names like GTS—the business name used to perpetrate the Section
1960 offense.  (*See id.* ¶ 23(b).)

Although the defendant halfheartedly acknowledges the "involved in" statutory language
from Section 981(a)(1)(A) (*see* Def. Mem. 22-23), the defendant's argument effectively proceeds
as if that language did not exist, instead focusing principally on the statutory term "proceeds"
from Section 981(a)(1)(C) and the definition of that term supplied elsewhere in the statute (*see*
Def. Mem. 19-21).  The authority the defendant cites construing the statutory definition of
"proceeds," such as *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012), imposes no limit
on the scope of the seizure in this case because the broader "involved in" phrase is available as a

result of the unlicensed money services business charge.  Accordingly, there is no need to "scale back" the scope of the Seizure Warrants.

## II.     The Defendants' Motion for a Bill of Particulars Should Be Denied

The defendant's motion for a bill of particulars, (Def. Mem. 24-34.), should be denied because the defendant has not, and cannot, establish that he is entitled to a bill of particulars in light of the various forms of detailed notice that the Government has provided with respect to the charges in this case.

### A.     Applicable Law

While Federal Rule of Criminal Procedure 7(f) permits the Court to direct the Government to file a bill of particulars, it is well established that "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) (same).  Because a "bill of particulars is not an investigative tool for the defendants," *United States v. Johnson*, 21 F. Supp. 2d 329, 339 (S.D.N.Y. 1998), "[t]he important question is whether the information sought is *necessary*, not whether it is helpful," *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) (emphasis added; citations omitted).

Consistent with the above, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (noting that "[a]cquisition of evidentiary detail is not the function of the bill of particulars" (internal quotation and citation omitted)).  Indeed, it is well

established that "the defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial properly."  *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989); *see also id.* ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts." (internal quotation and citation omitted)); *and see United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense." (citing cases)).

There are good reasons why bills of particulars are warranted only when the allegations in the indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197 (citation omitted); *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the

bill"); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.* (citation omitted).

Applying these principles, courts routinely deny demands for bills of particulars identifying (i) "all acts" the defendant is alleged to have undertaken as part of the crime charged, *id.* at 1197 (noting that this demand "fall[s] clearly outside the ambit of a bill of particulars"), including wires or transactions alleged to be a part of a criminal scheme, *see, e.g.*, *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013); *United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310, at *3-4 (S.D.N.Y. Sept. 24, 2009); *United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810, at *4-5 (S.D.N.Y. Nov. 14, 2007), or (ii) "where, when, and with whom" the Government will prove the defendant conspired, *Trippe*, 171 F. Supp. 2d at 240; *United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008, at *9 (S.D.N.Y. 2003); *see also*, *e.g.*, *Samsonov*, 2009 WL 176721, at *4 (noting that demand for particulars identifying co-conspirators was "a veiled attempt to discern who is cooperating with the Government"); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) ("There

is no need to provide a list of all unindicted co-conspirators.").

Moreover, "[i]f the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence, no bill of particulars is required." *United States v. Binday*, 908 F. Supp. 2d 485, 497 (S.D.N.Y. 2012) (citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)); *see also United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." (quoting *Walsh*, 194 F.3d at 47).

### B.    Discussion

Here, the Court should deny the defendant's request for a bill of particulars.  First, the indictments provide more than enough information to allow the defendant to prepare for trial.  The Original Indictment offers a clear roadmap to Counts One through Four.  It contains detailed allegations regarding: (i) the overall structure and operation of the scheme; (ii) the defendant's role in the scheme; and (iii) illustrative examples of the defendant's conduct, including a summary of misrepresentations the defendant made to open a specific bank account in furtherance of the scheme.  (Dkt. 4 at 1-9.)  The Government then filed a bill of particulars on August 27, 2020, which provides further detail by listing bank accounts that were obtained and used as part of the scheme charged in Counts One through Four.  (Dkt 66.)  Because the Government has identified these bank accounts, this case is different from *Bortnovsky*. There, the defendants were charged in a twelve-count indictment in connection with a scheme to defraud the Federal Emergency Management Association and the New York Property Insurance Underwriting Association by submitting false claims for burglary losses.  820 F.2d at 573-74.  At trial, the Government introduced evidence about twelve burglaries, even though it admitted only four of those twelve

21

were fabricated.  *Id.* at 574.  The Second Circuit concluded that the defense had been unable to adequately prepare for trial since the Government had failed to specify the dates of the fake burglaries.  *Id.* at 574-75.  By contrast, here, the Government has identified the specific bank accounts it alleges were part of the scheme, allowing the defendant to focus his defense well in advance of trial.

The charging language of Count Five, which is only included in the Superseding Indictment, provides the defendant the key information he needs to prepare his defense, including his alleged misrepresentations ("falsely claiming personal ownership of funds that were, in truth and in fact, funds [the defendant] had obtained through the unlicensed money transmitting business"); to whom he made the misrepresentations ("individuals associated with a professional sports league"); and what he obtained through these misrepresentations ("acquisition of an ownership stake in the League").  (Dkt. 55 at 5-6.)  The defendant has sufficient notice as to the nature of Count Five, especially given that Count Five covers a period of only approximately eight months and a single business deal.  Indeed, all of the conduct occurred in a short amount of time and did not involve a large number of co-conspirators.  This sharply contrasts with the cases the defendant cites in support of his request, which often included charges spanning many years and involving dozens of co-conspirators.  *See, e.g.*, *United States v. Bin Laden*, 92 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) (bill of particulars ordered in a case involving conduct occurring over ten years).

The Government has also provided extensive additional detail to the defendant through discovery. The Government's productions have been well-organized and, as the defendant acknowledges, the Government has made itself available to discuss the materials it has produced. *See United States v. Skelos*, No. 15 Cr. 317, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015)

("[T]he Government here has done more than merely produce 'mountains of documents'; instead, the Government has provided the information in an organized and comprehensible fashion."); *Mandell*, 710 F. Supp. 2d at 385 (denying request for particularization of alleged misrepresentations where the indictment was detailed and Government had provided voluminous, organized discovery); *Samsonov*, 2009 WL 176721, at *4 (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial).  Some of the discovery materials, such as affidavits filed in support of search warrants, already provide the sort of detailed case summary that the defendant seeks through a bill of particulars.  Moreover, in February 2020 the Government produced approximately 20,000 pages of standalone discovery for Count Five, an amount within the defendant's capacity to review during the time he has had it.  Additionally, on June 30, 2021, the Government sent a letter to the defendant outlining key testimony and documents that it would introduce at trial against the defendant, including the Government's analysis of how GTS funds were used to fund the defendant's $13.5 million payment to the AAF.  (Dkt. 97.)

The foregoing materials more than suffice to provide the defendant with the detail to which he is entitled.  *See Binday*, 908 F Supp. 2d at 497 ("If the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence," no bill of particulars in required.") (citing *Bortnovsky*, 820 F.2d at 574)); *United States v. Remire*, 400 F. Supp. 2d 627, 633-34 (S.D.N.Y. 2005) (denying bill of particulars where indictment and discovery materials gave adequate information to prepare for trial); *Trippe*, 171 F. Supp. 2d at 240 (denying bill of particulars request in stock fraud case where indictment was detailed and substantial discovery had been provided).

This fact is underscored when looking at the specific categories of information in the

defendant's request for a bill of particulars.  With respect to Counts One through Four, the defendant's requests fall into three main categories.  First, the defendant requests that the Government identify the defendant's co-conspirators. (Def. Mem. 33-34.)  Leaving aside that two co-conspirators—Ravid Yosef and Oz Yosef—have been charged in this case, the defendant has already received information about many of the participants in what is not a wide-ranging conspiracy.  For example, the Government provided disclosure letters on June 29, 2021 and August 10, 2021, which identified statements by other individuals involved in the money-services business, including individuals who worked for the defendant in Arizona.  Though the Government may identify other co-conspirators as part of its ongoing investigation and preparations for trial, the Government has provided ample notice of the defendant's co-conspirators at this stage of the case. *See, e.g.*, *United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Nov. 4, 2002) (denying request for bill of particulars that would identify alleged co-conspirators and victims); *Trippe*, 171 F. Supp. 2d at 240 ("[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."); *United States v. Fruchter*, 104 F. Supp. 2d 289, 313 (S.D.N.Y. 2000) (denying "Defendants' request for names of all aiders, abettors, unindicted co-conspirators, and confidential informants" as "nothing more than a request for a witness list").

Second, the defendant asks for information about the bank accounts that were related to Counts One through Four. (Def. Mem. 33.)  The Government already provided a list of those bank accounts identified to date in its bill of particulars.

Third, the defendant makes catchall requests for all misrepresentations, all documents, or all "all acts in furtherance" of the defendant's conduct. (Def. Mem. 33-34.)  Such requests are routinely denied as beyond the scope of a bill of particulars.  *See, e.g.*, *Bonventre*, 2013 WL

2303726, at *5-7 (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction); *Guttenberg*, 2007 WL 4115810, at *4-5 (in insider trading case, denying request for bill of particulars itemizing trades alleged to have been based on material nonpublic information).

The defendant's requests with respect to Count Five largely mirror the requests for Counts One through Four, with the additional request for information about victims of Count Five and specific property converted as part of the charged conduct.   (Def. Mem. 34.)   While the Government has no obligation to provide this information in a bill of particulars, *see Sindone*, 2002 WL 48604, at *1, the defendant already has enough detail about these categories through discovery materials and the information provided in the June 30, 2021 letter, including its analysis of funds sent from GTS accounts to the AAF.   These materials, taken together, satisfy the Government's obligation under Rule 7(f).

The defendant's insistence that the Government cabin its proof at trial through a bill of particulars is inconsistent with the principle that a bill of particulars is required only when the information is *necessary*.   The charging instrument, discovery materials, and correspondence in this case clearly put the defendant on notice of the nature of the charges against him and are more than sufficient to permit him to understand the charges and to prepare for trial.   *See, e.g.*, *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *6 (S.D.N.Y. Apr. 14, 2020) ("There

25

is no basis for a bill of particulars in this case. The charges against the defendants are explained in detail in the lengthy speaking Indictment, and the charges track the language of the applicable statutes while stating the time and place in approximate terms of the charged conspiracy.").

### III.   The Defendant's Motion to Strike Surplusage From the Indictment is Meritless and Should be Denied.

The defendant's request that the Court strike broadening phrases from the Superseding Indictment is meritless. "It has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Bin Laden,* 91 F.Supp.2d 600, 621 (S.D.N.Y. 2000) (quoting *United States v. Jimenez,* 824 F.Supp. 351, 369 (S.D.N.Y.1993)). When it comes to broadening phrases, if they are used in the charging language to "enlarge the specific charges," then they should be struck. *United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2009 WL 995139, at *3 (S.D.N.Y. Apr. 9, 2009). If the broadening language, however, goes to the proof the Government will offer to sustain its charges, it is permissible so long as it is not irrelevant or inflammatory. *Id.*

As the defendant concedes, Courts have routinely denied motions to strike language similar, if not identical, to the language he seeks to strike in his motion. *See United States v. Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013); *United States v. Booth*, No. 99 CR. 378 LBS, 1999 WL 1192317, at *11 (S.D.N.Y. Dec. 14, 1999); *United States v. Washington*, 947 F. Supp. 87, 90 (S.D.N.Y. 1996); *United States v. DePalma*, 461 F. Supp. 778, 799 (S.D.N.Y. 1978). In response, the defendant first argues that the broadening language in the Superseding Indictment "insinuate[s] crimes not charged." (Def. Mem. 35.) All the language does, however, is note that there are additional individuals, locations, and means by which the defendant and others committed the crime. This is permissible as "the Government is not required to set forth [in the indictment] all the acts relied upon to effectuate the [charged conduct]." *DePalma*, 461 F. Supp. at 799. The

26

defendant's second argument is that, because this crime occurred in part in the virtual realm, the broadening language could expand the conspiracy to include "anyone and everyone in every location of the world."  (Def. Mem. 35.)  This is not the relevant inquiry for determining whether to strike surplusage.  Rather, this is simply another way of stating the defendant's request for a bill of particulars, which the Court should deny for the reasons already set forth herein.

## IV.  The Defendants' Motion to Disclose Purported *Brady* Material Should Be Denied

The defendant asks that the Government be required to immediately disclose any "statements made to the Government prior to Mr. Fowler's indictment exculpating Fowler from criminal involvement in the charged conduct."  (Def. Mem. 36.)  In practice, the defendant seeks the immediate production of "full witness statements."  (Def. Mem. 37.)  The defendant's request should be denied.

The defendant concedes that the Government has already made numerous *Brady* disclosures of witness statements.  (Dkt. 97.)  Yet the defendant maintains, without any factual support, that the Government is holding back additional exculpatory witness statements.  This speculation provides no basis for relief.  The Government has diligently and timely produced the materials it has gathered related to this case, including reviewing witness statements for exculpatory information, satisfying any potential *Brady* obligations.  Moreover, the Government has committed to producing all witnesses' statements, regardless of whether the Government intends to call them as witnesses at trial.  As a courtesy, the Government intends to produce these materials well in advance of the typical timeline for production of Jencks Act materials in this District and is currently finalizing them for production.  Thus, the Court should deny the defendant's request.

**V.      The Defendant's Motion for a Pretrial Disclosure Schedule Should Be Denied**

Finally, the Court should deny the defendant's requests that the Court enter a pretrial disclosure schedule for certain of the Government's trial materials.  (Def. Mem. 38-39.)  First, the defendant has made no attempt to meet and confer with the Government regarding this pretrial disclosure schedule.  The Government is prepared to formulate a fair and reasonable timeline for mutual pretrial disclosures.   The defendant should not be allowed to avoid this process by appealing directly to the Court.  Second, the defendant's proposed pretrial disclosure schedule is incomplete.  It provides no timeline for the defendant's production of pretrial materials.  It also omits a schedule for motions *in limine* and a date for proposed *voir dire* instructions.  Allowing the parties to meet and confer will help ensure a comprehensive pretrial disclosure schedule.  Finally, the defendant asks the Court to order early disclosure of Jencks Act materials even though the timing for such disclosure is set by statute.  18 U.S.C. §§ 3500(a)-(b).  Consistent with the practice in this District, the Government is committed to a pretrial disclosure schedule of all materials, including Jencks Act materials, that will provide the defendant time to prepare for trial.  The Court, however, should allow the parties to reach an agreement on that schedule and deny the defendant's unilateral and unreasonable request for a pretrial disclosure schedule.

28

## **CONCLUSION**

For the foregoing reasons, the defendant's pretrial motions should be denied.

Dated: New York, New York
November 4, 2021

<div style="margin-left: 40%;">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/_____
Jessica Greenwood
Samuel Rothschild
Sheb Swett
Assistant United States Attorneys
Southern District of New York
(212) 637-1090/2504/6522

</div>

29