# SAPONE & PETRILLO, LLP

MANHATTAN

40 Fulton Street, 17th Floor
New York, New York 10038
Telephone: (212) 349-9000
Facsimile: (212) 349-9003
E-mail: ed@saponepetrillo.com

LONG ISLAND

1103 Stewart Avenue, Suite 200
Garden City, New York 11530
Telephone: (516) 678-2800
Facsimile: (516) 977-1977
E-mail: bill@saponepetrillo.com

April 10, 2023

**BY ECF**
The Honorable Andrew L. Carter, Jr.
United States District Court for the
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:  *United States v. Reginald Fowler*
          *Docket No. 19 Cr. 254 (ALC)*

Dear Judge Carter:

   There can be no doubt that, before the advancement of civil rights laws and social justice in the United States beginning in the 1960's, Alabama was not the land of opportunity for people like Defendant Reginald Fowler ("Reggie"). In 1959, Reggie's mother gave birth to him there when she was only 15. Until Reggie was four, he didn't know his mother, and he didn't meet his father until many years later. Mom had him out of wedlock. And she had no relationship with Reggie's dad. With no one else to care for him, Reggie was shuffled off to his grandmother's sister's house. He lacked the support of his parents, and although his grandmother's sister stepped up to the plate to take Reggie into her home, she was too old to raise him for more than

just a few years.   If we were to freeze the frame here, we would have to agree that Reggie could be a poster child for a horrible statistic of modern U.S. history: young Black men raised in the 1960's in broken homes in the Deep South and plagued by poverty.

But remarkably, Reggie Fowler would grow up and beat all the odds to became an American success story.  He would suppress all of his pain, study long hours and work hard, and he would turn adversity into advancement.  Reggie Fowler would become a poster child of success driven by old-fashioned ingenuity and a lifetime of hard work.

Reggie is heartbroken by the reality that, after more than six decades of extraordinary contributions to family and community, he allowed himself to engage in the instant offense conduct.  While he may never forgive himself for committing these offenses at age 60, he took the right step of accepting full responsibility to each of the five counts in the indictment: substantive and conspiratorial Bank Fraud, s*ee* 18 U.S.C. §1346, (counts 1 and 2), crimes that lasted eight months; substantive and conspiratorial Unlicensed Operation of a Money Transmitting Business, *see* 18 U.S.C. §1960, (counts 3 and 4), crime that lasted two months; and Wire Fraud, *see* 18 U.S.C. §1342 (count 5).   Unlicensed Operation of a Money Transmitting Business drives the Guidelines in this case to a 30-level Guidelines enhancement due to the loss amount.  *See* §§2S1.3(a)(2) and 2B1.1(b)(1)(P) (loss exceeds $550 million)[1].  Because the five offenses are substantially similar, they are grouped, and Reggie's Guidelines per the Presentence Investigation Report include a total offense level of 36, CHC I, resulting in an advisory total offense range of 188-235 months of imprisonment.

---

[1] We believe that the loss amount exceeds $250 million and is less than $550 million resulting in a 28-level Guidelines increase.

We ask the Court to calculate the advisory Guidelines as follows:

|  |  |
|---|---|
| - Base Offense Level: | 7 |
| - Guidelines Increase Based on Loss: | +28 (Greater Than $250 million) |
| - §4C1.1 Reduction[2]: | -2 |
| - Timely Acceptance of Responsibility: | -3 |
| - Total Advisory Offense Level: | 30 |

_____

|  |  |
|---|---|
| - Advisory Sentencing Range: | 97-121 months of incarceration (CHC I) |

We are asking Your Honor to impose a non-custodial sentence upon this 64-year-old,

first-time offender who has zero criminal history points.  *See* U.S.S.C., Staff Discussion Paper,

*Sentencing Options Under the Guidelines* 18-19 (Nov. 1996) (finding that "alternatives divert

offenders from the criminogenic effects of imprisonment which include contact with more

serious offenders, disruption of legal employment, and weakening of family ties."); U.S.S.C.,

_____

[2] New U.S.S.G. §4C1.1 would provide a decrease of two levels from the offense level determined under Chapters Two and Three if the defendant meets these criteria: "(1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848."

*Alternative Sentencing in the Federal Criminal Justice System*, at 2-3 (2009) ("alternatives to incarceration can provide a substitute for costly incarceration.").

Reggie is a man who didn't have a parent in his life until he was five years of age. And the transition to his mother's care was just as detrimental as was the transition when his mother gave him up as a baby to her mother's sister. Before Reggie's mom took him back, she had married Mr. Fowler, Reggie's step-father, and had given birth to another child. So the transition back to the care of his mother was not only harmful, as he was ripped away from the only woman who cared for and raised him; it was also traumatizing, as he was then thrust into a new environment that included two additional people whom Reggie didn't know: a step-father and step-brother. None of this is to suggest that Reggie's mother, step-father and step-brother didn't love him and contribute to his life. Reggie's mother gave him up so that she could continue in school. She was smart enough to realize that the only chance of a good life for her and Reggie would come from her becoming educated. And Reggie's step-father was a good man who agreed to raise Reggie as his own. Reggie even took his step-father's surname, and he benefitted from having a strong male role model in his life, even though Mr. Fowler was in the military and the family moved around a lot.

As traumatizing as was the beginning of Reggie's life, the most severe trauma that Reggie has been forced to endure is the untimely death of his only son. Reggie's son died November 7, 2018 when he was only 26. We will not belabor the very important considerations attendant to the death of Reggie's son, as there are few considerations more obvious. We must note, however, that the time period of the crimes for which Reggie has accepted responsibility is February 2018 to October 2018, the month preceding his son's death.

If the concept *hell on earth* has any merit, those with experience dealing with drug addiction know that one of the few pains in life more excruciating than a person dealing with the effects of addiction—including the intense suffering caused by withdrawals, overdose, hospitalizations, all the losses of relationships, status, positions and possessions, the physical suffocation, the mental and emotional anguish, and the list goes on—is the pain a person endures watching a loved one suffer through it.  Before Reggie was in the midst of the instant offense and during the life of it, Reggie was in the throes of the immense suffering of life as a father to his only son who was dying the slow death of addiction, until the day came when the suffering stopped and a new suffering began, because his son died.

Reggie Fowler is guilty of the crimes for which he accepted responsibility.  This is true.  Equally true, however, is that leading to the commission of the offense conduct and while Reggie was committing these offenses, he was in the deepest, darkest pit of hell in his life watching his son die a little each day until he died from a tragic overdose.  He is guilty of each element of each crime to which he pled guilty.  But the circumstances matter.  They matter as we contemplate Reggie's history and characteristics, and they matter as we contemplate the circumstances of the offense.  *See* 18 U. S. C. §3553(a).

And as life-altering as it was to lose his son, Reggie's old-fashioned qualities endured when Reggie had an appointment to meet with an agency of the government in connection with this case, and he kept the appointment, which was the day right after his son's death.

Reggie is now 64 years of age, but he has always been an old-fashioned person.  He is respectful, practical, and makes no excuses.  Although Reggie is extremely remorseful for his misconduct, a quality helpful to defense counsel in a post-guilty-plea posture, he is a difficult

man to represent as he's resistant to discussions of the extreme disadvantages he suffered throughout his life and the extraordinary accomplishments he, alone, made happen. Reggie Fowler is too humble for his own good, and he's a pull-yourself-up-by-the-bootstraps kind of guy. For Reggie, things are black or white. They are what they are.

The same can be said about this case: It is what it is. Hundreds of millions of dollars ran through Reggie's U.S. bank accounts, and a football league had to find alternative investments and then went belly up after Reggie failed to make good on an investment promise. Tough facts for a 64-year-old defendant who came into this world as part of an ugly statistic and who, with draconian fraud Guidelines attached to his case, knows he can be part of another if the sentencing proceedings scheduled for April 20th at 3:30 p.m. don't go his way.

We are asking Your Honor to not only spare Reggie Fowler the kind of sentence that, at his age, will result in him dying in prison, but also to spare him a prison sentence all together. We firmly believe that a sentence that will satisfy the parsimony clause, that is, that's sufficient, but not greater than necessary, to achieve the objectives of 18 U.S.C. §3553(a)(2) is a sentence of:

- time-served,

- three years of supervised release,

- six months of home confinement with electronic monitoring,

- 150 hours of community service, and

- orders of forfeiture and restitution.

An analysis of *18 U.S.C. §3553(a)(1) (Nature and Circumstances of the Offense)* reveals that although more than $250 million ran through Reggie's bank accounts, which increases the

advisory Guidelines by 30 levels, this money relates only to the offense of Unlicensed Operation of a Money Transmitting Business, s*ee 18 U.S.C. §1960,* as the banks lost no money.

By way of background, Reggie's company, Global Trade Solutions, LLC ("GTS"), had a client, GTS Swiss, that had approximately 100 investors.  Those investors acquired money from various sources, including cryptocurrency transactions.  GTS held bank accounts in Europe and in the United States.  The investors of GTS Swiss routinely caused deposits of money into GTS' U.S. bank accounts.  Upon the requests of GTS Swiss, GTS engaged in lots of transactions moving the monies in and out of the numerous bank accounts.

In 2018, Reggie applied for a license for GTS, which permitted him to engage in the same kind of money transmitting business in Europe and abroad.  The license would enable GTS and Reggie to lawfully engage in the same conduct in which GTS and Reggie were engaging in the United States.  The license was finally granted on January 2, 2019.  *See Exhibit A.[3]*  The fact that Reggie secured a license in Europe, in no way, excuses the misconduct for which Reggie has accepted full responsibility before this Court.  The fact remains that Reggie did not have a license in the United States.  Although the Unlicensed Operation of a Money Transmitting Business is wrong and illegal, and a lot of money was deposited into the banks, no bank lost money.

Reggie has lost a lot in a life that was often filled with pain,  but he has overcome nearly insurmountable hurdles, and against all odds he has made herculean strides to educate himself and to work hard to accomplish so much.  *See 18 U.S.C. §3553(a)(1) (History and*

---

[3] On January 2, 2019, Reggie's company, Global Trade Solutions, LLC ("GTS"), Company I.D. No. 402099572, obtained from the Republic of Georgia, a license, Free Zone License No. 0110/265, Register No. 162, 218, to conduct financial services, including cryptocurrency transactions in Georgia and in relation to foreign exchanges.

*Characteristics).* The hardships that Reggie has endured and the accomplishments that he has achieved are extraordinary.

Not the least of these is the MBA he earned from the University of Arizona; a pilot's license; the building, management, and development of commercial real estate projects spanning hundreds of acres, many of which he manages to this day; and broken sales records in the food store supplies industry.

After Reggie earned his MBA, from 1984 to 1987, he went to work for a worldwide oil and gas company in the chemical division.  This was his first professional job out of college.  As their regional sales representative, Reggie was their top sales person.

Then from 1987 to 1989, he went to work for a multi-nation food store that was a leader in the United States in the food store supply industry.  Reggie worked his way up to become the national sales representative.  He constantly traveled, and during the three years that he worked for the company, Reggie covered 48 of the 50 states.  He worked so hard and sold so many items that he would routinely sell out the production lines of merchandise, which created free time.

Instead of simply taking days off to relax, Reggie tarted a business one day a week selling office supplies, locally.  He started this business with $100.

He then left the company in 1989, and returned to the store supply business by building his own store supply company.  He started the project with $1,000.   He distributed both office supplies and food store supplies.  He toiled day and night from 1989 to 2000, and was one of the most successful in each industry.  After he sold the company in 2000 for $20 million, he worked for the buyer until about 2005 to make sure that the buyer would succeed.

Sad but ultimately fortuitous for Reggie is that when he set out to get back into the store supply business, he intended to rent space. No one would rent spent to him. Reggie, who in no way is a conspiracy theorist and who is very comfortable among people of all backgrounds, is confident that no one would rent space to him because he is Black. So he applied for loans at various banks to buy some buildings for his business. But, again, because of the color of Reggie's skin, he couldn't get a loan. That's when, as Reggie puts it, he "bought some dirt, and built [his] own buildings."

From that moment on, Reggie was a real estate developer. He would continue to work long, hard hours, which resulted in him landing two contracts with a world-renowned entertainment corporation, one with one of the largest credit card companies, one with a large investment firm and a distribution center and manufacturing plant for a large supermarket.

In addition, he built and opened to the public three ice skating rinks. For years, hockey teams used the ice on which to practice for their games. Even more importantly for Reggie, was that kids used the rinks to learn how to skate and to have fun.

Reggie also built a children's play place and indoor volleyball courts. Reggie's focus has always been on activities for children. He built a grade school facility in 1996 and a high school in 2001 for a charter school in Arizona; he funded the buildings and was involved in the construction. *See Exhibit B*. In addition, in 1994 he worked with an owner of land and the board of directors of a church to construct a building where the parishioners could worship. The church, the members of which had been meeting in a high school, finally had a proper church building to in which to congregate. That building remained intact for more than 15 years and

was very important to the community.  It was ultimately taken by public domain because a freeway was built.

Reggie also had a passion for flying.  He built an aviation company in the Denver, Colorado area, and he constructed a large facility where they built simulators for pilots to complete their training.  Before long, Reggie engaged in  contracts with airline companies and pilots.

And although Reggie's passions centered upon flying and helping children, he has always been very active in real estate.  Since 1995, Reggie has managed a real estate development business through which he has developed properties in the San Fernando Valley, CA. and in Denver, Colorado.

Around the year 2015, Reggie began to travel to other countries, including many in Europe, to engage in other projects, largely real estate development.  A few years before his arrest in the instant case, Reggie was involved in the same kind of money transmitting business as formed the basis of the instant indictment, except he had a license to conduct his business in Europe.  When Reggie opened the bank accounts at issue in this case, the banks asked him to identify the business he was conducting.  They wanted to know the anticipated source of the money that would be deposited into the bank accounts.  Reggie had been in the real estate business, and he told that to the banks.  He failed, however, to tell the banks that he would be depositing money that would be derived from cryptocurrency transactions.

Reggie's commission of these offenses is atypical and aberrant.  Those who best know Reggie, know him for his extraordinary qualities.

Jaine Foster-Valdez met Reggie in high school, and has known him for almost 50 years. After not being in touch for some time, they reconnected in 2004, and he became her "close personal friend, a trusted ally and confidante."[4]  In her letter of support, Ms. Foster-Valdez shares many instances that she has witnessed that are indicative of Reggie's character and value system.

> one of very few black students in a predominantly white school . . .
> I never knew him to treat others with the kind of disrespect that he
> regularly encountered.  You wouldn't find him in detention, he was
> on the Honor Roll.  His athleticism gave him an edge, but still he
> was up before dawn to work out every day to stay at the top of his
> game.  He still starts his day before the rest of us are awake and is
> often still at his desk into the wee hours of the morning.  I have
> always admired his drive but I don't think I fully appreciated until
> much later that while I, as a white woman from a middle-class
> household, took for granted that I could go on to college, Reggie
> needed that athletic scholarship to get to the next rung of the ladder
> he was climbing.  He had his goals set high even as a teenager; he
> made me read I am Third by Gayle Sayers which pretty much laid
> out his life plan at the time.

She goes on to share a very personal story about her sister:

> As a friend, even from a young age, he has been someone I can
> count on.   Reggie never drank, smoked or used any chemical
> enhancements.   There was a time when he encountered my sister,
> who had been engaging in some underage drinking and had placed
> herself in a precarious situation.  Reggie made sure she got home
> with her dignity intact.   I didn't learn of his gallantry until
> sometime later because he didn't want to embarrass her or pat
> himself on the back.  He was just doing what was right.

Ms. Foster-Valdez also remembers an incident in which Reggie showed his respect and compassion for the people who work for him:

> When he owned some convenience stores, a night clerk was killed
> in a robbery.  Reggie not only helped the family get through the
> ordeal financially, he was physically there with them to offer

---

[4] *See Exhibit C* Letter of Support from Jaine Foster-Valdez.

> support.   It is not uncommon to find Reggie doing someone else's
> job, including sweeping the floors, so that that employee could
> have some time off to be with their family.   During the height of
> the pandemic, Reggie was literally running his office on his own so
> his employees could stay safely at home.

She is clearly a huge supporter of Mr. Fowler and believes that society is better served by

allowing him to continue to serve the community.

Nanette and Robert Stark met Reggie 18 years ago when he began a romantic relationship

with their daughter, Molly.  Reggie became the "son [they] never had."[5] The Starks have a close

relationship with Reggie and speak highly of him.  They share, in their letter of support, that:

> Reggie is part of our family.   He is always there for us, whether
> helping us get to medical appointments, helping us around the
> house, sharing all of our family holidays and celebration, or just
> providing moral support when we need it.   In short, he is like a
> devoted son.[6]

Dragan Stevanovic, a German Economist, has known Reggie for more than 15 years, and

they share a very special and close relationship.  Mr. Stevanovic considers Reggie a brother and

loves him dearly.  They have spent a lot of time together sharing special moments, which has

helped Mr. Stevanovic to come to know Reggie's true character.  Sadly, after the death of

Reggie's son, Mr. Stevanovic did not see Reggie as often.  In his letter of support, he describes

Reggie's wonderful qualities highlighting his kindness, compassion, generosity and selflessness.

Most impressive has been Reggie's ability to forgive.  In his letter, Mr. Stevanovic tells us:

> I know his childhood was hard, because of his race and color, but I
> understood from the beginning of our friendship that he has
> forgiven the people that treated him bad, by saying: They didn't
> know what they were doing, and we have to move on. He could

---

[5] *See Exhibit D* Letter of Support from Nanette and Robert Stark.

[6] *See Id.*

forgive easily, that's one of his most beautiful personalities I recognized in so many situations where people were acting bad against him and used him or took his money.

His level of tolerance is really one of a kind. Maybe he should have been harder on some people that used him or made use of his name and his status, but I guess he will never change and always be Reggie Fowler, a warmhearted person ready to help and always ready to forgive people's mistakes even when it hurts or damages himself.[7]

Karl Purdy has known Reggie for more than 12 years.  Mr. Purdy is a retired USAF officer who has focused on supporting our troops with innovative concepts that save lives.  He came to know Reggie through a friend who suggested they meet, as they had common interests.  They went on to develop a business relationship in which Reggie was able to invest in projects that benefitted the United States military.  They also went on to become friends.  In his letter of support, Mr. Purdy shares, "There are a lot of citizens of this country who say they support our troops, but Reggie's actions showed he meant it."[8]

Michael M. Walker has been Reggie's close friend for almost 15 years.  In his letter of support, Mr. Walker shares many examples of Reggie's generosity and his love for community:

[H]e organized and paid for a school to be built in town.    This school is still in operation today and has served our community well.    Additionally, he has provided the building for a kids volleyball center that serves 1000's of kids each month and is a center for boys and girls volleyball in our state.  He has sponsored many kids that couldn't afford to pay so all kids can and would participate.   On both instances he has never been the face of the project or daughter accolades rather the person behind the project working to get things done.[9]

---

[7] *See Exhibit E* Letter of Support from Dragan Stevanovic.

[8] *See Exhibit F* Letter of Support from Karl Purdy.

[9] *See Exhibit G* Letter of Support from Michael M. Walker.

Mr. Walker recognizes that Reggie has struggled tremendously with the passing of his son, yet he has continued to work hard to support his community, and "wants to do more positive things for the community, including working to develop a pool for local kids to have a place to go in the summer that might otherwise be left without.   He has a very strong vision of how to do right in his community."[10]

Michael J. Demeure, M.D. met Reggie on their first day of their executive MBA class in 2006; they have known each other for more than 15 years.   Despite their different backgrounds — Dr. Demeure was raised in a traditional family with two parents and financial security whereas Reggie was adopted and could only afford college on an athletic scholarship — they became good friends.  In their class, they shared the same work ethic, taking on more responsibility than the other students in their small group and doing most of the work. Dr. Demeure is most impressed with Reggie's commitment and compassion for his friends and family.  In his letter of support, he states:

> Reggie is most of all very devoted to his family and friends.   He shares freely of his time and resources.   He was there to help me when I had surgery on my hip.   He was there to help my wife and I after each of our 3 children were born.   He has been there when his significant other's parents needed help.    I have seen him help others by providing a job even keeping them employed after there really wasn't any work to be done anymore.[11]

Dr. Demeure asks for the Court's leniency when sentencing Reggie, and is committed to doing all he can to help him.

---

[10] *See Id.*

[11] *See Exhibit H* Letter of Support from Michael J. Demeure, MD.

Glenn R. Mahone, a recently retired lawyer and Vietnam veteran, and combat engineer platoon leader, has known Reggie for roughly 15 years.  Mr. Mahone met Reggie at a forum of African American entrepreneurs focused on building wealth and collective enterprise.   Reggie became a client of Mr. Mahone, and during their attorney-client relationship he assisted Reggie in corporate matters related to Reggie's several businesses.    Mr. Mahone praises Reggie's commitment to the Black business community, and offers that Reggie possesses:

> levels of character and courage that matched his convictions.  One experience which illustrates this important trait occurred when an African American entrepreneur and colleague of Mr. Fowler was in financial distress and on the brink of losing his business. Mr. Fowler called me to assist this colleague and, purely on his own motion, sent via overnight mail a cashier's check for $3,000,000 to support his colleague's efforts.   This extension of credit was without documentation at the time, but that did not deter Mr. Fowler from coming to the aid of a worthy colleague.  It leveled the playing field  and led to his colleague's ultimate success.  Mr. Fowler was generous, perhaps to a fault, with his good fortune in supporting African American enterprise.[12]

Jean Gries is a former employee of Reggie's company, Spiral Global Development. Ms. Gries held several positions over the years, and shares that Reggie "was always professional and supportive . . . and demonstrated numerous qualities as a valuable person. . . . He is a kind, considerate and a devoted father. As a compassionate and understanding person, he allowed me to work from home for several years after the birth of my daughter and for this I will be forever grateful."[13]  Ms. Gries started out as one of hundreds of employees Reggie has had over the years.  She went from being just an employee to knowing Reggie as well as anyone.  Ms. Gries has known Reggie for more than 30 years.

---

[12] *See Exhibit I* Letter of Support from Glenn R. Mahone.

[13] *See Exhibit J* Letter of Support from Jean Gries.

Finally, L.L. Fowler, Reggie's ex-wife, has known him for more than 35 years.  She speaks very highly of Reggie, and is proud of all of his accomplishments, including what an amazing father he always was to their two children, the son mentioned above, and a daughter. But most impressive to her is Reggie's commitment to charity and the community.  According to her, Reggie is not boastful about his contributions which have been significant and impactful, especially for children.  In her letter of support, Ms. Fowler shares:

> Within the community, Reggie quietly, and without any recognition, was involved in financing the construction of a community church and a charter-based grade school and high school - both of which are still going strong today.  Reggie's focus on helping children of all ages has been a constant.  Because of his businesses, he has created facilities for local children that have included ice skating/hockey rinks; volleyball and basketball courts; and a 35,000-square foot indoor children's play space.  Today, all of those facilities are still in operation and still benefiting the community.[14]

Ms. Fowler's letter filled with praise for Reggie is truly a testament to his admirable character.

While the Bank Fraud offense permits a sentence of up to 30 years of incarceration, there is no Guidelines enhancement for loss, and the sentencing range is 0-6 months of incarceration. *C.f., 18 U.S.C. §3553(a)(4) (Kinds of Sentence and Sentencing Range Established For Applicable Category of Offense Committed By Applicable Category of Defendant).*  The statutory maximum sentence for the crime that drives the loss calculation of hundreds of millions of dollars (Unlicensed Operation of a Money Transmitting Business under 18 U.S.C. §1960) is five years of incarceration.  Therefore, even though a sentence above five years is legally permissible,

---

[14] *See Exhibit K* Letter of Support from L.L. Fowler.

because the category of offense that drives the Guidelines carries a 60-month statutory cap, and given the facts of this case, including that the Bank Fraud offenses carry no loss, a sentence north of five years should not be imposed.

Section 5C1.1, as amended, provides part of the basis for this viewpoint.  On Thursday, April 6th at 4:00 p.m., following a two-hour public meeting, the United States Sentencing Commission voted unanimously to change U.S.S.G. §5C1.1, which was amended to recommend a non-custodial sentence for certain defendants.   First-time offenders with no criminal history points who meet certain factors should receive a non-incarceratory sentence.

Prior to the new amendments, to be considered for a non-custodial sentence (*Booker* variance aside), the offense had to have fallen in Zones A or B.  Part B of the new amendment will amend the Commentary to §5C1.1 (Imposition of a Term of Imprisonment) as part of the Commission's implementation of 28 U.S.C. § 994(j). This directed the Commission to make sure that the Guidelines reflect that it's general purpose is to impose a non-incarceratory sentence in cases in which the defendant is a first-time offender who has not been convicted of a violent crime or an "otherwise serious offense," regardless of the zone in which the offense falls.

Part B of the amendment addresses the alternatives to a term of prison that is available to "zero-point" offenders by revising the application note in U.S.S.G. §5C1.1 that addresses non-violent first-time offenders to focus on "zero- point" offenders.  Two new provisions will be added.

New Application Note 4(A) will provide that if the defendant received an adjustment under new U.S.S.G. §4C1.1 and the applicable Guidelines range is in Zone A or B of the

Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate.

New Application Note 4(B) will provide that a departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under new §4C1.1 and the applicable Guideline range overstates the gravity of the offense, because the offense of conviction is not either a crime of violence or an otherwise serious offense. *See* U.S. SENT'G COMM'N, REVISITING STATUS POINTS (2022), *available at* https://www.ussc.gov/research/research-reports/revisiting-status-points.

The questions to consider, include:  Is Reggie a first-time offender?  Does he have zero criminal history points?  Is the crime of conviction a crime of violence?   Should he receive an adjustment under new §4C1.1?  Given that the answer to all of these questions is yes, then we should consider whether the applicable Guideline range overstates the gravity of the offense?  The applicable Guideline range overstates the gravity of the offense if the offense of conviction is not a crime of violence or an otherwise serious offense.

Here, the offense of conviction is not a crime of violence.  Therefore, the remaining question is whether Unlicensed Operation of a Money Transmitting Business is "otherwise a serious offense."   One view of whether or not an offense is "serious" is offered by Congress, itself, as Congress has indicated its view of "serious" as: "a crime of violence that results in serious bodily injury." *See* 28 U.S.C. § 994(i).  In addition, Congress has directed the Commission to specify a prison term for offenders with at least two prior felony convictions committed at different times, offenses constituting a pattern of criminal conduct that afforded the defendant a substantial portion of their income, defendants who with at least three others

18

supervise racketeering conspiracies, defendants who commit a violent felony while on supervision, and large-scale narcotics offenses.  *See* U.S.C. §994(j).  Finally, Congress has required the Commission to specify a maximum prison term for certain third-time offenders in narcotics cases and in those involving violence.  *See* 28 U.S.C. § 994(h).  None of these details apply to Reggie or this case.

In this case, the Guidelines recommended by the U.S. Probation Department include a total offense level of 36 and an advisory sentencing range of 188-235 months of incarceration. As mentioned, according to Probation, these Guidelines are driven by a 30-level enhancement based on a loss count exceeding $550 million.  While the dollar amount of money that ran through Reggie's bank accounts is high, the Guidelines are driven by the mere fact that the money went into accounts that were held by someone who did not have a license in the United States to operate a money transmitting business.  The money wasn't the proceeds of narcotics transactions or tied to firearms offenses or crimes of violence; nor was the money derived from fraudulent conduct.

The American Football League ("AFL") didn't benefit from the investment that Reggie had planned to make.  Reggie's bank accounts were frozen, he could not secure the investment money, and he was not able to invest the large sum of money he promised to invest.  The league found another investor, but then it subsequently folded, and the league lost a lot of money.  But Reggie did not set out to defraud the league.  And those damages, while unfortunate, are not "direct damages."  They are "consequential damages," or losses beyond those which naturally and directly flow from the defendant's conduct.  As a result, Reggie is subject to a civil lawsuit. And these damages do not factor into any loss enhancements in this case.  They are not even

recoverable as part of a restitution award under the Victim and Witness Protection Act (VWPA) or the Mandatory Victims Restitution Act (MRVA). *See* 18 U.S.C.A. §§ 3663(b)(1), 3663A(b) (1); *see also United States v. Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2011).

This, in no way, is meant to suggest that Reggie is, in any way, opposed to paying an order of restitution. He looks forward to continuing a dialogue that I began with the Government so that hopefully we can arrive at a dollar amount of direct damages suffered by any identifiable victim that will be added to a proposed order of restitution for Your Honor's consideration.

And we look forward to the imposition of a reasonable order of forfeiture. Respectfully, the amount that the Government seeks is grossly disproportionate to the gravity of the offense conduct. *See United States v. Bajakajian*, 524 U.S. 321 (1998); *see also United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016); *see also* 8th Amendment to the U.S. Constitution (cruel and unusual punishment provision). In *United States v. Akhavan*, (S.D.N.Y. 8/30/21, Rakoff, J.), Judge Rakoff held that the forfeiture amount proposed by the Government was grossly excessive. The Second Circuit affirmed in part and reversed in part. The case is currently on remand before Judge Rakoff.

Reggie is extremely remorseful, and he is intent upon satisfying whatever orders of forfeiture and restitution the Court imposes.

Remorse and acceptance of responsibility, both felt by Reggie, are important considerations as we consider general and specific deterrence. And the requested sentence certainly can provide just punishment and promote respect for the law while providing adequate general and specific deterrence.

The available empirical evidence does not support a finding that a prison sentence necessarily leads to increased deterrent effects.  *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates … were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

 Studies have also demonstrated that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of more than a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").  The requested sentence would require that Reggie, including the four

years of pretrial supervision, spend approximately seven years reporting to either a U.S. Pretrial Services Officer or a U.S. Probation Officer, being subjected to strict supervision. *See United States v. Gall*, 552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual's liberty."); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that "[probationers are] subject to several standard conditions that substantially restrict their liberty."); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that "[probationers] do not enjoy the absolute liberty to which every citizen is entitled.").

The Sentencing Commission has similarly found that "[t]here is no correlation between recidivism and guidelines' offense level. … While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

A more relevant predictor of recidivism is a defendant's criminal history, of which Reggie has none. Social science research indicates low recidivism rates for offenders with no prior criminal history. In 2004, the U.S.S.C. issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender': A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004. In its report, the USSC notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and

22

> less likely to re-offend. As such, they are deserving of reduced punishment.

*Id.*, p. 1; *see also* 28 U.S.C. § 994(j).

The USSC found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). *See id.*, p. 13- 14, 26.

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only "never-count" offenses specified under U.S.S.G. §4A1.2(c)(2)). *See id.*, p. 14, 26.

The U.S.S.C. notes: "Its low recidivism rate makes first offender group A stand out. Recall that group A offenders have no prior criminal events, not even a prior arrest." *Id.*, p. 14.

Prior to this case, Reggie, age 64, had never been arrested.  He has lived a thoroughly law-abiding life, and thus falls within the category of defendants with the lowest rate of recidivism. He has a history of consistent employment dating back decades.  For the past four years, Reggie has remained fully compliant with the terms of his release.

<u>Conclusion</u>

We very much appreciate Your Honor's consideration of this submission, and look

forward to addressing the Court in person on April 20th at 3:30 p.m.

Respectfully submitted,

*<u>Edward V. Sapone</u>*
Edward V. Sapone (ES-2553)
Sapone & Petrillo, LLP
40 Fulton Street / 17th Floor
New York, NY 10038
(O): (212) 349-9000
(E): ed@saponepetrillo.com
www.saponepetrillo.com

cc: All Government Counsel (By ECF)

24