

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 17, 2023

**WITH REQUEST FOR FILING UNDER SEAL**

The Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      **Re:**    ***United States v. Reginald Fowler*, S3 19 Cr. 254 (ALC)**

Dear Judge Carter:

      The Government respectfully submits this letter and attached exhibits[1] in advance of the sentencing of defendant Reginald Fowler, currently scheduled for April 20, 2023, and in response to defendant's sentencing memorandum submitted April 11, 2023 ("Fowler Sentencing Memo" or "Def. Mem.").[2]

      Reginald Fowler operated Global Trading Solutions LLC, which worked with Crypto Capital Corp., collectively functioning as an unlicensed money transmitter that gave cryptocurrency exchanges access to the U.S. banking system without appropriate regulatory scrutiny. Fowler's lies to financial institutions allowed criminals to pass their illegal gains through the financial system and exposed financial institutions to regulatory and counterparty risk. ███ ███████████████████████████, he then defrauded an up-and-coming football league, and left the league unable to pay its employees and players: players who, just like Fowler, were trying to use sports to make a better life for themselves. Instead of saving funds to repay his victims, the defendant then wasted hundreds of thousands of dollars at various casinos while on bail after his plea. Nor did he provide Probation with accurate and complete financial information, which will further impede the Government's attempts to recover funds for forfeiture and for the victims of Fowler's crimes.

---

[1] The Government's exhibits include a Proposed Order of Forfeiture (Exhibit A), a Proposed Order of Restitution (Exhibit F), and other exhibits described herein. Because of the size and format of some of the remaining exhibits, the Government will provide copies directly to the Court and defense counsel.

[2] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

The Government therefore respectfully requests that the Court impose a sentence of at least 84 months' imprisonment, below the applicable Guidelines range of 188 to 235 months, to reflect the seriousness of the offense, the need to promote respect for the law, and to afford adequate specific and general deterrence. The Court should also impose an order of restitution for $53,189,261.80 to the Trustee of the Alliance of American Football; and an order of forfeiture for $740,249,140.52.

## I.    Factual Background

### A.  Crypto Capital

In or about February 2018, the defendant established Global Trading Solutions LLC ("GTS") and began working with a previously existing set of companies, under the umbrella Crypto Capital Corp. ("Crypto Capital"). Crypto Capital had been set up by others, including Israeli siblings, and co-defendants, Oz and Ravid Yosef. (Presentence Investigation Report ("PSR") ¶ 23). Crypto Capital was based overseas, in Panama and Colombia. (PSR ¶ 23). Crypto Capital serviced cryptocurrency exchanges seeking to assist their customers in exchanging traditional currency for cryptocurrency and vice-versa. (PSR ¶ 23). At no time did Crypto Capital, Fowler, GTS, or any of the other relevant individuals obtain a license from the Department of Treasury or the U.S. states where they operated, as required to transmit money under federal law. (PSR ¶ 34).

In order to access traditional currency on behalf of GTS and Crypto Capital, Fowler opened bank accounts in the name of GTS and its affiliates at banks, including banks backed by the FDIC. (PSR ¶ 26). At the time, traditional financial institutions were often cautious about dealing with cryptocurrency companies, and some refused to engage in any business with such entities or subjected them to heightened due diligence. (PSR ¶ 24). In order to evade these restrictions, Fowler lied to the banks and falsely claimed that the accounts would be used for other purposes. (PSR ¶ 27). Once the accounts were opened, millions of dollars flowed through as part of the money transmitting scheme. (PSR ¶¶ 28–31).

The large sums of money at times caused the banks to ask further questions to Fowler about the nature of the accounts. To avoid these questions, Fowler and his co-conspirators directed customers of the cryptocurrency exchanges to include false information on the wire transfers to the accounts. (PSR ¶¶ 30, 32). Nonetheless, as banks became aware of the misrepresentations, they often shut down the accounts, so Fowler frequently opened new bank accounts to facilitate the scheme. (PSR ¶ 34). In total, between February 2018 and October 2018, GTS and Crypto Capital processed approximately $750 million in cryptocurrency transactions in various currencies, of which approximately $600 million was in U.S. dollars. (PSR ¶ 34).

Crypto Capital marketed itself as a pure payment processor, meaning it would act as a custodian for customer funds and not lend them out. Based on interviews conducted pursuant to this investigation, however, the Government has learned that the defendant and co-defendant Oz Yosef had an agreement under which the defendant could invest ten percent of incoming deposits into Crypto Capital, with the requirement that he return the funds and pay interest to Yosef. Internal

spreadsheets, prepared by the defendant's employees and at his direction, reflect this arrangement. (Ex. B).

## B. The Alliance of American Football (the "AAF")

From about June 2018 up to and including about February 2019, the defendant made fraudulent representations about the amount and source of his wealth to secure an ownership stake in the AAF—a new springtime professional football league. During a June 2018 meeting with AAF executives, including AAF co-founder Charlie Ebersol, Fowler showed the AAF corporate team printouts of bank account information purporting to show that Fowler had hundreds of millions of dollars in foreign bank accounts. Fowler would not let anyone take the printouts after the meeting. Fowler told Ebersol that Fowler's wealth, which he said was largely in cash, came from real estate holdings and an aviation business that built drones in Germany for U.S. Government contracts. During an October 2018 meeting, one of Ebersol's associates took a picture of a bank account printout that Fowler presented. That printout showed roughly $60 million in an HSBC account (the "HSBC Account").

In reality, those bank accounts with hundreds of millions of dollars were related to the defendant's illegal money services business. Thus, when Fowler represented his net worth by relying on those accounts, he was lying about both the source of those funds (they were not from real estate or drone businesses) as well as the ownership of those funds (they belonged to GTS and, more generally, were necessary to redeem GTS/Crypto Capital clients who sold their cryptocurrency, not money Fowler could use).

As a result of Fowler's misrepresentations about his wealth, Ebersol and his associates entered into a Stock Purchase Agreement with Fowler in November 2018, whereby Fowler would pay approximately $50 million for roughly 31% of Ebersol Sports Media Group, Inc., the AAF's parent company, which would make the defendant the largest shareholder in the AAF. Fowler was supposed to pay the $50 million in installments, to be paid at the AAF's request. At the same time, Fowler also executed an agreement with the AAF to provide a $120 million line of credit. Once the Agreement was signed and the AAF started demanding payment, Fowler missed payment deadlines and sent payments in random amounts, less than what was requested.

Moreover, the payments that Fowler did make to the AAF were comprised of GTS/Crypto Capital funds. For example, on or about December 24, 2018, a Fowler company—Spiral Global Development Corporation—transferred roughly $13.5 million to Ebersol Sports Media Group, Inc., through a series of transactions both within the defendant's own accounts and with another individual. Approximately $9 million of that $13.5 million consisted of GTS/Crypto Capital funds—funds that Fowler effectively stole from his other clients using his illegal money transmission business. By January 2019, however, the defendant was once again behind on his payments to the AAF.

The AAF began its inaugural ten-week football season on February 9, 2019. Ultimately, the defendant withdrew his funding commitment after the first week of the season. On April 2, 2019, the AAF suspended its operations, and, on April 17, 2019, the AAF filed for Chapter 7

bankruptcy in U.S. Bankruptcy Court for the Eastern District of Texas, dashing the hopes and plans of many individuals who had joined the league's mission in one form or another.



## II.    Procedural History

On April 30, 2019, Fowler was arrested on a four-count indictment. On February 20, 2020, he was charged in the S3 Superseding Indictment (the "Superseding Indictment"), with conspiracy to commit bank fraud, bank fraud, conspiracy to operate an unlicensed money transmitting business, operation of an unlicensed money transmitting business, and wire fraud. After filing a suppression motion, and within a few weeks of trial, on April 25, 2022, he appeared pleaded guilty to the Superseding Indictment.

## III.    Guidelines Analysis and Probation's Recommendation

Probation calculated a total offense level of 36. (PSR ¶ 69). Probation grouped all five counts together, pursuant to U.S.S.G. § 3D1.2(d), because the offense level for all counts is determined largely on the basis of economic loss. (*Id.* ¶ 57). Probation then calculated the Guidelines under U.S.S.G. § 2B1.1, the section applicable to fraud-related offenses. (*Id.* ¶ 58). Probation calculated the base offense level, pursuant to U.S.S.G. § 2B1.1(a)(1), of 7. (*Id.* ¶ 59). Probation then added the following specific enhancements: (i) an increase of 30 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(P), because the total amount of funds involved in the offenses was greater than $550 million; and (ii) an increase of 2 levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because of the harm to the victims of the offense. (*Id.* ¶¶ 60-61). Three levels are removed for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. (*Id.* ¶¶ 67–68). The Guidelines range is thus 188 to 235 months' imprisonment. (*Id.* ¶ 129).

In his sentencing submission, the defendant suggests, without explanation, that the total amount of funds was $250 million to $550 million, which would lower his total offense level by two. (Def. Mem. at 2 n.1). The Court should reject that argument. During the course of the conspiracy, the defendant and his co-conspirators kept regular spreadsheets documenting the flow of funds through the defendant's many accounts. Those reports were typically sent to Oz Yosef,. One such example, prepared in October 2018, reflected the last internal accounting before the Government's investigation went overt. (Ex. B). The first spreadsheet in this file was entitled "Oz

Report" and listed a total of $740,249,140.52 for "Total Received in USD." (*Id.*). This figure came from a more detailed spreadsheet, entitled "September – Received – Master." This spreadsheet contains a month-by-month breakdown of the incoming funds to the defendant's accounts, broken down by currency. Based on the calculations of the defendant and his co-conspirators, the defendants' accounts received approximately $590,474,749 in U.S. dollars as of October 2018, which places the loss amount squarely above the $550 million level set forth in U.S.S.G. § 2B1.1(b)(1)(P). Adding in other currencies such as the Euro, the Pound, and the Yen, results in a total amount of over $740 million. Although the movement of other currencies in overseas accounts would not implicate the need to register as a U.S.-based MSB, the funds flowing through those accounts certainly were involved in the conspiracy to operate an unlicensed money services business, as charged in Count Three of the Superseding Indictment. Thus, whether looking just at the dollar figure or the overall amount of funds, the defendant, by his and his co-conspirators' own calculations, clearly falls under U.S.S.G. § 2B1.1(b)(1)(P).

Probation recommends a sentence of 120 months' imprisonment. (PSR at 34). Its recommendation focuses on the serious offense conduct, comprising two schemes, as well as "concerns regarding the defendant's willingness to comply with the directives of the probation office during any imposed term of supervised release." (*Id.* at 36).

## IV.   Sentencing Analysis

### A. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(18)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

© to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B. A Significant Term of Imprisonment of at Least 84 Months' Is Sufficient and Not Greater Than Necessary

The Government believes that a sentence within the applicable Guidelines range is too high under the factors set forth in 18 U.S.C. § 3553(a). The Government requests that the Court impose a sentence of at least 84 months' imprisonment. This would be a sentence in line with the applicable Guidelines were Fowler convicted only of Count Five, defrauding the AAF,[3] and properly reflects the seriousness of Fowler's criminal conduct, including operating the unlicensed MSB and bank fraud, affords adequate deterrence, as well reflects the personal characteristics that he highlights in his sentencing submission.

### 1. Seriousness of the Offense

A substantial sentence is needed because the defendant played a critical role in a serious criminal enterprise. Federal law prohibits the operation of unlicensed money transmitting businesses to safeguard the financial system, both in the United States and around the world, from illicit use, and to combat money laundering. Financial institutions are required to register with the Department of Treasury, which mandates the implementation of robust anti-money laundering checks. Those provisions ensure that the financial institutions do not foster criminal activity or lead to the diversion of victim funds, and also require that when a financial institution does identify suspicious activity on its platform, it reports that to law enforcement through a suspicious activity report ("SAR"). Cryptocurrency compounds the need for anti-money laundering programs because of the technology's pseudonymity; without appropriate anti-money laundering checks, a user of cryptocurrency could evade law enforcement by hiding behind the string of numbers describing their wallet address.

By operating GTS, assisting Crypto Capital as a "shadow bank" for cryptocurrency platforms, Fowler created an opportunity for cryptocurrency users to do exactly that. While the full ambit of the criminal activity that flowed through Crypto Capital may never be known, some is clear. From at least about October 2017 until 2019, the Crypto Capital website bragged about the company's partnership with a cryptocurrency exchange called QuadrigaCX. According to a report filed by the Ontario Securities Commission, found at https://www.osc.ca/sites/default/files/2020-10/QuadrigaCX-A-Review-by-Staff-of-the-Ontario-Securities-Commission.pdf, QuadrigaCX "operated like a Ponzi scheme" as of at least 2017 and

---

[3]  The Government estimates that Fowler's sentencing range on Count Five would be 70 to 87 months' imprisonment, based on the approximately $9 million in funds diverted from GTS to the AAF, and the substantial hardship Fowler's fraud imposed on the league.

2018, which ultimately led to its "downfall" in April 2019: in other words, throughout the period of its partnership with Crypto Capital. Crypto Capital also had a close financial relationship with Airbit, a cryptocurrency Ponzi scheme whose operators were prosecuted by this Office; some of the fraud proceeds obtained by the Airbit operators was laundered through Crypto Capital.

Fowler let these criminal proceeds flow through the U.S. financial system through a series of lies. These lies to banks have material consequences. First, the banks to which Fowler lied could have faced regulatory action for banking an unlicensed MSB. *See* Interagency Interpretive Guidance on Providing Banking Services to Money-Services Businesses Operating in the United States, FRRS 3-1873.11, FinCEN Interpretative Guidance issued April 2005 ("Minimum Bank Secrecy Act Due-Diligence Expectations" include a bank's obligation to "confirm FinCEN registration, if required" and "confirm compliance with state or local licensing requirements, if applicable"); *In re Bethex Federal Credit Union*, 2016-06 (FinCEN Enforcement action against financial institution for inadequate monitoring of MSBs that had been allowed to open accounts). Second, the recent turmoil in the U.S. banking system reflects the substantial economic risks to the banks. Banks like Silvergate and Signature knowingly took exposure to the cryptocurrency industry; the banks Fowler lied to were also exposed to the volatility of the industry but were unaware of that fact. Third, lies such as Fowler's have cascading indirect effects. Financial institutions must spend large amounts of money to detect and stop such fraud schemes, which requires significant investment in compliance and fraud detection programs to identify, address, and remediate the fraud and to protect the integrity of the global financial system. Those costs may then be passed on to consumers in the form of higher credit card fees or interest rates.

The defendant's fraudulent conduct with respect to the AAF was also incredibly serious. He lied to obtain an ownership interest in the league, and then, unable to honor the commitments he had undertaken under false pretenses, he let the league falter. That conduct harmed many—not just the other financiers of the AAF, who gave their own money in reliance on Fowler's position as the primary funder of the league, but also the many vendors who entered into contracts that the league was not able to honor after Fowler failed to provide the promised funds, not to mention the many players, coaches, and other personnel, many of whom uprooted their lives to be part of the league. In that respect, the defendant's fraudulent conduct deprived so many of an opportunity that has given him so much:  He attended college on a football scholarship, was a linebacker in the United States Football League (a now-defunct professional spring football league, much like the one that the defendant defrauded), was on the practice squad for the Cincinnati Bengals, and went on to become a three-percent owner of the Minnesota Vikings. (PSR ¶¶ 92, 101, 107-10). In driving the AAF to bankruptcy, Fowler deprived many of these players of the same potential path to success he enjoyed.

### 2.  Need For Deterrence and To Promote Respect for the Law

The Government's proposed sentence is also necessary to deter the defendant and promote respect for the law. The defendant's submission claims that the defendant's lack of criminal history makes him unlikely to recidivate after this conviction. (Def. Mem. at 20-24). But this is a case where the defendant's criminal history does not tell the complete story. As is set forth in further detail below, the defendant engaged and reengaged in criminal conduct even after being offered

offramps to exit the scheme. ████████████████████████████████████████
████████████    The defendant has a history of both financial irresponsibility and financial secrecy, continuing even up to this time, which heightens the risk of further financial crimes. And, finally, the defendant has demonstrated again and again a tendency to justify his behavior rather than fully acknowledge his criminal conduct.

The defendant was willing to continue with the scheme even as the threat of detection and enforcement increased. From February 2018 until October 2018, the defendant cycled through a series of bank accounts to stay one step ahead of compliance departments and financial regulators, repeating the lies that had led to earlier bank closures. This was not a one-time act; this was not even a short-lived scheme that wound down after its discovery. Instead, the defendant and his co-defendants continued to press forward despite the obvious risk of detection.

When the Government seized a number of accounts related to GTS in October 2018, it essentially put an end to the cryptocurrency scheme. But it did not stop the defendant from committing further crimes.



Simply put, there is no basis to conclude that the fact of this criminal prosecution will deter the defendant from additional crimes. This prosecution— indeed, the seizure of over $60 million—did nothing to stop the defendant's criminal behavior.

Additionally, in assessing the need for deterrence, the Court should consider the evidence that this is not the defendant's first crime, even if it is his first conviction. As detailed in the PSR, the defendant was detained at the Canadian border in December 2016 with items "commonly used for a black money scam." (PSR ¶¶ 73-75). The defendant provided a bizarre explanation for why he had the items, involving a United Nations diplomat and complicated exchange of funds. (*Id.* ¶ 74). United States Secret Service agents reviewed messages on the defendant's phone, which seemed inconsistent with the defendant's story and consistent with a more straightforward explanation: the defendant was involved in counterfeiting currency. (*Id.* ¶ 75). Over two years later, when FBI agents searched the defendant's residence in Arizona, they recovered, among other items, $14,000 in counterfeit currency and other items used to produce counterfeit bills. (PSR ¶ 37). These two episodes, taken together, lead to an obvious conclusion: the criminal convictions in this case are not aberrations but are consistent with other instances of the defendant engaging in financial misconduct.

Even now, as the defendant awaits sentencing, there is little to reassure the Court that the defendant will not return to secretive, irresponsible, and illicit financial activity. In assessing the defendant's financial condition, Probation was hampered by the defendant's repeated refusal to

provide basic financial information. Eventually, after months of requests, the defendant finally provided *unsigned* financial records replete with inconsistencies about his bank accounts, his securities, his rental properties, and more. (PSR ¶¶ 113-127). And, as the Government informed the Court in its March 15, 2023 letter, the defendant has gambled away hundreds of thousands of dollars that could have been used to pay the substantial financial penalties the defendant faces in this case. That conduct cries out for deterrence and speaks volumes about the defendant's respect for the law.

Finally, a need for specific deterrence is apparent because the defendant continues to present implausible explanations for his behavior. For example, in his sentencing submission, the defendant claims he sought a license to transmit money "in Europe and abroad." (Def. Mem. at 7). The defendant attached a copy of the certificate to his submission, which, to be clear, was not issued until after the period charged in this case. (Def. Ex. A). This "certificate," rather than showing the defendant's attempts to comply with the law, appears to be nothing more than another sham document meant to cover his tracks. The certificate is not issued by any government, but by the "Hualing Free Industrial Zone" within the Republic of Georgia. The defendant offers no explanation as to why he sought a license from a "free industrial zone" administered by a private company. A fair inference is that at some point, likely in response to the scrutiny he was under, the defendant wanted some "proof," no matter how specious, that his enterprise was operating legally. That he is presenting this document at sentencing to justify his behavior further shows that he has not fully accepted responsibility for his conduct.

A substantial sentence of imprisonment is also necessary for purposes of general deterrence, and to avoid unwarranted sentencing disparities. The defendant was not the first person, nor the last, to operate an unlicensed money transmitting business exchanging traditional currency for crypto. This Office, and the Department of Justice more broadly, have prosecuted numerous such cases, often resulting in meaningful periods of incarceration. *See, e.g., United States v. Marmilev*, 13 Cr. 368 (S.D.N.Y.) (DLC) (five year sentence for defendant who was Chief Technology Officer at unlicensed money transmitting business in digital currency, some of which he knew were derived from criminal activity); *United States v. Chukharev*, 13 Cr. 368 (S.D.N.Y.) (DLC) (three year sentence for minor participant at the same unlicensed money transmitting business in digital currency as *Marmilev*, but who did not know about its use for criminal activity); *United States v. Shrem*, 14 Cr. 243 (S.D.N.Y.) (JSR) (two year sentence for defendant who was the CEO and compliance officer of a Bitcoin exchange company that operated as an unlicensed money services business and who deliberately allowed a specific customer to circumvent AML restrictions); *United States v. Lord*, 15 Cr. 240 (W.D. La.) (46 months' sentence for operating an unlicensed money services business in cryptocurrency); *United States v. Murgio*, 15 Cr. 769 (S.D.N.Y.) (AJN) (66 months' total sentence for defendant convicted of operating an unlicensed money transmitting business and bank fraud, as well as other related offenses); *United States v. Tetley*, 17 Cr. 738 (C.D. Cal.) (sentence of a year and a day for a defendant who operated an unlicensed money services business in cryptocurrency, as well as committed money laundering through that business).

Unfortunately, those prosecutions did not deter Fowler from his crimes; nor has the prosecution of Fowler deterred others. In announcing its charges against the defendant, the Government described Crypto Capital as a "shadow bank" for the cryptocurrency industry.

https://www.justice.gov/usao-sdny/pr/arizona-man-and-israeli-woman-charged-connection-providing-shadow-banking-services. Since then, the phrase has, unfortunately, gone mainstream. *See, e.g.*, Ex. C (quoting Senator Elizabeth Warren that "[c]rypto is the new shadow bank"); Ex. D (discussing whether the business model of a stablecoin "is still fundamentally one of a shadow bank"). Other actors have picked up where the defendant and his co-conspirators left off, including recent allegations against Sam Bankman-Fried. *See United States v. Bankman-Fried*, S5 22 Cr. 673 (LAK), ¶¶ 14–21 (alleging that the CEO of cryptocurrency platform FTX lied to a bank in order to open an account to exchange traditional currency for cryptocurrency without a license). A significant term of imprisonment will send an important message to the cryptocurrency industry of the consequences for improperly using financial institutions to facilitate unregulated cryptocurrency transactions.

White collar offenses like those Fowler committed also merit a substantial sentence because they are "lucrative" and "are difficult to detect and punish," which means that "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses." *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018).

### C.  The Defendant's Mitigating Factors Do Not Warrant the Extreme Variance He Seeks

In his submission, the defendant offers numerous mitigating factors for the Court's consideration. While the Government does not want to minimize the difficulties the defendant has faced throughout his life, it respectfully submits that there is no link between those challenges and the instant offense. The defendant's difficult upbringing must have left a mark on him but cannot explain his decision, well into his career, to lie to banks and set up a massive, unregulated, money services business. Similarly, his son's addiction and ultimate death surely weighed heavily on him, but given the nature of these crimes—which were sophisticated and involved numerous co-conspirators and counterparties—the defendant cannot show that these crimes were the result of poor judgment caused by the pain of losing his son.

As to arguments that the Guidelines range is overly punitive, the Government is in partial agreement. While the Government strenuously objects to a non-custodial sentence for such serious misconduct, the Government is recommending a sentence well below the Guidelines range in part due to the factors the defendant has identified in his submission. But on the other hand, the defendant appears unable and unlikely to pay the restitution he owes to his victims, which counsels in support of a meaningful sentence of incarceration.

## V.      Forfeiture

Enclosed is the Government's proposed Preliminary Order of Forfeiture, seeking a money judgment of $740,249,140.52 (the "Proposed Money Judgment"), as well as certain specific property which the Government has identified during the pendency of the case (the "Proposed Specific Property"). The Proposed Specific Property consists of bank accounts used as part of the schemes and identified in the Government's Bill of Particulars (Dkt. 66), including funds seized pursuant to seizure warrants (described in Exhibit A of the Preliminary Order of Forfeiture as ¶¶ a–f); funds restrained pursuant to post-indictment restraining orders (described in Exhibit A of the

Preliminary Order of Forfeiture as ¶¶ nn–ss, tt–ww); funds in accounts that are described on the document found in Fowler's co-conspirator Oz Yosef's files, described above (described in Exhibit A of the Preliminary Order of Forfeiture as ¶¶ aaa–hhh) and funds in accounts that are described on another document found in Fowler's co-conspirator Oz Yosef's files enclosed herein as Exhibit E (described in Exhibit A of the Preliminary Order of Forfeiture as ¶¶ xx–zz). These funds include approximately $68 million in HSBC accounts that the Government seized on or about October 23, 2018 and on or about November 16, 2018, as well as funds seized by overseas law enforcement agencies.

As discussed above, the Proposed Money Judgment sum is based on a document found in Fowler's co-conspirator Oz Yosef's files, obtained pursuant to a search warrant. This document, entitled "Funds Management" and enclosed with this submission as Exhibit B, states that the total amount received by Crypto Capital and its related accounts as of about September 2018[4] is the amount of the Money Judgment.

Contrary to Fowler's position, (Def. Mem. at 20), that sum is perfectly consistent with the Eighth Amendment, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. A criminal forfeiture imposed as part of a sentence "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Supreme Court has emphasized that the constitutional standard is not "strict proportionality" but "gross disproportionality," *id.* at 336, a standard that "reserves a constitutional violation for only the extraordinary case," *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003).

Four "traditional" factors set out in *Bajakajian* guide the constitutional analysis:

(1) the essence of the crime of the defendant and its relation to other criminal activity,
(2) whether the defendant fits into the class of persons for whom the statute was principally designed,
(3) the maximum sentence and fine that could have been imposed, and
(4) the nature of the harm caused by the defendant's conduct.

*United States v. Viloski*, 814 F.3d 104, 110, 113 (2d Cir. 2016) (paragraph breaks added). Courts may also consider, as part of the gross disproportionality analysis, "whether the forfeiture would deprive the defendant of his livelihood, i.e., his future ability to earn a living," but "may not consider as a discrete factor a defendant's personal circumstances, such as age, health, or present financial condition." *Id.* at 111-12. The defendant bears the burden of showing that the forfeiture is unconstitutional. *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010).

Under the law, the Proposed Money Judgment is not grossly disproportionate to the offense. The first *Bajakajian* factor requires consideration of "the essence of the crime of the defendant and its relation to other criminal activity." *Id.* at 121. Here, Fowler helped orchestrate an international, massive, unlicensed money transmitting and bank fraud conspiracy involving

---

[4]  As the Court can see, the first page states that it includes "Transactions Through 6/20/18," but other tabs show that it includes transactions through at least September 2018.

coconspirators throughout the world. His crimes required layers of deception, from false bank account applications to wire information. Numerous banks were defrauded to the tune of thousands upon thousands of transactions and over $700 million. A nascent football league was defrauded, contributing to its collapse. Plainly, the total criminal proceeds of Fowler's conduct represent the essence of his crime.

Second, Fowler fits into the class of persons for whom the statute was principally designed. *Bajakajian*, 524 U.S. at 122. As a putatively sophisticated investor and businessman, he is the kind of person to whom the money transmitting business and fraud laws are directed. Thus, the second *Bajakajian* factor also weighs in favor of full forfeiture. *See also Viloski*, 814 F.3d at 114 (defendant fit squarely within class of persons for whom the federal fraud statutes were aimed— he used facilities of interstate commerce to engage in fraudulent schemes and then disguised the nature of the proceeds).

The third *Bajakajian* factor considers the maximum sentence and fine that could have been imposed. Here, the maximum sentence is 90 years. The maximum statutory fine under 18 U.S.C. § 3571, the alternative fine provision, is at least approximately $120 million, twice the $60 million in pecuniary gain he had on deposit in an HSBC Securities account which was seized by the Government.[5] While the Proposed Money Judgment is larger than the maximum statutory fine, that is no constitutional barrier – "[b]ecause [Fowler] faced a maximum prison sentence of . . . effectively a life sentence—the challenged forfeiture cannot be deemed disproportional notwithstanding the statutory maximum fine of $10 million." *United States v. Bonventre*, 646 F. App'x 73, 91–92 (2d Cir. 2016) (affirming forfeiture amount of more than $19 billion).

The final *Bajakajian* factor is the nature of the harm caused by Fowler's conduct. Fowler's scheme was costly for banks, as described above. His fraud on the AAF was devastating, ultimately contributing to the league's bankruptcy. This factor once again weighs heavily in favor of full forfeiture.

Indeed, the Second Circuit has specifically rejected Eighth Amendment challenges to forfeiture amounts in cases involving unlicensed money transmitting businesses, holding that when the "total amount" transmitted through the defendant's unlicensed MSB is "quite close to the amount ordered forfeited," there is no constitutional bar to such a forfeiture sum. *United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008) (affirming forfeiture sum of more than $20 million). Because Fowler was convicted of not only operating an unlicensed money transmitting business, but also multiple fraud offenses, the case for full forfeiture is even stronger here.

Fowler cites to only one case supporting his position that full forfeiture would raise constitutional issues: Judge Rakoff's recent decision in *United States v. Akhavan*. But as he himself admits, "[t]he Second Circuit affirmed in part and reversed in part." *United States v. Patterson*, No. 21-1678-CR, 2022 WL 17825627, at *6 (2d Cir. Dec. 21, 2022). While the case is indeed currently "on remand before Judge Rakoff," the Second Circuit provided important principles to

---

[5] Even assuming that these funds do not represent pecuniary gain, the alternative fine provision is still over $100 million: twice the pecuniary loss to AAF, which as described below is more than $53 million.

guide the district court, stating that "our precedents suggest that a forfeiture amount is not necessarily greatly disproportionate where it equals the proceeds of the illegal scheme, even if it significantly exceeds the maximum statutory fine," and cited *Elfgeeh* as affirming a forfeiture judgment "where evidence showed the amount roughly equaled the total funds defendants unlawfully transmitted."  Fowler has not come close to meeting his burden of showing that the Proposed Money Judgment is unconstitutional. *Castello*, 611 F.3d at 120.

## VI.    Restitution

The Government submits a Proposed Order of Restitution in the amount of $53,189,261.80 on behalf of the AAF, which was a victim of Fowler's wire fraud. (Ex. F). In support of that Proposed Order, the Government submits the Proffer of Brian S. Engel, a general counsel for the trustee of the consolidated bankruptcy estates of the debtor entities comprising the AAF bankruptcy cases. (Ex. G.). That proffer explains the methodology underlying the Government's request for $53,189,261.80 on behalf of the AAF. That figure is comprised of two categories of loss. One category is expenses that the AAF incurred, that came due, and that the AAF was unable to pay, while Fowler was in position as a financier of the league. Such expenses amount to $35,333,917.70. The other category is financing commitments that others made to the AAF, and lost, in reliance on Fowler's position as the lead investor. Those financing commitments amount to $17,855,344.10. As reflected in Mr. Engel's proffer, Mr. Engel prepared two summary spreadsheets—one for each category of loss, and the Government submits those spreadsheets. (Exs. H-I). The Government also submits the claims and supporting documents the underly Mr. Engel's work and that are mentioned in the proffer. (*E.g.*, Exs. J, L).[6] Among the documents supporting the claim for the financing commitments is the Preferred Stock Purchase Agreement that all financiers of the league entered into. (Ex. K). Section 1.4.1 of that Agreement, titled "Additional Fowler Funding Requests," provided, in pertinent part, that "Fowler hereby irrevocably and unconditionally agrees to pay the Company . . . the amount . . . set forth on the applicable Equity Funding Request . . . within one (1) Business Day of the Company's delivery of such Equity Funding Request to Fowler."  In short, the Agreement that all financiers of the league signed made explicit their and the league's reliance on Fowler's ability to satisfy his obligations. That reliance is reflected not only in the Stock Purchase Agreement, but also in declarations submitted by many of the financiers, including Charlie Ebersol. (Exs. O-U).

Under the restitution statutes, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2); *accord* 18 U.S.C. § 3663(a)(2). A person is directly harmed by the commission of an offense when the offense is a but-for cause of the harm. *E.g.*, *United States v. Mathew*, 916 F.3d 510, 519 (5th Cir. 2019). A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct. *Id.*; *see also United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019) ("The central goal of a proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked

---

[6] In addition, the Government submits a Victim Impact Statement and supporting Appendix on behalf of the AAF. (Exs. M-N).

by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created, it would be unjust or impractical to impose liability").[7]

Here, Fowler's fraud was a but-for cause of harm to the AAF. But for Fowler's fraudulent representations about the ownership and availability of funds, and his failure to fund as he committed, the league would have had sufficient funds on hand to satisfy the obligations the league incurred through February 2019; AAF would not have defaulted, and the now-creditors' debts would have been paid.

The harms visited upon the AAF, its creditors, owners, and other stakeholders, moreover, were proximately caused by Fowler's failure to fund because those harms were reasonably foreseeable. Fowler's funding commitments were to provide operating finances to build-out and operate the league's growth. At the time, the league projected operating expenses would exceed revenue in the initial stages of operation. Fowler's loan commitment alone was double the amount of capital raised from share sales, including to Fowler. Fowler had ready and actual access to all of that information. After all, in addition to becoming the largest shareholder, Fowler gained roles as an AAF director, the chairman of the football operations committee, and a co-chair of the finance committee.

The AAF entered into exactly the sorts of transactions and incurred exactly the sorts of debts that were reasonably foreseeable to Fowler and for which his funds were intended. That the AAF would be saddled with debts if Fowler did not satisfy his obligations was a reasonably foreseeable consequence of his conduct. The risk that the AAF would default on debts it could not pay because Fowler lied about his funds and failed to provide funds was precisely within "the kinds of harms [Fowler] risked by his conduct." *Calderon*, 944 F.3d at 95.

Against the foregoing, the defendant—who, exhibiting an utter lack of acceptance of responsibility, claims that he "did not set out to defraud the league"—contends that the AAF's losses "are not 'direct damages'" but instead "are 'consequential damages,' or losses beyond those

---

[7] Given that the AAF is a victim under the restitution statutes, the AAF's bankruptcy estate is a victim as a matter of law. Commencing a bankruptcy case creates an estate "comprised of . . . all legal or equitable interests of the debtor in property."   11 U.S.C. § 541(a)(1). That includes contractual rights and causes of action. *See, e.g.*, *In re Mid-Island Hospital, Inc.*, 276 F.3d 123, 128 (2d Cir. 2002); *In re Prudential Lines Inc.*, 928 F.2d 565, 573 (2d Cir. 1991). Like all of the AAF's property rights, its right to restitution for Fowler's fraud transferred by operation of law to the AAF's bankruptcy estate. Bankruptcy estates may qualify as restitution victims. *See, e.g.*, *United States v. Theall*, 525 Fed. Appx. 256, 267 (5th Cir. 2013); *United States v. Waldner*, 580 F.3d 699, 710 (8th Cir. 2009); *United States v. Shadduck,* 112 F.3d 523, 531 (1st Cir. 1997). Moreover, The Chapter 7 trustee "is the representative of the estate" vested with full control of the estate and all estate property. 11 U.S.C. § 323(a). In fact, "[o]nly the [Chapter 7] bankruptcy trustee has standing to bring claims owned by the bankruptcy estate."  *In re Beckford*, 729 Fed. Appx. 127, 128 (2d Cir. 2018). Accordingly, here it is only the trustee who can assert the AAF estate's claims. *Cf. In re Wilton Armetale, Inc.*, 968 F.3d 273, 282 (3d Cir. 2020).

which naturally and directly flow from the defendant's conduct, and thus "are not even recoverable as part of a restitution award." (Def. Mem. at 19-20). In support of that contention, the defense cites one case: *United States v. Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009). But *Donaghy* is inapposite. There, the Government sought restitution on behalf of the NBA from defendants involved in a scheme whereby an NBA referee provided tips to individuals who went on to place bets on games that the referee was refereeing. Among the categories of expenses that the NBA sought was expenses paid to the NBA's outside counsel for various services related to the investigation and prosecution of the criminal case. The Honorable Carol Bagley Amon, U.S. District Judge for the Eastern District of New York, awarded almost all of what the Government sought on behalf of the NBA. To be sure, there was one category of attorney expense that the court did not award. Namely, the Government argued that the cost of an attorney's time consulting with the NBA regarding its public response to one of the defendant's guilty pleas was a "direct and foreseeable" result of the conspiracy at issue, but the Court reasoned that "only foreseeable steps taken for the purpose of *assisting the [G]overnment in the investigation or prosecution of the offense* . . . are recoverable pursuant to subsection (b)(4), the specific provision under which these fees are sought." 570 F. Supp. 2d at 432 (emphasis added). But that subsection is not at issue here. The AAF seeks restitution not for "expenses incurred during participation in the investigation or prosecution of the offense," under 18 U.S.C. § 3663A(b)(4), but rather for "loss . . . of property," under 18 U.S.C. § 3663A(b)(1). Fowler simply offers no reason why it was not reasonably foreseeable to him that, if he lied about his ability to fund the league and did not, in fact, fund the league, then the league would default on expenses and financing commitments that the league incurred while Fowler was in position as the league's lead funder.

Finally, the Trustee's approach here of looking to the amounts of allowed claims in the bankruptcy case as a measure of the estate's losses is appropriate. The restitution statutes do not impose on courts any particular formula or exacting calculation to determine such losses. Instead, courts need make only a reasonable approximation of loss based on a rational method. In *United States v. Gushlak*, the Second Circuit explained:

> [W]e have never used the word "actual [loss]" in [the restitution] context to mean "mathematically precise." Nor have we ever adopted a one-size-fits-all standard of precision for application in restitution cases. To the contrary, our case law reflects the settled understanding among courts of appeals that a "reasonable approximation" will suffice, especially in cases in which an exact dollar amount is inherently incalculable.

728 F.3d 184, 195-96 (2d Cir. 2013).

For the foregoing reasons, the Government respectfully requests that the Court enter the Proposed Order of Restitution.

## VII.     Conclusion

Reginald Fowler has committed serious crimes. Only a significant period of incarceration, of at least 84 months' imprisonment, could reflect that seriousness, promote respect for the law, and afford adequate deterrence.


Very truly yours,

DAMIAN WILLIAMS
United States Attorney


by: /s_____
    Jessica Greenwood
    Samuel Raymond
    Samuel P. Rothschild
    Sheb Swett
    Assistant United States Attorneys
    (212) 637- /2504/6519


cc: Edward V. Sapone, Esq. (by e-mail)