IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
———————————————————————————X
                                         :
                                         :
                                         :
  UNITED STATES OF AMERICA               :
                                         :
       —V.—                              :   S3 19-Cr. 254 (ALC)
                                         :
  REGINALD FOWLER,                       :
                                         :
       DEFENDANT.                        :
                                         :
———————————————————————————X
```

## PROFFER OF BRIAN S. ENGEL

If called to testify from the witness stand, Brian S. Engel, a general counsel for the consolidated bankruptcy estates of the debtor entities comprising the AAF bankruptcy cases would testify substantially as follows and declares:

My name is Brian Scott Engel. I am a Texas resident and a United States citizen. I reside in Dripping Springs, Hays County, Texas. I am over the age of twenty-one and competent to make this proffer of testimony. I am a member of the bar of the State of Texas licensed to practice in Texas state and federal courts and have been admitted to practice in cases in other federal courts also.

A substantial part of my practice over many years has involved representing creditors and bankruptcy trustees in bankruptcy cases in Texas bankruptcy courts. I am one of the attorneys representing Randolph N. Osherow in his capacity as the Chapter 7 Trustee of the substantively consolidated Chapter 7 bankruptcy estates Ebersol Sports Media Group, Inc. and five of its subsidiaries formerly operating as the Alliance of American Football ("AAF"). The substantively consolidated bankruptcy estates are being administered in *In re Legendary Field Exhibitions, LLC*, No. 19-50900-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio, Division.[1] Each commenced on April 17, 2019; the AAF bankruptcy cases

---

[1] The consolidated cases are:
*In re Legendary Field Exhibitions, LLC*, No. 19-50900;
*In re AAF Players, LLC*, No. 19-50902;
*In re AAF Properties, LLC*, No. 19-50903;
*In re Ebersol Sports Media Group, LLC*, 19-50904;
*In re LFE2, LLC, No. 19-50905*;
*In re We Are Realtime, LLC*, No. 19-50906.

1

were substantively consolidated by bankruptcy court order signed on July 8, 2019.[2]

The Court is probably broadly familiar with the Chapter 7 bankruptcy process. Functionally, it provides an extensively regulated creditors' remedy. On filing, all of a debtor's property and rights in property by operation of the federal Bankruptcy Code forms and comprises an estate. The estate is a juridical entity. Pre-petition creditors have a claim against that estate and can file a "proof of claim" but otherwise cannot pursue individual collection actions. A chapter 7 debtor correspondingly has no authority to exercise any control over the estate. Instead, a court-appointed Chapter 7 trustee is the *only* person authorized to act on behalf of the estate or to deal with property and rights the estate may have, including the estate's rights and claims against third parties. Federal law defines and delimits a Chapter 7 trustee's duties. Among them, the Chapter 7 trustee is charged to investigate debtors' financial affairs and collect and reduce the property of the estate to money, which may then be distributed according to the order of priority the Bankruptcy Code sets out. The Chapter 7 trustee is authorized with court approval to engage one or more general or special counsel to aid him in carrying out these and other functions.

I and my partner, Steve Turner, have served as general counsel for the Trustee since approximately the outset of the AAF bankruptcy.[3] As a general counsel to the estate, my role was and is to aid the Trustee in carrying out his responsibilities as Trustee. My role has included primary responsibility for conducting such work as compiling and analyzing AAF's business records related to the enterprise's financial affairs, reviewing claims filed in the case to consider recommendations to the Trustee whether to object or re-characterize claims, dealing with under-secured creditors, analyzing the legal duties and potential liabilities of directors and officers and litigating and ultimately resolving a significant class action case filed by former players involving claims under their 3-year player contracts with the AAF (the "Player Case").[4] For the most part, the work I was called upon to address as general counsel to the Estate is typical of the types of work that attorneys representing Chapter 7 trustees perform generally, and typical of work I have engaged in on behalf of the Trustee in other cases.

In that role, I have been the person most involved in investigating the AAF's business affairs and compiling and reviewing the AAF's business records relevant to the AAF's operation and financial affairs. Those business records, like other property, are estate property. Ultimately, I was able to compile more than one-million records. After an extended period, and with the help of special counsel in another matter the Trustee is pursuing, we were able to import the bulk of these records into "Relativity," a familiar e-discovery management tool with robust OCR, search and native file management capabilities. This facilitated locating and reviewing relevant AAF business records.

---

[2] Pacer Docket No. 150 in No. 19-50900.
[3] The order approving my employment in that regard is docketed at Pacer Docket No. 142, Case No. 19-50900.
[4] That class action litigation is *Colton Schmidt, et al. v. AAF Players, LLC, et al*, Adversary Proceeding No. 19-05053, in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Chief Judge Craig A. Gargotta presiding.

I have also been engaged in discussions with creditors and in conducting interviews with former AAF representatives and their attorneys regarding the AAF's financial affairs and the merits of creditor claims.

Overall, my role has been to cull through and understand large amounts of information in order to inform the Trustee on matters so that he can exercise his independent business judgment on points of decision regarding the Estate. It is fair to say, and it is usual in this type of work, that I am better informed than the Trustee at a granular level regarding the documents and facts underlying matters presented to the Trustee for decision. And that is case in this matter. My knowledge derives from my review and investigation of the Estate's business records and public records, my interactions with creditors and their counsel, and interaction and interviews with most of the AAF's key management personnel. My factual statements expressed are based on my review of records, interviews with interested parties and in many cases their declarations made in connection with this matter or other litigation matters that have occurred in the bankruptcy case.

In the course of my work, I became aware of facts and circumstances related to Reginald Fowler's interactions with and funding commitments to the AAF, about his prosecution and ultimately about his conviction. I am the person on behalf of the Estate who followed the case developments and searched for and provided to the United States relevant business records that attorneys for the government collected. When asked, I am the person who tried to answer the attorneys' questions based on my review of records. I understand that Charlie Ebersol, the former CEO of Ebersol Sports Media Group, Inc. ("ESMG") and the cofounder of the AAF, also assisted the government in providing information and context. I have interviewed Mr. Ebersol for the Estate several times on particular matters and questions, including detailed discussions about ESMG's funding rounds and in particular Mr. Fowler's transactions, relations with and representations to ESMG and the AAF.

Based on my investigation, it is apparent that Mr. Fowler's commitment to lead the AAF's "Series 1" primary funding round in the summer of 2018 with $50 million in equity funding and a $120 million credit facility was fundamental to the AAF scaling the league in earnest from a conceptual plan to a full operating business, incurring millions in debts and obligations on the expectation that Fowler's money was real and immediately available. There can be no doubt that Fowler's equity and debt funding amounts were needed and intended to be used to directly pay these scale-up obligations. Charlie Ebersol, the AAF's founder and original chief executive confirmed this to me in interviews on several occasions and provided a declaration that says so explicitly.

AAF's business records and operations bear this out. The AAF's pro forma financial model projected net negative operating income approximating $126 million for 2019. AAF raised only about 25% of that amount in aggregate from its original seed financing round and borrowings from

note and warrant and convertible note purchasers. AAF's business plan, which Mr. Fowler received no later than June 28, 2018, stated explicitly that the proceeds from the fundraising Fowler committed to lead "will be used to build out local team operations, complete the digital platform, sign players, run training camp and complete our inaugural season." The same business plan also stated that the primary use of proceeds from what came to be called the Series 1 raise, would be "to build the digital platform/app and for general league and team expenses to prepare for kick-off and operate the league and teams."

Even more particularly, the plan informed that at the league level "operational expense items include but are not limited to [s]alaries, bonuses & benefits, season build up marketing and media, CBS fees, content production costs, PR, branding research and services, football and training equipment, training camp payments, hiring and relocation fees, office rent, supplies and furniture, city launch events, television and digital production costs, legal and consulting fees and travel." At the team level, the identified operational expense items would include, but not be limited to [s]alaries, bonuses & benefits, player personal services, stadium deposits and rentals, travel to away games, monthly rent and office supplies, referee costs, medical supplies, game staff, catering and hospitality costs, recruitment and relocations costs, player housing and local advertising.

It is telling, and AAF's bank statements establish, that ESMG received investment into the same Silicon Valley Bank account, no. xxxxxx2308, out of which AAF's operating expenses were paid. According to its employee census the Trustee received, AAF hired more than 70% of its operating staff after securing Mr. Fowler's commitment evidenced by his term sheet; all of AAF's players were signed to contracts after that time.

It appears that rather than become a mere passive investor in the AAF enterprise, Mr. Fowler sought and obtained a significant control position in the league. He required and became an ESMG director, chaired the league's Football Committee and headed the AAF's Finance Committee charged with overseeing the league's operating budgets.

It is ineluctably evident that AAF expected that Mr. Fowler's funding would be used to pay the operating obligations that the AAF needed to and did incur. This is not surprising. It requires no special expertise to understand that starting and operating a professional sports league with teams and events in eight cities takes a lot of money and the toils of many people. Similarly, it is mundanely obvious that early stage startup ventures like the AAF use the operating capital they raise to pay the freight of operations. So it was with AAF and Mr. Fowler.

The operating obligations that the AAF incurred and that were not paid are reflected in the proofs of claim filed in the AAF bankruptcy and Estate obligations.

In connection with Mr. Fowler's commitment, AAF received and held, among other things, a Series 1 Preferred Stock Purchase Agreement and Line of Credit Agreement backed by stock warrants. These instruments, which required Fowler to fund equity draws and advance loans in immediately available funds represented valuable property rights worth $170 million to AAF, in exchange for which Mr. Fowler received approximately 53% of the company's preferred stock (about 27.1% ownership) and warrants to acquire as much as an additional 10% stake. In these instruments Fowler made agreements to maintain liquid funds sufficient to perform them and acknowledged that ESMG "is relying on the fulfillment of Fowler's obligations' in entering into stock purchase agreement.

After Fowler pleaded guilty, I reached out to the Assistant United States Attorneys in the matter to discuss the Estate's status as a victim of Fowler's wire fraud scheme. Based on the pertinent indictment, my independent investigation and AAF business records, I had concluded, and Mr. Fowler's allocution directly bears this out, that the AAF was the direct target of Mr. Fowler's scheme and accompanying falsehoods. I am not a criminal lawyer, but I was aware of statutes such as the MVRA and VWPA that require and authorize restitution to victims of offenses such as those of which Mr. Fowler was convicted. I had engaged in researching significant authorities concerning restitution and the standards for awarding and methods for estimating restitution, including in cases where a scheme or artifice is an element of the offense of conviction, as here.

With the Trustee's approval and with information and assistance obtained from class counsel in the Player Case, I prepared and submitted a Victim Impact Statement on behalf of the Estate. It is not my intention in my remarks here to recapitulate all that was said in that victim impact statement, except to say that it advanced that the most appropriate measure to achieve a reasonable and just estimation of the pecuniary loss to the Estate from Fowler's fraud is the aggregate amount of:

a. the allowed proofs of claim presented in the consolidated cases, adjusted to exclude obligations and amounts that were incurred before Fowler's involvement in June 2018, or that were incurred after Dundon Capital Partners and Thomas Dundon made financing commitments to provide funding to the AAF going forward after it became apparent that Mr. Fowler would not provide his funds timely or at all; and

b. investment contributions and bridge loans made on the expectation that Fowler had available and would provide the $170 Million funding he promised in the Series 1 financing and related letter of credit facility, regardless whether a proof of claim or interest was filed.[5]

---

[5] These bridge loan and convertible note claims are readily identified and quantified. AAF kept complete records of these lending transactions and I was able to review the relevant debt instruments and confirm that the amounts were not repaid.

5

Limiting restitution to those components effectively both provides in the bankruptcy context recompense to the AAF and the Estate for its pecuniary loss and limits that pecuniary loss to amounts caused by Fowler's course of criminal conduct. Applying this computation method ensures that startup expenses and obligations to third parties that were actually satisfied, or that were incurred before AAF relied on Fowler's fraudulent representations, are not attributed to Fowler. It also assures that debts AAF incurred for going-forward obligations expecting that Dundon Capital Partners or Thomas Dundon would fund them, are also excluded.

In my opinion, this method is particularly appropriate in the Chapter 7 bankruptcy context. The basic premise in a Chapter 7 entity liquidation, generally, and in the AAF's particular case, is that the entity will not survive or be resurrected. Pecuniary loss for unsecured and under-secured indebtedness is liquidated through the proofs of claim filed subject to serious penalty for a false claim. Typically, proofs of claim are also supported by invoices, contracts and other documents. And equity investment can be repaid in the event of a surplus estate. The bankruptcy process has within a robust and court-supervised process for prioritizing distribution. In this way, assessing economic loss based on the claims against the Estate is reasonably likely to yield accurate estimates of loss to the AAF, to vindicate and value the Estate's property rights, and to serve bankruptcy's purpose to ratably distribute the remains of the debtor entity.

Applying these principles, I individually reviewed each of 396 proofs of claim creditors filed in the six consolidated AAF bankruptcies and the attached supporting documents. In general, I followed the following process:
   a. I identified claims that were filed in duplicate in more than one case and eliminated the duplicates so that no claim would be considered more than once.
   b. I excluded from review the claim filed by Dundon Capital Partners and the claim filed by Thomas Dundon, who agreed to fund the AAF once it became clear that Fowler would not honor his commitments.
   c. I excluded from review claims to which the trustee objected and that were denied.
   d. For the remaining claims, I reviewed the basic nature of the claim, the amount claimed and the supporting documents attached, including each invoice to determine when the services or goods were ordered/performed. Where the attached supporting documents left documents or were missing, I searched AAF's business records for relevant contracts, book entries and communications to resolve questions my review raised.
   e. For executory contracts rejected by operation of law, I determined whether the contract was entered during relevant period and reviewed the rejection damages claimed.
   f. I excluded de minimis amounts, such as partial refund of season ticket fees for the games not played in season weeks 9 and 10. My review indicated that these were often not supported by verifying information.
   g. Because the period attributable to Fowler's involvement ended by February 23, 2019 but AAF continued to operate based on funds provided by Dundon Capital Partners, it was

      necessary to view each invoice and amount to assure that only expenses and obligations within the relevant time window were included in the computation.

  h. I performed that analysis on three separate passes through the claims. I adopted this redundancy to make sure that Fowler received the benefit of reasonable doubts as to whether an amount should be included and so that I could confidently represent to the United States and the Court that I had made all reasonable efforts to exclude amounts not fairly attributable to Fowler. In instances where the documents submitted with the proof of claim were inconclusive, I performed additional content-based searches of the AAF's business records. I used the Relativity tool I mentioned earlier and also some reports that I was able to retrieve from the AAF's Quickbooks online accounting software.

As I conducted each pass through the documents, I prepared a spreadsheet enumerating each debt claim that I considered in my analysis, including claim identifying information, the claim amount as filed, any reducing adjustments and the resulting amount, notes explaining the adjustments, and other explanatory notes. I did this to be transparent for the Court, the defendant and the government about my work and computation. I know that the government has produced that spreadsheet to the defendant. I also made available each of the claims and attached support in .pdf form, although those are also available on Pacer.

Regarding bridge lenders, I was able to confirm that the loans were advanced to accommodate Mr. Fowler's claimed timing difficulties in arrangements to transfer his funds. I obtained declarations to this effect from the bridge lenders, Dick Ebersol as representative of the Ebersol Saint James Family Trust and David Pottruck as representative of the David S. Pottruck Revocable Trust.

Regarding convertible note investments converted and cancelled in the Series 1 raise, I reviewed the relevant financing documentation. While it was apparent to me from the Series 1 Preferred Stock Purchase Agreement executing the financing that the convertible note purchasers were entitled to and did consent to cancellation and conversion of their notes in reliance on the expectation that Mr. Fowler's funds were real and immediately available (and not part of an ongoing crime), I nevertheless obtained declarations to this effect from many of them.

I summarized the financing and bridge loan transactions in an additional spreadsheet which I provided to the government and which I am informed the government provided to Mr. Fowler. In this respect, also, my objective was to be transparent.

The final summary of claims, after the described reducing adjustments shows economic losses attributable to the time of Fowler's involvement incurred in reliance on Fowler's commitments and reveals a loss amount of $35,333,917.70. Regarding the bridge debt obligations and note conversion investors, the amount is $17,855,344.10.

I have briefly reviewed Mr. Fowler's presentencing submittal filed on the docket and want to address in my remarks here its conclusory statement that the amounts the government advances for restitution are mere "consequential damages." Nothing could be further from the truth. As my remarks above indicate, and it is undeniably true, the AAF was holding instruments from Mr. Fowler worth $170 million on their face. **The specific purpose of those instruments was to provide funds to pay for the operation of the AAF**. That means to pay its operating bills. The AAF incurred obligations relying that Mr. Fowler was being truthful and would perform. The Court should be aware that Mr. Fowler signed those definitive agreements and transmitted them to the AAF in late November 2018, fully a month after, I am informed, the accounts he represented would be used to perform the agreement were seized. In addition, he became an ESMG director with the utmost duty of candor to the AAF. He, and no one else, made the AAF insolvent and put it in the position of having to raise replacement funds on the literal eve of its failure on a "beggars can't be choosers" basis.

AAF's operating expenses are not merely remote incidents to the agreements and commitments Mr. Fowler made. Based on my understanding of the transactions, they were the very subject and the very purpose of the agreements between the AAF and Fowler. AAF's inability to pay its obligations incurred relying on Fowler naturally and directly flowed from his fraud. They are in no sense incidental and unforeseeable. To the contrary, they were foreseen by all, including Mr. Fowler.

In working with the government to fashion a measure that both makes the Estate whole and is fair to Mr. Fowler in the unique bankruptcy context, the estimating method selected, based on the value of creditors' and interest holders' claims, is in my view the very best measure. As I said above, the basic Chapter 7 proposition is that the bankrupt entity is dead and the best that can be done is to satisfy its debts and return what is left to its owners in the way federal bankruptcy law prescribes. The measure adopted confines restitution to actual pecuniary loss gives all the relief that can be accomplished in bankruptcy.

There is one additional matter I wanted to call to the Court's attention regarding proof of claim number 214 filed in the bankruptcy. This was a proof of claim filed by the class action plaintiffs in the Player Case seeking the lump sum base compensation amounts for each year of 436 identical three-year player contracts. As a result of a contested class action settlement, the bankruptcy Court awarded the settlement class an allowed claim against the Estate for rejection or repudiation damages representing the value of contract years 2 and 3. The aggregate amount of that claim is $78,480,000, which the settlement adjudges subordinated to other general unsecured creditors. Each class member also received an allowed level four priority claim for $13,650 ($5,951,400 in aggregate) for the portion of season 1 base compensation not paid. These allowed claims are Estate obligations just like any other debt claim.

The Estate respectfully believes that, although the government has not included these amounts in its restitution calculation, they are properly considered for restitution. The contracts from which they arise were entered only after and because of Mr. Fowler's false promises to lead the AAF's main funding round with $170 million in committed immediately available funding. The contract dates and Charles Ebersol's statements and declaration to me, which I believe the Court was provided, confirm this. Also, AAF's business plan provided to Mr. Fowler at the outset of their interactions specifically says that what came to be called the "Series 1" fundraising would be used to "sign players."

The Estate is enormously respectful of the efforts and attention of the government's attorneys with whom I have been interacting. We believe that the amounts included in their restitution computation are appropriately compensable and amply supported by the records they requested and that I compiled and provided for the Estate. The Estate also believes that other amounts set forth immediately above should be part of a restitution order and are supported by the record and by the law.

As a final note, the Estate believes and respectfully requests that Mr. Fowler be required to pay the restitution ordered in a lump sum within a reasonable time, not later than 90 days from the date of sentencing.

I am prepared to be examined and answer questions the Court or other parties may have concerning my work and the amounts that aggregate into the restitution amounts the government and the Estate seek. Thank you. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 14, 2023.

Brian S. Engel