## EBERSOL SPORTS MEDIA GROUP, INC.

## SERIES 1 PREFERRED STOCK PURCHASE AGREEMENT

This Series 1 Preferred Stock Purchase Agreement (this "***Agreement***") is made as of November 21, 2018 by and among Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), the investors listed on Exhibit A attached to this Agreement (each a "***Purchaser***" and together the "***Purchasers***").

The parties hereby agree as follows:

## 1. PURCHASE AND SALE OF PREFERRED STOCK AND COMMON STOCK.

### 1.1 Sale and Issuance of Series 1 Preferred Stock and Common Stock.

1.1.1 The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Initial Closing (as defined below) the Restated Certificate of Incorporation in substantially the form of Exhibit B attached to this Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***Restated Certificate***").

1.1.2 Subject to the terms and conditions of this Agreement, each Purchaser agrees to purchase at the Initial Closing and the Company agrees to sell and issue to each Purchaser at the Initial Closing that number of shares of Series 1 Preferred Stock, $0.00001 par value per share, and that number of shares of Common Stock, $0.00001 par value per share, set forth opposite each Purchaser's name on Exhibit A (the "***Shares***"), at a purchase price of $4.6023 per share (the "***Per Share Purchase Price***") in the case of new cash investment for Series 1 Preferred Stock and otherwise as set forth on Exhibit A with respect to the conversion of outstanding convertible securities in accordance with Section 1.2.3 below.

### 1.2 Closing; Delivery.

1.2.1 The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures on the date of this Agreement or at such other time and place as the Company and the Purchasers representing a majority of the Shares to be sold mutually agree upon, orally or in writing (which time and place are designated as the "***Initial Closing***"). In the event there is more than one closing, the term "***Closing***" shall apply to each such closing unless otherwise specified.

1.2.2 At the Initial Closing, the Company shall deliver to each Purchaser a certificate representing the Shares being purchased by such Purchaser at the Initial Closing against payment of the purchase price therefor by check payable to the Company, by wire transfer to a Company account at a nationally recognized bank mutually agreed upon by the Company and FO2 LLC ("***Fowler***"), by cancellation or conversion of indebtedness of the Company to Purchaser or by any combination of such methods; provided, however, that notwithstanding anything stated to the contrary, the Company shall deliver to Fowler a certificate

representing 10,864,133 Shares being purchased by Fowler at the Initial Closing (the "***Fowler Shares***") against payment of $15,000,000 (the "***Initial Fowler Funding Amount***").

1.2.3    Each Purchaser that is purchasing Shares through conversion of indebtedness (such Purchaser, a "***Note Purchaser***"), hereby acknowledges that the Company issued to such Purchaser convertible promissory notes in the aggregate initial principal amounts as set forth across such Note Purchaser's name on Exhibit A under the heading. "Cancellation of Indebtedness" (collectively, the "***Convertible Notes***" and individually, a "***Convertible Note***"). Each Note Purchaser hereby (a) acknowledges and agrees that all outstanding principal and accrued but unpaid interest under each Convertible Note held by the Note Purchaser shall be converted into (i) the number of shares of Series 1 Preferred Stock set forth opposite such Note Purchaser's name under the column "Shares of Series 1 Preferred Stock issued for Cancellation of Notes" on Exhibit A  and (ii) the number of shares of Common Stock set forth opposite such Note Purchaser's name under the column "Shares of Common Stock issued for Cancellation of Notes" on Exhibit A in connection with the Initial Closing and such number of Shares shall constitute full and complete satisfaction of all obligations of the Company under the Convertible Notes; (c) acknowledges and agrees that, to the extent they may conflict with the terms hereof, the terms of the Convertible Notes held by such Note Purchaser are hereby amended, including, without limitation, to the extent such Convertible Notes convert into shares of Series 1 Preferred Stock and Common Stock hereunder;, (c) agrees that each such Convertible Note is cancelled, released, extinguished and of no further force or effect as of the Initial Closing, (d) waives any rights of notice related thereto, (e) agrees that the principal and interest for each note, for purposes of the Note Conversion, shall be calculated as of November 20, 2018 and no further interest will accrue after November 20, 2018 and (f) agrees that upon the conversion, the Note Purchaser shall not be entitled to any other consideration in respect of such Convertible Note other than those Shares set forth opposite such Note Purchaser's name on Exhibit A. No fractional shares shall be issued upon conversion of the Convertible Notes.  Each Note Purchaser shall deliver to the Company each Convertible Note held by such Note Purchaser for cancellation by the Company or if such Convertible Note has been lost, stolen or destroyed, an affidavit of lost, stolen or destroyed note (but without posting any bond) and agreement to indemnify in a form acceptable to the Company. Notwithstanding the foregoing, the cancellation, release and extinguishment of each such Convertible Note is effective whether or not such Convertible Note is delivered to and canceled by the Company.

**1.3**    <u>**Sale of Additional Shares of Preferred Stock.**</u>  At any time and from time to time after the Initial Closing, the Company may sell, on the same terms and conditions as those contained in this Agreement, without obtaining the signature, consent or permission of any of the Purchasers, in the aggregate up to that number of additional shares (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or similar recapitalization affecting such shares) of Series 1 Preferred Stock that is equal to 17,915,551 shares of Series 1 Preferred Stock less the number of Shares actually issued and sold by the Company at the Initial Closing (the "***Additional Shares***"), to one or more purchasers (the "***Additional Purchasers***") in additional Closings (each, an "***Additional Closing***"), provided that (a) each such subsequent sale is consummated on or prior to the date that is ninety (90) days after the Initial Closing, and (b) each Additional Purchaser shall become a party to the Transaction Agreements (as defined below), by executing and delivering a counterpart signature page to each of the Transaction

Agreements.  Exhibit A to this Agreement shall be updated to reflect the number of Additional Shares purchased at each such Closing and the parties purchasing such Additional Shares.

### 1.4     Additional Fowler Funding and Fowler Share Forfeiture.

1.4.1     *Additional Fowler Funding Requests*.  At any time from time to time after the Initial Closing through February 28, 2019 (the "***Last Equity Funding Date***"), without obtaining the signature, consent or permission of Fowler or any of the other Purchasers, and subject to Section 1.4.2 hereof, Fowler hereby irrevocably and unconditionally agrees to pay the Company, by wire transfer to a Company account at a nationally recognized bank designated in writing by the Company, the amount (each such amount an "***Additional Fowler Funding Amount***" and together with the Initial Fowler Funding Amount and all Additional Fowler Funding Amounts actually funded, the "***Total Fowler Funding Amount***") set forth on the applicable Equity Funding Request in substantially the form attached hereto as Exhibit J (each such request an "***Equity Funding Request***") within one (1) Business Day of the Company's delivery of such Equity Funding Request to Fowler; provided, however, that no Additional Fowler Funding Amount may exceed an amount equal to $50,000,000 (the "***Fowler Funding Commitment***") *less* the then current Total Fowler Funding Amount (before giving effect to such Additional Fowler Funding Amount). For the avoidance of doubt, the Company shall be under no obligation or be required to submit any Equity Funding Requests to Fowler.

1.4.2     *Operating Budget*.  Prior to the presentment of the first Equity Funding Request after the Initial Closing, the Company will develop and deliver to Fowler an operating budget (the "***Budget***") covering the time period between the Initial Closing through the Last Equity Funding Date that, among other things, sets the basis for Equity Funding Requests and the delivery of Equity Funding Requests. Additionally, the Company will present unaudited financial statements to Fowler on a monthly basis through the Last Equity Funding Date, which will include a report on the variance between actual financial results against the corresponding items in the Budget. In the event that cumulative expenses for the applicable month reported in such financial statements are more than five percent (5%) above the corresponding cumulative expenses in the Budget (a "***Budget Deficit Event***"), the Company will within five (5) Business Days (as defined below) of delivery to Fowler of such financial statements advise Fowler of the Company's plans (such plans, the "***Budget Reconciliation Plan***") to eliminate or materially mitigate the Budget deficit (such five (5) Business Day period, the "***Budget Reconciliation Period***"). During the Budget Reconciliation Period, Fowler reserves the right to limit or reduce any Equity Funding Request, but not below the aggregate amount required by the Company to satisfy its payment obligations during the Budget Reconciliation Period without default.

1.4.3     *Agreement to Forfeit*.  Fowler hereby agrees that upon the occurrence of any Forfeiture Trigger (as defined below), Fowler immediately and automatically forfeits to the Company, without any cost or charge to the Company, the number of Fowler Shares equal to (a) the Fowler Funding Commitment *less* the then current Total Fowler Funding Amount, *divided by* (b) the Per Share Purchase Price (rounded to the nearest Share) (the "***Unfunded Fowler Shares***"), and thereafter Fowler will have no further rights as a holder of such Unfunded Fowler Shares so forfeited. For purposes of this Agreement, "***Forfeiture Trigger***" means any of: (a) the Last Equity Funding Date, (b) the consummation of any Deemed Liquidation Event (as defined in the Restated Certificate) or (c) Fowler's failure to timely fulfill

an Equity Funding Request in full (other than during a Budget Reconciliation Period in accordance with Section 1.4.2); provided, however, that Fowler's failure to timely fulfill an Equity Funding Request in full shall not constitute a "Forfeiture Trigger" if in connection with such failure to fund (i) a Budget Deficit Event has occurred, (ii) the Company has not delivered a Budget Reconciliation Plan during the applicable Budget Reconciliation Period and (iii) the then current Total Fowler Funding Amount is greater than $30,000,000.

1.4.4 *Encumbrances*. Fowler may not grant a lien or security interest in, or pledge, hypothecate or encumber, any then currently Unfunded Fowler Shares.

1.4.5 *Enforcement Costs*. Fowler further agrees to pay all reasonable and documented out-of-pocket costs and expenses (including, but not limited to, reasonable and documented out-of-pocket attorneys' fees) paid or incurred by the Company in enforcing Fowler's obligations under this Section 1.4. Fowler acknowledges that the Company is relying on the fulfillment of Fowler's obligations under this Section 1.4 in entering into this Agreement and consummating the transactions contemplated herein.

**1.5** **Defined Terms Used in this Agreement.** In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

"***Action***" means any action, suit, proceeding, arbitration, mediation, complaint, claim, charge or, to the Company's knowledge, investigation, in each case, before any court, arbitrator, mediator or governmental body.

"***Affiliate***" means, with respect to any specified Person, such Person's principal or any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such Person or such Person's principal, including, without limitation, any general partner, managing member or partner, officer or director of such Person or such Person's principal or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person or such Person's principal. For purposes of this definition, the terms "***controlling***," "***controlled by***," or "***under common control with***" shall mean the possession, directly or indirectly, of (a) the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, or (b) the power to elect or appoint at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"***Board***" means the Board of Directors of the Company.

"***Business Day***" means a weekday on which banks are open for general banking business in San Francisco, California.

"***Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated by the Internal Revenue Service thereunder.

"***Company Intellectual Property***" means Intellectual Property that is necessary to the conduct of the Company's business as now conducted and as presently proposed to be conducted.

"***Common Stock***" means the common stock of the Company, $0.00001 par value per share.

"***Conversion Shares***" means the Common Stock issuable upon conversion of the Shares.

"***Disclosure Schedule***" means the Disclosure Schedule attached as <u>Exhibit C</u> to this Agreement.

"***ERISA***" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"***FF Preferred Stock***" means the Series FF Preferred Stock of the Company, $0.00001 par value per share.

"***Intellectual Property***" means all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes.

"***Investors' Rights Agreement***" means the Amended and Restated Investors' Rights Agreement among the Company and the Purchasers dated as of the date of the Initial Closing, in the form of <u>Exhibit D</u> attached to this Agreement.

"***Key Employees***" means Charles Ebersol.

"***knowledge***," including the phrase "***to the Company's knowledge***," shall mean the actual knowledge of Charles Ebersol.

"***Material Adverse Effect***" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition or results of operations of the Company.

"***Material Agreement***" has the meaning given to that term in Section 2.11.1.

"***Person***" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"***Preferred Stock***" means the preferred stock of the Company, $0.00001 par value per share. For the avoidance of doubt, "Preferred Stock" shall not include any FF Preferred Stock.

"***Purchaser***" means each of the Purchasers who is a party to this Agreement.

"***Right of First Refusal and Co-Sale Agreemen***t" means the Amended and Restated Right of First Refusal and Co-Sale Agreement among the Company, the Purchasers, and

certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit E attached to this Agreement.

"**Securities Act**" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"**Series 1 Preferred Stock**" means the Series 1 Preferred Stock of the Company, $0.00001 par value per share.

"**Series Seed Preferred Stock**" means the Series Seed Preferred Stock of the Company, $0.00001 par value per share.

"**Stock Plan**" has the meaning given to that term in Section 2.2.4.

"**Transaction Agreements**" means this Agreement, the Investors' Rights Agreement, the Right of First Refusal and Co-Sale Agreement and the Voting Agreement.

"**Voting Agreement**" means the Amended and Restated Voting Agreement among the Company, the Purchasers and certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit F attached to this Agreement.

## 2. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company hereby represents and warrants to each Purchaser that, except as set forth on the Disclosure Schedule, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Initial Closing, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections contained in this Section 2, and the disclosures in any section of the Disclosure Schedule shall qualify other sections in this Section 2 to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections.

2.1 **Organization, Good Standing, Corporate Power and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all corporate power and corporate authority required (a) to carry on its business as presently conducted and as presently proposed to be conducted and (b) to execute, deliver and perform its obligations under the Transaction Agreements. The Company is duly qualified to transact business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2 **Capitalization.** The authorized equity capital of the Company consists, immediately prior to the Initial Closing (unless otherwise noted), of the following.

2.2.1 43,403,801 shares of Common Stock, 8,000,000 shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws.

2.2.2    2,000,000 shares of FF Preferred Stock, all of which are issued and outstanding immediately prior to the Initial Closing.   All of the outstanding shares of FF Preferred Stock are duly authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws.   Each outstanding share of Series FF Preferred Stock is initially convertible into one (1) share of Common Stock.

2.2.3    22,522,194 shares of Preferred Stock, (a) 3,846,154 of which are designated as Series Seed Preferred Stock, all of which are issued and outstanding immediately prior to the Initial Closing and (b) 18,676,040 of which are designated as Series 1 Preferred Stock, none of which are issued and outstanding immediately prior to the Initial Closing.   None of the rights, preferences and powers of, or the restrictions on, the Preferred Stock set forth in the Restated Certificate are prohibited by the General Corporation Law of the State of Delaware. Upon the Initial Closing, each outstanding share of Preferred Stock initially will be convertible into one (1) share of Common Stock.

2.2.4    5,990,267 shares of Common Stock are subject to issuance to officers, directors, employees and consultants of the Company pursuant to the Company's 2017 Equity Incentive Plan duly adopted by the Board and approved by the Company stockholders (the "*Stock Plan*").   Of such shares of Common Stock reserved under the Stock Plan, 1,058,017 options to purchase shares have been granted and are currently outstanding, no shares have been issued pursuant to restricted stock purchase agreements or the exercise of options, and 4,932,250 shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan.

2.2.5    There are no outstanding preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, FF Preferred Stock or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock, FF Preferred Stock or Preferred Stock, except for (a) the conversion privileges of the Shares to be issued under this Agreement and the FF Preferred Stock pursuant to the terms of the Restated Certificate, (b) the rights provided in Section 4 of the Investors' Rights Agreement, and (c) the securities and rights described in Section 2.2.4 of this Agreement.   All outstanding shares of the Common Stock and all shares of the Common Stock underlying outstanding options are subject to (i) a right of first refusal in favor of the Company upon any proposed transfer (other than transfers for estate planning purposes); and (ii) a lock-up or market standoff agreement of not less than one hundred eighty (180) days following each public offering of securities of the Company pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act commencing with the initial public offering of the Company's securities.   No Person (A) has been granted full ratchet, formula adjustment, or any other type of, protection against dilution of their ownership interest in the Company, (B) has been granted rights to require the Company to repurchase any of the Company's securities, (C) has been granted rights to receive the same or better rights in connection with any ownership interest in the Company as any other person or entity may receive either pursuant to this Agreement or at any time hereafter or (D) have been granted rights of redemption by the Company.   No full ratchet, formula adjustment, or any other type of, protection against dilution

of any ownership interest in the Company has been triggered, nor will be triggered by the transactions provided for in this Agreement.

2.2.6   To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been or will be timely filed by all individuals who have acquired unvested shares of the Common Stock.

2.2.7   None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events.   The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means.   Except as may be set forth in the Restated Certificate, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock

**2.3**     **Subsidiaries.**   The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.   The Company is not a participant in any joint venture, partnership or similar arrangement.

**2.4**     **Authorization.**   All corporate action has been taken, or will be taken prior to the Closing, on the part of the Board and stockholders that is necessary for (a) adoption of the Restated Certificate, (b) the authorization, execution and delivery of the Transaction Agreements by the Company, (c) the performance by the Company of the obligations to be performed by the Company as of the date hereof under the Transaction Agreements and (d) the issuance of the Conversion Shares.   All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, and the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, has been taken or will be taken prior to the Closing.   The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

**2.5**     **Valid Issuance of Shares.**   The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, the Restated Certificate, the Company's Bylaws, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.   Based in part on the accuracy of the representations of the Purchasers in Section 3 of this Agreement and subject to the filings described in Section 2.6 below, the offer, sale and issuance of the Shares to be issued pursuant to and in conformity with the terms of this Agreement and the issuance of the Conversion Shares, if any, to be issued upon

conversion thereof for no additional consideration and pursuant to the Restated Certificate, will be issued in compliance with all applicable federal and state securities laws. The Conversion Shares have been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser. Based in part upon the representations of the Purchasers in Section 3 of this Agreement, and subject to Section 2.6 below, the Conversion Shares will be issued in compliance with all applicable federal and state securities laws.

      **2.6**    <u>**Governmental Consents and Filings**</u>. Based in part on the accuracy of the representations made by the Purchasers in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the Company's valid execution, delivery and performance of the Transaction Agreements except for (a) the filing of the Restated Certificate, which will have been filed as of the Closing, and (b) required filings pursuant to Regulation D of the Securities Act (if any), and applicable state securities laws (if any), which have been made or will be made in a timely manner if applicable.

      **2.7**    <u>**Litigation.**</u> There is no Action pending, or to the Company's knowledge, currently threatened in writing (a) against the Company or (b) against any officer, director or Key Employee of the Company arising out of his or her employment or board relationship with the Company or that could otherwise materially impact the Company. The foregoing includes, without limitation, Actions pending or overtly threatened involving the prior employment or consultancy of any of the Company's employees, officers, directors, or Key Employees, their services provided in connection with the Company's business. Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government body (in the case of officers, directors or Key Employees, such as would affect the Company). There is no Action by the Company pending or that the Company intends to initiate.

      **2.8**    <u>**Intellectual Property.**</u> The Company owns or possesses or believes it can acquire on commercially reasonable terms sufficient legal rights to all Company Intellectual Property without any violation or infringement (or in the case of third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Company) of the rights of others. No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any rights to Intellectual Property of any other party, except that with respect to third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications the foregoing representation is made to the Company's knowledge only. Other than with respect to the non-exclusive license to the Company of generally commercially available software products under standard end-user object code license agreements, there is no outstanding option, license, agreement, claim, encumbrance or shared ownership interest of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other Person. The Company has not

received any written communications alleging that the Company has violated or, by conducting its business, would violate any of the Intellectual Property of any other Person.  The Company has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's business.  To the Company's knowledge, it will not be necessary to use any inventions of any of its employees or consultants (or Persons it currently intends to hire) made prior to their employment by or consulting relationship with the Company.  Each current and former employee and consultant has fully and validly assigned and transferred to the Company all Intellectual Property he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted.  Section 2.8 of the Disclosure Schedule lists all Company Intellectual Property that is registered with a governmental entity.  The Company has not embedded, used or distributed any open source, copyleft or community source code in any of its products generally available or in development, including but not limited to any libraries, code or software licensed or distributed under any General Public License, Lesser General Public License or similar license arrangement in a manner that would require (or purport to require) the distribution of the source code of such software or prohibit (or purport to prohibit) the Company from charging for the distribution or use of the software or otherwise limit such software's use for commercial purposes.

    **2.9**  **Confidential Information and Invention Assignment Agreements.**  Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for the Purchasers.  No current or former employee or consultant has excluded works or inventions from his or her assignment of inventions pursuant to such agreement.  To the Company's knowledge, no such employee, consultant or officer is in violation thereof.

    **2.10**  **Compliance with Other Instruments.**  The Company is not in violation or default (a) of any provisions of the Restated Certificate or Bylaws, (b) of any judgment, order, writ or decree of any court or governmental entity, (c) under any agreement, instrument, contract, lease, note, indenture, mortgage or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or, (d) to its knowledge, of any provision of federal or state statute, rule or regulation materially applicable to the Company.  The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any such violation or default, or constitute, with or without the passage of time and giving of notice, either (i) a default under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or purchase order or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.  The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any acceleration of benefits or obligations, with or without the passage of time and giving of notice, under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or purchase order.

**2.11    Agreements; Actions.**

2.11.1  Except for the Transaction Agreements, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (a) obligations (contingent or otherwise) of, or payments to, the Company in excess of $100,000, (b) the license of any Intellectual Property to or from the Company (other than (A) the nonexclusive license of the Company's software in object code form in the ordinary course of business; and (B) licenses with respect to commercially available software products under standard end-user object code license agreements or standard customer terms of service and privacy policies for Internet sites), (c) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person, or that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (d) indemnification by the Company with respect to infringements of proprietary rights other than standard customer or channel agreements (each, a "***Material Agreement***").  The Company is not in material breach of or default under any Material Agreement and, to the Company's knowledge, there is no current claim or threat that the Company is or has been in material breach of or default under any Material Agreement.  Each Material Agreement is in full force and effect and is enforceable by the Company in accordance with its respective terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) the effect of rules of law governing the availability of equitable remedies.  To the Company's knowledge, no other party to a Material Agreement is in material default thereunder or in actual or anticipated material breach thereof.

2.11.2  The Company has not (a) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (b) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $100,000 or in excess of $200,000 in the aggregate (other than indebtedness or liabilities that have already been fully satisfied), (c) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (d) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.  For the purposes of Section 2.11.1 and this Section 2.11.2, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such Section.

2.11.3  The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

**2.12    Certain Transactions.**

2.12.1  Other than (a) standard employee benefits generally made available to all employees, (b) standard director and officer indemnification agreements approved by the Board, and (c) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Company's Common Stock, in each instance, approved in the written minutes of the Board there is no agreement, understanding or proposed

transaction between the Company and any of its officers, directors, consultants, Key Employees, members of the immediate families of the foregoing, or any Affiliate of any of the foregoing.

2.12.2 The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees.  None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any (a) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors or (b) direct or indirect ownership interest in any Person with which the Company is affiliated or with which the Company has a business relationship, or any Person that competes with the Company except that directors, officers or employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company.

   **2.13   Rights of Registration and Voting Rights.**  Except as provided in the Investors' Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its securities (whether currently outstanding or to be issued in the future). To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreement with respect to the voting of capital shares of the Company.

   **2.14   Absence of Liens.**  The property and assets that the Company owns are owned free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets.  With respect to the property and assets it leases, the Company is in compliance with such leases and, to the Company's knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets.

   **2.15   Financial Statements.**  The Company has delivered to each Purchaser its unaudited financial statements (including balance sheet, income statement and statement of cash flows) as of December 31, 2017 and for the eight (8) month period ended August 31, 2018 (the "***Balance Sheet Date***") (such financial statements collectively referred to herein as the "***Financial Statements***"). The Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by generally accepted accounting principles. The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited financial statements to normal year-end adjustments. Except as set forth in the Financial Statements, the Company has

no material liabilities or obligations, contingent or otherwise, in excess of $100,000 individually or $200,000 in the aggregate.

      **2.16**   **Changes**. Since the Balance Sheet Date there has not been:

      (a)     any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except immaterial changes in the ordinary course of business;

      (b)     any material damage, destruction or loss, whether or not covered by insurance;

      (c)     any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

      (d)     any satisfaction or discharge of any lien, claim, or encumbrance or payment of any material obligation by the Company;

      (e)     any entry into, or change or amendment to, a material contract, agreement, or arrangement by which the Company or any of its assets is bound or subject;

      (f)     any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

      (g)     any resignation or termination of employment of any officer or Key Employee of the Company;

      (h)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

      (i)     any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary and customary course of its business;

      (j)     any dividend, declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

      (k)     any sale, assignment, transfer, or exclusive license of any material Company Intellectual Property;

      (l)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)     to the Company's knowledge, any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that would reasonably be expected to result in a Material Adverse Effect; or

(n)     any arrangement or commitment by the Company to do any of the things described in this Section 2.16.

### 2.17     Employee Matters.

2.17.1  To the Company's knowledge, none of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such Person's ability to promote the interest of the Company or that would conflict with the Company's business.  Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

2.17.2  To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee, nor does the Company have a present intention to terminate the employment of any of the foregoing.  Each officer and Key Employee of the Company is currently devoting all of his or her business time to the conduct of the Company's business.  The Company is not aware that any of its officers and Key Employees is planning to work less than full-time for the Company in the future.  The employment of each employee of the Company is terminable at the will of the Company.  Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due.  The Company has no policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

2.17.3  The Company has not made any representations regarding equity incentives or compensation to any officer, employees, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Board, the representations set forth herein, or the Disclosure Schedule.

2.17.4  Section 2.17.4 of the Disclosure Schedule sets forth each employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to ERISA.  The Company has made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

2.17.5  The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the

knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company.  There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, nor is the Company aware of any labor organization activity involving its employees.

2.18    **Tax Returns and Payments.**  There are no federal, state, county, local or foreign taxes dues and payable by the Company which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  The Company has not elected pursuant to the Code, to be treated as an "S" corporation or a collapsible corporation pursuant to Section 1362(a).  The Company has not made any other elections pursuant to the Code (other than elections which relate solely to matters of accounting, depreciation or amortization) that would have a material effect on the Company, its financial condition, its business as presently conducted or presently proposed to be conducted or any of its properties or material assets.

2.19    **Insurance.**  The Company has in full force and effect fire and casualty insurance policies with extended coverage, in the amounts that are sufficient, subject to reasonable deductions, to allow it to replace any of its material properties that might be damaged or destroyed.

2.20    **Permits.**  The Company has all material franchises, permits, licenses and any similar authority necessary for the conduct of its business.  The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.21    **Corporate Documents.**  The Restated Certificate is the currently effective certificate of incorporation of the Company.  The Bylaws of the Company are in the form provided to the Purchasers and their counsel.  The copy of the minute books of the Company provided to the Purchasers and their counsel contains minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders with respect to all transactions referred to in such minutes.

2.22    **Real Property Holding Corporation.**  The Company is not now and has never been a "United States real property holding corporation" as defined in the Code and any applicable regulations promulgated thereunder.  The Company has filed with the Internal Revenue Service all statements, if any, with its United States income tax returns which are required under such regulations.

### 2.23    **No "Bad Actor" Disqualification**

. No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) promulgated by the SEC under the Securities Act (a "***Disqualification Event***") is applicable to the Company or,

to the Company's knowledge, any Company Covered Person (as defined below), except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3) is applicable. "***Company Covered Person***" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated by the SEC under the Securities Act, any person or entity listed in the first paragraph of Rule 506(d)(1).

### 3. REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.
Each Purchaser hereby represents and warrants to the Company, as of the closing in which such Purchaser is participating, severally and not jointly, as follows.

**3.1 Authorization.** The Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which such Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

**3.2 Purchase Entirely for Own Account.** This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Purchaser has not been formed for the specific purpose of acquiring the Shares.

**3.3 Disclosure of Information.** The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management. Nothing in this Section 3, including the foregoing sentence, limits or modifies the representations and warranties of the Company in Section 2 of this Agreement or the right of the Purchasers to rely thereon.

**3.4 Restricted Securities.** The Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Shares are "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has

no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale except as set forth in the Investors' Rights Agreement.  The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

        **3.5**    **No Public Market**.  The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

        **3.6**    **Legends**.

        3.6.1   The Purchaser understands that the Shares and any securities issued in respect of or exchange for the Shares, may bear any one or more of the following legends:  (a) any legend set forth in, or required by, the other Transaction Agreements; (b) any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended; and (c) the following legend:

> *"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

        3.6.2   Fowler understands that the Fowler Shares and any securities issued in respect of or exchange for the Fowler Shares, will bear the following legend:

> *"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A FORFEITURE OBLIGATION IN FAVOR OF THE ISSUER AND/OR ITS ASSIGNEE(S), AS SET FORTH IN A STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH FORFEITURE OBLIGATION IS BINDING ON TRANSFEREES OF THESE SHARES."*

        **3.7**    **Accredited Investor.**  The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (*i.e.*, (a) a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her

purchase exceeds $1,000,000 (excluding the value of such person's primary residence), (b) a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year, (c) a corporation, limited liability company or partnership having total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Company pursuant to the Purchase Agreement or (d) otherwise meets the requirements for an "accredited investor" under Regulation D promulgated by the Securities and Exchange Commission under the Securities Act).

      **3.8**    **No General Solicitation.**   At no time (a) has the Purchaser or any of its officers, directors, employees or other agents, been presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale or purchase of the Shares, whether or not such advertising or solicitation was received directly from the Company or indirectly from a broker, finder or other person or entity, nor (b) has the Purchaser or any of its officers, directors, employees or other agents attended any public meeting or seminar concerning an investment in the Shares.

      **3.9**    **Exculpation Among Purchasers.**  The Purchaser acknowledges that it is not relying upon any Person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company.  The Purchaser agrees that neither any Purchaser nor the respective controlling Persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Shares.

      **3.10**    **Residence.**  If the Purchaser is an individual, then the Purchaser resides in the state or province identified in the address of the Purchaser set forth on Exhibit A; if the Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of the Purchaser in which its principal place of business is identified in the address or addresses of the Purchaser set forth on Exhibit A.

      **3.11**    **Foreign Investors.**  If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Shares, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

      **3.12**    **Regulation S Representations and Restrictions.**  If the Purchaser's address on Exhibit A is an address located outside of the United States, the Purchaser makes the following additional representations, warranties and agreements:

(a)     Purchaser is <u>not</u> a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act.  The offer and sale of the Shares to such Purchaser was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and the Purchaser is not acquiring the Shares (or the Conversion Shares) for the account or benefit of any U.S. Person;

(b)     Purchaser will not, during the Restricted Period applicable to the Shares set forth in the legend set forth below (the "***Restricted Period***") and to any certificate representing the Shares, offer or sell any of the foregoing securities (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S; and

(c)     Purchaser will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Shares (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.

Purchaser acknowledges and agrees that the Company shall not register the transfer of the Shares (or the Conversion Shares) in violation of these restrictions.  Purchaser acknowledges and agrees that the certificates evidencing the Shares and the Conversion Shares will bear the legend set forth below (in addition to any other legend required by applicable federal, state or foreign securities laws or provided in any other agreement with the Company:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND THE COMPANY DOES NOT INTEND TO REGISTER THEM PRIOR TO NOVEMBER 21, 2019, THE SHARES MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH SECURITIES) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(K) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE SHARES ARE REGISTERED UNDER THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. PURCHASERS OF SHARES PRIOR TO NOVEMBER 21, 2019, MAY RESELL SUCH SECURITIES ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER OF THE SECURITIES WHO IS A

DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT PRIOR TO NOVEMBER 21, 2019 RESELL THE SECURITIES TO A U.S. PERSON AS DEFINED BY RULE 902(K) OF REGULATION S UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.

### 4. CONDITIONS TO THE PURCHASERS' OBLIGATIONS AT CLOSING.

The obligations of each Purchaser to purchase Shares at a particular Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived, *provided* that upon the consummation of such Closing, all such conditions shall be deemed waived in writing.

**4.1** **Representations and Warranties.** The representations and warranties of the Company contained in Section 2 shall be true and correct in all material respects as of the Initial Closing.

**4.2** **Performance.** The Company shall have performed and complied with all material covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

**4.3** **Compliance Certificate.** The President or Chief Executive Officer of the Company shall have delivered to the Purchasers at the Initial Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

**4.4** **Qualifications.** All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall have been obtained and effective as of such Closing.

**4.5** **Opinions of Company Counsel.** The Purchasers shall have received from Fenwick & West, LLP, counsel for the Company, an opinion, dated as of the Initial Closing, in the form attached to this Agreement as Exhibit G.

**4.6** **Board of Directors.** The authorized size of the Board shall be six (6). As of the Initial Closing, the Board shall be comprised of Charles Ebersol, Dick Ebersol, Keith Rabois, Reggie Fowler ("*Fowler*"), Jeff Moorad and one (1) vacancy.

**4.7** **Investors' Rights Agreement.** The Company and each Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder) shall have executed and delivered the Investors' Rights Agreement.

**4.8** **Right of First Refusal and Co-Sale Agreement.** The Company, each Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder), and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.9     **Voting Agreement.**   The Company, each Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder), and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.10    **Restated Certificate.**   The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to such Closing, which shall continue to be in full force and effect as of such Closing.

4.11    **Secretary's Certificate.**   The Secretary of the Company shall have delivered to the Purchasers at the Initial Closing a certificate certifying as to the truth and correctness of (a) the Restated Certificate; (b) the Bylaws of the Company; (c) resolutions of the Board approving the Restated Certificate, Transaction Agreements, and the transactions provided for therein, and any other necessary matters; and (d) resolutions of the stockholders of the Company approving the Restated Certificate and any other necessary matters.

4.12    **Proceedings and Documents.**   All corporate and other proceedings in connection with the transactions contemplated at such Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to each Purchaser, and each Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.  Such documents may include good standing certificates.

4.13    **Indemnification Agreement.**   The Company shall have executed and delivered an indemnification agreement acceptable to each director of the Company.

4.14    **Line of Credit.**   The Company and Fowler shall have entered into the Line of Credit Agreement in substantially the form attached hereto as Exhibit H (the "*LoC*").

4.15    **Warrant.**   The Company shall have delivered to Fowler the Warrant to Purchase Shares of Common Stock in substantially the form attached hereto as Exhibit I (the "*Warrant*").

4.16    **Football Committee.**   The Company shall have established a Football Steering Committee (the "*Football Committee*"), which will provide oversight of the football operations of the Company's professional football league. As of the Initial Closing, the Football Committee shall be comprised of Fowler, Willie Lanier, Charlie Ebersol and Bill Polian, with the initial chair of the Football Committee being Fowler.

4.17    **Delivery of Operating Budget.**   The Company shall have delivered to Fowler the Budget.

5.      **CONDITIONS OF THE COMPANY'S OBLIGATIONS AT CLOSING.**  The obligations of the Company to sell Shares to each Purchaser at such Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions of such Purchaser, unless otherwise waived:

**5.1** **Representations and Warranties.** The representations and warranties of such Purchaser contained in Section 3 shall be true and complete in all respects as of such Closing.

**5.2** **Performance.** Such Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before such Closing.

**5.3** **Qualifications.** All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of such Closing.

**5.4** **Restated Certificate.** The Secretary of State of the State of Delaware shall have filed the Restated Certificate as of such Closing.

**5.5** **Proceedings and Documents.** All corporate and other proceedings in connection with the transactions contemplated at such Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Company and its counsel, and the Company (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

**5.6** **Voting Agreement.** Such Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

**5.7** **Investors' Rights Agreement.** Such Purchaser shall have executed and delivered the Investors' Rights Agreement.

**5.8** **Right of First Refusal and Co-Sale Agreement.** Such Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

**5.9** **Line of Credit.** The Company and Fowler shall have entered into the LoC.

**5.10** **Stock Power.** Fowler shall have delivered a duly executed copy of a blank Stock Power and Assignment Separate from Stock Certificate in the form attached hereto as Exhibit K (the "***Stock Power***").

## 6. **GENERAL PROVISIONS.**

**6.1** **Survival of Warranties.** Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchasers contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchasers or the Company.

**6.2**     **Successors and Assigns.**   The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.   Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.3**     **Governing Law.**   This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

**6.4**     **Counterparts; Facsimile.**     This Agreement may be executed and delivered by facsimile or electronic signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**6.5**     **Titles and Subtitles.**   The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**6.6**     **Notices.**   All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or:  (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next Business Day delivery, with written verification of receipt.   All communications shall be sent to the respective parties at their address as set forth on the signature page or Exhibit A, or to such address, email address, or facsimile number as subsequently modified by written notice given in accordance with this Section 6.6.   If notice is given to the Company, it shall be sent to 149 New Montgomery Street, San Francisco, California 94105, marked "Attention: Chief Executive Officer"; and a copy (which shall not constitute notice) shall also be sent to each of Fenwick & West, LLP, Silicon Valley Center, 801 California Street, Mountain View, California 94041, Attn: Dawn Belt and Morgan, Lewis & Bockius LLP, One Market, Spear Street Tower, San Francisco, California 94105, Attn: Baird D. Fogel.   If no facsimile number is listed on Exhibit A for a party (or above in the case of the Company), notices and communications given or made by facsimile shall not be deemed effectively given to such party.

**6.7**     **No Finder's Fees.**   Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.   Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which each

Purchaser or any of its officers, employees, or representatives is responsible.  The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

       **6.8**    **Fees and Expenses**.  At the Initial Closing, the Company shall pay the reasonable fees and expenses of Reed Smith LLP, special counsel for Fowler, in an amount not to exceed, in the aggregate, $50,000, which Fowler may deduct against the purchase price to be paid pursuant to Section 1.2.2.

       **6.9**    **Attorneys' Fees**.  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

       **6.10**    **Amendments and Waivers**.  Except as set forth in Section 1.3 of this Agreement, any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of a majority of the then-outstanding Shares (or Common Stock issued on conversion thereof); *provided*, that Additional Purchasers may become parties to this Agreement in accordance with Section 1.3 without any amendment of this Agreement or any consent or approval of any Purchaser.  Any amendment or waiver effected in accordance with this Section 6.10 shall be binding upon the Purchasers and each transferee of the Shares (or the Common Stock issuable upon conversion thereof), each future holder of all such securities, and the Company.

       **6.11**    **Severability**.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

       **6.12**    **Delays or Omissions**.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

       **6.13**    **Entire Agreement**.  This Agreement (including the Exhibits hereto), the Restated Certificate and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

**6.14** **Dispute Resolution.** The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that a party is not subject to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution based upon judgment or order of such court(s), that any suit, action or proceeding arising out of or based upon this Agreement commenced in the federal or state courts located in the Northern District of California is brought in an inconvenient forum, that the venue of such suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court. Should any party commence a suit, action or other proceeding arising out of or based upon this Agreement in a forum other than the federal or state courts located in the Northern District of California, or should any party otherwise seek to transfer or dismiss such suit, action or proceeding from such court(s), that party shall indemnify and reimburse the other party for all legal costs and expenses incurred in enforcing this provision.

**6.15** **Waiver of Conflict of Interest.** Each Purchaser and the Company is aware that Fenwick & West LLP ("*F&W*") may have previously performed and may continue to perform certain legal services for certain of the Purchasers in matters unrelated to F&W's representation of the Company. In connection with its Purchaser representation, F&W may have obtained confidential information of such Purchasers that could be material to F&W's representation of the Company in connection with negotiation, execution and performance of this Agreement. In addition, an affiliate of F&W, may be investing as a Purchaser under the terms of this Agreement. By signing this Agreement, each Purchaser and the Company hereby acknowledges that the terms of this Agreement were negotiated between the Purchasers and the Company and are fair and reasonable and waives any potential conflict of interest arising out of such representation (including any future representation of such parties) or such possession of confidential information and consents to the investment by such affiliate of F&W. Each Purchaser and the Company further represents that it has had the opportunity to be, or has been, represented by independent counsel in giving the waivers contained in this Section 6.15.

**6.16** **Escrow.** As security for Fowler's faithful performance of this Agreement, Fowler agrees, immediately upon receipt of the stock certificate(s) evidencing the Fowler Shares, to deliver such certificate(s), together with the Stock Power executed by Fowler (with the date, transferee, stock certificate number and number of Shares left blank), to the Secretary of the Company or other designee of the Company (the "*Escrow Holder*"), who is hereby appointed to hold such certificate(s) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases of such Fowler Shares as are in accordance with the terms of this Agreement. The placement into escrow of the Fowler Shares shall not constitute a legal proxy or a grant of authority to vote the Fowler Shares to the Escrow Holder, a representative of the Company, or any other third party; said voting rights to remain with Fowler during the term of Escrow. Escrow Holder will act solely for the Company as its agent and not as a fiduciary. Fowler and the Company agree that Escrow Holder will not be liable to any party to this Agreement (or to any other party) for any actions or omissions unless Escrow Holder is grossly

negligent or intentionally fraudulent in carrying out the duties of Escrow Holder under this Agreement. Escrow Holder may rely upon any letter, notice or other document executed with any signature purported to be genuine and may rely on the advice of counsel and obey any order of any court with respect to the transactions contemplated by this Agreement. The Fowler Shares will be released from escrow upon the total Fowler Funding Amount equaling the Fowler Funding Commitment.

       6.17   **MGM Promissory Note.**  Following the Initial Closing, the Company intends to contact MGM Resorts International Operations, Inc. ("***MGM***") regarding a proposed amendment to that certain Promissory Note, dated September 28, 2018, by and between the Company and MGM (the "***MGM Note***"), pursuant to which any amounts due under the MGM Note in the event of a liquidation, dissolution or winding up of the Company would rank *pari passu* with the Series 1 Preferred Stock.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**COMPANY:**

**EBERSOL SPORTS MEDIA GROUP, INC.**

By: _____

Name:  Charles Ebersol _____

Title: Chief Executive Officer _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**FO2 LLC**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

<u>**PURCHASERS**</u>:

**THE FOUNDERS FUND VI, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: _____
              Brian Singerman
Title: _____
              Managing Member

**THE FOUNDERS FUND VI PRINCIPALS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: _____
              Brian Singerman
Title: _____
              Managing Member

**THE FOUNDERS FUND VI ENTREPRENEURS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: _____
        Brian Singerman
Title: _____
        Managing Member

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**<u>PURCHASERS</u>:**

**RAB 175 ACQUISITIONS LLC**

By: _____

Name: <u>Robert Bowman</u>

Title: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**KENNETH KANTOWITZ**

By: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**KRINICK ASC HOLDINGS LLC**

By: _____

Name: <u>Ron Krinick</u>

Title: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**EBERSOL-SAINT JAMES FAMILY TRUST
DATED NOVEMBER 14, 2007**

By: _____

Name: <u>Dick Ebersol</u>

Title: <u>Trustee</u>

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**ALAN KANTOWITZ**

By: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**<u>PURCHASERS</u>:**

**MOORAD SPORTS PARTNERS LLC**

By: _____
Name: Jeffrey S. Moorad
Title: Manager

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**DAVID S POTTRUCK REVOCABLE TRUST**

By: _David Pottruck_____

Name: _David Pottruck_____

Title: _CEO_____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**<u>PURCHASERS</u>:**


**KIDS 42 INVESTMENTS, L.P.**

By: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

<u>**PURCHASERS:**</u>

**SLOW VENTURES III, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: *Kevin Colleran*
Name: Kevin Colleran
Its: Managing Director


**SLOW VENTURES III-A, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: *Kevin Colleran*
Name: Kevin Colleran
Its: Managing Director

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

<u>**PURCHASERS**</u>**:**

**ROBERT DAVIS NOELL AND**
**STACEY WILSON NOELL**

By: _____

Name:  Robert Davis Noell

By: _____

Name:  Stacey Wilson Noell

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "*Agreement*"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated:   11/21/18

PURCHASER

FO2 LLC

_____
(Signature)

Reggie Fowler
(Please Print Name)

CEO
(Title)

**Instructions to Purchaser:**  Please do not fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**THE FOUNDERS FUND VI, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: Brian Singerman
Title: Managing Member

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**THE FOUNDERS FUND VI PRINCIPALS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: _____ Brian Singerman _____
Title: _____ Managing Member _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*


Dated: _____


**PURCHASER:**


**THE FOUNDERS FUND VI**
**ENTREPRENEURS FUND, LP**


By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: __Brian Singerman_____
Title: __Managing Member_____


**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated:  _____

**PURCHASER:**

**RAB 175 ACQUISITIONS LLC**

By:  _____

Name:  <u>Robert Bowman</u>_____

Title:  _____

**<u>Instructions to Purchaser</u>:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "**_Agreement_**"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**_Company_**"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. _THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO._

Dated: _____

PURCHASER:

**KENNETH KANTOWITZ**

By: _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**KRINICK ASC HOLDINGS LLC**

By: _____

Name: Ron Krinick _____

Title: _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**EBERSOL-SAINT JAMES FAMILY TRUST DATED NOVEMBER 14, 2007**

By: _Dick Ebersol_____

Name: Dick Ebersol_____

Title: Trustee_____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

**STOCK POWER AND ASSIGNMENT**

**SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**ALAN KANTOWITZ**

By: _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

**STOCK POWER AND ASSIGNMENT**

**SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**MOORAD SPORTS PARTNERS LLC**

By: _____
Name: Jeffrey S. Moorad
Title: Manager

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**DAVID S POTTRUCK REVOCABLE TRUST**

By: *David Pottruck*
_____

Name: David Pottruck_____

Title: CEO_____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "**Agreement**"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**KIDS 42 INVESTMENTS, L.P.**

By: *Ronnie Lott* _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

DocuSign Envelope ID: 9AE561B1-837F-4191-A94E-B728C8CA13DF

# STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "**Agreement**"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**SLOW VENTURES III, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: *Kevin Colleran* _____
Name: Kevin Colleran
Its: Managing Director

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

DocuSign Envelope ID: 9AE561B1-835F-4191-AA5E-B728C8CA13DF

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "*Agreement*"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**SLOW VENTURES III-A, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: *Kevin Colleran* _____
Name: Kevin Colleran
Its: Managing Director

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November [__], 2018 (the "*Agreement*"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**ROBERT DAVIS NOELL AND STACEY WILSON NOELL**

By: _____

Name: Robert Davis Noell

By: _____

Name: Stacey Wilson Noell

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## <u>LIST OF EXHIBITS</u>

| <u>Exhibit</u> | | <u>Document</u> |
|---|---|---|
| Exhibit A | – | Schedule of Purchasers |
| Exhibit B | – | Form of Restated Certificate of Incorporation |
| Exhibit C | – | Disclosure Schedule |
| Exhibit D | – | Form of Investors' Rights Agreement |
| Exhibit E | – | Form of Right of First Refusal and Co-Sale Agreement |
| Exhibit F | – | Form of Voting Agreement |
| Exhibit G | – | Form of Legal Opinion of Company Counsel |
| Exhibit H | – | Form of LoC |
| Exhibit I | – | Form of Warrant |
| Exhibit J | – | Form of Equity Funding Request |
| Exhibit K | – | Stock Power and Assignment Separate from Certificate |

<u>**EXHIBIT A**</u>

**Schedule of Purchasers**

**Initial Closing: November 21, 2018**

| Name and Address of Purchaser | Shares of Series 1 Preferred Stock | Shares of Series 1 Preferred Stock Issued for Cancellation of Notes | Shares of Common Stock Issued for Cancellation of Notes | Cancellation of Indebtedness* | Total Purchase Price |
|---|---|---|---|---|---|
| **FO2 LLC**<br>Reginald D. Fowler, Manager<br>9920 South Rural Road #108-95<br>Tempe, AZ  85284<br>Mobile: (480) 567-5753<br>Office Tel: (480) 961-9610<br>Office Fax: (480) 961-9614<br>Email:  fo2@spiral-global.com<br><br>With a copy to:<br><br>Jim Davis<br>9920 South Rural Road #108-95<br>Tempe, AZ  85284<br>Mobile:  (318) 816-6968<br>Office Tel:  (480) 961-9610<br>Office Fax: (480) 961-9614<br>Email:  jim@spiral-kairos.com | 10,864,133 | | | - | $49,999,999.31 |

| | | | | |
|---|---|---|---|---|
| **Shaquille O'Neal Revocable Trust Agreement, dated January 27, 1995 as Amended And Restated On March 10, 2016, Lester J. Knispel and Shaquille R. O'Neal, Trustees or Registered Assigns** [Address] | | 27,341 | 5,507 | $125,832.20 | $125,832.20 |
| **Remar Investments, LP, a Nevada Limited Partnership** [Address] | | 218,514 | 44,013 | $1,005,671.24 | $1,005,671.24 |
| **Robert Davis Noell and Stacey Wilson Noell** [Address] | | 21,851 | 4,401 | $100,567.13 | $100,567.13 |
| **Ebersol-Saint James Family Trust Dated November 14, 2007** [Address] | | 1,094,539 | 220,461 | $5,037,397.27 | $5,037,397.27 |
| **Alan Kantowitz** 8 10th Street #702 San Francisco, CA 94103 | | 4,368 | 879 | $20,103.57 | $20,103.57 |
| **Kenneth Kantowitz** 355 East 72 St., Apt. 10J New York, NY 10021 | | 4,384 | 884 | $20,180.83 | $20,180.83 |
| **Krinick ASC Holdings LLC** 6844 Queenferry Circle Boca Raton, FL 33496 | | 32,884 | 6,623 | $151,343.84 | $151,343.84 |
| **RAB 175 Acquisitions LLC** [Address] Email: bobbowman4@gmail.com | | 54,887 | 11,056 | $252,609.59 | $252,609.59 |

| | | | | |
|---|---|---|---|---|
| **Mark V. Houghton-Berry**<br>Corner Green, South Drive<br>Virginia Water<br>Surrey GU25 4JS<br>United Kingdom<br>Email: markvhb@yahoo.com | | 219,640 | 44,239 | $1,010,849.32 | $1,010,849.32 |
| **Plexo Capital I, L.P.**<br>[Address]<br>Email: lo@plexocap.com | | 55,097 | 11,098 | $253,575.35 | $253,575.35 |
| **The Mila Kutcher/Ashton<br>Kutcher Family Trust**<br>[Address]<br>Email: a@aplus.com | | 22,105 | 4,452 | $101,734.25 | $101,734.25 |
| **M Ventures Fund II, LP**<br>6255 Sunset Blvd., Suite 1060<br>Los Angeles, CA 90028<br>Email: mike@m.ventures | | 55,249 | 11,128 | $254,273.98 | $254,273.98 |
| **The Founders Fund VI, LP**<br>1 Letterman Drive, Bldg. D, 5th<br>Floor<br>San Francisco, CA 94129<br>Email: npai@foundersfund.com | | 520,652 | 96,257 | $2,396,200.61 | $2,396,200.61 |
| **The Founders Fund VI<br>Principles Fund, LP**<br>1 Letterman Drive, Bldg. D, 5th<br>Floor<br>San Francisco, CA 94129<br>Email: npai@foundersfund.com | | 128,739 | 23,801 | $592,500.03 | $592,500.03 |

| | | | | |
|---|---|---|---|---|
| **The Founders Fund VI Entrepreneurs Fund, LP**<br>1 Letterman Drive, Bldg. D, 5th Floor<br>San Francisco, CA 94129<br>Email: npai@foundersfund.com | | 6,472 | 1,197 | $29,792.54 | $29,792.54 |
| **Slow Ventures III, LP**<br>1006 Kearny Street<br>San Francisco, CA 94133<br>Email:<br>kevin@slow.co<br>backoffice@slow.co | | 288,577 | 50,925 | $1,328,119.26 | $1,328,119.26 |
| **Slow Ventures III-A, LP**<br>1006 Kearny Street<br>San Francisco, CA 94133<br>Email:<br>kevin@slow.co<br>backoffice@slow.co | | 15,718 | 2,774 | $72,341.02 | $72,341.02 |
| **Moorad Sports Partners LLC**<br>[Address] | | 217,514 | 38,385 | $1,001,068.50 | $1,001,068.50 |
| **David S Pottruck Revocable Trust**<br>[Address] | | 434,815 | 76,732 | $2,001,150.69 | $2,001,150.69 |
| **Kids 42 Investments, L.P.**<br>[Address] | | 21,735 | 3,836 | $100,032.88 | $100,032.88 |
| **TOTALS:** | **10,864,133** | **3,445,081** | **658,648** | **$15,855,344.1** | **$65,855,343.41** |

\* All principal due and accrued interest shall be converted into Shares as set forth on this table.  Any additional amounts owed under any instruments of indebtedness converted into Shares under this Agreement are waived.

## **EXHIBIT B**

**Form of Restated Certificate of Incorporation**

## EXHIBIT C

### Disclosure Schedule

### November 21, 2018

This Disclosure Schedule (this "***Disclosure Schedule***") is delivered by Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), in connection with the sale of shares of the Company's Series 1 Preferred Stock on or about the date hereof pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 by and among the Company and the investors listed on Exhibit A to the Agreement (the "***Agreement***"). This Disclosure Schedule is arranged in sections corresponding to the numbered and lettered sections contained in Section 2 of the Agreement, and the disclosures in any section of this Disclosure Schedule shall qualify other sections in Section 2 of the Agreement to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections.  Where any representation or warranty is limited or qualified by the materiality of the matters to which the representation or warranty are given, the inclusion of any matter in this Disclosure Schedule does not constitute a determination by the Company that such matter is material.  Unless otherwise defined herein, any capitalized terms in this Disclosure Schedule shall have the same meanings assigned to such terms in the Agreement.  Nothing in this Disclosure Schedule constitutes an admission of any liability or obligation of the Company to any third party, or an admission against the Company's interests.

# **EXHIBIT D**

## **Form of Investors' Rights Agreement**

# **EXHIBIT E**

**Form of Right of First Refusal and Co-Sale Agreement**

## **EXHIBIT F**

### **Form of Voting Agreement**

## **EXHIBIT G**

**Form of Legal Opinion**

**<u>EXHIBIT H</u>**

**Form of LoC**

**<u>EXHIBIT I</u>**

**Form of Warrant**

## EXHIBIT J

**Form of Equity Funding Request**

## EQUITY FUNDING REQUEST

[Date]

FO2 LLC
Reginald D. Fowler, Manager
9920 South Rural Road #108-95
Tempe, AZ  85284
Mobile: (480) 567-5753
Office Tel: (480) 961-9610
Office Fax: (480) 961-9614
Email:  fo2@spiral-global.com

With a copy to:

Jim Davis
9920 South Rural Road #108-95
Tempe, AZ  85284
Mobile:  (318) 816-6968
Office Tel:  (480) 961-9610
Office Fax: (480) 961-9614
Email:  jim@spiral-kairos.com

**Re: Equity Funding Request**


The undersigned authorized officer of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), pursuant to the terms of the attached Series 1 Preferred Stock Purchase Agreement dated November 21, 2018 (the "***Purchase Agreement***"), hereby instructs Fowler to pay the Company, by wire transfer to the Company account at the below wire instructions, an Additional Fowler Funding amount equal to $_____ within one (1) Business Day of the date of this Equity Funding Request. After payment by Fowler to the Company of such Additional Fowler Funding Amount, the Total Fowler Funding Amount will equal $_____ and the number of Unfunded Fowler Shares will equal _____. Capitalized terms used in this Equity Funding Request and not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement.

*COMPANY WIRE INSTRUCTIONS:*

Bank Name: Silicon Valley Bank
Type: Checking
Routing #: 121140399
Account #: 3302322308
Account Name: Ebersol Sports Media Group

**EBERSOL SPORTS MEDIA GROUP, INC.**

By: _____

Name: _____

Title: _____

-ii-

## **EXHIBIT K**

**Stock Power and Assignment Separate from Certificate**

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER

**FO2 LLC**

_____
(Signature)

_____
(Please Print Name)

_____
(Title)

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.