IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
— — — — — — — — — — — — — — — — — — — — — — — — — — — X
:
:
UNITED STATES OF AMERICA                :
:
—V.—                                    :   S3 19-Cr. 254 (ALC)
:
REGINALD FOWLER,                        :
:
DEFENDANT.                              :
:
— — — — — — — — — — — — — — — — — — — — — — — — — — — X

**VICTIM IMPACT STATEMENT
SUBMITTED ON BEHALF OF THE BANKRUPTCY
ESTATES OF THE ALLIANCE OF AMERICAN FOOTBALL**

Randolph N. Osherow ("Trustee") is the appointed Chapter 7 Trustee of the substantively consolidated bankruptcy estates (collectively, the "Estate") of Ebersol Sports Media Group, Inc.("ESMG")[1] and five subsidiaries that formed and operated as the Alliance of American Football League ("AAF"). [2] The Trustee submits this statement to the Court in connection with the sentencing of Reginald Fowler ("Fowler") for the fraud he perpetrated against the AAF. It is the Trustee's hope that this statement will aid the U.S. Attorney and the Court in appreciating the

---

[1] Ebersol Sports Media Group, Inc. was the ultimate parent of all of the entities doing business as the AAF.
[2] The six bankruptcy cases forming the AAF bankruptcy are all in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. They are substantively consolidated and are being administered by Chief Judge Craig Gargotta under the lead case, In re Legendary Field Exhibitions, identified first below:
   In re Legendary Field Exhibitions, LLC, Case No. 19-50900
   In re AAF Players, LLC, Case No 19-50902
   In re AAF Properties, LLC, Case No. 19-50903
   In re Ebersol Sports Media Group, LLC, Case No. 19-50904
   In re LFE2, LLC, Case No. 19-50905
   In re We Are Realtime, LLC, Case No. 50906.

nature and extent of harms Fowler's fraud and aid the Court in imposing a just sentence that includes a restitution award and facilitates remission or restoration of seized funds to AAF.[3]

## I.
## Trustee's Role

The Trustee 's involvement in the AAF's insolvency arose upon appointment to administer and equitably pay claims out of a presently impoverished Estate. The Trustee was not involved in the personal interactions that might bear on Fowler's conduct. Although it falls to the Trustee to offer the Court some explanation of the impact of Fowler's fraud, the Trustee is mostly informed about monetary loss from what is revealed in the AAF's business records, the bankruptcy proofs of claim individuals and business large and small filed and the Trustee's counsel's interactions and interviews with individuals involved in the AAF's business.[4] The Trustee hopes to assist the U.S. Attorney in addressing the financial harm Fowler's fraud caused to the AAF and that flowed through the AAF to hundreds of other victims whose legitimate debts the AAF incurred and did not pay because Fowler's commitments were false and a fraud.

## II.
## STATEMENT

1.      Reggie Fowler's fraudulent scheme to acquire the controlling stake in the fledgling Alliance of American Football league with $170,000,000.00 in funding commitments he knew and has now confessed were criminally derived pushed AAF into a debilitating

---

[3] Because the AAF entities are all debtors in bankruptcy, any funds the Trustee may recover from Fowler or by remission or restoration will be distributed under bankruptcy's equitable scheme to mitigate the loss that flowed through the AAF to its creditors.

[4] The Trustee's counsel collected and reviewed available records and interviewed former AAF representatives, including league founder Charles Ebersol, as well as displaced players and Estate claimants. These records and interactions underlie this statement and illuminate the impacts that followed when Fowler defrauded the AAF.

insolvency from which it could not escape. Mr. Fowler convinced the AAF's founders and other investors that his funding sources were legal and immediately available to provide the AAF with needed operating capital for its inaugural season and beyond. Relying on Fowler's deceit, AAF entered into a term sheet and definitive stock purchase and warrant-backed line of credit agreements with Fowler, which AAF's board of directors approved.[5] AAF incurred millions in obligations for essential infrastructure, facilities, services and personnel to build out the league during the crucial time period between October 2018 and the league's debut in February 2019. For his false promises, Fowler obtained rights to acquire, as the AAF's "lead investor", more than 13 million shares of ESMG's then authorized preferred and common stock. He gained a seat on the AAF's board of directors and football steering committee. In reliance on these promises, the AAF entered into irrevocable payment obligations requiring immediate liquidity Fowler promised.

2. Fowler's committed funds were neither legal nor available. The Trustee is now informed that the United States obtained seizure warrants in or about October 2018 for the same accounts and funds he was touting to the AAF; the government evidently believed and concluded that Fowler was using the accounts as part of an illegal money transmitting business. During the same period the United States was obtaining a seizure warrant for Fowler's accounts, Fowler was representing to the AAF that the funds in them were his available funds, transmitting and exhibiting false records to the AAF to further those falsehoods, and entering into contracts to fund the AAF's operating capital needs with funds in those impounded accounts. Despite his duties of candor and full disclosure as an ESMG director, it is now obvious that Fowler did not

---

[5] See Appendix Exh. 1

disclose his illicit activities to AAF or the reasons his funds never materialized.  Instead, Fowler misrepresented funding delays and gave false assurances that funds would be forthcoming.

3. Fowler's fraud and subsequent inability to meet his investment and loan commitments deprived the AAF of operating capital in the crucial months and days leading up to the league's debut. AAF made promises to individuals, families, and vendors based on the mistaken belief that its liquidity was just a capital call away, instantly accessible in a bank account. Midway through February 2019, Fowler's commitments were still not paid; the AAF was forced to relinquish control of ESMG and the league in order to get new funding from a new investor. Within eight weeks, this investor forced the AAF into Chapter 7 liquidation. This investor contends that he ordered the action in part because AAF took on debts to vendors that Fowler had promised to pay but did not pay. Because of Fowler's fraud, hundreds or even thousands of people's dreams were crushed.

4. The details of the AAF's formation present a story of a business that, while rushing to be first-to-market was poised to succeed.  Like many startups, AAF had administrative and management challenges, but the AAF had put together an experienced management team and organization capable of putting out a high quality innovative football product ready for a national audience.  On its first night, February 9, 2019, the Alliance of American Football (AAF) was the highest-rated sports show in primetime on CBS. NFL Network and Turner Sports added millions more viewers through their broadcast partnerships. The first weekend of the AAF games, more than 6 million people watched.

5. AAF founders Charles Ebersol and Bill Polian were individuals with football and television pedigrees. Polian was an experienced and revered football executive.  As the Buffalo Bills General Manager, he built an organization that reached four consecutive Super Bowl's

before he was inducted into the NFL Hall of Fame. For his part, Ebersol grew up in football and television entertainment, learning that business from his father, Dick Ebersol, renowned as the long-serving president of NBC Sports & Olympics who engineered the NFL's return to NBC. Charlie produced a television documentary, *This Was The XFL*, studying the XFL's 2001 collapse and was committed to avoiding the mistakes that brought the XFL down. Ebersol brought his father in as an AAF advisor and board of directors member.

6. AAF recruited head and assistant coaches with NFL experience[6] and an executive staff experienced in single-owner professional sports leagues. The league's player relations and human resources staff came from NFL and NBA backgrounds. The AAF retained other administrative, marketing and software development professionals, more than 500 in all across the nation, needed to make a multi-city professional sports league a success. The league secured broadcasting rights with CBS TV, NFL Networks and other streaming platforms.

7. Unlike others' previous attempts at an NFL alternative league, AAF was determined not to compete with the NFL. Instead, AAF's founders envisioned a spring league to complement the NFL, filling the inter-season gap between the Super Bowl and the NFL draft with real professional football that would offer players the opportunity to be seen in actual game scenarios and that might afford them a return path to the NFL. The AAF designed its contracts to assure that where there was NFL interest, players could move to the NFL.[7] AAF engaged the NFL and its player's union toward that goal.

8. Fowler's funding commitment provided the crucial last piece of the AAF puzzle. AAF raised more than $25 million in seed financing from more than 20 investors and entered a

---

[6] AAF engaged as head coaches Steve Spurrier, Brad Childress, Rick Nueheisel, Dennis Erickson, Mike Singletary, Mike Martz, Mike Riley and Tim Lewis
[7] Appendix Exh.2.

business alliance with MGM Resorts International, Inc. to provide $7 million in additional funding.  Based on the AAF's pro forma, which projected initial operating losses, Fowler's capital and line of credit commitments, with the other financing AAF raised, more than adequately funded the league's projected operating costs, without even considering revenues from league operations.[8]

9. After receiving Fowler's funding commitments in July 2018, the AAF began signing players to 3-year, $250,000 standard player agreements. After the all-league training camp in January 2019, more than 400 of those players made it onto AAF team rosters and became the AAF's public face.

10. The AAF had reason to accept Fowler at his word about his financial *bona fides*. Fowler had formerly been a co-owner of the NFL's Minnesota Vikings franchise.  He sold that interest in 2014.  Although there were rumors about Fowler's liquidity at that time, Fowler presented to AAF and its attorneys banking account records showing available funds more than sufficient to meet the commitments to fund the league.  Willie Lanier, a legendary NFL Hall of Fame member, introduced Fowler to the AAF and vouched for him.  Fowler represented himself to the AAF, its investors, executives and attorneys as a sophisticated real estate investor and a government contractor.  He touted his relationships with HSBC and other banks.

11. In July 2018, Fowler and the AAF agreed in principle to terms that would make Fowler the AAF's lead investor. Fowler and AAF memorialized their agreement in a term sheet signed soon thereafter.  Fowler would invest $50 million in equity funding and provide a $120 million in line of credit financing with warrants exercisable to convert line of credit loans to

---

[8] See Appendix Exh.3 (ESMG Annual Financial Projections).  AAF projected to earn approximately $64 million from operations.

common stock at Fowler's election.[9] Based on the term sheet and at the same funding levels, the parties prepared and signed definitive documents on or about November 21, 2018, long after Fowler's accounts had been frozen.[10] Fowler's wholly owned and controlled special purpose entity, FO2, LLC would hold the interest and provide the direct funding.

12. Despite his unequivocal funding commitment, Fowler provided only small amounts in dribs and drabs. This cut AAF deeply. AAF needed the funds as the company had incurred and was incurring significant obligations connected to the league's football operations as it prepared to hold training camps and put on televised professional football productions in four cities weekly over 10 weeks from February to April 2019. Fowler's failure to fund his commitments sapped the AAF in noticeable ways engendering uncertainty among its employees and others. Finalized training camp arrangements were delayed and the app development, an important piece of AAF's objective to provide a novel interactive fan experience, was falling behind. Without Fowler's funding, the AAF's financial resources dwindled. AAF's records show the company was deferring payment of its trade vendors.

13. In February 2019, AAF could no longer wait on Fowler to fund his commitments or believe in his assurances. It desperately needed replacement funding. The organization had employee and player payroll obligations of approximately $5 million coming immediately due. Without Fowler's funding, or funding from another source, the AAF did not then have available cash to meet the payroll and its auspicious beginning was in grave jeopardy.

14. Out of money and out of time, AAF was forced on unthinkably short notice to obtain alternate funding on draconian terms a new investor dictated. Among other things, AAF's

---

[9] Appendix Exh.1.
[10] Appendix Exh.1.

founder and original investors had to relinquish majority ownership all control of the company. The new investor and one of his employees became the only voting board members.

15. Ultimately, that investor funded AAF with just less than $70 million before forcing AAF into Chapter 7 liquidation. That investor blamed the liquidation in part on millions in unfunded accounts payable obligations that accrued while Fowler was failing to meet his funding commitments.

16. AAF couldn't pay the debts it was racking up while Fowler was continuing his deception, but the company dutifully recorded them in its regular accounting practices. This appears clearly from "Unpaid Bills" reports kept by AAF's contractor engaged to provide treasury functions for the AAF.[11] One such report generated titled "Unpaid Bills V2 (as of 2/15) evidences that as of the time AAF entered into an arrangement for alternate funding on February 14, 2019 [12] AAF's approved and unpaid accounts totaled at least $15,461,740.35.[13] These represent vendors AAF certainly became indebted to, and who provided goods and services to AAF, based on the expectation that Fowler would fund his commitments as promised. AAF had also incurred an approximately $4.1 million dollar football payroll[14] for the February 9, 2019

---

[11] The AAF's accounting firm, Clifton, Larson Allen provided a dedicated employee to provide financial tracking and analysis for AAF. This contract controller, prepared and kept financial information and reports, including tracking when service and vendor invoices were paid. When the AAF filed bankruptcy, the Trustee requested those records pursuant to Bankruptcy Rule 2004 and the accounts cooperated in turning over their records as wells as the actual AAF issued computer the contract controller used. The Trustee's counsel received the computer directly from the accountant and has constantly possessed it since its receipt. The Trustee's counsel also interviewed the account to understand the nature of the reports and records made and stored on the unit.

[12] This is the date that the AAF first obtained some substitute funding from an alternative investor after agreeing to give up all control of the AAF to that financier.

[13] The report is included in Appendix Exh.4. The total sum of the items in the open balance column is $15,461,740.35.

[14] See Appendix, Exh. 5. AAF had some funds available related to the payroll which were drafted by its PEO organization to cover tax liabilities related to payroll. It appears the total payroll obligation for the February 15 football payroll was approximately $5.7 million.

debut games for which AAF had insufficient funds, absent performance by Fowler or capital from another source.

17. These amounts are part of the AAF's monetary loss directly traceable to Fowler's fraud. But for Fowler's inability to meet its obligations to AAF after the United States seized his criminally derived accounts, AAF could and would have paid its obligations during the period and would likely be an unqualified success story today. These losses flowed directly through to the hundreds of individuals and organizations who were relying on AAF to pay its bills, something the AAF could have done but for Fowler's fraud.

18. Some of these creditors and vendors were large, but many were small and mid-sized businesses who filed claims that doubtless represent material losses to them. These vendors and creditors run the gamut from schools and local universities who provided facilities, to local doctors, physical trainers, caterers, hotel operators, season ticket holders, designers, merchandise providers, local newspaper and billboard advertisers, broadcast talent, apartment locators, assistant coaches, production service providers, stadium security, state taxing authorities, attorneys, transportation providers, public relations consultants, stadium workers and the people who provide porta-potties. The claims register available in PACER for bankruptcy case 19-50900 through 50906[15] chronicle the claims of the individuals and businesses who filed seeking some repayment from the AAF that will likely not occur unless Fowler is held financially responsible for his crimes.

19. Furthermore, the Trustee believes that the estate's player contracts settlement, which the bankruptcy court found reasonable as an allowed claim against the estate, is directly

---

[15] All of these cases are in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division and are being administered by Chief Bankruptcy Judge Craig Gargotta.

attributable to Fowler's fraud. AAF would not have entered into those binding commitments if Fowler had not made false promises and committed criminal fraud. If Fowler had not committed fraud against the AAF, they would have been paid in full, not just in part. The total amount of allowed class action player claims is around $78 million.[16] In addition to losing control of the AAF, its founding investors lost all their investments exceeding, in total, $27,765,000.[17]

20. None of that would have happened if Fowler had been truthful and provided the money he committed. AAF would not have been forced into a devil's deal with a new financier. Its founders would not have lost all control of the AAF's direction and business; its' founding investors' interests would not have been diluted to insignificance. AAF also would not have suffocated under the weight of the obligations it owed but could not pay to its creditors because of Fowler's fraud and failure to provide immediately available funds.[18]

21. When the mortally wounded AAF succumbed to Fowler induced wounds, its value as an enterprise has evaporated. The Estate is impoverished and has no present ability to

---

[16] The AAF's player contracts with its approximately 400 rostered players were on their face worth more than $104 million, but when the AAF collapsed, it had only paid out about $23 million. These players sued the AAF. The Trustee eventually settled the suit, in which the players received an approximately $78 million allowed claim against the Estate.[16] Some of that claim is a priority wage claim and some is a subordinated general unsecured claim. The amount of the approved priority claim for the players by itself is greater than and will consume all of the Estate's current available funds. The unfortunate financial consequence of Fowler's fraud and the AAF's liquidation is that unless Fowler is held responsible for his fraud, the AAF will only pay the players a small fraction of what they are owed, and the vendors mentioned herein will get nothing through the Estate.

[17] The AAF raised its original financing through an issuance of seed series preferred stock, April and November 2018 convertible note sales, a December 2018 unsecured note and warrant sale. AFF raised $3,000,000.00 in additional funds through warrant backed debt instruments evidently to mitigate Fowler's refusal to fund his commitments. All of these financings are documented and contain information about the individual and organizational investors. Those instruments are not included in the Appendix, but if the Court desired to verify this financing, the Trustee would provide them in camera.

[18] Fowler's failure to exhibit the slightest candor or honesty in October and November 2018, when his accounts were seized drove AAF deeper into a financial hole. Violating every duty a board member owes to the corporation, Fowler deprived AAF of the opportunity to seek alternate funding earlier when there were other potential investors. He robbed AAF of the chance to limit its financial exposure by renegotiating terms with creditors or limiting the obligations it incurred. This was as damaging as anything to the AAF. And ultimately, Fowler's fraud flowed through the AAF to its hundreds of creditors large and small.

engage experts to determine that value.  The best the Trustee can do to express as nearly as practicable the pecuniary extent of harm to the Estate and the debtors through (a) the obligations that would have been satisfied in the accounts payable process but for Fowler's fraud, (b) the amount the Estate and debtors became obligated for in settlement of the player contracts entered on the expectation that Fowler was real and would perform, and (c) the lost seed financing that went up in smoke when Fowler's fraud forced the AAF to accept substitute financing on dictated terms that involved relinquishing control and 75% ownership in the AAF.

22.     Fowler's fraud and criminal conduct, for which he was indicted and has admitted guilt is the direct and legal cause of all of these harms. It is important to not lose sight of the broad sweep of those impacts, pecuniary and otherwise, on the AAF and the human beings and small businesses connected to the league.[19]

23.     In all, more than 1000 staff and players who believed in the AAF's promise to succeed, uprooted their lives, left other jobs, moved their families and joined the innovative new enterprise, all on the belief that the AAF had funding in place.  The founders believed it too. Only Fowler knew otherwise; his fraud on the AAF harmed the organization and its people top to bottom in every corner and at every level financially and personally.

24.     A couple of anecdotes from individuals affected may aid the Court in appreciating the personal consequences its staff faced when the AAF shuttered its operations.[20] For example,

---

[19] Fowler's perfidy also resulted in injuries that cannot be measured in money but are no less real. Charles Ebersol lost his dream to do what his father could not in 2001 by bringing a successful spring football league to market because of his faith in Fowler and for reasons he could not control.  Bill Polian, an NFL Hall of Famer general manager and now a mere creditor of the Estate, carries has the AAF's failure as a closing mark on an otherwise illustrious career.

[20] These anecdotes were communicated to the Trustee from counsel for the player class, Jonathan Farahi, who has been intimately involved in interviewing players, coaches and some other employees since the AAF folded in the course of determining whether to represent those individuals.  Their names have been left out here to protect their privacy.

one football operations staff left his secure job in the NFL to join the AAF because he believed it would advance his career. He relocated his family of four, including two toddlers. His salary stopped when the AAF did, after just a few months. When the AAF collapsed abruptly, he could not find work in collegiate football because spring practices had begun and staffs were set. The NFL was in between seasons so there was no immediate path back to his former employer. His termination, through no fault of his own, brought on the worst possible circumstances. He was left alone in a new city with no money coming to support his family.

25. In another example, a 23 year old AAF player ("Player 1) was subjected to a head-on collision in practice that left him with periodic paralysis, numbness and tingling in his extremities due to the neck injury he incurred. Forced to retire, he needs surgical intervention for cervical fusion. But because the AAF could not pay its insurance premiums, he has no insurance benefits and cannot afford the procedure out-of-pocket.

26. Finally, the AAF collapsed without providing any means for the players, at least, to obtain information needed to file tax returns. The Trustee and the Trustee's counsel worked for more than a year following the AAF's bankruptcy filing to try to rectify this situation. The Trustee's counsel fielded phone calls and provided information as recently as last month and often fielded calls seeking help from players trying to file and receive desparately needed tax refunds, or lost in an IRS bureaucracy that they said wouldn't accept copies of W2s or needed proof of income for state tax purposes because AAF didn't pay its PEO.

27. In addition to its players' and staffs' travails, AAF lost the ability to continue to innovate and raise capital on its initial success. It's effort toward creating and interactive fan experience through its real time app and its potential gaming applications evaporated and its intellectual property was repossessed. AAF's 1000 players and employees were

uceremoniously terminated without severance with one-day days' notice.  The AAF lost its advantage as the first to bring a spring professional league to market; other leagues, including the USFL filled the gap.  Many of the AAF's vendors and investors had personal relationships with the league's founders that have likely been made more difficult.  The AAF wanted to pay its vendors, staff and creditors, and believed it had funding commitments to cover the obligations it was incurring.  But for Fowler's fraud, the AAF could have and would have paid its obligations.

28. The Chapter 7 bankruptcy is designed to create a central mechanism for the Trustee to seek recourse for injuries to the AAF that flowed through to its many creditors.  It provides a central forum those creditors who derivatively suffered the consequences of Fowler's fraud to present those claims.  The AAF's rights of restitution (or through remission or restoration) belong to the Trustee, but the Trustee's role is to redistribute those funds in the most equitable manner to those who suffered with the AAF when it collapsed because Fowler is a liar.

29. Claims filed against the Estate currently exceed $60 million (excluding the claims of the substitute funding source), but that amount encompasses some vendor claims that accrued after the AAF secured substitute funding, albeit insufficient and on draconian terms. The Trustee believes and urges that a true and reasonable measure of the loss to vendor claimant's directly traceable to Fowler's fraud is the amount of unpaid expense incurred up to that time.  AAF very plainly incurred those obligations on the expectation of Fowler's funding commitments, which the AAF continuously asked Fowler to meet. But for Fowler's fraud, those amounts would have been paid. That amount, based on AAF's business records the Trustee obtained and the filed claims, including the league's first player payroll in arrears, is approximately $19,561,740.35.

30. Although the Trustee is not strictly concerned with reimbursing equity investors absent a surplus Estate, all of the equity of the founding investors, exceeding $25 million, it

appears directly and foreseeably because Fowler defrauded the AAF initially and continued that fraud until it was too late in February 2019 for the AAF to obtain substitute capital on reasonable terms.

31. As a victim of Fowler's confessed fraud, AAF is entitled to mandatory restitution for harm directly and reasonably foreseeable as a result of Fowler's fraud. Rather than using more complex calculations, the Trustee believes that calculating financial harm by the obligations incurred by AAF and that would have been paid if Fowler's commitments were linked to legal funding sources is the best measure and approach. Fowler's fraud is the but-for and foreseeable cause of these losses, which are reasonably determinable.

32. As reflected in the AAF's records included in the Appendix, that amount totals approximately $19,561,740.00 + 78,000,000.00 + $27,765,000.00 = $125,326,740.00.

33. Respectfully, the Trustee asserts that a restitution order that includes all of these components would be appropriate. It is only 71% of Fowler's full funding commitment. If the Court determines that a restitution judgment of another or lessor amount is appropriate, the Trustee notes that funds recovered on a judgment will be used pursuant to the bankruptcy code to pay the claims of claimants the AAF did not pay because of Fowler's criminal fraud.

Respectfully submitted,

**BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP**

By: */s/ Brian S. Engel*
    Brian S. Engel
    Texas Bar No. 00789279
    Steve Turner
    Texas Bar No. 20341700
    3809 Juniper Trace, Suite 205
    Austin, Texas 78738
    Telephone: (512) 687-2502

Facsimile: (512) 477-1112
brianen@bdfgroup.com
stevet@bdfgroup.com

Boris Treyzon
Jonathon S. Farahi
Abir Cohen Treyzon Sala, LLP
16001 Ventura Blvd.
Suite 200
Encino, CA 91436
JFarahi@actslaw.com
btreyzon@actslaw.com

**ATTORNEYS FOR RANDOLPH N. OSHEROW, CHAPTER 7 TRUSTEE OF THE CHAPTER 7 BANKRUPTCY ESTATES OF THE CONSOLIDATED DEBTORS**