IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X
:
:
UNITED STATES OF AMERICA            :
:
        —V.—                        :        S3 19-Cr. 254 (ALC)
:
REGINALD FOWLER,                    :
:
        DEFENDANT.                  :
:
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

**APPENDIX TO**

**VICTIM IMPACT STATEMENT
SUBMITTED ON BEHALF OF THE BANKRUPTCY
<u>ESTATES OF THE ALLIANCE OF AMERICAN FOOTBALL</u>**

### TERM SHEET FOR SERIES 1 PREFERRED STOCK FINANCING

The following is a summary of terms for a proposed financing of the company set forth below.  Except as set forth next to "Confidentiality" below, this Term Sheet is not intended to, and does not, create any binding obligation on the part of any party and there shall be no legal obligation of any party with respect to the matters contemplated hereby until mutually agreeable definitive documents relating thereto are executed by all parties.

**Offering Terms:**

| | |
|---|---|
| **Issuer:** | Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"). |
| **Securities:** | Series 1 Preferred Stock (the "**Series 1**" and together with the Company's Series Seed Preferred Stock, the "**Preferred Stock**"). |
| **Investment / Investors:** | Reggie Fowler, either directly or through an entity controlled by him (the "**Lead Investor**"), will invest $50,000,000, with other existing investors (collectively with the Lead Investor, the "**Investors**") to invest up to their pro rata amounts.  See Schedule of Investors attached hereto as Appendix A indicating preliminary pre-and post- money capital structure. |
| **Line of Credit:** | As discussed further below, at the Initial Closing, the Company and the Lead Investor will enter into a Line of Credit (the "**LoC**") pursuant to which the Company may borrow up to an aggregate principal amount of $120,000,000 (the "**Line of Credit Amount**") and the Lead Investor agrees to make the Line of Credit Amount available at any time for the Company to borrow, subject to the conditions specified below. |
| **Closing:** | The initial closing shall occur as soon as practicable, targeting October 15, 2018 (the "**Initial Closing**").   Prior to the Initial Closing at a mutually convenient time, the appropriate officers of the Company shall present in person to the Lead Investor the Company's business plan, together with such related supporting documentation as is customary for transactions of this nature. |
| **Pre-and Post- Money Valuation:** | $115,000,000 and $179,813,572.84, respectively. |
| **Available Equity Pool:** | 12.5% of the fully-diluted capitalization of the Company for the issuance of equity compensation (primarily in the form of options to purchase common stock) to employees, consultants and advisors in accordance with the Plan attached hereto as Appendix B. |

**Terms of Series 1:**

| | |
|---|---|
| **Liquidation Preference:** | In the event of any liquidation, dissolution or winding up of the Company, the holders of the Series 1 Preferred Stock shall be entitled to receive in preference to the holders of the Series Seed Preferred Stock and Common Stock a per share amount equal to the original purchase price of the Series 1 Preferred Stock plus any declared but unpaid dividends (the "**Series 1 Liquidation Preference**"). After the payment of the Series 1 Liquidation Preference to the holders of the Series 1 Preferred Stock, the holders of the Series Seed Preferred Stock shall be entitled to receive in preference to the holders of Common Stock a per share amount equal to the original purchase price of the Series Seed Preferred Stock plus any declared but unpaid dividends (the "**Series Seed Liquidation Preference**" and together with the Series 1 Liquidation Preference, the "**Liquidation Preference**").  After the |

*EXHIBIT 1*

payment of the Liquidation Preference to the holders of the Preferred Stock, the remaining assets shall be distributed ratably to the holders of the Common Stock. A merger, acquisition or sale of the Company in which the stockholders of the Company do not own a majority of the outstanding shares of the surviving corporation, or the sale or other disposition of all or substantially all of the assets or intellectual property of the Company, shall be deemed to be a Liquidation Event.

**Conversion; Anti-Dilution:** Each share of Series 1 converts into one share of Common Stock at the option of holder. The Preferred Stock shall automatically convert (1) upon the election of a majority of then outstanding Preferred Stock voting together as a single class (provided that conversion of the Series 1 shall require consent of a majority of the outstanding shares of Series 1) or (2) upon a qualified IPO (over $40 million in gross proceeds), in each case subject to customary broad based anti-dilution protections consistent with the Company's existing financing documents.

**Protective Provisions:** Consistent with the Company's existing financing documents, consent of the holders of a majority of the Preferred Stock voting together as a single class shall be required for any of the following actions: (a) alter or change the rights, powers or preferences of the Preferred Stock; (b) increase or decrease the authorized number of shares of Preferred Stock or Common Stock; (c) authorize or create any new class or series of capital stock having rights, powers, or preferences senior to or on a parity with any series of Preferred Stock, or authorize or create any security convertible into or exercisable for any such new class or series of capital stock; (d) redeem or repurchase any shares of capital stock, other than pursuant to service agreements giving the Company a repurchase right upon the termination of services, the Company's right of first refusal or as approved by the Board (including a Preferred Director); (e) declare or pay any other distribution or dividend; (f) otherwise amend, alter, restate, or repeal any provision of the Company's certificate of incorporation or bylaws; (g) effect any merger, consolidation, or liquidation event; (h) change the authorized number of directors; (i) with respect to any subsidiary controlled by the Company, authorize or create any new class or series of capital stock having rights, powers, or preferences senior to or on a parity with any series of such subsidiary's capital stock held by the Company, or authorize or create any security convertible into or exercisable for any such new class or series of capital stock of the subsidiary; (j) create, or hold capital stock in, any subsidiary that is not wholly owned by the Company, other than as approved by the Board (including a Preferred Director) or (k) (I) sell, issue, sponsor, create or distribute any digital tokens, cryptofinance coins, blockchain-based assets, digital assets or cryptocurrency ("**Tokens**"), including through a Simple Agreement for Future Tokens or other agreement, pre-sale, initial coin offering, token distribution event or crowdfunding; or (II) develop a computer network either incorporating Tokens or permitting the generation of Tokens by network participants.

**Terms of the LoC:**

**Availability:** At any time, and from time to time, until the Termination Date, the Company will have the unilateral right, but not the obligation, to borrow from the Lead Investor an aggregate outstanding amount up to the Line of Credit Amount, in $15 million increments (a "**Standard Draw Amount**"), by delivering a written notice to the Lead Investor (each, a "**Draw Request**"). The Lead Investor irrevocably agrees and will be obligated to

fund the amount listed in a Draw Request within 10 calendar days of receipt of such Draw Request, subject to the budget deficit provisions set forth below.    The Company may submit Draw Requests pursuant to a predetermined schedule/budget to be approved by the Finance Committee (as defined below), which shall contain reasonable financial triggers designed to give Lead Investor adequate notice ahead of each Draw Request and to tie the Company's submission of Draw Requests to financial needs. The Lead Investor agrees to maintain funds available under the LoC in a separate account at a nationally recognized bank, not to be commingled with funds for other uses, in a form with adequate liquidity sufficient to meet each Draw Request.

**Finance Committee:** While all or any portion of the principal of the LoC is outstanding, the Company will establish a Financing Committee which will provide financial oversight regarding the LoC, including the pre-approval of the budget to be finally approved by the Board of Directors (the "***Budget***") that, among other things, sets the basis of the Draw Requests, the delivery of Draw Requests, the extension of the LoC and any material modifications of the terms of the LoC.    The Company will present unaudited financial statements to the Financing Committee on a monthly  basis, which will include a report on the variance between actual financial results against the corresponding items in the Budget.   In the event that any material category of revenue or expense reported in such financial statements misses the corresponding item in the Budget by more than the greater of three percent (3%) and $100,000, the Company shall within thirty (30) days advise the Lead Investor of its plans to eliminate or materially mitigate the Budget deficit.  If the Budget deficit reaches or exceeds the greater of five percent (5%) and $170,000 (a "***Budget Deficit Event***"), the Lead Investor, in its sole discretion, may upon thirty (30) days' notice elect to deny funding on any Draw Requests until the Budget Deficit Event is remediated. The initial members and co-chairs of the Financing Committee will be Reggie Fowler and Charlie Ebersol, and the Company's Chief Financial Officer, when such person is hired, or another appropriate finance or operations officer

**Term and Repayment:** The LoC will terminate upon the earlier of (a) the date that is 3 years from the Initial Closing, subject to two additional mutually agreed upon one-year extensions, and (b) the date that all borrowed Standard Draw Amounts are repaid in full (the "**Termination Date**").

The Company may repay any Standard Draw Amounts at any time, provided that all Standard Draw Amounts are to be repaid no later than 5 years from the Initial Closing.

**Local Team Revenue Share:** Until the Termination Date, the Lead Investor will have the right to receive a baseline of 15% of the local revenue of each of the Company's first eight football teams (the "**Initial Teams**"), including ticket sales, sponsorships and merchandise, all online and television platform and distribution (with respect to each Initial Team, the "**Local Revenue Share**"). For the avoidance of doubt, Local Revenue Share payments will not serve as repayment of any Standard Draw Amount.

Each time the Company borrows a Standard Draw Amount, the Local Revenue Share of one Initial Team selected by mutual agreement (in each case, the "**Selected Team**") will be increased from the baseline 15% to 30%. Subsequently, upon the aggregate Local Revenue Share payments for the applicable Selected Team equaling the Standard Draw Amount, the

Local Revenue Share of such Selected Team will return to the baseline 15%.

If the Company sells a "Fanchise" license for an Initial Team after the Initial Closing, the proceeds from such sale will be used to repay all then-outstanding Standard Draw Amounts (in $15M increments) and the Local Revenue Share for such Initial Team will be decreased to 0%. Additionally, upon repayment in full of a Standard Draw Amount associated with a Selected Team (regardless of whether in connection with the sale of a "Fanchise" license), the Local Revenue Share for the applicable Selected Team will be decreased to 0%.

In the event that the Investor denies funding on any Draw Requests in connection with a Budget Deficit Event, the Lead Investor will cease to have the right to receive Local Revenue Share payments on any teams that are not then Selected Teams (as defined below), until such time as the Lead Investor funds on the Company's next Draw Request.

*Illustrative Example*: The Company has made, and Lead Investor has funded, two Draw Requests, Lead Investor will have the right to receive a 30% Local Revenue Share payment on two Selected Teams and the baseline 15% Local Revenue Share payment on the other six Initial Teams that are not Selected Teams. A Budget Deficit Event then occurs, and Lead Investor exercises its right to deny funding on the Company's next Draw Request. Lead Investor continues to receive the 30% Local Revenue Share payment on the two Selected Teams, but stops receiving the 15% Local Revenue Share payment on the other six Initial Teams. The Company then makes a subsequent Draw Request, which Lead Investor funds. Lead Investor would then receive the 30% Local Revenue Share payment on the three Selected Teams, and the 15% Local Revenue Share payment on the other five Initial Teams.

| | |
|---|---|
| **LoC Warrant Coverage:** | At the Initial Closing, the Lead Investor will be issued a Warrant to purchase up to an aggregate number of shares of the Company's Common Stock equal to 10% of the fully-diluted capitalization of the Company as of immediately following the Initial Closing (the "***Warrant***"). Initially the Warrant will not be exercisable for any shares, and upon each Standard Draw Amount being borrowed by the Company, the Warrant will become exercisable for an additional aggregate number of shares equal to 1.25% of the fully-diluted capitalization of the Company as of immediately following the Initial Closing. The Warrant will have an exercise price per share of $0.01, which may be payable in cash or pursuant to a "net exercise" provision allowing the surrender of the Warrant for shares valued at the excess of fair market value over the exercise price. The Warrant will have the same term as the LoC, subject to earlier termination immediately prior to a change in control, sale of all or substantially all of the Company's assets, a merger of the Company with or into another corporation, or the liquidation, dissolution or winding up of the Company. The Warrant shall not be transferable without the Company's prior written consent, other than to such Investor's affiliates. |

**Other Rights:**

| | |
|---|---|
| **Information Rights:** | Major Investors shall receive customary information rights consistent with the Company's existing financing documents. |

**Registration Rights:**             Investors shall have standard demand, S-3 and piggyback registration rights consistent with the Company's existing financing documents.

**Preemptive rights;**
**ROFR & Co-Sale:**             Major Investors shall have customary pro rata participation, ROFR and co-sale rights, in each case subject to customary exceptions, consistent with the Company's existing financing documents.

**Deadlock Provision:**             In the event that Charlie Ebersol and Reggie Fowler do not agree on a matter presented to the stockholders of the Company (whether for a fully outstanding, class or series vote) for approval, Mr. Ebersol and Mr. Fowler each agree to vote, and cause their affiliates to vote, in accordance with the recommendation of the Series Seed Director (or, in the event the Series Seed Director has a direct interest in the transaction presented for approval, such other disinterested Board member mutually agreed upon by Mr. Ebersol and Mr. Fowler), which includes without limitation the matters set forth in the section entitled "Protective Provisions."

**Board of Directors:**             The authorized size of the Board shall initially be set at six members, consisting of: (a) one person designated by the holders of a majority of the Series Seed Preferred Stock voting together as a single class (initially Keith Rabois) (the "**Series Seed Director**") (b) for as long as the LoC is outstanding, two persons designated by the holders of a majority of the Series 1 voting together as a single class (initially Reggie Fowler and his designee.) (the "**Series 1 Directors**" and together with the Series Seed Director, the "**Preferred Directors**") and (c) three persons elected solely by the holders of Common Stock, one of which shall be the then-serving CEO, and two of which shall be designated by Charlie Ebersol (currently Dick Ebersol and one vacant seat). Similarly, during the period the LoC is outstanding, all material Board or Shareholder actions shall be ratified, approved and executed pursuant to the affirmative vote of no less than seventy five percent (75%) of the members of the Board of Directors or Shareholders, as the case may be. Following the termination and payment of the LC, the Series 1 Preferred Stock Holders shall appoint the number of directors consistent with their Stock ownership .

**<u>Other Matters</u>:**

**Football Steering Committee:**             In connection with the transactions contemplated by the Term Sheet, the Company will establish a Football Steering Committee (the "***Football Committee***"), which will provide oversight to the football operations of the Company's professional football league. The initial members of the Football Committee shall include Reggie Fowler, Willie Lanier, Charlie Ebersol, Bill Polian and other members to be determined by the Board. The Board will select a chair of the Football Committee, initially to be Reggie Fowler.

**Conditions to Closing:**             Standard conditions to closing, which shall include, satisfactory completion of financial and legal due diligence, and completion of definitive documentation. The Investors shall receive customary representations and warranties by the Company. Board members to receive customary indemnity agreements.

**Counsel and Expenses:**             Company counsel to draft definitive financing documents consistent with the Company's existing financing documents. The Company shall reimburse the fees of one counsel for the Lead Investor incurred in

negotiating and documenting the transactions contemplated hereby, not to exceed $50,000.

**Confidentiality:**   The terms of this Term Sheet and any related discussions shall be kept confidential by the Company and shall be disclosed by the Company only to such parties as have a need to know as part of the legal and due diligence and related usual and customary processes related to preparing and executing the definitive agreements that will consummate the transactions contemplated hereby.

[signature page follows]

**Acknowledged and agreed:**

**Reggie Fowler**

By: _____

Name: _____

Title: _____

**Ebersol Sports Media Group, Inc.**

By: _____

Name: Charles Ebersol

Title: Chief Executive Officer

**TERM SHEET FOR SERIES 1 PREFERRED STOCK FINANCING**

**<u>Appendix A</u>**

| Name | Pre-Money | | | | | | Post-Money (4) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Common Stock (2) | Series FF | Series Seed | Series 1 (Notes) (3) | Total Shares | % FD | Series 1 | Total Preferred | Total Shares | % Preferred | % FD |
| Charlie Ebersol (1) | 8,000,000 | 2,000,000 | - | | 10,000,000 | 47.83% | - | | 10,000,000 | 0.00% | 30.59% |
| Founders Fund | 56,240 | - | 1,648,351 | 183,970 | 1,888,561 | 9.03% | 1,322,954 | 3,155,275 | 3,211,515 | 18.45% | 9.82% |
| Slow Ventures | - | - | 824,175 | | 824,175 | 3.94% | 577,342 | 1,401,517 | 1,401,517 | 8.20% | 4.29% |
| Keith Rabois | - | - | 549,450 | | 549,450 | 2.63% | 384,894 | 934,344 | 934,344 | 5.46% | 2.86% |
| TCG Digital, LLC | - | - | 274,725 | | 274,725 | 1.31% | 192,447 | 467,172 | 467,172 | 2.73% | 1.43% |
| Public Partners, LLC | - | - | 307,692 | | 307,692 | 1.47% | 215,541 | 523,233 | 523,233 | 3.06% | 1.60% |
| Other Series Seed Investors | - | - | 241,761 | | 241,761 | 1.16% | - | 241,761 | 241,761 | 1.41% | 0.74% |
| Outstanding Options | 1,058,017 | - | | | 1,058,017 | 5.06% | - | - | 1,058,017 | 0.00% | 3.24% |
| Available Pool | 480,445 | - | | | 480,445 | 2.30% | - | - | 480,445 | 0.00% | 1.47% |
| Pool Increase | 3,605,934 | - | | | 3,605,934 | 17.25% | - | - | 3,605,934 | 0.00% | 11.03% |
| Reggie Fowler | - | - | - | | - | 0.00% | 9,090,248 | 9,090,248 | 9,090,248 | 53.17% | 27.81% |
| Note Holders | 392,592 | - | - | 1,284,253 | 1,676,845 | 8.02% | - | 1,284,253 | 1,676,845 | 7.51% | 5.13% |
| **Totals** | **13,593,228** | **2,000,000** | **3,846,154** | **1,468,223** | **20,907,605** | **100%** | **11,783,426** | **17,097,803** | **32,691,031** | **100%** | **100%** |

12.50%

| | |
|---|---|
| Pre Money Valuation | $115,000,000.00 |
| Series 1  New Investment | $50,000,000.00 |
| Series 1 Pro Rata Investment | $14,813,572.84 |
| Pro Rata Shares (5) | 2,693,178 |
| Total Series 1 Shares | 11,783,426 |
| Post-Money Pool | 12.50% |
| Post Money Valuation | $179,813,572.84 |
| **Series 1 Price Per Share** | **$        5.5004** |

**Notes**
(1) Via Teddy Bright Pictures, Inc.
(2) Includes Common Stock from Convertible Notes
(3) Assumes Sept. 15 Closing Date
(4) Does not include the Warrant to be issued to Reggie Fowler
(5) Assumes Full Pro Rata Participation

**<u>Appendix B</u>**

## EBERSOL SPORTS MEDIA GROUP, INC.

## 2017 EQUITY INCENTIVE PLAN

### As Adopted on December 5, 2017

1.      **PURPOSE.**  The purpose of this Plan is to provide incentives to attract, retain and motivate eligible persons whose present and potential contributions are important to the success of the Company, its Parent and Subsidiaries by offering eligible persons an opportunity to participate in the Company's future performance through the grant of Awards covering Shares. Capitalized terms not defined in the text are defined in Section 14 hereof.  Although this Plan is intended to be a written compensatory benefit plan within the meaning of Rule 701, grants may be made pursuant to this Plan that do not qualify for exemption under Rule 701 or Section 25102(o).  Any requirement of this Plan that is required in law only because of Section 25102(o) need not apply if the Committee so provides.

2.      **SHARES SUBJECT TO THE PLAN.**

2.1      **Number of Shares Available.**  Subject to Sections 2.2 and 11 hereof, the total number of Shares reserved and available for grant and issuance pursuant to this Plan will be 1,538,462 Shares.  Subject to Sections 2.2 and 11 hereof, Shares subject to Awards that are cancelled, forfeited, settled in cash, used to pay withholding obligations or pay the exercise price of an Option or that expire by their terms at any time will again be available for grant and issuance in connection with other Awards.  In the event that Shares previously issued under the Plan are reacquired by the Company pursuant to a forfeiture provision, right of first refusal, or repurchase by the Company, such Shares shall be added to the number of Shares then available for issuance under the Plan.  At all times the Company will reserve and keep available a sufficient number of Shares as will be required to satisfy the requirements of all Awards granted and outstanding under this Plan.  In no event shall the total number of Shares issued (counting each reissuance of a Share that was previously issued and then forfeited or repurchased by the Company as a separate issuance) under the Plan upon exercise of ISOs exceed 3,076,924 Shares (adjusted in proportion to any adjustments under Section 2.2 hereof) over the term of the Plan (the "***ISO Limit***").

2.2      **Adjustment of Shares.**  In the event that the number of outstanding shares of the Company's Common Stock is changed by a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or other change in the capital structure of the Company affecting Shares without consideration, then in order to prevent diminution or enlargement of the benefits or potential benefits intended to be made available under the Plan (a) the number of Shares reserved for issuance under this Plan, (b) the Exercise Prices of and number of Shares subject to outstanding Options and SARs, and (c) the Purchase Prices of and/or number of Shares subject to other outstanding Awards will (to the extent appropriate) be proportionately adjusted, subject to any required action by the Board or the stockholders of the Company and compliance with applicable securities laws; *provided*, *however*, that fractions of a Share will not be issued but will either be paid in cash at the Fair

1

Market Value of such fraction of a Share or will be rounded down to the nearest whole Share, as determined by the Committee.

### 3.    PLAN FOR BENEFIT OF SERVICE PROVIDERS.

**3.1    Eligibility.**  The Committee will have the authority to select persons to receive Awards.  ISOs (as defined in Section 4 hereof) may be granted only to employees (including officers and directors who are also employees) of the Company or of a Parent or Subsidiary of the Company.  NQSOs (as defined in Section 4 hereof) and all other types of Awards may be granted to employees, officers, directors and consultants of the Company or any Parent or Subsidiary of the Company; *provided* such consultants render bona fide services not in connection with the offer and sale of securities in a capital-raising transaction when Rule 701 is to apply to the Award granted for such services.  A person may be granted more than one Award under this Plan.

**3.2    No Obligation to Employ.**  Nothing in this Plan or any Award granted under this Plan will confer or be deemed to confer on any Participant any right to continue in the employ of, or to continue any other relationship with, the Company or any Parent or Subsidiary or limit in any way the right of the Company or any Parent or Subsidiary to terminate Participant's employment or other relationship at any time, with or without Cause.

### 4.    OPTIONS.

**4.    OPTIONS.**  The Committee may grant Options to eligible persons described in Section 3 hereof and will determine whether such Options will be Incentive Stock Options within the meaning of the Code ("*ISOs*") or Nonqualified Stock Options ("*NQSOs*"), the number of Shares subject to the Option, the Exercise Price of the Option, the period during which the Option may be exercised, and all other terms and conditions of the Option, subject to the following.

**4.1    Form of Option Grant.**  Each Option granted under this Plan will be evidenced by an Award Agreement which will expressly identify the Option as an ISO or an NQSO ("*Stock Option Agreement*"), and will be in such form and contain such provisions (which may be electronic or written and need not be the same for each Participant) as the Committee may from time to time approve, and which will comply with and be subject to the terms and conditions of this Plan.

**4.2    Date of Grant.**  The date of grant of an Option will be the date on which the Committee makes the determination to grant such Option, unless a later date is otherwise specified by the Committee.  The Stock Option Agreement and a copy of this Plan will be delivered to the Participant within a reasonable time after the granting of the Option.

**4.3    Exercise Period.**  Options may be exercisable within the time or upon the events determined by the Committee in the Award Agreement and may be awarded as immediately exercisable but subject to repurchase pursuant to Section 10 hereof or may be exercisable within the times or upon the events determined by the Committee as set forth in the Stock Option Agreement governing such Option; *provided*, *however*, that (a) no Option will be exercisable after the expiration of ten (10) years from the date the Option is granted; and (b) no ISO granted to a person who directly or by attribution owns more than ten percent (10%) of the

total combined voting power of all classes of stock of the Company or of any Parent or Subsidiary ("**Ten Percent Stockholder**") will be exercisable after the expiration of five (5) years from the date the ISO is granted.  The Committee also may provide for Options to become exercisable at one time or from time to time, periodically or otherwise, in such number of Shares or percentage of Shares as the Committee determines.

       4.4    **Exercise Price.**  The Exercise Price of an Option will be determined by the Committee when the Option is granted and shall not be less than the Fair Market Value per Share unless expressly determined in writing by the Committee on the Option's date of grant; _provided_ that the Exercise Price of an ISO granted to a Ten Percent Stockholder will not be less than one hundred ten percent (110%) of the Fair Market Value of the Shares on the date of grant.  Payment for the Shares purchased must be made in accordance with Section 8 hereof.

       4.5    **Method of Exercise.**  Options may be exercised only by delivery to the Company of a stock option exercise agreement (the "**Exercise Agreement**") in the form specified by the Committee, which Exercise Agreement may be electronic or written and need not be the same for each Participant.  The Exercise Agreement will state (a) the number of Shares being purchased, (b) the restrictions imposed on the Shares purchased under such Exercise Agreement, if any, and (c) such representations and agreements regarding Participant's investment intent and access to information and other matters, if any, as may be required or desirable by the Company to comply with applicable securities laws.  Each Participant's Exercise Agreement may be modified by (i) agreement of Participant and the Company or (ii) substitution by the Company, upon becoming a public company, in order to add the payment terms set forth in Section 8.1 that apply to a public company and such other terms as shall be necessary or advisable in order to exercise a public company option.  Upon exercise of an Option, Participant shall execute and deliver to the Company the Exercise Agreement then in effect, together with payment in full of the Exercise Price for the number of Shares being purchased and payment of any applicable taxes.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 2.2 of the Plan.  Exercising an Option in any manner will decrease the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

       4.6    **Termination.**  Subject to earlier termination pursuant to Sections 11 and 13.3 hereof and notwithstanding the exercise periods set forth in the Stock Option Agreement, exercise of an Option will always be subject to the following terms and conditions.

       4.6.1   <u>Other than Death or Disability or for Cause</u>.  If the Participant is Terminated for any reason other than death, Disability or for Cause, then the Participant may exercise such Participant's Options only to the extent that such Options are exercisable as to Vested Shares upon the Termination Date or as otherwise determined by the Committee.  Such Options must be exercised by the Participant, if at all, as to all or some of the Vested Shares calculated as of the Termination Date or such other date determined by the Committee, within three (3) months after the Termination Date (or within such shorter time period, not less than thirty (30) days, or within such longer time period after the Termination Date as may be determined by the Committee, with any exercise beyond three (3) months after the date

Participant ceases to be an employee deemed to be an NQSO) but in any event, no later than the expiration date of the Options.

4.6.2   <u>Death or Disability</u>.  If the Participant is Terminated because of Participant's death or Disability (or the Participant dies within three (3) months after a Termination other than for Cause), then Participant's Options may be exercised only to the extent that such Options are exercisable as to Vested Shares by Participant on the Termination Date or as otherwise determined by the Committee.   Such options must be exercised by Participant (or Participant's legal representative or authorized assignee), if at all, as to all or some of the Vested Shares calculated as of the Termination Date or such other date determined by the Committee, within twelve (12) months after the Termination Date (or within such shorter time period, not less than six (6) months, or within such longer time period, after the Termination Date as may be determined by the Committee, with any exercise beyond (a) three (3) months after the date Participant ceases to be an employee when the Termination is for any reason other than the Participant's death or disability, within the meaning of Section 22(e)(3) of the Code, or (b) twelve (12) months after the date Participant ceases to be an employee when the Termination is for Participant's disability, within the meaning of Section 22(e)(3) of the Code, deemed to be an NQSO) but in any event no later than the expiration date of the Options.

4.6.3   <u>For Cause</u>.   If the Participant is terminated for Cause, the Participant may exercise such Participant's Options, but not to an extent greater than such Options are exercisable as to Vested Shares upon the Termination Date and Participant's Options shall expire on such Participant's Termination Date, or at such later time and on such conditions as are determined by the Committee.

**4.7**     **Limitations on Exercise.**    The Committee may specify a reasonable minimum number of Shares that may be purchased on any exercise of an Option, *provided* that such minimum number will not prevent Participant from exercising the Option for the full number of Shares for which it is then exercisable.

**4.8**     **Limitations on ISOs.**  The aggregate Fair Market Value (determined as of the date of grant) of Shares with respect to which ISOs are exercisable for the first time by a Participant during any calendar year (under this Plan or under any other incentive stock option plan of the Company or any Parent or Subsidiary of the Company) will not exceed One Hundred Thousand Dollars ($100,000).  If the Fair Market Value of Shares on the date of grant with respect to which ISOs are exercisable for the first time by a Participant during any calendar year exceeds One Hundred Thousand Dollars ($100,000), then the Options for the first One Hundred Thousand Dollars ($100,000) worth of Shares to become exercisable in such calendar year will be ISOs and the Options for the amount in excess of One Hundred Thousand Dollars ($100,000) that become exercisable in that calendar year will be NQSOs.  In the event that the Code or the regulations promulgated thereunder are amended after the Effective Date (as defined in Section 13.1 hereof) to provide for a different limit on the Fair Market Value of Shares permitted to be subject to ISOs, then such different limit will be automatically incorporated herein and will apply to any Options granted after the effective date of such amendment.

**4.9**     **Modification, Extension or Renewal.**    The Committee may modify, extend or renew outstanding Options and authorize the grant of new Options in substitution

therefor, *provided* that any such action may not, without the written consent of a Participant, impair any of such Participant's rights under any Option previously granted.  Any outstanding ISO that is modified, extended, renewed or otherwise altered will be treated in accordance with Section 424(h) of the Code.  Subject to Section 4.10 hereof, the Committee may reduce the Exercise Price of outstanding Options without the consent of Participants by a written notice to them; *provided*, *however*, that the Exercise Price may not be reduced below the minimum Exercise Price that would be permitted under Section 4.4 hereof for Options granted on the date the action is taken to reduce the Exercise Price.

**4.10**  **No Disqualification.**  Notwithstanding any other provision in this Plan, no term of this Plan relating to ISOs will be interpreted, amended or altered, nor will any discretion or authority granted under this Plan be exercised, so as to disqualify this Plan under Section 422 of the Code or, without the consent of the Participant, to disqualify any Participant's ISO under Section 422 of the Code.

**5.**  **RESTRICTED STOCK.**  A Restricted Stock Award is an offer by the Company to sell to an eligible person Shares that are subject to certain specified restrictions.  The Committee will determine to whom an offer will be made, the number of Shares the person may purchase, the Purchase Price, the restrictions to which the Shares will be subject, and all other terms and conditions of the Restricted Stock Award, subject to the following terms and conditions.

**5.1**  **Form of Restricted Stock Award.**  All purchases under a Restricted Stock Award made pursuant to this Plan will be evidenced by an Award Agreement ("***Restricted Stock Purchase Agreement***") that will be in such form (which may be electronic or written and need not be the same for each Participant) as the Committee will from time to time approve, and will comply with and be subject to the terms and conditions of this Plan.  The Restricted Stock Award will be accepted by the Participant's execution and delivery of the Restricted Stock Purchase Agreement and full payment for the Shares to the Company within thirty (30) days from the date the Restricted Stock Purchase Agreement is delivered to the person in electronic or written form.  If such person does not execute and deliver the Restricted Stock Purchase Agreement along with full payment for the Shares to the Company within such thirty (30) days, then the offer will terminate, unless otherwise determined by the Committee.

**5.2**  **Purchase Price.**  The Purchase Price of Shares sold pursuant to a Restricted Stock Award will be determined by the Committee on the date the Restricted Stock Award is granted or at the time the purchase is consummated.  Payment of the Purchase Price must be made in accordance with Section 8 hereof.

**5.3**  **Dividends and Other Distributions.**  Participants holding Restricted Stock will be entitled to receive all dividends and other distributions paid with respect to such Shares, unless the Committee provides otherwise at the time of award.  If any such dividends or distributions are paid in Shares, the Shares will be subject to the same restrictions on transferability and forfeitability as the Shares of Restricted Stock with respect to which they were paid.

**5.4      Restrictions.**  Restricted Stock Awards may be subject to the restrictions set forth in Sections 9 and 10 hereof or, with respect to a Restricted Stock Award to which Section 25102(o) is to apply, such other restrictions not inconsistent with Section 25102(o).

6.      **RESTRICTED STOCK UNITS.**

**6.1      Awards of Restricted Stock Units.**  A Restricted Stock Unit ("***RSU***") is an Award covering a number of Shares that may be settled in cash, or by issuance of those Shares at a date in the future.  No Purchase Price shall apply to an RSU settled in Shares.  All grants of Restricted Stock Units will be evidenced by an Award Agreement that will be in such form (which may be electronic or written and need not be the same for each Participant) as the Committee will from time to time approve, and will comply with and be subject to the terms and conditions of this Plan.  No RSU will have a term longer than ten (10) years from the date the RSU is granted.

**6.2      Form and Timing of Settlement.**  To the extent permissible under applicable law, the Committee may permit a Participant to defer payment under a RSU to a date or dates after the RSU is earned, *provided* that the terms of the RSU and any deferral satisfy the requirements of Section 409A of the Code (or any successor) and any regulations or rulings promulgated thereunder.  Payment may be made in the form of cash or whole Shares or a combination thereof, all as the Committee determines.

**6.3      Dividend Equivalent Payments.**  The Board may permit Participants holding RSUs to receive dividend equivalent payments on outstanding RSUs if and when dividends are paid to stockholders on Shares.  In the discretion of the Board, such dividend equivalent payments may be paid in cash or Shares and they may either be paid at the same time as dividend payments are made to stockholders or delayed until when Shares are issued pursuant to the RSU grants and may be subject to the same vesting requirements as the RSUs.  If the Board permits dividend equivalent payments to be made on RSUs, the terms and conditions for such payments will be set forth in the Award Agreement.

7.      **STOCK APPRECIATION RIGHTS.**

**7.1      Awards of SARs.**  Stock Appreciation Rights ("***SARs***") may be settled in cash, or Shares (which may consist of Restricted Stock or RSUs), having a value equal to the value determined by multiplying the difference between the Fair Market Value on the date of exercise over the Exercise Price and the number of Shares with respect to which the SAR is being settled.  All grants of SARs made pursuant to this Plan will be evidenced by an Award Agreement that will be in such form (which may be electronic or written and need not be the same for each Participant) as the Committee will from time to time approve, and will comply with and be subject to the terms and conditions of this Plan.

**7.2      Exercise Period and Expiration Date.**  A SAR will be exercisable within the times or upon the occurrence of events determined by the Committee and set forth in the Award Agreement governing such SAR.  The Award Agreement shall set forth the Expiration Date; *provided* that no SAR will be exercisable after the expiration of ten years from the date the SAR is granted.

**7.3** **Exercise Price.** The Committee will determine the Exercise Price of the SAR when the SAR is granted, and which may not be less than the Fair Market Value on the date of grant and may be settled in cash or in Shares.

**7.4** **Termination.** Subject to earlier termination pursuant to Sections 11 and 13.1 hereof and notwithstanding the exercise periods set forth in the Award Agreement, exercise of SARs will always be subject to the following terms and conditions:

**7.4.1** Other than Death or Disability or for Cause. If the Participant is Terminated for any reason other than death, Disability or for Cause, then the Participant may exercise such Participant's SARs only to the extent that such SARs are exercisable as to Vested Shares upon the Termination Date or as otherwise determined by the Committee. SARs must be exercised by the Participant, if at all, as to all or some of the Vested Shares calculated as of the Termination Date or such other date determined by the Committee, within three (3) months after the Termination Date (or within such shorter time period, not less than thirty (30) days, or within such longer time period after the Termination Date as may be determined by the Committee) but in any event, no later than the expiration date of the SARs.

**7.4.2** Death or Disability. If the Participant is Terminated because of Participant's death or Disability (or the Participant dies within three (3) months after a Termination other than for Cause), then Participant's SARs may be exercised only to the extent that such SARs are exercisable as to Vested Shares by Participant on the Termination Date or as otherwise determined by the Committee. Such SARs must be exercised by Participant (or Participant's legal representative or authorized assignee), if at all, as to all or some of the Vested Shares calculated as of the Termination Date or such other date determined by the Committee, within twelve (12) months after the Termination Date (or within such shorter time period, not less than six (6) months, or within such longer time period after the Termination Date as may be determined by the Committee) but in any event no later than the expiration date of the SARs.

**7.4.3** For Cause. If the Participant is terminated for Cause, the Participant may exercise such Participant's SARs, but not to an extent greater than such SARs are exercisable as to Vested Shares upon the Termination Date and Participant's SARs shall expire on such Participant's Termination Date, or at such later time and on such conditions as are determined by the Committee.

**8.** **PAYMENT FOR PURCHASES AND EXERCISES.**

**8.1** **Payment in General.** Payment for Shares acquired pursuant to this Plan may be made in cash (by check) or cash equivalents (by Automated Clearing House ("*ACH*") transfer) or, where expressly approved for the Participant by the Committee and where permitted by law:

(a) by cancellation of indebtedness of the Company owed to the Participant;

(b) by surrender of shares of the Company that are clear of all liens, claims, encumbrances or security interests and: (i) for which the Company has received "full payment of the purchase price" within the meaning of SEC Rule 144 (and, if such shares were

purchased from the Company by use of a promissory note, such note has been fully paid with respect to such shares) or (ii) that were obtained by Participant in the public market;

(c)     by tender of a full recourse promissory note having such terms as may be approved by the Committee and bearing interest at a rate sufficient to avoid imputation of income under Sections 483 and 1274 of the Code; *provided*, *however*, that Participants who are not employees or directors of the Company will not be entitled to purchase Shares with a promissory note unless the note is adequately secured by collateral other than the Shares; *provided*, *further*, that the portion of the Exercise Price or Purchase Price, as the case may be, equal to the par value (if any) of the Shares must be paid in cash or other legal consideration permitted by the laws under which the Company is then incorporated or organized;

(d)     by waiver of compensation due or accrued to the Participant from the Company for services rendered;

(e)     by participating in a formal cashless exercise program implemented by the Committee in connection with the Plan;

(f)     subject to compliance with applicable law, provided that a public market for the Company's Common Stock exists, by exercising through a "same day sale" commitment from the Participant and a broker-dealer whereby the Participant irrevocably elects to exercise the Award and to sell a portion of the Shares so purchased sufficient to pay the total Exercise Price or Purchase Price, and whereby the broker-dealer irrevocably commits upon receipt of such Shares to forward the total Exercise Price or Purchase Price directly to the Company; or

(g)     by any combination of the foregoing or any other method of payment approved by the Committee.

For avoidance of uncertainty: ACH transfers that have been successfully received by the Company into its bank account designated for receipt of such transfers under this Section 8.1 shall be deemed to have been received for all purposes under this Plan as of the date on which such transfers were initiated from the transferor's account and made irrevocable by the transferor.

## 8.2     <u>Withholding Taxes</u>.

8.2.1     <u>Withholding Generally</u>.   Whenever Shares are to be issued in satisfaction of Awards granted under this Plan, the Company may require the Participant to remit to the Company an amount sufficient to satisfy applicable tax withholding requirements prior to the delivery of any written or electronic certificate or certificates for such Shares.  Whenever, under this Plan, payments in satisfaction of Awards are to be made in cash by the Company, such payment will be net of an amount sufficient to satisfy applicable tax withholding requirements.

8.2.2     <u>Stock Withholding</u>.   When, under applicable tax laws, a Participant incurs tax liability in connection with the exercise or vesting of any Award that is subject to tax withholding and the Participant is obligated to pay the Company the amount required to be withheld, the Committee may in its sole discretion allow the Participant to satisfy the minimum

tax withholding obligation by electing to have the Company withhold from the Shares to be issued up to the minimum number of Shares having a Fair Market Value on the date that the amount of tax to be withheld is to be determined that is not more than the minimum amount to be withheld; or to arrange a mandatory "sell to cover" on Participant's behalf (without further authorization) but in no event will the Company withhold Shares or "sell to cover" if such withholding would result in adverse accounting consequences to the Company.  Any elections to have Shares withheld or sold for this purpose will be made in accordance with the requirements established by the Committee for such elections and be in writing in a form acceptable to the Committee.

9.   **RESTRICTIONS ON AWARDS.**

9.1   **Transferability.**  Except as permitted by the Committee, Awards granted under this Plan, and any interest therein, will not be transferable or assignable by Participant, other than by will or by the laws of descent and distribution, and, with respect to NQSOs, by instrument to an inter vivos or testamentary trust in which the NQSOs are to be passed to beneficiaries upon the death of the trustor (settlor), or by gift to "family member" as that term is defined in Rule 701, and may not be made subject to execution, attachment or similar process. For the avoidance of doubt, the prohibition against assignment and transfer applies to a stock option and, prior to exercise, the shares to be issued on exercise of a stock option, and pursuant to the foregoing sentence shall be understood to include, without limitation, a prohibition against any pledge, hypothecation, or other transfer, including any short position, any "put equivalent position" or any "call equivalent position" (in each case, as defined in Rule 16a-1 promulgated under the Exchange Act).  Unless an Award is transferred pursuant to the terms of this Section, during the lifetime of the Participant an Award will be exercisable only by the Participant or Participant's legal representative and any elections with respect to an Award may be made only by the Participant or Participant's legal representative. The terms of an Option shall be binding upon the executor, administrator, successors and assigns of the Participant who is a party thereto.

9.2   **Securities Law and Other Regulatory Compliance.**  Although this Plan is intended to be a written compensatory benefit plan within the meaning of Rule 701 promulgated under the Securities Act, grants may be made pursuant to this Plan that do not qualify for exemption under Rule 701 or Section 25102(o).  Any requirement of this Plan which is required in law only because of Section 25102(o) need not apply with respect to a particular Award to which Section 25102(o) will not apply.  An Award will not be effective unless such Award is in compliance with all applicable federal and state securities laws, rules and regulations of any governmental body, and the requirements of any stock exchange or automated quotation system upon which the Shares may then be listed or quoted, as they are in effect on the date of grant of the Award and also on the date of exercise or other issuance.  Notwithstanding any other provision in this Plan, the Company will have no obligation to issue or deliver written or electronic certificates for Shares under this Plan prior to (a) obtaining any approvals from governmental agencies that the Company determines are necessary or advisable, and/or (b) compliance with any exemption, completion of any registration or other qualification of such Shares under any state or federal law or ruling of any governmental body that the Company determines to be necessary or advisable.  The Company will be under no obligation to register the Shares with the SEC or to effect compliance with the exemption, registration, qualification or

listing requirements of any state securities laws, stock exchange or automated quotation system, and the Company will have no liability for any inability or failure so do.

9.3    **Exchange and Buyout of Awards.**  The Committee may, at any time or from time to time, authorize the Company, with the consent of the respective Participants, to issue new Awards in exchange for the surrender and cancellation of any or all outstanding Awards.  Without prior stockholder approval the Committee may reprice Options or SARs (and where such repricing is a reduction in the Exercise Price of outstanding Options or SARs, the consent of the affected Participants is not required provided written notice is provided to them).  The Committee may at any time buy from a Participant an Award previously granted with payment in cash, Shares (including Restricted Stock) or other consideration, based on such terms and conditions as the Committee and the Participant may agree.

10.    **RESTRICTIONS ON SHARES.**

10.1    **Privileges of Stock Ownership.**   No Participant will have any of the rights of a stockholder with respect to any Shares until such Shares are issued to the Participant.  After Shares are issued to the Participant, the Participant will be a stockholder and have all the rights of a stockholder with respect to such Shares, including the right to vote and receive all dividends or other distributions made or paid with respect to such Shares; _provided_, that if such Shares are Restricted Stock, then any new, additional or different securities the Participant may become entitled to receive with respect to such Shares by virtue of a stock dividend, stock split or any other change in the corporate or capital structure of the Company will be subject to the same restrictions as the Restricted Stock.  The Participant will have no right to retain such stock dividends or stock distributions with respect to Unvested Shares that are repurchased as described in this Section 10.

10.2    **Rights of First Refusal and Repurchase.**   At the discretion of the Committee, the Company may reserve to itself and/or its assignee(s) in the Award Agreement (a) a right of first refusal to purchase all Shares that a Participant (or a subsequent transferee) may propose to transfer to a third party, _provided_ that such right of first refusal terminates upon the Company's initial public offering of Common Stock pursuant to an effective registration statement filed under the Securities Act and (b) a right to repurchase Unvested Shares held by a Participant for cash and/or cancellation of purchase money indebtedness owed to the Company by the Participant following such Participant's Termination at any time.

10.3    **Escrow; Pledge of Shares.**  To enforce any restrictions on a Participant's Shares, the Committee may require the Participant to deposit all written or electronic certificates representing Shares, together with stock powers or other instruments of transfer approved by the Committee, appropriately endorsed in blank, with the Company or an agent designated by the Company to hold in escrow until such restrictions have lapsed or terminated.  The Committee may cause a legend or legends referencing such restrictions to be placed on the written or electronic certificate.  Any Participant who is permitted to execute a promissory note as partial or full consideration for the purchase of Shares under this Plan will be required to pledge and deposit with the Company all or part of the Shares so purchased as collateral to secure the payment of Participant's obligation to the Company under the promissory note; _provided_, _however_, that the Committee may require or accept other or additional forms of collateral to

secure the payment of such obligation and, in any event, the Company will have full recourse against the Participant under the promissory note notwithstanding any pledge of the Participant's Shares or other collateral.  In connection with any pledge of the Shares, Participant will be required to execute and deliver a written pledge agreement in such form as the Committee will from time to time approve.  The Shares purchased with the promissory note may be released from the pledge on a pro rata basis as the promissory note is paid.

        **10.4**   **Securities Law Restrictions.**  All written or electronic certificates for Shares or other securities delivered under this Plan will be subject to such stock transfer orders, legends and other restrictions as the Committee may deem necessary or advisable, including restrictions under any applicable federal, state or foreign securities law, or any rules, regulations and other requirements of the SEC or any stock exchange or automated quotation system upon which the Shares may be listed or quoted.

        **11.**    **CORPORATE TRANSACTIONS.**

        **11.1**   **Acquisitions or Other Combinations.**  In the event that the Company is subject to an Acquisition or Other Combination, outstanding Awards acquired under the Plan shall be subject to the agreement evidencing the Acquisition or Other Combination, which need not treat all outstanding Awards in an identical manner.   Such agreement, without the Participant's consent, shall provide for one or more of the following with respect to all outstanding Awards as of the effective date of such Acquisition or Other Combination:

        (a)    The continuation of such outstanding Awards by the Company (if the Company is the successor entity).

        (b)    The assumption of outstanding Awards by the successor or acquiring entity (if any) in such Acquisition or Other Combination (or by any of its Parents, if any), which assumption, will be binding on all Participants; provided that the exercise price and the number and nature of shares issuable upon exercise of any such option or stock appreciation right, or any award that is subject to Section 409A of the Code, will be adjusted appropriately pursuant to Section 424(a) and Section 409A of the Code.  For the purposes of this Section 11, an Award will be considered assumed if, following the Acquisition or Other Combination, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the Acquisition or Other Combination, the consideration (whether stock, cash, or other securities or property) received in the Acquisition or Other Combination by holders of Shares for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Acquisition or Other Combination is not solely common stock of the successor corporation or its Parent, the Committee may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of an Option or Stock Appreciation Right or upon the payout of a Restricted Stock Unit, for each Share subject to such Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Acquisition or Other Combination.

(c)     The substitution by the successor or acquiring entity in such Acquisition or Other Combination (or by any of its Parents, if any) of equivalent awards with substantially the same terms for such outstanding Awards (except that the exercise price and the number and nature of shares issuable upon exercise of any such option or stock appreciation right, or any award that is subject to Section 409A of the Code, will be adjusted appropriately pursuant to Section 424(a) and Section 409A of the Code).

(d)     The full or partial exercisability or vesting and accelerated expiration of outstanding Awards.

(e)     The settlement of the full value of such outstanding Award (whether or not then vested or exercisable) in cash, cash equivalents, or securities of the successor entity (or its Parent, if any) with a Fair Market Value equal to the required amount, followed by the cancellation of such Awards; provided however, that such Award may be cancelled without consideration if such Award has no value, as determined by the Committee, in its discretion.  Subject to Section 409A of the Code, such payment may be made in installments and may be deferred until the date or dates when the Award would have become exercisable or vested.  Such payment may be subject to vesting based on the Participant's continued service, provided that without the Participant's consent, the vesting schedule shall not be less favorable to the Participant than the schedule under which the Award would have become vested or exercisable.  For purposes of this Section 11.1(e), the Fair Market Value of any security shall be determined without regard to any vesting conditions that may apply to such security.

(f)     The cancellation of outstanding Awards in exchange for no consideration.

Immediately following an Acquisition or Other Combination, outstanding Awards shall terminate and cease to be outstanding, except to the extent such Awards, have been continued, assumed or substituted, as described in Sections 11.1(a), (b) and/or (c).

**11.2    <u>Assumption of Awards by the Company.</u>**  The Company, from time to time, also may substitute or assume outstanding awards granted by another entity, whether in connection with an acquisition of such other entity or otherwise, by either (a) granting an Award under this Plan in substitution of such other entity's award or (b) assuming and/or converting such award as if it had been granted under this Plan if the terms of such assumed award could be applied to an Award granted under this Plan.   Such substitution or assumption will be permissible if the holder of the substituted or assumed award would have been eligible to be granted an Award under this Plan if the other entity had applied the rules of this Plan to such grant.  In the event the Company assumes an award granted by another entity, the terms and conditions of such award will remain unchanged (except that the exercise price and the number and nature of shares issuable upon exercise of any such option or stock appreciation right, or any award that is subject to Section 409A of the Code, will be adjusted appropriately pursuant to Section 424(a) of the Code).  In the event the Company elects to grant a new Option or SAR rather than assuming an existing option or stock appreciation right, such new Option or SAR may be granted with a similarly adjusted Exercise Price.

12.     **ADMINISTRATION.**

      12.1     **Committee Authority.**  This Plan will be administered by the Committee or the Board if no Committee is created by the Board.  Subject to the general purposes, terms and conditions of this Plan, and to the direction of the Board, the Committee will have full power to implement and carry out this Plan.  Without limitation, the Committee will have the authority to:

      (a)     construe and interpret this Plan, any Award Agreement and any other agreement or document executed pursuant to this Plan;

      (b)     prescribe, amend, expand, modify and rescind or terminate rules and regulations relating to this Plan;

      (c)     approve persons to receive Awards;

      (d)     determine the form and terms of Awards;

      (e)     determine the number of Shares or other consideration subject to Awards granted under this Plan;

      (f)     determine the Fair Market Value in good faith and interpret the applicable provisions of this Plan and the definition of Fair Market Value in connection with circumstances that impact the Fair Market Value, if necessary;

      (g)     determine whether Awards will be granted singly, in combination with, in tandem with, in replacement of, or as alternatives to, other Awards under this Plan or awards under any other incentive or compensation plan of the Company or any Parent or Subsidiary of the Company;

      (h)     grant waivers of any conditions of this Plan or any Award;

      (i)     determine the terms of vesting, exercisability and payment of Awards to be granted pursuant to this Plan;

      (j)     correct any defect, supply any omission, or reconcile any inconsistency in this Plan, any Award, any Award Agreement, any Exercise Agreement or any Restricted Stock Purchase Agreement;

      (k)     determine whether an Award has been earned;

      (l)     extend the vesting period beyond a Participant's Termination Date;

      (m)     adopt rules and/or procedures (including the adoption of any subplan under this Plan) relating to the operation and administration of the Plan to accommodate requirements of local law and procedures outside of the United States;

(n)     delegate any of the foregoing to a subcommittee consisting of one or more executive officers pursuant to a specific delegation as may otherwise be permitted by applicable law;

(o)     change the vesting schedule of Awards under the Plan prospectively in the event that the Participant's service status changes between full and part time status in accordance with Company policies relating to work schedules and vesting of awards; and

(p)     make all other determinations necessary or advisable in connection with the administration of this Plan.

**12.2     Committee Composition and Discretion.**   The Board may delegate full administrative authority over the Plan and Awards to a Committee consisting of at least one member of the Board (or such greater number as may then be required by applicable law). Unless in contravention of any express terms of this Plan or Award, any determination made by the Committee with respect to any Award will be made in its sole discretion either (a) at the time of grant of the Award, or (b) subject to Section 4.9 hereof, at any later time.   Any such determination will be final and binding on the Company and on all persons having an interest in any Award under this Plan.   To the extent permitted by applicable law, the Committee may delegate to one or more officers of the Company the authority to grant an Award under this Plan, *provided* that each such officer is a member of the Board.

**12.3     Nonexclusivity of the Plan.**   Neither the adoption of this Plan by the Board, the submission of this Plan to the stockholders of the Company for approval, nor any provision of this Plan will be construed as creating any limitations on the power of the Board to adopt such additional compensation arrangements as it may deem desirable, including, without limitation, the granting of stock options and other equity awards otherwise than under this Plan, and such arrangements may be either generally applicable or applicable only in specific cases.

**12.4     Governing Law.**   This Plan and all agreements hereunder shall be governed by and construed in accordance with the laws of the State of California, without giving effect to that body of laws pertaining to conflict of laws.

**13.     EFFECTIVENESS, AMENDMENT AND TERMINATION OF THE PLAN.**

**13.1     Adoption and Stockholder Approval.**   This Plan will become effective on the date that it is adopted by the Board (the "***Effective Date***").   This Plan will be approved by the stockholders of the Company (excluding Shares issued pursuant to this Plan), consistent with applicable laws, within twelve (12) months before or after the Effective Date.   Upon the Effective Date, the Board may grant Awards pursuant to this Plan; *provided*, *however*, that:  (a) no Option or SAR may be exercised prior to initial stockholder approval of this Plan; (b) no Option or SAR granted pursuant to an increase in the number of Shares approved by the Board shall be exercised prior to the time such increase has been approved by the stockholders of the Company; (c) in the event that initial stockholder approval is not obtained within the time period provided herein, all Awards for which only the exemption from California's securities qualification requirements provided by Section 25102(o) can apply shall be canceled, any Shares issued pursuant to any such Award shall be canceled and any purchase of such Shares issued hereunder shall be rescinded; and (d) Awards (to which only the exemption from California's

securities qualification requirements provided by Section 25102(o) can apply) granted pursuant to an increase in the number of Shares approved by the Board which increase is not approved by stockholders within the time then required under Section 25102(o) shall be canceled, any Shares issued pursuant to any such Awards shall be canceled, and any purchase of Shares subject to any such Award shall be rescinded.

      **13.2**   **Term of Plan.**  Unless earlier terminated as provided herein, this Plan will automatically terminate ten (10) years after the later of (i) the Effective Date, or (ii) the most recent increase in the number of Shares reserved under Section 2 that was approved by stockholders.

      **13.3**   **Amendment or Termination of Plan.**  Subject to Section 4.9 hereof, the Board may at any time (a) terminate or amend this Plan in any respect, including without limitation amendment of any form of Award Agreement or instrument to be executed pursuant to this Plan and (b) terminate any and all outstanding Options, SARs or RSUs upon a dissolution or liquidation of the Company, followed by the payment of creditors and the distribution of any remaining funds to the Company's stockholders; *provided*, *however*, that the Board will not, without the approval of the stockholders of the Company, amend this Plan in any manner that requires such stockholder approval pursuant to Section 25102(o) or pursuant to the Code or the regulations promulgated under the Code as such provisions apply to ISO plans. The termination of the Plan, or any amendment thereof, shall not affect any Share previously issued or any Award previously granted under the Plan.

      **14.**   **DEFINITIONS.**  For all purposes of this Plan, the following terms will have the following meanings.

      "***Acquisition***," for purposes of Section 11, means:

      (a)    any consolidation or merger in which the Company is a constituent entity or is a party in which the voting stock and other voting securities of the Company that are outstanding immediately prior to the consummation of such consolidation or merger represent, or are converted into, securities of the surviving entity of such consolidation or merger (or of any Parent of such surviving entity) that, immediately after the consummation of such consolidation or merger, together possess less than fifty percent (50%) of the total voting power of all voting securities of such surviving entity (or of any of its Parents, if any) that are outstanding immediately after the consummation of such consolidation or merger;

      (b)    a sale or other transfer by the holders thereof of outstanding voting stock and/or other voting securities of the Company possessing more than fifty percent (50%) of the total voting power of all outstanding voting securities of the Company, whether in one transaction or in a series of related transactions, pursuant to an agreement or agreements to which the Company is a party and that has been approved by the Board, and pursuant to which such outstanding voting securities are sold or transferred to a single person or entity, to one or more persons or entities who are Affiliates of each other, or to one or more persons or entities acting in concert; or

(c)      the sale, lease, transfer or other disposition, in a single transaction or series of related transactions, by the Company and/or any Subsidiary or Subsidiaries of the Company, of all or substantially all the assets of the Company and its Subsidiaries taken as a whole, (or, if substantially all of the assets of the Company and its Subsidiaries taken as a whole are held by one or more Subsidiaries, the sale or disposition (whether by consolidation, merger, conversion or otherwise) of such Subsidiaries of the Company), except where such sale, lease, transfer or other disposition is made to the Company or one or more wholly owned Subsidiaries of the Company (an "*Acquisition by Sale of Assets*").

"*Affiliate*" of a specified person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified (where, for purposes of this definition, the term "*control*" (including the terms *controlling, controlled by* and *under common control with*) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise).

"*Award*" means any award pursuant to the terms and conditions of this Plan, including any Option, Restricted Stock Unit, Stock Appreciation Right or Restricted Stock Award.

"*Award Agreement*" means, with respect to each Award, the signed written or electronic agreement between the Company and the Participant setting forth the terms and conditions of the Award as approved by the Committee.  For purposes of the Plan, the Award Agreement may be executed via written or electronic means.

"*Board*" means the Board of Directors of the Company.

"*Cause*" means Termination because of (a) Participant's unauthorized misuse of the Company or a Parent or Subsidiary of the Company's trade secrets or proprietary information, (b) Participant's conviction of or plea of nolo contendere to a felony or a crime involving moral turpitude, (c) Participant's committing an act of fraud against the Company or a Parent or Subsidiary of the Company or (d) Participant's gross negligence or willful misconduct in the performance of his or her duties that has had or will have a material adverse effect on the Company or Parent or Subsidiary of the Company' reputation or business.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Committee*" means the committee created and appointed by the Board to administer this Plan, or if no committee is created and appointed, the Board.

"*Company*" means Ebersol Sports Media Group, Inc., or any successor corporation.

"*Disability*" means that the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

16

"*Exercise Price*" means the price per Share at which a holder of an Option may purchase Shares issuable upon exercise of the Option.

"*Fair Market Value*" means, as of any date, the value of a share of the Company's Common Stock determined as follows:

(a)    if such Common Stock is then publicly traded on a national securities exchange, its closing price on the date of determination on the principal national securities exchange on which the Common Stock is listed or admitted to trading as reported in The Wall Street Journal;

(b)    if such Common Stock is publicly traded but is not listed or admitted to trading on a national securities exchange, the average of the closing bid and asked prices on the date of determination as reported by The Wall Street Journal (or, if not so reported, as otherwise reported by any newspaper or other source as the Committee may determine); or

(c)    if none of the foregoing is applicable to the valuation in question, by the Committee in good faith.

"*Option*" means an award of an option to purchase Shares pursuant to Section 4 of this Plan.

"*Other Combination*" for purposes of Section 11 means any (a) consolidation or merger in which the Company is a constituent entity and is not the surviving entity of such consolidation or merger or (b) any conversion of the Company into another form of entity; *provided* that such consolidation, merger or conversion does not constitute an Acquisition.

"*Parent*" of a specified entity means, any entity that, either directly or indirectly, owns or controls such specified entity, where for this purpose, "*control*" means the ownership of stock, securities or other interests that possess at least a majority of the voting power of such specified entity (including indirect ownership or control of such stock, securities or other interests).

"*Participant*" means a person who receives an Award under this Plan.

"*Plan*" means this 2017 Equity Incentive Plan, as amended from time to time.

"*Purchase Price*" means the price at which a Participant may purchase Restricted Stock pursuant to this Plan.

"*Restricted Stock*" means Shares purchased pursuant to a Restricted Stock Award under this Plan.

"*Restricted Stock Award*" means an award of Shares pursuant to Section 5 hereof.

"*Restricted Stock Unit*" or "*RSU*" means an award made pursuant to Section 6 hereof.

"***Rule 701***" means Rule 701 *et seq.* promulgated by the Commission under the Securities Act.

"***SEC***" means the Securities and Exchange Commission.

"***Section 25102(o)***" means Section 25102(o) of the California Corporations Code.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Shares***" means shares of the Company's Common Stock reserved for issuance under this Plan, as adjusted pursuant to Sections 2.2 and 11 hereof, and any successor security.

"***Stock Appreciation Right***" or "***SAR***" means an award granted pursuant to Section 7 hereof.

"***Subsidiary***" means any entity (other than the Company) in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain owns stock or other equity securities representing fifty percent (50%) or more of the total combined voting power of all classes of stock or other equity securities in one of the other entities in such chain.

"***Termination***" or "***Terminated***" means, for purposes of this Plan with respect to a Participant, that the Participant has for any reason ceased to provide services as an employee, officer, director or consultant to the Company or a Parent or Subsidiary of the Company. A Participant will not be deemed to have ceased to provide services while the Participant is on a bona fide leave of absence, if such leave was approved by the Company in writing. In the case of an approved leave of absence, the Committee may make such provisions respecting crediting of service, including suspension of vesting of the Award (including pursuant to a formal policy adopted from time to time by the Company) it may deem appropriate, except that in no event may an Option be exercised after the expiration of the term set forth in the Stock Option Agreement. The Committee will have sole discretion to determine whether a Participant has ceased to provide services and the effective date on which the Participant ceased to provide services (the "***Termination Date***").

"***Unvested Shares***" means "***Unvested Shares***" as defined in the Award Agreement for an Award.

"***Vested Shares***" means "***Vested Shares***" as defined in the Award Agreement.

\* \* \* \* \* \* \* \* \* \* \*

## EBERSOL SPORTS MEDIA GROUP, INC.

## SERIES 1 PREFERRED STOCK PURCHASE AGREEMENT

This Series 1 Preferred Stock Purchase Agreement (this "***Agreement***") is made as of November 21, 2018 by and among Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), the investors listed on <u>Exhibit A</u> attached to this Agreement (each a "***Purchaser***" and together the "***Purchasers***").

The parties hereby agree as follows:

### 1.   PURCHASE AND SALE OF PREFERRED STOCK AND COMMON STOCK.

#### 1.1   Sale and Issuance of Series 1 Preferred Stock and Common Stock.

1.1.1   The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Initial Closing (as defined below) the Restated Certificate of Incorporation in substantially the form of <u>Exhibit B</u> attached to this Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "***Restated Certificate***").

1.1.2   Subject to the terms and conditions of this Agreement, each Purchaser agrees to purchase at the Initial Closing and the Company agrees to sell and issue to each Purchaser at the Initial Closing that number of shares of Series 1 Preferred Stock, $0.00001 par value per share, and that number of shares of Common Stock, $0.00001 par value per share, set forth opposite each Purchaser's name on <u>Exhibit A</u> (the "***Shares***"), at a purchase price of $4.6023 per share (the "***Per Share Purchase Price***") in the case of new cash investment for Series 1 Preferred Stock and otherwise as set forth on <u>Exhibit A</u> with respect to the conversion of outstanding convertible securities in accordance with Section 1.2.3 below.

#### 1.2   Closing; Delivery.

1.2.1   The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures on the date of this Agreement or at such other time and place as the Company and the Purchasers representing a majority of the Shares to be sold mutually agree upon, orally or in writing (which time and place are designated as the "***Initial Closing***").  In the event there is more than one closing, the term "***Closing***" shall apply to each such closing unless otherwise specified.

1.2.2   At the Initial Closing, the Company shall deliver to each Purchaser a certificate representing the Shares being purchased by such Purchaser at the Initial Closing against payment of the purchase price therefor by check payable to the Company, by wire transfer to a Company account at a nationally recognized bank mutually agreed upon by the Company and FO2 LLC ("***Fowler***"), by cancellation or conversion of indebtedness of the Company to Purchaser or by any combination of such methods; provided, however, that notwithstanding anything stated to the contrary, the Company shall deliver to Fowler a certificate

representing 10,864,133 Shares being purchased by Fowler at the Initial Closing (the "***Fowler Shares***") against payment of $15,000,000 (the "***Initial Fowler Funding Amount***").

1.2.3    Each Purchaser that is purchasing Shares through conversion of indebtedness (such Purchaser, a "***Note Purchaser***"), hereby acknowledges that the Company issued to such Purchaser convertible promissory notes in the aggregate initial principal amounts as set forth across such Note Purchaser's name on Exhibit A under the heading. "Cancellation of Indebtedness" (collectively, the "***Convertible Notes***" and individually, a "***Convertible Note***"). Each Note Purchaser hereby (a) acknowledges and agrees that all outstanding principal and accrued but unpaid interest under each Convertible Note held by the Note Purchaser shall be converted into (i) the number of shares of Series 1 Preferred Stock set forth opposite such Note Purchaser's name under the column "Shares of Series 1 Preferred Stock issued for Cancellation of Notes" on Exhibit A  and (ii) the number of shares of Common Stock set forth opposite such Note Purchaser's name under the column "Shares of Common Stock issued for Cancellation of Notes" on Exhibit A in connection with the Initial Closing and such number of Shares shall constitute full and complete satisfaction of all obligations of the Company under the Convertible Notes; (c) acknowledges and agrees that, to the extent they may conflict with the terms hereof, the terms of the Convertible Notes held by such Note Purchaser are hereby amended, including, without limitation, to the extent such Convertible Notes convert into shares of Series 1 Preferred Stock and Common Stock hereunder;, (c) agrees that each such Convertible Note is cancelled, released, extinguished and of no further force or effect as of the Initial Closing, (d) waives any rights of notice related thereto, (e) agrees that the principal and interest for each note, for purposes of the Note Conversion, shall be calculated as of November 20, 2018 and no further interest will accrue after November 20, 2018 and (f) agrees that upon the conversion, the Note Purchaser shall not be entitled to any other consideration in respect of such Convertible Note other than those Shares set forth opposite such Note Purchaser's name on Exhibit A. No fractional shares shall be issued upon conversion of the Convertible Notes. Each Note Purchaser shall deliver to the Company each Convertible Note held by such Note Purchaser for cancellation by the Company or if such Convertible Note has been lost, stolen or destroyed, an affidavit of lost, stolen or destroyed note (but without posting any bond) and agreement to indemnify in a form acceptable to the Company. Notwithstanding the foregoing, the cancellation, release and extinguishment of each such Convertible Note is effective whether or not such Convertible Note is delivered to and canceled by the Company.

1.3    **Sale of Additional Shares of Preferred Stock.**  At any time and from time to time after the Initial Closing, the Company may sell, on the same terms and conditions as those contained in this Agreement, without obtaining the signature, consent or permission of any of the Purchasers, in the aggregate up to that number of additional shares (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or similar recapitalization affecting such shares) of Series 1 Preferred Stock that is equal to 17,915,551 shares of Series 1 Preferred Stock less the number of Shares actually issued and sold by the Company at the Initial Closing (the "***Additional Shares***"), to one or more purchasers (the "***Additional Purchasers***") in additional Closings (each, an "***Additional Closing***"), provided that (a) each such subsequent sale is consummated on or prior to the date that is ninety (90) days after the Initial Closing, and (b) each Additional Purchaser shall become a party to the Transaction Agreements (as defined below), by executing and delivering a counterpart signature page to each of the Transaction

Agreements. Exhibit A to this Agreement shall be updated to reflect the number of Additional Shares purchased at each such Closing and the parties purchasing such Additional Shares.

### 1.4 Additional Fowler Funding and Fowler Share Forfeiture.

1.4.1 *Additional Fowler Funding Requests*. At any time from time to time after the Initial Closing through February 28, 2019 (the "***Last Equity Funding Date***"), without obtaining the signature, consent or permission of Fowler or any of the other Purchasers, and subject to Section 1.4.2 hereof, Fowler hereby irrevocably and unconditionally agrees to pay the Company, by wire transfer to a Company account at a nationally recognized bank designated in writing by the Company, the amount (each such amount an "***Additional Fowler Funding Amount***" and together with the Initial Fowler Funding Amount and all Additional Fowler Funding Amounts actually funded, the "***Total Fowler Funding Amount***") set forth on the applicable Equity Funding Request in substantially the form attached hereto as Exhibit J (each such request an "***Equity Funding Request***") within one (1) Business Day of the Company's delivery of such Equity Funding Request to Fowler; provided, however, that no Additional Fowler Funding Amount may exceed an amount equal to $50,000,000 (the "***Fowler Funding Commitment***") *less* the then current Total Fowler Funding Amount (before giving effect to such Additional Fowler Funding Amount). For the avoidance of doubt, the Company shall be under no obligation or be required to submit any Equity Funding Requests to Fowler.

1.4.2 *Operating Budget*. Prior to the presentment of the first Equity Funding Request after the Initial Closing, the Company will develop and deliver to Fowler an operating budget (the "***Budget***") covering the time period between the Initial Closing through the Last Equity Funding Date that, among other things, sets the basis for Equity Funding Requests and the delivery of Equity Funding Requests. Additionally, the Company will present unaudited financial statements to Fowler on a monthly basis through the Last Equity Funding Date, which will include a report on the variance between actual financial results against the corresponding items in the Budget. In the event that cumulative expenses for the applicable month reported in such financial statements are more than five percent (5%) above the corresponding cumulative expenses in the Budget (a "***Budget Deficit Event***"), the Company will within five (5) Business Days (as defined below) of delivery to Fowler of such financial statements advise Fowler of the Company's plans (such plans, the "***Budget Reconciliation Plan***") to eliminate or materially mitigate the Budget deficit (such five (5) Business Day period, the "***Budget Reconciliation Period***"). During the Budget Reconciliation Period, Fowler reserves the right to limit or reduce any Equity Funding Request, but not below the aggregate amount required by the Company to satisfy its payment obligations during the Budget Reconciliation Period without default.

1.4.3 *Agreement to Forfeit*. Fowler hereby agrees that upon the occurrence of any Forfeiture Trigger (as defined below), Fowler immediately and automatically forfeits to the Company, without any cost or charge to the Company, the number of Fowler Shares equal to (a) the Fowler Funding Commitment *less* the then current Total Fowler Funding Amount, *divided by* (b) the Per Share Purchase Price (rounded to the nearest Share) (the "***Unfunded Fowler Shares***"), and thereafter Fowler will have no further rights as a holder of such Unfunded Fowler Shares so forfeited. For purposes of this Agreement, "***Forfeiture Trigger***" means any of: (a) the Last Equity Funding Date, (b) the consummation of any Deemed Liquidation Event (as defined in the Restated Certificate) or (c) Fowler's failure to timely fulfill

an Equity Funding Request in full (other than during a Budget Reconciliation Period in accordance with Section 1.4.2); provided, however, that Fowler's failure to timely fulfill an Equity Funding Request in full shall not constitute a "Forfeiture Trigger" if in connection with such failure to fund (i) a Budget Deficit Event has occurred, (ii) the Company has not delivered a Budget Reconciliation Plan during the applicable Budget Reconciliation Period and (iii) the then current Total Fowler Funding Amount is greater than $30,000,000.

       1.4.4   *Encumbrances*.  Fowler may not grant a lien or security interest in, or pledge, hypothecate or encumber, any then currently Unfunded Fowler Shares.

       1.4.5   *Enforcement Costs*.  Fowler further agrees to pay all reasonable and documented out-of-pocket costs and expenses (including, but not limited to, reasonable and documented out-of-pocket attorneys' fees) paid or incurred by the Company in enforcing Fowler's obligations under this Section 1.4. Fowler acknowledges that the Company is relying on the fulfillment of Fowler's obligations under this Section 1.4 in entering into this Agreement and consummating the transactions contemplated herein.

       **1.5**   **Defined Terms Used in this Agreement.**  In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

"***Action***" means any action, suit, proceeding, arbitration, mediation, complaint, claim, charge or, to the Company's knowledge, investigation, in each case, before any court, arbitrator, mediator or governmental body.

"***Affiliate***" means, with respect to any specified Person, such Person's principal or any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such Person or such Person's principal, including, without limitation, any general partner, managing member or partner, officer or director of such Person or such Person's principal or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person or such Person's principal.  For purposes of this definition, the terms "***controlling***," "***controlled by***," or "***under common control with***" shall mean the possession, directly or indirectly, of (a) the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, or (b) the power to elect or appoint at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"***Board***" means the Board of Directors of the Company.

"***Business Day***" means a weekday on which banks are open for general banking business in San Francisco, California.

"***Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated by the Internal Revenue Service thereunder.

"***Company Intellectual Property***" means Intellectual Property that is necessary to the conduct of the Company's business as now conducted and as presently proposed to be conducted.

"***Common Stock***" means the common stock of the Company, $0.00001 par value per share.

"***Conversion Shares***" means the Common Stock issuable upon conversion of the Shares.

"***Disclosure Schedule***" means the Disclosure Schedule attached as <u>Exhibit C</u> to this Agreement.

"***ERISA***" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"***FF Preferred Stock***" means the Series FF Preferred Stock of the Company, $0.00001 par value per share.

"***Intellectual Property***" means all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes.

"***Investors' Rights Agreement***" means the Amended and Restated Investors' Rights Agreement among the Company and the Purchasers dated as of the date of the Initial Closing, in the form of <u>Exhibit D</u> attached to this Agreement.

"***Key Employees***" means Charles Ebersol.

"***knowledge***," including the phrase "***to the Company's knowledge***," shall mean the actual knowledge of Charles Ebersol.

"***Material Adverse Effect***" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition or results of operations of the Company.

"***Material Agreement***" has the meaning given to that term in Section 2.11.1.

"***Person***" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"***Preferred Stock***" means the preferred stock of the Company, $0.00001 par value per share. For the avoidance of doubt, "Preferred Stock" shall not include any FF Preferred Stock.

"***Purchaser***" means each of the Purchasers who is a party to this Agreement.

"***Right of First Refusal and Co-Sale Agreemen***t" means the Amended and Restated Right of First Refusal and Co-Sale Agreement among the Company, the Purchasers, and

certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit E attached to this Agreement.

"***Securities Act***" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"***Series 1 Preferred Stock***" means the Series 1 Preferred Stock of the Company, $0.00001 par value per share.

"***Series Seed Preferred Stock***" means the Series Seed Preferred Stock of the Company, $0.00001 par value per share.

"***Stock Plan***" has the meaning given to that term in Section 2.2.4.

"***Transaction Agreements***" means this Agreement, the Investors' Rights Agreement, the Right of First Refusal and Co-Sale Agreement and the Voting Agreement.

"***Voting Agreement***" means the Amended and Restated Voting Agreement among the Company, the Purchasers and certain other stockholders of the Company, dated as of the date of the Initial Closing, in the form of Exhibit F attached to this Agreement.

## 2. <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

The Company hereby represents and warrants to each Purchaser that, except as set forth on the Disclosure Schedule, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Initial Closing, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections contained in this Section 2, and the disclosures in any section of the Disclosure Schedule shall qualify other sections in this Section 2 to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections.

### 2.1 <u>Organization, Good Standing, Corporate Power and Qualification</u>.

The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all corporate power and corporate authority required (a) to carry on its business as presently conducted and as presently proposed to be conducted and (b) to execute, deliver and perform its obligations under the Transaction Agreements. The Company is duly qualified to transact business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

### 2.2 <u>Capitalization</u>.

The authorized equity capital of the Company consists, immediately prior to the Initial Closing (unless otherwise noted), of the following.

2.2.1   43,403,801 shares of Common Stock, 8,000,000 shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws.

2.2.2   2,000,000 shares of FF Preferred Stock, all of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of FF Preferred Stock are duly authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws. Each outstanding share of Series FF Preferred Stock is initially convertible into one (1) share of Common Stock.

2.2.3   22,522,194 shares of Preferred Stock, (a) 3,846,154 of which are designated as Series Seed Preferred Stock, all of which are issued and outstanding immediately prior to the Initial Closing and (b) 18,676,040 of which are designated as Series 1 Preferred Stock, none of which are issued and outstanding immediately prior to the Initial Closing. None of the rights, preferences and powers of, or the restrictions on, the Preferred Stock set forth in the Restated Certificate are prohibited by the General Corporation Law of the State of Delaware. Upon the Initial Closing, each outstanding share of Preferred Stock initially will be convertible into one (1) share of Common Stock.

2.2.4   5,990,267 shares of Common Stock are subject to issuance to officers, directors, employees and consultants of the Company pursuant to the Company's 2017 Equity Incentive Plan duly adopted by the Board and approved by the Company stockholders (the "**Stock Plan**"). Of such shares of Common Stock reserved under the Stock Plan, 1,058,017 options to purchase shares have been granted and are currently outstanding, no shares have been issued pursuant to restricted stock purchase agreements or the exercise of options, and 4,932,250 shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan.

2.2.5   There are no outstanding preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, FF Preferred Stock or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock, FF Preferred Stock or Preferred Stock, except for (a) the conversion privileges of the Shares to be issued under this Agreement and the FF Preferred Stock pursuant to the terms of the Restated Certificate, (b) the rights provided in Section 4 of the Investors' Rights Agreement, and (c) the securities and rights described in Section 2.2.4 of this Agreement. All outstanding shares of the Common Stock and all shares of the Common Stock underlying outstanding options are subject to (i) a right of first refusal in favor of the Company upon any proposed transfer (other than transfers for estate planning purposes); and (ii) a lock-up or market standoff agreement of not less than one hundred eighty (180) days following each public offering of securities of the Company pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act commencing with the initial public offering of the Company's securities. No Person (A) has been granted full ratchet, formula adjustment, or any other type of, protection against dilution of their ownership interest in the Company, (B) has been granted rights to require the Company to repurchase any of the Company's securities, (C) has been granted rights to receive the same or better rights in connection with any ownership interest in the Company as any other person or entity may receive either pursuant to this Agreement or at any time hereafter or (D) have been granted rights of redemption by the Company. No full ratchet, formula adjustment, or any other type of, protection against dilution

of any ownership interest in the Company has been triggered, nor will be triggered by the transactions provided for in this Agreement.

2.2.6   To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been or will be timely filed by all individuals who have acquired unvested shares of the Common Stock.

2.2.7   None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events.  The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means.  Except as may be set forth in the Restated Certificate, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock

**2.3**     **Subsidiaries.**  The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

**2.4**     **Authorization.**  All corporate action has been taken, or will be taken prior to the Closing, on the part of the Board and stockholders that is necessary for (a) adoption of the Restated Certificate, (b) the authorization, execution and delivery of the Transaction Agreements by the Company, (c) the performance by the Company of the obligations to be performed by the Company as of the date hereof under the Transaction Agreements and (d) the issuance of the Conversion Shares.  All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, and the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, has been taken or will be taken prior to the Closing.  The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

**2.5**     **Valid Issuance of Shares.**  The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, the Restated Certificate, the Company's Bylaws, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.  Based in part on the accuracy of the representations of the Purchasers in Section 3 of this Agreement and subject to the filings described in Section 2.6 below, the offer, sale and issuance of the Shares to be issued pursuant to and in conformity with the terms of this Agreement and the issuance of the Conversion Shares, if any, to be issued upon

conversion thereof for no additional consideration and pursuant to the Restated Certificate, will be issued in compliance with all applicable federal and state securities laws. The Conversion Shares have been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser. Based in part upon the representations of the Purchasers in Section 3 of this Agreement, and subject to Section 2.6 below, the Conversion Shares will be issued in compliance with all applicable federal and state securities laws.

       **2.6**    **Governmental Consents and Filings.**  Based in part on the accuracy of the representations made by the Purchasers in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the Company's valid execution, delivery and performance of the Transaction Agreements except for (a) the filing of the Restated Certificate, which will have been filed as of the Closing, and (b) required filings pursuant to Regulation D of the Securities Act (if any), and applicable state securities laws (if any), which have been made or will be made in a timely manner if applicable.

       **2.7**    **Litigation.**  There is no Action pending, or to the Company's knowledge, currently threatened in writing (a) against the Company or (b) against any officer, director or Key Employee of the Company arising out of his or her employment or board relationship with the Company or that could otherwise materially impact the Company. The foregoing includes, without limitation, Actions pending or overtly threatened involving the prior employment or consultancy of any of the Company's employees, officers, directors, or Key Employees, their services provided in connection with the Company's business. Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government body (in the case of officers, directors or Key Employees, such as would affect the Company). There is no Action by the Company pending or that the Company intends to initiate.

       **2.8**    **Intellectual Property.**  The Company owns or possesses or believes it can acquire on commercially reasonable terms sufficient legal rights to all Company Intellectual Property without any violation or infringement (or in the case of third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Company) of the rights of others. No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any rights to Intellectual Property of any other party, except that with respect to third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications the foregoing representation is made to the Company's knowledge only. Other than with respect to the non-exclusive license to the Company of generally commercially available software products under standard end-user object code license agreements, there is no outstanding option, license, agreement, claim, encumbrance or shared ownership interest of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other Person. The Company has not

received any written communications alleging that the Company has violated or, by conducting its business, would violate any of the Intellectual Property of any other Person.  The Company has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's business.  To the Company's knowledge, it will not be necessary to use any inventions of any of its employees or consultants (or Persons it currently intends to hire) made prior to their employment by or consulting relationship with the Company.  Each current and former employee and consultant has fully and validly assigned and transferred to the Company all Intellectual Property he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted.  Section 2.8 of the Disclosure Schedule lists all Company Intellectual Property that is registered with a governmental entity.  The Company has not embedded, used or distributed any open source, copyleft or community source code in any of its products generally available or in development, including but not limited to any libraries, code or software licensed or distributed under any General Public License, Lesser General Public License or similar license arrangement in a manner that would require (or purport to require) the distribution of the source code of such software or prohibit (or purport to prohibit) the Company from charging for the distribution or use of the software or otherwise limit such software's use for commercial purposes.

2.9    **Confidential Information and Invention Assignment Agreements.**  Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for the Purchasers.  No current or former employee or consultant has excluded works or inventions from his or her assignment of inventions pursuant to such agreement.  To the Company's knowledge, no such employee, consultant or officer is in violation thereof.

2.10    **Compliance with Other Instruments.**  The Company is not in violation or default (a) of any provisions of the Restated Certificate or Bylaws, (b) of any judgment, order, writ or decree of any court or governmental entity, (c) under any agreement, instrument, contract, lease, note, indenture, mortgage or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or, (d) to its knowledge, of any provision of federal or state statute, rule or regulation materially applicable to the Company.  The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any such violation or default, or constitute, with or without the passage of time and giving of notice, either (i) a default under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or purchase order or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.  The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any acceleration of benefits or obligations, with or without the passage of time and giving of notice, under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or purchase order.

**2.11    Agreements; Actions.**

2.11.1  Except for the Transaction Agreements, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (a) obligations (contingent or otherwise) of, or payments to, the Company in excess of $100,000, (b) the license of any Intellectual Property to or from the Company (other than (A) the nonexclusive license of the Company's software in object code form in the ordinary course of business; and (B) licenses with respect to commercially available software products under standard end-user object code license agreements or standard customer terms of service and privacy policies for Internet sites), (c) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person, or that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (d) indemnification by the Company with respect to infringements of proprietary rights other than standard customer or channel agreements (each, a "***Material Agreement***").  The Company is not in material breach of or default under any Material Agreement and, to the Company's knowledge, there is no current claim or threat that the Company is or has been in material breach of or default under any Material Agreement.  Each Material Agreement is in full force and effect and is enforceable by the Company in accordance with its respective terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) the effect of rules of law governing the availability of equitable remedies.  To the Company's knowledge, no other party to a Material Agreement is in material default thereunder or in actual or anticipated material breach thereof.

2.11.2  The Company has not (a) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (b) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $100,000 or in excess of $200,000 in the aggregate (other than indebtedness or liabilities that have already been fully satisfied), (c) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (d) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.  For the purposes of Section 2.11.1 and this Section 2.11.2, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such Section.

2.11.3  The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

**2.12    Certain Transactions.**

2.12.1  Other than (a) standard employee benefits generally made available to all employees, (b) standard director and officer indemnification agreements approved by the Board, and (c) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Company's Common Stock, in each instance, approved in the written minutes of the Board there is no agreement, understanding or proposed

transaction between the Company and any of its officers, directors, consultants, Key Employees, members of the immediate families of the foregoing, or any Affiliate of any of the foregoing.

2.12.2  The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees.  None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any (a) material commercial, industrial, banking, consulting, legal, accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors or (b) direct or indirect ownership interest in any Person with which the Company is affiliated or with which the Company has a business relationship, or any Person that competes with the Company except that directors, officers or employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company.

2.13  **Rights of Registration and Voting Rights.**  Except as provided in the Investors' Rights Agreement, the Company is not under any obligation to register under the Securities Act any of its securities (whether currently outstanding or to be issued in the future). To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreement with respect to the voting of capital shares of the Company.

2.14  **Absence of Liens.**  The property and assets that the Company owns are owned free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets.  With respect to the property and assets it leases, the Company is in compliance with such leases and, to the Company's knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets.

2.15  **Financial Statements.**  The Company has delivered to each Purchaser its unaudited financial statements (including balance sheet, income statement and statement of cash flows) as of December 31, 2017 and for the eight (8) month period ended August 31, 2018 (the "*Balance Sheet Date*") (such financial statements collectively referred to herein as the "*Financial Statements*"). The Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by generally accepted accounting principles. The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited financial statements to normal year-end adjustments. Except as set forth in the Financial Statements, the Company has

no material liabilities or obligations, contingent or otherwise, in excess of $100,000 individually or $200,000 in the aggregate.

**2.16    <u>Changes</u>**. Since the Balance Sheet Date there has not been:

(a)    any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except immaterial changes in the ordinary course of business;

(b)    any material damage, destruction or loss, whether or not covered by insurance;

(c)    any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(d)    any satisfaction or discharge of any lien, claim, or encumbrance or payment of any material obligation by the Company;

(e)    any entry into, or change or amendment to, a material contract, agreement, or arrangement by which the Company or any of its assets is bound or subject;

(f)    any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(g)    any resignation or termination of employment of any officer or Key Employee of the Company;

(h)    any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(i)    any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary and customary course of its business;

(j)    any dividend, declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(k)    any sale, assignment, transfer, or exclusive license of any material Company Intellectual Property;

(l)    receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)     to the Company's knowledge, any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that would reasonably be expected to result in a Material Adverse Effect; or

(n)     any arrangement or commitment by the Company to do any of the things described in this Section 2.16.

### 2.17     Employee Matters.

2.17.1  To the Company's knowledge, none of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such Person's ability to promote the interest of the Company or that would conflict with the Company's business.  Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

2.17.2  To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee, nor does the Company have a present intention to terminate the employment of any of the foregoing.  Each officer and Key Employee of the Company is currently devoting all of his or her business time to the conduct of the Company's business.  The Company is not aware that any of its officers and Key Employees is planning to work less than full-time for the Company in the future.  The employment of each employee of the Company is terminable at the will of the Company.  Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due.  The Company has no policy, practice, plan, or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

2.17.3  The Company has not made any representations regarding equity incentives or compensation to any officer, employees, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Board, the representations set forth herein, or the Disclosure Schedule.

2.17.4  Section 2.17.4 of the Disclosure Schedule sets forth each employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to ERISA.  The Company has made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

2.17.5  The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the

knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company.  There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, nor is the Company aware of any labor organization activity involving its employees.

       **2.18**   **Tax Returns and Payments.**  There are no federal, state, county, local or foreign taxes dues and payable by the Company which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  The Company has not elected pursuant to the Code, to be treated as an "S" corporation or a collapsible corporation pursuant to Section 1362(a).  The Company has not made any other elections pursuant to the Code (other than elections which relate solely to matters of accounting, depreciation or amortization) that would have a material effect on the Company, its financial condition, its business as presently conducted or presently proposed to be conducted or any of its properties or material assets.

       **2.19**   **Insurance.**  The Company has in full force and effect fire and casualty insurance policies with extended coverage, in the amounts that are sufficient, subject to reasonable deductions, to allow it to replace any of its material properties that might be damaged or destroyed.

       **2.20**   **Permits.**  The Company has all material franchises, permits, licenses and any similar authority necessary for the conduct of its business.  The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

       **2.21**   **Corporate Documents.**  The Restated Certificate is the currently effective certificate of incorporation of the Company.  The Bylaws of the Company are in the form provided to the Purchasers and their counsel.  The copy of the minute books of the Company provided to the Purchasers and their counsel contains minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders with respect to all transactions referred to in such minutes.

       **2.22**   **Real Property Holding Corporation.**  The Company is not now and has never been a "United States real property holding corporation" as defined in the Code and any applicable regulations promulgated thereunder.  The Company has filed with the Internal Revenue Service all statements, if any, with its United States income tax returns which are required under such regulations.

       **2.23**   **No "Bad Actor" Disqualification**

   . No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) promulgated by the SEC under the Securities Act (a "***Disqualification Event***") is applicable to the Company or,

to the Company's knowledge, any Company Covered Person (as defined below), except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3) is applicable. "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated by the SEC under the Securities Act, any person or entity listed in the first paragraph of Rule 506(d)(1).

3. **REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS.** Each Purchaser hereby represents and warrants to the Company, as of the closing in which such Purchaser is participating, severally and not jointly, as follows.

3.1 **Authorization.** The Purchaser has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which such Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

3.2 **Purchase Entirely for Own Account.** This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3 **Disclosure of Information.** The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management. Nothing in this Section 3, including the foregoing sentence, limits or modifies the representations and warranties of the Company in Section 2 of this Agreement or the right of the Purchasers to rely thereon.

3.4 **Restricted Securities.** The Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Shares are "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has

no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale except as set forth in the Investors' Rights Agreement.  The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

        3.5    **No Public Market.**  The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

        3.6    **Legends.**

        3.6.1   The Purchaser understands that the Shares and any securities issued in respect of or exchange for the Shares, may bear any one or more of the following legends:  (a) any legend set forth in, or required by, the other Transaction Agreements; (b) any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended; and (c) the following legend:

> *"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."*

        3.6.2   Fowler understands that the Fowler Shares and any securities issued in respect of or exchange for the Fowler Shares, will bear the following legend:

> *"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A FORFEITURE OBLIGATION IN FAVOR OF THE ISSUER AND/OR ITS ASSIGNEE(S), AS SET FORTH IN A STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH FORFEITURE OBLIGATION IS BINDING ON TRANSFEREES OF THESE SHARES."*

        3.7    **Accredited Investor.**  The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (*i.e.*, (a) a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her

purchase exceeds $1,000,000 (excluding the value of such person's primary residence), (b) a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year, (c) a corporation, limited liability company or partnership having total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Company pursuant to the Purchase Agreement or (d) otherwise meets the requirements for an "accredited investor" under Regulation D promulgated by the Securities and Exchange Commission under the Securities Act).

**3.8     No General Solicitation.**  At no time (a) has the Purchaser or any of its officers, directors, employees or other agents, been presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the offer, sale or purchase of the Shares, whether or not such advertising or solicitation was received directly from the Company or indirectly from a broker, finder or other person or entity, nor (b) has the Purchaser or any of its officers, directors, employees or other agents attended any public meeting or seminar concerning an investment in the Shares.

**3.9     Exculpation Among Purchasers.**  The Purchaser acknowledges that it is not relying upon any Person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company.  The Purchaser agrees that neither any Purchaser nor the respective controlling Persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore taken or omitted to be taken by any of them in connection with the purchase of the Shares.

**3.10     Residence.**  If the Purchaser is an individual, then the Purchaser resides in the state or province identified in the address of the Purchaser set forth on Exhibit A; if the Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of the Purchaser in which its principal place of business is identified in the address or addresses of the Purchaser set forth on Exhibit A.

**3.11     Foreign Investors.**  If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Shares, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

**3.12     Regulation S Representations and Restrictions.**  If the Purchaser's address on Exhibit A is an address located outside of the United States, the Purchaser makes the following additional representations, warranties and agreements:

(a)    Purchaser is <u>not</u> a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act.  The offer and sale of the Shares to such Purchaser was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and the Purchaser is not acquiring the Shares (or the Conversion Shares) for the account or benefit of any U.S. Person;

(b)    Purchaser will not, during the Restricted Period applicable to the Shares set forth in the legend set forth below (the "***Restricted Period***") and to any certificate representing the Shares, offer or sell any of the foregoing securities (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S; and

(c)    Purchaser will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Shares (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.

Purchaser acknowledges and agrees that the Company shall not register the transfer of the Shares (or the Conversion Shares) in violation of these restrictions.  Purchaser acknowledges and agrees that the certificates evidencing the Shares and the Conversion Shares will bear the legend set forth below (in addition to any other legend required by applicable federal, state or foreign securities laws or provided in any other agreement with the Company:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND THE COMPANY DOES NOT INTEND TO REGISTER THEM  PRIOR TO NOVEMBER 21, 2019, THE SHARES MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH SECURITIES) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(K) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE SHARES ARE REGISTERED UNDER THE  ACT,  OR  AN  EXEMPTION  FROM  THE  REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. PURCHASERS OF SHARES  PRIOR  TO  NOVEMBER  21,  2019,  MAY  RESELL  SUCH SECURITIES  ONLY  PURSUANT  TO  AN  EXEMPTION  FROM REGISTRATION  UNDER  THE  ACT  OR  OTHERWISE  IN  ACCORDANCE WITH  THE  PROVISIONS  OF  REGULATION  S  OF  THE  ACT,  OR  IN TRANSACTIONS  EFFECTED  OUTSIDE  OF  THE  UNITED  STATES PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF  SOLICITS)  PURCHASERS  IN  THE  UNITED  STATES  OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE SECURITIES  MAY  NOT  BE  CONDUCTED  UNLESS  IN  COMPLIANCE WITH  THE  ACT.   A  HOLDER  OF  THE  SECURITIES  WHO  IS  A

DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT PRIOR TO NOVEMBER 21, 2019 RESELL THE SECURITIES TO A U.S. PERSON AS DEFINED BY RULE 902(K) OF REGULATION S UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.

**4.     CONDITIONS TO THE PURCHASERS' OBLIGATIONS AT CLOSING.** The obligations of each Purchaser to purchase Shares at a particular Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived, *provided* that upon the consummation of such Closing, all such conditions shall be deemed waived in writing.

**4.1     Representations and Warranties.**  The representations and warranties of the Company contained in Section 2 shall be true and correct in all material respects as of the Initial Closing.

**4.2     Performance.**  The Company shall have performed and complied with all material covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

**4.3     Compliance Certificate.**  The President or Chief Executive Officer of the Company shall have delivered to the Purchasers at the Initial Closing a certificate certifying that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

**4.4     Qualifications.**  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall have been obtained and effective as of such Closing.

**4.5     Opinions of Company Counsel.**  The Purchasers shall have received from Fenwick & West, LLP, counsel for the Company, an opinion, dated as of the Initial Closing, in the form attached to this Agreement as Exhibit G.

**4.6     Board of Directors.**  The authorized size of the Board shall be six (6).  As of the Initial Closing, the Board shall be comprised of Charles Ebersol, Dick Ebersol, Keith Rabois, Reggie Fowler ("*Fowler*"), Jeff Moorad and one (1) vacancy.

**4.7     Investors' Rights Agreement.**  The Company and each Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder) shall have executed and delivered the Investors' Rights Agreement.

**4.8     Right of First Refusal and Co-Sale Agreement.**  The Company, each Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder), and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

4.9     **Voting Agreement**.   The Company, each Purchaser (other than the Purchaser relying upon this condition to excuse such Purchaser's performance hereunder), and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

4.10    **Restated Certificate**.   The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to such Closing, which shall continue to be in full force and effect as of such Closing.

4.11    **Secretary's Certificate**.   The Secretary of the Company shall have delivered to the Purchasers at the Initial Closing a certificate certifying as to the truth and correctness of (a) the Restated Certificate; (b) the Bylaws of the Company; (c) resolutions of the Board approving the Restated Certificate, Transaction Agreements, and the transactions provided for therein, and any other necessary matters; and (d) resolutions of the stockholders of the Company approving the Restated Certificate and any other necessary matters.

4.12    **Proceedings and Documents**.   All corporate and other proceedings in connection with the transactions contemplated at such Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to each Purchaser, and each Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.  Such documents may include good standing certificates.

4.13    **Indemnification Agreement**.   The Company shall have executed and delivered an indemnification agreement acceptable to each director of the Company.

4.14    **Line of Credit**.   The Company and Fowler shall have entered into the Line of Credit Agreement in substantially the form attached hereto as Exhibit H (the "*LoC*").

4.15    **Warrant**.   The Company shall have delivered to Fowler the Warrant to Purchase Shares of Common Stock in substantially the form attached hereto as Exhibit I (the "*Warrant*").

4.16    **Football Committee**.   The Company shall have established a Football Steering Committee (the "*Football Committee*"), which will provide oversight of the football operations of the Company's professional football league. As of the Initial Closing, the Football Committee shall be comprised of Fowler, Willie Lanier, Charlie Ebersol and Bill Polian, with the initial chair of the Football Committee being Fowler.

4.17    **Delivery of Operating Budget**.   The Company shall have delivered to Fowler the Budget.

5.      **CONDITIONS OF THE COMPANY'S OBLIGATIONS AT CLOSING.**  The obligations of the Company to sell Shares to each Purchaser at such Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions of such Purchaser, unless otherwise waived:

**5.1** **Representations and Warranties.**  The representations and warranties of such Purchaser contained in Section 3 shall be true and complete in all respects as of such Closing.

**5.2** **Performance.**  Such Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before such Closing.

**5.3** **Qualifications.**  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of such Closing.

**5.4** **Restated Certificate.**  The Secretary of State of the State of Delaware shall have filed the Restated Certificate as of such Closing.

**5.5** **Proceedings and Documents.**  All corporate and other proceedings in connection with the transactions contemplated at such Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Company and its counsel, and the Company (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

**5.6** **Voting Agreement.**  Such Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Voting Agreement.

**5.7** **Investors' Rights Agreement.**  Such Purchaser shall have executed and delivered the Investors' Rights Agreement.

**5.8** **Right of First Refusal and Co-Sale Agreement.**  Such Purchaser and the other stockholders of the Company named as parties thereto shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

**5.9** **Line of Credit.**  The Company and Fowler shall have entered into the LoC.

**5.10** **Stock Power.**  Fowler shall have delivered a duly executed copy of a blank Stock Power and Assignment Separate from Stock Certificate in the form attached hereto as Exhibit K (the "***Stock Power***").

**6.** **GENERAL PROVISIONS.**

**6.1** **Survival of Warranties.**  Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchasers contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchasers or the Company.

**6.2** **Successors and Assigns.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.3** **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

**6.4** **Counterparts; Facsimile.** This Agreement may be executed and delivered by facsimile or electronic signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**6.5** **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**6.6** **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next Business Day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page or Exhibit A, or to such address, email address, or facsimile number as subsequently modified by written notice given in accordance with this Section 6.6. If notice is given to the Company, it shall be sent to 149 New Montgomery Street, San Francisco, California 94105, marked "Attention: Chief Executive Officer"; and a copy (which shall not constitute notice) shall also be sent to each of Fenwick & West, LLP, Silicon Valley Center, 801 California Street, Mountain View, California 94041, Attn: Dawn Belt and Morgan, Lewis & Bockius LLP, One Market, Spear Street Tower, San Francisco, California 94105, Attn: Baird D. Fogel. If no facsimile number is listed on Exhibit A for a party (or above in the case of the Company), notices and communications given or made by facsimile shall not be deemed effectively given to such party.

**6.7** **No Finder's Fees.** Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which each

Purchaser or any of its officers, employees, or representatives is responsible.  The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

       **6.8**    **Fees and Expenses**.  At the Initial Closing, the Company shall pay the reasonable fees and expenses of Reed Smith LLP, special counsel for Fowler, in an amount not to exceed, in the aggregate, $50,000, which Fowler may deduct against the purchase price to be paid pursuant to Section 1.2.2.

       **6.9**    **Attorneys' Fees**.  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

       **6.10**    **Amendments and Waivers**.  Except as set forth in Section 1.3 of this Agreement, any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of a majority of the then-outstanding Shares (or Common Stock issued on conversion thereof); *provided*, that Additional Purchasers may become parties to this Agreement in accordance with Section 1.3 without any amendment of this Agreement or any consent or approval of any Purchaser.  Any amendment or waiver effected in accordance with this Section 6.10 shall be binding upon the Purchasers and each transferee of the Shares (or the Common Stock issuable upon conversion thereof), each future holder of all such securities, and the Company.

       **6.11**    **Severability**.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

       **6.12**    **Delays or Omissions**.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

       **6.13**    **Entire Agreement.**  This Agreement (including the Exhibits hereto), the Restated Certificate and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

**6.14** **Dispute Resolution.**   The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that a party is not subject to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution based upon judgment or order of such court(s), that any suit, action or proceeding arising out of or based upon this Agreement commenced in the federal or state courts located in the Northern District of California is brought in an inconvenient forum, that the venue of such suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.   Should any party commence a suit, action or other proceeding arising out of or based upon this Agreement in a forum other than the federal or state courts located in the Northern District of California, or should any party otherwise seek to transfer or dismiss such suit, action or proceeding from such court(s), that party shall indemnify and reimburse the other party for all legal costs and expenses incurred in enforcing this provision.

**6.15** **Waiver of Conflict of Interest.**   Each Purchaser and the Company is aware that Fenwick & West LLP ("***F&W***") may have previously performed and may continue to perform certain legal services for certain of the Purchasers in matters unrelated to F&W's representation of the Company.   In connection with its Purchaser representation, F&W may have obtained confidential information of such Purchasers that could be material to F&W's representation of the Company in connection with negotiation, execution and performance of this Agreement.   In addition, an affiliate of F&W, may be investing as a Purchaser under the terms of this Agreement.   By signing this Agreement, each Purchaser and the Company hereby acknowledges that the terms of this Agreement were negotiated between the Purchasers and the Company and are fair and reasonable and waives any potential conflict of interest arising out of such representation (including any future representation of such parties) or such possession of confidential information and consents to the investment by such affiliate of F&W.   Each Purchaser and the Company further represents that it has had the opportunity to be, or has been, represented by independent counsel in giving the waivers contained in this Section 6.15.

**6.16** **Escrow.**   As security for Fowler's faithful performance of this Agreement, Fowler agrees, immediately upon receipt of the stock certificate(s) evidencing the Fowler Shares, to deliver such certificate(s), together with the Stock Power executed by Fowler (with the date, transferee, stock certificate number and number of Shares left blank), to the Secretary of the Company or other designee of the Company (the "***Escrow Holder***"), who is hereby appointed to hold such certificate(s) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases of such Fowler Shares as are in accordance with the terms of this Agreement.   The placement into escrow of the Fowler Shares shall not constitute a legal proxy or a grant of authority to vote the Fowler Shares to the Escrow Holder, a representative of the Company, or any other third party; said voting rights to remain with Fowler during the term of Escrow. Escrow Holder will act solely for the Company as its agent and not as a fiduciary. Fowler and the Company agree that Escrow Holder will not be liable to any party to this Agreement (or to any other party) for any actions or omissions unless Escrow Holder is grossly

negligent or intentionally fraudulent in carrying out the duties of Escrow Holder under this Agreement.  Escrow Holder may rely upon any letter, notice or other document executed with any signature purported to be genuine and may rely on the advice of counsel and obey any order of any court with respect to the transactions contemplated by this Agreement.  The Fowler Shares will be released from escrow upon the total Fowler Funding Amount equaling the Fowler Funding Commitment.

   **6.17**   **MGM Promissory Note.**  Following the Initial Closing, the Company intends to contact MGM Resorts International Operations, Inc. ("***MGM***") regarding a proposed amendment to that certain Promissory Note, dated September 28, 2018, by and between the Company and MGM (the "***MGM Note***"), pursuant to which any amounts due under the MGM Note in the event of a liquidation, dissolution or winding up of the Company would rank *pari passu* with the Series 1 Preferred Stock.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**COMPANY:**

**EBERSOL SPORTS MEDIA GROUP, INC.**

By: _____

Name:  Charles Ebersol

Title: Chief Executive Officer

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**FO2 LLC**

By: _____

Name: Reggie Fowler

Title: CEO

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

<u>**PURCHASERS**</u>:

**THE FOUNDERS FUND VI, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: Brian Singerman
Title: Managing Member

**THE FOUNDERS FUND VI PRINCIPALS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: Brian Singerman
Title: Managing Member

**THE FOUNDERS FUND VI ENTREPRENEURS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: Brian Singerman
Title: Managing Member

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**<u>PURCHASERS</u>:**

**RAB 175 ACQUISITIONS LLC**

By: _____

Name: <u>Robert Bowman</u>

Title: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

<u>**PURCHASERS**</u>**:**

**KENNETH KANTOWITZ**

By: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**<u>PURCHASERS</u>:**

**KRINICK ASC HOLDINGS LLC**

By:  _____

Name:  <u>Ron Krinick</u>_____

Title:  _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**<u>PURCHASERS</u>:**

**EBERSOL-SAINT JAMES FAMILY TRUST
DATED NOVEMBER 14, 2007**

By: _____

Name: <u>Dick Ebersol</u>

Title: <u>Trustee</u>

**[S<small>IGNATURE</small> P<small>AGE TO</small> E<small>BERSOL</small> S<small>PORTS</small> M<small>EDIA</small> G<small>ROUP</small>, I<small>NC</small>. S<small>ERIES</small> 1 P<small>REFERRED</small> S<small>TOCK</small> P<small>URCHASE</small> A<small>GREEMENT</small>]**

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**ALAN KANTOWITZ**

By: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**MOORAD SPORTS PARTNERS LLC**

By: _____
Name: Jeffrey S. Moorad
Title: Manager

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**DAVID S POTTRUCK REVOCABLE TRUST**

By: _David Pottruck_____

Name: David Pottruck_____

Title: CEO_____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**


**KIDS 42 INVESTMENTS, L.P.**

By: _____

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

<u>**PURCHASERS:**</u>

**SLOW VENTURES III, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: _Kevin Colleran_____
Name: Kevin Colleran
Its: Managing Director

**SLOW VENTURES III-A, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: _Kevin Colleran_____
Name: Kevin Colleran
Its: Managing Director

IN WITNESS WHEREOF, the parties have executed this **Series 1 Preferred Stock Purchase Agreement** as of the date first written above.

**PURCHASERS:**

**ROBERT DAVIS NOELL AND**
**STACEY WILSON NOELL**

By: _____

Name:  Robert Davis Noell

By: _____

Name:  Stacey Wilson Noell

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated:   11/21/18

PURCHASER

FO2 LLC

_____
(Signature)

Reggie Fowler
(Please Print Name)

CEO
(Title)

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**THE FOUNDERS FUND VI, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: Brian Singerman
Title: Managing Member

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "**Agreement**"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**THE FOUNDERS FUND VI PRINCIPALS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: ____Brian Singerman_____
Title: ____Managing Member_____

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**THE FOUNDERS FUND VI ENTREPRENEURS FUND, LP**

By: The Founders Fund VI Management, LLC
Its: General Partner

By: _____
Name: __Brian Singerman_____
Title: __Managing Member_____

**Instructions to Purchaser**: Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**RAB 175 ACQUISITIONS LLC**

By: _____

Name: Robert Bowman _____

Title: _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

**STOCK POWER AND ASSIGNMENT**

**SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

                                        **PURCHASER:**

                                        **KENNETH KANTOWITZ**

                                        By: _____

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**KRINICK ASC HOLDINGS LLC**

By: _____

Name: Ron Krinick_____

Title: _____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "**Agreement**"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER:

**EBERSOL-SAINT JAMES FAMILY TRUST DATED NOVEMBER 14, 2007**

By: _____*Dick Ebersol*_____

Name: Dick Ebersol_____

Title: Trustee_____

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "*Agreement*"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**ALAN KANTOWITZ**

By: _____

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "**_Agreement_**"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**_Company_**"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. _THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO._

Dated: _____


**PURCHASER:**


**MOORAD SPORTS PARTNERS LLC**


By: _____
Name: Jeffrey S. Moorad
Title: Manager




**Instructions to Purchaser:** Please do not fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**DAVID S POTTRUCK REVOCABLE TRUST**

By: _____

Name: David Pottruck_____

Title: CEO_____

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**KIDS 42 INVESTMENTS, L.P.**

By: _____

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

DocuSign Envelope ID: 9AFE61B4-937F-419D-AA4E-B728C8CA13DF

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "*Agreement*"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**SLOW VENTURES III, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: *Kevin Colleran*
Name: Kevin Colleran
Its: Managing Director

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**SLOW VENTURES III-A, LP**
By: SLOW VENTURES GP III, LLC, its General Partner

By: *Kevin Colleran*
Name: Kevin Colleran
Its: Managing Director

**Instructions to Purchaser:** Please do <u>not</u> fill in any blanks other than the signature line. The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November [__], 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). ____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

**PURCHASER:**

**ROBERT DAVIS NOELL AND
STACEY WILSON NOELL**

By: _____

Name:  Robert Davis Noell

By: _____

Name:  Stacey Wilson Noell

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares  upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

**LIST OF EXHIBITS**

Exhibit                    Document

Exhibit A          –          Schedule of Purchasers

Exhibit B          –          Form of Restated Certificate of Incorporation

Exhibit C          –          Disclosure Schedule

Exhibit D          –          Form of Investors' Rights Agreement

Exhibit E          –          Form of Right of First Refusal and Co-Sale Agreement

Exhibit F          –          Form of Voting Agreement

Exhibit G          –          Form of Legal Opinion of Company Counsel

Exhibit H          –          Form of LoC

Exhibit I          –          Form of Warrant

Exhibit J          –          Form of Equity Funding Request

Exhibit K          –          Stock Power and Assignment Separate from Certificate

## EXHIBIT A

### Schedule of Purchasers

**Initial Closing: November 21, 2018**

| Name and Address of Purchaser | Shares of Series 1 Preferred Stock | Shares of Series 1 Preferred Stock Issued for Cancellation of Notes | Shares of Common Stock Issued for Cancellation of Notes | Cancellation of Indebtedness* | Total Purchase Price |
|---|---|---|---|---|---|
| **FO2 LLC**<br>Reginald D. Fowler, Manager<br>9920 South Rural Road #108-95<br>Tempe, AZ  85284<br>Mobile: (480) 567-5753<br>Office Tel: (480) 961-9610<br>Office Fax: (480) 961-9614<br>Email:  fo2@spiral-global.com<br><br>With a copy to:<br><br>Jim Davis<br>9920 South Rural Road #108-95<br>Tempe, AZ  85284<br>Mobile:  (318) 816-6968<br>Office Tel:  (480) 961-9610<br>Office Fax: (480) 961-9614<br>Email:  jim@spiral-kairos.com | 10,864,133 | | | - | $49,999,999.31 |

| | | | | |
|---|---|---|---|---|
| **Shaquille O'Neal Revocable Trust Agreement, dated January 27, 1995 as Amended And Restated On March 10, 2016, Lester J. Knispel and Shaquille R. O'Neal, Trustees or Registered Assigns** [Address] | | 27,341 | 5,507 | $125,832.20 | $125,832.20 |
| **Remar Investments, LP, a Nevada Limited Partnership** [Address] | | 218,514 | 44,013 | $1,005,671.24 | $1,005,671.24 |
| **Robert Davis Noell and Stacey Wilson Noell** [Address] | | 21,851 | 4,401 | $100,567.13 | $100,567.13 |
| **Ebersol-Saint James Family Trust Dated November 14, 2007** [Address] | | 1,094,539 | 220,461 | $5,037,397.27 | $5,037,397.27 |
| **Alan Kantowitz** 8 10th Street #702 San Francisco, CA 94103 | | 4,368 | 879 | $20,103.57 | $20,103.57 |
| **Kenneth Kantowitz** 355 East 72 St., Apt. 10J New York, NY 10021 | | 4,384 | 884 | $20,180.83 | $20,180.83 |
| **Krinick ASC Holdings LLC** 6844 Queenferry Circle Boca Raton, FL 33496 | | 32,884 | 6,623 | $151,343.84 | $151,343.84 |
| **RAB 175 Acquisitions LLC** [Address] Email: bobbowman4@gmail.com | | 54,887 | 11,056 | $252,609.59 | $252,609.59 |

| | | | | | |
|---|---|---|---|---|---|
| **Mark V. Houghton-Berry**<br>Corner Green, South Drive<br>Virginia Water<br>Surrey GU25 4JS<br>United Kingdom<br>Email: markvhb@yahoo.com | | 219,640 | 44,239 | $1,010,849.32 | $1,010,849.32 |
| **Plexo Capital I, L.P.**<br>[Address]<br>Email: lo@plexocap.com | | 55,097 | 11,098 | $253,575.35 | $253,575.35 |
| **The Mila Kutcher/Ashton Kutcher Family Trust**<br>[Address]<br>Email: a@aplus.com | | 22,105 | 4,452 | $101,734.25 | $101,734.25 |
| **M Ventures Fund II, LP**<br>6255 Sunset Blvd., Suite 1060<br>Los Angeles, CA 90028<br>Email: mike@m.ventures | | 55,249 | 11,128 | $254,273.98 | $254,273.98 |
| **The Founders Fund VI, LP**<br>1 Letterman Drive, Bldg. D, 5th Floor<br>San Francisco, CA 94129<br>Email: npai@foundersfund.com | | 520,652 | 96,257 | $2,396,200.61 | $2,396,200.61 |
| **The Founders Fund VI Principles Fund, LP**<br>1 Letterman Drive, Bldg. D, 5th Floor<br>San Francisco, CA 94129<br>Email: npai@foundersfund.com | | 128,739 | 23,801 | $592,500.03 | $592,500.03 |

| | | | | |
|---|---|---|---|---|
| **The Founders Fund VI Entrepreneurs Fund, LP** 1 Letterman Drive, Bldg. D, 5th Floor San Francisco, CA 94129 Email: npai@foundersfund.com | | 6,472 | 1,197 | $29,792.54 | $29,792.54 |
| **Slow Ventures III, LP** 1006 Kearny Street San Francisco, CA 94133 Email: kevin@slow.co backoffice@slow.co | | 288,577 | 50,925 | $1,328,119.26 | $1,328,119.26 |
| **Slow Ventures III-A, LP** 1006 Kearny Street San Francisco, CA 94133 Email: kevin@slow.co backoffice@slow.co | | 15,718 | 2,774 | $72,341.02 | $72,341.02 |
| **Moorad Sports Partners LLC** [Address] | | 217,514 | 38,385 | $1,001,068.50 | $1,001,068.50 |
| **David S Pottruck Revocable Trust** [Address] | | 434,815 | 76,732 | $2,001,150.69 | $2,001,150.69 |
| **Kids 42 Investments, L.P.** [Address] | | 21,735 | 3,836 | $100,032.88 | $100,032.88 |
| **TOTALS:** | **10,864,133** | **3,445,081** | **658,648** | **$15,855,344.1** | **$65,855,343.41** |

\* All principal due and accrued interest shall be converted into Shares as set forth on this table.  Any additional amounts owed under any instruments of indebtedness converted into Shares under this Agreement are waived.

**<u>EXHIBIT B</u>**

**Form of Restated Certificate of Incorporation**

## EXHIBIT C

**Disclosure Schedule**

**November 21, 2018**

This Disclosure Schedule (this "***Disclosure Schedule***") is delivered by Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), in connection with the sale of shares of the Company's Series 1 Preferred Stock on or about the date hereof pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 by and among the Company and the investors listed on Exhibit A to the Agreement (the "***Agreement***"). This Disclosure Schedule is arranged in sections corresponding to the numbered and lettered sections contained in Section 2 of the Agreement, and the disclosures in any section of this Disclosure Schedule shall qualify other sections in Section 2 of the Agreement to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections.  Where any representation or warranty is limited or qualified by the materiality of the matters to which the representation or warranty are given, the inclusion of any matter in this Disclosure Schedule does not constitute a determination by the Company that such matter is material.  Unless otherwise defined herein, any capitalized terms in this Disclosure Schedule shall have the same meanings assigned to such terms in the Agreement.  Nothing in this Disclosure Schedule constitutes an admission of any liability or obligation of the Company to any third party, or an admission against the Company's interests.

## <u>EXHIBIT D</u>

**Form of Investors' Rights Agreement**

**EXHIBIT E**

**Form of Right of First Refusal and Co-Sale Agreement**

## **EXHIBIT F**

**Form of Voting Agreement**

**<u>EXHIBIT G</u>**

**Form of Legal Opinion**

**<u>EXHIBIT H</u>**

**Form of LoC**

**<u>EXHIBIT I</u>**

**Form of Warrant**

**EXHIBIT J**

**Form of Equity Funding Request**

**EQUITY FUNDING REQUEST**

[Date]

FO2 LLC
Reginald D. Fowler, Manager
9920 South Rural Road #108-95
Tempe, AZ  85284
Mobile: (480) 567-5753
Office Tel: (480) 961-9610
Office Fax: (480) 961-9614
Email:  fo2@spiral-global.com

With a copy to:

Jim Davis
9920 South Rural Road #108-95
Tempe, AZ  85284
Mobile:  (318) 816-6968
Office Tel:  (480) 961-9610
Office Fax: (480) 961-9614
Email:  jim@spiral-kairos.com

**Re: Equity Funding Request**


The undersigned authorized officer of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), pursuant to the terms of the attached Series 1 Preferred Stock Purchase Agreement dated November 21, 2018 (the "***Purchase Agreement***"), hereby instructs Fowler to pay the Company, by wire transfer to the Company account at the below wire instructions, an Additional Fowler Funding amount equal to $_____ within one (1) Business Day of the date of this Equity Funding Request. After payment by Fowler to the Company of such Additional Fowler Funding Amount, the Total Fowler Funding Amount will equal $_____ and the number of Unfunded Fowler Shares will equal _____. Capitalized terms used in this Equity Funding Request and not otherwise defined shall have the meanings ascribed to them in the Purchase Agreement.

*COMPANY WIRE INSTRUCTIONS:*

Bank Name: Silicon Valley Bank
Type: Checking
Routing #: 121140399
Account #: 3302322308
Account Name: Ebersol Sports Media Group

**EBERSOL SPORTS MEDIA GROUP, INC.**

By: _____

Name: _____

Title: _____

-ii-

**EXHIBIT K**

**Stock Power and Assignment Separate from Certificate**

## STOCK POWER AND ASSIGNMENT

## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Series 1 Preferred Stock Purchase Agreement dated as of November 21, 2018 (the "***Agreement***"), the undersigned hereby sells, assigns and transfers unto _____, _____ shares of the Series 1 Preferred Stock, $0.00001 par value per share, of Ebersol Sports Media Group, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____ delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company. *THIS ASSIGNMENT MAY ONLY BE USED AS AUTHORIZED BY THE AGREEMENT AND ANY EXHIBITS THERETO.*

Dated: _____

PURCHASER

**FO2 LLC**

_____
(Signature)

_____
(Please Print Name)

_____
(Title)

**Instructions to Purchaser:**  Please do <u>not</u> fill in any blanks other than the signature line.  The purpose of this Stock Power and Assignment is to enable the Company and/or its assignee(s) to acquire the Unfunded Fowler Shares upon the occurrence of a "Forfeiture Trigger" set forth in Section 1.4.3 of the Agreement without requiring additional signatures on the part of the Purchaser.

34405/00013/FW/10292784.7

## LINE OF CREDIT AGREEMENT

1.  **DATE:**  November 21, 2018 (the "***Effective Date***").

2.  **MAXIMUM CREDIT AMOUNT:   FO2 LLC, a Delaware limited liability company** ("***Lender***"), hereby establishes a line of credit (the "***Line of Credit***") in favor of **EBERSOL SPORTS MEDIA GROUP, INC.**, a Delaware corporation ("***Borrower***"), in the aggregate principal amount not to exceed One Hundred Twenty Million Dollars ($120,000,000) at any one time outstanding (the "***Maximum Credit Amount***").

3.  **LOANS**:

    (a)      The parties hereto agree that subject to, and upon the terms and conditions of this Line of Credit Agreement (as the same may from time to time be amended, modified, extended, renewed or restated, this "***Agreement***"), Lender will make loans to Borrower or for the benefit of Borrower under the Line of Credit (each a "***Loan***", and collectively, the "***Loans***") from time to time prior to the Termination Date (defined below).  Loans may be borrowed and repaid, in whole or in part; provided that no Loan shall be made if, before or after the making of such Loan, the aggregate outstanding principal amount of all Loans as of such date would exceed the Maximum Credit Amount.  The Borrower may not reborrow the principal amount of any Loan after repayment or prepayment thereof.  The Loans do not bear interest.

    (b)      Loans will be made in increments of Fifteen Million Dollars ($15,000,000) (a "***Standard Draw Amount***").  Loans made by Lender pursuant to this Agreement shall be evidenced by and paid in accordance with this Agreement and such other agreements, documents and/or instruments as may be reasonably required from time to time by Lender, in each case, in form and substance reasonably acceptable to Lender (collectively, along with this Agreement and the Fowler Warrant (as defined below), the "***Loan Documents***").

    (c)      Borrower authorizes Lender to rely on telephonic, telegraphic, telecopy, email or written instructions of any person identifying himself as a manager or officer of Borrower, and on any signature which Lender in good faith believes to be genuine, and Borrower shall be bound thereby in the same manner as if such person were actually authorized or such signature were genuine.  Borrower also hereby agrees to defend and indemnify Lender and hold Lender harmless from and against: (i) any and all claims, demands, damages, and liabilities (collectively, "***Claims***") claimed or asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (ii) any and all losses or expenses (including, without limitation, reasonable out-of-pocket attorneys' fees and expenses) in any way suffered, incurred, or paid by Lender relating to or arising out of or in connection with the acceptance of instructions for making Loans or repayments under the Line of Credit and the Loan Documents, except for Claims and/or losses directly caused by Lender's gross negligence or willful misconduct.

    (d)      Commencing on the Effective Date, Lender shall make each Loan requested by Borrower, for one or more Standard Draw Amounts, by wire transfer of immediately available funds to the account of Borrower designated in writing by Borrower by notice to Lender promptly, and in any case not more than ten (10) calendar days after the date Borrower delivers a written notice to Lender (each, a "***Draw Request***") to make such Loan, subject to the Budget Deficit Provision (as defined below). Following Lender's delivery of each Standard Draw Amount(s) to Borrower in connection with a Draw Request, Lender will receive an increased Local Revenue Share (as defined below) with respect to a Selected Team (as defined below) as set forth in paragraph (b) of the section titled "Local Team Revenue Share" and certain shares subject to the Fowler Warrant shall become exercisable, on the terms and conditions set forth therein.

    (e)      Lender and Borrower shall each record the date and amount of all Loan disbursements and all payments of principal in the records it maintains with respect thereto.  Borrower's books and

records showing the account between Lender and Borrower shall be admissible in evidence in any action or proceeding and shall constitute prima facie proof of the items therein set forth absent manifest error.

(f)      Borrower may submit Draw Requests pursuant to a predetermined schedule/budget to be approved by the Financing Committee (as defined below), which shall contain reasonable financial triggers designed to give Lender adequate notice ahead of each Draw Request and to tie Borrower's submission of Draw Requests to its financial needs.

(g)      Lender agrees to maintain funds available under the Line of Credit at a US licensed banking institution, in a form with adequate liquidity sufficient to meet each Draw Request.

(h)      Borrower may prepay any Loan at any time, in any amount, without penalty and without the consent of Lender.

## 4.   LOCAL TEAM REVENUE SHARE:

(a)      Until the Termination Date, Lender will have the right to receive a baseline of fifteen percent (15%) of the local revenue attributable solely to each of Borrower's first eight football teams (each an "*Initial Team*" and collectively, the "*Initial Teams*"), including all net revenue generated by home game ticket sales, local sponsorships and merchandise, all local online and television platform and distribution but excluding all amounts attributable to Borrower's professional football league (the "*League*") as a whole, which shall include national television platform and distribution revenue associated with the Initial Teams (with respect to each Initial Team, the "*Local Revenue Share*"). For the avoidance of doubt, any payments delivered by Borrower to Lender as Local Revenue Share payments will not serve as repayment of any Standard Draw Amount.

(b)      Until the Termination Date, each time Borrower borrows a Standard Draw Amount, the Local Revenue Share of one Initial Team selected by mutual agreement between Borrower and Lender (in each case, the "*Selected Team*") will be increased from the baseline fifteen percent (15%) of local revenue (as described above) to thirty percent (30%) of local revenue (as described above) for the Selected Team. Subsequently, upon Lender's receipt of aggregate Local Revenue Share payments in respect of a Selected Team equaling the Standard Draw Amount, the Local Revenue Share of such Selected Team will return to the baseline fifteen percent (15%).

(c)      If Borrower sells a Fanchise License for an Initial Team after the Effective Date (a "*Fanchised Initial Team*"), (i) Borrower shall use the proceeds from the sale of such Franchise License to repay any Standard Draw Amounts (in $15,000,000 increments) outstanding under this Line of Credit and (ii) (A) if the Initial Team is a Selected Team, upon repayment of all or a portion of the Standard Draw Amount associated with such Selected Team, the Local Revenue Share percentage for such Fanchised Initial Team will be decreased in the same proportional amount as the repayment amount of the applicable Standard Draw Amount, and (b) if the Initial Team is not a Selected Team, the Local Revenue Share for such Fanchised Initial Team will be decreased to zero percent (0%).

(d)      Upon repayment in full of a Standard Draw Amount associated with a Selected Team (regardless of whether in connection with the sale of a Franchise License), the Local Revenue Share for such Selected Team will be decreased to zero percent (0%).

(e)      In the event that Lender denies funding on any Draw Requests pursuant to the Budget Deficit Provision, no Local Revenue Share payments shall be due to Lender on any Initial Teams that are not then Selected Teams until such time as Lender funds on Borrower's next Draw Request.

(f)      *This paragraph (f) is solely intended to provide an illustrative example of how Draw Requests, Local Revenue Share, and a Budget Deficit Event may interact:* Borrower has made, and Lender has funded, two Draw Requests, each for one Standard Draw Amount. Lender will have the right to receive a 30% Local Revenue Share payment on two Selected Teams and the baseline 15% Local

Revenue Share payment on the other six Initial Teams that are not Selected Teams. A Budget Deficit Event then occurs, and Lender exercises its right to deny funding on Borrower's next Draw Request. Lender continues to receive the 30% Local Revenue Share payment on the two Selected Teams, but stops receiving the 15% Local Revenue Share payment on the other six Initial Teams. Borrower then makes a subsequent Draw Request, which Lender funds. Lender would then receive the 30% Local Revenue Share payment on the three Selected Teams, and the 15% Local Revenue Share payment on the other five Initial Teams.

**5.   REPRESENTATIONS AND WARRANTIES**:  Borrower represents and warrants to Lender that: (a) Borrower is a corporation duly incorporated, validly existing and in good standing under the laws of the state of its incorporation; (b) that the material facts as to this Agreement and Reginald D. Fowler's relationship or interests in Borrower, both as a member of Borrower's Board of Directors (the "***Board***") and as a stockholder, have been fully disclosed and are known to the Board, and the Board in good faith authorized Borrower to execute this Agreement and the transactions contemplated herein by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors may be less than a quorum; and that Borrower and its Board further acknowledge that this Agreement is fair as to the Board and its stockholders as of the time it is authorized, approved or ratified by the  Board and executed by Borrower; (c) the execution, delivery and performance by Borrower of the Loan Documents (i) are within the corporate powers of Borrower, (ii) have been duly authorized by all necessary corporate action on the part of Borrower, (iii) require no consent, approval or authorization of, action by or in respect of or filing or recording with any governmental or regulatory body, instrumentality, authority, agency or official or any other person or entity and (iv) do not conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under or result in any violation of, the terms of the certificate of incorporation, by-laws or other organizational documents of Borrower, as applicable, or any applicable law, rule, regulation, order, writ, judgment or decree of any court or governmental or regulatory body, instrumentality, authority, agency or official to which Borrower is a party or by which Borrower is bound; and (d) the Loan Documents have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligation of Borrower and are enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**6.   COVENANTS**:  Borrower covenants and agrees with Lender as follows:

(a)      Borrower will keep proper books of record and account that present, fairly in all material respects, Borrower's financial condition and results of operations and will furnish to Lender such financial information reasonably requested by Lender from time to time.

(b)      While any Loans (or portions thereof) are outstanding, Borrower will establish and maintain a Financing Committee which will provide financial oversight regarding the Line of Credit, including the pre-approval of the Borrower's budget to be finally approved by the Board (the "***Budget***") that, among other things, sets the basis of the Draw Requests, the delivery of Draw Requests, the extension of the Line of Credit and any material modifications of the terms of the Line of Credit. Borrower will present unaudited financial statements to the Financing Committee on a monthly basis, which will include a report on the variance between actual financial results against the corresponding items in the Budget. In the event that any material category of revenue or expense reported in such financial statements misses the corresponding item in the Budget by more than the greater of three percent (3%) and $100,000, Borrower will within thirty (30) days advise Lender of Borrower's plans to eliminate or materially mitigate the Budget deficit. If the Budget deficit reaches or exceeds the greater of five

percent (5%) and $170,000 (a "***Budget Deficit Event***"), Lender, in its sole discretion, may upon thirty (30) days' notice elect to deny funding on any Draw Requests until the Budget Deficit Event is remediated (the "***Budget Deficit Provision***"). The initial members and co-chairs of the Financing Committee will be Reggie Fowler, Charlie Ebersol and Borrower's Chief Financial Officer, when such person is hired, or another appropriate finance or operations officer. While any Loans (or portions thereof) are outstanding, Lender shall have the option to appoint a replacement for the position on the Financing Committee initially filled by Reggie Fowler, which said appointment will serve as co-chair of the Finance Committee and be accepted by Borrower.

(c)    Borrower will (i) preserve and maintain its corporate existence and all of its rights, privileges and franchises reasonably necessary to the conduct of its business, and (ii) conduct its business activities in compliance with all applicable laws, the violation of which would reasonably be expected to result in a material adverse effect on the Company's business.

(d)    Borrower will notify Lender in writing of any of the following promptly describing the same and, if applicable, the steps being taken by the person(s) or entity(ies) affected with respect thereto: (i) the occurrence of any Event of Default (defined below); (ii) any change in the name of Borrower; (iii) the occurrence of any Change of Control Event; and (iv) the occurrence of such other events as Lender may from time to time reasonably specify. "***Change of Control Event***" means the acquisition of, or, if earlier, the shareholder or director approval of the acquisition of, ownership or voting control, directly or indirectly, beneficially of record, by any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934, as amended), of more than 50% of the outstanding voting shares of Borrower.

(e)    Borrower will promptly upon request, execute and deliver to Lender, at any time and from time to time, any and all further agreements, documents and instruments, and take any and all further actions which may be required under applicable law, or which Lender may from time to time reasonably request, in order to effectuate the transactions contemplated by this Agreement and the other Loan Documents.

**7.    TERMINATION DATE**:  Unless terminated sooner pursuant to the terms of the Loan Documents, the Line of Credit will remain in effect until the earlier of (a) the three (3) year anniversary of the Effective Date (the "***Termination Date***"), subject to two (2) additional mutually agreed upon one-year extensions and (b) the date that all borrowed Standard Draw Amounts are repaid in full. On the Termination Date, the Line of Credit will terminate and Borrower may not submit any additional Draw Requests. Standard Draw Amounts outstanding as of the Termination Date will be repaid no later than five (5) years from the Effective Date, during which time all Local Revenue Share percentages due and owing to Lender for any Initial Teams or Selected Teams shall continue to be paid according to this Agreement.

**8.    EVENTS OF DEFAUT**:  The occurrence of any of the following will constitute an "Event of Default" under this Agreement:

(a)    The failure to pay when due any principal, fees or other charges hereunder or under this Agreement or any other Loan Document.

(b)    Any representation or warranty made by Borrower under this Agreement or any other Loan Document proves to be incorrect, false or misleading, in each case, in any material respect when furnished or made.

(c)    Any material default in the performance of or compliance with any obligation, agreement or other provision of this Agreement or of any other Loan Document (other than those specifically described

as an "Event of Default" in this section), and with respect to any such default which by its nature can be cured, such default will continue for a period of thirty (30) days after the earlier of (i) receipt by Borrower of written notice from Lender of such default, or (ii) actual knowledge of an executive officer of Borrower of such default.

(d)      Borrower becomes insolvent, or suffers or consents to or applies for the appointment of a receiver, trustee, custodian or liquidator of itself or any of its property, or generally fails to pay its debts as they become due, or makes a general assignment for the benefit of creditors; Borrower files a voluntary petition in bankruptcy, or seeking reorganization, in order to effect a plan or other arrangement with creditors or any other relief under the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time (the "***Bankruptcy Code***"), or under any state or federal law granting relief to debtors, whether now or hereafter in effect; or Borrower files an answer admitting the jurisdiction of the court and the material allegations of any involuntary petition; Borrower is adjudicated a bankrupt, or an order for relief is entered against Borrower by any court of competent jurisdiction under the Bankruptcy Code or any other applicable state or federal law relating to bankruptcy, reorganization or other relief for debtors which has not been stayed or dismissed within forty-five (45) days of the filing; or any involuntary petition or proceeding pursuant to the Bankruptcy Code or any other applicable state or federal law relating to bankruptcy, reorganization or other relief for debtors is filed or commenced against Borrower which has not been stayed or dismissed within forty-five (45) days of the filing.

(f)      The occurrence of any of the following events or conditions: (i) the entry of any judgment or decree against Borrower resulting in a monetary judgement(s) not covered by insurance in an amount in excess of One Million Dollars ($1,000,000) individually or in the aggregate or any form of equitable relief which would reasonably be expected to have a material adverse effect on the business and such judgment or decree shall not have been vacated, discharged or stayed pending appeal within sixty (60) days from the entry thereof; or (ii) the service of a notice of levy and/or of a writ of attachment or execution, or other like process, against the assets of Borrower.

(g)      The dissolution or liquidation of Borrower; or Borrower or any of its managers, directors, stockholders or members, shall take action seeking to effect the dissolution or liquidation of Borrower.

(i)      The occurrence of any Change of Control Event.

(j)      Any sale, lease, transfer or other disposition of all or substantially all of the assets of Borrower, except in the ordinary course of its business.

**9.    RIGHTS AND REMEDIES**:  Upon the occurrence of any Event of Default, Lender may declare all Loans outstanding hereunder to be immediately due and payable without presentment, demand, notice of nonperformance, notice of protest, protest or notice of dishonor, all of which are expressly waived by Borrower; provided that upon the occurrence of an Event of Default described in clause (d) of the previous Section, the Maturity Date shall automatically accelerate without any action by Lender and the principal outstanding hereunder shall at once be due and payable. Borrower shall pay to Lender immediately upon demand the full amount of all payments, advances, charges, and expenses, including reasonable out-of-pocket attorneys' fees and expenses, expended or incurred by Lender in connection with the enforcement of Lender's rights and/or the collection of any amounts which become due to Lender under this Agreement, whether or not suit is brought, and the prosecution or defense of any action in any way related to this Agreement, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Lender or any other person) relating to Borrower or any other person or entity.  Upon the occurrence of any Event of Default, and until Borrower pays to Lender the full amount

of all payments, advances, charges, and expenses, including reasonable out-of-pocket attorneys' fees and expenses, expended or incurred by Lender in connection with the enforcement of Lender's rights and/or the collection of any amounts due to Lender under this Agreement,  Lender shall continue to receive payment of all Local Revenue Share percentages due and owing Lender under the terms of this Agreement, in addition to all other amounts owed, for any Initial Teams or Selected Teams, which said continuing payment obligations shall survive any Event of Default.

**10.  NOTICES**: All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next Business Day delivery, with written verification of receipt.  Any party may change its mailing address, or email address by giving the other party written notice thereof.

If to Borrower:

Ebersol Sports Media Group, Inc.
149 New Montgomery Street
San Francisco, CA 94105
Attn:    Chief Executive Officer
Email:   charlie@aaf.com


with a copy, which will not constitute notice, to:

Fenwick & West LLP
801 California Ave.
Mountain View, CA 94041
Attn:    Dawn Belt
Email:   dbelt@fenwick.com

If to Lender:

FO2 LLC
Reginald D. Fowler, Manager
9920 South Rural Road #108-95
Tempe, AZ  85284
Mobile: (480) 567-5753
Office Tel: (480) 961-9610
Office Fax: (480) 961-9614
Email:  fo2@spiral-global.com

With a copy to:

Jim Davis
9920 South Rural Road #108-95
Tempe, AZ  85284
Mobile:  (318) 816-6968
Office Tel:  (480) 961-9610
Office Fax: (480) 961-9614

34405/00600/FW/10396669.4

Email: jim@spiral-kairos.com

**11. AMENDMENTS**:  This Agreement may not be amended or renewed except by an instrument in writing signed by Lender and Borrower.

**12. BINDING EFFECT; ASSIGNMENT**:  This Agreement is binding upon and for the benefit of the successors and permitted assignees of each party; provided that (a) Borrower may not assign any rights under this agreement without Lender's prior written consent and (b) Lender may not assign any rights under this Agreement without Borrower's prior written consent, other than to Lender's Affiliate. For purposes of this Agreement, "***Affiliate***" shall mean respect to Lender, Lender's principal or any other person who or which, directly or indirectly, controls, is controlled by, or is under common control with Lender or Lender's principal, including, without limitation, any general partner, managing member or partner, officer or director of Lender or such Lender's principal.  For purposes of this definition, the terms "***controlling***," "***controlled by***," or "***under common control with***" shall mean the possession, directly or indirectly, of (a) the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise, or (b) the power to elect or appoint at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such person.

**13. GOVERNING LAW:** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

**14. HEADINGS; INTERPRETATION**: The headings and captions used in this Agreement are used only for convenience and are not to be considered in construing or interpreting this Agreement.  In this Agreement, (a) the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined; (b) the captions and headings are used only for convenience and are not to be considered in construing or interpreting this Agreement and (c) unless otherwise expressly indicated in any particular instance, the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation". All references in this Agreement to sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by this reference.  All references in this Agreement to "Dollars" or "$" are United States Dollars.

**15. SEVERABILITY**:  If one or more provisions of this Agreement are held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

**16. ENTIRE AGREEMENT**: This Agreement, together with all exhibits and schedules hereto, and the other Loan Documents, constitute the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersede any and all prior negotiations, correspondence, agreements, understandings duties or obligations between any of the parties with respect to the subject matter hereof.

**17. WAIVER.**  The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right to enforce that provision or any other provision hereof at any time thereafter.

**18. COUNTERPARTS; FACSIMILE SIGNATURES**:  This Agreement may be executed and delivered by facsimile or electronic signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts

may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

34405/00600/FW/10396669.4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**BORROWER**:

**EBERSOL SPORTS MEDIA GROUP, INC.**

By:_____
Name:    Charlie Ebersol
Title:     Chief Executive Officer

**LENDER**:

**FO2 LLC**

By:_____
Name: _____
Title: _____

[Signature Page to Line of Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**BORROWER**:

**EBERSOL SPORTS MEDIA GROUP, INC.**

By:_____
Name:    Charlie Ebersol
Title:     Chief Executive Officer

**LENDER**:

**FO2 LLC**

By:_____
Name:    Reggie Fowler
Title:     CEO

[Signature Page to Line of Credit Agreement]





## STANDARD PLAYER AGREEMENT

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "Alliance"), and ███████ ("Player") (this "Agreement" or "Standard Player Agreement" or "SPA") with regard to the use by the Alliance of Player's personal services and expertise as a professional football player and Player's Likeness on, and in connection with, the Embodiments, Promotional Rights and Non-Commercial License (as defined below).

By executing this Agreement, Player expressly agrees to be bound by (i) all terms and conditions set forth in this SPA; (ii) all terms and conditions set forth in the Standard Terms and Conditions of the SPA as set forth in the attached Exhibit A, which is incorporated herein by this reference (as may be amended, altered or modified from time to time, "Exhibit A") (collectively, the SPA and Exhibit A shall be referred to herein as the "SPA," the "Standard Player Agreement" or the "Agreement") and (iii) the terms and conditions of employment applicable to Alliance players (as may be amended, altered or modified from time to time, the "Football Administration Manual").  The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or condition in this Agreement, provided that the SPA, Exhibit A and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein and provided, further, that the parties to this Agreement may agree upon terms over and above the minimum requirements established in the Football Administration Manual.  All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in Exhibit A or the Football Administration Manual, as applicable.

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in the SPA and any other addenda, schedules, and exhibits hereto (which are all incorporated in this Agreement by this reference), the parties agree as follows:

A.      **CONTRACT PERIOD:** The term of this Agreement shall commence on the last date set forth on the signature page below (the "Effective Date") and shall end three (3) years after the Effective Date on the final day of the applicable League Year (as defined in the Football Administration Manual) (the "Contract Period").

B.      **GRANT OF PROMOTIONAL RIGHTS:** Player hereby acknowledges and confirms his grant to the Alliance of the right to use Player's Likeness on and in connection with the Embodiments, Promotional Rights and the Non-Commercial License as such terms are defined and set forth herein.

C.      **BASE COMPENSATION:** Subject to the Effective Date, the Payment Period (as defined in the Football Administration Manual), and Player's compliance with the terms and conditions of employment set forth in the Football Administration Manual, the Alliance shall pay Player an annual base compensation in the amount set forth opposite the contract

year indicated below (subject to any withholdings and other applicable payroll deductions required by law, "Base Compensation") in ten (10) equal payments during the applicable regular season:

| League Year | Base Compensation |
|---|---|
| 2019 | $70,000 |
| 2020 | $80,000 |
| 2021 | $100,000 |

Notwithstanding the foregoing, Player shall receive a per diem payment for each day that Player participates in a day of Designated Team Activities ("DTA") as designated by the Alliance or the team to which Player is allocated by Alliance. The amount of per diem payments shall be equal to the amount set forth in the Football Administration Manual. Where applicable, the Alliance may, in its sole discretion, provide meal, lodging and transportation for Player in connection with Player's participation in any DTA and as an offset to the amounts set forth in the Football Administration Manual.

D. **BONUSES:** In addition to Base Compensation, the Alliance may elect to pay Player the following bonuses as set forth in the Football Administration Manual:

1. Player will be eligible to receive a performance bonus if Player satisfies certain statistical or performance targets as established and awarded by Player's Alliance team;

2. Player will be eligible to receive a post-secondary education tuition stipend for each year that Player completes with the Alliance (in accordance with the applicable Alliance program); and

3. Player may be eligible to receive additional bonuses, as determined and established in the sole discretion of the Alliance, which will be determined by, among other things, Player's personal performance and the performance of the Alliance.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Alliance of American Football Standard Player Agreement as of the last date set forth below.

**AAF PLAYERS, LLC**



By:

Name:  JK McKay

Its:   Head of Football Operations

**PLAYER**

Name:

Signature:

Date of Birth:

Street Address:

City, State or Province, Zip Code and Country:

U.S. Social Security # or Canadian Social Insurance:

Telephone:

Email:

Date:

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:

Street Address:        N/A

City, State or Province, Zip Code and Country: N/A

Telephone:

Email:

Date:



**EXHIBIT A**

**STANDARD TERMS AND CONDITIONS TO THE
ALLIANCE OF AMERICAN FOOTBALL STANDARD PLAYER AGREEMENT**

These Standard Terms and Conditions (these "Terms and Conditions") are hereby incorporated into the Alliance of American Football Standard Player Agreement (the "SPA") and are subject to the rules, regulations and policies of the Alliance as set forth in the "Football Administration Manual" (which may be amended from time to time). The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or provision of the SPA, provided that the SPA and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein, and provided, further, that the parties to the SPA may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the SPA or the Football Administration Manual, as applicable.

1.      Compensation and Player Category. During the Contract Period, the Alliance shall employ Player as a skilled professional football player and the Alliance shall compensate Player as set forth in Sections C and D of the SPA and below. Player acknowledges that the Alliance has no responsibility to render tax advice and assumes no responsibility with respect to Player's tax obligations.

(a)      Unless otherwise agreed to in writing, if the SPA is executed (or Player is activated) after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation becoming due and payable after he is activated. If the SPA is terminated after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation having become due and payable up to the time of termination.

(b)      Prior to and following the Contract Period, Player will not be employed by the Alliance and will not be covered by workers' compensation insurance or by any other insurance or employee benefit of the Alliance (including health insurance).

2.      Player Obligations. In addition to complying with the obligations set forth in the Football Administration Manual, at all times during the Contract Period, Player shall:

(a)      give his best efforts and loyalty to the Alliance and conduct himself on and off the field with appropriate recognition and acknowledgment of the fact that the success of professional sports organizations is dependent upon the public's respect for those associated with the game and upon the public's confidence in the integrity of Alliance games. Player will report promptly for and participate fully in all Alliance mandatory mini-camp(s), preseason training camp(s), all Alliance and Alliance team meetings and practice sessions and all pre-season, regular season and post-season football games scheduled for or by the Alliance. If invited, Player will practice for and play in any all-star football game sponsored by the Alliance;

(b)      not play football or attempt to play any type of football (i.e., indoor or outdoor, regardless of the surface) for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance, which may be given or withheld in the Alliance's sole and absolute discretion;

(c)      be in default or in violation of his obligations under the SPA or the Football Administration Manual if Player, without the prior written consent of the Alliance, fails or refuses to report to an Alliance team as allocated by the Alliance or fails to practice with or play for an Alliance team to which he has been allocated or leaves such Alliance team for any reason, other than Player's injury (as certified by Alliance physicians) or death;

(d)      maintain a high level of physical and mental conditioning and competitive skills, not engage in alcohol abuse, not use prohibited substances or any other substances in contravention of the law or the Alliance policies applicable to Player and generally develop and maintain a physical and mental readiness necessary to play for the Alliance. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Alliance or fails to make the required full and complete disclosure and good faith responses to any Alliance physician, then the Alliance may terminate the SPA;

(e)      authorize and hereby authorizes and consents to the Alliance and all Alliance physicians to use and disclose such Player's complete health information (whether obtained by Alliance physicians or provided by other Player physicians) for use in physical condition assessments, determination and treatment of injuries and insurance purposes;

(f)      serve as a spokesman for the Alliance and the team to which Player is allocated by the Alliance when reasonably requested and only as directed, by the Alliance, to do so;

(g)      comport and conduct himself at all times, both on and off the field, to a high standard of honesty, fair play and sportsmanship and in a manner befitting his position as a representative of the Alliance and the team to which Player is allocated by the Alliance and be in compliance with all applicable laws;

(h)      refrain from conduct which is, or may be, detrimental to the best interest of the Alliance or Alliance teams, reputation, character or standing of the Alliance, Alliance teams or any of its affiliates or conduct that undermines the public's confidence in the Alliance and its games; and

(i)      submit to testing for performance-enhancing substances and participate in mental health screening and treatment in accordance with the Alliance policies.

3.      <u>Conditions to Effectiveness of Agreement</u>.  If performance of this Agreement or of any obligation hereunder by the Alliance is prevented or substantially restricted or interfered with by reason of an event of "Force Majeure" (defined below) or by reason of a material business interruption, the Alliance, upon giving notice to the Player, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference.  The Alliance shall use its reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder whenever such causes are removed.  "<u>Force Majeure</u>" means fire, earthquake, flood, or other casualty or accident; strikes or labor disputes; war, civil strife or other violence; any law, any change in law, order,

proclamation, regulation, ordinance, action, demand, action or requirement of any government agency or utility; or any other act or condition beyond the reasonable control of the Alliance.

4.    Exclusive Compensation.  Player shall not be permitted to receive any payments or other benefits from any team or team operator or any other entity or person related to or affiliated with the Alliance, in exchange for the services provided by Player under the SPA (or any other agreement entered into between Player and the Alliance).  In the event that Player receives any payments or other benefits (except for per diem payments, travel-related expenses, approved lodging and meal expenses or other payments that are approved in writing by the Alliance) from any team or team operator or any other entity or person related to or affiliated with the Alliance, Player shall promptly disclose such payments or benefits to the Alliance or the team to which Player has been allocated by the Alliance.  In the event of any dispute under this Section 4, Player shall have the burden to show that such payment or benefit (i) was not received in exchange for the services provided by Player under the SPA, or the Football Administration Manual; and (ii) represents fair market value for the services provided for such payment.

5.    Representations and Warranties.

(a)    Player represents and warrants as follows:

(i)    that he is not obligated to play football in or for any other league, association of teams or team during the Contract Period other than the Alliance;

(ii)    that by executing the SPA, Player grants to the Alliance the exclusive right to his services as a professional football player, including, but not limited to, playing professional football, practicing and training to play professional football and such other rights and services typically attendant to a person playing professional football (all of which are collectively referred to as "Playing Rights"), the Non-Commercial License, the Promotional Rights (as defined below) and Player's Likeness (as defined below) and no third party has any competing rights therein and neither Player nor any third party will attempt to assert any rights therein against the Alliance;

(iii)    that he is free to enter into the SPA and that his doing so does not violate any other agreement to which he may be a party;

(iv)    that he does not and will not, either directly or indirectly, own any stock or hold any other ownership or financial interest in any Alliance team or any other entity related to or affiliated with the Alliance;

(v)    that by executing the SPA, he understands and accepts that he may be waiving any remaining eligibility to play collegiate sports and any related college scholarship or grant (not including any scholarship or grant provided by the Alliance, unless otherwise set forth in the SPA);

(vi)    that he knows of no physical or mental conditions that could impair his ability to play skilled professional football during the Contract Period and has not knowingly concealed any such conditions;

(vii)    that he shall maintain himself in excellent physical condition; and

(viii)     that he has not breached any previous standard player agreement or any other agreements between Player and the Alliance, in particular but without limitation, in connection with the provisions governing the use of the Playing Rights, the Player's Likeness and the Promotional Rights.

(b)     The Alliance represents and warrants that it is free to enter into the SPA and that doing so does not violate any other agreement to which it is party.

(c)     The warranting party will indemnify, defend and hold the other party harmless of and from any claims, actions, demands, losses, costs, expenses, liabilities, penalties and damages in the event its representations and warranties set forth in this Section are in any way materially inaccurate and the warrantee will use reasonable efforts to mitigate any loss suffered by it.

      6.     <u>Video/Digital Images, Pictures, Likenesses and Promotions</u>.

(a)     During the Contract Period, the Alliance shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format) and/or on and in connection with the Promotional Rights. Player shall be available during the Contract Period, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance or the team to which Player is allocated by the Alliance shall designate. The Alliance shall have Promotional Rights with respect to any Embodiments created under the SPA or the Football Administration Manual. All rights, including, but not limited to, copyright, in any such Embodiments shall belong to the Alliance throughout the world and Player assigns such rights to Alliance together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments created under the SPA and all Promotional Rights with respect to such Embodiments shall be exclusive, irrevocable and survive the termination of the Contract Period (and without regard to the circumstances in which the SPA expires or is terminated).

(b)     <u>Grant of Non-Commercial Licensing Rights</u>.  Player hereby grants to the Alliance the authority to use Player's Likeness ("<u>Non-Commercial License</u>") for any and all uses or purposes that promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, and Player hereby acknowledges that the Non-Commercial License includes the right and authority for the Alliance to use and authorize affiliates and business partners to use the Non-Commercial License solely for the purposes described herein. Player will cooperate with any such media and will participate upon request in reasonable activities to promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league. Player will not contest the rights of the Alliance and Alliance teams to use Player's Likeness and the Playing Rights in connection with the telecast, broadcast or other transmission of Alliance football games or any other related content or the right of the Alliance to use Player's Likeness to

produce, sell, market, advertise or distribute football game film footage or any other related content for the promotion of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.  The Alliance may also use such broadcasts, telecasts or transmissions of footage in social media, digital gaming and Alliance digital platforms and in any and all media now or hereafter known.

       7.      <u>Definitions</u>.  For purposes of the SPA and the Football Administration Manual and such other Alliance rules, regulations and policies applicable to Player, the definitions set forth below apply:

       (a)     "<u>Embodiment</u>" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

       (b)     "<u>Likeness</u>" means a player's:

          (i)     picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

          (ii)     name or nickname;

          (iii)    signature or facsimile thereof;

          (iv)    voice;

          (v)     identifiable attributes or any colorable imitation or adaptation thereof;

          (vi)    to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

          (vii)   to the extent that he has rights therein, biographical information.

       (c)     "<u>Promotional Rights</u>" shall mean the right to promote, advertise and otherwise disseminate, by any means or media now or hereafter known, any Embodiments, created during the Contract Period, for the promotion, marketing, sale or advertising of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league, and the right to grant to third parties the right to use Player's Likeness to create and use any Embodiments to promote, market, advertise, sell, by any means or media now or hereafter known, the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.

       8.      <u>Player's Unique Skill and Breach of Agreement; Dispute Resolution</u>.

(a)     Player represents that he has extraordinary and unique skill and ability as a football player, that the services to be rendered by him under the SPA cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach or violation by Player of the SPA or the Football Administration Manual (as the case may be) will cause irreparable injury to the Alliance and to its assignees.  In addition, Player understands and acknowledges that refusing or failing to report to training, games or commercial appearances (with respect to the Promotional Rights or Non-Commercial License) for any reason without the prior written approval of the Alliance constitutes a breach or a violation of the SPA or the Football Administration Manual (as the case may be) and is extremely disruptive to the operation of the Alliance.  Therefore, in the event that the Alliance believes Player is, during the Contract Period, refusing or failing to report for any reason or playing, attempting or threatening to play, or negotiating for the purpose of playing for any other person, firm, corporation, professional football team, association, league or organization, without the prior written consent of the Alliance, then the Alliance and its assignees shall have the right to seek equitable relief or otherwise resolve the dispute through the Grievance Procedures set forth and defined in the Football Administration Manual.

(b)     Player understands that he is competing with other players for a position on an Alliance team roster within the applicable player roster limits.  If at any time, in the sole judgment of the Alliance, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions in the Alliance (a "Skill Termination"), or if Player engages in or has engaged in conduct that is detrimental to the best interests of the Alliance or the public's confidence in the integrity of Alliance games, or may otherwise impair, the reputation, character or standing of the Alliance (as determined by the Alliance in its sole discretion) (a "Morality Termination"), then the Alliance may immediately terminate this Agreement with no further payment obligations to Player.  Further, if Player is terminated by the Alliance for a Morality Termination, the Player's remaining annual salary for that Alliance regular season shall be escrowed until such time as the charges or claims that resulted in Player's Morality Termination are fully and finally adjudicated.  If such changes are adjudicated as false or improper, then the escrowed amount shall be paid to Player.  If such charges result in Player's conviction or such claims are adjudicated as proper, the Alliance shall permanently retain the escrowed amount and Player waives any and all rights to such escrowed amount.

(c)     Except as otherwise provided herein with respect to injunctive relief, all disputes arising out of, relating to and in connection with the SPA, or otherwise relating to Player's employment by the Alliance, shall be resolved exclusively and solely through the Grievance Procedures set forth in the Football Administration Manual.

(i)     All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(ii)     Player and the Alliance understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not limited to a decree enjoining Player from any further breach or violation of the SPA or the Football Administration Manual (as the case may be) or any other agreement or commitment to provide exclusive rights or services to the Alliance or Alliance Properties, including from

playing football for any other person, firm, corporation or organization during the Contract Period, all without the Alliance posting a bond or other security or proving actual damages.

9.   <u>Teams as Alliance Agents</u>.  Instructions given or requests made by the Alliance to Player pursuant to the SPA or the Football Administration Manual may be made by the team to which Player has been allocated by the Alliance and for such purposes such Alliance team shall be acting as an authorized agent of the Alliance, acting through its General Manager or Head Coach or their designees.  The scope of the authority of teams to act as agent of the Alliance shall be as set forth in the Alliance's rules, policies and regulations governing the relationship between the Alliance teams and the Alliance.  In relation to those instructions and/or requests specifically contemplated by the SPA or the Football Administration Manual to be directed to Player by a team, Player shall be entitled to assume that the team has the authority to act on the Alliance's behalf.

10.   <u>Injury</u>.  If Player is injured in the performance of his services under the SPA and promptly reports such injury to an Alliance or Alliance team physician, then Player will receive such medical and hospital care during the Contract Period as an Alliance physician may deem necessary and, if during the regular season Player is physically unable to perform the services required of him by the SPA because of such football-related injury, as determined by the Alliance or Alliance team physician in such physician's sole and absolute professional judgment, Player will continue to receive his Base Compensation for the period he is physically unable to perform during the season of injury only and for no subsequent period covered by the SPA.  If Player's injury in the performance of his services under the SPA results in his death, the unpaid balance of his Base Compensation for the season of injury only will be paid to his stated beneficiary or, in the absence of a stated beneficiary, to his estate.

11.   <u>Workers' Compensation</u>.  Any compensation paid to Player under the SPA, for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial or permanent partial disability will be deemed an advance payment of workers' compensation benefits due to Player and the Alliance will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

12.   <u>General Provisions</u>.

(a)   <u>Interpretation of Terms</u>.  The terms of the SPA and the Football Administration Manual shall be interpreted to give maximum effect to the Alliance's intent (and Player's acknowledgment thereof) to establish, through the SPA, the Football Administration Manual and other rules, regulations, policies and practices applicable to Player and players, a framework within which to manage effectively and administer a professional sports league.  The language of the SPA shall be construed neutrally and without regard for which party drafted such language.  If any provision of the SPA is determined to be invalid or unenforceable, the remaining provisions of the SPA, as applicable, shall be enforced in accordance with their terms.  Player acknowledges that by executing the SPA, he understands that he is bound by the terms of the SPA, the Football Administration Manual and such other player-related policies as may be adopted and implemented from time to time by the Alliance, all of which shall be adopted with notice to Player and made available to Player on the Alliance website or by any other digital storage that is accessible to Player.

(b)    Termination.   The rights of termination set forth in the SPA and/ or the Football Administration Manual will be in addition to any other rights of termination allowed either party by law.  Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under the SPA, will automatically terminate the SPA.

(c)    Rules.  Player will comply with and be bound by all Alliance rules, regulations, policies and employment practices applicable to Player and players in the Alliance in effect (or as amended) during the Contract Period.

(d)    Integrity of Game.  Player recognizes the detriment to the Alliance and professional football that would result from impairment of public confidence in the integrity of the game, in the honest and orderly conduct of Alliance games, or in the integrity and good character of the Alliance players.  Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix any Alliance game; fails to promptly report a bribe offer or an attempt to throw or fix any Alliance game; bets on any Alliance game; knowingly associates with gamblers or unauthorized gambling activity; or is guilty of any other form of conduct judged by the Alliance to be detrimental to the best interests of the Alliance, to the public's confidence in the integrity of the game, or the best interest of the game of professional football in general, then, subject to the Alliance's sole and absolute discretion, the Alliance shall have the right to issue appropriate discipline including banning Player from playing in the Alliance indefinitely and to terminate the SPA.

(e)    Extension.  If Player becomes a member of the Armed Forces of the United States or any other country, accepts a contractual offer to join a non-Alliance team with the Alliance's prior written consent, retires from professional football as an active player or otherwise fails or refuses to perform his services under the SPA, then the SPA will be tolled between the date of Player's induction into the Armed Forces, his acceptance of a non-Alliance contract, his retirement or his failure or refusal to perform and the later date of his return to professional football with the Alliance.  During the period the SPA is tolled, Player will not be entitled to any compensation or benefits.  On Player's return to professional football with the Alliance, the Contract Period will be extended for a period equal to the number of seasons (or portion of a season) remaining at the time the SPA was tolled.  The Alliance's right of renewal, if any, contained in the SPA will remain in effect until the end of any such extension of the Contract Period.

(f)    Assignment.  The Alliance may assign the SPA and Player's services thereunder to any successor to the Alliance or to any other team in the Alliance.  Player will report to his assigned Alliance team promptly upon being informed of any such assignment and will faithfully perform his services under the SPA.  Player may not assign the SPA without the prior written consent of the Alliance.

(g)    Notice.  Any notice, request, approval or consent under the SPA or the Football Administration Manual will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to the SPA or to such other address as the recipient may subsequently have furnished in writing to the sender.

(h)    Other Agreements.  The SPA, and the Authorized Alternative League Release, set forth the entire agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

(i)     Law.  The SPA is made under and shall be governed by the laws of the State of Delaware.

*[Remainder of Page Intentionally Left Blank]*



## STANDARD COMMERCIAL LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** is made and entered into by and between Alliance Properties. LLC, a Delaware limited liability company ("Alliance Properties"), and ▆▆▆ ▆▆▆▆▆ "Player") (the "Agreement") with regard to the use by Alliance Properties of Player's Likeness on, and in connection with, the Commercial License (as such terms are defined below).

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

1.      Term, Termination and Extension.

(a)     Term.  Subject to the termination provision(s) of this Agreement, the term of this Agreement shall commence on the last date set forth on the signature page below (the "Effective Date") and shall continue for three (3) years from the Effective Date (the "Term").

(b)     Termination.  Notwithstanding the foregoing, if Player's Standard Player Agreement with AAF Players, LLC (the "Alliance") (the "SPA") is terminated due to a Skill Termination or a Morality Termination (as those terms are defined in Player's SPA), this Agreement may be terminated by Alliance Properties, at which time, subject to Section 2 of this Agreement, Player shall have no further rights with respect to the Player Participation Pool (as defined below). The rights of termination set forth in this Agreement will be in addition to any other rights of termination allowed to either party by law.  Termination will be effective upon the giving of written notice, except that Player's death will automatically terminate this Agreement.

(c)     Extension.  The Term shall be extended for another three (3) years upon execution by Player of a new SPA during the Term of this Agreement.  If Player's SPA is terminated due to Player's acceptance of a contract with an Authorized Alternative League (as defined in Player's SPA) (an "Authorized Alternative League Termination"), the remaining Term of this Agreement shall be extended to include the conclusion of the next subsequent Alliance League Year (as defined in the Football Administration Manual) immediately following the date on which the Term of this Agreement would have otherwise expired.

2.      Grant of Commercial Licensing Rights.  Player hereby grants to Alliance Properties worldwide, exclusive rights in and to Player's Likeness pursuant to the terms set forth herein (the grant of the worldwide, exclusive rights in and to Player's Likeness as set

forth herein, the "Commercial License"). Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the Alliance, and commercial programs associated therewith. Player hereby acknowledges that the rights he is granting to Alliance Properties under the Commercial License shall include, but are not limited to, the irrevocable and exclusive worldwide right, in any and all media now or hereafter known, including, but not limited to, newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, to use, assign or license the Likeness (including the right to use or license Player's Likeness in connection with the Likenesses of other players, former players and other persons affiliated with the Alliance of American Football (the "League")) in combination with the use of any or all League team names, logos, trademarks, trade dress, uniforms or other form of intellectual property, for any commercial purpose, including but not limited to: (1) in any form of trade or consumer promotion; in the sale, distribution, promotion, marketing or advertising of any good, of any consumer product, or of any service; such rights shall also include the use of Player's Likeness in all collateral materials, point of sale materials, and/or packaging associated with the rights set forth herein, (2) in any form of, or in connection with, products licensed by Alliance Properties, and (3) on and in connection with any sponsorship or endorsement of the League by third parties. Player understands and agrees that at the conclusion of the Contract Period (as set forth in Player's SPA), Alliance Properties shall continue to have the right to use the Commercial License, subject to Player's continuing eligibility to participate in the Player Participation Pool (as defined below). Player acknowledges that Alliance Properties may grant, sub-license or assign the Commercial License without Player's further approval or consent. Player also understands and agrees that this Commercial License authorizes Alliance Properties to use his Likeness in connection with corporate sponsorships and Alliance Properties shall have the right to represent Player and commit Player, subject to Player's reasonable availability and approval, to make appearances and provide other personal services on behalf of Alliance Properties and in connection with corporate sponsorships and the general promotion of the Alliance, provided that Player shall be eligible to receive additional compensation for such appearances and other personal services through the Player Participation Pool.

       3.      Embodiments. During the Term, Alliance Properties shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format). Player shall be available during the Term, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance shall designate. All rights, including, but not limited to, copyright, in any such Embodiments, shall belong to Alliance Properties throughout the world and Player assigns such rights to Alliance Properties together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments shall be exclusive and irrevocable, and survive the termination of the Term.

       4.      Exception to Grant Commercial Licensing Rights to Authorized Alternative League. Notwithstanding anything herein to the contrary, upon Player's written request, Alliance Properties may grant Player written permission to grant use of Player's Likeness to an Authorized Alternative League, provided: (1) such Authorized Alternative League has teams playing in no fewer than 25 professional football markets; and (2) Player presents

Alliance Properties with suitable evidence of a contract offer from a team in such Authorized Alternative League and, within three (3) days of its complete execution, Player provides Alliance Properties with a copy of the fully executed contract to play in such Authorized Alternative League.

     5.     <u>Restriction from Granting Commercial Licensing Rights to Competitive Alternative League</u>.  Player shall not:

     (a)     permit a professional football league (or any person or entity associated therewith) that plays its regular season games primarily in or between the months of February through July ("<u>Competitive Alternative League</u>") to use Player's Likeness for any reason during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement, or

     (b)     provide any personal services to a Competitive Alternative League during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement.

     6.     <u>Player Participation Pool and Commercial Advances</u>.  As consideration for Player's grant of the Commercial License, if Player is added to the regular season roster of a League team, Player will be eligible to receive a fractional share of the Player Participation Pool in proportion to use of Player's Likeness to the total overall usage of all players' Likenesses in all programs, promotional activities, sales and licenses that are subject to the Player Participation Pool.  As additional consideration for the grant of the Commercial License, Player shall receive, as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool:  (i) One Hundred Dollars ($100.00) if Player is added to the training camp roster of the League or a League team ("<u>Training Camp Commercial Advance</u>") and (ii), as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool, an additional Nine Hundred Dollars ($900.00) if Player is added to the regular season roster of a League team ("<u>Regular Season Commercial Advance</u>"). Notwithstanding the foregoing, in the event that Player is not on a regular season roster and has not earned an amount equal to or greater than the Training Camp Commercial Advance and/or the Regular Season Commercial Advance, as applicable, Alliance Properties will not seek to recoup any unearned portion of the Training Camp Commercial Advance or the Regular Season Commercial Advance, as applicable.

     (a)     <u>Standard Player Agreement</u>.  Player understands that nothing in Player's grant of the Commercial License above negates any of the Alliance's rights under the SPA or in the Football Administration Manual.

     (b)     <u>Protection and Enforcement of Commercial License</u>.  Player hereby authorizes Alliance Properties to take all actions necessary to protect and enforce rights granted in the Commercial License.  Player further consents to Alliance Properties joining him as a party in any proceeding to prosecute or defend any claims relating to the Commercial License so long as Alliance Properties pays for the reasonable costs (including reasonable attorney's fees) of prosecuting and/or defending Player's interests in such an action; <u>*provided*</u>, <u>*however*</u>, that Alliance Properties shall not be required to pay such costs (including reasonable attorney's fees) if such joinder is in connection with Player's obligation (set forth in Section 6(e)) to indemnify Alliance Properties.

(c)      <u>Further Assurances</u>.  Player shall take such additional steps as Alliance Properties may reasonably request in connection with the Commercial License, including but not limited to the execution of additional documents that may be necessary for Alliance Properties to implement, confirm or enforce its rights under the Commercial License.

(d)      <u>Acknowledgments</u>.  Player acknowledges that the consideration stated herein, including the Training Camp Commercial Advance, the Regular Season Commercial Advance and payments from the Player Participation Pool, if earned, constitutes the entire and adequate consideration for the Commercial License.  Player further acknowledges that nothing in the Commercial License is intended to confer upon him any rights in the Embodiments created by or on behalf of Alliance Properties or its sponsors or licensees and nothing in the Commercial License is intended to obligate Alliance Properties, or its respective sponsors or licensees, to use Player's Likeness for any purpose.  For purposes of clarity, Player acknowledges that Alliance Properties has established, as and for additional consideration for the Commercial License, a pool of funds to compensate Player and players for the Commercial License and for participating in commercial, endorsement, and fan engagement activities, and such consideration shall be paid in accordance with Alliance Properties' policies (the "<u>Player Participation Pool</u>"), which may be amended from time to time to effectuate its intent to encourage Player and players to participate in commercial, promotional endorsement, and fan engagement activities.

(e)      <u>Indemnification</u>.  Player represents and warrants that he has not entered into any other agreements concerning his Likeness that would in any way conflict with Alliance Properties' rights (or those of its licensees or assignees) under the Commercial License.  Player shall indemnify and hold Alliance Properties (and its affiliates, licensees, and assignees) harmless from any claims, actions, demands, losses, costs, liabilities, penalties and damages arising out of his entering into agreements that conflict or interfere with the rights granted to Alliance Properties (or its respective licensees or assignees) under the Commercial License or his breach of this Agreement.

7.      <u>Covenants</u>.  Player shall:

(a)      not use the name or logo of any League team or Alliance Properties or any related entity for any purpose unless he shall have received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(b)      not use or make any endorsements or commercial appearances, sponsor any products or consent to any third party using Player's name, picture or Likeness in which (1) he appears, either alone or with others, in any League team uniform, in any attire which closely resembles or is substantially similar to any League team uniform, is likely to confuse the public as to the affiliation of Alliance Properties or any League teams or in any attire bearing or displaying the marks and/or logos of any League teams; (2) he appears together with two (2) or more players or former players in the League in which Player and the other players, either directly or indirectly, identify themselves as players or former players in the League, regardless of their attire; or (3) he either directly or indirectly identifies himself as a player or former player in the League, unless he has received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(c)      at all League team games, practices, training camps, clinics or other

events sponsored or arranged by Alliance Properties or any League teams and at all Player appearances, wear and/or display only such footwear, clothing, equipment and other items as are endorsed by Alliance Properties or the team to which Player is allocated by the League (and shall promptly obey and comply with any and all other guidelines and directives hereinafter issued by Alliance Properties regarding apparel and/or equipment, permitted or not permitted to be worn or utilized by players for such League team); and

(d)     not display any logo upon or endorse, or agree to display any logo upon or endorse, any item of on-field equipment which is not produced by an official equipment supplier of the League.

8.     <u>Definitions</u>.  For purposes of this Agreement and such other League rules, regulations and policies applicable to Player, the definitions set forth below apply.

(a)     "<u>Embodiment</u>" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, or fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

(b)     "<u>Likeness</u>" means a player's:

(i)     picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

(ii)     name or nickname;

(iii)    signature or facsimile thereof;

(iv)    voice;

(v)     identifiable attributes or any colorable imitation or adaptation thereof;

(vi)    to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

(vii)   to the extent that he has rights therein, biographical information.

9.     <u>General Provisions</u>.

(a)     <u>Interpretation of Terms</u>.  The language of this Agreement shall be construed neutrally and without regard for which party drafted such language.  If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

(b)     <u>Assignment</u>.  Alliance Properties may assign this Agreement and Player's obligations thereunder to any successor to Alliance Properties.  Player may not assign this Agreement without the prior written consent of Alliance Properties.

(c)      Notice.  Any notice, request, approval or consent under this Agreement will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to this Agreement or to such other address as the recipient may subsequently have furnished in writing to the sender.

(d)      Other Agreements.  This Agreement, sets forth the entire agreement between Player and Alliance Properties and cannot be modified or supplemented orally. Player and Alliance Properties each represent that no other agreement, oral or written, except as specifically incorporated in this Agreement, exists between them.

(e)      Amendment and Modification.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

(f)      Disputes.

(i)      Injunctive Relief.  Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the League, and commercial programs associated with the Player Participation Pool.  Player acknowledges that his grant of the Commercial License in and to Player's Likeness is unique and has significant intangible and intrinsic value to Alliance Properties.  Player acknowledges that Player's breach of the provisions of this Agreement will irreparably harm Alliance Properties and substantially interfere with and impair the effective administration of the Player Participation Pool and the commercial programs associated therewith to the substantial detriment to Alliance Properties and, among other things, other players who participate in the Player Participation Pool, and that any injury suffered by Alliance Properties as a result of Player's breach of the terms and conditions of this Commercial License cannot be adequately remedied with monetary damages.  Accordingly, Player and Alliance Properties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance Properties shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without Alliance Properties posting a bond or other security or proving actual damages.

(ii)      Other Disputes.  Except as otherwise provided herein with respect to injunctive relief in Section 9(f)(i), all other disputes arising out of, relating to and in connection with this Agreement shall be resolved exclusively and solely through the Grievance Procedures set forth in the League's Football Administration Manual.

(A)      All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(B)      Player and Alliance Properties understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not

limited to a decree enjoining Player from any further breach or violation of this Agreement, all without Alliance Properties posting a bond or other security or proving actual damages.

(g)      Law.  This Agreement is made under and shall be governed by the laws of the State of Delaware.

(h)      Counterparts.  This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart).  Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Standard Commercial License Agreement as of the last date set forth below.

**ALLIANCE PROPERTIES, LLC**

By:

Name:  JK McKay

Its:   Head of Football Operations

**PLAYER**

Name:

Signature:

Date of Birth:

Street Address:

City, State or Province, Zip Code and Country:

U.S. Social Security # or Canadian Social Insurance:

Telephone:

Email:

Date:

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name: ███████████

Street Address: ███████████

City, State or Province, Zip Code and Country: N/A

Telephone: ███████████

Email: ███████████

Date: ███████████



## AUTHORIZED ALTERNATIVE LEAGUE RELEASE

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "<u>Alliance</u>"), and ████████ ("<u>Player</u>")

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

Player is a party to a Standard Player Agreement ("<u>SPA</u>") with the Alliance and Player has requested Alliance consent to terminate his SPA to sign a contract to play in an Authorized Alternative League (i.e., a professional football league that plays all its games, except such league's championship game, in or between August through January and which has teams playing in no fewer than 25 of the top 40 Designated Market Areas in the United States of America). Player represents that he has met the conditions set forth in the SPA, and that prior to making his request for termination of his SPA, Player received a bona fide offer from the Authorized Alternative League.

Player acknowledges that the Alliance has (1) made a significant investment in Player's development; (2) provided a valuable forum for player to showcase his skills and (3) made a significant investment in the development and operation of the Alliance. Player also acknowledges that the termination of the SPA is not required of Alliance and further that Alliance has provided Player with other good and valuable consideration, the sufficiency and receipt of which is also hereby acknowledged by player.

Player agrees that, in exchange for the Alliance's termination of the SPA and for the other good and valuable consideration, receipt of which Player hereby acknowledges, he shall not, for a period of eighteen (18)  months from the initial date on which he is no longer under contract with an Authorized Alternative League (the "<u>Competitive Alternative League Exclusion</u>"), execute a contract with, or play football for any team, professional football league, or association of teams that plays its regular season games in or between the months of

February through July ("Competitive Alternative League"), or provide any other personal services to a Competitive Alternative League.  Following the expiration of the Competitive Alternative League Exclusion, Player agrees that Alliance shall have an additional thirty (30) day exclusive period to tender and sign a new SPA with Player ("Exclusive Tender and Signing Period") at the then prevailing compensation rate for Player, based on his years of service to Alliance and that during the Exclusive Tender and Signing Period, Player may not solicit or accept an offer to play football in a Competitive Alternative League.

Parties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without the Alliance posting a bond or other security or proving actual damages.

The language of this Agreement shall be construed neutrally and without regard for which party drafted such language.  If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

The Alliance may assign this Agreement and Player's obligations thereunder to any successor to the Alliance.  Player may not assign this Agreement without the prior written consent of the Alliance.

This Agreement, along with the SPA, sets forth the agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

This Agreement is made under and shall be governed by the laws of the State of Delaware.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart).  Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from and be represented by persons of his own selection and acknowledges that he has read, understands, and agrees to the rights and responsibilities created by this Agreement.

*[Signature Page Follows]*

        IN WITNESS WHEREOF, the undersigned have executed and agreed to this Authorized Alternative League Release as to form and content as of the last date set forth below.

**AAF PLAYERS, LLC**

By: ███████████████

Name:  JK McKay

Its:   Head of Football Operations

**PLAYER**

Name:

Signature:

Date of Birth:

Street Address:

City, State or Province, Zip Code and Country: ██████████████

U.S. Social Security # or Canadian Social Insurance: ██████████

Telephone: ████████████

Email:

Date:

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:

Street Address:

City, State or Province, Zip Code and Country: N/A

Telephone:

Email:

Date:

# AUTHORIZATION TO RELEASE INFORMATION

I, ████████████ hereby request and authorize the release of any and all medical records pertaining to my treatment and care as outlined herein and pursuant to Section 2(e) of the Standard Player Agreement between AAF Players, LLC and me. I understand that these records may contain

privileged information including psychiatric and substance abuse evaluations, and I expressly authorize the release of all such records. I further expressly waive the protection of confidentiality by law.

PATIENT/ATHLETE NAME ██████████
SOCIAL SECURITY # ██████████
Date of Birth ████████
PHONE NUMBER ██████████

Pursuant to this **Authorization to Release Medical Information**, I hereby request and authorize:

**Alliance of American Football**
Sports Medicine Department

To obtain my medical records from :

ContactName: ████████
Affiliation (Pick one of the Four Options- "Physician", "Agency", "School/University" or "Pro Team"): Pro team- ██████████
Mailing Address: N/A
Telephone No. ████████████
Fax No.: N/A
Email: N/A

All information I hereby authorize to be obtained from this individual/agency will be held strictly confidential and cannot be released by the recipient without written consent. I understand that this authorization shall remain in effect for the period necessary to complete all transactions on accounts related to the services provided to me. I understand that unless otherwise limited by state or federal regulations and except to the extent that action has been taken which was based on my consent, I may withdraw this consent at any time. It is understood and agreed that the information to be disclosed is from records which may be protected by HIPPA which prohibits making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by law.



Signature of Patient/Athlete; or parent/Guardian of a minor child

[*Signature Page to Authorized Alternative League Release*]

For
Name
Title



**Signed on 2018-10-11 18:03:03 GMT**

Secured by Concord™
DocumentID: MmQxZTZiOTAtMz
SigningID: Mjk5MzcyYjAtOG
Signing date: 10/11/2018
IP Address: 204.10.237.161
Email: b862j304@gmail.com

For    AAF
Name
Title



**Signed on 2018-10-12 00:12:03 GMT**

Secured by Concord™
DocumentID: MmQxZTZiOTAtMz
SigningID: MTdiNGVkMmEtNj
Signing date: 10/12/2018
IP Address: 47.138.222.139
Email: jk@aaf.com

## EBERSOL SPORTS MEDIA GROUP ANNUAL FINANCIAL PROJECTIONS

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Teams* | *8* | *10* | *12* | *14* | *16* | *16* | *16* | *16* | *16* | *16* |
| *# of Players* | *416* | *520* | *624* | *728* | *832* | *832* | *832* | *832* | *832* | *832* |
| League Revenue | $15,350,000 | $25,421,000 | $59,355,988 | $75,716,459 | $94,948,776 | $111,040,843 | $139,630,046 | $163,499,565 | $206,112,494 | $241,654,125 |
| Team Revenue | 44,800,000 | 74,690,000 | 151,488,288 | 204,041,470 | 263,292,963 | 283,819,076 | 301,140,562 | 319,536,591 | 339,075,036 | 359,828,148 |
| Digital Revenue | 4,160,760 | 32,796,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,193 | 233,713,076 | 270,399,291 |
| **Total Revenue** | **$64,310,760** | **$132,907,547** | **$267,044,309** | **$361,258,975** | **$466,574,765** | **$531,681,906** | **$607,878,668** | **$682,383,348** | **$778,900,607** | **$871,881,564** |
| | | | | | | | | | | |
| Digital Expenses | $13,217,050 | $15,973,761 | $18,128,379 | $18,490,947 | $18,860,766 | $19,237,981 | $19,622,741 | $20,015,196 | $20,415,500 | $20,823,810 |
| Football Expenses | 64,668,212 | 84,949,056 | 99,818,399 | 114,967,382 | 130,154,470 | 130,677,739 | 139,211,471 | 131,755,881 | 132,311,178 | 132,877,581 |
| Player Relations Expenses | 2,227,900 | 3,424,446 | 3,436,068 | 3,447,922 | 11,177,334 | 11,189,667 | 11,202,247 | 11,215,078 | 11,228,166 | 11,241,516 |
| Marketing/Branding Expenses | 21,984,486 | 21,861,356 | 22,240,810 | 22,685,626 | 23,139,339 | 23,602,126 | 24,074,168 | 24,555,651 | 25,046,764 | 25,547,700 |
| Production Expenses | 17,999,418 | 16,049,106 | 16,356,869 | 16,684,007 | 17,017,687 | 17,358,041 | 17,705,201 | 18,059,305 | 18,420,491 | 18,788,901 |
| League Expenses | 28,428,067 | 33,500,880 | 38,271,789 | 43,090,061 | 47,911,251 | 48,114,353 | 48,322,812 | 48,536,656 | 48,755,916 | 48,980,630 |
| Team Expenses | 25,395,399 | 38,026,520 | 45,631,824 | 53,237,128 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 |
| Medical Expenses | 8,462,900 | 13,462,096 | 15,414,093 | 17,367,186 | 19,321,397 | 27,115,228 | 27,174,542 | 27,235,043 | 27,296,753 | 27,359,698 |
| Corporate Expenses | 5,986,000 | 6,712,620 | 6,797,790 | 6,933,746 | 7,072,421 | 7,213,869 | 7,358,147 | 7,505,309 | 7,655,416 | 7,808,524 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,113 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total Expenses** | **$190,345,793** | **$249,538,201** | **$292,791,038** | **$335,617,002** | **$386,955,283** | **$410,341,879** | **$426,890,091** | **$444,410,469** | **$462,986,329** | **$482,710,455** |
| | | | | | | | | | | |
| **Total Operating Income (Loss)** | **($126,035,033)** | **($116,630,654)** | **($25,746,729)** | **$25,641,973** | **$79,619,482** | **$121,340,028** | **$180,988,577** | **$237,972,879** | **$315,914,278** | **$389,171,109** |
| *% Margin* | -196.0% | -87.8% | -9.6% | 7.1% | 17.1% | 22.8% | 29.8% | 34.9% | 40.6% | 44.6% |
| | | | | | | | | | | |
| **Cumulative Net Cash Flow** | **($126,035,033)** | **($242,665,687)** | **($268,412,416)** | **($242,770,443)** | **($163,150,962)** | **($41,810,934)** | **$139,177,643** | **$377,150,522** | **$693,064,800** | **$1,082,235,910** |

*Memo: Expense Reporting*

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| Payroll | 90,037,450 | 136,944,319 | 160,064,463 | 181,835,010 | 211,368,455 | 220,016,066 | 220,946,235 | 221,895,008 | 222,862,757 | 223,849,860 |
| Professional Services | 1,699,661 | 1,870,659 | 1,955,135 | 2,040,255 | 2,126,031 | 2,160,185 | 2,195,022 | 2,230,555 | 2,266,800 | 2,303,769 |
| Advertising & Promotions | 20,741,953 | 19,484,292 | 19,986,478 | 20,496,207 | 21,013,631 | 21,413,904 | 21,822,182 | 22,238,626 | 22,663,398 | 23,096,666 |
| Travel | 23,529,116 | 26,870,073 | 30,213,224 | 33,559,205 | 36,908,454 | 37,129,886 | 37,357,042 | 37,589,956 | 37,828,668 | 38,073,221 |
| Office & Facility Costs | 4,009,592 | 5,811,834 | 6,880,945 | 7,950,264 | 9,019,794 | 9,030,790 | 9,042,006 | 9,053,446 | 9,065,115 | 9,077,017 |
| Other General & Administrative Costs | 48,351,661 | 42,978,665 | 46,995,777 | 51,023,065 | 55,060,730 | 55,600,604 | 56,151,276 | 56,712,961 | 57,285,880 | 57,870,258 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,113 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total** | **$190,345,793** | **$249,538,201** | **$292,791,038** | **$335,617,002** | **$386,955,283** | **$410,341,879** | **$426,890,091** | **$444,410,469** | **$462,986,329** | **$482,710,455** |
| | | | | | | | | | | |
| *Payroll* | 47% | 55% | 55% | 54% | 55% | 54% | 52% | 50% | 48% | 46% |
| *Professional Services* | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% |
| *Advertising & Promotions* | 11% | 8% | 7% | 6% | 5% | 5% | 5% | 5% | 5% | 5% |
| *Travel* | 12% | 11% | 10% | 10% | 10% | 9% | 9% | 8% | 8% | 8% |
| *Office & Facility Costs* | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| *Other General & Administrative Costs* | 25% | 17% | 16% | 15% | 14% | 14% | 13% | 13% | 12% | 12% |
| *Digital Payment Fees* | 1% | 4% | 6% | 7% | 8% | 10% | 12% | 13% | 15% | 17% |
| *AAF Player Digital Distributions* | 0% | 2% | 3% | 4% | 5% | 6% | 7% | 8% | 9% | 10% |
| *Total* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| | | | | | | | | | | |
| *Memo: Average Player Bonuses* | $1,750 | $11,037 | $15,761 | $19,592 | $22,786 | $28,779 | $35,149 | $41,930 | $49,158 | $56,875 |

**EXHIBIT 3**

| Vendor | Invoice # | Date | Due Date | Aging | Approval St | Payment St | Open Balance |
|---|---|---|---|---|---|---|---|
| STATSports | SI00000621 - 2 | 8/1/2018 | 1/1/2018 | 411 | Approving | Unpaid | 100000 |
| Morgan, Lewis & Bockius | 4010368 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 124 |
| Morgan, Lewis & Bockius | 4010425 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 57132.95 |
| Morgan, Lewis & Bockius | 4010360 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 474 |
| Morgan, Lewis & Bockius | 4010354 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 22250.5 |
| Morgan, Lewis & Bockius | 4010371 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4010372 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4010364 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 118.5 |
| Morgan, Lewis & Bockius | 4010369 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 124 |
| Morgan, Lewis & Bockius | 4010370 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 737.82 |
| Morgan, Lewis & Bockius | 4010435 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 19970.5 |
| Morgan, Lewis & Bockius | 4010432 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 51870 |
| Morgan, Lewis & Bockius | 4010362 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 1771 |
| Morgan, Lewis & Bockius | 4010359 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 1027 |
| Morgan, Lewis & Bockius | 4010358 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 14580 |
| Morgan, Lewis & Bockius | 4010361 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 118.5 |
| Morgan, Lewis & Bockius | 4010363 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 79 |
| Morgan, Lewis & Bockius | 4010365 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 124 |
| Morgan, Lewis & Bockius | 4010367 | 9/11/2018 | 9/11/2018 | 158 | Approving | Unpaid | 62 |
| KORE Interactive Systems | INV00002830 | 9/20/2018 | 1/1/2018 | 411 | Approving | Unpaid | 50100 |
| XOS Digital | Sales order AAF2 - | 10/2/2018 | 11/1/2018 | 107 | Approving | Unpaid | 590226 |
| Simplified Coach, Inc. | SC8517i | 10/11/2018 | 11/10/2018 | 98 | Approving | Unpaid | 8975 |
| Threaded Agency | 1014 | 10/15/2018 | 1/1/2018 | 411 | Approving | Unpaid | 2500 |
| SocialFlow, Inc. | 5723 | 10/17/2018 | 1/1/2018 | 411 | Assigned | Unpaid | 35000 |
| Morgan, Lewis & Bockius | 4036698 | 10/23/2018 | 11/22/2018 | 86 | Approving | Unpaid | 425.5 |
| Daversa Partners | 9238 | 10/25/2018 | 10/25/2018 | 114 | Approving | Unpaid | 30000 |
| Threaded Agency | 1015 | 11/1/2018 | 1/1/2018 | 411 | Approving | Unpaid | 5000 |
| Salus Labs, Inc (dba Triplebyte) | 22573 | 11/5/2018 | 12/5/2018 | 73 | Assigned | Unpaid | 15000 |
| swirl \| mcgarrybowen | INV-14158 | 11/5/2018 | 1/1/2018 | 411 | Approving | Unpaid | 702762 |
| Salesforce | 13640433 | 11/6/2018 | 12/6/2018 | 72 | Approving | Unpaid | 26208 |
| Wiley Graphics | 11.06.18 | 11/6/2018 | 12/6/2018 | 72 | Approving | Unpaid | 3572.8 |
| Silverman Group | 9710 | 11/7/2018 | 12/7/2018 | 71 | Approving | Unpaid | 17550 |
| XOS Digital | INV 25134 | 11/9/2018 | 12/9/2018 | 69 | Approving | Unpaid | 2040 |
| UNCF | 111320181 | 11/13/2018 | 12/13/2018 | 65 | Approving | Unpaid | 7500 |
| Accolade  USA Inc. | 289397-S1 | 11/14/2018 | 12/14/2018 | 64 | Assigned | Unpaid | 5459.87 |
| Accolade  USA Inc. | 289396-S1 | 11/14/2018 | 12/14/2018 | 64 | Assigned | Unpaid | 5454.12 |
| AMER Sports | 4526474777 | 11/14/2018 | 12/14/2018 | 64 | Approving | Unpaid | 4156.8 |
| MWW Group LLC | 48596 | 11/14/2018 | 12/14/2018 | 64 | Approving | Unpaid | 28000 |
| Florida Citrus Sports Events Inc. | FBFC111718#1 | 11/15/2018 | 12/15/2018 | 63 | Approving | Unpaid | 5000 |
| Accolade  USA Inc. | 289760-S1 | 11/16/2018 | 12/16/2018 | 62 | Approving | Unpaid | 11498.03 |
| New Memphis Institute | 11162018ME | 11/16/2018 | 12/16/2018 | 62 | Assigned | Unpaid | 2000 |
| Ticketmaster LLC | 10051112 | 11/16/2018 | 12/16/2018 | 62 | Approving | Unpaid | 15461.65 |
| MWW Group LLC | 48657 | 11/19/2018 | 12/19/2018 | 59 | Approving | Unpaid | 2150.77 |
| T.O.P Marketing USA | 10292 | 11/19/2018 | 12/19/2018 | 59 | Approving | Unpaid | 1869.8 |

**EXHIBIT 4**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AMER Sports | | 4526537735 | 11/21/2018 | 11/21/2018 | 87 | Approving Unpaid | 5546.09 |
| Zoominfo Inc. | | 71338 | 11/21/2018 | 1/5/2019 | 42 | Approving Unpaid | 49900 |
| IMG College, LLC | | 1832025118 | 11/24/2018 | 12/4/2018 | 74 | Approving Unpaid | 3500 |
| Jason Zone Fisher | | 2 | 11/26/2018 | 12/26/2018 | 52 | Approving Unpaid | 9000 |
| The Ebersol Lanigan Company LLC | | 701701 | 11/26/2018 | 12/6/2018 | 72 | Approving Unpaid | 43919 |
| Ogletree Deakins | | 1995620 | 11/27/2018 | 11/27/2018 | 81 | Approving Unpaid | 12376 |
| The Montag Group | | 2018721 | 11/27/2018 | 12/27/2018 | 51 | Approving Unpaid | 20000 |
| eClinicalWorks LLC | | 1544777 | 11/28/2018 | 12/28/2018 | 50 | Approving Unpaid | 100000 |
| Morgan, Lewis & Bockius | | 4036693 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 1008.5 |
| Morgan, Lewis & Bockius | | 4036682 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 23355.5 |
| Morgan, Lewis & Bockius | | 4036695 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 7300 |
| Morgan, Lewis & Bockius | | 4036680 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 52084.5 |
| Morgan, Lewis & Bockius | | 4036733 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 247.5 |
| Morgan, Lewis & Bockius | | 4036687 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 16265.62 |
| Morgan, Lewis & Bockius | | 4036677 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 27767.5 |
| Morgan, Lewis & Bockius | | Sept Serv Combine | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 4455 |
| Morgan, Lewis & Bockius | | Sept Serv Combine | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 1980 |
| Morgan, Lewis & Bockius | | 4036692 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 613 |
| Morgan, Lewis & Bockius | | Sept Serv Combine | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 1643 |
| Morgan, Lewis & Bockius | | 4036691 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 1167 |
| Morgan, Lewis & Bockius | | 4036728 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 247.5 |
| Morgan, Lewis & Bockius | | 4036685 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 59316.99 |
| Morgan, Lewis & Bockius | | 4036690 | 11/28/2018 | 11/28/2018 | 80 | Approving Unpaid | 73269 |
| LSI Graphics, LLC | INV69055 | | 11/29/2018 | 12/29/2018 | 49 | Approving Unpaid | 1388.35 |
| Prospect Productions LLC dba Barnicle | | 1111 | 11/29/2018 | 12/29/2018 | 49 | Approving Unpaid | 20000 |
| San Diego Regional Chamber | SAL-18-030901 | | 11/29/2018 | 11/29/2018 | 79 | Approving Unpaid | 4500 |
| Database Builders Inc./Full House Sports Marketing | | 2369 | 12/1/2018 | 12/1/2018 | 77 | Approving Unpaid | 1581.8 |
| DESERET DIGITAL MEDIA Inc. (dba KSL.com, Deseretnews.com, DDM, Utah.com) | SIN040567 | | 12/1/2018 | 12/1/2018 | 77 | Approving Unpaid | 12906 |
| Flying V Group | | 10206 | 12/1/2018 | 12/1/2018 | 77 | Approving Unpaid | 3500 |
| LIQUID SOUL MEDIA, LLC | | 761 | 12/1/2018 | 12/1/2018 | 77 | Approving Unpaid | 12500 |
| Mind Over Media LLC | | 1245 | 12/1/2018 | 12/29/2018 | 49 | Approving Unpaid | 5450.11 |
| Overlook Networks | | 1081 | 12/1/2018 | 12/1/2018 | 77 | Approving Unpaid | 1600 |
| Summit Media | 835-9106 | | 12/1/2018 | 12/31/2018 | 47 | Assigned Unpaid | 980 |
| Summit Media | 835-9016 | | 12/1/2018 | 12/31/2018 | 47 | Assigned Unpaid | 1200 |
| Threaded Agency | | 1016 | 12/1/2018 | 12/1/2018 | 77 | Approving Unpaid | 5000 |
| Won Worldwide LLC | 18-005 | | 12/1/2018 | 12/16/2018 | 62 | Approving Unpaid | 25000 |
| LIQUID SOUL MEDIA, LLC | | 762 | 12/3/2018 | 12/3/2018 | 75 | Approving Unpaid | 12500 |
| swirl | mcgarrybowen | INV-14352 | | 12/3/2018 | 12/18/2018 | 60 | Approving Unpaid | 702762 |
| T.O.P Marketing USA | | 10321 | 12/3/2018 | 1/2/2019 | 45 | Approving Unpaid | 1084.98 |
| TS2 Holdings, LLC | | 1433 | 12/3/2018 | 1/2/2019 | 45 | Approving Unpaid | 15000 |
| Integrated Sports Specialties, LLC | 9000PQ | | 12/4/2018 | 1/3/2019 | 44 | Approving Unpaid | 3375.2 |
| Overlook Networks | | 1092 | 12/4/2018 | 1/3/2019 | 44 | Approving Unpaid | 1200 |
| Silverman Group | | 9731 | 12/4/2018 | 1/3/2019 | 44 | Approving Unpaid | 16800 |
| swirl | mcgarrybowen | INV-14366 | | 12/4/2018 | 12/4/2018 | 74 | Approving Unpaid | 746000 |
| exhibit experts | AAF111918E | | 12/7/2018 | 1/6/2019 | 41 | Approving Unpaid | 695 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| iHeartMedia Ent. Inc. | | 2813521848 | 12/7/2018 | 1/6/2019 | 41 Assigned | Unpaid | 3450 |
| Kilpatrick Townsend & Stockton LLP | | 12135945 | 12/7/2018 | 12/7/2018 | 71 Approving | Unpaid | 5000 |
| Spark Printing | | 2249 | 12/7/2018 | 1/6/2019 | 41 Approving | Unpaid | 823.13 |
| SportSoft | | 18209 | 12/7/2018 | 1/6/2019 | 41 Approving | Unpaid | 5669 |
| Daversa Partners | | 9242 | 12/10/2018 | 12/10/2018 | 68 Approving | Unpaid | 30000 |
| exhibit experts | AAF113018E | | 12/11/2018 | 1/10/2019 | 37 Approving | Unpaid | 18665 |
| G&G Outfitters Inc. | | 130660 | 12/11/2018 | 1/10/2019 | 37 Approving | Unpaid | 2742.33 |
| GHP Media | | 393611011 | 12/11/2018 | 1/11/2019 | 36 Approving | Unpaid | 1647.16 |
| Salus Labs, Inc (dba Triplebyte) | | 223672 | 12/11/2018 | 1/10/2019 | 37 Approving | Unpaid | 12500 |
| Texon II Inc. | SI-110619 | | 12/11/2018 | 1/10/2019 | 37 Approving | Unpaid | 22673.35 |
| Mind Over Media LLC | | 1248 | 12/12/2018 | 12/12/2018 | 66 Approving | Unpaid | 7103.92 |
| GHP Media | | 393196011 | 12/14/2018 | 12/31/2018 | 47 Approving | Unpaid | 3456.14 |
| Language of Caring, LLC | | 2576 | 12/14/2018 | 1/13/2019 | 34 Approving | Unpaid | 1057.59 |
| Teamworks Innovations, Inc. | Pymt 1 | | 12/14/2018 | 1/1/2019 | 46 Approving | Unpaid | 54350 |
| Werqwise, Inc | INV-0755 | | 12/14/2018 | 1/7/2019 | 40 Approving | Unpaid | 65625 |
| Werqwise, Inc | INV-00753 | | 12/14/2018 | 12/14/2018 | 64 Approving | Unpaid | 30899 |
| Werqwise, Inc | INV-00754 | | 12/14/2018 | 12/31/2018 | 47 Approving | Unpaid | 36810 |
| Ken Schanzer | | 12/15/2018 | 12/15/2018 | 1/1/2018 | 411 Assigned | Unpaid | 5000 |
| KSL NewsRadio - Bonneville | 57467-2 | | 12/16/2018 | 1/15/2019 | 32 Approved | Unpaid | 0 |
| KongBasileConsulting, LLC | | 7272 | 12/17/2018 | 12/17/2018 | 61 Approving | Unpaid | 20000 |
| MWW Group LLC | | 49197 | 12/17/2018 | 1/16/2019 | 31 Approving | Unpaid | 3673.34 |
| Salus Labs, Inc (dba Triplebyte) | | 223678 | 12/17/2018 | 1/16/2019 | 31 Approving | Unpaid | 25000 |
| T.O.P Marketing USA | | 10353 | 12/17/2018 | 1/16/2019 | 31 Assigned | Unpaid | 7555 |
| iHeartMedia Ent. Inc. | | 2513554316 | 12/18/2018 | 1/17/2019 | 30 Assigned | Unpaid | 3500 |
| iHeartMedia Ent. Inc. | | 2513547915 | 12/18/2018 | 1/17/2019 | 30 Assigned | Unpaid | 500 |
| TRI-C Club Supply Inc. | IN139342 | | 12/18/2018 | 1/17/2019 | 30 Approving | Unpaid | 28999.12 |
| G&G Outfitters Inc. | | 130737 | 12/19/2018 | 1/18/2019 | 29 Approving | Unpaid | 3309.82 |
| Quest Staffing Services, LLC / Commercial Funding, Inc | | 44766 | 12/19/2018 | 1/18/2019 | 29 Assigned | Unpaid | 1165.05 |
| Simplified Coach, Inc. | SC8693i | | 12/19/2018 | 1/18/2019 | 29 Approving | Unpaid | 12000 |
| ACO Medical Supply, Inc. | | 5739206 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 860.63 |
| ACO Medical Supply, Inc. | | 5739215 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 494.46 |
| ACO Medical Supply, Inc. | | 5739211 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 1277.42 |
| ACO Medical Supply, Inc. | | 5739203 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 623.15 |
| ACO Medical Supply, Inc. | | 5739205 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 846.22 |
| ACO Medical Supply, Inc. | | 5739201 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 913.49 |
| Fenwick & West LLP | | 734192 | 12/20/2018 | 1/19/2019 | 28 Approving | Unpaid | 57103.72 |
| G&G Outfitters Inc. | | 130739 | 12/20/2018 | 1/19/2019 | 28 Approving | Unpaid | 1753.44 |
| New Era Cap | | 95766476 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 8656.56 |
| New Era Cap | | 95766475 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 16570.08 |
| Olympic Case Co | | 53553 | 12/20/2018 | 1/19/2019 | 28 Assigned | Unpaid | 12377.97 |
| Tom Ward | Exp report 1 | | 12/20/2018 | 12/20/2018 | 58 Approving | Unpaid | 3770.06 |
| ACO Medical Supply, Inc. | | 5739229 | 12/21/2018 | 1/20/2019 | 27 Assigned | Unpaid | 569.45 |
| ACO Medical Supply, Inc. | | 5739202 | 12/21/2018 | 1/20/2019 | 27 Assigned | Unpaid | 887.03 |
| Adidas | | 6176842541 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 679.25 |
| Adidas | | 6176842538 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 1149.5 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Adidas | | 6176839507 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 2978.25 |
| Adidas | | 6176839512 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 1097.25 |
| Adidas | | 6176839508 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 1201.75 |
| Adidas | | 6176839510 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 522.5 |
| Adidas | | 6176842544 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 1254 |
| Adidas | | 6176839513 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 940.5 |
| Adidas | | 6176842539 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 1254 |
| Adidas | | 6176839509 | 12/21/2018 | 2/19/2019 | -3 Assigned | Unpaid | 1410.75 |
| AMER Sports | | 4526861824 | 12/21/2018 | 12/21/2018 | 57 Assigned | Unpaid | 15037.75 |
| D.J. May | Minicamp381 | | 12/21/2018 | 12/21/2018 | 57 Approved | Unpaid | 205 |
| Home2 Suites by Hilton Birmingham Downtown | 59241 A | | 12/21/2018 | 12/21/2018 | 57 Assigned | Unpaid | 4601.52 |
| Language of Caring, LLC | | 2570 | 12/21/2018 | 1/20/2019 | 27 Assigned | Unpaid | 8000 |
| Present Creative | AF-1812-005 | | 12/21/2018 | 1/20/2019 | 27 Approving | Unpaid | 6615 |
| Robert Myers * | Minicamp433 | | 12/21/2018 | 12/21/2018 | 57 Denied | Unpaid | 405 |
| SBR Technologies Vision Graphics | | 459683 | 12/21/2018 | 1/20/2019 | 27 Assigned | Unpaid | 235.59 |
| SBR Technologies Vision Graphics | | 459669 | 12/21/2018 | 1/20/2019 | 27 Assigned | Unpaid | 247.59 |
| Undefined Creative Inc. | | 1787 | 12/21/2018 | 1/20/2019 | 27 Assigned | Unpaid | 35200 |
| BaseCamp Franchising, LLC | | 12/23/2018 | 12/23/2018 | 12/23/2018 | 55 Assigned | Unpaid | 9663.66 |
| KFMB-TV | 1693728-1 | | 12/23/2018 | 1/22/2019 | 25 Assigned | Unpaid | 10800 |
| KSL NewsRadio - Bonneville | 55896-3 | | 12/23/2018 | 1/22/2019 | 25 Assigned | Unpaid | 4200 |
| Alpha Media | 354231-1 | | 12/25/2018 | 1/24/2019 | 23 Assigned | Unpaid | 8765 |
| Alpha Media | 354239-1 | | 12/25/2018 | 1/24/2019 | 23 Assigned | Unpaid | 2848 |
| Alpha Media | 354240-1 | | 12/25/2018 | 1/24/2019 | 23 Assigned | Unpaid | 2781 |
| Adidas | | 6176842540 | 12/26/2018 | 2/24/2019 | -8 Assigned | Unpaid | 992.75 |
| Adidas | | 6176839511 | 12/26/2018 | 2/24/2019 | -8 Assigned | Unpaid | 1045 |
| ATLANTA CONCOURSE RENAISSANCE | | 1 | 12/26/2018 | 1/25/2019 | 22 Approving | Unpaid | 55370.18 |
| Dr. Jill's Foot Pads, Inc. | | 141166 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141168 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141164 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141162 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141170 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141167 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141165 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Dr. Jill's Foot Pads, Inc. | | 141169 | 12/26/2018 | 12/26/2018 | 52 Assigned | Unpaid | 2226.75 |
| Olympic Case Co | | 53573 | 12/26/2018 | 1/25/2019 | 22 Approving | Unpaid | 9403.56 |
| ankleaid | AA1052 | | 12/27/2018 | 1/26/2019 | 21 Assigned | Unpaid | 448 |
| Canto Inc. | | 5046 | 12/27/2018 | 1/26/2019 | 21 Assigned | Unpaid | 5000 |
| FireEye | 10170756 | | 12/27/2018 | 1/26/2019 | 21 Assigned | Unpaid | 13200 |
| G&G Outfitters Inc. | | 130780 | 12/27/2018 | 1/26/2019 | 21 Assigned | Unpaid | 3179.33 |
| GHP Media | 394168011 | | 12/27/2018 | 1/27/2019 | 20 Assigned | Unpaid | 1479.32 |
| GHP Media | 394008011 | | 12/27/2018 | 1/27/2019 | 20 Assigned | Unpaid | 470.5 |
| iHeartMedia Ent. Inc. | 5013563825 | | 12/27/2018 | 1/26/2019 | 21 Assigned | Unpaid | 20250 |
| iHeartMedia Ent. Inc. | 2813565477 | | 12/27/2018 | 1/26/2019 | 21 Approving | Unpaid | 9390 |
| Graham Media Group DBA KSAT-TV;NSAT-TV;IKSAT | 493205-1 | | 12/28/2018 | 1/27/2019 | 20 Approving | Unpaid | 2000 |
| iHeartMedia Ent. Inc. | | 6213631407 | 12/30/2018 | 1/29/2019 | 18 Approving | Unpaid | 20665 |

| Vendor | Doc # | Date 1 | Date 2 | Code | Status 1 | Status 2 | Amount |
|---|---|---|---|---|---|---|---|
| 1954 Productions, LLC | 701701 | 12/31/2018 | 1/1/2018 | 411 | Approving | Unpaid | 43919 |
| KongBasileConsulting, LLC | 7380 | 12/31/2018 | 12/31/2018 | 47 | Approved | Unpaid | 0 |
| Morgan, Lewis & Bockius | 4081634 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 44369 |
| Morgan, Lewis & Bockius | 4081630 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 13218.75 |
| Morgan, Lewis & Bockius | 4081635 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 148.5 |
| Morgan, Lewis & Bockius | 4081618 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 99 |
| Morgan, Lewis & Bockius | 4081636 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 148.5 |
| Morgan, Lewis & Bockius | 4081619 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 57560 |
| Morgan, Lewis & Bockius | 4081631 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 29742.5 |
| Morgan, Lewis & Bockius | 4081629 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 22134.69 |
| Morgan, Lewis & Bockius | 4081632 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 513.5 |
| Morgan, Lewis & Bockius | 4081615 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 75830.34 |
| Morgan, Lewis & Bockius | 4081626 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 111448 |
| Morgan, Lewis & Bockius | 4081633 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 3480.5 |
| Morgan, Lewis & Bockius | 4081624 | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 25154.33 |
| Shock Doctor, Inc. | 5365390 | 12/31/2018 | 1/30/2019 | 17 | Approving | Unpaid | 45640 |
| SOL Studio Architects, LLC | N/A | 12/31/2018 | 12/31/2018 | 47 | Assigned | Unpaid | 850 |
| ACM HUB, LLC dba Titan Sign Company | 12845 | 1/1/2019 | 1/26/2019 | 21 | Assigned | Unpaid | 1082.5 |
| ACO Medical Supply, Inc. | 5739987 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 6615.7 |
| ACO Medical Supply, Inc. | 5740020 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 98.06 |
| ACO Medical Supply, Inc. | 5739986 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 6615.7 |
| ACO Medical Supply, Inc. | 5739988 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 5993.6 |
| ACO Medical Supply, Inc. | 5740019 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 287.6 |
| ACO Medical Supply, Inc. | 5740027 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 95.47 |
| ACO Medical Supply, Inc. | 5740548 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 202.08 |
| ACO Medical Supply, Inc. | 5740021 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 283.62 |
| ACO Medical Supply, Inc. | 5740022 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 95.46 |
| ACO Medical Supply, Inc. | 5739963 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 6336.35 |
| ACO Medical Supply, Inc. | 5740028 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 32.51 |
| ACO Medical Supply, Inc. | 5739955 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 6222.1 |
| ACO Medical Supply, Inc. | 5739971 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 4780.7 |
| ACO Medical Supply, Inc. | 5739972 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 2850.7 |
| ACO Medical Supply, Inc. | 5739970 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 2850.7 |
| Adidas | 2349091 | 1/1/2019 | 3/2/2019 | -14 | Approving | Unpaid | 2194.5 |
| Adidas | 2348793 | 1/1/2019 | 3/2/2019 | -14 | Approving | Unpaid | 2403.5 |
| Adidas | 2349101 | 1/1/2019 | 3/2/2019 | -14 | Approving | Unpaid | 2194.5 |
| Adidas | 2349151 | 1/1/2019 | 3/2/2019 | -14 | Approving | Unpaid | 1201.75 |
| Adidas | 2348389 | 1/1/2019 | 3/2/2019 | -14 | Approving | Unpaid | 2194.5 |
| bluemedia | INV-64071-2 | 1/1/2019 | 3/1/2019 | -13 | Approving | Unpaid | 44888.09 |
| COMMON LOGIC | 19-AAF-01 | 1/1/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 600 |
| CRC Broadcasting Company Inc. dba KFNN-AM;Money Radio 1510; KQFN-AM; 1500 The Fanatic | 8324-1 | 1/1/2019 | 11/30/2018 | 78 | Approving | Unpaid | 1105 |
| Cumulus Media - WGKX-FM | AA1900107 | 1/1/2019 | 12/16/2018 | 62 | Approving | Unpaid | 4590 |
| DESERET DIGITAL MEDIA Inc. (dba KSL.com, Deseretnews.com, DDM, Utah.com) | SIN041688 | 1/1/2019 | 12/31/2018 | 47 | Approving | Unpaid | 13300 |
| DiFebo Company LLC | OA-001 (2) | 1/1/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 2500 |
| G-III Leather Fashions | 4310824 | 1/1/2019 | 11/9/2018 | 99 | Approving | Unpaid | 6435 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G-III Leather Fashions | 4377040 | 1/1/2019 | 11/16/2018 | 92 | Approving | Unpaid | 6720 |
| G-III Leather Fashions | 4377039 | 1/1/2019 | 11/16/2018 | 92 | Approving | Unpaid | 6720 |
| G-III Leather Fashions | 4366755 | 1/1/2019 | 11/15/2018 | 93 | Approving | Unpaid | 2880 |
| G-III Leather Fashions | 4310827 | 1/1/2019 | 12/9/2018 | -296 | Approving | Unpaid | 7200 |
| GovX Inc | INV00073112 | 1/1/2019 | 12/31/2018 | 47 | Approving | Unpaid | 42 |
| Hiregy | 472040933 | 1/1/2019 | 1/11/2019 | 36 | Assigned | Unpaid | 1197.2 |
| iQ Graphics | 13-7361 | 1/1/2019 | 12/27/2019 | -314 | Assigned | Unpaid | 3474.94 |
| Jason Zone Fisher | 3 | 1/1/2019 | 12/18/2018 | 60 | Assigned | Unpaid | 2315 |
| Karick Enterprises, LLC dba Signarama - Salt Lake City | INV-24041 | 1/1/2019 | 12/19/2018 | 59 | Approving | Unpaid | 108.93 |
| New Era Cap | 95674661 | 1/1/2019 | 12/18/2018 | -305 | Assigned | Unpaid | 971.65 |
| New Era Cap | 95711105 | 1/1/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 9350 |
| New Era Cap | 95561129 | 1/1/2019 | 10/25/2018 | 114 | Assigned | Unpaid | 1509.6 |
| New Era Cap | 95778404 | 1/1/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 29103.84 |
| New Era Cap | 95676760 | 1/1/2019 | 12/2/2018 | 76 | Approving | Unpaid | 3427.2 |
| New Era Cap | 95604641 | 1/1/2019 | 11/7/2018 | 101 | Assigned | Unpaid | 2244 |
| New Era Cap | 95778494 | 1/1/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 29103.84 |
| New Era Cap | 95614392 | 1/1/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 3366 |
| New Era Cap | 95767025 | 1/1/2019 | 1/20/2019 | 27 | Assigned | Unpaid | 11262.37 |
| New Era Cap | 95574728 | 1/1/2019 | 10/28/2018 | 111 | Assigned | Unpaid | 2768.04 |
| New Era Cap | 95594672 | 1/1/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 2551.2 |
| OUTFRONT Media Inc. | 4510431 | 1/1/2019 | 1/17/2019 | 30 | Approving | Unpaid | 100 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985915 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90986027 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20361.84 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985921 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90981480 | 1/1/2019 | 1/21/2019 | 26 | Assigned | Unpaid | 4019.7 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985916 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90981479 | 1/1/2019 | 1/21/2019 | 26 | Assigned | Unpaid | 4230.49 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985917 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985920 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985922 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90981468 | 1/1/2019 | 1/21/2019 | 26 | Assigned | Unpaid | 5152.78 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985918 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Performance Health Supply Inc. dba. Medco Supply Company | IN90985919 | 1/1/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 20.83 |
| Sinclair Broadcasting WBMA WTTO WABM | 6360686 | 1/1/2019 | 1/30/2019 | 17 | Approving | Unpaid | 880 |
| Sinclair Broadcasting WBMA WTTO WABM | 6360687 | 1/1/2019 | 1/30/2019 | 17 | Approving | Unpaid | 160 |
| Sinclair Broadcasting WBMA WTTO WABM | 6360688 | 1/1/2019 | 1/30/2019 | 17 | Approving | Unpaid | 3960 |
| Skymail International, Inc. | 19983 | 1/1/2019 | 10/23/2018 | 116 | Approving | Unpaid | 347.1 |
| SocialFlow, Inc. | 5967 | 1/1/2019 | 1/31/2019 | 16 | Approving | Unpaid | 35000 |
| Spark Printing | 2251 | 1/1/2019 | 12/2/2018 | 76 | Approving | Unpaid | 430.97 |
| SportsMEDIA Technology Corp | 0011905-IN | 1/1/2019 | 1/1/2019 | 46 | Approving | Unpaid | 465186 |
| SportsMEDIA Technology Corp | 0021902-IN | 1/1/2019 | 2/1/2019 | 15 | Approving | Unpaid | 332208 |
| The Montag Group | 2019031 | 1/1/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 20000 |
| TRI-C Club Supply Inc. | IN139401 | 1/1/2019 | 1/11/2019 | 36 | Assigned | Unpaid | 3398.97 |
| WCF Mutual Insurance | 7213298 | 1/1/2019 | 1/22/2019 | 25 | Unassigned | Unpaid | 138268.5 |
| XOS Digital | Sales order AAF2-3 | 1/1/2019 | 5/1/2019 | -74 | Approving | Unpaid | 156500 |

| Vendor | Invoice | Date 1 | Date 2 | Days | Status | Paid | Amount |
|---|---|---|---|---|---|---|---|
| ACO Medical Supply, Inc. | 5740039 | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 1835 |
| ACO Medical Supply, Inc. | 5740048 | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 365.51 |
| ACO Medical Supply, Inc. | 5740047 | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 350.43 |
| AMER Sports | 4526916964 | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 1104.15 |
| HENRY SCHEIN, Inc. | 60809488 | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 15.47 |
| HENRY SCHEIN, Inc. | 60777630 | 1/2/2019 | 2/1/2019 | 15 | Approving | Unpaid | 15341.68 |
| Olympic Case Co | 53594 | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 11614.84 |
| Proscout | 694 | 1/2/2019 | 1/2/2019 | 45 | Assigned | Unpaid | 100000 |
| San Antonio Sports | 24228 | 1/2/2019 | 2/1/2019 | 15 | Approving | Unpaid | 10000 |
| Shock Doctor, Inc. | 5367747 | 1/2/2019 | 2/1/2019 | 15 | Approving | Unpaid | 6240 |
| Simplified Coach, Inc. | SC9000i | 1/2/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 12000 |
| Won Worldwide LLC | 18-006 | 1/2/2019 | 1/17/2019 | 30 | Assigned | Unpaid | 25000 |
| ACM HUB, LLC dba Titan Sign Company | 12824 | 1/3/2019 | 1/3/2019 | 44 | Approving | Unpaid | 7036.25 |
| ACM HUB, LLC dba Titan Sign Company | 12821 | 1/3/2019 | 1/3/2019 | 44 | Approving | Unpaid | 3031 |
| ACO Medical Supply, Inc. | 5740294 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 198.38 |
| ACO Medical Supply, Inc. | 5740267 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 178.72 |
| ACO Medical Supply, Inc. | 5740268 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 156.37 |
| ACO Medical Supply, Inc. | 5740289 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 115.58 |
| ACO Medical Supply, Inc. | 5740288 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 177.76 |
| ACO Medical Supply, Inc. | 5740295 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 198.38 |
| Birmingham Business Journal | 10166917 | 1/3/2019 | 2/2/2019 | 14 | Approving | Unpaid | 3000 |
| Comcast Spotlight | MP491033 | 1/3/2019 | 1/27/2019 | 20 | Approving | Unpaid | 4692.85 |
| Comcast Spotlight | MP491034 | 1/3/2019 | 1/27/2019 | 20 | Approving | Unpaid | 1190 |
| Encore Event Technologies | 353135 | 1/3/2019 | 2/2/2019 | 14 | Approving | Unpaid | 7919.95 |
| HENRY SCHEIN, Inc. | 60806473 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 704.99 |
| HENRY SCHEIN, Inc. | 60806476 | 1/3/2019 | 2/2/2019 | 14 | Assigned | Unpaid | 850.85 |
| HENRY SCHEIN, Inc. | 60777639 | 1/3/2019 | 2/2/2019 | 14 | Approving | Unpaid | 344.88 |
| TRI-C Club Supply Inc. | IN139785 | 1/3/2019 | 1/13/2019 | 34 | Approving | Unpaid | 1137.48 |
| TRI-C Club Supply Inc. | IN139790 | 1/3/2019 | 1/13/2019 | 34 | Approving | Unpaid | 1693.78 |
| ASU 365 Community Union | 103 | 1/4/2019 | 2/3/2019 | 13 | Approving | Unpaid | 1898.24 |
| G&G Outfitters Inc. | 130891 | 1/4/2019 | 2/3/2019 | 13 | Approving | Unpaid | 2251.6 |
| HENRY SCHEIN, Inc. | 60777593 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 654.8 |
| HENRY SCHEIN, Inc. | 60905096 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60777617 | 1/4/2019 | 2/3/2019 | 13 | Approving | Unpaid | 1997.82 |
| HENRY SCHEIN, Inc. | 60905083 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60905028 | 1/4/2019 | 2/3/2019 | 13 | Approving | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60911326 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 11.3 |
| HENRY SCHEIN, Inc. | 60905281 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60905278 | 1/4/2019 | 2/3/2019 | 13 | Approving | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60911340 | 1/4/2019 | 2/3/2019 | 13 | Approving | Unpaid | 11.3 |
| HENRY SCHEIN, Inc. | 60853800 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 50.7 |
| HENRY SCHEIN, Inc. | 60905069 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60777602 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 1798.06 |
| HENRY SCHEIN, Inc. | 60911353 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 11.3 |
| HENRY SCHEIN, Inc. | 60777614 | 1/4/2019 | 2/3/2019 | 13 | Assigned | Unpaid | 935.48 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HENRY SCHEIN, Inc. | 60777632 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 1119.62 |
| HENRY SCHEIN, Inc. | 60853778 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 8.45 |
| HENRY SCHEIN, Inc. | 60777613 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 19653.21 |
| HENRY SCHEIN, Inc. | 60911342 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 11.3 |
| HENRY SCHEIN, Inc. | 60817130 | 1/4/2019 | 2/3/2019 | 13 Approving | Unpaid | 115.28 |
| HENRY SCHEIN, Inc. | 60859479 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 233 |
| HENRY SCHEIN, Inc. | 60905275 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 37.48 |
| HENRY SCHEIN, Inc. | 60911344 | 1/4/2019 | 2/3/2019 | 13 Approving | Unpaid | 11.3 |
| HENRY SCHEIN, Inc. | 60777622 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 959.41 |
| New Era Cap | 95788022 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 33140.16 |
| Olympic Case Co | 53610 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 18033.93 |
| Salus Labs, Inc (dba Triplebyte) | 223693 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 12500 |
| Salus Labs, Inc (dba Triplebyte) | 223692 | 1/4/2019 | 2/3/2019 | 13 Assigned | Unpaid | 13000 |
| KFMB-TV | 1721403-1 | 1/6/2019 | 2/5/2019 | 11 Approving | Unpaid | 6000 |
| 1954 Productions, LLC | 701802 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 59015 |
| 1954 Productions, LLC | 701901 | 1/7/2019 | 1/17/2019 | 30 Approving | Unpaid | 75917 |
| Accu-Print San Antonio | 113222 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 1084.44 |
| Accu-Print San Antonio | 113458 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 3595.99 |
| Ace Parking Management Inc. | 152355 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 520.81 |
| ACO Medical Supply, Inc. | 5740580 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 202.08 |
| ACO Medical Supply, Inc. | 5740663 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 66.33 |
| ACO Medical Supply, Inc. | 5740662 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 66.33 |
| ACO Medical Supply, Inc. | 5740549 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 202.08 |
| ACO Medical Supply, Inc. | 5740550 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 202.08 |
| ACO Medical Supply, Inc. | 5740668 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 66.33 |
| ACO Medical Supply, Inc. | 5740568 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 202.08 |
| ACO Medical Supply, Inc. | 5740572 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 106.56 |
| ACO Medical Supply, Inc. | 5740666 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 38.4 |
| ACO Medical Supply, Inc. | 5740551 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 202.08 |
| BSN Sports | 904155308 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 1321.92 |
| HENRY SCHEIN, Inc. | 60921658 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |
| HENRY SCHEIN, Inc. | 60921672 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 280.68 |
| HENRY SCHEIN, Inc. | 60937860 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 119.84 |
| HENRY SCHEIN, Inc. | 60937837 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |
| HENRY SCHEIN, Inc. | 60949874 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 1505 |
| HENRY SCHEIN, Inc. | 60921652 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 280.68 |
| HENRY SCHEIN, Inc. | 60937839 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |
| HENRY SCHEIN, Inc. | 60962962 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 1032.44 |
| HENRY SCHEIN, Inc. | 60921649 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 280.68 |
| HENRY SCHEIN, Inc. | 60921659 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 694 |
| HENRY SCHEIN, Inc. | 60962978 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 1032.44 |
| HENRY SCHEIN, Inc. | 60921663 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 694 |
| HENRY SCHEIN, Inc. | 60937851 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 119.84 |
| HENRY SCHEIN, Inc. | 60961776 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |
| HENRY SCHEIN, Inc. | 60921662 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HENRY SCHEIN, Inc. | 60962967 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 123.84 |
| HENRY SCHEIN, Inc. | 60905145 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 908.6 |
| HENRY SCHEIN, Inc. | 60921650 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 280.68 |
| HENRY SCHEIN, Inc. | 60962968 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 1032.44 |
| HENRY SCHEIN, Inc. | 60937850 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 119.84 |
| HENRY SCHEIN, Inc. | 60961766 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |
| HENRY SCHEIN, Inc. | 60961777 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 136.56 |
| HENRY SCHEIN, Inc. | 60921666 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 347 |
| HENRY SCHEIN, Inc. | 60905146 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 1032.44 |
| HENRY SCHEIN, Inc. | 60962914 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 1032.44 |
| HENRY SCHEIN, Inc. | 60921673 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 280.68 |
| HENRY SCHEIN, Inc. | 60905161 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 1032.44 |
| James D. Edgeworth Jr. and Associates - JDEA | 01.07.19-2 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 20915.54 |
| James D. Edgeworth Jr. and Associates - JDEA | 01.07.19-3 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 70261.66 |
| James D. Edgeworth Jr. and Associates - JDEA | 01.07.19-1 | 1/7/2019 | 1/7/2019 | 40 Approving | Unpaid | 75163.66 |
| LinkedIn Corp. | 1.0102E+12 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 6608.22 |
| Outdoor America Images, Inc. | 166752 | 1/7/2019 | 2/6/2019 | 10 Approving | Unpaid | 797.65 |
| Security Industry Specialists, Inc. | 127289 | 1/7/2019 | 1/1/2018 | 411 Assigned | Unpaid | 139196.49 |
| Sportstar Athletics | 54964 | 1/7/2019 | 1/27/2019 | 20 Approving | Unpaid | 8850.5 |
| Sportstar Athletics | 54965 | 1/7/2019 | 1/27/2019 | 20 Approving | Unpaid | 5184 |
| XOS Digital | INV25346 | 1/7/2019 | 2/6/2019 | 10 Assigned | Unpaid | 840 |
| ACO Medical Supply, Inc. | 5740749 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |
| ACO Medical Supply, Inc. | 5740755 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |
| ACO Medical Supply, Inc. | 5740744 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740745 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 736.35 |
| ACO Medical Supply, Inc. | 5740751 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740760 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |
| ACO Medical Supply, Inc. | 5740759 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740850 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 66.57 |
| ACO Medical Supply, Inc. | 5740909 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 31.34 |
| ACO Medical Supply, Inc. | 5740748 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740750 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |
| ACO Medical Supply, Inc. | 5740753 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740756 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740757 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 507.85 |
| ACO Medical Supply, Inc. | 5740758 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |
| ACO Medical Supply, Inc. | 5740843 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 66.57 |
| ACO Medical Supply, Inc. | 5740847 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 66.33 |
| ACO Medical Supply, Inc. | 5740747 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 736.35 |
| ACO Medical Supply, Inc. | 5740752 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 114.25 |
| ACO Medical Supply, Inc. | 5740763 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740746 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |
| ACO Medical Supply, Inc. | 5740762 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 3765 |
| ACO Medical Supply, Inc. | 5740846 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 66.33 |
| ACO Medical Supply, Inc. | 5740743 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 457 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACO Medical Supply, Inc. | 5740761 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 357 |
| ACO Medical Supply, Inc. | 5740754 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 3765 |
| CBS Television Network | 60019389 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 485833 |
| HENRY SCHEIN, Inc. | 60983183 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 60983179 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 60995622 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 60983511 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 60.94 |
| HENRY SCHEIN, Inc. | 61019461 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 17.7 |
| HENRY SCHEIN, Inc. | 61019767 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 115.28 |
| HENRY SCHEIN, Inc. | 60983524 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 60.94 |
| HENRY SCHEIN, Inc. | 61019772 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 115.28 |
| HENRY SCHEIN, Inc. | 61019765 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 54.34 |
| HENRY SCHEIN, Inc. | 61041746 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 61019533 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 216.06 |
| HENRY SCHEIN, Inc. | 61007958 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 11.65 |
| HENRY SCHEIN, Inc. | 61019481 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 35.4 |
| HENRY SCHEIN, Inc. | 61019495 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 216.06 |
| HENRY SCHEIN, Inc. | 61041738 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 60983705 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 60.94 |
| HENRY SCHEIN, Inc. | 60983498 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 60.94 |
| HENRY SCHEIN, Inc. | 60983181 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 60983184 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 61019693 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 54.34 |
| HENRY SCHEIN, Inc. | 60983165 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 60983182 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 60962985 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 60983159 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 60963006 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 43.84 |
| HENRY SCHEIN, Inc. | 60983160 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 119.84 |
| HENRY SCHEIN, Inc. | 61041755 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 60777589 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 19763.06 |
| HENRY SCHEIN, Inc. | 60983158 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 119.84 |
| HENRY SCHEIN, Inc. | 60983164 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 119.84 |
| HENRY SCHEIN, Inc. | 61019509 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 216.06 |
| HENRY SCHEIN, Inc. | 61019748 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 54.34 |
| HENRY SCHEIN, Inc. | 61019757 | 1/8/2019 | 2/7/2019 | 9 Assigned | Unpaid | 54.34 |
| HENRY SCHEIN, Inc. | 60995619 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 59.3 |
| HENRY SCHEIN, Inc. | 61019484 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 216.06 |
| HENRY SCHEIN, Inc. | 60983419 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 60.94 |
| Midway Television Productions | 19001 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 1500 |
| Midway Television Productions | 18003 | 1/8/2019 | 2/7/2019 | 9 Approving | Unpaid | 1500 |
| Mind Over Media LLC | 1251 | 1/8/2019 | 1/8/2019 | 39 Approving | Unpaid | 7136.88 |
| OFFICE DEPOT | 2.54483E+11 | 1/8/2019 | 2/3/2019 | 13 Approving | Unpaid | 547.72 |
| OFFICE DEPOT | 2.54491E+11 | 1/8/2019 | 2/3/2019 | 13 Approving | Unpaid | 404.86 |
| OFFICE DEPOT | 2.5454E+11 | 1/8/2019 | 2/3/2019 | 13 Approving | Unpaid | 2373.86 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACO Medical Supply, Inc. | 5740955 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 1371 |
| ACO Medical Supply, Inc. | 5740949 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 1371 |
| ACO Medical Supply, Inc. | 5740944 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 914 |
| ACO Medical Supply, Inc. | 5740954 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 1256.75 |
| ACO Medical Supply, Inc. | 5740946 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 1371 |
| ACO Medical Supply, Inc. | 5740953 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 1713.75 |
| ACO Medical Supply, Inc. | 5740945 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 914 |
| ACO Medical Supply, Inc. | 5740956 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 1371 |
| HENRY SCHEIN, Inc. | 61058005 | 1/9/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 11.65 |
| HENRY SCHEIN, Inc. | 61041735 | 1/9/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 67.74 |
| HENRY SCHEIN, Inc. | 61058009 | 1/9/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 5.82 |
| HENRY SCHEIN, Inc. | 61058036 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 11.65 |
| HENRY SCHEIN, Inc. | 61058031 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 11.65 |
| HENRY SCHEIN, Inc. | 61042454 | 1/9/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 67.74 |
| HENRY SCHEIN, Inc. | 60777629 | 1/9/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 33590.17 |
| HENRY SCHEIN, Inc. | 61058037 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 11.65 |
| HENRY SCHEIN, Inc. | 61058049 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 11.65 |
| HENRY SCHEIN, Inc. | 61042462 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 67.74 |
| MediaRight, LLC | 134560 | 1/9/2019 | 2/8/2019 | 8 | Approving | Unpaid | 3195 |
| Precision Medical Services | 1 | 1/9/2019 | 1/1/2018 | 411 | Approving | Unpaid | 12500 |
| Contemporary Media, Inc | 1239306 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 300 |
| DTN, LLC | 5478107 | 1/10/2019 | 1/31/2019 | 16 | Approving | Unpaid | 1698.52 |
| HENRY SCHEIN, Inc. | 60870008 | 1/10/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 3464 |
| HENRY SCHEIN, Inc. | 61112871 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 689.77 |
| HENRY SCHEIN, Inc. | 61112878 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 689.77 |
| HENRY SCHEIN, Inc. | 61112988 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 689.77 |
| HENRY SCHEIN, Inc. | 61112874 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 344.88 |
| HENRY SCHEIN, Inc. | 61058030 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 18.74 |
| HENRY SCHEIN, Inc. | 60937833 | 1/10/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 61112892 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 689.77 |
| HENRY SCHEIN, Inc. | 61112869 | 1/10/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 689.77 |
| HENRY SCHEIN, Inc. | 61112883 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 689.77 |
| Miami Air International Inc | 131889 | 1/10/2019 | 1/26/2019 | 21 | Approving | Unpaid | 1273.23 |
| School of Health Corp. | 3540138-04 | 1/10/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 197.12 |
| School of Health Corp. | 3539444-01 | 1/10/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 1589.83 |
| Sir Speedy | 17844 | 1/10/2019 | 2/9/2019 | 7 | Approving | Unpaid | 447.3 |
| T.O.P Marketing USA | 10411 | 1/10/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 1059 |
| ACO Medical Supply, Inc. | 5741356 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 342.75 |
| Carey International Inc. | S0725713 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 94046.27 |
| Dental Choice holdings LLC | 1 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 7750 |
| DTN, LLC | 5478297 | 1/11/2019 | 1/31/2019 | 16 | Approving | Unpaid | 1499.52 |
| Encore Event Technologies | 358715 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 748.28 |
| HENRY SCHEIN, Inc. | 61041740 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 61041741 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 61152747 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 343.29 |

| Vendor | Invoice | Date 1 | Date 2 | Days | Status | Payment | Amount |
|---|---|---|---|---|---|---|---|
| HENRY SCHEIN, Inc. | 61112882 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 48.62 |
| HENRY SCHEIN, Inc. | 61159154 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 61069514 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 60777621 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 4800 |
| HENRY SCHEIN, Inc. | 61041752 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 173.5 |
| HENRY SCHEIN, Inc. | 60777611 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 728 |
| HENRY SCHEIN, Inc. | 61069511 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 60777609 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 296 |
| HENRY SCHEIN, Inc. | 61069560 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 136.12 |
| HENRY SCHEIN, Inc. | 60777607 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 296 |
| Jesse R. McGuire dba PowerTrump Inc | 01.11.19 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 500 |
| Jim N Nicks Management, LLC | 01.11.19 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 5940 |
| MWW Group LLC | 49537 | 1/11/2019 | 1/11/2019 | 36 | Approving | Unpaid | 32146 |
| PSAV | 1001943218 | 1/11/2019 | 2/10/2019 | 6 | Approving | Unpaid | 12456.71 |
| School of Health Corp. | 3540180-01 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 2867.14 |
| School of Health Corp. | 3540210-02 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 5922.33 |
| School of Health Corp. | 3540173-01 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 3600.94 |
| School of Health Corp. | 3540138-02 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 2781.6 |
| School of Health Corp. | 3540204-02 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 3306.56 |
| School of Health Corp. | 3540200-01 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 4120.1 |
| School of Health Corp. | 3540148-01 | 1/11/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 2065.99 |
| Audio Visual Management Solutions Inc. | 64-403182 | 1/13/2019 | 1/28/2019 | 19 | Approving | Unpaid | 534.21 |
| Flinn Broadcasting dba KXHT-FM;WHBQ-FM;WIVG-FM;WHBQ-AM | IN-119011278 | 1/13/2019 | 1/13/2019 | 34 | Approving | Unpaid | 1650 |
| Accu-Print San Antonio | 113569 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 93.13 |
| Clear Channel Outdoor | 58145949 | 1/14/2019 | 1/14/2019 | 33 | Approving | Unpaid | 31351 |
| Clear Channel Outdoor | 17100957 | 1/14/2019 | 1/14/2019 | 33 | Approving | Unpaid | 5800 |
| Don McPherson Enterprises | 1 | 1/14/2019 | 2/13/2019 | 3 | Assigned | Unpaid | 19500 |
| HENRY SCHEIN, Inc. | 61176138 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 520.5 |
| HENRY SCHEIN, Inc. | 61176711 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 694 |
| HENRY SCHEIN, Inc. | 61186132 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 694 |
| Jason Zone Fisher | 4 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 9195 |
| LAMAR | 109870903 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 600 |
| LAMAR | 109870898 | 1/14/2019 | 2/13/2019 | 3 | Approving | Unpaid | 1500 |
| RIght Choice Digital | INV-0036 | 1/14/2019 | 1/14/2019 | 33 | Approving | Unpaid | 6260.16 |
| Werqwise, Inc | 890 | 1/14/2019 | 1/14/2019 | 33 | Approving | Unpaid | 3000 |
| Aerial Video Systems | 32896-1 | 1/15/2019 | 1/15/2019 | 32 | Assigned | Unpaid | 1085 |
| Aerial Video Systems | 32896-2 | 1/15/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 1085 |
| Athletes for Hope | 1 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 12531.52 |
| bluemedia | INV-63744-2 | 1/15/2019 | 3/1/2019 | -13 | Approving | Unpaid | 45703.27 |
| Clear Gear | 12257 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 330 |
| G&G Outfitters Inc. | 130945 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 1113.66 |
| G-III Leather Fashions | 4654325 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 55181 |
| G-III Leather Fashions | 4654348 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 55181 |
| G-III Leather Fashions | 4654321 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 55181 |
| G-III Leather Fashions | 4654906 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 55181 |

| Vendor | Invoice | Date 1 | Date 2 | Code | Status | Paid | Amount |
|---|---|---|---|---|---|---|---|
| G-III Leather Fashions | 4654816 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 55181 |
| G-III Leather Fashions | 4654850 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 55181 |
| HENRY SCHEIN, Inc. | 61176705 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 30.87 |
| HENRY SCHEIN, Inc. | 61221201 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 5121.45 |
| HENRY SCHEIN, Inc. | 60995624 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 29.49 |
| HENRY SCHEIN, Inc. | 61275163 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 302.4 |
| HENRY SCHEIN, Inc. | 61115651 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 60.36 |
| HENRY SCHEIN, Inc. | 61221196 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 1630.85 |
| HENRY SCHEIN, Inc. | 61176144 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 30.87 |
| HENRY SCHEIN, Inc. | 61042443 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 29.49 |
| HENRY SCHEIN, Inc. | 60983163 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 29.49 |
| HENRY SCHEIN, Inc. | 61186131 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 30.87 |
| HENRY SCHEIN, Inc. | 61221200 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 42.25 |
| HENRY SCHEIN, Inc. | 61176123 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 30.87 |
| HENRY SCHEIN, Inc. | 61042410 | 1/15/2019 | 2/14/2019 | 2 | Approving | Unpaid | 29.49 |
| Prospect Productions LLC dba Barnicle | 1115 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 25619.34 |
| School of Health Corp. | 3540138-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 265.95 |
| School of Health Corp. | 3540210-04 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 523.34 |
| School of Health Corp. | 3540148-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 197.12 |
| School of Health Corp. | 3539444-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 720.46 |
| School of Health Corp. | 3540210-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 176.12 |
| School of Health Corp. | 3540204-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 159.9 |
| School of Health Corp. | 3539444-02 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 265.95 |
| School of Health Corp. | 3540200-02 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 265.95 |
| School of Health Corp. | 3540173-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 523.34 |
| School of Health Corp. | 3540148-02 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 265.95 |
| School of Health Corp. | 3540200-03 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 523.34 |
| School of Health Corp. | 3540138-05 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 523.34 |
| School of Health Corp. | 3540173-02 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 265.95 |
| Security Industry Specialists Inc. | 128716 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 159198.5 |
| Sir Speedy | 18261 | 1/15/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 297.14 |
| Sloane, Offer, Weber and Dern, LLP | 1/15/2019 | 1/15/2019 | 1/15/2019 | 32 | Approving | Unpaid | 5000 |
| Werqwise, Inc | 980 | 1/15/2019 | 1/30/2019 | 17 | Approving | Unpaid | 95250 |
| AMER Sports | 4527024337 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 17478.05 |
| Dicon dba Private Diagnostic Clinic, PLLC | #2 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 1005.25 |
| HENRY SCHEIN, Inc. | 61275171 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 3537.69 |
| HENRY SCHEIN, Inc. | 60552656 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 592 |
| HENRY SCHEIN, Inc. | 60777598 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 728 |
| HENRY SCHEIN, Inc. | 61283882 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 16.87 |
| HENRY SCHEIN, Inc. | 61298391 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 410.88 |
| HENRY SCHEIN, Inc. | 61042426 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 29.49 |
| HENRY SCHEIN, Inc. | 61275161 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 799.51 |
| HENRY SCHEIN, Inc. | 61298372 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 410.88 |
| HENRY SCHEIN, Inc. | 61298379 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 410.88 |
| HENRY SCHEIN, Inc. | 61259057 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 6.56 |

| Vendor | Invoice | Inv Date | Due Date | Qty | Status | Pay | Amount |
|---|---|---|---|---|---|---|---|
| HENRY SCHEIN, Inc. | 61209402 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 694 |
| HENRY SCHEIN, Inc. | 60777605 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 728 |
| HENRY SCHEIN, Inc. | 61275170 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 4348.55 |
| HENRY SCHEIN, Inc. | 61275176 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 3357.03 |
| HENRY SCHEIN, Inc. | 60777596 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 728 |
| HENRY SCHEIN, Inc. | 61283894 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 694 |
| HENRY SCHEIN, Inc. | 61275151 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 799.51 |
| HENRY SCHEIN, Inc. | 61298399 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 410.88 |
| HENRY SCHEIN, Inc. | 60777590 | 1/16/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 18467.69 |
| HENRY SCHEIN, Inc. | 61275159 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 4412.14 |
| HENRY SCHEIN, Inc. | 61298378 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 410.88 |
| HENRY SCHEIN, Inc. | 61252933 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 86.08 |
| HENRY SCHEIN, Inc. | 61283893 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 694 |
| HENRY SCHEIN, Inc. | 61041756 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 30.87 |
| HENRY SCHEIN, Inc. | 61283881 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 694 |
| Media2, Inc. dba m2 | 10804 | 1/16/2019 | 2/15/2019 | 1 | Approving | Unpaid | 33000 |
| Michael Aagard | #20 | 1/16/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1200 |
| ACO Medical Supply, Inc. | 5741927 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 85.62 |
| ACO Medical Supply, Inc. | 5741926 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 84.52 |
| AMER Sports | 4527032864 | 1/17/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 5607.35 |
| APPLE | 6791114446 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 3536.59 |
| Bruno Event Team LLC | 9301 | 1/17/2019 | 1/31/2019 | 16 | Approving | Unpaid | 15500 |
| BSN Sports | 300603097 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 672.71 |
| Clear Gear | 12230 | 1/17/2019 | 1/17/2019 | 30 | Assigned | Unpaid | 7009.92 |
| Contemporary Media, Inc | 1239458 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 1445 |
| COX Media - West Arizona | Feb-19 | 1/17/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 7180.8 |
| EM Printing, LLC | 90944 | 1/17/2019 | 1/17/2019 | 30 | Approving | Unpaid | 167 |
| HENRY SCHEIN, Inc. | 61221202 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 748.2 |
| HENRY SCHEIN, Inc. | 61275177 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 267.81 |
| HENRY SCHEIN, Inc. | 61275172 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 267.81 |
| HENRY SCHEIN, Inc. | 60983166 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 29.49 |
| HENRY SCHEIN, Inc. | 61275162 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 267.81 |
| HENRY SCHEIN, Inc. | 61275152 | 1/17/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 267.81 |
| HENRY SCHEIN, Inc. | 61275169 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 107.6 |
| HENRY SCHEIN, Inc. | 61275160 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 908 |
| HENRY SCHEIN, Inc. | 61176703 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 30.87 |
| HENRY SCHEIN, Inc. | 61275173 | 1/17/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1175.81 |
| HENRY SCHEIN, Inc. | 61275174 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 3658.13 |
| HENRY SCHEIN, Inc. | 61275175 | 1/17/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 267.81 |
| Kilpatrick Townsend & Stockton LLP | 12152424 | 1/17/2019 | 1/17/2019 | 30 | Approving | Unpaid | 5000 |
| MWW Group LLC | 49632 | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 2553.85 |
| Olympic Case Co | 53718 | 1/17/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 17983.81 |
| Simplified Coach, Inc. | SC9013i | 1/17/2019 | 2/16/2019 | 0 | Approving | Unpaid | 12000 |
| Smedley Events LLC | 1005 | 1/17/2019 | 1/25/2019 | 22 | Assigned | Unpaid | 1500 |
| Accolade  USA Inc. | 294768 -S1 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 1115.56 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Adidas | 6176990143 | 1/18/2019 | 3/19/2019 | -31 | Approving | Unpaid | 755.89 |
| APPLE | 6791323938 | 1/18/2019 | 2/17/2019 | -1 | Approving | Unpaid | 3536.59 |
| Custom Specialties & Supply Inc. | 353054 | 1/18/2019 | 2/7/2019 | 9 | Assigned | Unpaid | 4095 |
| DESERET DIGITAL MEDIA Inc. (dba KSL.com, Deseretnews.com, DDM, Utah.com) | 1231283 | 1/18/2019 | 2/17/2019 | -1 | Approving | Unpaid | 1000 |
| G&G Outfitters Inc. | 130976 | 1/18/2019 | 2/17/2019 | -1 | Approving | Unpaid | 1152.89 |
| HENRY SCHEIN, Inc. | 61371754 | 1/18/2019 | 2/17/2019 | -1 | Approving | Unpaid | 86.4 |
| HENRY SCHEIN, Inc. | 61275168 | 1/18/2019 | 2/17/2019 | -1 | Approving | Unpaid | 1821.72 |
| HENRY SCHEIN, Inc. | 61391776 | 1/18/2019 | 2/17/2019 | -1 | Approving | Unpaid | 5.82 |
| Michael Aagard | #21 | 1/18/2019 | 2/18/2019 | -2 | Approving | Unpaid | 1200 |
| Pioneer Manufacturing Company dba Pioneer Athletics & Revere Products | INV706341-1 | 1/18/2019 | 2/2/2019 | 14 | Approving | Unpaid | 6810.59 |
| School of Health Corp. | 3540173-05 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 197.12 |
| School of Health Corp. | 3540180-04 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 197.12 |
| School of Health Corp. | 3540204-05 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 197.12 |
| School of Health Corp. | 3540200-05 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 197.12 |
| School of Health Corp. | 3540210-06 | 1/18/2019 | 1/18/2019 | 29 | Assigned | Unpaid | 197.12 |
| Vicis | IN1-1819-22 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 70749.6 |
| Vicis | IN1-1820-21 | 1/18/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 6094.51 |
| Gabriel Bermea | 2/18/2019 | 1/19/2019 | 2/18/2019 | -2 | Approving | Unpaid | 250.69 |
| SBR Technologies Vision Graphics | 460850 | 1/19/2019 | 2/18/2019 | -2 | Assigned | Unpaid | 403.65 |
| SBR Technologies Vision Graphics | 460852 | 1/19/2019 | 2/18/2019 | -2 | Assigned | Unpaid | 2864.57 |
| SBR Technologies Vision Graphics | 460851 | 1/19/2019 | 2/18/2019 | -2 | Assigned | Unpaid | 471.78 |
| Third Eye Media - John Rosales | 165 | 1/20/2019 | 2/18/2019 | -2 | Assigned | Unpaid | 2100 |
| ACO Medical Supply, Inc. | 5742261 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742248 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742258 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742242 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 267.75 |
| ACO Medical Supply, Inc. | 5742256 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742247 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742249 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742244 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| ACO Medical Supply, Inc. | 5742252 | 1/21/2019 | 2/20/2019 | -4 | Approving | Unpaid | 1120 |
| Adidas | 6177002222 | 1/21/2019 | 3/22/2019 | -34 | Approving | Unpaid | 261.25 |
| Adidas | 6177002221 | 1/21/2019 | 3/22/2019 | -34 | Approving | Unpaid | 653.64 |
| BSN Sports | 904282837 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 672.71 |
| Clear Channel Outdoor | 17101148 | 1/21/2019 | 1/21/2019 | 26 | Approving | Unpaid | 10125 |
| Edward Lepp dba Leppdesign, LLC | SAC0001 | 1/21/2019 | 1/21/2019 | 26 | Assigned | Unpaid | 2970 |
| OFFICE DEPOT | 2.63681E+11 | 1/21/2019 | 2/10/2019 | 6 | Approving | Unpaid | 161.94 |
| OFFICE DEPOT | 2.63242E+11 | 1/21/2019 | 2/10/2019 | 6 | Approving | Unpaid | 104.33 |
| OFFICE DEPOT | 2269949480 | 1/21/2019 | 2/10/2019 | 6 | Approving | Unpaid | 51 |
| School of Health Corp. | 3547925-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 247.64 |
| School of Health Corp. | 3547950-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 196.75 |
| School of Health Corp. | 3547927-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 209.84 |
| School of Health Corp. | 3547943-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 209.84 |
| School of Health Corp. | 3547920-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 209.84 |
| School of Health Corp. | 3547937-00 | 1/21/2019 | 1/21/2019 | 26 | Assigned | Unpaid | 209.84 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| School of Health Corp. | 3547929-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 222.93 |
| School of Health Corp. | 3547948-00 | 1/21/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 196.75 |
| Adidas | 6177004095 | 1/22/2019 | 3/23/2019 | -35 | Approving | Unpaid | 470.25 |
| BSN Sports | 300617843 | 1/22/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 9084.34 |
| Fenwick & West LLP | 737217 | 1/22/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 22858.58 |
| KPHO Broadcasting Corporation dba KPHO-TV; KTVK-TV; AZFAMILY.COM | 923402-2 | 1/22/2019 | 1/22/2019 | 25 | Approving | Unpaid | 3389.66 |
| Medtel | 818019 | 1/22/2019 | 1/22/2019 | 25 | Approving | Unpaid | 4505.78 |
| Michael Kostel | 1 | 1/22/2019 | 2/21/2019 | -5 | Approving | Unpaid | 1400 |
| Midway Television Productions | 19002 | 1/22/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 3000 |
| New Era Cap | 95826324 | 1/22/2019 | 2/21/2019 | -5 | Approving | Unpaid | 441.7 |
| OFFICE DEPOT | 2270308730 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 30.05 |
| OFFICE DEPOT | 2.63482E+11 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 59.26 |
| OFFICE DEPOT | 2.63354E+11 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 24.23 |
| OFFICE DEPOT | 2.63627E+11 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 97.39 |
| OFFICE DEPOT | 2.63626E+11 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 307.41 |
| OFFICE DEPOT | 2.63627E+11 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 103.36 |
| OFFICE DEPOT | 2.62676E+11 | 1/22/2019 | 2/17/2019 | -1 | Approving | Unpaid | 130.57 |
| On-Air Sports Marketing LLC | 1146 | 1/22/2019 | 2/21/2019 | -5 | Approving | Unpaid | 850 |
| Pioneer Manufacturing Company dba Pioneer Athletics & Revere Products | INV706492 | 1/22/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 19545.88 |
| Proptology FX Inc. dba Set Masters | 3329-001 | 1/22/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 1313.45 |
| School of Health Corp. | 3547937-01 | 1/22/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 39.27 |
| Sports360az LLC | 1354 | 1/22/2019 | 1/22/2019 | 25 | Approving | Unpaid | 1500 |
| ACO Medical Supply, Inc. | 5742633 | 1/23/2019 | 2/22/2019 | -6 | Approving | Unpaid | 85.59 |
| ACO Medical Supply, Inc. | 5742632 | 1/23/2019 | 2/22/2019 | -6 | Approving | Unpaid | 85.59 |
| ACO Medical Supply, Inc. | 5742600 | 1/23/2019 | 2/22/2019 | -6 | Approving | Unpaid | 85.59 |
| ACO Medical Supply, Inc. | 5742636 | 1/23/2019 | 2/22/2019 | -6 | Approving | Unpaid | 85.59 |
| ACO Medical Supply, Inc. | 5742635 | 1/23/2019 | 2/22/2019 | -6 | Approving | Unpaid | 85.59 |
| Dr. Jill's Foot Pads, Inc. | 142306 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142307 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142313 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142315 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 66.95 |
| Dr. Jill's Foot Pads, Inc. | 142305 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142312 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142311 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142309 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| Dr. Jill's Foot Pads, Inc. | 142310 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 700 |
| G&G Outfitters Inc. | 130995 | 1/23/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 7626.51 |
| G&G Outfitters Inc. | 131012 | 1/23/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 1230.74 |
| Hubbard Radio Phoenix dba KSLX-FM, KAZG-AM, KDKB-FM, KUPD-FM, KDUS-AM | M-190115983795 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 3708.3 |
| Mind Over Media LLC | 1256 | 1/23/2019 | 1/23/2019 | 24 | Approving | Unpaid | 6255.27 |
| OFFICE DEPOT | 2.64395E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 61.68 |
| OFFICE DEPOT | 2.63977E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 81.96 |
| OFFICE DEPOT | 2270714115 | 1/23/2019 | 2/17/2019 | -1 | Approving | Unpaid | 48.69 |
| OFFICE DEPOT | 2.63975E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 190.2 |
| OFFICE DEPOT | 2.64364E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 114.12 |

| Vendor | Invoice | Date 1 | Date 2 | Num | Status | Pay | Amount |
|---|---|---|---|---|---|---|---|
| OFFICE DEPOT | 2.64111E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 18.41 |
| OFFICE DEPOT | 2.64132E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 69.56 |
| OFFICE DEPOT | 2.6386E+11 | 1/23/2019 | 2/12/2019 | 4 | Approving | Unpaid | 181.63 |
| OFFICE DEPOT | 2270661750 | 1/23/2019 | 2/17/2019 | -1 | Approving | Unpaid | 66.02 |
| Olympic Case Co | 53749 | 1/23/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 24110.84 |
| PCS Production Company, LP | 5890 | 1/23/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 73209.4 |
| Safari Jeffries dba Jeffries Media Enterprises LLC | 1.23.19 | 1/23/2019 | 1/31/2019 | 16 | Approving | Unpaid | 152.25 |
| Sandra Bryant | 1.23.19 | 1/23/2019 | 1/31/2019 | 16 | Approving | Unpaid | 21.75 |
| School of Health Corp. | 3540210-04 | 1/23/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 106.05 |
| School of Health Corp. | 3540210-05 | 1/23/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 106.05 |
| Whitney Stroup | 1.23.19 | 1/23/2019 | 1/31/2019 | 16 | Approving | Unpaid | 50.75 |
| ACO Medical Supply, Inc. | 5742738 | 1/24/2019 | 2/23/2019 | -7 | Approving | Unpaid | 283.7 |
| American Society of Composers, Authors and Publishers dba ASCAP | 01.24.19 | 1/24/2019 | 1/24/2019 | 23 | Approving | Unpaid | 3870 |
| D.J. May | 1.24.19Pmt36 | 1/24/2019 | 1/24/2019 | 23 | Approved | Unpaid | 455 |
| DLA Piper LLP | 3716475 | 1/24/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 6000 |
| OFFICE DEPOT | 2270793840 | 1/24/2019 | 2/17/2019 | -1 | Approving | Unpaid | 24.35 |
| OFFICE DEPOT | 2.64665E+11 | 1/24/2019 | 2/13/2019 | 3 | Approving | Unpaid | 54.58 |
| OFFICE DEPOT | 2.64665E+11 | 1/24/2019 | 2/13/2019 | 3 | Approving | Unpaid | 15.9 |
| Pioneer Manufacturing Company dba Pioneer Athletics & Revere Products | INV706634 | 1/24/2019 | 1/24/2019 | 23 | Assigned | Unpaid | 2758.78 |
| Prospect Productions LLC dba Barnicle | 1116 | 1/24/2019 | 2/23/2019 | -7 | Approving | Unpaid | 36965 |
| Savor & Black Tie | E00962 | 1/24/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 2537 |
| Tag Up by Rischard Marketing, Inc | 193201D | 1/24/2019 | 2/3/2019 | 13 | Approving | Unpaid | 2766.4 |
| ACM HUB, LLC dba Titan Sign Company | 12879 | 1/25/2019 | 1/25/2019 | 22 | Assigned | Unpaid | 3827.72 |
| Adidas | 6177029253 | 1/25/2019 | 3/26/2019 | -38 | Assigned | Unpaid | 365.75 |
| Adidas | 6177029252 | 1/25/2019 | 3/26/2019 | -38 | Assigned | Unpaid | 1724.25 |
| Comcast Spotlight - Los Angeles | 01.22.19 Prepay | 1/25/2019 | 1/25/2019 | 22 | Approving | Unpaid | 17000 |
| G&G Outfitters Inc. | 131031 | 1/25/2019 | 2/24/2019 | -8 | Approving | Unpaid | 1023.32 |
| Jeff Ortiz | 182201 | 1/25/2019 | 2/24/2019 | -8 | Assigned | Unpaid | 808.21 |
| NFL Alumni Inc. - Charity | 15-1114 | 1/25/2019 | 2/24/2019 | -8 | Assigned | Unpaid | 5000 |
| OFFICE DEPOT | 2271250800 | 1/25/2019 | 2/17/2019 | -1 | Approving | Unpaid | 156.09 |
| OFFICE DEPOT | 2.649E+11 | 1/25/2019 | 2/14/2019 | 2 | Approving | Unpaid | 60.78 |
| OFFICE DEPOT | 2.65095E+11 | 1/25/2019 | 2/14/2019 | 2 | Approving | Unpaid | 104.2 |
| OFFICE DEPOT | 2.6594E+11 | 1/25/2019 | 2/14/2019 | 2 | Approving | Unpaid | 190.2 |
| OFFICE DEPOT | 2.65193E+11 | 1/25/2019 | 2/14/2019 | 2 | Approving | Unpaid | 52.55 |
| Sir Speedy | 18563 | 1/25/2019 | 2/24/2019 | -8 | Approving | Unpaid | 300 |
| Skymail International, Inc. | 33308 | 1/25/2019 | 2/9/2019 | 7 | Approving | Unpaid | 577.62 |
| Texon II Inc. | SI-110982 | 1/25/2019 | 2/23/2019 | -7 | Approving | Unpaid | 15042.4 |
| The Enterprise-Utah's Business Journal | 43976 | 1/25/2019 | 2/9/2019 | 7 | Approving | Unpaid | 5000 |
| Vicis | IN1-1829 | 1/25/2019 | 2/24/2019 | -8 | Assigned | Unpaid | 649.5 |
| OFFICE DEPOT | 2271708179 | 1/26/2019 | 2/17/2019 | -1 | Approving | Unpaid | 116.83 |
| OFFICE DEPOT | 2271692782 | 1/26/2019 | 2/17/2019 | -1 | Approving | Unpaid | 135.58 |
| OFFICE DEPOT | 2271726719 | 1/26/2019 | 2/17/2019 | -1 | Approving | Unpaid | 326.64 |
| OFFICE DEPOT | 2271708926 | 1/26/2019 | 2/17/2019 | -1 | Approving | Unpaid | 155.35 |
| San Antonio Police Department | 01.26.19 | 1/26/2019 | 1/26/2019 | 21 | Assigned | Unpaid | 510.04 |
| Savor & Black Tie | E00968:Balance | 1/26/2019 | 1/26/2019 | 21 | Assigned | Unpaid | 15690 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Suzan Ramsey | 1 | 1/26/2019 | 2/25/2019 | -9 | Assigned | Unpaid | 2320 |
| Flinn Broadcasting dba KXHT-FM;WHBQ-FM;WIVG-FM;WHBQ-AM | IN-119012260 | 1/27/2019 | 1/27/2019 | 20 | Approving | Unpaid | 2002 |
| Flinn Broadcasting dba KXHT-FM;WHBQ-FM;WIVG-FM;WHBQ-AM | IN-119012300 | 1/27/2019 | 1/27/2019 | 20 | Approving | Unpaid | 1188 |
| Fox 5 San Diego | KS19010355 | 1/27/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 18692.5 |
| iHeartMedia Ent. Inc. | 2813732317 | 1/27/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 4175 |
| KFMB-TV | 1725677-1 | 1/27/2019 | 2/26/2019 | -10 | Approving | Unpaid | 2000 |
| KFMB-TV | 1721403-2 | 1/27/2019 | 2/26/2019 | -10 | Approving | Unpaid | 24890 |
| KSL NewsRadio - Bonneville | 63938-1 | 1/27/2019 | 2/26/2019 | -10 | Approving | Unpaid | 2144.6 |
| NBC Universal, LLC dba Telemundo of Texas, LLC (KDVA) | NA19010004 | 1/27/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 300 |
| OFFICE DEPOT | 2271950164 | 1/27/2019 | 2/17/2019 | -1 | Approving | Unpaid | 227.77 |
| OFFICE DEPOT | 2271956615 | 1/27/2019 | 2/17/2019 | -1 | Approving | Unpaid | 27.05 |
| Savor & Black Tie | E00969:Balance | 1/27/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 25338.55 |
| Savor & Black Tie | E00980 | 1/27/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 1734.18 |
| Savor & Black Tie | E00971 | 1/27/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 5826.12 |
| Savor & Black Tie | E00970 | 1/27/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 577.6 |
| Spectrum Reach / Charter | INV-130132471 | 1/27/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 6800 |
| Spectrum Reach / Charter | INV-130132475 | 1/27/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 671.5 |
| Spectrum Reach / Charter | INV-130132473 | 1/27/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 12161.87 |
| Spectrum Reach / Charter | INV-130132472 | 1/27/2019 | 1/27/2019 | 20 | Assigned | Unpaid | 3017.5 |
| Vokkero by Adeunis NA, Inc. | | 1/27/2019 | 1/27/2019 | 20 | Approving | Unpaid | 29504 |
| ACO Medical Supply, Inc. | 5743106 | 1/28/2019 | 2/27/2019 | -11 | Approving | Unpaid | 357.14 |
| Adidas | 6177033229 | 1/28/2019 | 3/29/2019 | -41 | Approving | Unpaid | 57.47 |
| Adidas | 6177042162 | 1/28/2019 | 3/29/2019 | -41 | Assigned | Unpaid | 52.25 |
| Documation, Inc. dba Documation of San Antonio | INV622987 | 1/28/2019 | 2/17/2019 | -1 | Assigned | Unpaid | 173.2 |
| Enfold I.T. | 2423 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 2950 |
| G&G Outfitters Inc. | 131051 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 52087.45 |
| Jonathan Grisham | 328 | 1/28/2019 | 2/12/2019 | 4 | Approving | Unpaid | 200 |
| Kristen Lange | 1001 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 3979.33 |
| LAMAR | 109905418 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 4332 |
| OFFICE DEPOT | 2.65734E+11 | 1/28/2019 | 2/17/2019 | -1 | Approving | Unpaid | 97.73 |
| OFFICE DEPOT | 2.67119E+11 | 1/28/2019 | 2/17/2019 | -1 | Approving | Unpaid | 190.2 |
| OFFICE DEPOT | 2.66139E+11 | 1/28/2019 | 2/17/2019 | -1 | Approving | Unpaid | 74.68 |
| Olympic Case Co | 53775 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 3139.28 |
| Pioneer Manufacturing Company dba Pioneer Athletics & Revere Products | ORD730120-1 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 4360.32 |
| Pro Orthopedic Devices, Inc. | 219684 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 525.1 |
| Pro Orthopedic Devices, Inc. | 219683 | 1/28/2019 | 2/27/2019 | -11 | Assigned | Unpaid | 589.18 |
| School of Health Corp. | 3541369-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541372-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541368-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541370-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541374-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541376-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541377-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| School of Health Corp. | 3541373-00 | 1/28/2019 | 1/28/2019 | 19 | Assigned | Unpaid | 72.4 |
| ACO Medical Supply, Inc. | 5743190 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 700.21 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACO Medical Supply, Inc. | 5743192 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 400.12 |
| ACO Medical Supply, Inc. | 5743194 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 300.09 |
| ACO Medical Supply, Inc. | 5743187 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 700.21 |
| ACO Medical Supply, Inc. | 5743193 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 300.09 |
| ACO Medical Supply, Inc. | 5743195 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 600.18 |
| Adidas | 6177044233 | 1/29/2019 | 3/30/2019 | -42 | Assigned | Unpaid | 104.5 |
| Adidas | 6177044234 | 1/29/2019 | 3/30/2019 | -42 | Assigned | Unpaid | 104.5 |
| Alexandra Ellington | 12919 | 1/29/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 2100 |
| Dex Imaging | AR3948531 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 257.42 |
| GHP Media | 395005011 | 1/29/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 423 |
| GHP Media | 395065011 | 1/29/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 3589 |
| iQ Graphics | 13-7422 | 1/29/2019 | 1/29/2019 | 18 | Assigned | Unpaid | 6491.94 |
| Matthew Metcalf | 1.29.19 Expense Re | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 1248.28 |
| Miami Air International Inc | 131988 | 1/29/2019 | 2/6/2019 | 10 | Unassigned | Unpaid | 7178.85 |
| Mike Van Ermen | 1.29 expense repor | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 1056.62 |
| New Era Cap | 95841104 | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 3643.7 |
| OFFICE DEPOT | 2.661E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 94.99 |
| OFFICE DEPOT | 2.67229E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 9.3 |
| OFFICE DEPOT | 2.67229E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 7.56 |
| OFFICE DEPOT | 2.67229E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 43.29 |
| OFFICE DEPOT | 2.67217E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 181.29 |
| OFFICE DEPOT | 2.67157E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 27.05 |
| OFFICE DEPOT | 2.67587E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 108.08 |
| OFFICE DEPOT | 2.66075E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 97.32 |
| OFFICE DEPOT | 2.67164E+11 | 1/29/2019 | 2/18/2019 | -2 | Approving | Unpaid | 28.82 |
| Office Resale Solutions, LLC | 2734 | 1/29/2019 | 2/1/2019 | 15 | Approving | Unpaid | 3000 |
| Olympic Case Co | 53783 | 1/29/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 5924.38 |
| Olympic Case Co | 53784 | 1/29/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 2946.94 |
| Olympic Case Co | 53785 | 1/29/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 3049.69 |
| Pro Orthopedic Devices, Inc. | 219695 | 1/29/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 1014.89 |
| Pyro Shows of Alabama, Inc. | 19PSAL00033 | 1/29/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 9020 |
| Rick Hamilton | Jan Expenses | 1/29/2019 | 2/28/2019 | -12 | Approving | Unpaid | 1247.63 |
| Air Cannons | W-2-6391 | 1/30/2019 | 1/30/2019 | 17 | Approving | Unpaid | 2025 |
| Alliance Productions | 24356 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 247000 |
| Caryn Marie Nichols | 1 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 2100 |
| Logicopy | INV24252 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 39.75 |
| Logicopy | INV24245 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 374.34 |
| Michael Aagard | #24 | 1/30/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 1200 |
| Morgan, Lewis & Bockius | 4095427 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095423 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095412 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095411 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095439 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095431 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095428 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Morgan, Lewis & Bockius | 4095416 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095415 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095441 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095450 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095403 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 25905 |
| Morgan, Lewis & Bockius | 4095399 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 75823.5 |
| Morgan, Lewis & Bockius | 4095410 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095408 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095447 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095424 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095440 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095444 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095398 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 75692.32 |
| Morgan, Lewis & Bockius | 4095407 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 9883.5 |
| Morgan, Lewis & Bockius | 4095419 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095434 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095430 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 93 |
| Morgan, Lewis & Bockius | 4095422 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095446 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095409 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095401 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 56938 |
| Morgan, Lewis & Bockius | 4095443 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 31 |
| Morgan, Lewis & Bockius | 4095451 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095448 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095445 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095435 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095420 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095438 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095436 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095426 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095402 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 2829.14 |
| Morgan, Lewis & Bockius | 4095413 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095418 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095442 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095449 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095406 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 8939.5 |
| Morgan, Lewis & Bockius | 4095429 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095452 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095433 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095437 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095432 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095405 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 124 |
| Morgan, Lewis & Bockius | 4095400 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 34399.5 |
| Morgan, Lewis & Bockius | 4095425 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095414 | 1/30/2019 | 1/30/2019 | 17 Assigned | Unpaid | 62 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Morgan, Lewis & Bockius | 4095417 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095461 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095469 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095462 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095454 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095457 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095460 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095459 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095465 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095456 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 31 |
| Morgan, Lewis & Bockius | 4095468 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095463 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095464 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095458 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095467 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095466 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095453 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095455 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 62 |
| Morgan, Lewis & Bockius | 4095470 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 12014 |
| Northside Education Foundation | 1228 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 3500 |
| OFFICE DEPOT | 2.67337E+11 | 1/30/2019 | 2/19/2019 | -3 | Approving | Unpaid | 219.96 |
| OFFICE DEPOT | 2.67424E+11 | 1/30/2019 | 2/19/2019 | -3 | Approving | Unpaid | 59.65 |
| OFFICE DEPOT | 2.67229E+11 | 1/30/2019 | 2/19/2019 | -3 | Approving | Unpaid | 8.93 |
| OFFICE DEPOT | 2.66682E+11 | 1/30/2019 | 2/19/2019 | -3 | Approving | Unpaid | 17.34 |
| OFFICE DEPOT | 2.6668E+11 | 1/30/2019 | 2/19/2019 | -3 | Approving | Unpaid | 1299.8 |
| Olympic Case Co | 53795 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 3138.97 |
| Olympic Case Co | 53794 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 2925.7 |
| Olympic Case Co | 53793 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 2946.94 |
| School of Health Corp. | 3540180-02 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 265.95 |
| School of Health Corp. | 3547948-01 | 1/30/2019 | 1/30/2019 | 17 | Assigned | Unpaid | 52.36 |
| Team Fitz Graphics | Quote: 00035714 | 1/30/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 965 |
| Accolade  USA Inc. | 295480-S1 | 1/31/2019 | 3/2/2019 | -14 | Approving | Unpaid | 21787.94 |
| Accu-Print San Antonio | 113224 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1020.74 |
| Accu-Print San Antonio | 113859 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 2405.31 |
| ACO Medical Supply, Inc. | 5743505 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 469.24 |
| ACO Medical Supply, Inc. | 5743514 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 341.52 |
| ACO Medical Supply, Inc. | 5743516 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 477.14 |
| ACO Medical Supply, Inc. | 5743518 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 662.4 |
| ACO Medical Supply, Inc. | 5743503 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 434.48 |
| ACO Medical Supply, Inc. | 5743504 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 404 |
| ACO Medical Supply, Inc. | 5743520 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 437.1 |
| ACO Medical Supply, Inc. | 5743506 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 559.16 |
| Alabama Media Group | 2331050 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 4500 |
| Arkansas Graphics Inc. | 50601 | 1/31/2019 | 3/2/2019 | -14 | Approving | Unpaid | 1942.61 |
| Cumulus Media - WGKX-FM | AA1930274 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 7609 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| D.J. May | 1.31.19Pmt107 | 1/31/2019 | 1/31/2019 | 16 | Approved | Unpaid | 130 |
| Documation, Inc. dba Documation of San Antonio | SO112083 | 1/31/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 324.75 |
| Dumac, LLC | 119051 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 935.12 |
| DVSport, Inc. | Feb-19 | 1/31/2019 | 2/15/2019 | 1 | Approving | Unpaid | 39000 |
| Entercom Tennessee LLC | 1166279-1 | 1/31/2019 | 1/31/2019 | 16 | Approving | Unpaid | 6474 |
| exhibit experts | BIR011819E | 1/31/2019 | 1/31/2019 | 16 | Approving | Unpaid | 1795 |
| Hiregy | 472041855 | 1/31/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 345.28 |
| iHeartMedia Ent. Inc. | 2513763186 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 59177.5 |
| iHeartMedia Ent. Inc. | 2813763505 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 12285 |
| KongBasileConsulting, LLC | 7588 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 9815 |
| Miami Air International Inc | 132011 | 1/31/2019 | 1/31/2019 | 16 | Approving | Unpaid | 500000 |
| OFFICE DEPOT | 2.67807E+11 | 1/31/2019 | 2/20/2019 | -4 | Approving | Unpaid | 17.22 |
| OFFICE DEPOT | 2.6804E+11 | 1/31/2019 | 2/20/2019 | -4 | Approving | Unpaid | 849.11 |
| OFFICE DEPOT | 2.67455E+11 | 1/31/2019 | 2/20/2019 | -4 | Approving | Unpaid | 850.04 |
| OFFICE DEPOT | 2273453203 | 1/31/2019 | 2/20/2019 | -4 | Approving | Unpaid | 444.2 |
| OFFICE DEPOT | 2.67806E+11 | 1/31/2019 | 2/20/2019 | -4 | Approving | Unpaid | 228.84 |
| OFFICE DEPOT | 2.68047E+11 | 1/31/2019 | 2/20/2019 | -4 | Approving | Unpaid | 497.73 |
| Pro Orthopedic Devices, Inc. | 219744 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1196.19 |
| Pro Orthopedic Devices, Inc. | 219743 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1235.15 |
| Pro Orthopedic Devices, Inc. | 219741 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 212.19 |
| Pro Orthopedic Devices, Inc. | 219746 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1190.19 |
| Pro Orthopedic Devices, Inc. | 219745 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1190.19 |
| Pro Orthopedic Devices, Inc. | 219742 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1455.48 |
| Pro Orthopedic Devices, Inc. | 219747 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1187.19 |
| Pro Orthopedic Devices, Inc. | 219748 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1177.69 |
| PSAV | 1001957295 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 13549.96 |
| Safety Services, Inc. dba U.S. Safety Services | 4521 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 10126.5 |
| School of Health Corp. | 3540180-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 4232.23 |
| School of Health Corp. | 3540173-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 4479.24 |
| School of Health Corp. | 3540200-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 3960.08 |
| School of Health Corp. | 3540210-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 1976.08 |
| School of Health Corp. | 3540148-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 3535.41 |
| School of Health Corp. | 3540204-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 2132.41 |
| School of Health Corp. | 3540138-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 5175.42 |
| School of Health Corp. | 3540204-01 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 162.43 |
| School of Health Corp. | 3540210-01 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 149.34 |
| School of Health Corp. | 3539444-00 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 6490.35 |
| School of Health Corp. | 3540138-01 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 123.16 |
| Sinclair Broadcasting WBMA WTTO WABM | 6411287 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 19500 |
| Sinclair Broadcasting WBMA WTTO WABM | 6410554 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 265 |
| Sinclair Broadcasting WBMA WTTO WABM | 6410557 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 11870 |
| Sinclair Broadcasting WBMA WTTO WABM | 6410555 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 580 |
| T&MG, LLC dba Fastsigns/Accuprint | 137983 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 653.74 |
| T&MG, LLC dba Fastsigns/Accuprint | 137989 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 725.11 |
| Texon II Inc. | SI-111017 | 1/31/2019 | 3/2/2019 | -14 | Approving | Unpaid | 1182.4 |

| Vendor | Invoice | Date 1 | Date 2 | Terms | Status | Payment | Amount |
|---|---|---|---|---|---|---|---|
| The Emblem Source LLC | TES-62594 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1018.99 |
| Trinity University Dept of Athletics | 2019-2 | 1/31/2019 | 3/2/2019 | -14 | Approving | Unpaid | 5000 |
| War Machine Inc dba TSHIRTGUN.COM | 19120 | 1/31/2019 | 1/31/2019 | 16 | Assigned | Unpaid | 8500 |
| wincraft | 451652 | 1/31/2019 | 3/2/2019 | -14 | Assigned | Unpaid | 1189.71 |
| Adidas | 6177072620 | 2/1/2019 | 4/2/2019 | -45 | Assigned | Unpaid | 52.25 |
| ADVANCED FRAMING CONCEPTS | 11027 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 442.8 |
| Alliance Productions | 24368 | 2/1/2019 | 2/1/2019 | 15 | Approving | Unpaid | 15016.71 |
| Barry Horn | 2 | 2/1/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 500 |
| bluemedia | INV-64071-1 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 22444.04 |
| BSN Sports | 904376906 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 9084.34 |
| Classic Traditions, Inc. | 14127 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 2854.58 |
| CP Communications | 1068036 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 25555.4 |
| DoubleTree Hotel San Antonio Downtown | SAC | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 651955.93 |
| First Insurance Funding | 900-77923510:02.: | 2/1/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 509775.53 |
| Five Marketing & Management LLC | 6011 | 2/1/2019 | 2/1/2019 | 15 | Approving | Unpaid | 18750 |
| HEB | 10025 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 9277.71 |
| Hilton Garden Inn Downtown Birmingham | 64403A | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 836.64 |
| John Murray | Expense report 2/1 | 2/1/2019 | 2/1/2019 | 15 | Approved | Unpaid | 1953.17 |
| KORE Interactive Systems | INV00003225 | 2/1/2019 | 2/1/2019 | 15 | Approving | Unpaid | 35100 |
| Mission Cloud Services | 15920 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 10900 |
| Mission Cloud Services | 15923 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 10900 |
| Muscular Moving Men | 27604 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 2800 |
| Muscular Moving Men | 27603 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 16625 |
| OFFICE DEPOT | 2.68532E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 40.25 |
| OFFICE DEPOT | 2.68608E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 4.33 |
| OFFICE DEPOT | 2.68202E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 68.99 |
| OFFICE DEPOT | 2.6838E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 58.78 |
| OFFICE DEPOT | 2.68606E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 37.32 |
| OFFICE DEPOT | 2.68666E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 73.15 |
| OFFICE DEPOT | 2.6852E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 102.38 |
| OFFICE DEPOT | 2.68666E+11 | 2/1/2019 | 2/21/2019 | -5 | Approving | Unpaid | 29.04 |
| OUTFRONT Media Inc. | 4537335 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 450 |
| OUTFRONT Media Inc. | 4537336 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 2850 |
| OUTFRONT Media Inc. | 4538601 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 2000 |
| OUTFRONT Media Inc. | 4516145 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 4300 |
| OUTFRONT Media Inc. | 4531917 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 750 |
| OUTFRONT Media Inc. | 4559098 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 450 |
| OUTFRONT Media Inc. | 4517417 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 1000 |
| Ralph Colella dba Queso Good by Ralph's Snack Bar | 20119 | 2/1/2019 | 2/11/2019 | 5 | Assigned | Unpaid | 2162 |
| S O S Global Express | WP086816 | 2/1/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 235 |
| San Antonio Police Department | 01.29.19 | 2/1/2019 | 2/1/2019 | 15 | Assigned | Unpaid | 11114.69 |
| San Diego Sportservice, Inc. dba Delaware North | 02.01.19 | 2/1/2019 | 2/1/2019 | 15 | Approving | Unpaid | 59286.87 |
| SportsMEDIA Technology Corp | 0031901-IN | 2/1/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 481307 |
| swirl \| mcgarrybowen | INV-14861 | 2/1/2019 | 2/1/2019 | 15 | Approving | Unpaid | 124078.29 |
| The Montag Group | 2019087 | 2/1/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 20000 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Switch Enterprises, LLC | 186017 | 2/1/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 4180 |
| Trinity University Dept of Athletics | 2019-3 | 2/1/2019 | 3/3/2019 | -15 | Approving | Unpaid | 8000 |
| CORT BUSINESS SERVICES CORP | 6696236 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 3202.5 |
| CORT BUSINESS SERVICES CORP | 6700492 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 3120.5 |
| CORT BUSINESS SERVICES CORP | 6717603 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 3306.32 |
| CORT BUSINESS SERVICES CORP | 6700115 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 7537.78 |
| CORT BUSINESS SERVICES CORP | 6713261 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 814.67 |
| CORT BUSINESS SERVICES CORP | 6695635 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 4425.84 |
| CORT BUSINESS SERVICES CORP | 6698977 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 3435.63 |
| CORT BUSINESS SERVICES CORP | 6696486 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 2747.39 |
| CORT BUSINESS SERVICES CORP | 6717132 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 1449.9 |
| CORT BUSINESS SERVICES CORP | 6714661 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 1714.59 |
| CORT BUSINESS SERVICES CORP | 6712331 | 2/2/2019 | 2/2/2019 | 14 | Approving | Unpaid | 3960.55 |
| Edgar Evan | 20190202 | 2/2/2019 | 3/4/2019 | -16 | Assigned | Unpaid | 2450 |
| S O S Global Express | 301276 | 2/2/2019 | 3/4/2019 | -16 | Assigned | Unpaid | 644.1 |
| APPLE | AA01312834 | 2/3/2019 | 3/5/2019 | -17 | Assigned | Unpaid | 2444.24 |
| CFO Partners dba CrossFit Orlando | 1025 | 2/3/2019 | 3/5/2019 | -17 | Approving | Unpaid | 3000 |
| Michael Aagard | #22 | 2/3/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 1200 |
| ACM HUB, LLC dba Titan Sign Company | 12868 | 2/4/2019 | 2/4/2019 | 12 | Approving | Unpaid | 3279.98 |
| City of San Antonio Alamodome | 3529 | 2/4/2019 | 2/4/2019 | 12 | Assigned | Unpaid | 1600 |
| G&G Outfitters Inc. | 131153 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 3689.79 |
| LAMAR | 109930111 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 668 |
| Michael Aagard | #25 | 2/4/2019 | 3/4/2019 | -16 | Assigned | Unpaid | 1200 |
| OUTFRONT Media Inc. | M-00025449 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 30000 |
| Pro Orthopedic Devices, Inc. | 219780 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 550.69 |
| Pro Orthopedic Devices, Inc. | 219782 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 583.27 |
| Pro Orthopedic Devices, Inc. | 219784 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 579.14 |
| Pro Orthopedic Devices, Inc. | 219783 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 583.27 |
| Pro Orthopedic Devices, Inc. | 219781 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 589.65 |
| Pro Orthopedic Devices, Inc. | 219785 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 574.33 |
| Prologis | 5369 | 2/4/2019 | 2/4/2019 | 12 | Assigned | Unpaid | 177.64 |
| S O S Global Express | 301471 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 528.9 |
| SewWrite | 6241 | 2/4/2019 | 2/4/2019 | 12 | Assigned | Unpaid | 552.82 |
| Simplified Coach, Inc. | SC9037i | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 1900 |
| Weldon Williams & Lick Inc. | 293671 | 2/4/2019 | 3/6/2019 | -18 | Assigned | Unpaid | 1361.63 |
| ACO Medical Supply, Inc. | 5743980 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 85.59 |
| Amy Schwartz | Reimbursement 2/5, | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 458.07 |
| Cliff Keen | OFF00319040 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 1661.1 |
| Cliff Keen | OFF0031938 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 1371.3 |
| Cliff Keen | OFF0031926 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 1185.75 |
| Cliff Keen | OFF0031941 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 237.3 |
| Cliff Keen | OFF0031937 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 79.05 |
| Cliff Keen | OFF0031939 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 195.9 |
| Comcast Spotlight - Los Angeles | 02.05.19  Prepay | 2/5/2019 | 2/5/2019 | 11 | Approving | Unpaid | 255 |
| Courtyard by Marriott San Antonio Airport | 337J4049881 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 71765.34 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| J&S Audio Visual | 1/11/2019 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 765.8 |
| Lisa Farrell | LF02032019 | 2/5/2019 | 2/20/2019 | -4 | Approving | Unpaid | 800 |
| MAC Printing | 3090 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 378.67 |
| Nelsons Tents and Events | 31415 | 2/5/2019 | 2/11/2019 | 5 | Assigned | Unpaid | 3217.43 |
| OFFICE DEPOT | 2.69375E+11 | 2/5/2019 | 2/25/2019 | -9 | Assigned | Unpaid | 178.8 |
| Savor & Black Tie | E01002 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 1812.76 |
| Savor & Black Tie | E01003 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 3227.38 |
| Sodexo | 7278 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 3398.34 |
| Sodexo | 7274 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 1223.78 |
| Sodexo | 7277 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 1363.75 |
| Sodexo | 7273 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 1217.23 |
| Sodexo | 7272 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 1332.78 |
| Sodexo | 7271 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 747.84 |
| Sodexo | 7275 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 556.11 |
| Sports and Healthcare Solutions LLC | 1827 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 63.11 |
| Suzan Ramsey | 2 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 3200 |
| The Highland Mint | INV19007605 | 2/5/2019 | 2/5/2019 | 11 | Assigned | Unpaid | 768 |
| Vicis | IN1-1972 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 1022.96 |
| Vicis | IN1-1871 | 2/5/2019 | 3/7/2019 | -19 | Assigned | Unpaid | 341 |
| Wright Fitness Inc. dba Wright Equipment | FebRental | 2/5/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 1695 |
| Accolade  USA Inc. | 295688 S4 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 5014.08 |
| Accolade  USA Inc. | 295687 -S4 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 2912 |
| Accolade  USA Inc. | 295690 -S4 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 2128.08 |
| Accolade  USA Inc. | 295689 -S4 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 3937.2 |
| ACO Medical Supply, Inc. | 5744038 | 2/6/2019 | 3/8/2019 | -20 | Approving | Unpaid | 300.49 |
| ACO Medical Supply, Inc. | 5744043 | 2/6/2019 | 3/8/2019 | -20 | Approving | Unpaid | 157.54 |
| ACO Medical Supply, Inc. | 5744087 | 2/6/2019 | 3/8/2019 | -20 | Approving | Unpaid | 117.11 |
| Air Cannons | W-2-6398 | 2/6/2019 | 2/6/2019 | 10 | Approving | Unpaid | 1725 |
| BexelESS | 61007 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 156676 |
| bluemedia | INV-63744-1 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 22851.64 |
| Downtown Tempe Authority | 153711 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 42 |
| Edward Lepp dba Leppdesign, LLC | SAC0003A | 2/6/2019 | 2/6/2019 | 10 | Approving | Unpaid | 570 |
| ExpandaBrand, Inc | 02.06.19 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 635 |
| Kevin Sullivan Communications, Inc. | 13 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 1750 |
| Marty Gilman Inc dba Gilman Gear | SO76529EX | 2/6/2019 | 2/6/2019 | 10 | Approving | Unpaid | 9933.95 |
| Midway Television Productions | 19003 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 2250 |
| Mobile Mini Solutions | 9005807364 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 382.32 |
| Mobile Mini Solutions | 9005807365 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 382.32 |
| NEP II, Inc dba NEP Supershooters, LP | 61015 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 381000 |
| OFFICE DEPOT | 2.69581E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 1493.87 |
| OFFICE DEPOT | 2275372313 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 257.99 |
| OFFICE DEPOT | 2.70352E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 28.33 |
| OFFICE DEPOT | 2.70743E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 42.07 |
| OFFICE DEPOT | 2.69839E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 327.64 |
| OFFICE DEPOT | 2.70354E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 80.07 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| OFFICE DEPOT | 2.70416E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 90.45 |
| OFFICE DEPOT | 2275342813 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 85.95 |
| OFFICE DEPOT | 2.69386E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 271.53 |
| OFFICE DEPOT | 2.69865E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 146.94 |
| OFFICE DEPOT | 2.69836E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 241.37 |
| OFFICE DEPOT | 2.70281E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 172.04 |
| OFFICE DEPOT | 2.70562E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 31.01 |
| OFFICE DEPOT | 2.70416E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 88.32 |
| OFFICE DEPOT | 2275351974 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 89.92 |
| OFFICE DEPOT | 2.69295E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 1003.25 |
| OFFICE DEPOT | 2.69377E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 261.56 |
| OFFICE DEPOT | 2.69704E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 774.98 |
| OFFICE DEPOT | 2.69721E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 176.31 |
| OFFICE DEPOT | 2.69839E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 110.71 |
| OFFICE DEPOT | 2.6949E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 963.52 |
| OFFICE DEPOT | 2.70281E+11 | 2/6/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 128.55 |
| Pyrotecnico FX, LLC | 02.06.19 | 2/6/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 19415 |
| Savor & Black Tie | E00959 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 7065.92 |
| Savor & Black Tie | E01011 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 8888.41 |
| Savor & Black Tie | E00958 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 6976 |
| Savor & Black Tie | E00957 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 2743.52 |
| Savor & Black Tie | E01013 | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 1324.42 |
| Savor & Black Tie | E00991 | 2/6/2019 | 2/6/2019 | 10 | Approving | Unpaid | 11670.54 |
| Savor & Black Tie | E01008Balance | 2/6/2019 | 2/6/2019 | 10 | Assigned | Unpaid | 1611.94 |
| Sodexo | 7281 | 2/6/2019 | 3/8/2019 | -20 | Assigned | Unpaid | 1192.58 |
| Tag Up by Rischard Marketing, Inc | 193863D | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 639.25 |
| Tag Up by Rischard Marketing, Inc | 193862D | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 553.05 |
| Tag Up by Rischard Marketing, Inc | 193864R | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 95.5 |
| TRI-C Club Supply Inc. | IN141091 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1110.73 |
| TRI-C Club Supply Inc. | IN141090 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1132.01 |
| TRI-C Club Supply Inc. | IN141086 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 2227.36 |
| TRI-C Club Supply Inc. | IN141087 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1092.61 |
| TRI-C Club Supply Inc. | IN141089 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1170.15 |
| TRI-C Club Supply Inc. | IN141088 | 2/6/2019 | 2/16/2019 | 0 | Assigned | Unpaid | 1166.19 |
| Violet Crown Independent | 100 | 2/6/2019 | 2/9/2019 | 7 | Assigned | Unpaid | 2000 |
| Adidas | 6177103477 | 2/7/2019 | 4/8/2019 | -51 | Assigned | Unpaid | 1598.68 |
| Adidas | 6177103478 | 2/7/2019 | 4/8/2019 | -51 | Assigned | Unpaid | 418 |
| Aramark | KC00930823 | 2/7/2019 | 2/7/2019 | 9 | Approving | Unpaid | 12753.94 |
| Aramark | KC00928915 | 2/7/2019 | 2/7/2019 | 9 | Approving | Unpaid | 6768.47 |
| Aramark | 000018047-000001 | 2/7/2019 | 2/7/2019 | 9 | Approving | Unpaid | 277811.26 |
| Clifton Larson Allen LLP | 2009965 | 2/7/2019 | 2/7/2019 | 9 | Assigned | Unpaid | 8258.5 |
| Clifton Larson Allen LLP | 2009960 | 2/7/2019 | 2/7/2019 | 9 | Assigned | Unpaid | 16432.85 |
| CM+PR dba Cardenas Marketing + Public Relations | 2019-0201 | 2/7/2019 | 3/9/2019 | -21 | Approving | Unpaid | 600 |
| DVSport, Inc. | 10465 | 2/7/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 32000 |
| G&G Outfitters Inc. | 131183 | 2/7/2019 | 3/9/2019 | -21 | Assigned | Unpaid | 5203.6 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| G&G Outfitters Inc. | | 131198 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 2051.13 |
| G&G Outfitters Inc. | | 131205 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 1055.27 |
| G&G Outfitters Inc. | | 131204 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 9316.88 |
| G&G Outfitters Inc. | | 131203 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 487.6 |
| G&G Outfitters Inc. | | 131209 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 13184.7 |
| G&G Outfitters Inc. | | 131196 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 999.19 |
| Gregory Hayden Mays | 02,07,19 | | 2/7/2019 | 2/7/2019 | 9 Assigned | Unpaid | 1050 |
| GTZ Machine & Welding Shop Inc. | | 1498 | 2/7/2019 | 2/7/2019 | 9 Assigned | Unpaid | 3150 |
| New Era Cap | | 95864557 | 2/7/2019 | 3/9/2019 | -21 Approving | Unpaid | 2313.01 |
| New Era Cap | | 95864556 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 336.6 |
| OFFICE DEPOT | | 2275709048 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 21.4 |
| OFFICE DEPOT | | 2.71275E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 80.8 |
| OFFICE DEPOT | | 2.71275E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 559.97 |
| OFFICE DEPOT | | 2.70869E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 20.35 |
| OFFICE DEPOT | | 2.708E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 318.17 |
| OFFICE DEPOT | | 2.70647E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 402.66 |
| OFFICE DEPOT | | 2.70749E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 91.29 |
| OFFICE DEPOT | | 2.70174E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 63.66 |
| OFFICE DEPOT | | 2.70338E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 502.75 |
| OFFICE DEPOT | | 2275696984 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 157.73 |
| OFFICE DEPOT | | 2.70416E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 349.94 |
| OFFICE DEPOT | | 2.7073E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 266.74 |
| OFFICE DEPOT | | 2.71054E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 360.16 |
| OFFICE DEPOT | | 2.70869E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 75.51 |
| OFFICE DEPOT | | 2.71152E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 112.95 |
| OFFICE DEPOT | | 2.70377E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 344.02 |
| OFFICE DEPOT | | 2.7043E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 73.58 |
| OFFICE DEPOT | | 2.70454E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 256.55 |
| OFFICE DEPOT | | 2.7061E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 351.6 |
| OFFICE DEPOT | | 2.69487E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 355.01 |
| OFFICE DEPOT | | 2.70164E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 252.1 |
| OFFICE DEPOT | | 2.70454E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 13.15 |
| OFFICE DEPOT | | 2.70846E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 77.46 |
| OFFICE DEPOT | | 2.70868E+11 | 2/7/2019 | 2/27/2019 | -11 Assigned | Unpaid | 40.3 |
| Orlando Food Service Partners dba Levy Restaurants | 68575-1 | | 2/7/2019 | 2/7/2019 | 9 Assigned | Unpaid | 28672.45 |
| Outdoor America Images, Inc. | | 167586 | 2/7/2019 | 3/9/2019 | -21 Approving | Unpaid | 6823.5 |
| Outdoor America Images, Inc. | | 167603 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 4824.34 |
| Outdoor America Images, Inc. | | 167602 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 4928.83 |
| RIDDELL SPORTS GROUP INC. | | 950828894 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 2605.08 |
| RIDDELL SPORTS GROUP INC. | | 950828895 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 7797.14 |
| SBR Technologies Vision Graphics | | 461629 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 35.55 |
| SBR Technologies Vision Graphics | | 461627 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 30.83 |
| Sneaky Bid Studios, LLC | 170673SB | | 2/7/2019 | 2/22/2019 | -6 Assigned | Unpaid | 180986.16 |
| Sodexo | | 7285 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 9223.09 |
| Sodexo | | 7286 | 2/7/2019 | 3/9/2019 | -21 Assigned | Unpaid | 9164.72 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| wincraft | 456788 | 2/7/2019 | 3/9/2019 | -21 | Assigned | Unpaid | 1053.4 |
| Arthur Rodriguez | 1003 | 2/8/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 10700 |
| Big Fogg, Inc. | 74903786 | 2/8/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 3150 |
| Big Fogg, Inc. | 74903785 | 2/8/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 3150 |
| Big Fogg, Inc. | 74903787 | 2/8/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 8500 |
| bluemedia | INV-64771 | 2/8/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 5194.53 |
| Cortez Liquid Waste Services | 418694 | 2/8/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 5453.64 |
| G&G Outfitters Inc. | 131219 | 2/8/2019 | 3/10/2019 | -22 | Assigned | Unpaid | 15728.74 |
| Josh Howard | 2/15/2020 | 2/8/2019 | 3/10/2019 | -22 | Assigned | Unpaid | 31 |
| Marty Gilman Inc dba Gilman Gear | SO76629 | 2/8/2019 | 2/8/2019 | 8 | Assigned | Unpaid | 128.1 |
| OFFICE DEPOT | 2276035143 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 63.78 |
| OFFICE DEPOT | 2.71666E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 307.87 |
| OFFICE DEPOT | 2.7158E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 98.97 |
| OFFICE DEPOT | 2.712E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 1087.62 |
| OFFICE DEPOT | 2.7202E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 367.63 |
| OFFICE DEPOT | 2.7128E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 1275.05 |
| OFFICE DEPOT | 2.71688E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 225.31 |
| OFFICE DEPOT | 2.70352E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 371.38 |
| OFFICE DEPOT | 2.70647E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 165.06 |
| OFFICE DEPOT | 2276005595 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 97.8 |
| OFFICE DEPOT | 2276010626 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 27.33 |
| OFFICE DEPOT | 2.715E+11 | 2/8/2019 | 2/28/2019 | -12 | Assigned | Unpaid | 70.83 |
| Orthotech Sports - Medical Equipment dba Intek | 186792 | 2/8/2019 | 2/8/2019 | 8 | Approving | Unpaid | 2414 |
| Outdoor America Images, Inc. | 167566 | 2/8/2019 | 3/10/2019 | -22 | Assigned | Unpaid | 5545.19 |
| Simplified Coach, Inc. | SC9029i | 2/8/2019 | 3/10/2019 | -22 | Approving | Unpaid | 10800 |
| Sodexo | 7270 | 2/8/2019 | 3/10/2019 | -22 | Assigned | Unpaid | 556.11 |
| Tag Up by Rischard Marketing, Inc | 194011D | 2/8/2019 | 2/18/2019 | -2 | Assigned | Unpaid | 1315.5 |
| Weldon Williams & Lick Inc. | 293836 | 2/8/2019 | 3/10/2019 | -22 | Assigned | Unpaid | 2552.48 |
| BZ Clarity Holdings, LLC dba Base 1836, LLC | 7004 | 2/9/2019 | 3/11/2019 | -23 | Assigned | Unpaid | 1000 |
| OFFICE DEPOT | 2.72073E+11 | 2/9/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 80.38 |
| OFFICE DEPOT | 2.70846E+11 | 2/9/2019 | 3/1/2019 | -13 | Assigned | Unpaid | 73.15 |
| Rhino Florida LLC | FL6080 | 2/9/2019 | 3/11/2019 | -23 | Assigned | Unpaid | 2884 |
| Savor & Black Tie | E00954 | 2/9/2019 | 2/9/2019 | 7 | Approving | Unpaid | 3698.9 |
| Savor & Black Tie | E00953 | 2/9/2019 | 2/9/2019 | 7 | Approving | Unpaid | 1812.76 |
| Savor & Black Tie | E01015 | 2/9/2019 | 3/11/2019 | -23 | Assigned | Unpaid | 349.66 |
| Adidas | 6177126981 | 2/10/2019 | 4/11/2019 | -54 | Assigned | Unpaid | 637.41 |
| Adidas | 6177126979 | 2/10/2019 | 4/11/2019 | -54 | Assigned | Unpaid | 522.5 |
| Adidas | 6177126980 | 2/10/2019 | 4/11/2019 | -54 | Assigned | Unpaid | 1442.1 |
| Alliance Productions | 24389 | 2/10/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 18554.09 |
| Jim N Nicks Management, LLC | 02.10.19 | 2/10/2019 | 3/12/2019 | -24 | Assigned | Unpaid | 838.15 |
| TRO Crewing, Inc | 19-109 (2) | 2/10/2019 | 2/10/2019 | 6 | Assigned | Unpaid | 17692.98 |
| Accu-Print San Antonio | 113999 | 2/11/2019 | 3/13/2019 | -25 | Approving | Unpaid | 1392.92 |
| bluemedia | INV-64772 | 2/11/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 4665.35 |
| bluemedia | INV-64823 | 2/11/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 824.27 |
| BPM Concerts, LLC dba Ballpark Music | 1901 | 2/11/2019 | 2/11/2019 | 5 | Assigned | Unpaid | 4536 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Creative Broadcast Techniques | Ex report wk 2/6 | 2/11/2019 | 2/11/2019 | 5 | Assigned | Unpaid | 2142.27 |
| DMS Color - Digital Marketing Services Inc | 78957 | 2/11/2019 | 2/26/2019 | -10 | Assigned | Unpaid | 208.05 |
| Dr. Jill's Foot Pads, Inc. | 143043 | 2/11/2019 | 2/11/2019 | 5 | Assigned | Unpaid | 775.9 |
| First in TV | 1901 | 2/11/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 2700 |
| First Insurance Funding | 900-7889256:03.0: | 2/11/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 89078.62 |
| OFFICE DEPOT | 2.72067E+11 | 2/11/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 182.99 |
| OFFICE DEPOT | 2.72042E+11 | 2/11/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 566.68 |
| OFFICE DEPOT | 2.7202E+11 | 2/11/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 655.4 |
| OFFICE DEPOT | 2.72117E+11 | 2/11/2019 | 3/3/2019 | -15 | Assigned | Unpaid | 72.19 |
| Olympic Case Co | 53858 | 2/11/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 940.94 |
| Rick Mikulic dba Two Fat Guys Grilled Cheese LLC | 02.08.19 | 2/11/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 1000 |
| Sodexo | 1080 | 2/11/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 9831.03 |
| Southern Foodservice Management, Inc. | 133185303A | 2/11/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 3450.6 |
| Tag Up by Rischard Marketing, Inc | 194065R | 2/11/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 86.5 |
| Vulcan Park and Museum | 02.11.19 | 2/11/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 100 |
| ACM HUB, LLC dba Titan Sign Company | 12874 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 493.62 |
| ACM HUB, LLC dba Titan Sign Company | 12876 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 757.75 |
| ACM HUB, LLC dba Titan Sign Company | 12875 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 129.9 |
| ACM HUB, LLC dba Titan Sign Company | 12872 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 3578.75 |
| ACO Medical Supply, Inc. | 5744601 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 973.42 |
| ACO Medical Supply, Inc. | 5744716 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 236.01 |
| ACO Medical Supply, Inc. | 5744717 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 46.99 |
| Adidas | 6177097856 | 2/12/2019 | 4/13/2019 | -56 | Assigned | Unpaid | 2894.42 |
| Ben Holden dba WME Entertainment, LLC | 1 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 7750 |
| Creative Broadcast Techniques | Ex report 2/11/19 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 4094 |
| Creative Broadcast Techniques | 5,6,7 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 45000 |
| EyeKing | 0739806-IN | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 511.76 |
| Fitness International, LLC | 02.11.19 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 6000 |
| G&G Outfitters Inc. | 131241 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 323.33 |
| Kilpatrick Townsend & Stockton LLP | 12163026 | 2/12/2019 | 2/12/2019 | 4 | Approving | Unpaid | 5000 |
| Logicopy | INV24425 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 232.3 |
| Logicopy | INV24427 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 11.91 |
| Michael Aagard | #27 | 2/12/2019 | 3/12/2019 | -24 | Assigned | Unpaid | 1200 |
| Morgan, Lewis & Bockius | 4095404 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 378 |
| Outdoor America Images, Inc. | 167563 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 5182.89 |
| Outdoor America Images, Inc. | 167537 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 1677.68 |
| Outdoor America Images, Inc. | 167539 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 1801.94 |
| ProShow Systems LLC | 13270 | 2/12/2019 | 2/12/2019 | 4 | Approving | Unpaid | 6244 |
| River City Marketing, Inc. dba Mission Golf Cars and Industrial Vehicles | 209610 | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 3464 |
| Safety Services, Inc. dba U.S. Safety Services | 4534 | 2/12/2019 | 2/12/2019 | 4 | Assigned | Unpaid | 2383 |
| Simplified Coach, Inc. | SC9056i | 2/12/2019 | 3/14/2019 | -26 | Assigned | Unpaid | 15000 |
| Tag Up by Rischard Marketing, Inc | 194111R | 2/12/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 796 |
| Tag Up by Rischard Marketing, Inc | 194075R | 2/12/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 1391.75 |
| Tag Up by Rischard Marketing, Inc | 194087R | 2/12/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 149.75 |
| TRI-C Club Supply Inc. | IN141358 | 2/12/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 1123.85 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACO Medical Supply, Inc. | 5744767 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 278.56 |
| ACO Medical Supply, Inc. | 5744768 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 278.56 |
| ACO Medical Supply, Inc. | 5744765 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 278.56 |
| ACO Medical Supply, Inc. | 5744766 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 278.56 |
| APPLE | AA02945484 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 2457.15 |
| APPLE | AA02943447 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 2376.02 |
| BSN Sports | 904454249 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 387.13 |
| Clay Hampton | | 2/13/2019 | 2/13/2019 | 3 | Denied | Unpaid | 5000 |
| Jay Valanju | 2/13/2019 | 2/13/2019 | 2/13/2019 | 3 | Assigned | Unpaid | 10000 |
| Memphis United Fitness, LLC dba  The Box | 03.01.19 | 2/13/2019 | 3/15/2019 | -27 | Assigned | Unpaid | 3000 |
| Memphis United Fitness, LLC dba  The Box | 05.01.19 | 2/13/2019 | 5/15/2019 | -88 | Assigned | Unpaid | 1500 |
| Memphis United Fitness, LLC dba  The Box | 02.01.19 | 2/13/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 3000 |
| Memphis United Fitness, LLC dba  The Box | 04.01.19 | 2/13/2019 | 4/15/2019 | -58 | Assigned | Unpaid | 3000 |
| Michael Aagard | #28 | 2/13/2019 | 3/13/2019 | -25 | Assigned | Unpaid | 1200 |
| TRI-C Club Supply Inc. | IN141441 | 2/13/2019 | 2/23/2019 | -7 | Assigned | Unpaid | 258.03 |
| Adidas | 6177151807 | 2/14/2019 | 4/15/2019 | -58 | Assigned | Unpaid | 1525.68 |
| Catering by Rosemary, Ink dba The RK Group | 1 | 2/14/2019 | 2/20/2019 | -4 | Assigned | Unpaid | 36604 |
| Hiregy | 472042039 | 2/14/2019 | 2/24/2019 | -8 | Assigned | Unpaid | 1076.63 |
| Hiregy | 472042029 | 2/14/2019 | 2/24/2019 | -8 | Assigned | Unpaid | 15000 |
| Kenny White | 1 | 2/14/2019 | 2/14/2019 | 2 | Approved | Unpaid | 881.79 |
| NBC Universal, LLC dba Telemundo of Texas, LLC (KDVA) | SA19010044 | 2/14/2019 | 3/16/2019 | -28 | Assigned | Unpaid | 3950 |
| Phil Savage | Expensify reimburs | 2/14/2019 | 2/14/2019 | 2 | Assigned | Unpaid | 1186.25 |
| Rod Woodson | 1 | 2/14/2019 | 3/16/2019 | -28 | Assigned | Unpaid | 10000 |
| STF Enterprises, dba Southern Tailors Fabric Imaging | 02.14.19 | 2/14/2019 | 2/21/2019 | -5 | Assigned | Unpaid | 1142.26 |
| Elior, Inc. dba Aladdin Food Management Services, LLC | 01.22.19 | 2/15/2019 | 2/25/2019 | -9 | Assigned | Unpaid | 15890 |
| Jamie Erdahl (WME c/o Josh Levy) | 1 | 2/15/2019 | 3/17/2019 | -29 | Assigned | Unpaid | 20000 |
| Kellie Brady | Exv report 2/15 | 2/15/2019 | 2/15/2019 | 1 | Assigned | Unpaid | 1254.65 |
| Maven Imaging | 1002 | 2/15/2019 | 2/22/2019 | -6 | Assigned | Unpaid | 6000 |
| Rhino Arizona, LLC | 38941 | 2/15/2019 | 3/17/2019 | -29 | Assigned | Unpaid | 603 |
| wincraft | 460557 | 2/15/2019 | 3/17/2019 | -29 | Assigned | Unpaid | 8202.89 |
| Grand Total | | | | | | | 18006765 |

02/13/2019
16:44:54

**CLIENT  107534   AAF PLAYERS LLC - AAF PLAYERS**

## CASH REQUIREMENT SUMMARY

### NET CASH
| | |
|---|---:|
| POC Checks | |
| SILICON VALLEY BANK | |
| ABA# xxxxx0399 Acct# xxxxx4094 | 103,607.00 |
| Funds Drafted 02/14/2019 | |
| | |
| Partial DD SILICON VALLEY BANK | |
| ABA# xxxxx0399 Acct# xxxxx4094 | 1,200.00 |
| Net DD SILICON VALLEY BANK | |
| ABA# xxxxx0399 Acct# xxxxx4094 | 2,261,253.34 |
| Direct Deposits Subtotal Drafted 02/14/2019 | 2,262,453.34 |
| | |
| TOTAL NET CASH | 2,366,060.34 |
| POC Manuals/Voids | .00 |
| Third Party Sick Payments* | .00 |
| POC Payables -- | |
| SILICON VALLEY BANK | |
| ABA# xxxxx0399 Acct# xxxxx4094 | .00 |
| **TOTAL** | **2,366,060.34** |

### EMPLOYEE TAX WITHHELD
| | |
|---|---:|
| Social Security - Employee | 228,814.62 |
| Medicare - Employee | 53,513.13 |
| Federal Income Tax | 858,439.63 |
| Alabama Withholding | 33,198.26 |
| Arkansas  Withholding | 181.24 |
| Arizona Withholding | 23,743.13 |
| California State E D D | 27,974.43 |
| CA Disability | 4,318.75 |
| Colorado Dept  Of Revenue | 642.00 |
| Connecticut Comm Of Revenue Se | 93.13 |
| Georgia Withholding | 50,209.07 |
| Hawaii Withholding | 540.15 |
| Iowa Withholding | 399.00 |
| Indiana Dept. Of Revenue | 1,353.50 |
| Kansas Dept  of Revenue | 757.63 |
| Kentucky State Treasurer | 348.51 |
| Louisiana Withholding | 732.18 |
| Massachusetts Commonwealth | 322.18 |
| Maryland Comptrlr Of Treasury | 430.55 |
| Michigan Withholding | 1,246.67 |
| Minnesota Dept of Revenue | 1,949.87 |

*EXHIBIT 5*

## CASH REQUIREMENT SUMMARY

| | | |
|---|---:|---:|
| Missouri Director of Revenue | 481.00 | |
| North Carolina State | 1,820.00 | |
| Nebraska State | 764.19 | |
| New Jersey Withholding | 4,213.33 | |
| New York State Income Tax | 3,555.41 | |
| Ohio State Treasurer | 674.77 | |
| Oregon Department of Revenue | 3,676.79 | |
| Oregon Statewide Transit Tax | 61.95 | |
| Pennsylvania Dept of Revenue | 1,074.50 | |
| South Carolina Withholding | 1,439.48 | |
| Utah State Tax Commission | 6,539.70 | |
| Virginia  Department Taxation | 393.20 | |
| Wisconsin | 466.09 | |
| West Virginia State W H | 197.00 | |
| Birmingham  Alabama | 8,784.33 | |
| Boone County  In - Res | 105.00 | |
| Floyd County In- Resident | 94.24 | |
| Hamilton Cty In- Resident | 140.00 | |
| Lake County In- Resident | 104.42 | |
| Marion County In- Resident | 704.28 | |
| **TOTAL EMPLOYEE TAX WITHHELD** | | 1,324,497.31 |

### EMPLOYER TAX LIABILITY
**PAYCOR FILING RESPONSIBILITY**

| | | |
|---|---:|---:|
| Social Security - Employer | 228,814.62 | |
| Medicare - Employer | 53,513.13 | |
| Federal Unemployment | 21,175.10 | |
| Missouri Discount | (9.62) | |
| Alabama Unemployment | 11,677.50 | |
| Arizona Unemployment | 8,663.32 | |
| California Unemployment | 14,063.26 | |
| Florida Unemployment | 12,239.33 | |
| Georgia Unemployment | 11,831.63 | |
| Tennessee Unemployment | 12,448.15 | |
| Texas Unemployment | 12,042.02 | |
| Utah Unemployment | 5,351.97 | |
| **TOTAL PAYCOR FILING RESPONSIBILITY** | | 391,810.41 |
| | | |
| **CLIENT FILING RESPONSIBILITY** | | |
| **TOTAL CLIENT FILING RESPONSIBILITY** | 0 | |
| **TOTAL EMPLOYER TAX LIABILITY** | 391810.41 | |
| Funds Drafted 02/14/2019 | | |

02/13/2019
16:44:54

**CLIENT  107534   AAF PLAYERS LLC - AAF PLAYERS**

**CASH REQUIREMENT SUMMARY**

| | |
|---|---|
| SILICON VALLEY BANK ABA# xxxxx0399 Acct# xxxxxx4094 | 1,716,307.72 |
| **TOTAL TAX FUNDS DRAFTED 02/14/2019** | **1,716,307.72** |
| **TOTAL PAYROLL LIABILITY** | **4,082,368.06** |
| **TOTAL CASH REQUIREMENTS LESS MANUAL VOIDS** | **4,082,368.06** |

The above cash requirement total does not include the invoiced amount for the payrun.