IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------X
:
:
UNITED STATES OF AMERICA         :
:
—V.—                             :   S3 19-Cr. 254 (ALC)
:
REGINALD FOWLER,                 :
:
DEFENDANT.                       :
:
---------------------------------X

## DECLARATION OF CHARLES "CHARLIE" EBERSOL

My name is Charlie Ebersol.  I am a citizen of the United States.  I currently reside in and am a citizen of Georgia.

In the Winter/Spring of 2016, while directing a television retrospective on the short-lived XFL for ESPN, I became convinced that a spring professional football league would succeed that complemented the NFL and delivered a high quality football product reminiscent of the NFL.  I also saw that there was an opportunity to combine such a league with in-game metric collection and analysis products to make the game experience interactive and develop corollary technology products that could transfer to other activities, such as gambling and performance.

I discussed the idea with a number of people I respected, including my father, formerly the Chairman of NBC Sports and Olympics.  He introduced me to Bill Polian, formerly the general manager of the NFL Buffalo Bills, Carolina Panthers and Indianapolis Colts and a Pro Football Hall of Fame inductee.  Throughout the summer of 2017, Mr. Polian and I, and consulting with others, worked on the concept and plan that became the Alliance of American Football.  I formed Ebersol Sports Media Group, Inc. on October 31, 2017.

ESMG raised $7 million in seed capital through traditional venture capital channels by December 2017.  The company planned to announce the league in the first quarter of 2018 and debut the league on February 9, 2019.  Following what I understand is a typical course for startup funding and advised by preeminent startup counsel, ESMG prepared for its next funding round contemplated to provide ESMG with the operating capital needed to achieve full-scale operation.  I began speaking to potential investors for this funding round.  In April we set up a convertible note purchase agreement to allow people who wanted to participate in smaller amounts to invest.

In early June, Willie Lanier, a former NFL Hall-of-Famer introduced me to Reggie Fowler. I understood that certain people associated with the NFL had suggested that Mr. Lanier make this introduction. Mr. Fowler represented himself to me and other ESMG personnel involved in capital raising as a successful real estate investor and entrepreneur; he had formerly owned a minority stake in the Minnesota Vikings. ESMG provided information and projections and we quickly reached a mutual understanding that Mr. Fowler would anchor a Series 1 funding round in which he would purchase $50 million in preferred stock and provide $120 million in immediately available funding through a convertible line of credit. Mr. Fowler said he was, and by all accounts was, successful in real estate investing. He presented bank and investment account statements from what he said was his real estate investing company showing several hundred million on account. He was himself represented by personal counsel and attorneys at a major international law firm, Reed Smith, adding to his appearance of credibility. We performed a background check, including speaking with bank executives with visibility into Mr. Fowler's account balances which exceed $300 million dollars; Mr. Fowler's assurances convinced us that he was real and genuinely wanted to get back into a football ownership position after having left a Minnesota Vikings investment group. We were happy to have him on board.

While ESMG's and Fowler's attorneys worked on preparing documentation for Fowler's Series 1 investment with Fowler as the lead investor as our term sheet outlined, ESMG began in earnest obtaining the goods, services, facilities and personnel, especially players, it would take to launch the league. We entered into three-year standard player agreements with potential players and worked on getting production assets needed to produce televised programming. The company held player combines beginning August and planned a month-long training camp to be held in San Antonio. Those were exciting days; the AAF was set on a course to launch and there was a lot of work to do. The company and our staff undertook all of this because we had Mr. Fowler's commitment and assurances.

Between April 23, 2018 and July 1st, ESMG raised about $1.6 million in additional capital from convertible promissory note sales in varying amounts from six investors, some new and some who were part of the original seed round. Although Fowler's name was not identified as the lead investor yet, those note purchasers all knew ESMG's plan was for a lead investor to anchor the next funding round, because I told them the plan. I have been told that this structure is common in startup finance. Once Mr. Fowler was on board in early July, I was able to talk more specifically with prospective note purchasers, and I did. From July 1 through the Series 1 closing in November, ESMG sold convertible promissory notes totaling $14,105,000 from previous and new investors. ESMG discussed the Series 1 structure and Fowler's involvement and commitments with these note purchasers. In fact, before the Series 1 closing, I had to talk with all them to obtain their consent to convert.

In addition, ESMG completed a $7 million secured note and warrant purchase financing from MGM Resorts International, Inc. MGM was well aware of Fowler's commitment level; I personally discussed it with them because they were concerned that the loan documentation be consistent with the Series 1 financing structure.

Fowler became a director and chair or co-chair of the football and finance committees. He was well aware of the league's needs for capital—his capital. The league was incurring bills for goods and services and was on a fixed path towards training camp and launch. There was no turning back. When Fowler had initial trouble providing his capital, he repeatedly assured us that the issues were merely logistical and that his team was working on getting the money moved to onshore accounts where it could quickly be moved to AAF. "It will be hear very soon" was a mantra.

ESMG did what it could to aid in giving Mr. Fowler the time he said he needed. David Pottruck and my father, Dick Ebersol caused their trusts to each make $7 million in loans to the company; we used the MGM funding tranches for general expenses, although we had hoped to use those funds primarily to accelerate AAF's technology product development.

Mr. Fowler did send some funds along the way, but little in comparison with his commitment to provide $170 million in immediate funding. He continued to assure, and we all continued to believe, that his funding delays were simply logistical. He never told us, and we had no way to know, that the very accounts he showed us to secure our relationship had been seized by the United States because of the criminal acts Mr. Fowler has now admitted to.

Although we believed in Mr. Fowler all along, eventually I had to seek new funding. I reached out to several venture capital managers, including Erik Anderson at West River Group. He introduced me to Tom Dundon. In very short order, we secured some funding commitment from Dundon Capital Partners and Dundon, but we had to give up a 75% ownership stake to DCP and total control of ESMG's board to Mr. Dundon and his partner. In other words, in order to try to save all we had built, I had to give up any ability to direct its future. DCP and Dundon also required ESMG to part ways with Fowler definitively through an agreement. Throughout that painful process, Fowler never told us he had been lying to us all along.

Without Fowler's assurances, the AAF would not have incurred all of the expenses we incurred before we were forced to move toward another investor at a great disadvantage. I am certain that had any of our convertible note investors or bridge lenders known that Mr. Fowler's assurances were a phony ploy, those investments and loans would never have materialized and the convertible noteholders would never have allowed their positions to become weaker through conversion of their debt to equity.

Fowler terribly and certainly victimized the ESMG and its now bankrupt subsidiaries that were the AAF. But Fowler victimized me personally too in another way. He harmed longstanding relationships with people I had known and done business with for years. We hired staff who left jobs and relocated to become a part of the AAF. Although many may have wanted the excitement of starting something completely knew and accepted some risks that go with a fledgling company, they did not expect that AAF would fail because Fowler was a fraud whose

crimes caused his accounts to be frozen and seized. Instead, they were excited that AAF had secured a lead investor of means.

More to the point of restitution though, Fowler cost me money personally. I was pleased to, and thankfully was able to, assist the government in its investigation and in obtaining materials that ultimately aided the investigations into Fowler. Even after Fowler had been a significant factor in taking from me all of the value of the business I started and our team built, I came out of pocket further to assist in locating documents, respond to subpoenas, give and attend interviews, incurring substantial travel costs and attorneys' fees personally. I had to meet with the bankruptcy trustee's counsel, who had possession of and was accumulating AAF's business documents, in order to respond to a department of justice subpoena. I incurred costs in assisting the government in identifying witnesses and then as trial neared connecting those witnesses with the DOJ. I made my attorneys available to represent them in that regard and in some cases paid the costs. I am compiling the amount of those fees and backup material, but I can say at this moment that they are substantial.

Executed on February _____, 2023.

_____
Charlie Ebersol