

LAW OFFICES OF MICHAEL JASON LEE
A PROFESSIONAL LAW CORPORATION

4660 LA JOLLA VILLAGE DRIVE, SUITE 100 ♦ SAN DIEGO, CALIFORNIA 92122
TELEPHONE: (858) 550-9984
ELECTRONIC MAIL: michael@mjllaw.com

ESTABLISHED 2000

April 23, 2023

*Via Electronic Mail*

Samuel Raymond
Samuel Rothschild
Sheb Swett
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

    RE:    *United States v. Fowler*, 1:19-CR-254 (S.D.N.Y.)

Dear AUSAs Raymond, Rothschild and Swett:

    We represent iFinex Inc. (d/b/a Bitfinex) ("Bitfinex") as a victim in connection with the above-captioned matter. On behalf of Bitfinex, we write to request that the Government seek, and that the Court include in the Judgment and Commitment, both an award of restitution pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, and a criminal forfeiture order, which the government has indicated it intends to seek as a result of the guilty plea. Specifically, Bitfinex seeks restitution of the funds Mr. Fowler stole from Bitfinex by and through his connection with the Crypto Capital group ("Crypto Capital"). Additionally, Bitfinex seeks restitution of certain legal fees and expenses related to its cooperation with the Government's investigation of Mr. Fowler's crimes. While the forfeiture order will not benefit Bitfinex directly, it will significantly expand the Government's authority to collect funds and other assets that can be used to satisfy the restitution order. We respectfully request that this letter be provided to the Probation Officer and to the Court.

    **I.**    <u>**Factual Background**</u>

    Bitfinex is one of the oldest and most well-established digital asset exchanges in the world. Founded in 2012, the Bitfinex exchange enables individuals and businesses to buy, sell or otherwise trade digital assets such as bitcoin or ether.

    Unlike many digital asset exchanges, Bitfinex allows its customers to deposit and withdraw U.S. dollars, Euros, British Pounds and/or Japanese Yen (collectively, "fiat currency"). For example, a verified Bitfinex customer might send $100 from a personal savings account with their bank to their Bitfinex account. Once their $100 is deposited, Bitfinex credits the customer with equivalent value for trading on the Bitfinex platform (i.e., after depositing $100, the customer may buy $100 worth of digital assets). Likewise, that Bitfinex customer might sell a given digital asset for fiat currency (e.g., $200) and withdraw those funds to their bank account.

Given this aspect of Bitfinex's business, its customers depend on Bitfinex's ability to receive and send fiat currency. For a period of time ending in 2018, Bitfinex relied on Crypto Capital as a financial intermediary to provide such fiat deposit and withdrawal services to its customers.

### a. Bitfinex's Relationship with Crypto Capital

Crypto Capital marketed itself as enabling its customers to "deposit and withdraw fiat funds instantly to any crypto exchange around the world," it further represented that it was a regulated and experienced payment processor[1] capable of facilitating hundreds or thousands of payments to and from Bitfinex's customers, around the globe and around-the-clock.

Specifically, Crypto Capital's website portrayed the company as a licensed, regulated financial institution, and made representations about its compliance with know-your-customer (KYC), anti-money laundering (AML) and suspicious activity reporting (SAR) requirements. And, as the voluminous documents and communications that Bitfinex has provided to the Government in its status as a crime victim show, Crypto Capital made repeated misrepresentations to Bitfinex that it was a licensed, regulated business that prioritized compliance and transparency with its banks. Among the many lies told to Bitfinex by Crypto Capital were the following:

- **Lies about compliance:** For instance, Crypto Capital told Bitfinex that Crypto Capital had "full KYC" on client accounts and that decisions regarding transactions had to be made by its compliance department, which "is and should be an independent department making sure everything gets done right."

- **Lies about Crypto Capital's fiduciary responsibilities:** For example, Crypto Capital told Bitfinex, "Fiduciary duty is a very important responsibility and I'm glad you take it as seriously as we do. Otherwise we wouldn't work with you guys."

- **Lies about bank relationships:** When Bitfinex asked Crypto Capital point-blank whether Crypto Capital's bank knew the nature of Crypto Capital's business, a Crypto Capital representative lied, repeatedly representing that it was transparent with its banks and committed to providing any documentation its bank required.

- **Lies about licensing:** For instance, Crypto Capital told Bitfinex, "our license is based on the fact that we hold funds in licensed financial institutions and we send Funds on behalf of clients … We are not a private company sending money from our account … We are transiting funds." On another occasion Crypto Capital claimed, "We have the federal chartered bank and EU banking license being integrated."

Bitfinex began working with Crypto Capital on an interim basis in 2014. For those transactions that utilized Crypto Capital's payment processing services, Bitfinex would direct the customer to wire funds to a bank account designated by Crypto Capital, which Crypto Capital represented to be owned and operated by Crypto Capital itself or its related entities. Once Crypto Capital received the funds transmitted by a given customer, it would then allocate deposits to a Bitfinex account at Crypto Capital and communicate receipt of

---

[1] In general terms, a payment processor (e.g., PayPal) serves as a trusted intermediary within a financial transaction, facilitating the exchange of funds between a business and its customer. For many businesses, payment processors provide a valuable service—for example, communicating and working with banks on behalf of the business or customer, transferring funds, facilitating credit card transactions and complying with rules and regulations pertaining to money transmission.

the deposit to Bitfinex. Bitfinex would then credit the customer's trading account on the Bitfinex exchange with that amount. Customer withdrawals processed by Crypto Capital were handled similarly.[2]

During the first several years of the relationship, Crypto Capital provided consistent payment processing services for Bitfinex, with millions of dollars' worth of transactions generally proceeding smoothly.

However, various issues began to arise in 2018. In or about April 2018, Bitfinex learned from news reports suggesting that Crypto Capital-controlled funds had been seized by authorities in Poland as part of an investigation into potential money-laundering. While initial unconfirmed reports speculated that funds owned by Bitfinex that were being held by Crypto Capital were seized as part of the investigation, Crypto Capital steadfastly maintained to Bitfinex that none of Bitfinex's funds were affected. That was a lie—just one of many lies that Crypto Capital told Bitfinex between April and December 2018, in an attempt to lull Bitfinex into believing that its funds remained safe and secure (indeed, this particularly lie was not exposed until December 2018). The documents and communications that Bitfinex has provided to the Government catalog the series of remarkably detailed explanations, which we now know were lies, that Oz/Ozzie Yosef (also known as Oz/Ozzie Joseph) ("Yosef"), one of Crypto Capital's principals, told Bitfinex about the status of Bitfinex's funds. As just a few examples:

- On July 27, 2018, Yosef told Bitfinex, in substance, that the delays in securing the release and return of Bitfinex funds that were held in Crypto Capital's accounts were caused by relatively new Crypto Capital banking relationships: "Of course mid August 150-200M will be released by the correspondence banks … The problem we've only worked with those Banks under crypto terms for less than 6 months … It will be reduced dramatically once the funds at those Banks are freed up."

- On July 30, 2018, Yosef told Bitfinex, in substance, that the delays in returning Bitfinex funds were caused by Crypto Capital needing to file its 2017 taxes in Poland: "[W]e finished our 2017 taxes finally last week in Poland which was holding some of our funds pending those payments … We will be transferring directly to you or your clients directly at least $200M this month … We have our lawyers and accountants working hard both in Poland and Portugal to make sure that as soon as possible wires will be going out."

- On August 1, 2018, Yosef again represented, in substance, that the delays were caused by an issue with Crypto Capital's 2017 taxes in Poland; when Bitfinex asked if it was correct to say that the funds would be released within the month, Yosef said yes, with the $350 million in Poland coming in tranches of $50 million each; Yosef added, "Our taxes for last year in Poland. Was holding things back. Finally was accepted yesterday to the tax office there. That was last hurdle."

By late August 2018, Crypto Capital began representing that approximately $500 million of Bitfinex's funds held in Crypto Capital-controlled accounts in both Poland ($350 million) and Portugal ($150 million) were being "held up" by regulators in these countries and continued to tell a series of what we now know were more lies about Crypto Capital's efforts to resolve the dispute with the "regulators" and the timing of the return of the funds to Bitfinex. For example, as documented in the materials provided to the Government by Bitfinex:

---

[2] In a typical withdrawal involving Crypto Capital, the Bitfinex customer would submit a withdrawal request to Bitfinex. Bitfinex would log onto the Crypto Capital platform and complete the beneficiary details provided by the customer. Bitfinex would then approve the withdrawal request and Crypto Capital would settle the withdrawal by remitting the funds to the Bitfinex customer from a bank account maintained by Crypto Capital or a company within the Crypto Capital group.

- On August 22, 2018, when pressed by Bitfinex for an update on the status of funds in Poland and Portugal, Yosef claimed, "We got clean bill from Poland, no more pending issues there.... Should be any day now we get the wire out.  Portugal there are slowly and annoyingly coming back from holidays there as well, waiting on the final clear. To start wires as well. … I'm on them every hour of everyday."

- On September 6, 2018, Yosef claimed that its lawyers were meeting with regulators in Portugal the next day "to talk about the schedule of release of the accounts"; when asked about Poland, Yosef said that Crypto Capital's lawyer had flown to Poland the previous day "to get final approval from regulators there to make sure nothing else is pending. He flew in and out and said nothing is no longer in our way there. He estimated that by next week funds should be clear as tax office gave us clean bill as well. … August was hard as nothing moved there. But things are moving now…"

- On September 9, 2018, Yosef represented to Bitfinex that Poland's legal authority to hold funds "runs out this week" and that for Portugal, "we are waiting on a certified letter that demonstrate our kyc/a[m]l/sar program is compliant.  About a 10-14 day process and then they are out of excuses of any funds being held as well."

- On September 27, 2018, when pressed again by Bitfinex, Yosef claimed, "The lawyers sent me a message last night that … expects good news today and that he hopes this nightmare will be over already … And lawyers are meeting again in Portugal today."

- On October 2, 2018, Yosef claimed for the first time that "Europol clearance" was holding up the release of the funds: "Over the holiday I got notified by polish lawyer that the funds release is pending Europol clearance which we weren't told that it that was holding the release do the polish bank can get clearance to release the funds .. we asked for that in writing. They stated that the clearance from Europol [i]s supposed to come in tomorrow Wednesday and that nothing should be between that and the release."  Yosef promised that if the funds were not released the next day, he would put Bitfinex in direct contact with Crypto Capital's lawyers to discuss a solution.

- On October 5, 2018, Crypto Capital went a step further and identified the Europol official who was purportedly holding up the "Europol clearance" as : "Steven Wilson, Europol head of Cybercrime."  (This lie had an air of credibility, as there was in fact a Steven Wilson who was serving as head of Europol's European Cybercrime Centre.)  Yosef added, "Since 09/25 we had the funds cleared by Poland. They are waiting on Europol to clear the release of funds. Lawyer recommended to be cautious if anyone makes contact has to be via the right channels not to be considered improper.  We keep on the Polish for release pressure daily …"

- On October 15, 2018, Yosef told Bitfinex, "Polish contact says October 25th will be the date they have the signature to follow through on release.  We requested the documents as soon as he has them."

- On October 31, 2018, when pressed again by Bitfinex, Yosef said Crypto Capital was "[w]aiting on Polish lawyer to update us as they are negotiating to at least start release of funds in segments."  With regard to Portugal, Yosef claimed the funds "[s]hould be approved for release by regulators this week, waiting on documentation and then the banks getting the clearance to allow us access again to send funds out."

- On November 13, 2018, Yosef represented that Crypto Capital expected with "80%" confidence that wires returning Bitfinex funds would "start this week" and "98%" sure those wires would start by early the following week.

- On November 22, 2018, Crypto Capital came up with a new excuse for not returning Bitfinex's funds–a supposedly corrupt head of a financial supervision authority (KNF) in Poland: "Poland was the KNF that was holding back the minister of finance. He stepped down last week after a scandal blackmailing banks for 'safety' now they don't want another scandal. So we are hoping to release very very soon. Very optimistic."  (This lie also had an air of credibility, as there was in fact a corrupt head of the KNF in Poland who stepped down on November 13, 2018 but there is no evidence this had anything to do with the release of Bitfinex's funds.

- On November 26, 2018, when pressed about the inaccurate "98%" prediction from earlier in the month, Yosef claimed that three banks in Portugal that were holding funds from Crypto Capital accounts that in fact belonged to Bitfinex had "max 10 days" to release the funds under Portuguese law.

Because Bitfinex was lulled by Crypto Capital's lies about the status of the Bitfinex funds in Crypto Capital's accounts in Poland[3] and Portugal, Bitfinex continued to rely on Crypto Capital to process customer transactions during this time, and Crypto Capital did in fact process millions of dollars in customer withdrawals during this period.  It was only at the end of November 2018—when an entire month had gone by without customer withdrawals processed, and as Crypto Capital's lies became more outlandish—that Bitfinex became concerned it was being lied to.  Indeed, on November 28, 2018, when Yosef claimed, "Lots of good developments yesterday," and indicated they were working with Hogan Lovells to get the issues relating to the funds resolved, Bitfinex pushed back and demanded that Crypto Capital "stop playing and tell … the truth about what is going on."

    b.  **The Emergence of Reginald Fowler**

As described above, and as detailed in the documents and communications Bitfinex provided to assist the Government, from August through November 2018, Yosef repeatedly reassured Bitfinex that its funds held in Crypto Capital-controlled accounts in Poland and Portugal were on the verge of being released and that Crypto Capital was working diligently with local authorities to secure their release.  While Crypto Capital did ultimately return around $200 million owed to Bitfinex (and, as noted above, was remitting funds up until late November 2018), it became clear that Crypto Capital was concealing information regarding Bitfinex's funds.  Under increasing pressure from Bitfinex and its attorneys, Crypto Capital eventually disclosed that hundreds of millions of dollars owed to Bitfinex were not simply "held up," but had in fact been seized by various governmental entities.  Crypto Capital eventually disclosed to Bitfinex that:

- Approximately $355,000,000 on deposit in accounts of multiple currencies, belonging to Crypto Capital's local subsidiary, Crypto sp. z o.o., held at Bank Spoldzielczy in Skierniewice, Poland were seized;

- Approximately $218,000,000 on deposit in accounts of multiple currencies at three separate Portuguese banks—Banco Português de Investimento ("Banco BPI"), Bankinter, S.A. ("Banco BIC") and Caixa Geral de Depositos S.A. ("Caixa")—were seized; and

- Additional funds had been seized by the United States and United Kingdom governments.

---

[3] Where Crypto Capital used the accounts of its local subsidiary, Crypto sp. z o.o., which directly processed Bitfinex's transactions.

Yosef repeatedly confirmed that the vast majority of the seized funds belonged to Bitfinex.

While Bitfinex was able to confirm that Crypto Capital's eventual (yet belated) admissions regarding the government seizures were accurate, Bitfinex would later discover that Crypto Capital's deception went far deeper. It was only later that Bitfinex learned that Crypto Capital was not in fact a licensed financial intermediary in Poland, and that the funds in Poland were frozen due to allegations that Crypto Capital was facilitating the laundering of money tied to drug trafficking, not some tax issue or a purportedly corrupt prosecutor or other official. And it was not until December 2018 that Bitfinex learned anything about Reginald Fowler and his role with Crypto Capital.

In December 2018, Crypto Capital disclosed for the first time that Fowler was centrally involved in its operations. Yosef had never previously disclosed anything about Fowler. Indeed, up until the end of 2018, Bitfinex's management had never heard of Fowler and had no idea who he was. Moreover, in a last-ditch attempt to convince Bitfinex that Crypto Capital still possessed the funds entrusted to it by Bitfinex, Yosef informed Bitfinex that an account in the name of G.T.S. Resources Limited held more than $300 million at "TCA Investment Bancorp & Trust." But Bitfinex learned that despite its name, "TCA Investment Bancorp & Trust" was not a bank and appeared to have no legitimate physical presence. Bitfinex also learned that G.T.S. Resources Limited was a United Kingdom entity wholly owned by Fowler.[4]

Armed with that information, Bitfinex promptly took action. Bitfinex prepared a criminal referral to DOJ based on what it believed was a fraud being perpetrated by Crypto Capital, in which Fowler appeared to be somehow involved. Bitfinex's outside counsel met with DOJ to make the initial criminal referral on January 23, 2019 and provided additional information about Crypto Capital's suspected crimes against Bitfinex during a presentation on February 25, 2019. Bitfinex also provided DOJ with voluminous documents regarding, and communications with, Crypto Capital. At the same time, Bitfinex undertook to investigate Fowler—among other individuals and entities—for the purpose of recovering the funds owed to Bitfinex and developing other information that could be used to help DOJ in its investigation and eventual prosecution. As described below, that investigation yielded a mountain of information about Fowler's participation in Crypto Capital's fraudulent activities that directly victimized Bitfinex.

### c. Bitfinex Cooperates Extensively As a Victim With DOJ's Investigation and Prosecution

Since that initial referral, Bitfinex has been cooperating with DOJ as a victim in the Crypto Capital investigation and prosecution for more than four years. Bitfinex and its affiliate, Tether, have provided prosecutors with additional information and documents following Fowler's indictment and even offered to participate in controlled communications with Yosef or other targets of the investigation at the direction of law enforcement. In fact, as recently as June 2022, Bitfinex's counsel reached out to the prosecutors to volunteer additional assistance, including, among other things, information developed during Bitfinex's efforts to trace the stolen funds and information to assist the government in locating and apprehending Yosef.

We appreciate the efforts of the prosecution team to keep Bitfinex, as a victim, apprised of the status of this matter. Not only did the team ensure that Bitfinex was entered into the SDNY's Victim Notification System so that it could receive regular updates on the case, but the team also directly provided updates to Bitfinex as the case has proceeded on its lengthy path from indictment to plea to sentencing, including information about the anticipated forfeiture proceeding and whether restitution might be an available avenue for the return of Bitfinex's stolen funds. The prosecution team likewise helped to ensure Bitfinex was appropriately advised about the timing for the submission of its Victim Impact Statement.

---

[4] Shortly after the identification of G.T.S. Resources Limited by Crypto Capital, Fowler changed the name of the entity to Spiral Global Development Limited. Spiral Global Development Limited is also reported to be a United Kingdom entity owned by Fowler.

### d. Bitfinex Undertakes International Recovery Efforts as Information Emerges About Fowler

In the months and years that followed Fowler's indictment, Bitfinex has undertaken extraordinary international legal efforts seeking to prevent the dissipation of its funds and secure their return.

For example, Bitfinex has initiated and sustained multiple criminal and civil actions in Poland to aggressively advance efforts to recover funds that remain frozen in the jurisdiction. And Bitfinex has pursued a similar course of action in Portugal. Bitfinex has sustained its recovery efforts for more than four years and fully intends to litigate the legal matters in both jurisdictions to successful completion.

In the United States, Bitfinex filed Applications for Discovery Pursuant to 28 U.S.C. § 1782 (providing "federal-court assistance in gathering evidence for use in foreign tribunals") in the United States District Courts for the District of Arizona, Central District of California, District of Colorado, Eastern District of Missouri and District of Nevada. Through those applications, Bitfinex learned further particulars as to how Fowler was funneling Bitfinex's funds into his own pocket, either directly or through third parties effectively controlled by him, investing in numerous ventures (including a disastrous investment into the Alliance of American Football) and financing his lavish lifestyle.

Among other discoveries, Bitfinex learned that Fowler created or controlled dozens of corporate entities around the globe (the "Fowler Entities"). On the surface, these entities were associated with Fowler's various business ventures and had similar names to each other or names similar to entities associated with Crypto Capital (e.g., Global Trading Solutions, LLC (Fowler) vs. Global Trade Solutions AG (Crypto Capital)). These entities also frequently shared addresses, directors, agents and other characteristics.

The records obtained by Bitfinex showed that the Fowler Entities were used to open bank accounts with numerous financial institutions in the United States and abroad (the "Fowler Accounts").[5] Unbeknownst to Bitfinex, Crypto Capital had provided various Fowler Accounts to Bitfinex for use by its customers, with Crypto Capital representing that it controlled the accounts. As Bitfinex customer funds flowed to these accounts, millions of dollars were wired or otherwise transferred to other Fowler Accounts without Bitfinex's knowledge.

The records further showed that funds siphoned from Bitfinex were commingled in the Fowler Accounts with money related to Fowler's other enterprises. Funds due and owing to Bitfinex were then used to seemingly finance Fowler's various investments (e.g., an athletic training center, brokerage accounts, financial positions in various businesses), acquire residential property or otherwise fund his personal expenses.

### e. Fowler's Connections to Crypto Capital

Bitfinex's investigative efforts have revealed countless examples of how Fowler benefited by conspiring with Crypto Capital to the direct and significant detriment of Bitfinex. Several of those examples are provided herein.

#### i. Global Trading Solutions, LLC

No later than September 2018, Crypto Capital provided Bitfinex with banking information for the purpose of receiving U.S. dollar deposits sent by Bitfinex's customers. The account given was held at HSBC

---

[5] The following is a non-exhaustive list of domestic financial institutions holding the Fowler Accounts: Bank of Arizona; Bank of Colorado; Citibank; Deutsche Bank; Enterprise Bank and Trust; HSBC Bank; JPMorgan Chase Bank; SunTrust Bank; TD Bank; and Wells Fargo.

Bank N.A. (ending in -0147), in the name of Global Trading Solutions, LLC. The address provided by Crypto Capital for Global Trading Solutions, LLC was 4939 W. Ray Road, #4-349, Chandler, AZ ("4939 W. Ray Road").

Because the name of Global Trading Solutions, LLC was similar to that of the entity that then owned Crypto Capital (Global Trade Solutions AG), Bitfinex reasonably believed Global Trading Solutions, LLC to be an entity related to Crypto Capital. Bitfinex then provided the banking information given by Crypto Capital for use by its customers for depositing funds on the Bitfinex trading platform. In reality, Global Trading Solutions, LLC was controlled by Fowler.[6]

Similarly, from approximately April 2018 to June 2018, Bitfinex unwittingly directed its customers to deposit funds to a bank account at Citibank in the name of Global Trading Solutions, LLC (ending in -9503). Here, too, Crypto Capital held out the -9503 account as controlled by Crypto Capital as part of its legitimate commercial payment processing service, with Fowler's association with the company being concealed. In truth, these accounts were controlled by Fowler, who funneled millions of dollars in Bitfinex customer deposits from Citibank to other Fowler Accounts without Bitfinex's knowledge. Indeed, records obtained from Citibank show that in May and June 2018, more than $100 million of Bitfinex customer funds were transferred from Citibank accounts held by Global Trading Solutions, LLC to an Enterprise Bank account ending in -7177 also held in the name of Global Trading Solutions, LLC. Separately, more than $40 million was transferred by Fowler to an Enterprise Bank account ending in -7193 in the name of Global Trading Solutions, LLC.

      ii. **The "Spiral Entities"**

Based upon this and other transactions, Bitfinex sought to obtain information regarding Fowler Accounts at Enterprise Bank. Upon receipt of such information, Bitfinex learned that Fowler had opened and was in control of at least *twenty-two* bank accounts there.

While three of the accounts at Enterprise Bank were opened in the name of Global Trading Solutions, LLC, most accounts were held in the names of entirely different entities. For example, Bitfinex discovered that $5 million that had been transferred from Fowler's Citibank accounts were directed to Enterprise Bank account ending in -7599. This account was held in the name of another Fowler Entity, Spiral Global Development Corporation. Spiral Global Development Corporation appears to be a foreign LLC registered with the State of Arizona as a "real estate and rental and leasing" business, with Fowler shown in public records as the entity's principal.

Bitfinex further learned that Fowler controlled a number of entities containing the word "Spiral" in their name and holding accounts at Enterprise Bank, including Spiral Sports Complex I LLC (Enterprise Bank -7843), Spiral Sports Complex II LLC (Enterprise Bank -5784), Spiral Kenneth 850 LLC (Enterprise Bank -7974) and Spiral Rickenbacker LLC (Enterprise Bank -7990). Likewise, Bitfinex found that Fowler controlled Spiral Global Trading Solutions AG (similar to Global Trade Solutions AG (the parent company of Crypto Capital)), with both this Fowler Entity and the Crypto Capital parent registered in the same small city of Zug, Switzerland.

Other entities associated with Fowler include Spiral, Inc., Spiral Development Company and Spiral Global Equities, Inc. Not surprisingly given their common ownership, many of the "Spiral Entities" are shown

---

[6] Publicly available records provided by the Colorado Secretary of State reflect that Global Trading Solutions, LLC was organized in February 2018 by Jean Gries—a known associate of Fowler—and provided 4939 W. Ray Road as the entity's mailing address. Later, corporate records would identify Fowler as the filer of documents on behalf of Global Trading Solutions, LLC.

in public corporate filings as associated with the same handful of addresses, while further sharing directors, members, document filers and/or mailing addresses.

### iii. The "Eligibility Entities"

Beyond the entities already discussed, many of the Fowler Accounts at Enterprise Bank (among other financial institutions) were held in the name of Eligibility Criterion, LLC. Corporate filings with the State of Colorado establish that Eligibility Criterion, LLC was formed on January 12, 2017, with a mailing address of 4939 W. Ray Road, #4-439 (the same address as Global Trading Solutions, LLC and many of the "Spiral Entities").

This Fowler Entity appears to have also been used in Fowler's elaborate shell game with funds stolen from Bitfinex. For example, Bitfinex's review of Fowler's banking records at Citibank revealed that Fowler had received two wire transfers totaling $4 million in a personal account ending in -9061. Those wire transfers are known to have originated from Banco BPI, which is one of the three Portuguese banks that Crypto Capital acknowledged using to hold Bitfinex customer funds (and which is subject to Bitfinex's recovery efforts in Portugal) and to have been sent by "Eligibility Criterion."

In other words, both Fowler and Crypto Capital maintained accounts held by entities with some variation of the name "Eligibility Criterion," in the same manner as other Fowler Entities. For example, Crypto Capital was associated with "Eligibility Criterion Unip LDA" and "Eligibility Criterion Unipessoal," and Fowler was associated with "Eligibility Criterion, LLC" and "Eligibility, LLC." This was apparently done to give the appearance that transfers between the entities related to a single business organization. Banking records produced to Bitfinex show that Fowler caused several millions of dollars of Bitfinex's funds to be wired to various bank accounts held in the name of "Eligibility," "Eligibility Criterion," and "Eligibility Criterion Unip LDA," often bearing the description of "Intercompany Transfer."

### f. Fowler's Personal Use of Funds Stolen from Bitfinex

Fowler's bank records further showed numerous instances in which Bitfinex's funds were redirected for Fowler's personal use and business investments.

For example, Bitfinex discovered that Fowler withdrew at least $275,000 for the benefit of Spiral Volleyball LLC, a business operating two athletic facilities located in Chandler, Arizona that was—prior to September 2008—legally named Adventure Park, LLC and managed by Fowler's corporation Spiral, Inc. The Club Director of Spiral Volleyball is Molly Stark, the recipient of payments from bank accounts held in the name of Global Trading Solutions, LLC.

Among other connections to Spiral Volleyball, Fowler held bank accounts at Enterprise Bank in the name of Spiral Sports Complex I LLC and Spiral Sports Complex II LLC, the two facilities that house Spiral Volleyball. Fowler's Enterprise Bank accounts for Spiral Sports Complex I and II were funded by at least $250,000 (and possibly as much as $4 million) directed from Wells Fargo Bank accounts connected to Fowler. Here, too, it appears that Bitfinex's funds were misappropriated by Fowler for the purpose of funding his investment in Spiral Sports Complex I and II.

As another example, Fowler's $5 million personal recognizance bond was secured by five residential properties held in the name of Eligibility, LLC. A review of publicly available records regarding all five properties indicates that there are no mortgages outstanding on any of them and Fowler's banking records show that at least three payments—totaling nearly $4.5 million—were made by Fowler to various title, escrow or mortgage payoff businesses. On information and belief, these payments by Fowler reflected the payoff of a mortgage tied to one or more residential properties, using funds stolen from Bitfinex.

Other investments include millions of dollars sent to various investment firms (e.g., $5 million to ARK Capital Management Limited;[7] $1,278,500 to COR Clearing LLC (now Axos Clearing LLC); transfers to HSBC Securities USA/Pershing LLC and what appear to be investments in numerous other businesses. At the same time, Fowler's bank records indicate that he regularly withdrew millions of dollars in the form of personal checks made out to himself and to seemingly pay his various attorneys, using Bitfinex's funds.

## II.  Discussion

### a. The Court Should Order Restitution to Bitfinex Under the MVRA and/or the VWPA As a Victim of Fowler's Conduct

The MVRA directs federal courts to award restitution to any victim of certain offenses, including "any offense against property under [Title 18],… including any offense committed by fraud or deceit." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The VWPA authorizes federal courts to award restitution on a discretionary basis to any "victim" of certain offenses. 18 U.S.C. § 3663(a).

There is no question that Fowler's crimes qualify for mandatory restitution, as he pled guilty to bank fraud, bank fraud conspiracy, conspiracy to operate an unlicensed money transmitting business, operation of an unlicensed money transmitting business and wire fraud.

There is also no question that Bitfinex is a victim of Mr. Fowler's despicable conduct, to which he admitted in his guilty plea, under both the MVRA and VWPA. Both the MVRA and VWPA define "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered[.]" 18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2); *see also United States v. Battista*, 575 F.3d 226, 231 (2d Cir. 2009). Additionally, "victim" is defined, "in the case of an offense that involves as an element a scheme, conspiracy or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2). Fowler committed these offenses by stealing directly from Bitfinex through his scheme to defraud and causing Bitfinex to suffer enormous losses. Because Fowler's conduct directly and proximately harmed Bitfinex, it is entitled to restitution as a victim under the MVRA and/or VWPA.

In calculating the amount of restitution, the Court must consider "the amount of loss sustained by each victim as a result of the offense; and the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i); *see also United States v. Jacques*, 321 F.3d 255, 260 (2d Cir. 2003). Where a Court orders restitution pursuant to § 3663(a)(1), it is not bound to the terms of the plea agreement. *United States v. Cacace*, 289 F. App'x. 440, 442 (2d Cir. 2008) (affirming a restitution order that was not contemplated in the defendant's plea agreement but where the defendant was put on notice in the presentence report that the at-issue restitution would be sought) (distinguishing from *United States v. Gottesman*, 122 F.3d 150 (2d Cir. 1997), where the order of restitution was based upon § 3663(a)(3)).

It is difficult to overstate the monetary, business and reputational harm suffered by Bitfinex at the hands of Fowler and his coconspirators at Crypto Capital.

First and foremost, in the wake of Crypto Capital's collapse, Bitfinex lost access to approximately $850 million that had been entrusted to the payment processing service. As of today's date, Bitfinex has been deprived of hundreds of millions of dollars misappropriated by Fowler and Crypto Capital and/or seized by governmental authorities. Insomuch as funds seized by the U.S. Government belong to Bitfinex, they should be returned to it and Bitfinex should be provided restitution.

---

[7] This entity appears to be unrelated to ARK Investment Management LLC.

In addition, Bitfinex has been forced to undertake a years-long international recovery effort spanning four nations to investigate, litigate and otherwise secure the release of customer funds frozen by various governmental organizations, incurring millions of dollars in legal fees. The foregoing costs are in addition to the funds that Bitfinex has taken from its own corporate treasury and profits to absorb the loss of access to its funds—by, for example, fully repaying the line of credit it was forced to take out to cover the funds it had entrusted to Crypto Capital and which were seized and/or misappropriated by Crypto Capital and/or Fowler.

In all, Fowler's conduct was the direct and proximate cause of the following losses: no less than $380,000,000 in stolen funds (likely a conservative figure), no less than $2,000,000 in costs from participation in the U.S. Government's investigation and prosecution of Fowler and no less than $3,500,000 in losses from legal fees incurred from proceedings related to the recovery of Bitfinex's funds. Accordingly, Bitfinex respectfully submits that it is entitled to no less than $385,500,000 under this section.

### b. A Criminal Forfeiture Order Should Also Be Entered

Where, as here, a defendant has pled guilty to charges that justify the entry of a criminal forfeiture order, and notice of the Government's intent to seek such an order was included in the indictment, the entry of the order is mandatory, in addition to—and not instead of—a restitution order. *See United States v. Bodouva*, 853 F.3d 76 (2nd Cir. 2017) (forfeiture and restitution are both mandatory and the court has no discretion to offset one against the other); *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012) (forfeiture and restitution both are mandatory; collecting cases). Both types of orders are properly entered against a convicted defendant, often in equal amounts, because the two types of orders serve different purposes in sentencing: the forfeiture order is punitive; the restitution order compensatory. *United States v. Kalish*, 626 F.3d 165, 169-70 (2d Cir. 2010) (defendant not entitled to any offset against a forfeiture money judgment reflecting a restitution order he is also ordered to pay, following *United States v. Emerson*, 128 F.3d 557 (7th Cir. 1997) (forfeiture and restitution are not mutually exclusive; defendant may be made to pay twice and is not entitled to reduce restitution by the amount of the forfeiture); *United States v. Leahy*, 464 F.3d 773, 793 n.8 (7th Cir. 2006) (same, also following *Emerson*).

As noted above, while the entry of a forfeiture order here will not benefit Bitfinex directly, since any funds collected by the Government pursuant to such an order would necessarily be Government property, Bitfinex is likely to benefit indirectly through the remission or restoration processes by which the Government is authorized, at the discretion of the Attorney General, to use forfeited funds to compensate victims of the underlying crimes of conviction, either through remission, by which the Government provides the funds to the victim directly through an administrative petition process (*see* 28 C.F.R. Part 9), or restoration, by which the Government applies the forfeited funds to the restitution order (*see Asset Forfeiture Policy Manual* (2022) (Dept. of Justice), Chapter 14, part 1, p. 163). *See also United States v. Sanjar,* 876 F.3d 725 (5th Cir. 2017) (Congress left it to the Attorney General to decide whether to apply forfeited funds to restitution); *United States v. Joseph,* 743 F.3d 1350, 1354-55 (11th Cir. 2014) ("the Attorney General alone has discretion to determine whether to retain forfeited property or apply it toward the restitution owed to the victims of a defendant's offense"; accordingly, "a district court generally has no authority to offset a defendant's restitution obligation by the value of the forfeited property") (collecting cases). The restoration process is significantly less complicated, and generally results in the funds being paid to the victim sooner, but cannot be used in the absence of a restitution order.

While the Government is not required (and cannot be compelled) to utilize either remission or restoration, the Government's policy is to do so whenever it can. *See Asset Forfeiture Policy Manual.*("Returning forfeited assets to victims through the remission and restoration processes is one of the primary goals of the Department of Justice's (Department) Asset Forfeiture Program.") For these reasons, the entry of both types of orders is appropriate here.

      **c.**      **Bitfinex is Entitled to Legal Fees and Costs**

The VWPA authorizes restitution of "necessary…expenses related to participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663(b)(4). The Second Circuit takes a "broad view of what expenses are 'necessary'" in calculating an award of restitution. *United States v. Cuti*, 708 F. App'x. 21, 22 (2d Cir. 2017) (Summary Order) (citing *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014)). The Second Circuit has interpreted "necessary" expenses under this provision as "expenses the victim was required to incur to advance the investigation or prosecution of the offense." *United States v. Cuti*, 778 F.3d 83, 93 (2d Cir. 2014) (citing *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014)). This may include attorneys' fees and accounting costs. *See Cuti*, 778 F.3d at 93 (citing *Maynard*, 743 F.3d at 381).

Bitfinex respectfully submits that it is entitled to the expenses incurred through its participation in the Government's investigation and prosecution of Fowler pursuant to 18 U.S.C. § 3663(b)(4). The Second Circuit has upheld awards of costs and attorneys' fees of hiring outside counsel to investigate fraud. *See United States v. Bahel*, 662 F.3d 610, 647-48 (2d Cir. 2011). When Bitfinex made the criminal referral of this matter and then proceeded to aid the Government over a period of more than four years by providing information about Fowler's and his companies' assets and accounts. Bitfinex also aided the Government's efforts in tracing the assets that Fowler stole. Additionally, Bitfinex incurred costs and attorneys' fees in the course of pursuing discovery in furtherance of the recovery of its stolen funds. These costs qualify as "necessary" expenses under this provision. *See Cuti*, 778 F.3d at 93 (restitution for attorneys' fees in connection with an internal investigation of misconduct may be ordered despite the fact that the Government did not specifically request those efforts or expenses). Bitfinex hired outside counsel to perform these tasks and incurred legal fees in an amount no less than $5,500,000.[8]

It should be noted that Bitfinex does not seek restitution for the following additional costs it has incurred as a result of Fowler's criminal conduct:

- Any reputational damages that Bitfinex sustained as a result of Fowler's conduct.

- Any lost profits and damages incurred as the result of Fowler's conduct.

- Any legal fees paid to any firm for monitoring Fowler's trial, in accordance with *Cuti*, 708 Fed. App'x. at 25.

- Any "redundant or duplicative expenses," in accordance with *Cuti*, *id.* at 23.

---

[8] *Lagos v. United States*, 138 S. Ct. 1684 (2018), does not affect the Second Circuit precedents cited above. In *Lagos*, the Supreme Court interpreted the MVRA which, similar to the VWPA, provides for restitution of certain expenses connected with a Government investigation or prosecution. Despite similar policy goals, the operative language in each statute is materially different. Prior to *Lagos*, the Second Circuit recognized the differences in the MVRA and VWPA's text even though in most cases the statutes are read in *pari materia*. *See Cuti*, 778 F.3d at 96 n.5; *Battista*, 575 F.3d at 233–34, n. 7. The MVRA authorizes restitution of "necessary…expenses *incurred during* participation in the investigation…." 18 U.S.C. § 3663A(b)(4) (emphasis added). The VWPA, however, authorizes restitution of "necessary…expenses *related to* participation in the investigation…." 18 U.S.C. § 3663(b)(4) (emphasis added). The language of the VWPA is broader and consequently includes the costs and fees sought herein in an award of restitution. *See Cuti*, 778 F.3d at 96 n.5 (finding that the VWPA does not limit itself to expenses incurred "during" the investigation like the MVRA). Based on the material textual differences in each statute, *Lagos* is limited to the MVRA. However, if the Court determines that *Lagos* does apply in the context of the VWPA, then Bitfinex still seeks an award of $2,000,000 in costs and attorney's fees. This sum reflects expenses incurred by Bitfinex that relate directly to the Government's investigation or which were incurred at the Government's request, as well as fees incurred in connection with post-verdict restitution proceedings.

### III.     Conclusion

In sum, in addition to very likely being the largest single victim of Fowler's criminal scheme and suffering a loss of more than $850,000,000, Bitfinex has lost hundreds of millions of dollars more as a result of the secondary harm associated with Fowler's crimes.  As detailed above, Bitfinex has lost not only the $380,000,000 (and likely substantially more) that Fowler stole from Bitfinex, at least $2,000,000 more related to its participation in the Government's investigation of Fowler and at least $3,500,000 in relation to its efforts to trace and recover funds Fowler stole from Bitfinex.

As a victim of Fowler's crimes, Bitfinex respectfully submits this request pursuant to the MVRA and VWPA for restitution covering these losses in the aggregate amount of at least $385,500,000 and for such additional amounts as the Court may deem just and proper.  Bitfinex further asks that the Court enter a forfeiture order in the full amount authorized by law to facilitate the compensation of Fowler's victims.

Very Truly Yours,

LAW OFFICES OF MICHAEL JASON LEE, APLC

*Michael Jason Lee*

Michael Jason Lee