N4kWfowC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 Cr. 254 (ALC)

5    REGINALD FOWLER,

6              Defendant.
                                           Conference
7    ------------------------------x

8                                          New York, N.Y.
                                           April 20, 2023
9                                          3:30 p.m.

10   Before:

11
                    HON. ANDREW L. CARTER, JR.,
12
                                           District Judge
13
                              APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  SEBASTIAN A. SWETT
          SAMUEL P. ROTHSCHILD
17        SAMUEL RAYMOND
          Assistant United States Attorneys
18
     SAPONE & PETRILLO, LLP
19        Attorneys for Defendant
     BY:  EDWARD V. SAPONE
20

21   Also Present:  Anthony Imperato, Paralegal Specialist

22

23

24

25
```

1        (Case called; appearances noted)

2        THE COURT:  Good afternoon.  Please be seated.

3        Before we get started, defense counsel filed a motion

4    to adjourn sentencing today.  The government filed a letter in

5    response opposing that but suggesting some sort of compromise.

6        I do think that perhaps a compromise is warranted here

7    in that the government indicates that there are victims who

8    have flown to New York to be here for a sentencing.  I think it

9    makes sense to perhaps hear from those victims today, and we

10   can adjourn the sentencing to deal with the other issues later.

11   But let me hear from counsel for the government as to your

12   thoughts about that.

13       MR. SWETT:  Thank you, your Honor.

14       We would propose proceeding on the sentencing and the

15   forfeiture aspect today.  We think that those are both teed up.

16       There are, as we understand it, no factual disputes

17   about the offense conduct.  There are no disputes as to the

18   guidelines.  There are no disputes as to the amount of

19   forfeiture, although there are legal arguments as to the

20   appropriate amount under the Eighth Amendment.  And so it is in

21   our strong interest to proceed with a sentencing that has been

22   adjourned a number of times and that has been pending for quite

23   some time.

24       With respect to restitution, it does not need to be

25   imposed at the time of sentencing.  We have presented and we've

N4kWfowC

1    provided exhibits detailing what we think are recoverable

2    expenses incurred by the AAF.  We have an individual here,

3    Mr. Brian Engel.  He's the trustee of the AAF.  He has

4    submitted a factual proffer as part of our sentencing

5    submission in support of restitution.  We made him available to

6    the extent defense counsel wants to question him, if defense

7    has factual disputes as to the amount of restitution or the

8    expenses that have been provided by the government.

9            However, if that is something that the Court wants to

10   defer, that is fine.  But it is our position and it is our

11   strong desire that we can do the sentencing today and that the

12   Court can decide both the term of incarceration and forfeiture.

13   We think everything is teed up for that.  We are prepared.

14   We've put a lot of effort into it.  Defense counsel has

15   submitted a submission making their arguments, and we're

16   hopeful that we can take care of that today.

17           THE COURT:  OK.

18           Let me hear from defense counsel, because my reading

19   of defense counsel's letter wasn't simply that the defense

20   needed more time to challenge restitution but that the defense

21   was looking for more time to deal with other matters regarding

22   the sentence, such as any custodial term or the like.  But let

23   me not put words in your mouth.

24           Let me hear from defense counsel.

25           MR. SAPONE:  Yes, your Honor.

N4kWfowC

1          I just want to start off by saying I have nothing but

2     respect and admiration for the government.  We get along, as

3     the British would say, smashingly, but we don't agree here in

4     this instance, and here's why -- and it's no one's fault, but

5     the reality is that I had yesterday to try to learn the

6     contents of a very fulsome, very well-written 16-page

7     single-spaced sentencing submission with exhibits that numbered

8     more than 300 pages, and I had Mr. Fowler come into town early

9     so we could spend the time working, and I worked until 3:45 in

10    the morning and I did my best to be ready today, and the truth

11    is, and I regret saying this, I cannot be ready today, because

12    as your Honor started to say, I think, it goes beyond just what

13    is the restitution amount.

14          I believe that this witness, Brian Engel, is a lawyer,

15    and he is a lawyer for the trustee in the bankruptcy

16    proceedings for the league.  When the league went into

17    bankruptcy, a trustee was assigned, and that trustee has a

18    lawyer, who is Mr. Engel.

19          I believe at the heart of this case, as to punishment,

20    as to how many years in prison, if any, Mr. Fowler will be

21    sentenced to bears upon whether or not Mr. Fowler harmed the

22    league and to what extent.  And I am not ready to cross-examine

23    Mr. Engel as to that issue -- not just restitution but harm to

24    the league.

25          What I was able to find, your Honor, in the last 24

N4kWfowC

```
1   hours, independently -- and I'm not saying that the government

2   had it; I'm just saying I found it -- was what I handed up to

3   your Honor, which is a 64-page complaint in the bankruptcy

4   action in Texas.  And the reason that's significant, your

5   Honor, is that until the last 24 hours, I believed that the

6   government's position was that Mr. Fowler harmed the league

7   because Mr. Fowler, according to the government, had promised

8   funding and did not supply the funding, which then caused the

9   league to go out of business and go belly-up.

10          I now read, for the first time in that 64-page

11  complaint that your Honor has at the bench, that a lawsuit was

12  initiated by no other than Brian Engel, the lawyer for the

13  trustee, in which he is blaming not Mr. Fowler, but he's

14  blaming Mr. Dundon.  In other words, after Mr. Fowler made it

15  clear that he could not or would not put the money up, the

16  league went elsewhere, and it is my understanding -- but I need

17  to run these issues down; that's why I'm asking for one week,

18  because I now understand that Mr. Dundon put substantial money

19  into the league and made promises and that when the league went

20  belly-up, the league thinks that it's Dundon's fault, not

21  Mr. Fowler's, and that changes the whole landscape of the case.

22          And so what I want to do is I want to get prepared to

23  cross-examine Mr. Engel.  I want to see what else is in that

24  64-page complaint that might be important to my defense at

25  these sentencing proceedings.  I want to get my hands on 3500
```

N4kWfowC

1    material, because I'm sure that Mr. Engel sat down with the

2    government, and maybe they asked him who is responsible for the

3    demise of the league.  I want to see those notes.  And again,

4    I'm not blaming anyone, but I need to do more work.

5         My concern is that I'm not able to provide effective

6    assistance of counsel because I had yesterday to try to learn

7    too much material.  I worked until as late as I could.

8         Last thing I want to say, your Honor, if there are

9    victims here that want to be heard -- in other words, like

10   victim impact statements -- I have no problem with that,

11   because I don't want folks to waste any time flying into New

12   York for no reason.  I won't even ask them a question.  But

13   because this bears directly on punishment, I need more time.

14        THE COURT:  OK.  Let me just confirm with the

15   government.

16        Are there victims here today who wish to speak?

17        MR. SWETT:  Yes, your Honor.

18        Just very, very briefly, first, I did misspeak.

19   Mr. Engel is the lawyer for the trustee.  I called him the

20   trustee of the AAF.  I just wanted to make sure I corrected

21   that.  And I do want to make it clear that we had provided

22   information about this second investor as far back as when we

23   were producing 3500 in advance of trial.  We reiterated that on

24   February 20, when we provided an overview of our view of

25   restitution, but I'm not otherwise litigating what Mr. Sapone

N4kWfowC

1    just said.

2           There is a representative of the AAF here who would

3    like to speak as a victim as to the demise of the AAF and his

4    experience going through that.

5           THE COURT:  OK.  And let me also find out, regarding

6    Mr. Engel, does the government have a sense as to the length of

7    your -- were you planning on calling him to the stand and doing

8    sort of a direct of him and then having him crossed?  Or what

9    were you planning on doing, just having him available for the

10   defense to cross him?

11          MR. SWETT:  We planned on having him available.  We

12   submitted a proffer from him, and we have been attempting to

13   learn whether the defense wanted to cross him or not, and we

14   did learn that 3:30 this morning.  But we had already asked him

15   to be here as a precaution.  So we did not plan on examining

16   him.  We have his statements through our exhibit, but we

17   thought that there might be a desire to cross him.

18          THE COURT:  And other than this individual from the

19   AAF, are there other victims here today who wish to speak?

20          MR. SWETT:  Your Honor, we are not aware of any.  No,

21   we're not aware of any victims that are here today to speak.

22          THE COURT:  All right.

23          It seems to me what makes sense is let's have that

24   victim address the Court.  It is certainly not standard

25   procedure or, I think, even appropriate for defense counsel to

N4kWfowC

| | |
|---|---|
| 1 | cross-examine this person.  This person will make their |
| 2 | statement, and then we can adjourn this matter for the |
| 3 | continued sentencing hearing. |
| 4 | MR. SWETT:  Thank you, your Honor. |
| 5 | The individual's name is Boris Treyzon. |
| 6 | Where would you like him to make the statement from? |
| 7 | THE COURT:  He can either stay seated there in the |
| 8 | audience.  We'll bring him the cordless microphone, and if that |
| 9 | doesn't work, if he doesn't have any mobility issues, he can |
| 10 | come to the podium. |
| 11 | MR. TREYZON:  Thank you very much. |
| 12 | My name is Boris Treyzon. |
| 13 | THE COURT:  Thank you.  Go ahead. |
| 14 | MR. TREYZON:  Once again, good afternoon, your Honor. |
| 15 | I am an attorney.  I am special litigation counsel for |
| 16 | the trustee in the AAF bankruptcy matter.  We wanted to address |
| 17 | some of the issues that came up -- and they were put forth by |
| 18 | the defendants -- and that speak as to the methodology that was |
| 19 | used in order to prepare our victim impact statement. |
| 20 | Your Honor, a lot has been said in the submissions |
| 21 | whether the harm that has been suffered by the AAF was either |
| 22 | direct or indirect, and this is the part that I wanted to |
| 23 | address. |
| 24 | AAF was an entity that was created for the purposes of |
| 25 | organizing a football league, and as parts of its creation, as |

N4kWfowC

1   it was going through the inception, Mr. Fowler came forth and

2   agreed to provide funding for it.  As part of providing funding

3   for it, he asked for and became a member of the board of

4   directors, the finance committee, the football committee.  He

5   was intimately involved with the operation of the league.

6        As part of doing that, certain documents were created,

7   and one of those documents is part of the exhibit G that the

8   government has submitted, which is -- puts forth the

9   memorandum, like the deal points.  One of those memorandums of

10  the term sheet provided that the money that Mr. Fowler

11  committed is segregated and placed in a separate account for

12  the AAF league.

13       Then as part of being a part of the budget committee,

14  on a regular, ongoing basis -- daily, weekly, with very much

15  regularity -- Mr. Fowler was part of the process where AAF

16  would go out and commit to paying salaries, to hiring vendors,

17  to providing money for the daily operations of the league.  On

18  an ongoing basis, regularly, those expenses were being made

19  when the league was under impression that it had money sitting

20  in the bank in a separate, segregated account.

21       When ultimately the league folded -- right?  When

22  ultimately it came out that Mr. Fowler was not providing the

23  money, notwithstanding representations over and over again that

24  it's nothing but a timing issue, that it's a transfer issue,

25  that he needs to talk to the bank, the league was essentially

N4kWfowC

1    like a dog hit on the freeway by a car.  It was wobbling

2    around.  It was searching for anybody who would provide it a

3    lifeline to go forward.

4            At this point, it was in the middle of the first

5    season, and it had no choice.  It had to go forward.

6            So the impact of that, your Honor, has been when the

7    league ultimately did fold, it was unable to pay its promised

8    bills.  We had people who suffered injuries that were unable to

9    obtain medical care that feel the effects of that to this day.

10   We have 450 players who pretty much missed out on most of their

11   career because they did not commit to different plays.  They

12   committed to playing in this league on a three-year contract.

13           The effect of this has been nothing but direct.  We

14   are not bringing forth victims who didn't get paid, because the

15   contract, that agreement, the agreement to provide this money,

16   was made directly with my client.  It was not made directly

17   with the players.  AAF, and the league who stands in its shoes,

18   was promised this money was made, it's available, it is in a

19   segregated account.

20           And to address what the defense has put forth, there's

21   been a segregation between damages that have been done by

22   Mr. Fowler's statements and the untruth contained therein and

23   what happened afterward, when Mr. Dundon came in.  So all

24   together, the forfeiture and the restitution that is being

25   sought here in this case is directly caused by Mr. Fowler's

1    misdeeds, not what happened afterwards, when a subsequent

2    follow-on investor came in.

3              THE COURT:  OK.

4              MR. TREYZON:  That's all, your Honor.

5              THE COURT:  All right.  Thank you.

6              MR. TREYZON:  Thank you.

7              THE COURT:  Before we adjourn and get another date,

8    let me just find out from defense counsel, at this point, other

9    than the issue of restitution, what other issues are there for

10   which there might need to be some sort of additional fact

11   finding or evidentiary hearing?

12             MR. SAPONE:  The nature and circumstances of the

13   offense under 18 U.S.C. 3553(a)(1), in my opinion, will be in

14   dispute and will be determined in part by what harm, if any,

15   Mr. Fowler caused versus what the subsequent investor caused.

16   So that's one issue.

17             Another is, under 3553(a), the seriousness of the

18   offense in that, while, of course, it's serious -- I would

19   never say it's not -- there will be a difference depending on

20   what Fowler caused versus what he didn't.  OK?  So to the heart

21   of sentencing and punishment, that's one issue, for the reasons

22   I just stated.

23             Another issue is forfeiture, and that is, your Honor,

24   $750 million more or less ran through various bank accounts in

25   the United States and in Europe.  In the United States, it is

my belief that approximately $220 million ran through the U.S.

bank accounts and the other 500-plus million in foreign bank

accounts.  And so as to forfeiture, your Honor may find that it

doesn't matter right now if all of the money ran through U.S.

bank accounts, and your Honor may find that an Eighth Amendment

violation is not appropriate based on the maximum fine and

based on some of the facts.  But we believe that that's an

issue for the Court -- the extent of forfeiture and whether or

not it triggers the Eighth Amendment.

Another issue, your Honor, is restitution, and that is

obviously identifiable victims and direct harm that Mr. Fowler

caused versus consequential damages.

The guidelines themselves, your Honor, we have to

obviously calculate, and so I don't know about the two-level

enhancement for harm to any victim, because it's my

understanding that although $750 million ran through various

bank accounts, no bank lost money and no person lost money and

that we have, on the one side, your Honor, under 2S, because

money was involved, there could be a 30-level increase if

between 550 million and 1.5 billion -- if that amount of money

was involved, quote/unquote, under the 2S statute -- I think

it's 2S1.3 -- then there should be a 30-level increase.  But

there's a five-level cap on the unlicensed money-transmitting

business.  So the way that a sentence would ever exceed five

years is because of grouping, because --

N4kWfowC

1          THE COURT:  OK.  I get that.  What I'm trying to find

2     out now in terms of scheduling --

3          MR. SAPONE:  Yes.

4          THE COURT:  I understand these are arguments that you

5     are making based on facts that I think are part of the record,

6     and they're legal arguments you're making.  I'm trying to

7     figure out, are you seeking some sort of *Fatico* hearing

8     regarding these guideline issues?  Are you seeking some other

9     sort of evidentiary hearing?

10          The government has indicated there's this witness

11     they're going to make available to you.  Are there other

12     witnesses that you're interested in calling or other facts that

13     need to be brought to my attention to supplement the record?

14          MR. SAPONE:  No.  I think both sides agree that $750

15     million ran through various bank accounts, and we don't need a

16     witness come to say that.  How that gets applied and how the

17     guidelines are calculated will be something we don't need a

18     witness for.

19          THE COURT:  OK.  So do we need a witness?  What do we

20     need?  This witness is going to testify about issues concerning

21     restitution and you're going to make those same arguments based

22     on the facts from this witness regarding the nature and

23     circumstances of the offense.  I just want to find out, what

24     other facts are there that you are seeking, if any, to

25     supplement the record?

N4kWfowC

1          MR. SAPONE:  What harm, if any, Mr. Fowler caused to

2     the AAF versus what harm did the subsequent investor cause.  To

3     me, that's the heart of the argument.

4          THE COURT:  Right.  That's the argument.  I guess what

5     I'm trying to figure out is -- I just want to make sure that

6     we're not in a situation in which we adjourn this for

7     sentencing and then we end up adjourning this again because

8     you're looking for some other witness or some other facts or

9     some other documents.

10          MR. SAPONE:  Yes, your Honor.

11          THE COURT:  I understand the arguments and the

12     different positions that the parties are taking.  I'm just

13     trying to figure out what other witnesses or documents, if any,

14     are you looking for?

15          MR. SAPONE:  So, I guess the truthful answer is I

16     don't know what I'm going to find.  I, in the last 24 hours,

17     came up -- that is, discovered -- that 64-page complaint, and

18     it's pointing all fingers at the other individual, not at

19     Mr. Fowler, even though he's mentioned.  So I don't know what

20     I'm going to find, is the truth.

21          THE COURT:  What does that mean?  I guess if you can

22     be more clear -- what do you mean by that?  This witness, the

23     victim, just testified about that.  Certainly it is possible

24     that harm could be caused by more than one individual to the

25     AAF.  When you say you don't know what you're going to find, I

N4kWfowC

1    guess that's what I'm trying to figure out.

2              If the issues that you're talking about are issues

3    that go to the guideline calculation and these are enhancements

4    that the government is seeking, certainly you could ask for a

5    *Fatico* hearing and we could figure out burdens of proof and the

6    like, but I don't know if that's what you're asking for.  I

7    guess that's what I'm trying to figure out.  I understand you

8    want to make arguments.  You have this document that you just

9    found.  You're going to make arguments based on that.  That's

10   fine.  I just don't want to be in a situation where we're

11   adjourning this again.  That's what I'm trying to avoid.

12             MR. SAPONE:  Yes, your Honor.

13             THE COURT:  Can you give me a sense of what you think

14   you might find or what you're looking for, and if you find

15   something, what will it mean?

16             MR. SAPONE:  Sure.  I may find proof --

17             THE COURT:  Hold on just a second.

18             MR. SAPONE:  Yes.

19             THE COURT:  Just one second.

20             MR. SAPONE:  Yes, your Honor.

21             THE COURT:  OK.  Go ahead.

22             MR. SAPONE:  Proof that individuals other than

23   Mr. Fowler are responsible for the league folding --

24   specifically, it was Mr. Dundon's fault, not Mr. Fowler's

25   fault.  And I don't know how I would prove that, because I have

N4kWfowC

1    not -- I have not done my investigation.  But by reading this

2    complaint, it appears that there are a lot of facts and details

3    that would support what I just told the Court; that is, that

4    the reason that the league went out of business is because

5    Mr. Dundon made certain representations that he did not pull

6    through on and, as a result, the league went out of business

7    and Mr. Dundon got sued.

8            THE COURT:  OK.  Again, what I'm concerned about is,

9    based on what you're saying, you're saying you're going to be

10   looking for some things.  You don't know what you're going to

11   find until you find them and when you find them, if you find

12   them, they will be within this week's period of time that

13   you're looking to adjourn this for.

14           If you find something, the government has a right to

15   see this --

16           MR. SAPONE:  Yes.

17           THE COURT:  -- so that they're not just sandbagged at

18   the last minute when we have this sentencing hearing.  So I

19   guess what I'm wondering, even though I hate to say this, I

20   don't know how we can adjourn this for a week if we have to

21   wait for you to do some sort of investigation and then give the

22   government an opportunity to look at this.  It seems like we're

23   going to be in this -- I just don't want to have a situation in

24   which we put this on for a week, you find something at the last

25   minute, give it to the government, the government flies people

N4kWfowC

1       down here for this and we end up adjourning it again.

2               MR. SAPONE:  Yes.  I can tell your Honor the reason I

3       selected a week is because it was palpably clear to me that

4       folks wanted to get on with it, and I can work hard and long

5       hours, so I did not want to ask for more than I needed to.  I

6       was trying to be extra reasonable.

7               THE COURT:  All right.

8               What's the government's position on this?

9               MR. SWETT:  Your Honor, having heard Mr. Sapone's

10      representations, none of these facts are disputed and none of

11      these facts are new.  Mr. Sapone has arguments that he wishes

12      to make based on these facts, arguments about the guidelines

13      and arguments about the 3553(a) factors.  But we're not

14      disputing that after Mr. Fowler's funding disappeared, another

15      investor came and propped up the league for a few more months

16      until it declared bankruptcy.  We're not disputing that, and

17      we're not -- and Mr. Sapone is free to argue that that is

18      relevant for the Court's sentence.

19              I think there are a couple of key points here that I

20      want to make sure are clear.

21              One, Mr. Fowler has pled guilty to wire fraud against

22      the AAF.  I mean there's no question here about whether he

23      actually defrauded them or not.  To the extent there is a

24      question about the degree to which his fraud caused recoverable

25      losses, as we said, that's restitution.  We have put in

N4kWfowC

1    information about restitution, but the Court does not need to

2    impose that today or in a week if the sentencing is in a week.

3    So that's point one.

4            Point two, on restitution and on the point of whether

5    we even need to have any kind of factual finding as to

6    restitution, all we are seeking in restitution are expenses

7    that were incurred during the period of time when the defendant

8    was the lead investor in the league.  Everything after that we

9    are not saying he is responsible for, and it is a smaller

10   number than the entire amount of claims in bankruptcy for

11   exactly that reason.  And what we have not heard, despite

12   asking again and again, is whether the defendant disputes the

13   expenses that we have identified.  He may dispute whether those

14   expenses are recoverable as restitution.  That is a legal

15   argument that he can make, and we'll all dust off our tort

16   casebooks to think about but-for cause and proximate cause and

17   look at the statute and decide if that's the case.  But all we

18   have done in our restitution argument, or at least in our

19   restitution submission, is list the expenses that happened from

20   when Fowler said "I will invest in this league" until everyone

21   realized that he had no money to invest in this league and he

22   had been lying to them.

23           Again, in a week or two weeks or however much time, I

24   think Mr. Sapone could strengthen his 3553(a) arguments, and it

25   sounds like that's what he wants to do, but that is different

N4kWfowC

1   from saying I need to find facts that require a *Fatico* hearing,

2   because we all agree on the amount of funds that flowed through

3   Mr. Fowler's account as part of the cryptocurrency scheme.  We

4   all agree that he defrauded the AAF.  I don't think there's

5   much dispute that the expenses we listed are what they say they

6   are.  And so again, that was why we think we can go forward

7   with a substantial part of the sentencing today, and we are

8   interested, we are extremely committed to getting this done as

9   soon as possible.  This case was charged four years ago, and

10  it's time.  It's time for the Court to impose sentence.

11          THE COURT:  OK.  Anything else from defense counsel on

12  that?

13          MR. SAPONE:  No.  I could just say to your Honor that

14  the moment that I discover additional information, new

15  information, I will share it with the government.  I will work

16  very hard, every day, on this.  Mr. Fowler has committed to

17  remain in New York and work with me daily.  And so we have no

18  reason to want to delay this longer than it needs to be, and

19  that's why I suggested a week, because I'm being optimistic

20  that I could work very hard for the next week and be ready for

21  sentencing.

22          THE COURT:  From the government's perspective --

23  again, I have concern about witnesses coming here and victims

24  coming here and having their time wasted.  We've heard from the

25  victim who wanted to make a victim impact statement here in

1    court.  From the government's perspective, what prejudice is

2    there to the government if this is adjourned for a week or two

3    weeks in terms of the victims, the witnesses or the government?

4              MR. SWETT:  The first and the most serious prejudice,

5    which we identified in our letter, and the Court has addressed,

6    which we appreciate, to some extent, is people coming in to be

7    available for this.  Mr. Treyzon was able to speak, and we

8    appreciate that the Court gave him that opportunity.

9              We still don't know whether the defendant will

10   challenge the facts that Mr. Engel has put forth as it relates

11   to restitution -- again, not using Mr. Engel as a vehicle to

12   advance 3553(a) arguments.  So it's possible that this

13   proceeding concludes and we talk to Mr. Sapone and he says

14   yeah, I don't actually dispute the expenses, in which case

15   likely we wouldn't need to have him available.  We don't know

16   that yet, and that's what we've been trying to find out.

17             So the alternative is prejudicial to the government

18   and to individuals that have come in at the government's

19   request.  Mr. Engel, if he has to come back -- from Texas, I

20   believe -- if he has to come back from Texas, that will be a

21   burden on him and an unnecessary one that could have been

22   avoided if a number of things had happened differently.  But

23   that's the main prejudice.

24             Secondarily, this is a case that needs to wrap up, and

25   it needs to wrap up for a number of reasons, not just having to

1    do with the government's interest in finality.  There are

2    large, large seizures of funds involved in GTS and Crypto

3    Capital that may be folded into restitution, that may

4    ultimately have claimants who wish to access those funds.

5    There's $60 million in the U.S.  There's, I'd say, in excess of

6    a hundred million dollars overseas.  Once the Court orders

7    forfeiture and identifies property subject to forfeiture, then

8    the government and other interested individuals can begin the

9    process of trying to finalize that forfeiture.  And this is

10   something that has been -- these funds have been sitting there

11   for a long time, and I think there are a number of people who

12   are interested in starting that process as soon as possible.

13           THE COURT:  OK.  And from the government's

14   perspective, are the government's plans for Mr. Engel, for this

15   witness, is that he would -- if we were to adjourn this for a

16   week, is that he would stay in New York for this week, or would

17   he be returning to Texas and coming back in a week in any

18   event?

19           MR. SWETT:  We have not discussed that with Mr. Engel.

20   I think the first thing we would do is ascertain whether, in

21   fact, he was necessary to be here.  We don't know that yet.

22   But we don't know whether he would stay here or whether he

23   would return to Texas.

24           THE COURT:  OK.

25           All right.  Hold on a second.

N4kWfowC

```
 1            Thank you.
 2            All right.  Here's what I suggest.  We can adjourn
 3   sentencing for about a week.  We could do it either on April
 4   the 28th at 3:30 or May 2 at 3:30.
 5            Do either of those dates, both of those dates, work
 6   for the government?
 7            Hold on.  I think the victim is raising -- counsel for
 8   the government --
 9            MR. TREYZON:  Your Honor, I apologize.
10            THE COURT:  Yes.
11            MR. TREYZON:  Mr. Engel was scheduled to start a
12   specially set trial May 1, so he would not be able to travel
13   back here (inaudible).
14            MR. ENGEL:  Your Honor, I apologize.
15            Brian Engel, by the way, for the record.
16            I'm sorry.
17            I am a lawyer for the trustee.  I did most of the
18   investigation, which is why you see me on the affidavits.  I
19   know more about the facts than, I guarantee you, anybody in
20   this courtroom.
21            That said, I was specially set in a trial in a case
22   that was filed originally in 2015 about some young kids who
23   suffered carbon monoxide poisoning.
24            THE COURT:  OK.  Before we get -- let me just ask you,
25   how's April 28?  Are you available then?
```

N4kWfowC

1          MR. ENGEL:  Your Honor, I cannot be available.  That's

2     the pretrial hearing date and motions *in limine* for that May 1

3     trial.  So I'm a pumpkin until -- that's probably a ten-day

4     trial, ten calendar days, because everybody's thinking it's

5     eight trial days.

6          THE COURT:  OK.

7          MR. ENGEL:  So I'm a pumpkin until -- I don't have a

8     calendar with me, but probably May 15-ish, May 10-ish.

9          THE COURT:  OK.

10          MR. ENGEL:  I'm here today, and I can speak to this

11     complaint if Mr. Sapone wants to ask me questions about it.  I

12     will come back, obviously, if the Court needs me to.  I don't

13     want to inconvenience Mr. Fowler at all, but I'm not in a

14     position to be inconvenienced myself --

15          THE COURT:  OK.

16          MR. ENGEL:  -- because there's other (inaudible)

17     involved.

18          THE COURT:  All right.  Thank you.

19          MR. SWETT:  Your Honor, again, Mr. Engel, to the

20     extent defense wants to question him, is relevant to

21     restitution, and we still want to go forward today, but if

22     we're not doing anything today, we want to do sentencing and

23     forfeiture as soon as possible.  And so given that we don't

24     know if Mr. Engel will be examined and given that his relevance

25     is to whether the expenses were properly calculated, we want to

N4kWfowC

 1 | move this forward as quickly as possible.

 2 |          THE COURT:  All right.  Hold on a second.

 3 |          OK.  Let's do this.  Let's adjourn this matter until

 4 | May 17 at 3:30.

 5 |          Does that date and time work for the government?

 6 |          MR. SWETT:  One moment, your Honor?

 7 |          That works for the government.

 8 |          THE COURT:  Does that work for the defense?

 9 |          MR. SAPONE:  Yes, your Honor.

10 |          THE COURT:  All right.

11 |          Let's also do this so we don't end up in a similar

12 | situation.  Let's have the parties file a joint status report

13 | on May the 2nd letting me know whether or not the defense still

14 | wants to call Mr. Engel, whether or not the defense is seeking

15 | any sort of *Fatico* hearing, just to make sure that we're ready

16 | to go then on May the 17th.  Let's get that joint status report

17 | filed on May 2, on or before May 2.

18 |          MR. SAPONE:  Yes, your Honor.

19 |          THE COURT:  Anything else from the government for

20 | today?

21 |          MR. SWETT:  Your Honor, we want to put on the record

22 | that if the sentencing is adjourned beyond the 17th, the

23 | government will likely seek the defendant's remand pending

24 | sentencing given the delay, given issues THAT we have raised in

25 | a bail letter that we brought to the Court's attention

N4kWfowC

1   involving gambling, and given our concern, frankly, that this

2   could drag on, depending on what happens on the defense side.

3   So we're not asking the Court to do anything now, but we want

4   to put on the record that we may likely take that position if

5   the sentencing moves, and in light of all of the adjournments,

6   if the Court imposes a term of imprisonment on the 17th, we

7   will likely be seeking immediate remand.

8           THE COURT:  Anything else from the defense?

9           MR. SAPONE:  I just wanted to make clear that it is

10  not (inaudible) Mr. Fowler has done anything wrong.

11          THE COURT:  They're not asking for anything now.

12  They're just saying that that's what they may do when we get

13  there.  Hopefully, it is my sincere hope and my belief that we

14  will not be adjourning this after May 17.

15          MR. SAPONE:  Yes, your Honor.

16          THE COURT:  Anything else from the defense?

17          MR. SAPONE:  No.  Thank you.

18          THE COURT:  OK.

19          We're adjourned.  Thank you.

20          (Adjourned)

21

22

23

24

25