N656FOWS                    Sentencing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                          19 CR 254(ALC)

5    REGINALD FOWLER,

6                    Defendant.

7    ------------------------------x

8                                            New York, N.Y.
                                             June 5, 2023
9                                            10:10 a.m.

10   Before:

11                   HON. ANDREW L. CARTER, JR.,

12                                           District Judge

13                         APPEARANCES

14   DAMIAN WILLIAMS,
          United States Attorney for the
15        Southern District of New York
     BY:  SEBASTIAN A. SWETT
16        SAMUEL RAYMOND
          SAMUEL ROTHSCHILD
17        JESSICA GREENWOOD
          Assistant United States Attorneys
18
     EDWARD V. SAPONE
19        Attorney for Defendant

20
     Also Present:  Anthony Imperato, Paralegal
21

22

23

24

25

1              (Pages 2-4 SEALED by order of the Court)

2              (In open court; case called)

3          DEPUTY CLERK:  Counsel, please state your appearances,

4     for the government.

5          MR. SWETT:  Good morning, your Honor.  Sheb Swett

6     joined at counsel table by Samuel Rothschild,

7     Jessica Greenwood, and Samuel Raymond, all Assistant United

8     States Attorneys representing the government.  We're also

9     joined by a paralegal from our office, Anthony Imperato.

10         DEPUTY CLERK:  For the defendant.

11         MR. SAPONE:  Good morning, your Honor.  Good morning,

12    everyone.  My name is Edward Sapone, appearing for and with

13    Mr. Fowler, ready for sentencing.

14         THE COURT:  Good morning.  Please be seated.

15         We're here today to impose sentence in the case of

16    *United States v. Fowler*.  In preparation for today's proceeding

17    I've reviewed the presentence report, a submission from the

18    defendant, a submission from the government with several

19    exhibits, several victim impact statements.

20         Is there anything else that I should have from the

21    government?

22         MR. SWETT:  Your Honor, we have given defense counsel

23    a proposed consent restitution order.  We expect the

24    restitution will be by consent, and so we would furnish a copy

25    of that as soon as the defendant and defense counsel have

N656FOWS                        Sentencing

1    signed it.

2              THE COURT:  Is there anything else I should have from

3    defense counsel?

4              MR. SAPONE:  No, thank you, your Honor.

5              THE COURT:  Okay.  All right.

6              Defense counsel, I know from your submissions that you

7    reviewed the presentence report.  But just so the record is

8    complete, have you reviewed the presentence report with your

9    client?

10             MR. SAPONE:  Yes, your Honor.

11             THE COURT:  And other than what's contained in your

12   submissions, are there any objections to the presentence

13   report?

14             MR. SAPONE:  No, thank you, your Honor.

15             THE COURT:  Again, I notice you have an objection to

16   the guideline calculation.  Are there any objections to any of

17   the factual portions of the presentence report?

18             MR. SAPONE:  No, your Honor.

19             THE COURT:  Counsel for the government, have you

20   reviewed the presentence report?

21             MR. SWETT:  Yes, your Honor.

22             THE COURT:  Any objections to anything in the report

23   by the government?

24             MR. SWETT:  No, your Honor.

25             THE COURT:  Then I adopt the factual findings in the

1    presentence report.  To the extent I haven't already done so, I

2    accept Mr. Fowler's plea of guilty.

3           One other thing, as a preliminary matter, I informed

4    counsel for the government and Mr. Fowler's prior counsel that

5    I have a conflict with JP Morgan Chase Bank as well as Bank of

6    New York.  It appears that neither of those banks are victims

7    in this case.

8           I will note that regarding forfeiture, one of the

9    accounts that the government seeks forfeiture on is a JP Morgan

10   Chase account.  It doesn't appear to me that that would present

11   any sort of conflict for me since they're not a victim of this

12   fraud or in this case.  And they are certainly not a party

13   here, but I wanted to find if counsel have any thoughts on

14   that, starting with the government.

15          MR. SWETT:  Your Honor, we see no reason why that

16   would conflict the Court off of this case.

17          THE COURT:  Okay.  Defense counsel.

18          MR. SAPONE:  I agree, your Honor.

19          THE COURT:  Okay.  Although I'm no longer required to

20   strictly adhere to the sentencing guidelines, I must consider

21   the applicable guideline range before imposing sentence.  So

22   let's turn to that.

23          I noticed the defense had an objection to the

24   guideline range as laid out in the presentence report.  The

25   presentence report sets out a guideline range at Offense Level

1    36 and Criminal History Category I, resulting in a guideline

2    range of, I believe, 188 to 235 months' imprisonment.

3             Does the government object to that calculation?

4             MR. SWETT:  No, your Honor.

5             THE COURT:  Defense counsel, let me just turn to your

6    objections.

7             So the defense has proposed that the total offense

8    level should be 30, as opposed to 36.  The defense agrees that

9    the base offense level is seven.  The defense posits that for

10   special offense characteristics in terms of the loss amount,

11   that the loss amount is greater than 250 million but less than

12   500 million, or 550 million.

13            Can you tell me more about that as to why it is that

14   you think it's less than 550 million?

15            MR. SAPONE:  Your Honor, simply it's based on

16   discovery that the government had handed over.  There was a

17   sheet that was apparently prepared in-house at Mr. Fowler's

18   offices that I thought showed that the money that ran through

19   the accounts was less than $550 million.  I believe that that

20   sheet showed 200 million ran through the United States bank

21   accounts, your Honor.  And that the balance -- and, again, the

22   total being less than 550 -- ran through the European bank

23   accounts.  So it was just a straight analysis based on the

24   discovery.

25            THE COURT:  Let me hear from the government on this.

1          MR. SWETT:  Your Honor, the defense is right that we

2     have been looking at GTS internal documents to make sense of

3     the total volume of funds.  However, I think Mr. Sapone doesn't

4     have the figures right.

5          As set forth in Paragraph 34 of the PSR, our read of

6     that spreadsheet is that overall the defendant, through his

7     accounts, processed approximately $750 million.  And just so

8     that it's clear, we're looking at one-way transactions.  We're

9     not counting the money going in and the money going out, which

10    would essentially double that figure or at least augment it by

11    a considerable degree.

12         And the spreadsheet has a number of sub tabs and

13    breaks it down into some granularity.  And we've gone through

14    that and as set forth in the PSR, our view is that

15    approximately $600 million of that flow was in U.S. dollars.

16    Both in bank accounts in the United States but also in

17    dollar-denominated accounts elsewhere.

18         Our view is that the total amount is relevant for the

19    guidelines calculation because you're talking about a

20    conspiracy, and having a network of banks throughout the world

21    obviously enhances the ability to operate the conspiracy and

22    operate the money services business.  But whether you're

23    looking at the total flow converted to dollars or you're just

24    looking at the dollar-denominated transactions, we think we are

25    squarely within the offense level set forth in the PSR.

1      THE COURT:  Anything else from defense counsel on

2  this?

3      MR. SAPONE:  No, thank you, your Honor.

4      THE COURT:  Looking at the presentence report in

5  Paragraph 34 as well as the government's submission, I do find

6  that the loss amount is greater than $550 million, so we will

7  add 30 points as opposed to 28.

8      The defense does not mention in your objection to the

9  guideline calculation what it mentioned in Paragraph 61 of the

10  presentence report, the specific offense characteristic of a

11  two-point enhancement because the offense involved ten or more

12  victims.  What's the defense's position on that?

13      MR. SAPONE:  So, if the government's proof bears that

14  out, then obviously the guidelines are the guidelines, your

15  Honor.  I would -- I'm guided by the evidence.

16      THE COURT:  Okay.  You didn't mention it at all in

17  this, but what's the government's position on that, on that

18  two-level enhancement?

19      MR. SWETT:  One moment, your Honor.

20      THE COURT:  Sure.

21      MR. SWETT:  Your Honor, as we've made clear through

22  the indictment, through our bill of particulars, through our

23  submission, there were dozens of banks that opened accounts as

24  part of the GTS scheme and our view is that in all those

25  instances, the defendant and his coconspirators misrepresented

1    the nature of the business.

2             And so our position is that there are more than ten

3    victims.  That is also including the AAF which is its own

4    victim for the separate count.  So we think that that

5    enhancement properly applies.

6             THE COURT:  Anything else from defense on this?

7             MR. SAPONE:  No, thank you, your Honor.

8             THE COURT:  Okay.  I'll apply that two-level

9    enhancement mentioned in Paragraph 61.

10            The defense is seeking a two-level reduction under

11   4C1.1 under this proposed amendment to the guidelines.

12            What's the government's position on that?

13            MR. SWETT:  Your Honor, our position is that it is not

14   in effect yet, and so it should not be part of the Court's

15   guidelines determination until the sentencing commission, in

16   fact, adopts it as part of the guidelines.

17            THE COURT:  Okay.  If it were in effect, what's the

18   government's view on whether or not it applies?

19            MR. SWETT:  Your Honor, I'm not in a position --

20   perhaps if I could have a moment, your Honor.  I was not

21   anticipating this question.  I'm happy to give it some thought.

22            MR. SAPONE:  Your Honor, would it be okay if I spoke

23   while the government is gathering its thoughts.

24            THE COURT:  I don't think it's necessary.

25            MR. SAPONE:  Okay.

1          MR. SWETT:  Your Honor, I think it would apply if it

2     was part of the guidelines, but it's not.  So our view is it

3     should not apply at this time.

4          THE COURT:  Okay.

5          The government has conceded that if it were part of

6     the guidelines at this point, it would apply.  I will go ahead

7     and apply that even though I know it's not technically in

8     effect now.  I don't think it's appropriate to wait for it to

9     come into effect.  So I will apply that two-level reduction

10    under 4C1.1.  Therefore, that results in a total offense level

11    of 34 and Criminal History Category I, which results in a

12    guideline range of 151 to 188 months.

13         All right.  Now let's turn to -- well, let's turn to

14    the issue of restitution.  It seems the government has

15    indicated there may be an agreement on restitution.

16         Where are we regarding restitution?

17         MR. SWETT:  Yes, your Honor, the parties have

18    continued to discuss restitution since the sentencing was

19    continued several weeks ago.  And our understanding after

20    speaking with defense counsel this morning is that there will

21    be an agreed restitution amount, and we have a proposed order

22    for the Court's consideration setting forth restitution.

23         THE COURT:  Okay.  Defense counsel?

24         MR. SAPONE:  Government's correct.

25         THE COURT:  Okay.  When is this "will be" going to be?

N656FOWS                    Sentencing

```
 1              MR. SAPONE:  We're agreeing to the $53 million order
 2   of restitution.
 3              THE COURT:  Have you signed it?
 4              MR. SAPONE:  Yes, your Honor.
 5              THE COURT:  And your client has signed it?
 6              MR. SAPONE:  We'll do that right now.
 7              THE COURT:  Okay.
 8              MR. SAPONE:  May I approach?
 9              THE COURT:  Yes.  You can just hand it to my deputy.
10              Just so the record is complete, I note previously
11   defense counsel is requesting permission to cross-examine a
12   witness.  Is that still happening, defense counsel?
13              MR. SAPONE:  No, thank you, your Honor.
14              THE COURT:  I have before me a proposed consent order
15   of restitution, which appears to be signed by counsel and
16   Mr. Fowler.
17              Did you sign this today?
18              THE DEFENDANT:  Yes, sir, your Honor.
19              THE COURT:  Okay.  There's a line for the date, the
20   date has not been placed there yet.  I'll hand this back to
21   you, we'll do that administratively later.  But, again, you
22   signed that today, Mr. Fowler?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  Did you discuss this with your attorney?
25              THE DEFENDANT:  Yes, your Honor.
```

1          THE COURT:  Okay, you can stay seated.  That's fine.

2  And by signing this, do you consent to an order of restitution

3  in the amount of $53,189,261.80?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Okay.  I will sign this consent order of

6  restitution.

7          Anything else from the government regarding this?

8          MR. SWETT:  No, your Honor.

9          THE COURT:  And I will enter an order of restitution

10  in the amount of $53,189,261.80.

11          I'll hand this back to the defense counsel so that you

12  and your client can date it and hand it back to the government.

13          All right.  Let me hear from the parties on

14  forfeiture.  Let me find out.  Is there an agreement on

15  forfeiture?

16          MR. SWETT:  There is not, your Honor.

17          THE COURT:  Okay.  Let me hear from the parties on

18  forfeiture.

19          MR. SWETT:  Okay.  AUSA Raymond will be handing this

20  argument.

21          THE COURT:  Okay.

22          MR. RAYMOND:  Your Honor, I'm happy to take this in

23  whatever order the Court wants.  I understand the burden is the

24  defendant's to make the 8th Amendment argument that he's

25  raising to the challenge forfeiture.  So I'm happy to address

N656FOWS                    Sentencing

1    the Court first or have Mr. Sapone go first.

2              THE COURT:  Let's have the government address it

3    first.

4              MR. RAYMOND:  Sure, your Honor.  So just as a matter

5    of fact, as the government described in its sentencing

6    submission, it's clear that the preliminary order of

7    forfeiture, the amount of the money judgment is accurate

8    insofar as it properly assesses the amount of money that

9    followed through the various accounts under the defendant's

10   control and those of his coconspirators.

11             The 740 million-plus proposed money judgment that the

12   government has submitted to the Court represents that total sum

13   of the 1960, the unlicensed money transmitting business.

14             Your Honor, before I get into the 8th Amendment

15   argument, I just want to make clear, the unlicensed money

16   service business and the bank fraud that Mr. Fowler pled guilty

17   to does not specifically have victims for purposes of

18   restitution.  The Court has seen a number of victim letters and

19   victim impact statements.  The government submitted those from

20   these individuals who have relevant interests here.  But they

21   are not victims for purposes of the restitution statute here.

22             And so that's particularly why it's important that the

23   Court order full forfeiture.  These individuals will have

24   interests that can be vindicated potentially through the

25   government's remission process which happens after funds are

forfeited to the government and specifically the funds the

government is seeking.

So, your Honor, just given that, the defendant has not

met his 8th Amendment obligation, the burden again on him, that

these -- the $740 million would be excessive under the

8th Amendment and under the excessive fines portion of the

8th Amendment.

The relevant case here, your Honor, is the Supreme

Court's decision in *Bajakajian* and the Second Circuit's

decision in *Viloski*.  Under those factors, the factors laid out

in those cases, it's clear, your Honor, that this $740 million

is an appropriate forfeiture judgment with respect to the

defendant and his crimes.

This is -- these are -- the defendant's crimes fit

well within the essence of the charged offenses in its relation

to other criminal activity.  The defendant was a sophisticated

white-collar businessman who is well within the class of

persons for whom these statutes were designed.

The maximum sentence and fines that could be imposed,

your Honor, we cite to and I think the Second Circuit makes

clear in its recent decision in *Patterson*, which reversed

Judge Rakoff's decision that the defense cites.  That, for

instance, the appropriate fine provision here would be the

alternative fine provision under 18 U.S.C. 3571, and that's

twice the gross pecuniary gain or twice the gross pecuniary

N656FOWS                    Sentencing

loss, as the government asserts to your Honor as has now been

admitted through the consent restitution order, that's in the

$100 million range, at least, twice the amount of the

restitution judgment.

        And then finally, your Honor, the last factor is the

nature of the harm caused by the defendant's conduct.  As your

Honor has seen, as your Honor will hear further, the

defendant's conduct caused very serious harm to the AAF, as

well more broadly the financial system through his operation of

a shadow bank for cryptocurrency exchanges.

        Your Honor, we cite to two cases in particular that

really reaffirm why an 8th Amendment challenge here should be

rejected.

        The first is *Elfgeeh*, Second Circuit's decision 515

F.3d 100.  That was an unlicensed money transmitting business

case, and the amount that the Second Circuit specifically

rejected, the 8th Amendment challenged to, was the amount of

money that was quite close to the amount that had transmitted

through the defendant's unlicensed MSB.  So the government is

following the Second Circuit's guidance in the *Elfgeeh* case

sort of to a tee.

        But the other case, your Honor, that I really

respectfully submit is sort of on all fours here, is the

*Bonventre* case, which -- where the Second Circuit affirmed a

forfeiture judgment of more than $19 billion.  And the reason

1  for that was in *Bonventre* the defendant there faced a potential

2  maximum sentence of what was effectively a life sentence,

3  decades in prison.  And so even the extremely high forfeiture

4  provision in that case orders a magnitude larger than what the

5  government is seeking here, was appropriate under the

6  8th Amendment.  And the government notes, as your Honor knows,

7  the statutory maximum prison sentence that the defendant faces

8  is 90 years, just to be clear.

9          So for those reasons, your Honor, the government

10  respectfully submits the defendant's 8th Amendment challenge

11  cannot move forward here.

12          THE COURT:  Okay.  Let me hear from defense counsel on

13  this.

14          MR. SAPONE:  So, your Honor, I note that, of course,

15  this is different from the lion's share of the cases that come

16  before the Court, which -- in which the government seeks orders

17  of forfeiture and there are people who are harmed and it makes

18  perfect sense to impose that penalty in addition to an order of

19  restitution in those cases.

20          In this case, your Honor, the way the government

21  arrives at the $740 million is that it flowed through all of

22  the bank accounts, 200 million of which flowed through the U.S.

23  bank accounts.  The $53 million that the government mentions in

24  its argument as to restitution, has to do with harm to the AAF,

25  not harm to any bank.  So I just want to highlight and

1    underscore that.

2           Although the money flowed through the bank accounts,

3    the bank was not harmed to the tune of even $1.  All of that

4    money that flowed in flowed back out to either the customers

5    who asked that it be put into the account on whose behalf it

6    was put in or where they directed it.

7           So I think that because we're dealing with a situation

8    in which as we look at the money, the illegality is that it

9    flowed through the bank when it shouldn't have, but it's not

10   that the bank lost anything.  And for that reason, the reasons

11   in my sentence memo, I ask you to find it is excessive.

12   Especially in light of the fact that Mr. Fowler agreed to a

13   $53 million restitution order, to then impose a $740 million

14   order of forfeiture when the bank didn't lose $1, I believe is

15   excessive.

16          THE COURT:  All right.  Anything else from the

17   government?

18          MR. RAYMOND:  Your Honor, just respectfully, I think

19   the defendant is focused a little on the wrong issue and the

20   Second Circuit made that clear in *Elfgeeh*.  The forfeiture,

21   that was a 1960 case, just like one of the charges here.  And

22   the focus of the Second Circuit there was not unharmed, it

23   wasn't a question on who was harmed.  The Second Circuit held

24   nonetheless that more $20 million forfeiture judgment was

25   appropriate.

1          So, your Honor, for those reasons, the government

2     submits the 8th Amendment challenge here should fail.

3          THE COURT:  Let me ask defense counsel this:  Part of

4     the gross disproportionality analysis, courts may also consider

5     under *Viloski*, 814 F.3d 104 at 110, whether the forfeiture

6     would deprive the defendant of his livelihood, meaning his

7     future ability to earn a living.

8          Is there anything regarding that that you're making

9     that's part of your argument, or that I should consider or no?

10          MR. SAPONE:  I would just note that Mr. Fowler is

11     64 years of age and if he had to endure at the end of all of

12     this, meaning, once the case is over in its entirety, paying

13     the 53 million-dollar order of restitution, and then after that

14     had to face a 740 million-dollar order of forfeiture, yes, I

15     believe that it would certainly deprive him of his ability to

16     even pay normal bills.  I mean, it would be extraordinary.  He

17     would never get out from underneath those debts.

18          THE COURT:  Okay.  But it's necessary that this

19     analysis is, to sort of cabin this, because I'm not allowed to

20     consider personal circumstances such as his age or present

21     financial condition.  But in terms of his ability to earn a

22     livelihood, is there anything else you can tell me about that.

23          MR. SAPONE:  No, your Honor.

24          THE COURT:  Okay.  Anything else from the government

25     on that?

N656FOWS                    Sentencing

1          MR. RAYMOND:  So, your Honor, there's just a few small

2    points.  First of all, we're seeking a money judgment, not

3    necessarily garnishing wages or anything like that.  Just in

4    case it's not clear, the government is seeking specific

5    property to be forfeited and that's important because that's

6    money that can be returned to people affected by the

7    defendant's criminal conduct.

8          The last points, your Honor, I just raise very

9    briefly.  The defendant bears the burden of making the showing

10   under *Viloski* about his livelihood.  As the government made

11   clear in its sentencing submission, that I think we'll mention

12   at some point in the future, the defendant has not provided

13   full financial circumstances, his full financial circumstances.

14         So there is no record for the Court to make a

15   determination about what effect this would have on his

16   livelihood when he hasn't provided such information.  So for

17   those reasons, your Honor, I'm happy to answer any other

18   questions as well.

19         THE COURT:  Okay.  All right.  Let's move on.  I'll

20   think about that a little more.  Let's move on to the other

21   issues.  I'll hear from the parties regarding any issues they

22   want to raise about the appropriate sentence in this case.

23         I understand that the government is seeking a sentence

24   of at least 84 months.  The defense is seeking a non-custodial

25   sentence.

1        My inclination at this point is that a sentence

2   somewhere around six or seven years is appropriate given all

3   the circumstances here.  I may change my mind, but that's what

4   my thinking is.  Having said that, I'll hear from the parties,

5   starting with counsel for the defense.

6        MR. SAPONE:  Yes, your Honor.  Your Honor, oftentimes

7   when defense counsel stands up in proceedings like this one,

8   you would think that the defendant is up for man of the year

9   award, they launch into a monologue about how great and

10  wonderful the defendant is.  They never really get around to

11  putting a final point on what brings us here.  So I want to

12  start with that.

13       This is a case not in which Mr. Fowler went to trial.

14  He had that right, we have no problem with that.  It was

15  certainly something he could have done, but he instead accepted

16  responsibility, and so far be it from me to not start in that

17  area.

18       What he did was not only wrong, it was illegal.  We

19  want to be the first in today's proceeding to say that.

20       A person who operates an unlicensed money transmitting

21  business, even if the bank didn't lose a dollar, has committed

22  a serious federal felony.  No doubt about it.  No excuses.

23  This is not a halfway acceptance of responsibility, it's full.

24       When someone additionally commits bank fraud as

25  Mr. Fowler did, and lies to the bank, then that deprives the

1    bank of the opportunity to take him on as a customer.  Maybe

2    the bank would have elected to not open the accounts in the

3    U.S. because they didn't want cryptocurrency monies flowing

4    through the account.  And so there could be no doubt that the

5    bank fraud is not only wrong, but illegal and he's not halfway

6    accepting responsibility.  He's doing it all the way.

7            And then finally, on the wire fraud, certain

8    representations were made by Mr. Fowler during a 60-day period,

9    and he had promised to make certain financial payments and

10   infusions of money into the AAF and that didn't happen.  And

11   although they were able to find someone afterwards who sort of

12   stopped the bleeding, if you will, that doesn't do anything to

13   account for the harm that had been done already.  And there

14   could be no doubt about that.

15           So, there again, although monies were infused, it

16   wasn't what was promised and people were hurt.  And there's an

17   acceptance of responsibility thereto for sure.

18           With that said, your Honor, this Court knows very well

19   that we don't sentence crimes, we sentence people.  And we

20   don't just sentence people, we sentence the whole person.  And

21   I'd like to lean into that a bit because a deprivation of one's

22   liberty is nothing more serious than that.  And I appreciate

23   the Court's comments and I thank you for letting me know your

24   thoughts on that.

25           He's 64 years of age.  Six decades of extraordinary --

1   putting this case aside -- extraordinary contributions to

2   family and to community.  And I'm asking the Court as it

3   embarks upon sentencing the whole person -- not just what he

4   did wrong, and not just what he did that was illegal -- to take

5   that into account.

6       I am asking for a non-custodial sentence because I

7   think that we can look at the kinds of sentences available, and

8   we can address 18 U.S.C. 3553(a)(2) and the purposes of

9   sentencing without a prison sentence, especially for a

10  zero-point offender.  I'll talk about that for a moment.

11      Now, I know that it's not November of 2023 yet, but

12  the U.S. Sentencing Commission held a public meeting and voted

13  unanimously on those statutes, 4C1.1 and 5C1.1, the former of

14  which your Honor already talked about and reduced the

15  guidelines by two levels.  The latter of which, as long as the

16  crime is not quote, unquote, otherwise serious, would recommend

17  a non-custodial sentence.

18      And the reason I want to lean into that, your Honor,

19  at the outset is because I believe we're going to see those of

20  us who are active in criminal law and criminal cases, after

21  November of 2023, sentencing is going to change.  And the

22  reason it's going to change is whereas we're going to say in

23  the old days, a case like this, like any case, would have

24  resulted in years of prison, now after 5C1.1 as long as the ten

25  factors of 4C1.1 are met and the crime is not otherwise

serious, there's a recommendation of non-custodial.  And I
think it's going to change the landscape of sentencing.

            But obviously that's a forecast, I don't know that for
sure.  What I know for sure, what I know for sure is that this
man who sits to my right at age 64 really shouldn't have
accomplished all that he did because when he started out in
life, when he was born in 1959 in Alabama to a 15-year-old
mother, the world was not very kind to him.  And the reason I
begin way back then is because we know that statistically when
a young man comes into this world having been born to a young
mother, and maybe she hasn't achieved education or status in
society, and he didn't know his father, bad things happen.  Bad
things flow from that, and they never sort of come around to
making it in our community.

            But Mr. Fowler defied all odds, didn't know his
father, born to a 15-year-old mother in the deep south, and
somehow he made it.

            Now your Honor might be thinking so that he didn't
have to commit these crimes because it's a double-edged sword,
and we fully acknowledge that, that all criminality is wrong
and he didn't have to do what he did and he's very sorry for
that.  That's does not, however, take away what we can only
imagine were insurmountable odds growing up where at age five
he then is brought back to his mother's house, but he doesn't
know her and imagine beginning life that way and all of the

1    traumas that come along with it.  And then living in a

2    household with a stepfather, who by the way was a wonderful

3    man, but I think your Honor might understand my argument.

4         So what he does with the next decades of his life is

5    he studies hard and he works hard.  His education, I don't want

6    to belabor the point, it's in my memo, your Honor, is the kind

7    of education that we can applaud.  It's commendable with the

8    different degrees that he's gotten.  To say that he's a hard

9    worker is an understatement.  Maybe a real entrepreneur, with

10   not only the NBA license, but a pilot's office because he

11   thought that it would help the company that he was working for

12   that instead of spending 12 hours in a car to drive, he could

13   fly in 35 minutes.  That's the kind of man he was.

14        Commercial real estate, food store supplies industry,

15   aviation facilities, building ice skating rinks and schools,

16   elementary and high schools, volleyball courts, Club Disney,

17   and the list goes on, churches, et cetera.

18        Now, he doesn't deserve a pat on the back for being

19   some big shot, but what he does deserve is consideration for

20   entering the world against all odds and somehow doing all that,

21   not only for his own family, but for the community.

22        Your Honor, I would also want to lean into, without

23   excuse because at this table, you'll never get one, you'll

24   always get the straight truth.  But the lion's share of the

25   criminality here was in 2018.  And that was the same year in

1  which, and I'm sorry to mention it, but Mr. Fowler's son died.

2  Now, does a tragedy like that give someone a full license to

3  then go out and then commit crimes?  Of course not.

4          But we also know, your Honor, from our experience in

5  the system, that when someone is in a dark place and

6  emotionally in the depths of hell, they sometimes act in ways

7  that they ought not.  It does not excuse the conduct.  It is

8  still misconduct.  But it's misconduct with a little bit of

9  color as to the surrounding circumstances.  And what someone

10  might be, maybe what was going through during that time.

11          I also want to talk about the crimes at hand, in no

12  way of making an excuse and in no way of minimizing, your

13  Honor, but I just want to say when we have a case in which the

14  U.S. sentencing guidelines are increased by 30 levels for

15  loss -- I put that in quotes -- "loss" on the chart, yet this

16  is not the stereotypical case that all of us routinely have,

17  that is the white-collar case where the money, whether it's

18  740 million or whatever it is that drives the guidelines 30

19  levels up, is because real victims out there lost the

20  $740 million.  That is a different case.

21          The guidelines don't account for it because there's

22  still a plus 30.  And so if elderly women in the Midwest

23  receive telephone calls and e-mails and they're tricked out of

24  $740 million, then the guidelines are increased 30 levels.  Or

25  if $740 million goes through the bank accounts, 200 million of

1   which is in this country, it's still increased the same amount.

2   But we know that that crime is zero to five-year range.

3            So there's a disconnect, your Honor.  On the one hand,

4   Congress who promulgates law and statutory mandatory minimums

5   and maximums, says that a crime by Reggie Fowler –– I'm talking

6   about the unlicensed money transmittal business –– has no

7   mandatory minimum and so forget about downward departures like

8   in the old days, pre-2005, and forget about 18 U.S.C. 3553(a)

9   and *Booker* and its progeny.  Without any of that, a court does

10  not have to sentence to any prison time.

11           But Congress with the U.S. Sentencing Commission goes

12  further.  It says that that crime is capped at five years.  So

13  then the question is –– the guidelines are increased 30 levels

14  because that amount of money went through the account, the bank

15  didn't lose a dollar, and yet we're talking about, I think

16  188-month minimum if it's a guideline sentence.  Yet there's a

17  60-month cap.  How did that happen?  And the way it happened is

18  because Mr. Fowler accepted not only responsibility, but full

19  responsibility.

20           And so I don't say this in a disrespectful way, but

21  there was a borrowing from another statute to which he pled

22  guilty with a 30-year max.  That is the bank fraud.  And that's

23  how we can sentence him above 60 months.

24           But I think the point should be made clear to this

25  Court that the crime that drives the guidelines 30 levels

north, the fact that we're having a conversation about a 7-year

sentence, your Honor, is capped at 60 months because the bank

didn't lose a dollar.

I'm asking your Honor to consider that because of that

and the other factors of 18 U.S.C. 3553(a), that a custodial

sentence to this 64-year-old first-time zero-point offender,

that a custodial sentence is not necessary, your Honor.  With

the kinds of sentences available, we can provide just

punishment and impose specific and general deterrence and

promote respect for the law because there is no doubt that when

a heavy-handed sentence is imposed, that at times promotes

respect for the law.

But it can also be no doubt that when grace and mercy

are shown to a defendant who at one point in his multi-decade

life made the horrific errors in judgment at the worst time in

his life having lost his son to an overdose, that maybe the

Court, maybe the law could extend grace and mercy.  And maybe

the kinds of sentences available are enough that we can fashion

a sentence does not include prison time for a 64-year-old

zero-point offender.

What I suggest, your Honor, is a sentence of detention

for as long as the Court would think fit, but it's home

detention, hundreds of hours of community service so if the

Court feels that Mr. Fowler took away from anyone, that he

could give back to the community.  And supervised release and

N656FOWS                    Sentencing

we know the U.S. Probation Department does a phenomenal job
with people in making sure that any services that are needed
and any restrictions that should be imposed always with the
Court's approval are imposed.

          Your Honor, I had submitted my sentence memo with
about ten letters of support.  I'm not going to quote from even
one of them because I'm confident your Honor has read them all.

          What I do want to underscore, however, is that this is
not just a defendant or client communicating certain things to
the lawyer and the lawyer parroting these things to the Court.
This is a situation in which the people who best know
Mr. Fowler have written about with him, and the message is
clear.  He is extremely sorry for the mistakes that he made
which are more than just mistakes, they're criminality.  And he
accepts full responsibility for them.

          But when we look at the whole person, your Honor, this
is someone who, throughout his entire life, beginning with such
adversity, and then in the year 2018, the most extreme
adversity I could imagine, has done everything in his life
right.  Has helped family, has helped community.  He is an
extraordinary human being.  And that this case, of course, is
very serious and it's a case that involves money, and there are
money judgments and there are orders that can deal with that.

          And I just want to say that the AAF, the trustee, is a
wonderful person.  I had a lengthy discussion with him, it was

1   very enlightening and I do understand that players were hurt.

2   There was no doubt about it.   In that 60-day window, when

3   Mr. Fowler should have made good on the financial promises,

4   there can be no doubt that there was harm done.   But I also am

5   thankful at least someone stepped up to the plate.   Whether or

6   not he did the right thing is between him and the trustee.

7          But I just want to say, your Honor, when the smoke

8   cleared from that, that is when the AAF and Mr. Fowler parted

9   ways -- and I know this has nothing to do with the order of

10  restitution that we agreed upon -- there was a full release,

11  your Honor, given both ways.   And the government is aware of

12  it.   That is the AAF walked away from Reggie Fowler, said to

13  Mr. Fowler in a signed document, we are not going to come after

14  you for any claims, and Mr. Fowler said the same.

15         And it's not for him today, his sentencing hearing to

16  start throwing any mud as to what representations might have

17  been made to him.   I'm not going to go there.   But what I am

18  going to say is there is a full release both ways.   And so

19  maybe an organization like the AAF can make certain decisions

20  and got money from another individual, which I know has nothing

21  to do with the 60 days before, but there is a full release.

22         I don't want to end on that point, your Honor.   I

23  would like to just return to the lifetime of accomplishments

24  and the fact that there's a 30-point increase on a five-year

25  cap.   And those are my arguments and I appreciate you reading

1   my submission and listening to my thoughts.

2          THE COURT:   Okay.   Before I hear from the government I

3   do have some questions for defense counsel about time and

4   timing.   I certainly read the submission, I certainly

5   understand that Mr. Fowler had a very difficult upbringing.

6   And that is unfortunate.   That is something that I should take

7   into consideration.

8          However, those sorts of matters have more resonance

9   when someone is standing before the Court and they're 24 years

10  old, or they're maybe even 30 years old.   Mr. Fowler started

11  engaging in this conduct as alleged in the indictment when he

12  was 59 years old.   And I certainly understand the tragic loss

13  of his child.

14         Again, in terms of the timing, under the indictment, a

15  lot of his activity took place in February of 2018.   His child

16  tragically died in November of 2018.   You mentioned this new

17  amendment, 5C1.1, and you talked about why the crimes are

18  otherwise serious.   Why isn't this crime otherwise serious?

19         MR. SAPONE:   I'll start with that question first and

20  then go back to the comment you made about the timing.   It may

21  very well be, your Honor, but I tried to look for the

22  definition of otherwise serious.   And I found from Congress

23  itself and the comments that it's made, it's always been

24  violence, firearms, narcotics, or multiple offenders and lots

25  of criminal history points.   I haven't found anything that

1    covers this.

2            So as I embarked to find out what that means, that's

3    what I was left with.  I hope I put it in my papers because

4    that's what I believe, that when Congress had instructed the

5    United States Sentencing Commission to make the guidelines,

6    Congress speaks to them in writing.  And one of those sort of

7    promulgations, if you will, Congress says to the

8    U.S. Sentencing Commission in certain cases there has to be a

9    custodial sentence, and it gives examples.  And then it gives

10   examples of cases that should have heavy sentences because they

11   are serious.  And then it gives examples of what is serious.

12   And then it talks about cases where prison is not necessary.

13   It can be a no-mandatory minimum sentence, and that is largely

14   the white-collar cases.

15           So I don't have anything more to offer other than to

16   be completely candid with the Court, it may be, quote/unquote,

17   otherwise serious.  But I have tried to find instruction and

18   that's what I've come up with.

19           Your Honor, I would also like to say that I didn't

20   want to belabor this point because it's a very sensitive topic,

21   but the way in which -- I know I mentioned it quickly, but I'll

22   lean into it a little more.  The way in which Mr. Fowler's son

23   died was an overdose, a drug overdose, with which he had been

24   suffering in terms of the addiction for quite some time.  And

25   so your Honor notes that he joins the criminality in February

1    of 2018 and then there was the tragic passing, I guess,

2    nine months later.  But for that whole nine months, he was

3    dealing with a son who was very much in the depths of a

4    horrific addiction that ended in an overdose.

5         So it's that, your Honor.  It's that.  He was dealing

6    with that situation.  And then, of course, in November 2018,

7    there was the tragic passing, and then the criminality was

8    still there.  So that's what I meant by that.

9         Have I addressed the issues that your Honor has

10   raised?

11        THE COURT:  Yes.  And a little bit more on 5C1.1.

12        MR. SAPONE:  Yes, your Honor.

13        THE COURT:  The amendment -- the application note 4A

14   to the amendment would provide that if the defendant received

15   adjustment under 4C1.1, which he has, and the applicable

16   guideline range is in Zone A or B of the sentencing table, a

17   sentence other than a sentence of imprisonment is generally

18   appropriate.

19        This guideline range is not in Zone A or Zone B.  In

20   addition, as you indicate, the application note 4B would

21   provide that a departure, including a departure to a sentence

22   other than the sentence of imprisonment, may be appropriate if

23   the defendant received an adjustment under the new 4C1.1 and

24   the applicable guideline range overstates the gravity of the

25   offense because the offense of conviction is not either a crime

1    of violence or an otherwise serious offense.

2              We've addressed the serious offense, but I just want

3    to make clear my reading of that indicates that the new

4    application note does not require that a departure be to a

5    sentence other than a sentence of imprisonment, but that it may

6    be appropriate to depart under the guidelines.  And it may be

7    appropriate to depart all the way down to a sentence of

8    non-imprisonment.  But it's not that if the crime is not

9    otherwise serious, that automatically there is a departure to a

10   sentence of -- to a non-custodial sentence.  Am I reading that

11   correctly?

12             MR. SAPONE:  It's not automatic, you're right,

13   your Honor.

14             THE COURT:  Obviously, under the sentencing regime

15   there are departures, which are based on the sentencing manual

16   and the case law surrounding that manual.  And there are also

17   variances and as I've indicated, I intend to vary from the

18   guidelines considering the factors in 18 U.S.C. 3553(a).

19             Is there anything else you want to say, defense

20   counsel?

21             MR. SAPONE:  No, your Honor.

22             THE COURT:  Let me hear from government.

23             MR. SWETT:  Thank you, your Honor.

24             Let me just start with that.  For starters, the

25   government agrees with the Court's view of the proposed

1  amendment to the guidelines, and just wants to make it

2  abundantly clear that if there are serious white-collar

3  offenses, this is one of them.  We're talking about a guilty

4  plea to five separate counts involving the largest payment

5  processer for the cryptocurrency industry at the time of its

6  operation, involving lies to bank after bank after bank, both

7  big picture lies and extremely granular lies.  And we're

8  talking about a fraud against a nascent startup league that

9  resulted in $53 million of losses and disruption and

10  professional setbacks for untold individuals who were trying,

11  just like Mr. Fowler, to use sports as a way of improving their

12  lot in life.  That is a cruel irony here.

13         So a lot of that conversation I think is ultimately

14  beside the point because everyone is in agreement that a

15  variance here is appropriate.  But I think the government wants

16  to emphasize that this is serious conduct.  And that, in fact,

17  I think is the main factor that the Court should consider in

18  crafting the appropriate sentence here.

19         All of the counts come down to Fowler's dishonesty, to

20  the defendant's decision to lie and lie and lie, undeterred, by

21  the many red flags and the many offerings that were presented

22  to him over the course of approximately one year.

23         With the bank fraud, he lied in account opening

24  documents.  He told banks that these were real estate companies

25  when they had nothing to do with real estate.  He lied in

specific responses that were made by banks.  They would reach

out and ask about what was happening in these accounts and he

would lie about what was going on in those accounts and what

those accounts were being used for.

He lied by directing other people to put false

information in wires so banks would not pick up on the fact

that this extreme volume of transfers through his account were

related to cryptocurrency.  And he lied because he had to.  The

banks in this time would not have banked him and would not have

accepted the business that he was proposing to engage in

through those accounts if he had been truthful.

He needed to lie because he needed those accounts.

But he knew that if he told them what he was actually doing

with those accounts, they wouldn't let him open them.  So

instead, he traded on his business reputation and his other

business interests to deceive banks to allow him to open these

accounts.

Now, that pattern of lying to banks carries over

directly to how he operated this money services business.  Now,

he operated it without a license and the statute is unusual

because there's no real mens rea component.  But in this case,

there's ample evidence that he operated it deceitfully.  He and

his coconspirators knew what they were doing, they knew the

scrutiny that this business was under at this time.  And they

knew that they needed to create a facade of legitimately in

order to get around that heavy regulatory scrutiny and the

heavy scrutiny from the financial industry.

So, for instance, the parent company, which defendant

was not an owner of, but the parent company claimed it was

regulated by some self-regulating organization in Switzerland.

Basically not a government agency, but a sort of purported

FINRA-esq organization.  And the defendant -- and he maintains

this claim in his sentencing submission which, frankly, is

quite troubling -- he claimed to have thought there was

something okay with what he was doing because he had gotten a

license from a free industrial zone in the Republic of Georgia.

And it is the government's belief that that piece of

paper, which is about, you know -- is worth about nothing, that

that wasn't some honest attempt to find the correct regulatory

regime under which he could operate this business.  That was a

way to deal with the increasing pressure from banks that were

closing account after account, to deal with governments that

were seizing funds like dominoes falling down on a table, and

it was a way to keep this business going as long as possible.

The website that was public facing, the Crypto Capital

website made claims that had no basis in reality.  It had a

long list of countries including the United States where they

said they could do business.  Not true.  They said that their

funds would be held in trust and would not be used for things

like fractional reserve lending, would not be loaned out like

1   you'd see in a normal bank.  Not true.

2        This money services business was poorly run, was

3   deceitfully run, and was set up in a way so that there was some

4   plausible deniability on the part of the defendant and his

5   coconspirators.

6        So it's not just that he operated an unlicensed money

7   services business.  He deceitfully operated one.  It's entirely

8   consistent with the lies he made to the banks.

9        And I don't want to belabor this point because I think

10  we've discussed it a little bit in the forfeiture proceeding,

11  but it's wrong to say that this pattern of behavior did not

12  cause harm.  Our position is that there are no statutory

13  victims, that is true.  But when accounts got shut down and

14  when governments including Portugal, the United Kingdom and the

15  United States seized these accounts, individuals and companies

16  that were using Crypto Capital suddenly found their funds

17  inaccessible.  And this is a story that has played out since

18  then in the cryptocurrency space, but this was really sort of

19  ground zero for this problem, this recurring problem.  But it's

20  more than that.

21        The recent crises in the banking industry shows the

22  danger of knowing exposure to cryptocurrency.  Some of these

23  recent banks that have experienced problems, Silver Gate,

24  Signature, those banks understood their exposure to

25  cryptocurrency.  And here the defendant was opening accounts

1   and moving funds through them without the banks actually

2   knowing at the outset what they were getting into.

3         Now, fortunately, it did not result in any harm to the

4   banks, but that has nothing to do with what the defendant did.

5   That is a matter of coincidence and circumstance and it is not

6   because what he did was not serious.

7         And just an important point here as to harm and

8   especially harm mitigation, the entire point of the regulatory

9   scheme, certainly for money services business, and the entire

10  point of having banks that conduct KYC and that conduct due

11  diligence and that have anti-money-laundering programs, is to

12  put up guardrails to stop behavior that harms users of those

13  banks, that harms consumers, that harms innocent people.

14        And by evading those guardrails, the defendant and his

15  coconspirators were able to mismanage and misappropriate funds

16  that were used as part of the cryptocurrency scheme.  And this

17  included an agreement between the defendant and his

18  coconspirator, Oz Yosef, that the defendant could use

19  10 percent of the funds held in his account to essentially

20  invest in whatever speculative businesses he wanted.  Again,

21  something that was not made clear to people who were using

22  cryptocurrency at the time.

23        So the money services business scheme, the

24  cryptocurrency scheme, it was deceitful, it involved lies

25  across the board and it was extremely dangerous and it was

1    harmful at the end of the day.  There are customers and there

2    are exchanges that were using cryptocurrency as a payment

3    processer that are out funds, and there will be a process to

4    try to sort through all of that based on forfeiture in this

5    case.  But this was just an extremely disruptive and serious

6    offense.

7           And to compound the seriousness of all this, while

8    this cryptocurrency, while this Crypto Capital business was

9    imploding, the defendant engaged in a fresh fraud scheme, a

10   scheme that caused quantifiable losses that have been agreed

11   upon today.  And I would note a scheme, that if it were a

12   standalone offense before the Court, would result in a

13   guidelines range roughly comparable to the government's

14   recommendation, somewhere in the range of seven years.  And

15   that's something we've identified in our sentencing submission.

16          So Mr. Sapone made many arguments about 1960 and the

17   application of the guidelines and how to consider the loss,

18   quote/unquote, to use his words.  If you just look at AAF and

19   if you just look at what the defendant did in kneecapping this

20   startup, you would land at an offense level roughly similar to

21   what the government is proposing and what the Court is

22   considering at this time.

23          And what makes this fraud so offensive, your Honor, is

24   that it was happening while the defendant was fully aware of

25   all of the problems going on around him.  It was done in

1    defiance of those problems.  His accounts were being seized, he

2    was -- he knew he was under investigation for all of this.  And

3    as the situation around him became more dire, his

4    misrepresentations to the AAF became more brazen.

5           The account that he misrepresented as the source of

6    his wealth, an account that was actually flush with Crypto

7    Capital customer funds, that account was frozen by the

8    government.  And rather than come clean about that and rather

9    than say I'm facing a matter involving potential investigation

10   by the Department of Justice, the defendant continued to

11   obfuscate what was going on, continued to string the AAF along.

12          And every day that he did that, there were more

13   contracts that were entered into, there were more obligations

14   that were undertaken by the AAF.  And so when it finally came

15   to the point they could not manage -- they could not go forward

16   without funds from the defendant, they were in a complete hole

17   that they had to desperately try to dig themselves out of.

18   They basically couldn't play players for games that they were

19   playing that were being broadcast on national television.

20          Your Honor, these are serious offenses.  The

21   guidelines range accurately reflects the seriousness of them.

22   We understand that there might be reasons for variance, but we

23   don't want the Court to lose sight of the fact that each of

24   these different offenses, they are all linked and they all

25   share one common feature, which is the defendant repeatedly

1    brazenly, persistently, lying, misrepresenting, obfuscating,

2    and acting deceitfully in a way that frankly cries out for

3    some -- for a serious term of imprisonment.  I think that that

4    same pattern and the length of the offense and the way in which

5    it only escalated as it went along speaks to specific

6    deterrence.

7         Now, in many instances an individual in the

8    defendant's position would have strong arguments that specific

9    deterrence is not important for the Court's consideration.  I

10   submit that this is the rare instance when a first-time

11   offender who has reached the defendant's age and level of

12   success needs to be specifically deterred through prison and

13   through a term of imprisonment.

14        As I mentioned, he continued to engage in the offense

15   even after banks were shutting down his accounts, even after

16   countries were seizing his funds.  He initiated a completely

17   new scheme on the back of the original scheme.  And throughout

18   this process the defendant has continued to demonstrate his

19   unwillingness to level as to the nature of his financial

20   circumstances, for instance, which was a subject of lengthy

21   back and forth with probation, when they were just trying to

22   figure out what his finances looked like.  And he wouldn't give

23   them to them.

24        As set forth in the presentence report, the defendant

25   has an incident in which he was in possession of counterfeiting

1    materials at the border, trying to cross into Canada.  This was

2    in 2016, again, at a stage when it would -- it raises the very

3    serious question of what he was engaged in.  And that

4    counterfeiting incident doesn't appear to be a one off.

5    Because when the agent searched his business as part of this

6    case in 2019, they found additional materials that could be

7    used for counterfeiting.

8            There is a long track record here of someone who

9    doesn't think the rules apply to him.  And the kind of sentence

10   that the defendant is asking for will not get that message

11   across, that he needs to follow the rules, that he cannot lie

12   his way out of businesses that blow up, that he cannot fake it

13   until he makes it.  And so, your Honor, I do believe that

14   specific deterrence is an important factor here.

15           I'd also argue that general deterrence is particularly

16   important here.  This case in some ways was the canary in the

17   coal mine for problems that emerged in the cryptocurrency

18   space.  Since 2019 we've seen this story repeat itself.

19   Cryptocurrency company that moved fast, ignored the rules and,

20   in fact, we have recent charges that almost mirror -- that

21   mirror the essential elements of bank fraud scheme, where, for

22   instance, Sam Bankman-Fried was lying to banks about the nature

23   of the accounts in order to open them to engage in his

24   cryptocurrency business.

25           Your Honor, the sentence that the Court imposes today

1   can send an important message that emerging financial

2   industries have to deal honestly, they have to follow the

3   rules, and if they don't, they can expect serious consequences.

4          Your Honor, this is a case that shares many

5   similarities with sort of cutting-edge financial issues, but

6   it's also just a basic fraud case, and it's a basic money

7   services case.  And as we've set forth in our sentencing

8   submission on Page 9, there are cases like this that have

9   resulted in sentences commensurate with what we're asking for

10  today.

11         So we're not asking the Court to place Mr. Fowler in a

12  level beyond what anyone else has received for operating an

13  unlicensed MSB.  Far from it.  We think the Southern District

14  of New York has seen fraudsters, they've seen people who

15  operate unlicensed money services businesses, they've seen a

16  combination of the two.  And as set forth in our sentencing

17  submission, we believe that the sentence we're proposing is

18  consistent with the kinds of sentences that have been imposed

19  for similar offenses.

20         Your Honor, I just want to address a couple of things

21  that defense said in their presentation.

22         For starters, I do think regarding the way in which

23  the defendant picked up this offense and sort of ran with it, I

24  think the Court has hit on an issue that's important for the

25  government which is that this was something that began in

1    February of 2018, persisted until February of 2019.

2    Notwithstanding personal tragedies that may have occurred, it

3    was lengthy, but it was more than just lengthy, it was

4    deliberative, it was strategic.  It was not a case in which the

5    defendant was hands off and consciously avoided misconduct that

6    others were engaged in on his behalf or sort of with his

7    acquiescence.  The defendant was an active participant and

8    was -- if you look at the evidence, looking for ways to

9    perpetuate and to continue this illegal enterprise and then

10   looking for ways to get himself out of it when the walls came

11   crashing in.

12         So obviously, anyone dealing with tragedy, it's going

13   to affect what they do, but when you look at the deliberate

14   nature of the offense conduct here, I think that argument

15   cannot do the heavy lifting that Mr. Sapone wants it to do.  It

16   simply cannot outweigh all of the factors pointing towards a

17   sentence consistent with or higher than what the government is

18   recommending here.

19         Your Honor, I want to just sort of close on the AAF

20   and close on this notion of, well, there were mutual releases

21   and someone else stepped in.  I just -- the defendant was

22   essentially living a double life at that point when he was

23   dealing with the AAF.  Because to them, to the AAF, he was a

24   successful businessman, he was someone who had been a

25   government contractor, a real estate mogul.  He had done all

N656FOWS                    Sentencing

1    sorts of things that gave them confidence in who he was.  But

2    he knew, he knew what was really happening behind the scenes,

3    which was that the large pot of money that he used to get his

4    foot in the door with the AAF, that money was inextricably tied

5    up with a scheme that the Southern District of New York was

6    investigating at that time.  He knew that.  He chose not to

7    tell them that.

8           And so when in February of 2019 he got out of the

9    league and the AAF went searching for another investor, they

10   viewed it as a business deal gone bad.  But the Court knows,

11   sitting here today, that's not what it was.  They were not

12   fully informed as to what happened.  Just as they had not been

13   fully informed every step of the way.

14          Your Honor, I have taken up a lot of time.  As you can

15   tell, this is a case the government feels very strongly about,

16   and we do believe that a significant variance, but one that

17   imposes a serious term of imprisonment, will capture all of the

18   factors set forth in Section 3553(a), it will capture the

19   seriousness of the offense, it will capture the need to deter

20   Mr. Fowler, it will capture the need to send a message to

21   others, and it will impose a sentence, frankly, that is fair in

22   light of what other people have received for similar

23   misconduct.

24          Thank you, your Honor.

25          THE COURT:  Yes.

1          MR. SAPONE:  Your Honor, I -- if I could just be heard

2     for like 20 seconds.  I would appreciate it.  And it's not my

3     practice to stand up once the government sits down.

4          THE COURT:  Go ahead.

5          MR. SAPONE:  I just want to say -- I forgot to mention

6     this, your Honor.  Not only did Mr. Fowler not steal a dime

7     from anyone, but during that 60-day period I told you about

8     that he was dealing with the AAF and was promising to infuse

9     money, he actually infused $27 million of his money into the

10    league, so I forgot to mention that.  And the last thing I want

11    to say is that he was never arrested for counterfeiting and he

12    vehemently denies anything to do with counterfeiting.

13         THE COURT:  Okay.  Mr. Fowler, I'll give an

14    opportunity to address me if you'd like.  You don't have to say

15    anything, but if you want to I'll give you that opportunity

16    now.

17         Now, Mr. Fowler, I see you standing to show respect

18    for the proceedings.  While I appreciate that and the acoustics

19    aren't great, if you're not used to speaking in court you can

20    sit down and that way you can speak directly into the

21    microphone and I can hear everything you have to say.

22         THE DEFENDANT:  I would prefer to stand.

23         THE COURT:  Just make sure you get close to the

24    microphone, that's fine.  I want to make sure I can hear you

25    and the court reporter can hear you.

1              THE DEFENDANT:  Can you hear me?

2              THE COURT:  Yes.

3              THE DEFENDANT:  Thank you.  Thank you for giving me

4    the opportunity to speak to you, and I apologize for the length

5    of time it took for us to get to this point.

6              As stated earlier, I accept full responsibility for

7    all the allegations pressed against me.  I'd like to tell you

8    that I'm very sorry, I'm very remorseful, and I'm very sad.

9              I've hurt too many people along this path.  For the

10   government to not understand that I've learned my lesson, it's

11   too bad.  You don't get to where I am in my life without the

12   understanding, the repercussions, and the harm you put upon

13   other people.  Some of the decisions that I made are not

14   acceptable.

15             It was never my intent to be before you, to meet you

16   in this manner.  But I clearly understand the pain that I've

17   caused to my family, to my friends, and to the Court, to the

18   people of the AAF, and anybody else involved.  So to the people

19   who allege I don't understand what I did was wrong, I do

20   understand.  I can do more good on the outside than I can on

21   the inside.  That's not my decision.  I'm going to do whatever

22   you tell me to do.  I'm going to work hard and put myself on

23   the right path.  I'm very, very sorry.

24             I don't know what to tell you.  I'm embarrassed.  I'm

25   ashamed.  And I hurt for my family, and for what I've done to

1   everybody.  I never, never intended to put myself in this

2   position.  I don't care what anybody alleges.  I did not go

3   out, put myself in front of you today, but I'm here.  Being

4   here, I'm accepting responsibility.  I'll accept whatever you

5   do, and I'll work hard to put myself on the right path.  I

6   deserve that, my family deserves that.

7           And the people I hurt deserve to know that the

8   restitution that I have to make will be done 100 percent during

9   the remainder of my life.  And I'll try to be a better man; I

10  need to be a better man.  I don't ever want to be here again.

11  I don't ever want to do this again.

12          And if you give me the opportunity to show you that I

13  can do right, I will.  But I'll accept anything you put before

14  me.  And I appreciate you letting me speak to you.

15          Thank you.

16          THE COURT:  All right.  Thank you.

17          Are there any victims that wish to be heard today?

18          MR. SWETT:  No, your Honor.

19          THE COURT:  Okay.  Mr. Fowler, are you satisfied with

20  your legal representation up to this point?

21          THE DEFENDANT:  I am -- yes, your Honor, I am.  Yes,

22  sir.

23          THE COURT:  Okay.  Is there any reason why sentence

24  should not be imposed, counsel for the government?

25          MR. SWETT:  No, your Honor.

N656FOWS                        Sentencing

1          THE COURT:  Counsel for the defense.

2          MR. SAPONE:  No, your Honor.

3          THE COURT:  Okay.  I've considered all of the

4    submissions from the parties, all of the factors in 18 U.S.C.

5    3553.

6          I do believe that a variance is appropriate in this

7    case.  Based upon Mr. Fowler's age, his lack of a criminal

8    record, and just so the record is complete, I'm not considering

9    the allegation that he was involved in counterfeiting, working

10   as a paperhanger, I'm not considering that.

11         Also, considering the difficulty that he will face in

12   custody regarding the COVID-19 pandemic and how that will

13   continue to affect prisoners generally, as well as how the term

14   of custody will be more difficult for him based on his age, and

15   the loss of his son, I am not considering the government's -- I

16   understand the government's argument about deterrence.  I'm not

17   considering any arguments about any other defendants in any

18   other courtroom and sending a message to them, but I do believe

19   there is a need for general deterrence and there is a need for

20   specific deterrence.  There certainly is a need for punishment

21   for the offense.

22         I will impose a term of 75 months' custody for Counts

23   One, Two and Five to run concurrently with each other.  And

24   60 months on Counts Three and Four to all run concurrently with

25   each other as well as concurrently with One, Two, and Five.

1      I'll impose a term of three years' supervised release

2  on each count to run concurrently.  I will not impose a fine.

3  I've already addressed restitution.  I'll impose a special

4  assessment of $500.

5      Regarding the conditions of supervised release, I'll

6  impose the mandatory conditions as set forth in the presentence

7  report, along with the standard conditions as set forth in the

8  presentence report.  I'll impose the special conditions that he

9  must provide the probation officer with access to any requested

10  financial information, that he must not incur new credit

11  charges or open additional lines of credit without the approval

12  of probation officer unless he's in compliance with the

13  installment payment schedule.

14      What is the government's position regarding the search

15  condition recommended by probation as a special condition of

16  supervised release?

17      MR. SWETT:  We believe it's appropriate, your Honor.

18      THE COURT:  Defense counsel.

19      MR. SAPONE:  Your Honor, I'm so sorry, I was

20  distracted.  Could you ask me again?

21      THE COURT:  The search condition, special condition

22  three in the presentence report requested by probation.  What's

23  your position on that?

24      MR. SAPONE:  My position is that I don't think it's

25  necessary, but he's not going to object if obviously the Court

1    or even probation thinks it is, he will comply in every way.

2              THE COURT:  Can I hear more from the government why

3    you think it's necessary, if there's anything else you have to

4    say?

5              MR. SWETT:  Your Honor, there was a search conducted

6    as part of this, and there was ample evidence of the offense

7    conduct at the time.

8              And as I alluded to there was evidence of

9    counterfeiting materials.  We think a search condition that

10   would allow the probation to conduct searches based upon

11   reasonable suspicion is appropriate.  I think it goes to the

12   concern of deterrence and recidivism and a record of less than

13   full forthrightness when it comes to the defendant's

14   financials.

15             So I think a requirement that probation have access to

16   his financials and putting a bar on new credit lines is a good

17   start, but I do think a search condition is appropriate if it

18   becomes necessary down the line.

19             THE COURT:  Okay.  I will impose the search condition,

20   Specification 3, that Mr. Fowler submit his personal being,

21   property, residence, vehicle, papers, computers, other

22   electronic communication, that his storage devices, Cloud

23   storage, media, and effects to a search by any United States

24   probation officer and if needed with the assistance of any law

25   enforcement.  The search is to be conducted when there is

1    reasonable suspicion concerning violation of conditions of

2    supervision or upon unlawful conduct by Mr. Fowler.

3            Failure to submit to a search may be grounds for

4    revocation of release.  He shall warn any other occupants that

5    the premises may be subject to searches pursuant to this

6    condition.  Any search shall be conducted at a reasonable time

7    and in a reasonable manner.  I'll also impose the special

8    condition that he be supervised by the district of residence.

9            Regarding forfeiture, I deny the defense's

10   8th Amendment challenge.  I will impose forfeiture in the

11   amount of $740,249,140.52.  As well as the specific property

12   listed on the government's proposed preliminary order of

13   forfeiture.

14           Are there any open counts for the government?

15           MR. SWETT:  Your Honor, there are underlying

16   indictments, and we'd move to dismiss them.

17           THE COURT:  That is granted.

18           I will state that the sentence that I'm imposing,

19   again, I have fashioned a sentence that I believe is sufficient

20   but not greater than necessary to meet the goals of sentencing.

21           I would impose this same sentence even if I had

22   granted a departure as requested by the defense under 5C1.1,

23   and even if I adopted the defendant's guideline calculation, I

24   would still arrive at this same sentence.

25           Is there anything else before I advise Mr. Fowler of

N656FOWS                    Sentencing

```
1    his statutory right to appeal, counsel for the government.
2              MR. SWETT:  Your Honor, we're happy to do it now or
3    after he's advised of his right to appeal, but we'd like to be
4    heard on remand at this point.
5              THE COURT:  Okay.  I'll do that in a second.
6              Counsel for the defense.
7              MR. SAPONE:  Yes, your Honor, could I talk to you
8    about designation?  So, for example, Mr. Fowler lives in
9    Arizona.  And if your Honor could recommend -- obviously, it's
10   wherever the Bureau of Prisons has space and which facility is
11   suitable.  But could it be in the area of Arizona, if you could
12   recommend that?
13             Also, your Honor, I'll note that part of that public
14   meeting in April resulted in a decision, a vote to bring back
15   Shock Incarceration which is something that was instituted in
16   the 1990s, and we haven't had it for decades.  And so as long
17   as the defendant meets, or an inmate, certain criteria, it's
18   rehabilitative.  So if your Honor could recommend, as long as
19   he meets all the criteria on that and any other programming,
20   I'd ask if you could consider recommending that.
21             THE COURT:  When you say any other programming, what
22   do you mean?
23             MR. SAPONE:  Whatever is suitable for Mr. Fowler while
24   in the Bureau of Prisons including the Shock Incarceration
25   Program.
```

N656FOWS                    Sentencing

1          THE COURT:  Any objection to that by the government.

2          MR. SWETT:  No, your Honor.

3          THE COURT:  I'll recommend to the Bureau of Prisons

4    that Mr. Fowler be incarcerated in a facility in or close to

5    the state of Arizona.  I'll also recommend the Bureau of

6    Prisons consider him for the Shock Incarceration Program or any

7    other programs that he is eligible for.

8          Anything else from the defense?

9          MR. SAPONE:  No, your Honor.  Thank you.

10         THE COURT:  That is the sentence of the Court.

11   Mr. Fowler, you have a statutory right to appeal.  There are

12   time constraints on your ability to file a notice of appeal.

13   You should talk to your attorney about that.  If you cannot

14   afford to hire an attorney to help you prosecute the appeal,

15   the Court will give you an attorney for free.

16         Do you understand?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  Okay.  I'll hear from the government now.

19         MR. SWETT:  Thank you, your Honor.  We would request

20   that the defendant be remanded today to begin serving his

21   sentence.  We are in the posture of 3143 b(1).  And so is the

22   defendant's burden to establish by clear and convincing

23   evidence that he is not likely to flee or pose a danger to

24   society at this point.  Now, I'll address those factors in a

25   minute, but I think just the history here is relevant because

1    we are now more than five years out from when the defendant was

2    originally charged in this case.

3            There have been repeated adjournments.  And, in fact,

4    the sentencing itself was adjourned for over a year to

5    accommodate various issues.  But the point is, the defendant

6    has known about this day and has had ample time to prepare for

7    this day.  So I don't think there are any -- I don't think

8    there are any compelling equitable reasons why the defendant

9    needs time to settle his affairs prior to begin serving his

10   sentence.

11           Oftentimes the Court will allow the defendant some

12   time to sort of wind up his or her affairs.  Here that time has

13   been baked into the last year or so.  And, in fact, the

14   government has made it clear in prior appearances, our view

15   that remand is appropriate.  So the defendant certainly can't

16   be surprised by the position we're taking today.

17           I do think that in terms of whether the defendant can

18   establish and meet his burden on this, the very sentence itself

19   creates a strong incentive to flee.  We walked into court today

20   with two very different views of what an appropriate sentence

21   was.  Defense counsel was asking for a non-incarceratory

22   sentence.  And we were asking for a sentence of approximately

23   seven years.  The Court has come out at 75 months.  It is --

24   orders of magnitude longer than what the defense was asking for

25   is a serious sentence, and that alone raises the prospect that

1    the defendant, having received something different than he

2    might have expected, would be tempted to flee and not serve

3    that sentence.

4          I also want to bring to the Court's attention

5    information that we've disclosed to defense counsel, we learned

6    about it over the weekend.  Basically, we were contacted out of

7    the blue by individuals who know the defendant and who reported

8    to us that his romantic partner had recently taken a trip to

9    Europe for the purpose of withdrawing funds that the defendant

10   had access to and had wanted to withdraw close in time to the

11   sentencing so that the government wouldn't become aware of it.

12         We really haven't had much time to do anything with

13   this.  We did confirm that the woman in question was in Europe

14   and recently returned.  We haven't had time to serve subpoenas

15   or get returns from them.  We haven't had time to do any sort

16   of financial analysis.  But the FBI interviewed three different

17   people.  One person who knew of this through hearsay and then

18   two people who heard the romantic partner discussing this

19   themselves.  The three accounts are generally consistent.

20         We understand that this is a factual proffer without a

21   lot of meat on the bones, but we think it is another point in

22   favor of the government's argument that really at this point,

23   there's no reason the defendant shouldn't serve the sentence.

24   He has been out, he has been able to fight this case, and he's

25   been able to deal with this case without serious restrictions

1    on his liberty.  But now it's time for him to do the time that

2    the Court has imposed.

3           And in light of the sentence that he's received, in

4    light of a record of not being fully open with the Court, not

5    being fully open with the government, not being fully open with

6    business counter-parties, and in light of the government's real

7    concerns about this new information that recently came to

8    light, we think the defendant cannot meet his burden, and that

9    remand is appropriate.

10          Your Honor, I'll also just flag that under the

11   statutory framework, the clear and convincing analysis really

12   only comes to play if you establish that you have some

13   meritorious appeal that you're going to be pursuing.  Now, this

14   is a case where the defendant has pled guilty, he's received a

15   sentence well below the guidelines range, and so the appellate

16   avenues available to him seem limited and certainly do not seem

17   to raise any kind of close question or substantial question

18   that might allow the Court to deviate from the statutory

19   framework.

20          THE COURT:  Okay.  I'll hear from defense counsel.

21          MR. SAPONE:  Yes, your Honor.  I'm asking you to allow

22   Mr. Fowler to return home, get his affairs in order.  And that

23   he be permitted to self-report to the Bureau of Prisons once we

24   get the letter from the BOP.  This is not a narcotics case.

25   There's respectfully no good reason to remand him today.  He's

1   not a flight risk.

2           The government points out this case is five years out

3   since his arrest.  He has shown up to court every single time.

4   He's appeared every single time he's been asked to on the

5   telephone or remotely.  Not one adjournment request was his

6   fault at all.  I can proffer that to you.  He didn't ask for

7   even one.  I asked the Court to not hold it against Mr. Fowler

8   that our request was for a non-incarceratory sentence.  This is

9   a case with no statutory mandatory minimum, and I thought

10  certainly equitable arguments why it could be non-custodial.

11          The Court didn't feel that way, there was nothing

12  wrong with me asking your Honor.  But it shouldn't be held

13  against Mr. Fowler at all.  He shouldn't be remanded because of

14  it.

15          And then this information about the romantic partner

16  going to Europe.  I appreciate the government let me know this

17  morning what they knew about that.  But I listened to their

18  proffer and what I'm hearing is that she was in Europe and that

19  certain hearsay statements were made to an agent.  But what I

20  didn't hear was she even went to a bank in person, called a

21  bank, sent an e-mail to a bank trying to withdraw a dollar from

22  the bank.  Nothing -- no slip was filled out, no wire.  So I

23  would ask your Honor to find most respectfully that without

24  more, that that would not be enough to remand someone.

25          Thank you, your Honor.

1          THE COURT:  All right.  I'll think about this.  I'll

2    be back.

3          (Pause)

4          THE COURT:  Okay.  To be clear, I believe the

5    government mentioned 3143(b), but I believe the government

6    was -- maybe I misheard.  I believe the government is referring

7    to 81 U.S.C., Section 3143(b); is that correct?

8          MR. SWETT:  Yes, your Honor.

9          THE COURT:  So my question for the parties, and I'll

10   give you a chance to think about this, is if the government is

11   relying on U.S.C. 3143(b), why should I not be able to consider

12   release under 18 U.S.C. Section 3145(c) which reads:

13          A person who meets the conditions of release or a

14   person subject to the detention pursuant to Section 3141(a)(2)

15   or (b)(2), and who meets the conditions of release set forth in

16   Section 3141(a)(1) or (b)(1), may be ordered released under

17   appropriate conditions by the judicial officer if it is clearly

18   shown there are exceptional reasons why such person's detention

19   would not be appropriate.

20          I'll go back here and I'll let you think about it, and

21   I'll come back out.

22          (Recess)

23          THE COURT:  Okay.  So I looked at this a little more.

24   Perhaps 3145 is not appropriate.  Let me hear from the parties,

25   starting with the government.

1           MR. SWETT:  Your Honor, that's also our view.  It

2     appears that that section relates to certain presumption

3     offenses.  This is not a situation where the statute mandates

4     detention because of the nature of the offense.  What we are

5     arguing is that because of the posture that he has been

6     sentenced that if -- that remand is the default.  And if

7     there's an argument that he's going to be pursuing appeal, that

8     his burden remains clear and convincing evidence.  Even if

9     that's just a question for whether a surrender date is

10    appropriate, we just don't think he can meet that burden.

11          All of the instances in which the defendant came to

12    court and participated in these proceedings happened under very

13    different posture where he was either contesting the charges or

14    was gearing up for a sentencing in which he could have

15    anticipated a much lower sentence than he received.

16          So we think past is not predictive enough of future in

17    this case to carry the defendant's burden, not by a

18    preponderance, but by clear and convincing evidence.  And for

19    the other reasons we mentioned, we just think remand is

20    appropriate here.

21          And that's what we would ask the Court to do.

22          THE COURT:  Okay.  Let me hear from defense counsel.

23          MR. SAPONE:  Yes, your Honor, so I'll admit that I was

24    confused a few moments ago, that's why I said this is not a

25    drug case.  What I meant is this is not one of those cases

1    where that argument takes place because there's some

2    presumption.  The statutes under which Mr. Fowler accepted

3    responsibility do not presume detention following sentencing

4    here.  And I would just note that it's customary in all similar

5    cases, your Honor -- and I know every case is different for

6    sure -- but I seek time for clients to get their affairs in

7    order, and it's routinely granted here and across the bridge.

8         I do appreciate that if your Honor were to think that

9    Mr. Fowler might flee, and that changes the game, I could tell

10   you that for the reasons stated earlier he will not.  And I'll

11   give you the reason why specifically he'd like to go home today

12   and then self-report to the Bureau of Prisons where he's

13   designated.

14        He does run a business, he does have three employees.

15   His business manages properties, collects rents, does

16   landscaping, things of that sort.  He's got to now lay off

17   these employees, close up his business.  He does live in a

18   house.  This might sound silly, and I'm sorry if it does, but

19   he has a dog; he's now got to find a place to put his dog.

20   Close his house down.  He owns two warehouses.  He's got to

21   make arrangements for that.

22        So I'm just asking, your Honor, just for a reasonable

23   amount of time for him to go home, get his affairs in order and

24   the moment we get the letter from the Bureau of Prisons

25   explaining that he's been designated, the custom is by noon on

1    that day he has to appear, he'll be there.  He will have

2    someone drive him to the facility and he'll be there by noon.

3            And I'll end with I hope your Honor would take into

4    account that he is 64 and he's not going to flee.  He's going

5    to go to that Bureau of Prison facility when he's told to.

6            THE COURT:  Okay.  Thank you.

7            Let me hear from the government regarding your

8    position if hypothetically I were to find that there is clear

9    and convincing evidence that he's not likely to flee or pose a

10   danger to the safety to any other person or the community,

11   would your position be that he can still not be released, and

12   not have a surrender date unless I make the findings under

13   Paragraph B regarding the appeal.  Certainly the point where he

14   was just sentenced and the appeal has not been filed, and I

15   can't make any predictions about the appeal or any predictions

16   about an appeal that's not been filed.  But what's the

17   government's position on that?

18           MR. SWETT:  One moment, your Honor.

19           THE COURT:  Yes.

20           MR. SWETT:  Your Honor, I think this situation is --

21   it sort of fits within the statutory framework with some

22   difficulty because as the Court points out there's no appeal at

23   this point.  There can't be an appeal, and so there's no appeal

24   to assess in terms of the factors laid out.  I do think the

25   government's position is that that speaks to the default, which

1   is that someone who has been sentenced begins serving their

2   sentence.  And in this case in particular, the defendant came

3   to court today with all the time he needed to prepare his

4   affairs for that.

5          So I don't have a case that I can cite to you as to

6   whether that -- a finding that he does not pose, but he has met

7   his burden on the risk of flight and danger to the community,

8   obviates the appellate analysis today where he's not filed an

9   appeal.  So I don't want to overstate what the law is, but I do

10  think that the statute makes it clear what the default is.

11         THE COURT:  Okay.  What's the government's position

12  about the dog?

13         MR. SWETT:  The government's position is that care for

14  a dog is much easier to arrange than care for a child or any

15  number of other things.  And that the defendant is in a

16  position to find someone who can take the dog on a short-term

17  basis before finding a home for it.

18         THE COURT:  Okay.

19         MR. SAPONE:  Your Honor, I'm sorry to interrupt.  But

20  can I say one thing quickly?

21         THE COURT:  I would advise against it.

22         MR. SAPONE:  Thank you.

23         THE COURT:  And here's why I'm going to advise against

24  it.  I'm going to allow him -- I'm not going to remand him

25  today.  That's what I'm about to do.  But if you want to speak

1   some more, defense counsel, I'll let you do that?  I take it

2   you don't?

3             MR. SAPONE:  Oh, no, I don't want to say anything

4   after that, thank you.  Thank you.

5             THE COURT:  Okay.  I do find by clear and convincing

6   evidence that he's not likely to flee.  He's made all of the

7   Court appearances.  This case has taken a while.  But he still,

8   with many opportunities to flee, did not flee.  He's made all

9   the court appearances, he's appeared certainly by phone many

10  times because he resides in Arizona, but he's come to court

11  when required to come to court.  I don't find he poses a danger

12  to the safety of the community.

13            However, I understand the government's concerns.  I do

14  think that it makes sense to allow him to get his affairs in

15  order.  But we don't need to have a lengthy surrender date

16  waiting on him to be designated.  In terms of the things that

17  counsel is talking about, I think that those things should be

18  able to be wrapped up or I'll give him 21 days to wrap that up.

19  And then what he should do is if he is not designated, he very

20  well may not be by that point, he should surrender to the

21  marshals in Arizona.  What city is he in?  What city is he

22  near.

23            THE DEFENDANT:  Phoenix.

24            THE COURT:  Okay.  He should surrender to the marshals

25  in Phoenix by 10:00 o'clock on --

1          Tara, what's the Friday about three weeks from now?

2          DEPUTY CLERK:  June 30.

3          THE COURT:  On June the 30th.  Okay?

4          Anything else from the government?

5          MR. SWETT:  Your Honor, we would request that the

6     Court also impose GPS monitoring that is imposed when he

7     returns to Arizona.  That is upon arrival in Arizona.  He can

8     check in with his pretrial officer.  We do have serious flight

9     concerns, and we think the bracelet mitigates those to some

10    extent.

11         THE COURT:  Defense counsel, what's your view on that?

12         MR. SAPONE:  I just want to be very brief with that.

13    I don't think he's done anything to warrant that, and it's not

14    necessary.  It's a 21-day window.  I would ask you not to

15    impose it.

16         THE COURT:  I will impose the condition of GPS

17    monitoring when he gets back to Arizona just to make sure there

18    are no other issues.

19         Anything else from the government?

20         MR. SWETT:  No, thank you, your Honor.

21         THE COURT:  Anything else from the defense?

22         MR. SAPONE:  No, thank you, your Honor.

23         THE COURT:  Okay.  That is the sentence of the Court.

24         Mr. Fowler, I know that you're disappointed by the

25    sentence, but I do wish you well.  I hope that you take

N656FOWS                        Sentencing

1    advantage of any program that they have in prison, and I hope

2    that you continue to stay focused on trying to make yourself

3    better.  And to be able to -- to return to being a productive

4    member of society when you are released.  We are adjourned.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25