**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

REGINALD FOWLER,

        Defendant.

Case No. 1:19-cr-00254-ALC

**PETITION FOR REMISSION OR MITIGATION OF FORFEITURE BY SHIFT**
**MARKETS GROUP INC., SHIFT FOREX LLC AND CAPXM LLC**

      Pursuant to 28 C.F.R. §§ 9.4 and 9.8, Shift Markets Group Inc. ("Shift Markets"), Shift

Forex LLC ("Shift Forex") and CapXM LLC ("CapXM" and, collectively with Shift Markets and

Shift Forex, "Shift") respectfully submit this Petition For Remission or Mitigation of Forfeiture,

and declare as follows:

## I.    INFORMATION PURSUANT TO 28 C.F.R. § 9.4(C)(1)(I)-(IV)

### 1.    Shift's Contact Information

Shift Markets Group Inc., Shift Forex LLC and CapXM LLC
Attn: Andrew Barron – VP Legal
295 Madison Avenue, 30th Floor
New York, New York 10017
(646) 461-6213
andrew.barron@shiftmarkets.com

      Shift is filing this petition through its counsel, Duane Morris LLP.  Shift may be

contacted through its counsel as follows:

Sarah Fehm Stewart, Esq.
Duane Morris LLP
1037 Raymond Boulevard, 18th Floor
Newark, New Jersey 07102
(973) 424-2061
sfstewart@duanemorris.com

1

2.      **Shift's Taxpayer Identification Numbers**

Shift Markets Group Inc.: 88-1465434
Shift Forex LLC: 27-0487256[1]
CapXM LLC: 795LLC2021[2]

3.      **Seizing Agency, Asset ID Number, Date and Place of Seizure**

The asset referenced in this Petition is $180,381.91 US dollars deposited with Crypto

Capital Corp. ("Crypto Capital") by Shift Forex and CapXM, affiliates of Shift Markets (the

"Asset").  Ledgers showing the deposits are attached as Exhibit 1.  Shift does not have the

original account statements or deposit receipts from Crypto Capital because they are contained

on the Crypto Capital client portal, which Crypto Capital blocked Shift (and perhaps other

clients) from accessing years ago.  However, upon information and belief, the Government

would have seized or otherwise obtained access to these records.

It is our understanding from the Government that Defendant Reginald Fowler established

Global Trading Solutions LLC ("GTS") to work with Crypto Capital and, in order to access

traditional currency on behalf of GTS and Crypto Capital, opened bank accounts in the name of

GTS and its affiliates at banks.  *See* Exhibit 2 (Government Sentencing Submission) at p. 2.

It is also our understanding from the Government that these bank accounts were opened

with HSBC Bank USA ("HSBC Bank"), HSBC Securities USA ("HSBC Securities"), Pershing

LLC ("Pershing"), Canadian Imperial Bank of Commerce ("CIBC") and Santander UK PLC

Bank ("Santander"), and had the following account numbers:

- •    HSBC Bank account 141000147

---

[1] Please note that Shift Forex LLC merged with Shift Markets Group Inc. in 2022 and is no longer a stand-alone entity.

[2] Please note that this is an entity ID number, as CapXM is a limited liability company organized under the laws of Saint Vincent and the Grenadines.  CapXM pays taxes in the U.S. on all U.S. income.

- HSBC Bank account 697825922
- HSBC Securities account HMB861668
- HSBC Securities/Pershing account HMB878886
- HSBC Bank account 0141000201
- HSBC Bank account 0697690393
- CIBC account CC001006882 5108411
- CIBC account CC001006882 0374016
- CIBC account CC001099702 4464710
- CIBC account CC001099702 4113411
- CIBC account CC001099702 4097513
- CIBC account CC001099702 4210719
- Santander account 00080753
- Santander account 10379431
- Santander account 10446319
- Santander account 10446322

*See* Exhibit 3 (Amended Preliminary Order of Forfeiture as to Specific Property/Money

Judgment) at pp. 1-4.

It is further our understanding that these accounts (the "Seized/Restrained Accounts")

were either seized by the Government or subject to a Restraining Order by the Court as follows:

- HSBC Bank account 141000147 – seized October 23, 2018
- HSBC Bank account 697825922 – seized October 23, 2018
- HSBC Securities account HMB861668 – seized October 23, 2018 and November 16, 2018
- HSBC Securities/Pershing account HMB878886 – seized November 16, 2018
- HSBC Bank account 0141000201 – seized November 27, 2018
- HSBC Bank account 0697690393 – seized November 27, 2018
- CIBC account CC001006882 5108411 – subject to May 16, 2019 Post-Indictment Restraining Order
- CIBC account CC001006882 0374016 – subject to May 16, 2019 Post-Indictment Restraining Order
- CIBC account CC001099702 4464710 – subject to May 16, 2019 Post-Indictment Restraining Order
- CIBC account CC001099702 4113411 – subject to May 16, 2019 Post-Indictment Restraining Order
- CIBC account CC001099702 4097513 – subject to May 16, 2019 Post-Indictment Restraining Order
- CIBC account CC001099702 4210719 – subject to May 16, 2019 Post-Indictment Restraining Order
- Santander account 00080753 – subject to January 29, 2020 Post-Indictment Restraining Order

- Santander account 10379431 – subject to January 29, 2020 Post-Indictment Restraining Order
- Santander account 10446319 – subject to January 29, 2020 Post-Indictment Restraining Order
- Santander account 10446322 – subject to January 29, 2020 Post-Indictment Restraining Order

*See* Exhibit 3 at pp. 1-4.

All of these Seized/Restrained Accounts are identified in the Court's Amended Preliminary Order of Forfeiture as to Specific Property/Money Judgment, dated June 29, 2023. *See* Exhibit 3.

Shift does not know into which of the Seized/Restrained Accounts the Asset was deposited. In fact, Mr. Fowler and Crypto Capital hid the location of the Asset from Shift. However, upon information and belief, the Asset was deposited into a bank account that was seized by the Government on or before May 28, 2019, and likely sometime in 2018. Indeed, on May 28, 2019, over six months after Shift first asked to withdraw the Asset, Crypto Capital responded: "At the moment, we are not able to execute withdraws as funds have been frozen by US regulators." *See* Exhibit 4 (Email String Between Shift and Crypto Capital).

Shift has never received a Notice of Seizure and therefore is uncertain as to the seizing agency, asset ID number, date or place of seizure. Upon information and belief, the Asset would likely have been deposited by Crypto Capital in one of the HSBC accounts that was seized by the Government in October and November 2018:

- HSBC Bank account 141000147 – seized October 23, 2018
- HSBC Bank account 697825922 – seized October 23, 2018
- HSBC Securities account HMB861668 – seized October 23, 2018 and November 16, 2018
- HSBC Securities/Pershing account HMB878886 – seized November 16, 2018
- HSBC Bank account 0141000201 – seized November 27, 2018
- HSBC Bank account 0697690393 – seized November 27, 2018

4.      **District Court Docket Number**

*United States of America v. Reginald Fowler*, Case No. 1:19-cr-00254-ALC (S.D.N.Y.).

5.      **Description of Asset**

$180,381.91 US dollars deposited with Crypto Capital by Shift Forex and CapXM into one

of the Seized/Restrained Accounts, but likely one of the following:

- HSBC Bank account 141000147 – seized October 23, 2018
- HSBC Bank account 697825922 – seized October 23, 2018
- HSBC Securities account HMB861668 – seized October 23, 2018 and November 16, 2018
- HSBC Securities/Pershing account HMB878886 – seized November 16, 2018
- HSBC Bank account 0141000201 – seized November 27, 2018
- HSBC Bank account 0697690393 – seized November 27, 2018

## II.    SHIFT'S INTEREST IN THE PROPERTY PURSUANT TO 28 C.F.R. § 9.4(C)(1)(V)

Shift is the victim of Mr. Fowler's crimes which underlie the Amended Preliminary

Order of Forfeiture as to Specific Property/Money Judgment. *See* Exhibit 3. Shift is also the

direct owner of $63,092.14 of the Asset. Specifically, Shift deposited a total of $63,092.14 with

Crypto Capital for payment processing services. *See* Exhibit 5 (Victim Impact Statement), at p.

1; *see also* Exhibit 1. The source of these funds was from normal operating revenue. Shift is the

equitable owner of the remaining $117,289.77 of the Asset, which is comprised of funds that

CapXM customers deposited with Crypto Capital.[3] *See* Exhibit 1.

Unfortunately, not long after making these deposits, Crypto Capital essentially "took the

money and ran," by refusing to transparently disclose what bank accounts the deposits were

being held in, or to respond to withdrawal requests. Email after email was ignored by Crypto

---

[3] Shift has since reimbursed its CapXM customers for these funds, and taken equitable title to the deposits with Crypto Capital.

Capital, or met with the excuse that the funds were delayed and that Crypto Capital could not comment until "more information" became available. *See* Exhibit 4.

After more than six months of attempts to withdraw the Asset, on May 28, 2019, Crypto Capital responded: "At the moment, we are not able to execute withdraws as funds have been frozen by US regulators." *See* Exhibit 4

Mr. Fowler was indicted on or about April 11, 2019 for his fraud perpetrated against Shift and others. Shift did not know of the conduct giving rise to the indictment or the subsequent Amended Preliminary Order of Forfeiture as to Specific Property/Money Judgment. Shift did not in any way contribute to, participate in, benefit from, or act in a willfully blind manner towards the commission of the offense that was the underlying basis of the forfeiture.

The Government identified Shift as a victim of Mr. Fowler, and invited Shift to submit a Victim Impact Statement. *See* Exhibit 6 (Email from US DOJ).

Shift submitted the Victim Impact Statement to AUSA Sebastian Swett and Probation Officer Johnny Kim on July 6, 2022. The Victim Impact Statement was also provided to the Court.

As set forth in the Victim Impact Statement, Mr. Fowler and his company, Crypto Capital, took advantage of Shift by promising that the company had the necessary expertise and legal approvals to provide payment processing services. Based on these misrepresentations, Shift and its customers deposited a total of $180,381.91 with Crypto Capital. *See* Exhibit 5.

The loss of approximately $180,000.00 has been severely detrimental to Shift, which is a small company in need of working capital. Founded in 2009, Shift Markets is still a relatively young company, seeking to establish productive and positive relationships in the cryptocurrency industry and financial market at large. Due to Mr. Fowler's fraud, Shift Markets faced, and still

faces, financial hardship and tremendous reputational pain and mutilation of its good-will. Specifically, as a result of Mr. Fowler's fraud, Shift Markets has diminished working capital, and faces lost business opportunities, clients, and vendors, who may lack confidence in Shift's money management. *See* Exhibit 5.

Shift has not recovered the Asset via an insurance claim or any other source of recovery. Shift has not been compensated for the wrongful loss of the Property by Mr. Fowler or others. Shift does not have recourse reasonably available to other assets from which to obtain compensation for the wrongful loss of the Asset.

**WHEREFORE**, for all the foregoing reasons, Shift prays for a determination that: (1) Shift is the owner of the subject property, with a valid, good faith and legally cognizable interest in the subject property; (2) Shift is a victim of Reginald Fowler, and of the conduct underlying the seizure, restraint and/or forfeiture of the subject property; (3) the subject property be released from any and all forfeiture orders; (4) the Government remit to Shift the total amount of $180,381.91 USD; and/or (5) such other determination that is consistent with 28 C.F.R. § 9.1. *et seq.*

In the alternative, Shift prays for a determination that: (1) some relief should be granted to avoid extreme hardship; (2) return of the property combined with imposition of monetary or other conditions of mitigation in lieu of a complete forfeiture will promote the interest of justice and will not diminish the deterrent effect of the law; (3) partial relief is warranted; (4) the Government remit to Shift an amount less than $180,381.91 USD in its discretion; and/or (5) such other determination that is consistent with 28 C.F.R. § 9.1. *et seq.*

Dated: July 14, 2023

**DUANE MORRIS LLP**

By: _____

Sarah Fehm Stewart
One Riverfront Plaza
1037 Raymond Blvd., Suite 1800
Newark, New Jersey 07102
Tel: (973) 424-2000
Fax: (973) 424-2001
E-Mail: sfstewart@duanemorris.com
*Attorneys for Shift Markets Group Inc., Shift
Forex LLC and CapXM LLC*

## ATTORNEY DECLARATION

I, Sarah Fehm Stewart, as counsel for Shift Markets Group Inc., Shift Forex LLC and CapXM LLC (collectively, "Shift"), understand that the information and documents that I am providing in support of Shift's Petition for Remission or Mitigation of Forfeiture will be relied upon for purposes of determining Shift's right to receive a Petition award. I hereby declare under penalty of perjury under the laws of the United States of America that the information and documents I am providing in support of this Petition are true and correct.

Sarah Fehm Stewart

Name Printed

Signature

7/19/2023

Date

9

## SHIFT DECLARATION AND NOTICE OF REPRESENTATION

I, Andrew Barron, as Vice President – Legal of Shift Markets Group Inc. and Shift Forex LLC (collectively, "Shift") hereby declare that Shift has retained the attorneys who have completed the foregoing Petition and they are authorized to submit same and represent Shift.  I have reviewed the foregoing Petition and declare under penalty of perjury under the laws of the United States of America that the information and documents contained in the foregoing Petition are true and correct.

Andrew Barron
_____
Name Printed

_____
Signature

7.19.2023
_____
Date

10

## CAPXM DECLARATION AND NOTICE OF REPRESENTATION

I, Matthew Miller, as Beneficial Owner of CapXM LLC ("CapXM") hereby declare that CapXM has retained the attorneys who have completed the foregoing Petition and they are authorized to submit same and represent CapXM.  I have reviewed the foregoing Petition and declare under penalty of perjury under the laws of the United States of America that the information and documents contained in the foregoing Petition are true and correct.


Matthew Miller
_____
Name Printed

_Matt Miller_
_____
Signature


7.19.2023
_____
Date

11

# EXHIBIT   1

### Shift Markets Ltd
### Transactions by Account
#### All Transactions

| Type | Date | Name | Withdrawals/Deposit: | EUR Value | |
|------|------|------|----------|-----------|--|
| Deposit | 08/20/2018 | | 10,847.00 | 9,439.56 | 1009.1 · Crypto Capital USD |
| Deposit | 08/13/2018 | | 5,765.66 | 5,231.05 | 1009.2 · Crypto Capital EUR |
| General Journ | 10/16/2018 | | 12,532.94 | 10,886.00 | 1009.2 · Crypto Capital EUR |
| General Journ | 09/17/2018 | | 12,658.98 | 11,076.00 | 1009.2 · Crypto Capital EUR |
| Deposit | 08/22/2018 | | 18,975.80 | 16,528.00 | 1009.2 · Crypto Capital EUR |
| General Journ | 11/19/2018 | | 25,149.06 | 22,221.00 | 1009.2 · Crypto Capital EUR |
| Check | 08/13/2018 | | -10.25 | | |
| Check | 08/24/2018 | | -13,409.98 | | |
| Check | 09/05/2018 | | -4,923.72 | | |
| Check | 10/03/2018 | | -20.77 | | |
| General Journ | 02/28/2019 | | -530.06 | | |
| General Journ | 07/31/2019 | | -959.42 | | |
| General Journ | 08/31/2019 | | -808.62 | | |
| General Journ | 12/31/2018 | | 616.15 | | |
| Bill Pmt -Che | 08/23/2018 | | -2,790.63 | | |
| | | **Total** | **63,092.14** | | |

**CapXM, Ltd**

**Transactions by Account**

All Transactions

5:30 PM

05/12/2022

Accrual Basis

| Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **Crypto Capital** | | | | | | | | | | |
| Deposit | 10/08/2018 | | | Deposit | | √ | -SPLIT- | 1,348.70 | | 1,348.70 |
| Deposit | 10/23/2018 | | | Deposit | | √ | Clients' Depo | 1,290.00 | | 2,638.70 |
| Deposit | 10/31/2018 | | | Deposit | | √ | -SPLIT- | 1,303.69 | | 3,942.39 |
| General Joun | 11/06/2018 | | | | | √ | Crypto Capita | 9,980.00 | | 13,922.39 |
| Deposit | 11/08/2018 | | | Deposit | | √ | -SPLIT- | 10,486.19 | | 24,408.58 |
| Deposit | 11/08/2018 | | | Deposit | | √ | Clients' Depo | 290.00 | | 24,698.58 |
| General Joun | 11/13/2018 | | | | | √ | Crypto Capita | 1.00 | | 24,699.58 |
| Deposit | 11/13/2018 | | | Deposit | | √ | -SPLIT- | 2,460.00 | | 27,159.58 |
| General Joun | 11/16/2018 | | | | | √ | Crypto Capita | 31.00 | | 27,190.58 |
| Deposit | 11/20/2018 | | | Deposit | | √ | -SPLIT- | 9,975.00 | | 37,165.58 |
| General Joun | 11/21/2018 | | | | | √ | Crypto Capita | 31.00 | | 37,196.58 |
| General Joun | 11/26/2018 | | | | | √ | Crypto Capita | 61,116.09 | | 98,312.67 |
| Deposit | 11/27/2018 | | | Deposit | | √ | -SPLIT- | 4,965.00 | | 103,277.67 |
| Deposit | 11/28/2018 | | | Deposit | | √ | -SPLIT- | 1,847.10 | | 105,124.77 |
| General Joun | 01/16/2019 | | | Might be refunded | | √ | Clients' Depo | 12,175.00 | | 117,299.77 |
| General Joun | 01/16/2019 | | | Might be refunded | | √ | Clients' Deposits | | 10.00 | 117,289.77 |
| General Joun | 12/31/2019 | | | | | | Casualties and Thefts Loss | | 117,289.77 | 0.00 |
| **Total Crypto Capital** | | | | | | | | 117,299.77 | 117,299.77 | 0.00 |
| **TOTAL** | | | | | | | | 117,299.77 | 117,299.77 | 0.00 |

 SHIFT

# Invoice

295 Madison Ave
30th Floor
New York, NY 10017

| Date | Invoice # |
|------|-----------|
| 8/1/2018 | 4511 |



PLEASE INCLUDE INVOICE NUMBER IN MEMO

Bill To

| **Balance Due:** | **USD 0.00** |
|---|---|

| Rep | Terms | Due Date |
|-----|-------|----------|
| TH | Payment Due | 8/20/2018 |

## Payment Options



Wire Transfer Information:

**Shift accepts cryptocurrencies as payment. Please contact us directly via invoice@shiftforex.com or skype a member of our team to transact and confirm wallet address.**

**5% must be added to any bill paid using a credit card, Paypal, Skrill or Neteller.**

## Invoice Detail

| Description | Amount |
|-------------|--------|
| MT4 Desktop Support Fee | 1,450.00 |
| MT4 Mobile Support Fee | 1,000.00 |
| Forex Per Million Transactional Fees - July | 6,421.58 |
| Crypto Volume Fee - July | 0.46 |
| Current Desk Fees (includes Multi-User) | 950.00 |
| Current Desk User Overage (additional users 107 @ $5 per user) | 535.00 |
| Extra Security Set | 300.00 |
| Google Business Apps Users | 200.00 |
| | |
| Payments/Credits | USD -10,857.04 |

 SHIFT

295 Madison Ave
30th Floor
New York, NY 10017

# Invoice

| Date | Invoice # |
|------|-----------|
| 7/3/2018 | 4446 |



PAID 08/13/2018

PLEASE INCLUDE INVOICE NUMBER IN MEMO

Bill To

| **Balance Due:** | **EUR 0.00** |
|---|---|

| Rep | Terms | Due Date |
|-----|-------|----------|
| DR | | 7/20/2018 |

## Payment Options

Wire Transfer Information:

Please ensure to include the reference number in the wire
details.

Shift accepts cryptocurrencies as payment.
Please contact us directly via
invoice@shiftforex.com or skype a member
of our team to transact and
confirm wallet address.

5% must be added to any bill paid
using a credit card, Paypal, Skrill or
Neteller.

## Invoice Detail

| Description | Amount |
|-------------|--------|
| MT4 Support Fee - July | 1,814.45 |
| Per Million Fee - June | 1,765.46 |
| Crypto Volume Fee - June | 0.00 |
| Current Desk - July | 907.22 |
| Webtrader - July | 680.42 |
| HTTPS and Site Acceleration Services | 45.36 |
| Netpay Server | 18.14 |
| | |
| Payments/Credits | EUR -5,231.05 |

 SHIFT

295 Madison Ave
30th Floor
New York, NY 10017

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/6/2018 | 4569 |

Bill To

**PAID 09/17/2018**



PLEASE INCLUDE INVOICE NUMBER IN MEMO

**Balance Due:**      **USD 0.00**

| Rep | Terms | Due Date |
|-----|-------|----------|
| TH | Payment Due | 9/20/2018 |

## Payment Options

Wire Transfer Information:

Shift accepts cryptocurrencies as payment.
Please contact us directly via
invoice@shiftforex.com or skype a member
of our team to transact and
confirm wallet address.

5% must be added to any bill paid
using a credit card, Paypal, Skrill or
Neteller.

## Invoice Detail

| Description | Amount |
|-------------|--------|
| MT4 Support | 1,500.00 |
| MT4 Mobile Support | 1,000.00 |
| FX Volume Fee | 9,928.00 |
| Crypto Volume Fee | 231.00 |
| Payments/Credits | USD -12,659.00 |

 SHIFT

# Invoice

295 Madison Ave
30th Floor
New York, NY  10017

| Date | Invoice # |
|------|-----------|
| 9/17/2018 | 42 |

PAID

**PLEASE INCLUDE INVOICE NUMBER IN MEMO

Bill To



| **Balance Due:** | **EUR 0.00** |
|---|---|

| Rep | Terms | Due Date |
|-----|-------|----------|
| TH | Payment Due | 9/20/2018 |

## Payment Options



Wire Transfer Information:

**4% must be added to any bill paid
using a credit card or Paypal.**

**Any payment over $2500 will not be
accepted unless otherwise agreed.**

**Please ensure to enter in the reference to
ensure a seamless transaction**

## Invoice Detail

| Description | Amount |
|-------------|--------|
| MT4 Support | 1,312.50 |
| MT4 Mobile Support | 875.00 |
| FX Volume Fee | 8,687.00 |
| Crypto Volume Fee | 202.13 |
| Payments/Credits | EUR -11,076.63 |

 SHIFT

# Invoice

295 Madison Ave
30th Floor
New York, NY 10017

| Date | Invoice # |
| --- | --- |
| 8/1/2018 | 4483 |



PLEASE INCLUDE INVOICE NUMBER IN MEMO

Bill To

| **Balance Due:** | **EUR 0.00** |
| --- | --- |

| Rep | Terms | Due Date |
| --- | --- | --- |
| TH | Due on receipt | 8/1/2018 |

## Payment Options



Wire Transfer Information:

**Shift accepts cryptocurrencies as payment. Please contact us directly via invoice@shiftforex.com or skype a member of our team to transact and confirm wallet address.**

**5% must be added to any bill paid using a credit card, Paypal, Skrill or Neteller.**

## Invoice Detail

| Description | Amount |
| --- | --- |
| MT4 Support | 1,306.46 |
| MT4 Mobile Support | 870.97 |
| FX Volume Fee - July 2018 | 12,379.91 |
| Crypto Volume Fee - July 2018 | 1,970.66 |
| Payments/Credits | EUR -16,528.00 |

 SHIFT

# Invoice

295 Madison Ave
30th Floor
New York, NY 10017



PLEASE INCLUDE INVOICE NUMBER IN MEMO

| Date | Invoice # |
|------|-----------|
| 11/1/2018 | 4620 |

Bill To

| **Balance Due:** | **USD 0.00** |
|------------------|--------------|

| Rep | Terms | Due Date |
|-----|-------|----------|
| TH | Payment Due | 11/20/2018 |

## Payment Options

Wire Transfer Information:



**Shift accepts cryptocurrencies as payment.
Please contact us directly via
invoice@shiftforex.com or skype a member
of our team to transact and
confirm wallet address.**

**5% must be added to any bill paid
using a credit card, Paypal, Skrill or
Neteller.**

## Invoice Detail

| Description | Amount |
|-------------|--------|
| MT4 Support | 1,500.00 |
| MT4 Mobile Support | 1,000.00 |
| FX Volume Fee | 20,246.00 |
| Crypto Volume Fee | 2,403.00 |
| | |
| Payments/Credits | USD -25,149.00 |

# EXHIBIT 2



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 17, 2023

<u>**WITH REQUEST FOR FILING UNDER SEAL**</u>

The Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    ***United States v. Reginald Fowler*, S3 19 Cr. 254 (ALC)**

Dear Judge Carter:

      The Government respectfully submits this letter and attached exhibits[1] in advance of the sentencing of defendant Reginald Fowler, currently scheduled for April 20, 2023, and in response to defendant's sentencing memorandum submitted April 11, 2023 ("Fowler Sentencing Memo" or "Def. Mem.").[2]

      Reginald Fowler operated Global Trading Solutions LLC, which worked with Crypto Capital Corp., collectively functioning as an unlicensed money transmitter that gave cryptocurrency exchanges access to the U.S. banking system without appropriate regulatory scrutiny. Fowler's lies to financial institutions allowed criminals to pass their illegal gains through the financial system and exposed financial institutions to regulatory and counterparty risk. ███████, he then defrauded an up-and-coming football league, and left the league unable to pay its employees and players: players who, just like Fowler, were trying to use sports to make a better life for themselves. Instead of saving funds to repay his victims, the defendant then wasted hundreds of thousands of dollars at various casinos while on bail after his plea. Nor did he provide Probation with accurate and complete financial information, which will further impede the Government's attempts to recover funds for forfeiture and for the victims of Fowler's crimes.

---

[1] The Government's exhibits include a Proposed Order of Forfeiture (Exhibit A), a Proposed Order of Restitution (Exhibit F), and other exhibits described herein. Because of the size and format of some of the remaining exhibits, the Government will provide copies directly to the Court and defense counsel.

[2] ████████████████████████████████████████
████████████████████████████████████████

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 23 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 2 of 16

Page 2

The Government therefore respectfully requests that the Court impose a sentence of at least 84 months' imprisonment, below the applicable Guidelines range of 188 to 235 months, to reflect the seriousness of the offense, the need to promote respect for the law, and to afford adequate specific and general deterrence. The Court should also impose an order of restitution for $53,189,261.80 to the Trustee of the Alliance of American Football; and an order of forfeiture for $740,249,140.52.

## I.      Factual Background

### A. Crypto Capital

In or about February 2018, the defendant established Global Trading Solutions LLC ("GTS") and began working with a previously existing set of companies, under the umbrella Crypto Capital Corp. ("Crypto Capital"). Crypto Capital had been set up by others, including Israeli siblings, and co-defendants, Oz and Ravid Yosef. (Presentence Investigation Report ("PSR") ¶ 23). Crypto Capital was based overseas, in Panama and Colombia. (PSR ¶ 23). Crypto Capital serviced cryptocurrency exchanges seeking to assist their customers in exchanging traditional currency for cryptocurrency and vice-versa. (PSR ¶ 23). At no time did Crypto Capital, Fowler, GTS, or any of the other relevant individuals obtain a license from the Department of Treasury or the U.S. states where they operated, as required to transmit money under federal law. (PSR ¶ 34).

In order to access traditional currency on behalf of GTS and Crypto Capital, Fowler opened bank accounts in the name of GTS and its affiliates at banks, including banks backed by the FDIC. (PSR ¶ 26). At the time, traditional financial institutions were often cautious about dealing with cryptocurrency companies, and some refused to engage in any business with such entities or subjected them to heightened due diligence. (PSR ¶ 24). In order to evade these restrictions, Fowler lied to the banks and falsely claimed that the accounts would be used for other purposes. (PSR ¶ 27). Once the accounts were opened, millions of dollars flowed through as part of the money transmitting scheme. (PSR ¶¶ 28–31).

The large sums of money at times caused the banks to ask further questions to Fowler about the nature of the accounts. To avoid these questions, Fowler and his co-conspirators directed customers of the cryptocurrency exchanges to include false information on the wire transfers to the accounts. (PSR ¶¶ 30, 32). Nonetheless, as banks became aware of the misrepresentations, they often shut down the accounts, so Fowler frequently opened new bank accounts to facilitate the scheme. (PSR ¶ 34). In total, between February 2018 and October 2018, GTS and Crypto Capital processed approximately $750 million in cryptocurrency transactions in various currencies, of which approximately $600 million was in U.S. dollars. (PSR ¶ 34).

Crypto Capital marketed itself as a pure payment processor, meaning it would act as a custodian for customer funds and not lend them out. Based on interviews conducted pursuant to this investigation, however, the Government has learned that the defendant and co-defendant Oz Yosef had an agreement under which the defendant could invest ten percent of incoming deposits into Crypto Capital, with the requirement that he return the funds and pay interest to Yosef. Internal

Case 1:19-cr-00254-ALC  Document 156-1  Filed 11/30/23  Page 24 of 67
Case 1:19-cr-00254-ALC  Document 125  Filed 04/18/23  Page 3 of 16

Page 3

spreadsheets, prepared by the defendant's employees and at his direction, reflect this arrangement. (Ex. B).

## B. The Alliance of American Football (the "AAF")

From about June 2018 up to and including about February 2019, the defendant made fraudulent representations about the amount and source of his wealth to secure an ownership stake in the AAF—a new springtime professional football league. During a June 2018 meeting with AAF executives, including AAF co-founder Charlie Ebersol, Fowler showed the AAF corporate team printouts of bank account information purporting to show that Fowler had hundreds of millions of dollars in foreign bank accounts. Fowler would not let anyone take the printouts after the meeting. Fowler told Ebersol that Fowler's wealth, which he said was largely in cash, came from real estate holdings and an aviation business that built drones in Germany for U.S. Government contracts. During an October 2018 meeting, one of Ebersol's associates took a picture of a bank account printout that Fowler presented. That printout showed roughly $60 million in an HSBC account (the "HSBC Account").

In reality, those bank accounts with hundreds of millions of dollars were related to the defendant's illegal money services business. Thus, when Fowler represented his net worth by relying on those accounts, he was lying about both the source of those funds (they were not from real estate or drone businesses) as well as the ownership of those funds (they belonged to GTS and, more generally, were necessary to redeem GTS/Crypto Capital clients who sold their cryptocurrency, not money Fowler could use).

As a result of Fowler's misrepresentations about his wealth, Ebersol and his associates entered into a Stock Purchase Agreement with Fowler in November 2018, whereby Fowler would pay approximately $50 million for roughly 31% of Ebersol Sports Media Group, Inc., the AAF's parent company, which would make the defendant the largest shareholder in the AAF. Fowler was supposed to pay the $50 million in installments, to be paid at the AAF's request. At the same time, Fowler also executed an agreement with the AAF to provide a $120 million line of credit. Once the Agreement was signed and the AAF started demanding payment, Fowler missed payment deadlines and sent payments in random amounts, less than what was requested.

Moreover, the payments that Fowler did make to the AAF were comprised of GTS/Crypto Capital funds. For example, on or about December 24, 2018, a Fowler company—Spiral Global Development Corporation—transferred roughly $13.5 million to Ebersol Sports Media Group, Inc., through a series of transactions both within the defendant's own accounts and with another individual. Approximately $9 million of that $13.5 million consisted of GTS/Crypto Capital funds—funds that Fowler effectively stole from his other clients using his illegal money transmission business. By January 2019, however, the defendant was once again behind on his payments to the AAF.

The AAF began its inaugural ten-week football season on February 9, 2019. Ultimately, the defendant withdrew his funding commitment after the first week of the season. On April 2, 2019, the AAF suspended its operations, and, on April 17, 2019, the AAF filed for Chapter 7

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 25 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 4 of 16

Page 4

bankruptcy in U.S. Bankruptcy Court for the Eastern District of Texas, dashing the hopes and plans of many individuals who had joined the league's mission in one form or another.



## II.    Procedural History

On April 30, 2019, Fowler was arrested on a four-count indictment. On February 20, 2020, he was charged in the S3 Superseding Indictment (the "Superseding Indictment"), with conspiracy to commit bank fraud, bank fraud, conspiracy to operate an unlicensed money transmitting business, operation of an unlicensed money transmitting business, and wire fraud. After filing a suppression motion, and within a few weeks of trial, on April 25, 2022, he appeared pleaded guilty to the Superseding Indictment.

## III.   Guidelines Analysis and Probation's Recommendation

Probation calculated a total offense level of 36. (PSR ¶ 69). Probation grouped all five counts together, pursuant to U.S.S.G. § 3D1.2(d), because the offense level for all counts is determined largely on the basis of economic loss. (*Id.* ¶ 57). Probation then calculated the Guidelines under U.S.S.G. § 2B1.1, the section applicable to fraud-related offenses. (*Id.* ¶ 58). Probation calculated the base offense level, pursuant to U.S.S.G. § 2B1.1(a)(1), of 7. (*Id.* ¶ 59). Probation then added the following specific enhancements: (i) an increase of 30 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(P), because the total amount of funds involved in the offenses was greater than $550 million; and (ii) an increase of 2 levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because of the harm to the victims of the offense. (*Id.* ¶¶ 60-61). Three levels are removed for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. (*Id.* ¶¶ 67–68). The Guidelines range is thus 188 to 235 months' imprisonment. (*Id.* ¶ 129).

In his sentencing submission, the defendant suggests, without explanation, that the total amount of funds was $250 million to $550 million, which would lower his total offense level by two. (Def. Mem. at 2 n.1). The Court should reject that argument. During the course of the conspiracy, the defendant and his co-conspirators kept regular spreadsheets documenting the flow of funds through the defendant's many accounts. Those reports were typically sent to Oz Yosef,. One such example, prepared in October 2018, reflected the last internal accounting before the Government's investigation went overt. (Ex. B). The first spreadsheet in this file was entitled "Oz

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 26 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 5 of 16

Page 5

Report" and listed a total of $740,249,140.52 for "Total Received in USD." (*Id.*). This figure came from a more detailed spreadsheet, entitled "September – Received – Master." This spreadsheet contains a month-by-month breakdown of the incoming funds to the defendant's accounts, broken down by currency. Based on the calculations of the defendant and his co-conspirators, the defendants' accounts received approximately $590,474,749 in U.S. dollars as of October 2018, which places the loss amount squarely above the $550 million level set forth in U.S.S.G. § 2B1.1(b)(1)(P). Adding in other currencies such as the Euro, the Pound, and the Yen, results in a total amount of over $740 million. Although the movement of other currencies in overseas accounts would not implicate the need to register as a U.S.-based MSB, the funds flowing through those accounts certainly were involved in the conspiracy to operate an unlicensed money services business, as charged in Count Three of the Superseding Indictment. Thus, whether looking just at the dollar figure or the overall amount of funds, the defendant, by his and his co-conspirators' own calculations, clearly falls under U.S.S.G. § 2B1.1(b)(1)(P).

Probation recommends a sentence of 120 months' imprisonment. (PSR at 34). Its recommendation focuses on the serious offense conduct, comprising two schemes, as well as "concerns regarding the defendant's willingness to comply with the directives of the probation office during any imposed term of supervised release." (*Id.* at 36).

## IV.    Sentencing Analysis

### A. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(18)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

Case 1:19-cr-00254-ALC  Document 156-1  Filed 11/30/23  Page 27 of 67
Case 1:19-cr-00254-ALC  Document 125  Filed 04/18/23  Page 6 of 16

Page 6

© to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B. A Significant Term of Imprisonment of at Least 84 Months' Is Sufficient and Not Greater Than Necessary

The Government believes that a sentence within the applicable Guidelines range is too high under the factors set forth in 18 U.S.C. § 3553(a). The Government requests that the Court impose a sentence of at least 84 months' imprisonment. This would be a sentence in line with the applicable Guidelines were Fowler convicted only of Count Five, defrauding the AAF,[3] and properly reflects the seriousness of Fowler's criminal conduct, including operating the unlicensed MSB and bank fraud, affords adequate deterrence, as well reflects the personal characteristics that he highlights in his sentencing submission.

### 1. Seriousness of the Offense

A substantial sentence is needed because the defendant played a critical role in a serious criminal enterprise. Federal law prohibits the operation of unlicensed money transmitting businesses to safeguard the financial system, both in the United States and around the world, from illicit use, and to combat money laundering. Financial institutions are required to register with the Department of Treasury, which mandates the implementation of robust anti-money laundering checks. Those provisions ensure that the financial institutions do not foster criminal activity or lead to the diversion of victim funds, and also require that when a financial institution does identify suspicious activity on its platform, it reports that to law enforcement through a suspicious activity report ("SAR"). Cryptocurrency compounds the need for anti-money laundering programs because of the technology's pseudonymity; without appropriate anti-money laundering checks, a user of cryptocurrency could evade law enforcement by hiding behind the string of numbers describing their wallet address.

By operating GTS, assisting Crypto Capital as a "shadow bank" for cryptocurrency platforms, Fowler created an opportunity for cryptocurrency users to do exactly that. While the full ambit of the criminal activity that flowed through Crypto Capital may never be known, some is clear. From at least about October 2017 until 2019, the Crypto Capital website bragged about the company's partnership with a cryptocurrency exchange called QuadrigaCX. According to a report filed by the Ontario Securities Commission, found at https://www.osc.ca/sites/default/files/2020-10/QuadrigaCX-A-Review-by-Staff-of-the-Ontario-Securities-Commission.pdf, QuadrigaCX "operated like a Ponzi scheme" as of at least 2017 and

---

[3] The Government estimates that Fowler's sentencing range on Count Five would be 70 to 87 months' imprisonment, based on the approximately $9 million in funds diverted from GTS to the AAF, and the substantial hardship Fowler's fraud imposed on the league.

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 28 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 7 of 16

Page 7

2018, which ultimately led to its "downfall" in April 2019: in other words, throughout the period of its partnership with Crypto Capital. Crypto Capital also had a close financial relationship with Airbit, a cryptocurrency Ponzi scheme whose operators were prosecuted by this Office; some of the fraud proceeds obtained by the Airbit operators was laundered through Crypto Capital.

Fowler let these criminal proceeds flow through the U.S. financial system through a series of lies. These lies to banks have material consequences. First, the banks to which Fowler lied could have faced regulatory action for banking an unlicensed MSB. *See* Interagency Interpretive Guidance on Providing Banking Services to Money-Services Businesses Operating in the United States, FRRS 3-1873.11, FinCEN Interpretative Guidance issued April 2005 ("Minimum Bank Secrecy Act Due-Diligence Expectations" include a bank's obligation to "confirm FinCEN registration, if required" and "confirm compliance with state and local licensing requirements, if applicable"); *In re Bethex Federal Credit Union*, 2016-06 (FinCEN Enforcement action against financial institution for inadequate monitoring of MSBs that had been allowed to open accounts). Second, the recent turmoil in the U.S. banking system reflects the substantial economic risks to the banks. Banks like Silvergate and Signature knowingly took exposure to the cryptocurrency industry; the banks Fowler lied to were also exposed to the volatility of the industry but were unaware of that fact. Third, lies such as Fowler's have cascading indirect effects. Financial institutions must spend large amounts of money to detect and stop such fraud schemes, which requires significant investment in compliance and fraud detection programs to identify, address, and remediate the fraud and to protect the integrity of the global financial system. Those costs may then be passed on to consumers in the form of higher credit card fees or interest rates.

The defendant's fraudulent conduct with respect to the AAF was also incredibly serious. He lied to obtain an ownership interest in the league, and then, unable to honor the commitments he had undertaken under false pretenses, he let the league falter. That conduct harmed many—not just the other financiers of the AAF, who gave their own money in reliance on Fowler's position as the primary funder of the league, but also the many vendors who entered into contracts that the league was not able to honor after Fowler failed to provide the promised funds, not to mention the many players, coaches, and other personnel, many of whom uprooted their lives to be part of the league. In that respect, the defendant's fraudulent conduct deprived so many of an opportunity that has given him so much: He attended college on a football scholarship, was a linebacker in the United States Football League (a now-defunct professional spring football league, much like the one that the defendant defrauded), was on the practice squad for the Cincinnati Bengals, and went on to become a three-percent owner of the Minnesota Vikings. (PSR ¶¶ 92, 101, 107-10). In driving the AAF to bankruptcy, Fowler deprived many of these players of the same potential path to success he enjoyed.

### 2. Need For Deterrence and To Promote Respect for the Law

The Government's proposed sentence is also necessary to deter the defendant and promote respect for the law. The defendant's submission claims that the defendant's lack of criminal history makes him unlikely to recidivate after this conviction. (Def. Mem. at 20-24). But this is a case where the defendant's criminal history does not tell the complete story. As is set forth in further detail below, the defendant engaged and reengaged in criminal conduct even after being offered

Page 8

offramps to exit the scheme. ███████████████████████████████████████
███████████ The defendant has a history of both financial irresponsibility and financial secrecy,
continuing even up to this time, which heightens the risk of further financial crimes. And, finally,
the defendant has demonstrated again and again a tendency to justify his behavior rather than fully
acknowledge his criminal conduct.

The defendant was willing to continue with the scheme even as the threat of detection and
enforcement increased. From February 2018 until October 2018, the defendant cycled through a
series of bank accounts to stay one step ahead of compliance departments and financial regulators,
repeating the lies that had led to earlier bank closures. This was not a one-time act; this was not
even a short-lived scheme that wound down after its discovery. Instead, the defendant and his co-
defendants continued to press forward despite the obvious risk of detection.

When the Government seized a number of accounts related to GTS in October 2018, it
essentially put an end to the cryptocurrency scheme. But it did not stop the defendant from
committing further crimes. ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Simply put, there is no basis to conclude that the fact
of this criminal prosecution will deter the defendant from additional crimes. This prosecution—
indeed, the seizure of over $60 million—did nothing to stop the defendant's criminal behavior.

Additionally, in assessing the need for deterrence, the Court should consider the evidence
that this is not the defendant's first crime, even if it is his first conviction. As detailed in the PSR,
the defendant was detained at the Canadian border in December 2016 with items "commonly used
for a black money scam." (PSR ¶¶ 73-75). The defendant provided a bizarre explanation for why
he had the items, involving a United Nations diplomat and complicated exchange of funds. (*Id.* ¶
74). United States Secret Service agents reviewed messages on the defendant's phone, which
seemed inconsistent with the defendant's story and consistent with a more straightforward
explanation: the defendant was involved in counterfeiting currency. (*Id.* ¶ 75). Over two years
later, when FBI agents searched the defendant's residence in Arizona, they recovered, among other
items, $14,000 in counterfeit currency and other items used to produce counterfeit bills. (PSR ¶
37). These two episodes, taken together, lead to an obvious conclusion: the criminal convictions
in this case are not aberrations but are consistent with other instances of the defendant engaging in
financial misconduct.

Even now, as the defendant awaits sentencing, there is little to reassure the Court that the
defendant will not return to secretive, irresponsible, and illicit financial activity. In assessing the
defendant's financial condition, Probation was hampered by the defendant's repeated refusal to

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 30 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 9 of 16

Page 9

provide basic financial information. Eventually, after months of requests, the defendant finally provided *unsigned* financial records replete with inconsistencies about his bank accounts, his securities, his rental properties, and more. (PSR ¶¶ 113-127). And, as the Government informed the Court in its March 15, 2023 letter, the defendant has gambled away hundreds of thousands of dollars that could have been used to pay the substantial financial penalties the defendant faces in this case. That conduct cries out for deterrence and speaks volumes about the defendant's respect for the law.

Finally, a need for specific deterrence is apparent because the defendant continues to present implausible explanations for his behavior. For example, in his sentencing submission, the defendant claims he sought a license to transmit money "in Europe and abroad." (Def. Mem. at 7). The defendant attached a copy of the certificate to his submission, which, to be clear, was not issued until after the period charged in this case. (Def. Ex. A). This "certificate," rather than showing the defendant's attempts to comply with the law, appears to be nothing more than another sham document meant to cover his tracks. The certificate is not issued by any government, but by the "Hualing Free Industrial Zone" within the Republic of Georgia. The defendant offers no explanation as to why he sought a license from a "free industrial zone" administered by a private company. A fair inference is that at some point, likely in response to the scrutiny he was under, the defendant wanted some "proof," no matter how specious, that his enterprise was operating legally. That he is presenting this document at sentencing to justify his behavior further shows that he has not fully accepted responsibility for his conduct.

A substantial sentence of imprisonment is also necessary for purposes of general deterrence, and to avoid unwarranted sentencing disparities. The defendant was not the first person, nor the last, to operate an unlicensed money transmitting business exchanging traditional currency for crypto. This Office, and the Department of Justice more broadly, have prosecuted numerous such cases, often resulting in meaningful periods of incarceration. *See, e.g., United States v. Marmilev*, 13 Cr. 368 (S.D.N.Y.) (DLC) (five year sentence for defendant who was Chief Technology Officer at unlicensed money transmitting business in digital currency, some of which he knew were derived from criminal activity); *United States v. Chukharev*, 13 Cr. 368 (S.D.N.Y.) (DLC) (three year sentence for minor participant at the same unlicensed money transmitting business in digital currency as *Marmilev*, but who did not know about its use for criminal activity); *United States v. Shrem*, 14 Cr. 243 (S.D.N.Y.) (JSR) (two year sentence for defendant who was the CEO and compliance officer of a Bitcoin exchange company that operated as an unlicensed money services business and who deliberately allowed a specific customer to circumvent AML restrictions); *United States v. Lord*, 15 Cr. 240 (W.D. La.) (46 months' sentence for operating an unlicensed money services business in cryptocurrency); *United States v. Murgio*, 15 Cr. 769 (S.D.N.Y.) (AJN) (66 months' total sentence for defendant convicted of operating an unlicensed money transmitting business and bank fraud, as well as other related offenses); *United States v. Tetley*, 17 Cr. 738 (C.D. Cal.) (sentence of a year and a day for a defendant who operated an unlicensed money services business in cryptocurrency, as well as committed money laundering through that business).

Unfortunately, those prosecutions did not deter Fowler from his crimes; nor has the prosecution of Fowler deterred others. In announcing its charges against the defendant, the Government described Crypto Capital as a "shadow bank" for the cryptocurrency industry.

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 31 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 10 of 16

Page 10

https://www.justice.gov/usao-sdny/pr/arizona-man-and-israeli-woman-charged-connection-providing-shadow-banking-services. Since then, the phrase has, unfortunately, gone mainstream. *See, e.g.*, Ex. C (quoting Senator Elizabeth Warren that "[c]rypto is the new shadow bank"); Ex. D (discussing whether the business model of a stablecoin "is still fundamentally one of a shadow bank"). Other actors have picked up where the defendant and his co-conspirators left off, including recent allegations against Sam Bankman-Fried. *See United States v. Bankman-Fried*, S5 22 Cr. 673 (LAK), ¶¶ 14–21 (alleging that the CEO of cryptocurrency platform FTX lied to a bank in order to open an account to exchange traditional currency for cryptocurrency without a license). A significant term of imprisonment will send an important message to the cryptocurrency industry of the consequences for improperly using financial institutions to facilitate unregulated cryptocurrency transactions.

White collar offenses like those Fowler committed also merit a substantial sentence because they are "lucrative" and "are difficult to detect and punish," which means that "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses." *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018).

## C. The Defendant's Mitigating Factors Do Not Warrant the Extreme Variance He Seeks

In his submission, the defendant offers numerous mitigating factors for the Court's consideration. While the Government does not want to minimize the difficulties the defendant has faced throughout his life, it respectfully submits that there is no link between those challenges and the instant offense. The defendant's difficult upbringing must have left a mark on him but cannot explain his decision, well into his career, to lie to banks and set up a massive, unregulated, money services business. Similarly, his son's addiction and ultimate death surely weighed heavily on him, but given the nature of these crimes—which were sophisticated and involved numerous co-conspirators and counterparties—the defendant cannot show that these crimes were the result of poor judgment caused by the pain of losing his son.

As to arguments that the Guidelines range is overly punitive, the Government is in partial agreement. While the Government strenuously objects to a non-custodial sentence for such serious misconduct, the Government is recommending a sentence well below the Guidelines range in part due to the factors the defendant has identified in his submission. But on the other hand, the defendant appears unable and unlikely to pay the restitution he owes to his victims, which counsels in support of a meaningful sentence of incarceration.

## V.   Forfeiture

Enclosed is the Government's proposed Preliminary Order of Forfeiture, seeking a money judgment of $740,249,140.52 (the "Proposed Money Judgment"), as well as certain specific property which the Government has identified during the pendency of the case (the "Proposed Specific Property"). The Proposed Specific Property consists of bank accounts used as part of the schemes and identified in the Government's Bill of Particulars (Dkt. 66), including funds seized pursuant to seizure warrants (described in Exhibit A of the Preliminary Order of Forfeiture as ¶¶ a–f); funds restrained pursuant to post-indictment restraining orders (described in Exhibit A of the

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 32 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 11 of 16

Page 11

Preliminary Order of Forfeiture as ¶¶ nn–ss, tt–ww); funds in accounts that are described on the document found in Fowler's co-conspirator Oz Yosef's files, described above (described in Exhibit A of the Preliminary Order of Forfeiture as ¶¶ aaa–hhh) and funds in accounts that are described on another document found in Fowler's co-conspirator Oz Yosef's files enclosed herein as Exhibit E (described in Exhibit A of the Preliminary Order of Forfeiture as ¶¶ xx–zz). These funds include approximately $68 million in HSBC accounts that the Government seized on or about October 23, 2018 and on or about November 16, 2018, as well as funds seized by overseas law enforcement agencies.

As discussed above, the Proposed Money Judgment sum is based on a document found in Fowler's co-conspirator Oz Yosef's files, obtained pursuant to a search warrant. This document, entitled "Funds Management" and enclosed with this submission as Exhibit B, states that the total amount received by Crypto Capital and its related accounts as of about September 2018[4] is the amount of the Money Judgment.

Contrary to Fowler's position, (Def. Mem. at 20), that sum is perfectly consistent with the Eighth Amendment, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. A criminal forfeiture imposed as part of a sentence "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Supreme Court has emphasized that the constitutional standard is not "strict proportionality" but "gross disproportionality," *id.* at 336, a standard that "reserves a constitutional violation for only the extraordinary case," *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003).

Four "traditional" factors set out in *Bajakajian* guide the constitutional analysis:

(1) the essence of the crime of the defendant and its relation to other criminal activity,
(2) whether the defendant fits into the class of persons for whom the statute was principally designed,
(3) the maximum sentence and fine that could have been imposed, and
(4) the nature of the harm caused by the defendant's conduct.

*United States v. Viloski*, 814 F.3d 104, 110, 113 (2d Cir. 2016) (paragraph breaks added). Courts may also consider, as part of the gross disproportionality analysis, "whether the forfeiture would deprive the defendant of his livelihood, i.e., his future ability to earn a living," but "may not consider as a discrete factor a defendant's personal circumstances, such as age, health, or present financial condition." *Id.* at 111-12. The defendant bears the burden of showing that the forfeiture is unconstitutional. *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010).

Under the law, the Proposed Money Judgment is not grossly disproportionate to the offense. The first *Bajakajian* factor requires consideration of "the essence of the crime of the defendant and its relation to other criminal activity." *Id.* at 121. Here, Fowler helped orchestrate an international, massive, unlicensed money transmitting and bank fraud conspiracy involving

---

[4] As the Court can see, the first page states that it includes "Transactions Through 6/20/18," but other tabs show that it includes transactions through at least September 2018.

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 33 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 12 of 16

Page 12

coconspirators throughout the world. His crimes required layers of deception, from false bank account applications to wire information. Numerous banks were defrauded to the tune of thousands upon thousands of transactions and over $700 million. A nascent football league was defrauded, contributing to its collapse. Plainly, the total criminal proceeds of Fowler's conduct represent the essence of his crime.

Second, Fowler fits into the class of persons for whom the statute was principally designed. *Bajakajian*, 524 U.S. at 122. As a putatively sophisticated investor and businessman, he is the kind of person to whom the money transmitting business and fraud laws are directed. Thus, the second *Bajakajian* factor also weighs in favor of full forfeiture. *See also Viloski*, 814 F.3d at 114 (defendant fit squarely within class of persons for whom the federal fraud statutes were aimed— he used facilities of interstate commerce to engage in fraudulent schemes and then disguised the nature of the proceeds).

The third *Bajakajian* factor considers the maximum sentence and fine that could have been imposed. Here, the maximum sentence is 90 years. The maximum statutory fine under 18 U.S.C. § 3571, the alternative fine provision, is at least approximately $120 million, twice the $60 million in pecuniary gain he had on deposit in an HSBC Securities account which was seized by the Government.[5] While the Proposed Money Judgment is larger than the maximum statutory fine, that is no constitutional barrier – "[b]ecause [Fowler] faced a maximum prison sentence of . . . effectively a life sentence—the challenged forfeiture cannot be deemed disproportional notwithstanding the statutory maximum fine of $10 million." *United States v. Bonventre*, 646 F. App'x 73, 91–92 (2d Cir. 2016) (affirming forfeiture amount of more than $19 billion).

The final *Bajakajian* factor is the nature of the harm caused by Fowler's conduct. Fowler's scheme was costly for banks, as described above. His fraud on the AAF was devastating, ultimately contributing to the league's bankruptcy. This factor once again weighs heavily in favor of full forfeiture.

Indeed, the Second Circuit has specifically rejected Eighth Amendment challenges to forfeiture amounts in cases involving unlicensed money transmitting businesses, holding that when the "total amount" transmitted through the defendant's unlicensed MSB is "quite close to the amount ordered forfeited," there is no constitutional bar to such a forfeiture sum. *United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008) (affirming forfeiture sum of more than $20 million). Because Fowler was convicted of not only operating an unlicensed money transmitting business, but also multiple fraud offenses, the case for full forfeiture is even stronger here.

Fowler cites to only one case supporting his position that full forfeiture would raise constitutional issues: Judge Rakoff's recent decision in *United States v. Akhavan*. But as he himself admits, "[t]he Second Circuit affirmed in part and reversed in part." *United States v. Patterson*, No. 21-1678-CR, 2022 WL 17825627, at *6 (2d Cir. Dec. 21, 2022). While the case is indeed currently "on remand before Judge Rakoff," the Second Circuit provided important principles to

---

[5] Even assuming that these funds do not represent pecuniary gain, the alternative fine provision is still over $100 million: twice the pecuniary loss to AAF, which as described below is more than $53 million.

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 34 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 13 of 16

Page 13

guide the district court, stating that "our precedents suggest that a forfeiture amount is not necessarily greatly disproportionate where it equals the proceeds of the illegal scheme, even if it significantly exceeds the maximum statutory fine," and cited *Elfgeeh* as affirming a forfeiture judgment "where evidence showed the amount roughly equaled the total funds defendants unlawfully transmitted." Fowler has not come close to meeting his burden of showing that the Proposed Money Judgment is unconstitutional. *Castello*, 611 F.3d at 120.

## VI.    Restitution

The Government submits a Proposed Order of Restitution in the amount of $53,189,261.80 on behalf of the AAF, which was a victim of Fowler's wire fraud. (Ex. F). In support of that Proposed Order, the Government submits the Proffer of Brian S. Engel, a general counsel for the trustee of the consolidated bankruptcy estates of the debtor entities comprising the AAF bankruptcy cases. (Ex. G.). That proffer explains the methodology underlying the Government's request for $53,189,261.80 on behalf of the AAF. That figure is comprised of two categories of loss. One category is expenses that the AAF incurred, that came due, and that the AAF was unable to pay, while Fowler was in position as a financier of the league. Such expenses amount to $35,333,917.70. The other category is financing commitments that others made to the AAF, and lost, in reliance on Fowler's position as the lead investor. Those financing commitments amount to $17,855,344.10. As reflected in Mr. Engel's proffer, Mr. Engel prepared two summary spreadsheets—one for each category of loss, and the Government submits those spreadsheets. (Exs. H-I). The Government also submits the claims and supporting documents the underly Mr. Engel's work and that are mentioned in the proffer. (*E.g.*, Exs. J, L).[6] Among the documents supporting the claim for the financing commitments is the Preferred Stock Purchase Agreement that all financiers of the league entered into. (Ex. K). Section 1.4.1 of that Agreement, titled "Additional Fowler Funding Requests," provided, in pertinent part, that "Fowler hereby irrevocably and unconditionally agrees to pay the Company . . . the amount . . . set forth on the applicable Equity Funding Request . . . within one (1) Business Day of the Company's delivery of such Equity Funding Request to Fowler." In short, the Agreement that all financiers of the league signed made explicit their and the league's reliance on Fowler's ability to satisfy his obligations. That reliance is reflected not only in the Stock Purchase Agreement, but also in declarations submitted by many of the financiers, including Charlie Ebersol. (Exs. O-U).

Under the restitution statutes, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); *accord* 18 U.S.C. § 3663(a)(2). A person is directly harmed by the commission of an offense when the offense is a but-for cause of the harm. *E.g.*, *United States v. Mathew*, 916 F.3d 510, 519 (5th Cir. 2019). A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct. *Id.*; *see also United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019) ("The central goal of a proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked

---

[6] In addition, the Government submits a Victim Impact Statement and supporting Appendix on behalf of the AAF. (Exs. M-N).

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 35 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 14 of 16

Page 14

by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created, it would be unjust or impractical to impose liability").[7]

Here, Fowler's fraud was a but-for cause of harm to the AAF. But for Fowler's fraudulent representations about the ownership and availability of funds, and his failure to fund as he committed, the league would have had sufficient funds on hand to satisfy the obligations the league incurred through February 2019; AAF would not have defaulted, and the now-creditors' debts would have been paid.

The harms visited upon the AAF, its creditors, owners, and other stakeholders, moreover, were proximately caused by Fowler's failure to fund because those harms were reasonably foreseeable. Fowler's funding commitments were to provide operating finances to build-out and operate the league's growth. At the time, the league projected operating expenses would exceed revenue in the initial stages of operation. Fowler's loan commitment alone was double the amount of capital raised from share sales, including to Fowler. Fowler had ready and actual access to all of that information. After all, in addition to becoming the largest shareholder, Fowler gained roles as an AAF director, the chairman of the football operations committee, and a co-chair of the finance committee.

The AAF entered into exactly the sorts of transactions and incurred exactly the sorts of debts that were reasonably foreseeable to Fowler and for which his funds were intended. That the AAF would be saddled with debts if Fowler did not satisfy his obligations was a reasonably foreseeable consequence of his conduct. The risk that the AAF would default on debts it could not pay because Fowler lied about his funds and failed to provide funds was precisely within "the kinds of harms [Fowler] risked by his conduct." *Calderon*, 944 F.3d at 95.

Against the foregoing, the defendant—who, exhibiting an utter lack of acceptance of responsibility, claims that he "did not set out to defraud the league"—contends that the AAF's losses "are not 'direct damages'" but instead "are 'consequential damages,' or losses beyond those

---

[7] Given that the AAF is a victim under the restitution statutes, the AAF's bankruptcy estate is a victim as a matter of law. Commencing a bankruptcy case creates an estate "comprised of . . . all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1). That includes contractual rights and causes of action. *See, e.g.*, *In re Mid-Island Hospital, Inc.*, 276 F.3d 123, 128 (2d Cir. 2002); *In re Prudential Lines Inc.*, 928 F.2d 565, 573 (2d Cir. 1991). Like all of the AAF's property rights, its right to restitution for Fowler's fraud transferred by operation of law to the AAF's bankruptcy estate. Bankruptcy estates may qualify as restitution victims. *See, e.g.*, *United States v. Theall*, 525 Fed. Appx. 256, 267 (5th Cir. 2013); *United States v. Waldner*, 580 F.3d 699, 710 (8th Cir. 2009); *United States v. Shadduck*, 112 F.3d 523, 531 (1st Cir. 1997). Moreover, The Chapter 7 trustee "is the representative of the estate" vested with full control of the estate and all estate property. 11 U.S.C. § 323(a). In fact, "[o]nly the [Chapter 7] bankruptcy trustee has standing to bring claims owned by the bankruptcy estate." *In re Beckford*, 729 Fed. Appx. 127, 128 (2d Cir. 2018). Accordingly, here it is only the trustee who can assert the AAF estate's claims. *Cf. In re Wilton Armetale, Inc.*, 968 F.3d 273, 282 (3d Cir. 2020).

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 36 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 15 of 16

Page 15

which naturally and directly flow from the defendant's conduct, and thus "are not even recoverable as part of a restitution award." (Def. Mem. at 19-20). In support of that contention, the defense cites one case: *United States v. Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009). But *Donaghy* is inapposite. There, the Government sought restitution on behalf of the NBA from defendants involved in a scheme whereby an NBA referee provided tips to individuals who went on to place bets on games that the referee was refereeing. Among the categories of expenses that the NBA sought was expenses paid to the NBA's outside counsel for various services related to the investigation and prosecution of the criminal case. The Honorable Carol Bagley Amon, U.S. District Judge for the Eastern District of New York, awarded almost all of what the Government sought on behalf of the NBA. To be sure, there was one category of attorney expense that the court did not award. Namely, the Government argued that the cost of an attorney's time consulting with the NBA regarding its public response to one of the defendant's guilty pleas was a "direct and foreseeable" result of the conspiracy at issue, but the Court reasoned that "only foreseeable steps taken for the purpose of *assisting the [G]overnment in the investigation or prosecution of the offense* . . . are recoverable pursuant to subsection (b)(4), the specific provision under which these fees are sought." 570 F. Supp. 2d at 432 (emphasis added). But that subsection is not at issue here. The AAF seeks restitution not for "expenses incurred during participation in the investigation or prosecution of the offense," under 18 U.S.C. § 3663A(b)(4), but rather for "loss . . . of property," under 18 U.S.C. § 3663A(b)(1). Fowler simply offers no reason why it was not reasonably foreseeable to him that, if he lied about his ability to fund the league and did not, in fact, fund the league, then the league would default on expenses and financing commitments that the league incurred while Fowler was in position as the league's lead funder.

Finally, the Trustee's approach here of looking to the amounts of allowed claims in the bankruptcy case as a measure of the estate's losses is appropriate. The restitution statutes do not impose on courts any particular formula or exacting calculation to determine such losses. Instead, courts need make only a reasonable approximation of loss based on a rational method. In *United States v. Gushlak*, the Second Circuit explained:

> [W]e have never used the word "actual [loss]" in [the restitution] context to mean "mathematically precise." Nor have we ever adopted a one-size-fits-all standard of precision for application in restitution cases. To the contrary, our case law reflects the settled understanding among courts of appeals that a "reasonable approximation" will suffice, especially in cases in which an exact dollar amount is inherently incalculable.

728 F.3d 184, 195-96 (2d Cir. 2013).

For the foregoing reasons, the Government respectfully requests that the Court enter the Proposed Order of Restitution.

Case 1:19-cr-00254-ALC   Document 156-1   Filed 11/30/23   Page 37 of 67
Case 1:19-cr-00254-ALC   Document 125   Filed 04/18/23   Page 16 of 16

Page 16

## VII.   Conclusion

Reginald Fowler has committed serious crimes. Only a significant period of incarceration, of at least 84 months' imprisonment, could reflect that seriousness, promote respect for the law, and afford adequate deterrence.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: /s_____
Jessica Greenwood
Samuel Raymond
Samuel P. Rothschild
Sheb Swett
Assistant United States Attorneys
(212) 637- /2504/6519

cc: Edward V. Sapone, Esq. (by e-mail)

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        - v. -

REGINALD D. FOWLER,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _6-29-23_

**AMENDED PRELIMINARY ORDER OF FORFEITURE AS TO SPECIFIC <u>PROPERTY/MONEY JUDGMENT</u>**
S3 19 Cr. 254 (ALC)

WHEREAS, the Defendant was charged on or about February 20, 2019, in a five-count Superseding Indictment, S3 18 Cr. 294 (ALC) (the "Indictment"), with conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349 (Count One); bank fraud in violation of Title 18, United States Code, Sections 1344 (Count Two); conspiracy to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 371 (Count Three); operation of a money transmitting business, in violation of Title 18, United States Code, Section 1960 (Count Four); and wire fraud, in violation of Title 18, United States Code, Section 1344 (Count Five);

WHEREAS, the Indictment contains a forfeiture allegation providing notice of the Government's intent to seek forfeiture, pursuant to Title 18, United States Code, Section 982(a)(2)(A), of any property constituting or derived from proceeds obtained directly or indirectly as the result of the offenses alleged in Counts One and Two of the Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offenses charged in Counts One and Two of the Indictment and the following specific property:

    a.   Any and all funds seized on or about October 23, 2018 from HSBC Bank USA account 141000147, held by Global Trading Solutions LLC (the "GTS Account");

    b.  Any and all funds seized on or about October 23, 2018 from HSBC Bank USA account 697825922, held by Reginald D. Fowler (the "Fowler Account");

    c.  Any and all funds seized on or about October 23, 2018 from HSBC Securities USA account HMB861668, held by Reginald D. Fowler (the "Fowler Securities Account");

    d.  Any and all funds seized on or about November 16, 2018 from Fowler Securities Account; and

    e.  Any and all funds seized on or about November 16, 2018 from HSBC Securities USA/Pershing LLC account HMB878886, held by Global Trading Solutions LLC (the "GTS Securities Account").

(a. through e., collectively, the "Indictment Property").

WHEREAS, the Indictment contains a second forfeiture allegation providing notice of the Government's intent to seek forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1), of any and all property, real and personal, involved in the offenses charged in Counts Three and Four of the Indictment, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in the offenses charged in Counts Three and Four of the Indictment and the Indictment Property.

WHEREAS, on or about October 23, 2018, the Government seized $5,917,512.06 in United States currency from the GTS Account (the "GTS Account Seized Funds").

WHEREAS, on or about October 23, 2018, the Government seized $2,324.24 in United States currency from the Fowler Account (the "Fowler Account Seized Funds").

WHEREAS, on or about October 23, 2018 and November 16, 2018, the Government seized at total of $60,157,955.15 in United States currency from the Fowler Securities Account (the "Fowler Securities Account Seized Funds").

WHEREAS, on or about November 16, 2018, the Government seized $2,003,667.79 in United States currency from the GTS Securities Account.

WHEREAS, on or about November 27, 2018, the Government seized $100,000 formerly on deposit in HSBC Bank USA account 0141000201, held in the name of Spiral Global Corporation, LLC seized by the Government on or about November 2, 2018;

WHEREAS, on or about November 27, 2018, the Government seized $3,057.71 formerly on deposit in HSBC Bank USA account 0697690393, held in the name of Reginald Dennis Fowler;

WHEREAS, on or about May 16, 2019, Judge Andrew L. Carter, Jr. of the U.S. District Court for the Southern District of New York, issued a Post-Indictment Restraining Order directing the following accounts located at Canadian Imperial Bank of Commerce ("CIBC") be restrained:

   a.  Any and All funds held at CIBC, in account CC001006882 5108411, held in the name of GTS – Canada Corporation;

   b.  Any and All funds held at CIBC, in account CC001006882 0374016, held in the name of GTS – Canada Corporation;

   c.  Any and All funds held at CIBC, in account CC001099702 4464710, held in the name of GTS – Canada Corporation;

   d.  Any and All funds held at CIBC, in account CC001099702 4113411, held in the name of GTS – Canada Corporation;

   e.  Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001099702 4097513, held in the name of GTS – Canada Corporation; and

   f.  Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001099702 4210719, held in the name of GTS – Canada Corporation;

On or about January 29, 2020, Judge Andrew L. Carter, Jr. of the U.S. District Court for the Southern District of New York, issued a Post-Indictment Restraining Order directing the following accounts located at Santander UK PLC Bank ("Santander") be restrained:

    a.  Any and All funds held at Santander, in account 00080753, held in the name of Global Management Solutions Limit;

    b.  Any and All funds held at Santander, in account 10379431, held in the name of Global Management Group Ltd.;

    c.  Any and All funds held at Santander, in account 10446319, held in the name of CIA Technology Global Ltd.; and

    d.  Any and All funds held at Santander, in account 10446322, held in the name of CIA Technology Global Ltd;

WHEREAS, on or about August 27, 2020, the Government filed a "Forfeiture Bill of Particulars," giving notice of fifty-six bank accounts were included in the property subject to forfeiture;

WHEREAS, on or about April 25, 2022, the Defendant pled guilty to Counts One through Five of the Indictment;

WHEREAS, the Government asserts that $740,249,140.52 in United States currency represents the property constituting or derived from proceeds obtained directly or indirectly as the result of the offenses alleged in Counts One and Two of the Indictment, that the Defendant personally obtained, and all property involved in the commission of the offenses charged in Count Three and Four of the Indictment;

WHEREAS, the Government seeks a money judgment in the amount of $740,249,140.52 in United States currency, pursuant to (i) Title 18, United States Code, Section 982(a)(2)(A) representing the proceeds traceable to the offenses charged in Counts One and Two of the Indictment that the Defendant personally obtained; and (ii) Title 18, United States Code,

Section 982(a)(1) representing the property involved in the offenses charged in Counts Three and Four of the Indictment;

WHEREAS, the Government seeks the forfeiture of all of the Defendant's right, title and interest in the assets listed in Exhibit A attached hereto (the "Specific Property") as (i) proceeds traceable to the offenses charged in Counts One and Two of the Indictment that the Defendant personally obtained and/or (ii) property involved in the offenses charged in Counts Three and Four of the Indictment;

WHEREAS, the Court finds that as a result of acts and/or omissions of the Defendant, the proceeds traceable to the offenses charged in Counts One and Two of the Indictment that the Defendant personally obtained and the property involved in Counts Three and Four of the Indictment, with the exception of the Specific Property, cannot be located, upon the exercise of due diligence; and

WHEREAS, pursuant to Title 21, United States Code, Section 853(g), and Rules 32.2(b)(3), and 32.2(b)(6) of the Federal Rules of Criminal Procedure, the Government is now entitled, pending any assertion of third-party claims, to reduce the Specific Property to its possession and to notify any and all persons who reasonably appear to be a potential claimant of their interest herein;

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1.   As a result of the offenses charged in Counts One and Two of the Indictment, to which the Defendant pled guilty, a money judgment in the amount of $740,249,140.52 in United States currency (the "Money Judgment"), representing the amount of proceeds traceable to the offenses charged in Counts One and Two of the Indictment that the

Defendant personally obtained and property involved in the offenses charged in Counts Three and Four of the Indictment, shall be entered against the Defendant.

2.      As a result of the offense charged in Counts One through Four of the Indictment, to which the Defendant pled guilty, all of the Defendant's right, title and interest in the Specific Property is hereby forfeited to the United States for disposition in accordance with the law, subject to the provisions of Title 21, United States Code, Section 853.

3.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture as to Specific Property/Money Judgment is final as to the Defendant REGINALD D. FOWLER, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

4.      All payments on the outstanding Money Judgment shall be made by postal money order, bank or certified check, made payable to the United States Marshals Service, and delivered by mail to the United States Attorney's Office, Southern District of New York, Attn: Money Laundering and Transnational Criminal Enterprises Unit, One St. Andrew's Plaza, New York, New York 10007 and shall indicate the Defendant's name and case number.

5.      The United States Marshals Service is authorized to deposit the payments on the Money Judgment in the Assets Forfeiture Fund, and the United States shall have clear title to such forfeited property.

6.      Upon entry of this Preliminary Order of Forfeiture as to Specific Property/Money Judgment, the United States (or its designee) is hereby authorized to take possession of the Specific Property and to hold such property in its secure custody and control.

7.      Pursuant to Title 21, United States Code, Section 853(n)(1), Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the

Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions, the

United States is permitted to publish forfeiture notices on the government internet site,

www.forfeiture.gov. This site incorporates the forfeiture notices that have been traditionally

published in newspapers. The United States forthwith shall publish the internet ad for at least thirty

(30) consecutive days. Any person, other than the Defendant, claiming interest in the Specific

Property must file a Petition within sixty (60) days from the first day of publication of the Notice

on this official government internet web site, or no later than thirty-five (35) days from the mailing

of actual notice, whichever is earlier.

        8.      The published notice of forfeiture shall state that the petition (i) shall be for

a hearing to adjudicate the validity of the petitioner's alleged interest in the Specific Property, (ii)

shall be signed by the petitioner under penalty of perjury, and (iii) shall set forth the nature and

extent of the petitioner's right, title or interest in the Specific Property, the time and circumstances

of the petitioner's acquisition of the right, title and interest in the Specific Property, any additional

facts supporting the petitioner's claim, and the relief sought, pursuant to Title 21, United States

Code, Section 853(n).

        9.      Pursuant to 32.2 (b)(6)(A) of the Federal Rules of Criminal Procedure, the

Government shall send notice to any person who reasonably appears to be a potential claimant

with standing to contest the forfeiture in the ancillary proceeding.

        10.     Upon adjudication of all third-party interests, this Court will enter a Final

Order of Forfeiture with respect to the Specific Property pursuant to Title 21, United States Code,

Section 853(n), in which all interests will be addressed. All Specific Property forfeited to the

United States under a Final Order of Forfeiture shall be applied towards the satisfaction of the

Money Judgment.

11.    Pursuant to Title 21, United States Code, Section 853(p), the United States is authorized to seek forfeiture of substitute assets of the Defendant up to the uncollected amount of the Money Judgment.

12.    Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas.

13.    The Court shall retain jurisdiction to enforce this Preliminary Order of Forfeiture as to Specific Property/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

SO ORDERED:

_____          6 - 29 - 23
HONORABLE ANDREW L. CARTER, JR.          DATE
UNITED STATES DISTRICT JUDGE

## EXHIBIT A

a.     $5,917,512.06 formerly on deposit in HSBC Bank USA account 141000147, held by Global Trading Solutions LLC seized by the Government on or about October 23, 2018;

b.     $2,324.24 formerly on deposit in HSBC Bank USA account 697825922, held by Reginald D. Fowler seized by the Government on or about October 23, 2018;

c.     $60,157,955.15 formerly on deposit in HSBC Securities USA account HMB861668, held by Reginald D. Fowler seized by the Government on or about October 23, 2018 and on or about November 16, 2018;

d.     $2,003,667.79 formerly on deposit in HSBC Securities USA/Pershing LLC account HMB878886, held by Global Trading Solutions LLC seized by the Government on or about November 16, 2018;

e.     $100,000 formerly on deposit in HSBC Bank USA account 0141000201, held in the name of Spiral Global Corporation, LLC seized by the Government on or about November 2, 2018;

f.     $3,057.71 formerly on deposit in HSBC Bank USA account 0697690393, held in the name of Reginald Dennis Fowler;

g.     Any and All funds held at Citibank, in account 207112962, held in the name of Global Trading Solutions LLC;

h.     Any and All funds held at Citibank, in account 206618910, held in the name of Global Trading Solutions LLC;

i.     Any and All funds held at Citibank, in account 207129503, held in the name of Global Trading Solutions LLC;

j.      Any and All funds held at Citibank, in account 207132333, held in the name of Global Trading Solutions LLC;

k.      Any and All funds held at Citibank, in account 207139809, held in the name of Global Trading Solutions LLC;

l.      Any and All funds held at Citibank, in account 207139817, held in the name of Global Trading Solutions LLC;

m.      Any and All funds held at Citibank, in account 207134933, held in the name of Global Trading Solutions LLC;

n.      Any and All funds held at Citibank, in account 207132325, held in the name of Global Trading Solutions LLC;

o.      Any and All funds held at Citibank, in account 207134958, held in the name of Global Trading Solutions LLC;

p.      Any and All funds held at Citibank, in account 42024768923, held in the name of Reginald D. Fowler;

q.      Any and All funds held at Citibank, in account 42001787749, held in the name of Reginald D. Fowler;

r.      Any and All funds held at Citibank, in account 42024769061, held in the name of Reginald D. Fowler;

s.      Any and All funds held at Citibank, in account 57457749, held in the name of Reginald D. Fowler;

t.      Any and All funds held at Citibank, in account 9945530933, held in the name of Reginald D. Fowler;

u.      Any and All funds held at Citibank, in account 207108689, held in the name of

Eligibility Criterion;

v.       Any and All funds on deposit at Deutsche Bank AG, in account 192057016802, held in the name of Global Trade Solutions GMBH;

w.       Any and All funds held at Enterprise Bank, in account 1127548, held in the name of Eligibility Criterion;

x.       Any and All funds held at Enterprise Bank, in account 1241367, held in the name of Eligibility Criterion;

y.       Any and All funds held at Enterprise Bank, in account 1127564, held in the name of Eligibility Criterion;

z.       Any and All funds held at Enterprise Bank, in account 1127652, held in the name of Eurocontrol;

aa.      Any and All funds held at Enterprise Bank, in account 1127644, held in the name of Eurocontrol;

bb.      Any and All funds held at Enterprise Bank, in account 1127177, held in the name of Global Trading Solutions LLC;

cc.      Any and All funds held at Enterprise Bank, in account 1127193, held in the name of Global Trading Solutions LLC;

dd.      Any and All funds held at Enterprise Bank, in account 1128700, held in the name of Reginald D. Fowler;

ee.      Any and All funds held at Enterprise Bank, in account 1128727, held in the name of Reginald D. Fowler;

ff.      Any and All funds held at Enterprise Bank, in account 1127599, held in the name of Spiral Global Development Corporation;

gg.    Any and All funds held at Enterprise Bank, in account 1235784, held in the name of Spiral Sports II;

hh.    Any and All funds held at JP Morgan Chase Bank, in account 296219550, held in the name of Global Trading Solutions LLC; and

ii.    Any and All funds held at JP Morgan Chase Bank, in account 779558365, held in the name of Spiral Global Development;

jj.    Any and All funds held at Suntrust Bank, in account 1000211769301, held in the name of NLE Consulting d/b/a Global Trade Solutions LLC;

kk.    Any and All funds held at Bank of America, in account 898100395306, held in the name of NLE Consulting d/b/a Global Trade Solutions LLC;

ll.    Any and All funds held at Wells Fargo Bank, in account 2514680467, held in the name of NLE Consulting d/b/a Global Trade Solutions LLC;

mm.    Any and All funds held at TD Bank, in account 4350649188, held in the name of NLE Consulting d/b/a Global Trade Solutions LLC;

nn.    Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001006882 5108411, held in the name of GTS – Canada Corporation;

oo.    Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001006882 0374016, held in the name of GTS – Canada Corporation;

pp.    Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001099702 4464710, held in the name of GTS – Canada Corporation;

qq.    Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001099702 4113411, held in the name of GTS – Canada Corporation;

rr.     Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001099702 4097513, held in the name of GTS – Canada Corporation;

ss.     Any and All funds held at Canadian Imperial Bank of Commerce, in account CC001099702 4210719, held in the name of GTS – Canada Corporation;

tt.     Any and All funds held at Santander UK PLC Bank, in account 00080753, held in the name of Global Management Solutions Limit;

uu.     Any and All funds held at Santander UK PLC Bank, in account 10379431, held in the name of Global Management Group Ltd.;

vv.     Any and All funds held at Santander UK PLC Bank, in account 10446319, held in the name of CIA Technology Global Ltd.;

ww.     Any and All funds held at Santander UK PLC Bank, in account 10446322, held in the name of CIA Technology Global Ltd;

xx.     HSBC bank Account 40-05-26 01692372, held in the name of Reginald Fowler;

yy.     HSBC bank Account 40-11-99 84080273, held in the name of Reginald Fowler; and

zz.     HSBC bank Account 40-11-99 84080265, held in the name of Reginald Fowler;

aaa.     Any and All funds held at Caixa Bank, in account 0216076478170, held in the name of Global Trade AG;

bbb.     Any and All funds held at Caixa Bank, in account 0216076477370, held in the name of Global Trade AG;

ccc.     Any and All funds held at Caixa Bank, in account 0216076476570, held in the name of Global Trade AG;

ddd.     Any and All funds held at Caixa Bank, in account 0786071416230, held in the name of Global Trade AG;

eee.     Any and All funds held at Caixa Bank, in account 0786071414070, held in the name of Global Trade AG;

fff.     Any and All funds held at Caixa Bank, in account 0216076111170, held in the name of Global Trade AG;

ggg.     Any and All funds held at Caixa Bank, in account 0216075956230, held in the name of MOGW;

hhh.     Any and All funds held at Caixa Bank, in account 0216076490070, held in the name of MOGW;

((a) through (iii), collectively, the "Specific Property")

# EXHIBIT 4

**Subject:**                    Re: Transferring Funds to First Party Bank Account

---------- Forwarded message ---------
From: **Crypto Capital** <support@cryptocapital.co>
Date: Tue, May 28, 2019 at 6:54 AM
Subject: Re: Transferring Funds to First Party Bank Account
To: <carlos@shiftmarkets.com>

Hello Carlos,

At the moment, we are not able to execute withdraws as funds have been frozen by US regulators.

Once we receive an update, our customers will be notified via email.

We apologize for the inconvenience, but this is a sensitive and fluid situation and our legal team is hard at work to resolve it.
Thank you,
Jay
Support Services
Crypto Capital Corp

This email may contain confidential information, and is intended only for the named recipient and may be privileged. Distribution or copying of this email by anyone other than the named recipient is prohibited. If you are not the named recipient, please notify us immediately and permanently destroy this email and included files and all copies of it. Internet email is not always private, secure, or reliable. No member of the Crypto Capital entity is not liable for any errors or omissions in the content or transmission of this email. Any opinions contained in this email are solely those of the author, and unless clearly indicated otherwise in writing, are not endorsed by any member of the Crypto Capital Corp Entity.

Este correo electrónico puede contener información confidencial, solo está dirigida al destinatario del mismo, la información puede ser privilegiada. Esta prohibido que cualquier persona distinta al destinatario copie o distribuya este correo. Si usted no es el destinatario, por favor notifique esto de inmediato y destruya el correo y sus adjuntos, lo mismo que todas las copias que existan del mismo. Los correos electrónicos en Internet, no son privados, seguros ni confiables. Ningún miembro del Crypto Capital será responsable de los errores u omisiones en el contenido o transmisión de este correo electrónico. Cualquier opinión contenida en este correo es responsabilidad única y exclusiva del autor del mismo y, a menos que lo contrario se indique claramente y por escrito, no esta respaldado por ningún miembro del Crypto Capital.

On Wed, 22 May at 8:03 PM , Carlos Liang <carlos@shiftmarkets.com> wrote:
Hello Crypto Capital,

I have not heard from you for a week. Please provide an update on the inquiry. What is taking so long to get any substantial update?

1

On Wed, May 15, 2019 at 10:39 AM Carlos Liang <carlos@shiftmarkets.com> wrote:

Hello Crypto Capital,

It's now been 6 months since we first asked for our withdrawal. Nothing has happened and our funds remain stuck. We need the funds and there must be an alternative solution to return the funds to us. Crypto seems like the easy route since your company's name is Crypto Capital, otherwise, you must have alternative bank accounts that can facilitate the transfer.

On Wed, May 1, 2019 at 3:43 AM Crypto Capital <support@cryptocapital.co> wrote:

Hello Carlos,

Once we have more information available, our customers will be notified immediately.

Please let me know if I can help in any other way.
**Olivia**
Support Manager
CryptoCapital.co

This email may contain confidential information, and is intended only for the named recipient and may be privileged. Distribution or copying of this email by anyone other than the named recipient is prohibited. If you are not the named recipient, please notify us immediately and permanently destroy this email and all files included. Internet email is not always private, secure, or reliable. Crypto Capital is owned and operated by Global Trade Solutions AG a licensed financial institution in Switzerland by ARIFF under FINMA Terms &amp; Conditions, Privacy Policy, Compliance, KYC/AML. No member of the Crypto Capital or Global Trade Solutions entity is liable for any errors or omissions in the content or transmission of this email. Any opinions contained in this email are solely those of the author, and unless clearly indicated otherwise in writing, are not endorsed by any member of the Crypto Capital Corp or Global Trade Solutions Entity.

Este correo electronico puede contener informacion confidencial, solo esta dirigida al destinatario del mismo, la informacion puede ser privilegiada. Esta prohibido que cualquier persona distinta al destinatario copie o distribuya este correo. Si usted no es el destinatario, por favor notifique esto de inmediato y destruya el correo y sus adjuntos, lo mismo que todas las copias que existan del mismo. Los correos electronicos en Internet, no son privados, seguros ni confiables. Crypto Capital es propiedad y est&aacute; operado por Global Trade Solutions AG, una instituci&oacute;n financiera autorizada en Suiza por ARIFF bajo FINMA. T&eacute;rminos y condiciones, Pol&iacute;tica de privacidad, Cumplimiento, KYC / AML. Ningun miembro del Crypto Capital y Global Trade Solutions sera responsable de los errores u omisiones en el contenido o transmision de este correo electronico. Cualquier opinion contenida en este correo es responsabilidad unica y exclusiva del autor del mismo y, a menos que lo contrario se indique claramente y por escrito, no esta respaldado por ningun miembro del Crypto Capital o Global Trade Solutions.

On Tue, 30 Apr at 7:37 PM , Carlos Liang <carlos@shiftmarkets.com> wrote:

What options are you looking into for alternative solutions? When can we expect to hear about these options?

2

On Tue, Apr 30, 2019 at 3:41 AM Crypto Capital <support@cryptocapital.co> wrote:

Hello Carlos,

Once we have more information regarding an alternative solution to withdrawals, all of our customers will be notified immediately. At this time, we are unable to comment on any ongoing investigations that may concern our clients.

Please let me know if I can help in any other way.
**Olivia**
Support Manager
CryptoCapital.co



This email may contain confidential information, and is intended only for the named recipient and may be privileged. Distribution or copying of this email by anyone other than the named recipient is prohibited. If you are not the named recipient, please notify us immediately and permanently destroy this email and all files included. Internet email is not always private, secure, or reliable. Crypto Capital is owned and operated by Global Trade Solutions AG a licensed financial institution in Switzerland by ARIFF under FINMA Terms &amp; Conditions, Privacy Policy, Compliance, KYC/AML. No member of the Crypto Capital or Global Trade Solutions entity is liable for any errors or omissions in the content or transmission of this email. Any opinions contained in this email are solely those of the author, and unless clearly indicated otherwise in writing, are not endorsed by any member of the Crypto Capital Corp or Global Trade Solutions Entity.

Este correo electronico puede contener informacion confidencial, solo esta dirigida al destinatario del mismo, la informacion puede ser privilegiada. Esta prohibido que cualquier persona distinta al destinatario copie o distribuya este correo. Si usted no es el destinatario, por favor notifique esto de inmediato y destruya el correo y sus adjuntos, lo mismo que todas las copias que existan del mismo. Los correos electronicos en Internet, no son privados, seguros ni confiables. Crypto Capital es propiedad y est&aacute; operado por Global Trade Solutions AG, una instituci&oacute;n financiera autorizada en Suiza por ARIFF bajo FINMA. T&eacute;rminos y condiciones, Pol&iacute;tica de privacidad, Cumplimiento, KYC / AML. Ningun

3

miembro del Crypto Capital y Global Trade Solutions
sera responsable de los errores u omisiones en el
contenido o transmision de este correo electronico.
Cualquier opinion contenida en este correo es
responsabilidad unica y exclusiva del autor del
mismo y, a menos que lo contrario se indique
claramente y por escrito, no esta respaldado por
ningun miembro del Crypto Capital o Global Trade
Solutions.

--

Carlos Liang
Finance & Accounting Associate

Skype: carlos@shiftforex.com

+1 (646) 401-0148

www.shiftmarkets.com

295 Madison Ave 30th Floor | New York, NY 10017

--

Carlos Liang
Finance & Accounting Associate

Skype: carlos@shiftforex.com

+1 (646) 401-0148

www.shiftmarkets.com

295 Madison Ave 30th Floor | New York, NY 10017

--

Carlos Liang
Finance & Accounting Associate

Skype: carlos@shiftforex.com

+1 (646) 401-0148

www.shiftmarkets.com

295 Madison Ave 30th Floor | New York, NY 10017

--
Carlos Liang
Finance & Accounting Associate

Skype: carlos@shiftforex.com

+1 (646) 401-0148

www.shiftmarkets.com

295 Madison Ave 30th Floor | New York, NY 10017

# EXHIBIT 5

July 6, 2022

Hon. Andrew L Carter Jr.
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re:  Victim Impact and Loss Statement

Dear Judge Carter,

   I am the Vice President of Legal at Shift Markets.  Shift Markets submits this Victim Impact and Loss Statement for the Court's consideration in connection with the sentencing of Reginald Fowler, the mastermind behind a fraud that caused Shift Markets approximately $180,000.00 in damages.

   Shift Markets is a provider of technological and service-based products for businesses operating in the crypto and forex spaces.  Founded in 2009, Shift Markets is still a relatively young company, seeking to establish productive and positive relationships in the cryptocurrency industry and financial market at large.  While Shift Markets has been largely successful in doing so, unfortunately, in 2018, Shift Markets fell victim to Mr. Fowler and his deception.

   In particular, Mr. Fowler and his company, Crypto Capital, took advantage of Shift Markets by promising that the company had the necessary expertise and legal approvals to provide payment processing services.  Based on these misrepresentations, Shift Markets (through its affiliates Shift Forex LLC and CapXM LLC), deposited a total of $180,381.91 with Crypto Capital.

   Unfortunately, not long after making these deposits, Crypto Capital essentially "took the money and ran," by refusing to transparently disclose what bank accounts the deposits were being held, or to respond to withdrawal requests.  Email after email was ignored by Crypto Capital, or met with the excuse that the funds were delayed and that Crypto Capital could not comment until "more information" became available.  What this "more information" was or is, is still a mystery.  Fear quickly turned to dread after it became apparent that Crypto Capital had no intention of returning any of the funds they promised would be safe and secure.

   To date, Shift Markets has been unable to recover any of its deposits, and we understand that the money is now under seizure by the United States government.  To say the least, the loss of approximately $180,000.00 has been severely detrimental to our small company.

   Mr. Fowler demonstrated absolutely no regard for the lives and well-being of victims like Shift Markets.  We were forced to pick up the pieces in the wake of the destruction caused by Mr. Fowler.  While the lost deposits caused Shift Markets approximately $180,000.00 in damages, the total amount of damages may never be truly calculable, as Shift Markets faced, and still faces, tremendous reputational pain and mutilation of its good-will.  Specifically, as a result of Mr. Fowler's fraud, Shift Markets faces lost potential business opportunities, clients, and

vendors, who may lack confidence in Shift Markets' money management.  Ongoing client relationships may also be negatively affected due to the business interruption caused by the money detained and stolen by Crypto Capital.  In the burgeoning cryptocurrency industry, reputation is everything—ours has been tarnished by Mr. Fowler's deceit.

We respectfully request that Your Honor consider the impact of Mr. Fowler's fraud on Shift Markets during sentencing, as well as an order directing the return of Shift Markets' deposits.  Mr. Fowler has not only lied to banks and traditional financial institutions, but he has also ruined small businesses like Shift Markets who, thinking their money would be safe, deposited hundreds of thousands of dollars with Crypto Capital.

Thank Your Honor for your consideration.

Respectfully submitted,

Andrew Barron

2

# EXHIBIT 6

**Subject:**              U.S. Department of Justice - VNS - Investigative Case 272B-NY-3005226 - Court Case
                          19-CR-00254

---------- Forwarded message ---------
From: **'U.S. Department of Justice - VNS' via Legal** <legal@shiftforex.com>
Date: Wed, Apr 27, 2022 at 6:26 PM
Subject: U.S. Department of Justice - VNS - Investigative Case 272B-NY-3005226 - Court Case 19-CR-00254
To: Andrew Barron <legal@shiftmarkets.com>

DO NOT REPLY TO THIS EMAIL.



**U.S. Department of Justice**
Southern District of New York
One St. Andrews Plaza
New York, NY 10007
Phone: (212) 637-1028
Fax: (212) 637-0421

April 27, 2022

Shift Markets
Andrew Barron

Re:   United States v. Defendant(s) Reginald Fowler
      Case Number 2018R01442 and Court Docket Number 19-CR-00254

Dear Andrew Barron:

The enclosed information is provided by the United States Department of Justice Victim Notification System
(VNS). As a victim witness professional, my role is to assist you with information and services during the
prosecution of this case. I am contacting you because you were identified by law enforcement as a victim or
potential victim during the investigation of the above criminal case.

On April 25, 2022, defendant Reginald Fowler pled guilty to the charges listed below. Any remaining counts
will be disposed of at the time of sentencing. As a result of the guilty plea, there will be no trial involving this
defendant.

| Number of Charges | Description of Charge(s) | Disposition |
|---|---|---|
| 1 | Attempt and conspiracy fraud | Guilty |
| 1 | Conspiracy to commit offense or to defraud US | Guilty |
| 1 | Prohibition of illegal money transmitting business | Guilty |
| 1 | Fraud by wire, radio, or television | Guilty |
| 1 | Bank or financial institution fraud | Guilty |

1

It is helpful for the Court to know the impact of this crime on its victims. In an effort to provide this information to the Court, we are enclosing a Victim Impact Statement. If you choose to complete a statement, please forward it to:

United States Attorneys Office
Southern District of New York
One St. Andrews Plaza
New York, NY 10007

This is one way the Court can hear your concerns as they relate to the crime. A United States Probation Officer may also contact you in an effort to obtain additional victim impact information. Victim impact information is generally not public information; however, under criminal law and procedures, all information contained in your questionnaire will be disclosed to the defendant and his attorney.

The sentencing hearing for defendant(s), Reginald Fowler, has been set for August 30, 2022, 02:00 PM at Clerk's Office, 500 Pearl Street, New York, NY 10007 before Judge Andrew Carter. You are welcome to attend this proceeding; however, unless you have received a subpoena, your attendance is not required by the Court. If you plan on attending, you may want to verify the date and time by using the VNS Call Center or website. If you are a victim of the charged offense(s) and wish to speak at sentencing, please call our office well in advance of the scheduled hearing date.

A United States Probation Officer prepares a report for the Court and may contact you to discuss the impact the crime had on you financially, physically, and/or emotionally. If you are contacted, please make every effort to provide accurate and detailed information.

Because of the Court's schedule, hearing dates could change on very short notice. If you plan on attending, you may want to call the VNS Call Center or check the website to confirm the date and time. Please note, there is a 24-hour delay in information transfer to the website.

Through the Victim Notification System (VNS) we will continue to provide you with updated scheduling and event information as the case proceeds through the criminal justice system. You may obtain current information about this case on the VNS website at https://www.notify.usdoj.gov or from the VNS Call Center at 1-866-DOJ-4YOU (1-866-365-4968) (TDD/TTY: 1-866-228-4619) (International: 1-502-213-2767). In addition, you may use the Call Center or Internet to update your contact information and/or change your decision about participation in the notification program.

You will use your Victim Identification Number (VIN) '6668968' and Personal Identification Number (PIN) '6528' anytime you contact the Call Center and the first time you log into VNS on the website. If you are receiving notifications with multiple victim ID/PIN codes please contact the VNS Call Center. In addition, the first time you access the VNS website, you will be prompted to enter your last name (or business name) as currently contained in VNS. The name you should enter is Shift Markets.

Remember, VNS is an automated system and cannot answer questions. If you have other questions which involve this matter, please contact this office at the number listed above.

Sincerely,

Damian Williams
United States Attorney

2

Wendy Olsen
Victim Witness Coordinator

If you do not want to receive email notifications from the Victim Notification System (VNS) please log into the VNS Web site at https://www.notify.usdoj.gov, select "My Information", remove your email address and click the "update" button. If you remove your email address, you will continue to receive letters from VNS except in those case which have large numbers of victims. To change your email address, select "My Information", provide a new address and click the "update" button.

If you do not want to receive any notifications in your case, select "Stop Receiving Notifications" and follow the instructions on the screen.

If you believe you have received this email in error, please contact the office listed at top of the email message.

Please note, if this is the first notification you have received from VNS you will need to wait 4-8 hours from receipt of this email before you can login to the VNS Internet site (https://www.notify.usdoj.gov). In addition, it will also be 4-8 hours before any documents which may have been uploaded to VNS as part of this notification are available under the "Downloads/Links" section on the Web page.

Please call the Victim Notification System (VNS) Help Desk at phone number 1-866-625-1631 for assistance and questions.

# VICTIM IMPACT STATEMENT

Victim: Andrew Barron
Shift Markets
USAO Number: 2018R01442
Court Docket Number: 19-CR-00254

Insert the impact of the crime here (or, if a separate victim impact form is attached, please use that form to describe the impact of the crime):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____